**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re | Chapter 11 |
| DBMP LLC,[1] | Case No. 20-30080 (JCW) |
| Debtor. | |

**DECLARATION OF ROBERT J. PANARO**
**IN SUPPORT OF FIRST DAY PLEADINGS**

Robert J. Panaro, being first duly sworn, deposes and states as follows:

1.     I am the Vice President and Chief Restructuring Officer of DBMP LLC, a North Carolina limited liability company (the "Debtor"), which is the debtor and debtor in possession in the above-captioned chapter 11 case.  I have been the Vice President of the Debtor since its formation on October 23, 2019.  As Vice President of the Debtor, I have reviewed and become familiar with the financial results of both the Debtor and its subsidiary, Millwork & Panel LLC ("Millwork & Panel"), a North Carolina limited liability company.

2.     I am employed by Saint-Gobain Corporation, a Pennsylvania corporation and the Debtor's ultimate non-debtor parent company in the United States ("SGC"), and I serve as Senior Vice President and Chief Operations Officer of SGC.  I have held this position with SGC since March 2019.  Prior to that date I was the Senior Vice President and Chief Financial Officer of SGC from January 2018 to February 2019.  Prior to that position, I served as Vice President and Chief Financial Officer of the former CertainTeed Corporation from July 2008 to December 2017.  Prior to my role at CertainTeed Corporation, I served as Vice President of Finance and Management Information Systems for North America Abrasives n/k/a Saint-Gobain

---

[1]     The last four digits of the Debtor's taxpayer identification number are 8817.  The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19355.

Abrasives, Inc. from November 1996 to June 2008.  My first role with SGC and its affiliated

entities was as Vice President Controller for SGC from April 1993 to October 1996.

3.     Prior to my employment with SGC and its affiliates, I worked for

PricewaterhouseCoopers from 1981 to 1993.

4.     I earned a Bachelor of Science degree, *magna cum laude*, in Management

with a concentration in Accounting and Finance from Boston College in 1981.

5.     On the date hereof (the "Petition Date"), the Debtor filed a voluntary

petition with this Court for relief under chapter 11 of title 11 of the United States Code

(the "Bankruptcy Code"), as well as certain motions and other pleadings (collectively, the "First

Day Pleadings").

6.     I submit this Declaration to support the First Day Pleadings and to provide

certain information about the Debtor, its decision to commence this chapter 11 case and its

objectives for this case.  I have reviewed each of the First Day Pleadings, and it is my belief that

the relief sought therein is necessary to (a) avoid immediate and irreparable harm to the Debtor,

(b) maximize and preserve the value of the Debtor's chapter 11 estate, (c) assist in the smooth

transition of the Debtor into chapter 11 and/or (d) promote the efficient administration of this

case.

7.     As the Debtor's Chief Restructuring Officer, I am familiar with

the Debtor's day-to-day operations, assets, financial condition, business affairs and books and

records.  Except as otherwise indicated, all facts and statements set forth in this Declaration are

based upon:  (a) my personal knowledge; (b) information supplied to me by other members of

management, professionals or employees; (c) my review of relevant documents; and/or (d) my

opinion based upon my experience and knowledge of the Debtor's assets, liabilities and financial

condition.  If called upon to testify, I could and would testify to the facts and opinions set forth herein.

8.    Section I of this Declaration provides an overview of the Debtor's history and corporate structure.  Section II describes the corporate restructuring that was completed on October 23, 2019.  Section III describes the circumstances surrounding the commencement of this chapter 11 case and the Debtor's objectives for this case.  Section IV sets forth relevant facts in support of the First Day Pleadings.

## I.    THE DEBTOR'S HISTORY AND CORPORATE STRUCTURE

9.    The Debtor traces its history back to the General Roofing Manufacturing Company, an Illinois corporation formed in 1904, which in 1917 transferred all of its assets and liabilities to Certain-teed Products Corporation, a newly-formed Maryland corporation. Certain-teed Products Corporation changed its name to CertainTeed Corporation in 1976. Compagnie de Saint-Gobain, a French company ("Saint-Gobain"), became an indirect minority shareholder of CertainTeed Corporation in 1972, and an indirect majority shareholder in 1976. CertainTeed Corporation became an indirect wholly-owned subsidiary of Saint-Gobain in 1988 when Saint-Gobain's subsidiary, Saint-Gobain Investments, Inc. ("SGII"), merged with CertainTeed Corporation.  SGII was the surviving entity and, in connection with the merger, SGII changed its name to CertainTeed Corporation.  CertainTeed Corporation later converted to CertainTeed LLC (with all of its historical forms, collectively, "Old CT").  Thus, Old CT's ultimate parent, through various intermediate entities (including SGC), was Saint-Gobain.

10.   Old CT implemented a corporate restructuring (the "2019 Corporate Restructuring"), which was completed on October 23, 2019, as described below.  As a result of that restructuring, Old CT ceased to exist and two new entities were created:  (a) the Debtor in this case; and (b) the debtor's non-debtor affiliate, CertainTeed LLC ("New CT").  The Debtor

received certain of Old CT's assets and became solely responsible for the asbestos-related

liabilities of Old CT (other than asbestos liabilities for which the exclusive remedy is provided

under a workers' compensation statue or similar laws).  New CT received all other assets of Old

CT and became solely responsible for all other liabilities of Old CT.  The Debtor and New CT

initially were formed as Texas limited liability companies.  The Debtor then converted to a North

Carolina limited liability company, and New CT converted to a Delaware limited liability

company.

11.     As part of the 2019 Corporate Restructuring, Old CT's direct parent,

CertainTeed Holding Corporation ("CT Holding"), became the direct parent company of both

the Debtor and New CT.  In addition, the Debtor became the direct parent of Millwork & Panel.

A chart depicting the Debtor's corporate structure is attached to this Declaration as Annex 1.

12.     The Debtor manages and defends thousands of asbestos-related personal

injury claims and oversees the operations of its subsidiary, Millwork & Panel.  Millwork &

Panel, in turn, manufactures and sells vinyl siding and polyvinyl chloride (PVC) trim products

for the construction market.  These products are manufactured at two facilities:  one located in

Claremont, North Carolina; and the other in Social Circle, Georgia (together, the "M&P

Facilities").

13.     New CT manufactures and sells commercial and residential building

products.

## II.    THE 2019 CORPORATE RESTRUCTURING

14.     Old CT has engaged in multiple restructurings through the years to

achieve business and operational objectives.  Since it began operations in 1904, Old CT has

merged with other companies, been repositioned in its corporate family and acquired and sold a

number of assets and businesses.

15.     Most recently, Old CT implemented the 2019 Corporate Restructuring to provide additional flexibility to address its asbestos-related claims, including through the commencement of a chapter 11 reorganization proceeding to globally resolve these claims without subjecting the entire Old CT enterprise to chapter 11.  A key objective of this restructuring was to make certain that the Debtor has the same ability to fund the costs of defending and resolving present and future asbestos claims, both in the state and federal courts and in connection with any chapter 11 filing, as Old CT did prior to the restructuring.  This was achieved by establishing an uncapped funding agreement between the Debtor and New CT, in addition to including the siding and trim business, Millwork & Panel, as an operating subsidiary of the Debtor.

16.     The 2019 Corporate Restructuring was effectuated through a series of steps.  On October 22, 2019, the following transactions were effected, in sequence:

- Old CT's then-direct parent, Saint-Gobain Delaware Corporation, formed CT Holding and contributed to it all of the issued and outstanding stock of Old CT in exchange for a full ownership interest in CT Holding;

- Old CT converted from a Delaware corporation to a Delaware limited liability company;

- Old CT formed Millwork & Panel and, in exchange for full ownership of Millwork & Panel's equity, contributed to it:  (a) the M&P Facilities; (b) certain other assets relating to those facilities; and (c) a North Carolina bank account containing approximately $30 million in cash; and

- Old CT entered into a funding agreement with CT Holding (as amended from time to time, the "Funding Agreement"), with Old CT as payee and CT Holding as payor.

17.    On October 23, 2019, the remaining transactions in the 2019 Corporate Restructuring occurred in the following sequence:

- Old CT converted from a Delaware limited liability company to a Texas limited liability company;

- Old CT then effected a divisional merger under Chapter 10, Subchapter A of the Texas Business Organizations Code;

- Upon the effectiveness of the divisional merger, (a) Old CT ceased to exist; (b) two new Texas limited liability companies — the Debtor and New CT — were created; and (c) all of the assets and liabilities of Old CT were allocated between the Debtor and New CT, as described below;

- Immediately following the effectiveness of the divisional merger, (a) New CT assumed from CT Holding the obligations as payor under the Funding Agreement and CT Holding was released from its obligations thereunder in accordance with the express terms of the agreement, such that the Funding Agreement became an agreement between the Debtor, as payee, and New CT, as payor; and (b) the Debtor entered into certain other agreements with non-debtor affiliates, including the secondment agreement and services agreements discussed further below;

- Among its agreements with non-debtor affiliates, the Debtor entered into a divisional merger support agreement with New CT that, among other

things, provides that the Debtor will indemnify and hold harmless New CT

for any losses, liabilities or other damages relating to claims against

New CT in respect of the Debtor's assets or liabilities, including

the Debtor's asbestos-related liabilities;

- Thereafter, the Debtor converted from a Texas limited liability company to a North Carolina limited liability company, and New CT converted from a Texas limited liability company to a Delaware limited liability company; and

- Finally, the Funding Agreement and the other intercompany agreements of the Debtor, including the secondment and services agreements discussed further below, were amended and restated to reflect the names of the parties to those agreements at the conclusion of the 2019 Corporate Restructuring.[2]

18.    Pursuant to the divisional merger, the Debtor became solely responsible

for Old CT's liability arising from asbestos-related claims against it (other than claims for which

the exclusive remedy is provided under a workers' compensation statute or similar laws), and

the defense of those claims.  In addition, the Debtor received the following assets:

(a)    Three bank accounts and approximately $25 million in cash;

(b)    Old CT's rights and interests as payee under the Funding Agreement;

(c)    All contracts of Old CT related to its asbestos-related litigation, including settlement agreements, service contracts and engagement and retention contracts;

---

[2]    A copy of the Funding Agreement in effect as of the Petition Date (without its Schedule 2 that includes confidential bank account information) is attached hereto as Annex 2.  The summary of the terms of the Funding Agreement in this Declaration is provided for the convenience of the Court and parties in interest and is qualified in all respects by the more detailed terms contained in the Funding Agreement.

(d)      A surety bond with respect to the appeal of a certain asbestos-related judgment;

(e)      All equity interests in Millwork & Panel;

(f)      Causes of action that relate to the assets and liabilities allocated to the Debtor;

(g)      Records exclusively relating to the assets and liabilities allocated to the Debtor; and

(h)      Privileges relating to these matters.

In total, the Debtor's value is approximately $175 million, in addition to the value of the Funding

Agreement with New CT.

19.      Pursuant to the divisional merger, New CT received all other assets and

liabilities of Old CT, and New CT is solely responsible for those other liabilities.

20.      As I mentioned above, the design of the 2019 Corporate Restructuring

ensures that the Debtor has the same ability to fund asbestos claims and other liabilities as

Old CT had before the restructuring.  The Debtor received the equity of Millwork & Panel,

which the Debtor has projected will generate approximately $16.0 million in EBITDA in 2020

and approximately $15 million in EBITDA per year over the next five years thereafter.

The Debtor estimates the fair market value of its interest in Millwork & Panel to be

approximately $150 million, including cash on hand, as of the Petition Date.  In addition, as

noted, as part of the 2019 Corporate Restructuring, the Debtor received $25 million in cash and

became party to the Funding Agreement with New CT.

21.      Significantly, the Funding Agreement imposes no repayment obligation on

the Debtor; it is not a loan.  It obligates New CT to provide funding to pay for all costs and

expenses of the Debtor incurred in the normal course of its business (a) at any time when there is

no bankruptcy case and (b) during the pendency of any chapter 11 case, including the costs of

administering the chapter 11 case, in both situations to the extent that any cash distributions received by the Debtor from Millwork & Panel are insufficient to pay such costs and expenses. In addition, the Funding Agreement requires New CT to fund any amounts necessary or appropriate (a) to satisfy the Debtor's asbestos-related liabilities at any time when there is no bankruptcy case and (b) in the event of a chapter 11 filing, to provide the funding for a section 524(g) asbestos trust, in both situations to the extent that any cash distributions received by the Debtor from Millwork & Panel are insufficient to pay such costs and expenses and further, in the case of the trust funding, the Debtor's other assets are insufficient to provide that funding.

22.    To make sure the Debtor has access to services it needs to effectively operate its business, in connection with the 2019 Corporate Restructuring, the Debtor entered into two services agreements (together, the "Services Agreements") with its non-debtor affiliates, SGC and Saint-Gobain Shared Services Corporation ("Services Corp.").[3] Pursuant to the Services Agreements, SGC and Services Corp. each provide the Debtor with certain centralized services, including accounting, human resources, information technology, legal, risk management, tax and other support services.  In addition, the Debtor and SGC entered into a secondment agreement, pursuant to which SGC seconded to the Debtor certain of its employees, including the Debtor's Chief Legal Officer on a full-time basis, to manage the Debtor's defense of asbestos-related claims.  Following the 2019 Corporate Restructuring, the Debtor also established a cash pooling agreement with Millwork & Panel (the "Cash Pooling Agreement") that provides for a coordinated cash management system between the Debtor and its subsidiary.

---

[3]        Services Corp. is wholly-owned, through another affiliate, by SGC.

23.    Millwork & Panel entered into several agreements with the Debtor's

non-debtor affiliates, as well, including (a) services agreements with SGC, Services Corp. and

New CT pursuant to which Millwork & Panel receives certain corporate and administrative

services; (b) a secondment agreement with New CT pursuant to which Millwork & Panel

receives the services of certain New CT employees; and (c) a sales and marketing agreement

with New CT pursuant to which Millwork & Panel sells certain products to New CT, and

New CT provides certain sales and marketing services to Millwork & Panel.[4]  Further, although

Millwork & Panel is profitable and generates positive cash flow, Millwork & Panel entered into

a revolving credit agreement with a non-debtor affiliate, Saint-Gobain Finance Corporation,

which permits Millwork & Panel to access capital to address any liquidity needs that may arise

as a result of working capital requirements or timing issues.  The Debtor is not party to any of

those agreements between non-debtor Millwork & Panel and its non-debtor affiliates.

## III.    EVENTS LEADING TO THE COMMENCEMENT OF THIS CASE AND THE DEBTOR'S OBJECTIVES FOR ITS CHAPTER 11 REORGANIZATION

### A.    Asbestos Litigation Against the Debtor

24.    As described more fully in the *Informational Brief of DBMP LLC*

(the "Informational Brief"), filed concurrently with the Court, this chapter 11 case was caused by

the unceasing and unwarranted filing of thousands upon thousands of asbestos-related claims

against the Debtor and Old CT.  The burden of managing, defending and resolving these claims

is substantial, and this litigation and its associated burdens are expected to continue for decades

more.

25.    Old CT manufactured and/or sold certain products that contained asbestos,

including asbestos cement pipe ("AC Pipe"), asphalt roofing products, other asbestos cement

---

[4]      Under this arrangement, Millwork & Panel sells all of its products to New CT for resale to third party customers.

products such as siding shingles, joint compound products and specialty railroad insulation materials. Old CT also purchased and resold certain asbestos-containing products manufactured by other companies. Certain AC Pipe products continued to be produced and sold until 1992 and 1993, at which time Old CT ceased all production and sales of asbestos-containing products. Old CT ceased manufacturing and selling most other asbestos-containing products, however, by the 1970s or early 1980s.

26.     Old CT's litigation burden has far exceeded its reasonable liabilities. Most of Old CT's asbestos-containing products, including the products that give rise to the overwhelming majority of the asbestos claims, contained asbestos that was not friable and not likely to be released into the air in sufficient concentrations to be hazardous. Nonetheless, Old CT was relentlessly sued with respect to these products, as well as several other products that did not contain any asbestos at all. In many other cases, as described in the Informational Brief, the plaintiff's identification of Old CT's product was proven false after investigation by Old CT, but often only after substantial defense costs were incurred. I expect Old CT's products were falsely identified in many other cases, although Old CT did not search for or did not uncover evidence in those cases to confirm the misidentification. Further, as described in the Informational Brief, Old CT was sued in certain cases where the plaintiffs did not disclose, or did not fully disclose, their potential exposure to asbestos-containing products of bankrupt manufacturers. These omissions drove Old CT's settlement costs higher than they otherwise would have been if all potential exposures had been disclosed.

27.     The Debtor and Old CT have faced hundreds of thousands of asbestos-related claims since the 1970s — over 40 years ago. The vast majority of these claims relate to Old CT's production and sale of AC Pipe products or asbestos-containing asphalt roofing

products.[5]  Since 2002 alone, the Debtor and Old CT have incurred approximately $2 billion in

costs defending and resolving over 300,000 personal injury lawsuits relating to alleged asbestos

exposure.  Having long ago exhausted insurance coverage for asbestos claims, Old CT and

the Debtor have borne the brunt of these costs.  Together, Old CT and the Debtor have paid

approximately $1.5 billion of that amount out of pocket — i.e., net of insurance recoveries over

that same period of time.

28.    Despite having resolved hundreds of thousands of claims, more than

60,000 asbestos-related claims and associated lawsuits against the Debtor were pending on court

dockets as of the Petition Date.  These claims are pending in jurisdictions throughout the United

States, with approximately 32,700 of them on active dockets and the remainder pending on

"inactive" dockets.  The Debtor expects that, absent its bankruptcy filing, thousands of additional

claims would have been filed against it for decades to come.

**B.**    **The Costs and Burdens of the Asbestos Litigation**

29.    For more than 20 years, Old CT was named in a relatively small number

of asbestos lawsuits, and its defense and indemnity costs were likewise relatively low.

As certain defendants that were the primary targets of asbestos plaintiffs began to file for

bankruptcy protection, particularly in the early 2000s, the number of claims against Old CT,

including mesothelioma claims, escalated sharply.  Prior to 2001 as a member of a consortium of

asbestos defendants called the Center for Claims Resolution (CCR), Old CT participated in

the settlement of approximately 200 mesothelioma cases per year.  From and after 2001, new

mesothelioma claims against the company spiked to nearly 1,700 claims in 2002 and over

1,700 claims in 2003, with the number and size of settlements also skyrocketing.  Since 2002,

---

[5]    The asbestos material in these products was encapsulated, or "locked in" place by either asphalt or a
cement matrix, which significantly reduced potential exposure to the asbestos fibers.

the Debtor or Old CT was named in an average of more than 1,400 new mesothelioma claims annually. Indeed, in recent years, plaintiffs have sued Old CT in the majority of all mesothelioma claims filed annually in the United States. As described herein and in the Informational Brief, only a small fraction of those plaintiffs possibly could have been exposed to asbestos fibers released from Old CT's products.

30.     This sharp rise in asbestos claims, particularly mesothelioma claims, filed against Old CT since 2001 significantly increased the financial strain and administrative burden imposed by these claims. During the 1990s, Old CT paid less (and usually substantially less) than $10 million per year in indemnity costs to resolve mesothelioma claims. After the rash of bankruptcy filings in the early 2000s caused mesothelioma claims against Old CT to spike, however, Old CT has spent in the range of approximately $80 million to over $160 million every year since 2002 to defend and resolve asbestos claims.

31.     In the face of this deluge, Old CT continued to employ a strategy designed to minimize its costs to resolve claims. The vast majority of mesothelioma claims after 2001 were either dismissed (approximately 60% of resolved claims) or settled for $50,000 or less (approximately 20% of resolved claims), far less than the cost of discovery in most cases. Old CT paid more than $250,000 to settle a mesothelioma claim in fewer than 1,000 mesothelioma cases after 2001 — on average only about 50 claims per year. When unreasonable plaintiff demands forced it to go to trial, however, Old CT was very successful. From 2004 to 2019, Old CT won defense verdicts in 20 of the 25 cases that resulted in a verdict on liability.[6] But the cost of defending cases through trial was extremely high and, in some cases, exceeded $1 million per case.

---

[6]     Most of these trials involved mesothelioma claims—from 2004 to 2019, CertainTeed won 18 and lost 3 of those. These figures exclude cases where the verdict (plaintiff or defense) was reversed during post-trial proceedings or on appeal.

32.    As the number of claims against Old CT increased dramatically, particularly mesothelioma claims, so too did its defense costs.  To defend and manage this nonstop litigation filed in numerous jurisdictions across the country, the Debtor and Old CT engaged a substantial number of outside professionals, including more than 40 defense firms and often multiple experts in numerous disciplines for a single claim.  The Debtor estimates that in any given month, more than 250 attorneys and paralegals at roughly 25 outside defense counsel firms would expend in excess of 6,000 hours, or more, preparing and responding to pleadings and motions, conducting discovery, investigating claims and attending hearings.  Further, they would bill significantly more hours when preparing for, or participating in, a trial.  This time is in addition to (a) the charges of various investigators and outside experts that worked on the asbestos cases every month and (b) other costs associated with the asbestos litigation, like court reporter costs, filing fees, travel expenses and other expenses that defense professionals regularly incur.  Despite ongoing efforts to manage and reduce defense fees and expenses, however, Old CT and the Debtor have spent between approximately $20 million and $30 million per year to defend these lawsuits since 2001.

33.    Given the nature and limited use of Old CT's asbestos-containing products, this sudden and substantial rise in claims against Old CT, and the costs to defend and resolve those claims, cannot reasonably be attributed to anything other than the bankruptcy filings by key asbestos defendants and the naming practices employed by plaintiffs' counsel.  Many, if not all, of those defendants that filed for bankruptcy established trusts funded with billions of dollars.  Since those trusts were established, however, there has been no associated reduction in the number of mesothelioma claims filed against Old CT and the Debtor, or

the costs of resolving those claims.  Further, there is no sign that the substantial and ongoing

flow of new mesothelioma claims will diminish any time soon.

34.     The Debtor's asbestos litigation, and its associated burdens and costs, are

anticipated to continue for the foreseeable future.  The Debtor's primary competitors have all

filed for bankruptcy to resolve their asbestos liabilities, including all but one U.S.-based

company with a limited history of manufacturing AC Pipe.  As other co-defendants continue to

file for bankruptcy, trend lines indicate that the asbestos tort claimants will attempt to seek even

higher recoveries from fewer remaining defendants in the tort system.  Under these

circumstances, there is no predictable end in sight to the extraordinary and unflagging costs of

litigating, defending and resolving asbestos claims.

35.     All of these factors prompted the Debtor's consideration of a chapter 11

filing.[7]

**C.     The Decision to File This Case**

36.     After careful consideration of the status of its asbestos litigation and

potential options to resolve asbestos-related claims, the Debtor determined that the filing of a

chapter 11 case in this Court was appropriate and necessary.  The Debtor further concluded that

this chapter 11 case offered the best alternative under the circumstances — in fact, the only

alternative — to permanently, globally and fairly resolve the asbestos claims against it.   As I

described at length above, the burden of the litigation was considerable and anticipated to

continue unabated for decades.

37.     The Debtor's goal in this case is to negotiate and ultimately confirm a plan

of reorganization that would, among other things, (a) establish and fund a trust to resolve and pay

---

[7]     Additional burdens and risks of asbestos litigation on the Debtor are described in the Informational Brief.

valid current and future asbestos-related claims and (b) provide for the issuance of an injunction

that will permanently protect the Debtor and its affiliates (and any other relevant parties) from

any further asbestos-related claims arising from products manufactured and/or sold by Old CT,

or for which Old CT may otherwise have had legal responsibility, pursuant to section 524(g) of

the Bankruptcy Code. The Debtor believes it has sufficient assets, including cash available

under the Funding Agreement, to fund a section 524(g) trust that will (a) efficiently and fairly

review and compensate current and future asbestos claimants and (b) otherwise qualify for

section 524(g) relief.

38.     I understand that, in a bankruptcy case that seeks to utilize the provisions

of section 524(g) of the Bankruptcy Code, the Debtor is expected to, among other things,

(a) negotiate an agreement to fund a trust with representatives of current and future asbestos

claimants, (b) seek approval of any plan of reorganization implementing that agreement by

a vote of 75% or more of the current asbestos claimants and (c) obtain review and confirmation

of the plan of reorganization by this Court and the federal district court. The Debtor is prepared

to immediately commit the necessary resources to satisfy the various requirements of

section 524(g), including the negotiation of an agreement with the claimants' representatives on

an acceptable and confirmable plan of reorganization as soon as possible.

39.     The Debtor seeks to engage in good faith negotiations to reach a

consensual resolution of the Chapter 11 Case with representatives for current and future

claimants as soon as they are in a position and willing to begin discussions. To that end, the

Debtor is prepared to promptly provide relevant information to the asbestos claimants'

committee and future claimants' representative appointed in this case, subject to an agreed upon

protective order.[8]

## IV.    FIRST DAY PLEADINGS

40.    Concurrently with the filing of this chapter 11 case, the Debtor filed First

Day Pleadings requesting various forms of relief.

41.    The Debtor will move for entry of an order scheduling an expedited

hearing on certain of the First Day Pleadings.[9]  The Debtor anticipates that the Court will

conduct a hearing (the "First Day Hearing") as soon after the commencement of its chapter 11

case as the Court's schedule will permit, at which the Court will hear and consider certain of

the First Day Pleadings.  The Debtor also anticipates that the Court will consider the remainder

of the First Day Pleadings at a later time.  The First Day Pleadings that the Debtor anticipates

will be heard at the First Day Hearing are described in Section IV.A and IV.B, below.

The remaining First Day Pleadings are described in Section IV.C, below.

42.    Generally, the purpose of the First Day Pleadings is to:  (a) obtain

authorization for the continued use of the Debtor's bank accounts and operation under key

agreements with its affiliates; (b) extend and apply the automatic stay to certain non-debtors;[10]

and (c) establish procedures for the smooth and efficient administration of this chapter 11 case.

---

[8]    Prior to the Petition Date, the Debtor worked cooperatively with certain asbestos plaintiffs' counsel to organize an *ad hoc* committee of asbestos personal injury claimants (the "*Ad Hoc* Committee"). The *Ad Hoc* Committee consists of 11 individuals represented by law firms from a variety of geographic locations.  These firms have diverse caseloads of asbestos personal injury claims against the Debtor. Although there was insufficient time for the Debtor to engage in substantive discussions with the *Ad Hoc* Committee before the commencement of the Chapter 11 Case, the Debtor believed that forming this committee in cooperation with the asbestos plaintiffs' counsel could help facilitate and expedite discussions to advance this case.  The Debtor has filed concurrently herewith a motion asking the Court to appoint the *Ad Hoc* Committee as the official asbestos claimants' committee in this case.

[9]    Capitalized terms used below in the descriptions of the First Day Pleadings and not otherwise defined herein have the meanings given to them in the applicable First Day Pleadings.

[10]   Relief relating to the extension or application of the automatic stay to certain non-debtor affiliates and other non-debtor parties is supported by a separate declaration of Michael T. Starczewski filed concurrently herewith.

I have reviewed each of the First Day Pleadings, including the exhibits thereto, and I believe that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve a successful reorganization.

### A.    The Case Administration Motions

*Appointment of Claims, Noticing and Voting Agent*

43.    The Debtor will seek the entry of an order appointing Epiq Corporate Restructuring LLC ("Epiq") as claims, noticing and voting agent in this chapter 11 case. I understand that Epiq may, among other things:  (a) prepare and serve all notices required in the Debtor's chapter 11 case, including the notice of the commencement of this case and the meeting of creditors pursuant to section 341 of the Bankruptcy Code; (b) maintain the official claims register; and (c) assist with the mailing and tabulation of ballots in connection with any vote to accept or reject any plan or plans proposed in this chapter 11 case.  The Debtor obtained and reviewed engagement proposals from two other claims, noticing and voting agents to ensure selection through a competitive process.  The Debtor submits, based on all engagement proposals obtained and reviewed, that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise.

*Entry of an Order Establishing Certain Notice, Case Management and Administrative Procedures*

44.    The Debtor will request that the Court enter an order establishing certain notice, case management and administrative procedures (collectively, the "Case Management Procedures") to facilitate the orderly administration of the Debtor's chapter 11 case while ensuring that appropriate notice is provided to parties who express an interest in the chapter 11 case and those directly affected by a request for relief.

45.     The Debtor believes that implementation of the Case Management

Procedures, among other things, will facilitate service of Court Filings and Orders in a manner

that will maximize the efficiency and orderly administration of the chapter 11 case, ensure that

appropriate notice is provided to parties in interest and alleviate the significant administrative

burden and cost that otherwise could be imposed on the Debtor's estate, parties in interest,

the Court and the Clerk of Court due to (a) the substantial number of parties in interest expected

to be involved and (b) the number of Court Filings anticipated in the Debtor's chapter 11 case.

### *List of the Top Law Firms With Asbestos Cases Against the Debtor in Lieu of the List of the 20 Largest Unsecured Creditors and Notice Procedures for Asbestos Claimants*

46.     I understand that the Top 20 List primarily would be used by

the Bankruptcy Administrator to understand the types and amounts of unsecured claims against

the debtor and thus evaluate prospective candidates to serve on an official committee in the

debtor's case.  I further understand that, in an asbestos case, an official committee of asbestos

claimants is expected to be appointed.  Because an asbestos claimants' committee typically

consists of asbestos plaintiff law firms acting on behalf of individual asbestos-related claimants,

the Debtor seeks authority to file and provide the Bankruptcy Administrator with a list of the law

firms with the most significant representations of claimants, based on the volume of filings,

scope of payments or related factors, across the major types of claims faced by the Debtor

(a "Top Asbestos Counsel List"), in lieu of listing the individual asbestos claimants with the

largest unsecured claims against the Debtor on a "Top 20" list of unsecured creditors.

The Debtor believes that providing the Bankruptcy Administrator with a Top Asbestos Counsel

List would better facilitate the Bankruptcy Administrator's evaluation of members of an official

committee of asbestos claimants or the Debtor's request for an order appointing the *Ad Hoc*

Committee members to serve on the official committee.

47.    The Debtor also will seek Court approval for certain notice procedures relating to individuals (collectively, the "Asbestos Claimants") who are claimants in asbestos-related personal injury lawsuits or other proceedings involving the Debtor, including to (a) serve all notices, mailings, filed documents and other communications relating to its chapter 11 case on Asbestos Claimants in care of their counsel (collectively, the "Asbestos Firms") at such counsel's address, as further described in the Motion; and (b) list the names, addresses and other contact information, as applicable, of the Asbestos Firms in any creditor or service lists, including the creditor matrix provided to the Court or filed in this case, in lieu of listing the contact information of individual Asbestos Claimants.  To date, the Debtor has communicated solely with the Asbestos Firms regarding the Debtor's asbestos claims.

The Debtor in many cases cannot be sure that it has the current addresses (or any addresses) for the Asbestos Claimants.  Further, consistent with the rules of professional conduct, communicating with an adversary in litigation generally is conducted through counsel.

The Debtor therefore believes that providing notice to Asbestos Claimants through the Asbestos Firms, in accordance with past practice, is much more reliable and consistent with the rules of professional conduct.

48.    The notice procedures proposed in the Motion provide for an effective and appropriate noticing process for the Asbestos Claimants.  Further, implementing the proposed notice procedures would alleviate the administrative burden and expense of gathering current contact information for each of the Asbestos Claimants, which, in many cases, is not readily available or is difficult to verify.  The Debtor has access to the names and addresses of the counsel for the Asbestos Claimants (including counsel of record in pending lawsuits), but the names and addresses of a significant number of individual Asbestos Claimants themselves

are not readily available. It would be extremely burdensome, costly and time-consuming for the Debtor to attempt to obtain this information. In addition, any contact information for the individual Asbestos Claimants the Debtor has or is able to obtain may be outdated and unreliable. Consequently, providing notice in this chapter 11 case in accordance with the Asbestos Notice Procedures will be more efficient and reliable than providing notice to the individual Asbestos Claimants directly.

### *Extension of Time to File Schedules*

49.    The Debtor believes it will need additional time beyond the time period allotted under the Bankruptcy Code to assemble all of the information necessary to complete and file the required schedules of assets and liabilities and statement of financial affairs (collectively, the "Schedules"). The Debtor will need the additional time because of (a) the size and complexity of this chapter 11 case and (b) the volume of material that must be compiled and reviewed by the Debtor's limited staff to complete the Schedules during the hectic early days of this restructuring. Because the Debtor's chapter 11 case will involve tens of thousands of creditors and other parties in interest, it is my understanding that the Debtor would need to collect, review and assemble a substantial amount of information to complete the Schedules.

50.    Given (a) the large number of creditors and (b) the critical matters that the Debtor and its professionals were required to address prior to the commencement of this chapter 11 case, the Debtor was not in a position to complete the Schedules by the Petition Date, even with the assistance of professionals. The Debtor further estimates that, with the many critical matters to be addressed in the early days of this case, the Debtor will require more than 14 days after the Petition Date to complete the Schedules.

51.    The additional time requested is important to help ensure that the Schedules are as accurate as possible. Given the volume of information that is provided in

the Schedules, and the fact that the information must be accurate as of the Petition Date,

additional time to complete the Schedules will help ensure that the relevant information is fully

collected and evaluated and can be incorporated into the relevant filings.  Rushing to complete

the Schedules soon after the Petition Date, on the other hand, could compromise their

completeness.  Accordingly, the Debtor will seek to extend the deadline by which it must file its

Schedules to 46 days after the Petition Date, which is March 9, 2020, without prejudice to

the Debtor's right to seek a further extension for cause.

**B.    Request to Continue Using Bank Accounts,
Cash Management System and Related Relief**

52.    The Debtor will seek approval of the continued use of its prepetition bank

accounts, as well as authority to open and close bank accounts during the chapter 11 case,

as necessary or appropriate.  In the ordinary course of business, the Debtor maintains one bank

account at Bank of America, N.A. in Charlotte, North Carolina and two bank accounts at

J.P. Morgan Chase, N.A. in New York, New York (collectively, the "Bank Accounts").  One of

the Debtor's Bank Accounts at Bank of America serves as a concentration account

(the "Concentration Account") where all incoming cash is maintained.  All payments and other

funds that are received by the Debtor are deposited into that account, including cash from New

CT under the Funding Agreement and cash swept from the account of the Debtor's subsidiary,

Millwork & Panel, in accordance with the Cash Pooling Agreement.  The other two accounts at

J.P. Morgan Chase serve as general disbursement accounts (the "Disbursement Accounts") and

are used to pay all of the Debtor's costs and expenses, including professional fees.

The Disbursement Accounts are maintained as zero balance accounts, and are funded by

transfers of the Debtor's cash from the Concentration Account on an as-needed basis.

53.     The Debtor maintains, in the ordinary course, a process for collecting,
holding and disbursing cash using these Bank Accounts through its "Cash Management System."
The Debtor's Cash Management System is consistent with the Cash Pooling Agreement and
the Funding Agreement and is accurately described in the Motion.  The Cash Management
System promotes the central management of cash assets of the Debtor and its subsidiary.  Among
other things, it ensures adequate liquidity among the Debtor's Bank Accounts and Millwork &
Panel's bank accounts, and maximizes the efficiency of their financial management and
accounting.  Continued use of the Cash Management System and continued performance under
the Cash Pooling Agreement, as they are accurately described in the First Day Papers, are in the
best interest of the Debtor's estate and parties in interest.  The Debtor therefore will request
authority to maintain its prepetition Cash Management System and continue to perform under the
Cash Pooling Agreement.

54.     In addition, the Debtor will request authority for Bank of America and
J.P. Morgan Chase, and any other bank that may hold a bank account of the Debtor during
the chapter 11 case (each, a "Bank"), to charge, and the Debtor to pay or honor, both prepetition
and postpetition service and other fees, costs, charges and expenses to which the Bank may be
entitled in accordance with its contractual arrangements with the Debtor.  Further, the Debtor
will request that the Court authorize the Bank to charge back returned items to the Bank
Accounts in the normal course of business.  The Debtor requires this relief to minimize
disruption to the Bank Accounts and to assist in accomplishing a smooth transition to operating
in chapter 11.

55.     The Bank Accounts are insured by the United States through the Federal
Deposit Insurance Corporation (the "FDIC") and are maintained at large, well known and well

capitalized institutions.  Therefore, the Debtor will seek a waiver of section 345(b) of

the Bankruptcy Code in this case to the extent that the funds maintained in the Bank Accounts or

any other domestic accounts during this chapter 11 case exceed the amount insured by the FDIC

or the Federal Savings & Loan Insurance Corporation.

56.    To protect against the possible inadvertent payment of prepetition claims,

the Debtor will advise Bank of America and J.P. Morgan Chase not to honor checks issued prior

to the Petition Date, except as otherwise expressly permitted by an order of the Court and

directed by the Debtor.  The Debtor has the capacity to draw the necessary distinctions between

prepetition and postpetition obligations and payments without closing the Bank Accounts and

opening new ones.

57.    In the ordinary course of its business, the Debtor uses checks and other

business forms (collectively, the "Business Forms").  The Debtor will request that it not be

required to include the legend "D.I.P.," or any other debtor in possession designation, and

the corresponding bankruptcy case number, on its Business Forms because such alteration is not

necessary in this case.  The Debtor has relatively few business relationships, and the parties it

conducts business with (such as law firms) are expected to be well aware of the Debtor's status

as a debtor in possession.

## C.    Anticipated First Day Pleadings to Be Heard at a Later Hearing

### *Performance Under Certain Intercompany Agreements*

58.    The Debtor is a party to certain agreements with non-debtor affiliates

(collectively, the "Intercompany Agreements") that are essential to its day-to-day operations.

The transactions contemplated by the Intercompany Agreements are ordinary course

transactions.  Nevertheless, out of an abundance of caution and because each of

the counterparties to the Intercompany Agreements is a non-debtor affiliate of the Debtor,

the Debtor will seek confirmation of its authority to perform under the Intercompany

Agreements.

59.     The Intercompany Agreements consist of:  (a) the Services Agreements,

whereby the debtor's non-debtor affiliates, SGC and Services Corp., provide the Debtor with a

wide array of corporate and administrative services that are critical for the day-to-day operation

of its business; and (b) a secondment agreement whereby employees of SGC are seconded to

work for the Debtor on a full time or part time basis.  I have reviewed the descriptions of

the Intercompany Agreements set forth in the Motion and have determined that they are fair and

accurate to the best of my knowledge, information and belief.

60.     The Intercompany Agreements are critical to provide the Debtor with

the day-to-day services that are essential to the support and management of its business.  Further,

they provide the Debtor with uninterrupted access to the services of experienced employees with

significant historical knowledge and expertise relating to the Debtor's (a) administrative and

business operations and (b) asbestos-related claims.  It would be unduly burdensome and costly

for the Debtor to establish its own duplicative systems, programs and capabilities, and to hire

employees.  As such, even before the 2019 Corporate Restructuring, Old CT and its affiliates

used similar intercompany arrangements for years.  If the Debtor were unable to receive

employee and other services under the Intercompany Agreements, the Debtor likely would need

to contract with a different provider to receive such integral services, and any such contract with

a different provider would not be expected to be on such favorable terms.  Further, to ensure the

integrity of the services and personnel provided to the Debtor, the Debtor and SGC have agreed

that the Seconded Employees (a) will not work on any matters for the Debtor's non-debtor

affiliates that relate to the Debtor or its chapter 11 case and (b) at all times will act in the best

interest of the Debtor, including in the event of an actual or potential conflict between the Debtor and any of its non-debtor affiliates.

61.     The costs associated with the Intercompany Agreements, in each case, are fair and reasonable.  For instance, the Debtor pays only the portion of the Seconded Employees' annual base salaries that corresponds to the amount of time such employees spend working for the Debtor.  The Debtor does not bear the many other costs associated with their employment, including employee benefits, employee taxes, employee withholding, trust funds, surcharges, allowances or deductions arising out of or relating to their employment or payment of their compensation.  Moreover, the fees relating to the services agreements are consistent with the rates that SGC and Services Corp. charge their other affiliates for such services, which are market or below-market rates.  Therefore, because the Intercompany Agreements are (a) fair and reasonable, (b) essential to the Debtor's continued operations and (c) ordinary course, the Debtor will request authority to continue to perform under them.

### *Professional Retention Applications*

62.     The retention of certain chapter 11 professionals is essential to the Debtor's reorganization efforts.  Accordingly, the Debtor will seek to retain various professionals to represent and assist it in connection with this chapter 11 case.  These professionals include:  (a) Jones Day as bankruptcy counsel; (b) Robinson, Bradshaw & Hinson, P.A. as special counsel for asbestos claim estimation matters and local bankruptcy counsel; (c) Schiff Hardin as special counsel for asbestos matters; and (d) Bates White, LLC as asbestos consultants.

### *Interim Compensation Procedures for Retained Professionals*

63.     The Debtor's chapter 11 case is a large and complex case that requires significant investment of time and resources by the professionals retained by the Debtor.

Establishing an orderly, regular process for the allowance and payment of compensation and reimbursement of expenses for retained professionals will prevent such professionals from bearing the unjust burden of funding this chapter 11 case, and will enable the Debtor to closely monitor the costs of administration and establish consistent procedures to pay such costs.

64.     Therefore, the Debtor has proposed that, except as otherwise provided in an order of the Court authorizing the retention of a particular retained professional, all retained professionals be permitted to seek interim payment of compensation and reimbursement of expenses in accordance with the procedures proposed in the Motion.

### *Procedures for Engaging Ordinary Course Professionals*

65.     The Debtor's members and management, in the performance of their duties, call upon certain professionals that provide ordinary course services that are not directly related to this chapter 11 case (the "Ordinary Course Professionals") to provide professional services to assist them in carrying out their assigned duties and responsibilities in the ordinary course of the Debtor's business.  These Ordinary Course Professionals provide valuable assistance in addressing issues of importance to the Debtor and its business, particularly in connection with the management of the Debtor's asbestos-related litigation.

66.     The Debtor desires to employ the Ordinary Course Professionals, as and when requested by the Debtor, to render professional and other services to its estate in the same manner and for the same general purposes as such services were provided prior to the Petition Date.  To avoid potential disruptions, it is important that the Debtor continues to have the ability to employ the Ordinary Course Professionals (e.g., for defense counsel, to provide services related to the cases they have been defending), many of whom are familiar with the Debtor's business and affairs, including the thousands of pending litigation matters.

67.     Although the Ordinary Course Professionals identified to date are counsel in asbestos-related litigation that I understand is expected to remain stayed under section 362 of the Bankruptcy Code, services from these professionals may be needed from time to time. For example, the Debtor may require services in asbestos litigation relating to filing stay notices, addressing potential stay violations, monitoring dockets and providing information about these cases that is not available from any other source.  However, without assurance that the Debtor is authorized to use and pay these parties, I believe that many Ordinary Course Professionals may be reluctant to assist the Debtor when needed.  Therefore, the Debtor will request approval of certain procedures for the engagement and compensation of Ordinary Course Professionals.

### *Appointment of Official Committee of Asbestos Personal Injury Claimants*

68.     In the fall of 2019, after completing the 2019 Corporate Restructuring, the Debtor began working with certain law firms representing asbestos personal injury claimants to form the *Ad Hoc* Committee with the hope of engaging in discussions prior to any potential chapter 11 filing and advancing progress toward a resolution of its asbestos liabilities.  These law firms were identified as key firms in asbestos litigation based on a review of claims data, which was shared with certain of the firms to assist in identifying and organizing the group.   To be able to share this and other information, the Debtor has provided non-disclosure agreements to the firms.

69.     The *Ad Hoc* Committee consists of 11 individuals represented by law firms from a variety of geographic locations.  These firms have diverse caseloads of asbestos personal injury claims against the Debtor, including with respect to asbestos-related diseases and number of claims against the Debtor.  Certain of the law firms have the most substantial numbers of claims pending against the Debtor.

70.     Once the *Ad Hoc* Committee was formed, the Debtor began to share certain information about the 2019 Corporate Restructuring, as well as other information relevant to the Debtor's asbestos liabilities.  Because the *Ad Hoc* Committee was formed only shortly before the commencement of the Chapter 11 Case, however, the Debtor and the *Ad Hoc* Committee did not have sufficient time to engage in substantive discussions.  Nonetheless, they have laid the foundation to begin to do so promptly.

71.     The Debtor commenced this Chapter 11 Case to obtain a comprehensive and permanent resolution of its asbestos liability.  Accordingly, the Debtor intends to focus its efforts on negotiating with representatives of current and future asbestos claimants, and ultimately obtaining approval of, a plan of reorganization that will, among other things (a) establish and fund a trust under section 524(g) of the Bankruptcy Code to pay qualifying asbestos-related claims and (b) provide for the issuance of an injunction that will permanently protect the Debtor, its affiliates and others from any further asbestos-related claims.

72.     I believe the appointment of an official committee of asbestos personal injury claimants (the "ACC"), which is routine in asbestos chapter 11 cases, is necessary to ensure that the interests of current asbestos claimants are adequately and appropriately represented in the Chapter 11 Case.  Accordingly, the Debtor will request an order appointing the *Ad Hoc* Committee as the ACC.

73.     I believe such an order is appropriate in this case.  The proposed members of the ACC were fairly chosen, are representative of the Debtor's overall pool of asbestos personal injury claimants and include individuals represented by law firms with some of the most substantial numbers of lawsuits against the Debtor.  In addition, the proposed members' law firms have asserted various types of asbestos claims (e.g., mesothelioma, malignancy and

non-malignancy claims) against the Debtor and have claims pending in many different

jurisdictions.  The law firms also are geographically diverse (with offices in California, Illinois,

Indiana, Maryland, Missouri, New York, Ohio, Pennsylvania, South Carolina and other states

around the country) and have substantial experience representing claimants on asbestos

claimants' committees in asbestos-related bankruptcies and participating in trust advisory

committees for section 524(g) trusts.  Indeed, certain of the law firms have chaired asbestos

claimants' committees and most, if not all, have been involved in negotiating and confirming

plans of reorganization in other asbestos bankruptcy cases.  As a result, I believe the proposed

ACC members and their law firms are well-suited to represent the interests of asbestos personal

injury claimants in this Chapter 11 Case.

### **CONCLUSION**

74.     For all the reasons described herein and in the First Day Pleadings,

I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.


I declare under penalty of perjury that the foregoing is true and correct to the best of my

information, knowledge and belief.


EXECUTED on this 23rd day of January, 2020.


*/s/  Robert J. Panaro*
Robert J. Panaro

## **Annex 1**

Debtor's Corporate Structure Chart

**Organizational Structure of DBMP LLC**



## **Annex 2**

Funding Agreement

## AMENDED AND RESTATED FUNDING AGREEMENT

This AMENDED AND RESTATED FUNDING AGREEMENT, dated as of October 23, 2019 (as it may be amended, restated, modified or supplemented from time to time, this "Agreement") is between CERTAINTEED LLC, a Delaware limited liability company ("Payor"), and DBMP LLC, a North Carolina limited liability company ("Payee").

## RECITALS

A.     Prior to and in contemplation of the conversion of CertainTeed LLC, a Delaware limited liability company ("Old CT (DE)"), to a Texas limited liability company (as such, "Old CT (TX)") and the subsequent divisional merger of Old CT (TX) pursuant to Chapter 10 of the TBOC (the "Divisional Merger"), CertainTeed Holding Corporation, a Delaware corporation ("CT Holding"), as payor, and Old CT (DE), as payee, executed and delivered a Funding Agreement, dated as of October 22, 2019 (the "Original Funding Agreement").

B.     Immediately after the execution of the Original Funding Agreement and prior to the Divisional Merger, Old CT (DE) converted from a Delaware limited liability company into a Texas limited liability company, Old CT (TX), pursuant to Section 18.216 of the Delaware Limited Liability Company Act and Section 10.102 of the TBOC (the "TX Conversion").

C.     Immediately following the effectiveness of the TX Conversion, CT Holding, in its capacity as the sole member of CT (TX), approved a Plan of Divisional Merger contemplating the Divisional Merger (the "Plan of Divisional Merger").

D.     At the effective time of the Divisional Merger, (1) certain property of CT (TX), as set forth on Schedule 5(b)(i) to the Plan of Divisional Merger and certain liabilities and obligations of CT (TX), as set forth on Schedule 5(c)(i) to the Plan of Divisional Merger (collectively, the "Allocated Assets and Liabilities") were allocated to a new Texas limited liability company created upon the effectiveness of the Divisional Merger ("DBMP (TX)"), (2) the remaining property, liabilities and obligations of CT (TX) were allocated to another new Texas limited liability company created upon effectiveness of the Divisional Merger ("New CT (TX)"), and (3) CT (TX) ceased to exist.

E.     Immediately following the effectiveness of the Divisional Merger, CT Holding assigned to New CT (TX), and New CT (TX) assumed from CT Holding, all rights and obligations of CT Holding under the Original Funding Agreement (such assignment and assumption, the "Post-Merger Assignment"), whereupon CT Holding was released from its obligations, and ceased to have any further obligations, under the Original Funding Agreement.

F.     Following the Divisional Merger and the Post-Merger Assignment, (1) New CT (TX) effected a conversion (the "DE Conversion") into Payor, a Delaware limited liability company, and (2) DBMP (TX) effected a conversion (the "NC Conversion") into Payee, a North Carolina limited liability company.

G.     In connection with the allocation to DBMP (TX) of the Allocated Assets and Liabilities, CT Holding and its successors and assigns agreed, pursuant to the Original Funding Agreement, to provide funding to Old CT (DE) and, after the TX Conversion, CT (TX), and,

NAI-1509226699

after the Divisional Merger, DBMP (TX) and, after the NC Conversion, DBMP, sufficient to pay the costs of operations of DBMP's business and other liabilities and obligations included in the Allocated Assets and Liabilities as and when they become due.

H.    The Allocated Assets and Liabilities included the rights and obligations of CT (TX) (as successor to Old CT (DE) in the TX Conversion) under the Original Funding Agreement, and, at the effective time of the Divisional Merger, pursuant to the terms and conditions of the Plan of Divisional Merger, the rights and obligations of CT (TX) under the Original Funding Agreement were allocated to DBMP (TX) such that, following the effectiveness of the Divisional Merger, DBMP (TX), and, following the NC Conversion, DBMP, had assets having a value at least equal to its liabilities and had financial capacity sufficient to satisfy its obligations as they become due in the ordinary course of business, including any Asbestos Related Liabilities.

I.    Payor and Payee desire to amend and restate the Original Funding Agreement to reflect that the Merger, the Post-Merger Assignment, the DE Conversion and the NC Conversion have occurred and Payor, now a Delaware limited liability company having the name "CertainTeed LLC," and Payee, now a North Carolina limited liability company having the name "DBMP LLC," are the parties to such agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, the parties hereto agree as follows:

1.    <u>Definitions</u>.  As used in this Agreement, the following terms have the meanings herein specified unless the context otherwise requires:

"<u>Affiliate</u>" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.  For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"<u>Allocated Assets and Liabilities</u>" has the meaning specified in the recitals to this Agreement.

"<u>Asbestos Related Liabilities</u>" has the meaning specified in <u>Schedule 1</u> to this Agreement.

"<u>Bankruptcy Case</u>" means any voluntary case under chapter 11 of the Bankruptcy Code commenced by the Payee in the Bankruptcy Court.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"Bankruptcy Court" means the United States Bankruptcy Court where the Bankruptcy Case is commenced.

"Base Rate" means, for any day, a fluctuating interest rate per annum as shall be in effect from time to time, which rate per annum shall at all times be equal to the greater of (a) the rate of interest established by Bank of America, N.A from time to time, as its "prime rate," whether or not publicly announced, which interest rate may or may not be the lowest rate charged by it for commercial loans or other extensions of credit, and (b) the Federal Funds Effective Rate in effect from time to time, determined one Business Day in arrears, plus 1/2 of 1% per annum.

"Board" means (a) with respect to a corporation, the board of directors of the corporation or any committee thereof, (b) with respect to a partnership, the board of directors, the managing member or members or the board of managers, as applicable, of the general partner of the partnership, (c) with respect to a limited liability company, the managing member or members or the board of managers, as applicable, of the limited liability company, and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"Business Day" means each day other than a Saturday, a Sunday or a day on which banking institutions in Charlotte, North Carolina or at a place of payment are authorized by law, regulation or executive order to remain closed.

"Capital Stock" means (a) in the case of a corporation, corporate stock, (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock, (c) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited), and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding (in each case of (a) through (d) above) any debt securities convertible into such equity securities.

"Contractual Obligation" means, as to any Person, any obligation or similar provision of any security issued by such Person or any agreement, instrument or other undertaking (excluding this Agreement) to which such Person is a party or by which it or any of its property is bound.

"CT (DE)" has the meaning specified in the recitals to this Agreement.

"CT Holding" has the meaning specified in the recitals to this Agreement.

"CT (TX)" has the meaning specified in the recitals to this Agreement.

"DBMP" has the meaning specified in the recitals to this Agreement.

"DBMP (TX)" has the meaning specified in the recitals to this Agreement.

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"DE Conversion" has the meaning specified in the recitals to this Agreement.

"<u>District Court</u>" means the United States District Court in the district of the Bankruptcy Court.

"<u>Divisional Merger</u>" has the meaning specified in the recitals to this Agreement.

"<u>Event of Default</u>" has the meaning specified in <u>Section 6</u>.

"<u>Federal Funds Effective Rate</u>" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York.

"<u>Funding Account</u>" means the account of the Payee listed on <u>Schedule 2</u> to this Agreement, into which the proceeds of all Payments made under this Agreement shall be deposited, or such other account designated in writing by the Payee to the Payor from time to time.

"<u>Funding Date</u>" has the meaning specified in <u>Section 2(b)</u>.

"<u>Funding Request</u>" has the meaning specified in <u>Section 2(b)</u>.

"<u>GAAP</u>" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, in effect from time to time, consistently applied.  If at any time any change in GAAP (including any adoption of International Financial Reporting Standards) would materially affect the computation of any amount required to be computed under this Agreement, the Payor may give written notice to the Payee of its intent to preserve the original intent of this Agreement and upon delivery of such notice, such amounts shall be calculated in accordance with GAAP as in effect at the end of the fiscal period ended immediately prior to such change in GAAP.

"<u>Governmental Authority</u>" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"<u>NC Conversion</u>" has the meaning specified in the recitals to this Agreement.

"<u>New CT</u>" has the meaning specified in the recitals to this Agreement.

"<u>New CT (TX)</u>" has the meaning specified in the recitals to this Agreement.

"<u>Organizational Documents</u>" means (a) with respect to any corporation, its certificate or articles of incorporation and bylaws, (b) with respect to any limited liability company, its

certificate or articles of formation or organization and operating agreement, and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation of such entity.

"Original Funding Agreement" has the meaning specified in the recitals to this Agreement.

"Payee" has the meaning specified in the first paragraph of this Agreement.

"Payee Affiliate" means any wholly owned Affiliate of the Payee (and in no case includes the Payor or any Payor Affiliate).

"Payee Material Adverse Effect" means (a) a material impairment of the rights and remedies of the Payor under this Agreement, or of the ability of the Payee to perform its material obligations under this Agreement, or (b) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payee.

"Payment" has the meaning specified in Section 2(a).

"Payor" has the meaning specified in the first paragraph of this Agreement.

"Payor Affiliate" means any wholly owned Affiliate of the Payor (and in no case includes the Payee or any Payee Affiliate).

"Payor Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the business, assets, liabilities (actual or contingent) or financial condition of the Payor and its Subsidiaries, taken as a whole, (b) a material impairment of the rights and remedies of the Payee under this Agreement, or of the ability of the Payor to perform its material obligations under this Agreement, or (c) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payor.

"Permitted Funding Use" means each of the following:

(a) the payment of any and all costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee) at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee;

(b) the payment of any and all costs and expenses of the Payee incurred during the pendency of any Bankruptcy Case that are necessary or appropriate in connection therewith, including the costs of administering the Bankruptcy Case and any and all other costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee);

(c) the funding of any amounts necessary or appropriate to satisfy (i) the Payee's Asbestos Related Liabilities established by a judgment of a court of competent jurisdiction or final settlement thereof at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee, (ii) following the commencement of any Bankruptcy Case, the Payee's Asbestos Related Liabilities in connection with the funding of a trust under section 524(g) of the Bankruptcy Code for the benefit of existing and future claimants that is included in a plan of reorganization for the Payee confirmed by a final, nonappealable order of the Bankruptcy Court and the District Court, and (iii) in the case of either (i) or (ii), any ancillary costs and expenses of the Payee associated with such Asbestos Related Liabilities and any litigation thereof, including the costs of any appeals;

(d) the funding of any amounts necessary to cause the Funding Account to contain at least $5,000,000 at such time; and

(e) the funding of any obligations of the Payee owed to the Payor or any Payor Affiliate, including any indemnification or other obligations of the Payee under any agreement provided for in the Plan of Divisional Merger;

in the case of clauses (a) through (e) above, solely to the extent that any cash distributions theretofore received by the Payee from its Subsidiaries are insufficient to pay such costs and expenses and fund such amounts and obligations in full and further, in the case of clause (c)(ii) above, solely to the extent the Payee's other assets are insufficient to fund amounts necessary or appropriate to satisfy the Payee's Asbestos Related Liabilities in connection with the funding of such trust.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"Plan of Divisional Merger" has the meaning specified in the recitals to this Agreement.

"SEC" means the Securities and Exchange Commission.

"Subsidiary" means any Person a majority of the outstanding Voting Stock of which is owned or controlled by the Payor or by one or more other Subsidiaries and that is consolidated in the Payor's accounts.

"TX Conversion" has the meaning specified in the recitals to this Agreement.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of such Person.

2.      Funding Obligations and Procedures.

(a)      Funding Obligations.      The Payor hereby agrees, on the terms and conditions set forth in this Agreement, upon the request of the Payee from time to time in accordance with the requirements of Section 2(b), to make payments to the Payee (each, a

"Payment"), the proceeds of which shall be used by the Payee for any Permitted Funding Use. Nothing in this Agreement shall obligate the Payor to make Payments under this Agreement that in the aggregate exceed the aggregate amount necessary for the Payee to fund all Permitted Funding Uses, and nothing in this Agreement shall obligate the Payor to make any individual payment under this Agreement that exceeds the amount requested by the Payee in the applicable Funding Request.

(b)    Funding Requests.  To request a Payment, the Payee shall deliver to the Payor a written request (which written request may be a .pdf delivered via email) for such Payment in a form reasonably acceptable to the Payor and signed by the Payee (each, a "Funding Request").  Each Funding Request shall specify (i) the amount of the requested Payment, which shall be no less than $500,000, and (ii) the date of the requested Payment, which shall be the date that is five Business Days following the delivery of such Funding Request (each such date, a "Funding Date").  Each Funding Request by the Payee shall constitute a representation and warranty by the Payee that the conditions set forth in Section 2(d) have been satisfied.  Except as required to comply with the minimum requirements in Section 2(b)(i), Payee shall not deliver a Funding Request for an amount in excess of the aggregate amount necessary for the Payee to fund all current Permitted Funding Uses and all projected Permitted Funding Uses over the 30 days following the date of such Funding Request.

(c)    Payments.  Subject only to the satisfaction of the conditions set forth in Section 2(d), on any Funding Date, the Payor shall pay or cause to be paid to the Payee an amount equal to the amount of the requested Payment specified in the applicable Funding Request. All Payments shall be made by wire or other transfer of immediately available funds, in United States dollars, to the Funding Account.  In the event that the Payor does not make any Payment within the time period required by this Section 2(c), the amount of the requested Payment shall bear interest at a rate per annum equal to the Base Rate plus 2% until such Payment is made and the Payor shall include any interest accruing pursuant to this Section 2(c) in the next Payment made to the Payee.

(d)    Conditions to Payments.  The Payor's obligation to make any Payment is subject to the satisfaction of the following conditions as of the date of the Funding Request relating to such Payment (i) the representations and warranties of the Payee set forth in Section 3(b) shall be true and correct without regard to the impact of any Bankruptcy Case, including any notices or other actions that may be required therein, and (ii) there shall have been no violation by the Payee of the covenant set forth in Section 5.

3.    Representations and Warranties.

(a)    Representations and Warranties of the Payor.  The Payor represents and warrants to the Payee that:

(i)    Existence, Qualification and Power.  The Payor (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations,

consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement, and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payor Material Adverse Effect.

(ii)     Authorization; No Contravention. The execution, delivery and performance by the Payor of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payor Material Adverse Effect.

(iii)     Governmental Authorization; Other Consents.  No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution delivery or performance of this Agreement by, or enforcement against, the Payor.

(iv)     Binding Effect.  This Agreement has been duly executed and delivered by the Payor.  This Agreement constitutes a legal, valid and binding obligation of the Payor, enforceable against the Payor in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

(b)     Representations and Warranties of the Payee.  The Payee represents and warrants to the Payor that:

(i)     Existence, Qualification and Power.  The Payee (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that

failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

 (ii) <u>Authorization; No Contravention</u>.  The execution, delivery and performance by the Payee of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

 (iii) <u>Governmental Authorization; Other Consents</u>.  No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution delivery or performance of this Agreement by, or enforcement against, the Payee.

 (iv) <u>Binding Effect</u>. This Agreement has been duly executed and delivered by the Payee.  This Agreement constitutes a legal, valid and binding obligation of the Payee, enforceable against the Payee in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

4. <u>Covenants of the Payor</u>.

 (a) <u>Provision of Financial Information</u>.

 (i) The Payor will furnish to the Payee, no later than 90 days after the end of each fiscal year (in the case of annual financial statements) and 60 days after the end of each fiscal quarter other than the last fiscal quarter (in the case of quarterly financial statements), unaudited annual and quarterly consolidated financial statements prepared in accordance with GAAP (subject to the absence of notes to the financial statements and related disclosures, and, with respect to quarterly financial statements, normal year-end audit adjustments).

 (ii) By accepting such financial information, the Payee will be deemed to have represented to and agreed with the Payor that: (A) it will not use the information in violation of applicable securities laws or regulations; and (B) it will not communicate the information to any Person, including in any aggregated or converted form, and will keep the information confidential, other than where disclosure of such information is required by law, regulation or legal process (in

which case the Payee shall, to the extent permitted by law, notify the Payor promptly thereof).

(iii)    Notwithstanding the foregoing, the financial statements, information and other documents required to be provided as described in Section 4(a)(i), may be, rather than those of the Payor, those of any direct or indirect parent of the Payor.  Notwithstanding the foregoing, the Payor may fulfill the requirement to distribute such financial information by filing the information with the SEC within the applicable time periods required by the SEC.  The Payor will be deemed to have satisfied the reporting requirements of Section 4(a)(i) if any direct or indirect parent of the Payor has filed such reports containing such information with the SEC within the applicable time periods required by the SEC and such reports are publicly available.  To the extent a direct or indirect parent of the Payor provides financial statements, information and other documents pursuant to the first sentence of this Section 4(a)(iii) or such parent files such report with the SEC pursuant to the third sentence of this Section 4(a)(iii), and if the financial information so furnished relates to such direct or indirect parent of the Payor, the same shall be accompanied by consolidating information that explains in reasonable detail the difference between the information relating to such parent on the one hand, and the information relating to the Payor and its Subsidiaries on a standalone basis, on the other hand.

(b)    Successor to the Payor upon Consolidation or Merger.

(i)    Subject to the provisions of Sections 4(b)(ii) and 4(b)(iii), nothing contained in this Agreement shall prevent any consolidation or merger of the Payor with or into any Person, or successive consolidations or mergers in which the Payor or its successor or successors shall be a party or parties, or shall prevent any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all the property of the Payor (for the avoidance of doubt, calculated by including any equity interests held by the Payor), to any Person; *provided*, *however*, and the Payor hereby covenants and agrees, that, if the surviving Person, acquiring Person or lessee is a Person other than the Payor, upon any such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, all of the Payor's funding obligations under this Agreement and the observance of all other covenants and conditions of this Agreement to be performed by the Payor, shall be expressly assumed by an amendment to this Agreement or such other documentation in form reasonably satisfactory to the Payee, executed and delivered to the Payee by the Person formed by such consolidation, or into which the Payor shall have been merged, or by the Person which shall have acquired or leased such property.  This covenant will not apply to (A) a merger of the Payor with an Affiliate solely for the purpose of reincorporating the Payor in another jurisdiction within the United States, (B) any conversion of the Payor from an entity formed under the laws of one state to the same type of entity formed under the laws of another state, or (C) any conversion of the Payor from a limited liability company to a corporation, from a corporation to a limited liability company, from a limited liability company to a limited

partnership or a similar conversion, whether the converting entity and the converted entity are formed under the laws of the same state or the converting entity is formed under the laws of one state and the converted entity is formed of the laws of a different state.  Notwithstanding the foregoing, this <u>Section 4(b)(i)</u> will not apply to any consolidation or merger, or any sale, assignment, transfer, conveyance, lease or other disposition of assets, between or among Payor and its Subsidiaries.

(ii)    Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the assets, of the Payor (for the avoidance of doubt, calculated by including any equity interests held by the Payor) in a transaction that is subject to, and that complies with, the provisions of the preceding clause (i), the successor Person formed by such consolidation with the Payor or into which the Payor is merged, or to which such sale, assignment, transfer, lease, conveyance or other disposition is made, shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, lease, conveyance or other disposition, the provisions of this Agreement referring to the "Payor" shall refer instead to the successor Person and not to the Payor), and may exercise every right and power of, the Payor under this Agreement with the same effect as if such successor Person had been named as the Payor herein.  In the event of a succession in compliance with this <u>Section 4(b)(ii)</u>, the predecessor Person shall be relieved from every obligation and covenant under this Agreement upon the consummation of such succession.

(iii)    Any consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition referred to in the preceding clause (i) shall not be permitted under this Agreement unless immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing.

5.    <u>Covenants of the Payee</u>. The Payee shall not use the proceeds of any Payment made under this Agreement for any purpose other than a Permitted Funding Use.  The Payee will perform its indemnification obligations owing to the Payor under the agreements provided for in the Plan of Divisional Merger in all material respects.

6.    <u>Events of Default</u>.  Each of the following events constitutes an "<u>Event of Default</u>":

(a)    the Payor defaults in its funding obligations pursuant to <u>Section 2</u> and such default continues for a period of 10 Business Days;

(b)    the Payor defaults in the performance of, or breaches, any covenant or representation or  warranty of the Payor in this Agreement (other than a covenant or representation or warranty which is specifically dealt with elsewhere in this <u>Section 6</u>) and such default or breach continues for a period of 90 days, or, in the case of any failure to comply with <u>Section 4(a)</u> of this Agreement, 180 days, in each case after there has been given, by registered or certified mail, to the Payor by the Payee a written notice

specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(c)     the Payor, pursuant to or within the meaning of the Bankruptcy Code or any similar federal or state law for the relief of debtors, (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it or for all or substantially all of its property, (iv) makes a general assignment for the benefit of its creditors, or (v) generally is not paying its debts as they become due; and

(d)     a court of competent jurisdiction enters an order or decree under the Bankruptcy Code or any similar federal or state law for the relief of debtors that (i) is for relief against the Payor, (ii) appoints a custodian of the Payor for all or substantially all of the property of the Payor, or (iii) orders the liquidation of the Payor, and, in each case of (i) through (iii) above, such order or decree remains unstayed and in effect for 60 consecutive days.

Upon becoming aware of any Default or Event of Default, the Payor shall promptly deliver to the Payee a statement specifying such Default or Event of Default.

7.     Remedies.  Upon the occurrence of any Event of Default, and at any time thereafter during the continuance of any such Event of Default, the Payee may pursue any available remedy to collect any unfunded Payments due and owing to the Payee or to enforce the performance of any provision of this Agreement.

8.     Notices.  All notices required under this Agreement, including each Funding Request and any approval of or objection to a Funding Request, shall be delivered to the applicable party to this Agreement at the address set forth below.  Unless otherwise specified herein, delivery of any such notice by email, facsimile or other electronic transmission (including .pdf) shall be effective as delivery of a manually executed counterpart thereof.

Payor:

CERTAINTEED LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attention: Mark A. Rayfield, President and Chief Executive Officer
Email: Mark.A.Rayfield@saint-gobain.com

with a copy to:

CERTAINTEED LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attention: R. Craig Smith, Divisional Counsel
E-mail:  Craig.Smith@saint-gobain.com

Payee:

DBMP LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attention: Joseph N. Bondi, President
Email: Joseph.N.Bondi@saint-gobain.com

with a copy to:

DBMP LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attn: Michael T. Starczewski, Chief Legal Officer
E-mail: Michael.T.Starczewski@saint-gobain.com

9.    <u>Governing Law</u>.  This Agreement shall be governed and construed in accordance with the laws of the State of North Carolina.

10.    <u>No Implied Waiver; Amendments</u>.  No failure or delay on the part of the Payee to exercise any right, power or privilege under this Agreement, and no course of dealing between the Payor, on the one hand, and the Payee, on the other hand, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  No notice to or demand on the Payor in any case shall entitle the Payor to any other or further notice or demand in similar or other circumstances, or constitute a waiver of the right of the holder of this Agreement to any other or further action in any circumstances without notice or demand.  The remedies provided in this Agreement are cumulative and not exclusive of any remedies provided by law.  No amendment or waiver of any provision of this Agreement, nor consent to any departure by the Payee therefrom, shall in any event be effective unless the same shall be in writing, specifically refer to this Agreement, and be signed by the Payor and the Payee, and then such amendment or waiver shall be effective only in the specific instance and for the specific purpose for which given.  A waiver on any such occasion shall not be construed as a bar to, or waiver of, any such right or remedy on any future occasion.

11.    <u>Counterparts; Entire Agreement; Electronic Execution</u>.  This Agreement may be executed in separate counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersedes, in its entirety, the Original Funding Agreement.  This Agreement shall become effective when it shall have been executed by each party hereto and each party hereto shall have received counterparts hereof which, when taken together, bear the signatures of each of party hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy, .pdf or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

12.     Severability.  If any one or more of the provisions contained in this Agreement are invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of all the remaining provisions will not in any way be affected or impaired.  If any one or more provisions contained in this Agreement are deemed invalid, illegal or unenforceable because of their scope or breadth, such provisions shall be reformed and replaced with provisions whose scope and breadth are valid under applicable law.

13.     Transfer; Assignment.  This Agreement shall be binding upon the Payor and its successors and assigns, and the terms and provisions of this Agreement shall inure to the benefit of the Payee and its successors and assigns.  The Payor's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payee; *provided*, *however*, that no such consent of the Payee shall be required in connection with the Post-Merger Assignment or any transfer effected in compliance with Section 4(b).  Upon giving effect to the Post-Merger Assignment, CT Holding will be released from its obligations as the Payor and will have no further obligations under this Agreement.  The DE Conversion shall not constitute an assignment of the Payor's rights and obligations under this Agreement.  The Payee's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payor.  None of the TX Conversion, the Divisional Merger or the NC Conversion shall constitute an assignment of the Payee's rights and obligations hereunder.

14.     Construction.  The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement. The word "including" means without limitation by reason of enumeration. The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless specifically stated otherwise, all references to Sections and Schedules are to the Sections and Schedules of or to this Agreement.

15.     Rights of Parties.  This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**CERTAINTEED LLC**, a Delaware limited liability company, as the Payor

By: _____
     Mark A. Rayfield
     President and Chief Executive Officer

**DBMP LLC**, a North Carolina limited liability company, as the Payee

By: _____
     Joseph N. Bondi
     President

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**CERTAINTEED LLC**, a Delaware limited liability company, as the Payor

By: _____

    Mark A. Rayfield
    President and Chief Executive Officer

**DBMP LLC**, a North Carolina limited liability company, as the Payee

By: _____

    Joseph N. Bondi
    President

## SCHEDULE 1

### Definition of Asbestos Related Liabilities

For purposes of this Agreement, "<u>Asbestos Related Liabilities</u>" means all Liabilities (as defined below) of the Payee related in any way to asbestos or asbestos containing materials.

Capitalized terms that are used in this <u>Schedule 1</u> have the following meanings:

(a)     "<u>Cause of Action</u>" means any claim, judgment, cause of action, counterclaim, crossclaim, third party claim, defense, indemnity claim, reimbursement claim, contribution claim, subrogation claim, right of set off, right of recovery, recoupment, right under any settlement Contract and similar right, whether choate or inchoate, known or unknown, contingent or noncontingent.

(b)     "<u>Contract</u>" means any contract, agreement, arrangement, lease, indenture, mortgage, deed of trust, evidence of indebtedness, License, Plan, guarantee, understanding, course of dealing or performance, instrument, bid, order, proposal, demand, offer or acceptance, whether written or oral.

(c)     "<u>Governmental Authority</u>" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational governmental, legislative, administrative or regulatory authority, agency, court, arbitration tribunal, board, department or commission, or other governmental or regulatory entity, including any competent governmental authority responsible for the determination, assessment or collection of taxes.

(d)     "<u>Law</u>" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational statute, law, ordinance, decree, order, injunction, rule, regulation, directive, constitution, code, edict, writ, judgment, opinion, decree, injunction, stipulation, award or other document or pronouncement having the effect of law (including common law) of any Governmental Authority, including rules and regulations of any regulatory or self-regulatory authority with which compliance is required by any of the foregoing.

(e)     "<u>Liability</u>" shall mean any claim, demand, offer, acceptance, action, suit, liability or obligation of any kind, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, choate or inchoate, asserted or unasserted, known or unknown, including (i) those arising or that may arise under any past, present or future Law or Contract or pursuant to any Cause of Action or Proceeding and (ii) all claims for economic or noneconomic damages or injuries of any type or nature whatsoever (including claims for physical, mental and emotional pain and suffering, loss of enjoyment of life, loss of society or consortium and wrongful death, as well as claims for damage to property and punitive damages).

NAI-1509226699

(f)     "License" means any license, sublicense, agreement, covenant not to sue or permission.

(g)     "Person" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, benefit plan, unincorporated organization, business, syndicate, sole proprietorship, association, organization, labor union or other entity or Governmental Authority.

(h)     "Plan" means, with respect to any Person, (i) any "employee benefit plan" (as defined in Section 3(3) of ERISA), (ii) all specified fringe benefit plans as defined in Section 6039(D) of the Internal Revenue Code, and (iii) any other plan, program, policy, agreement or arrangement, whether or not in writing, relating to compensation, employee benefits, severance, change in control, retention, deferred compensation, equity, employment, consulting, vacation, sick leave, paid time off, salary continuation, disability, hospitalization, medical insurance, life insurance, scholarship programs, incentive compensation or bonus compensation, in each case that is sponsored, maintained or contributed to or required to be sponsored, maintained or contributed to by, or otherwise covering, such Person.

(i)     "Proceeding" means any action, appeal, arbitration, assessment, cancellation, charge, citation, claim, complaint, concurrent use, controversy, contested matter, demand, grievance, hearing, inquiry, interference, investigation, litigation (including class actions and multidistrict litigation), mediation, opposition, re-examination, summons, subpoena or suit, or other case or proceeding, whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private, commenced, brought, conducted or heard by or before, under the supervision or direction of, or otherwise involving, any Governmental Authority or arbitrator or other agreed-upon tribunal or dispute resolution mechanism.