# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

In re:

DBMP, LLC,[1]

     Debtor.

Chapter 11

Case No. 20-30080 (JCW)

## OBJECTION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS TO MOTION OF THE DEBTOR FOR ESTIMATION OF CURRENT AND FUTURE MESOTHELIOMA CLAIMS

The Official Committee of Personal Injury Asbestos Claimants (the "Committee"), by and through its undersigned counsel, respectfully objects to the *Motion of the Debtor for Estimation of Current and Future Mesothelioma Claims* [Dkt. No. 948] ("Estimation Motion"), filed on July 29, 2021.  In support of its Objection, the Committee states as follows:

### PRELIMINARY STATEMENT

1.  The Estimation Motion is the next step in CertainTeed's[2] long-planned bankruptcy scheme, designed to maroon asbestos creditors in bankruptcy and subject them to years of expense, delay, and harassment and ultimately pressure them into settling their claims at a discount.[3]  The Debtor, engineered by CertainTeed and its ultimate parent Compagnie de Saint-Gobain ("Saint

---

[1] The last four digits of the Debtor's taxpayer identification number are 8817.  The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19355.

[2] For purposes of this Motion, "CertainTeed" refers to (1) CertainTeed Corporation and CertainTeed LLC, as that entity existed prior to the Texas divisional merger on October 23, 2019, and (2) CertainTeed LLC, as it exists after the divisional merger.  When the context requires greater specificity, "former CertainTeed" refers to pre-divisional merger CertainTeed and "current CertainTeed" refers to post-divisional merger CertainTeed.

[3] *See* Gross Dep. Tr. 106:17-107:10, June 2, 2021 ("I believed and knew that the real purpose [of CertainTeed's restructuring] was to wind up with . . . an entity loaded with asbestos liability for purpose of a bankruptcy proceeding and ultimate estimation that was less than continuing business as usual.").  As the Court is aware, Amiel Gross is a former in-house counsel for CertainTeed who was also seconded to the Debtor until October 2020.  His deposition transcript is attached as Exhibit A.

Gobain"), is the perfect vehicle for this strategy.  As a result of the Corporate Restructuring, the Debtor is a shell with no meaningful stake in the proceedings.  CertainTeed, a non-debtor wholly owned by Saint-Gobain Corporation ("SGC") and Saint Gobain—a foreign company seeking refuge from those it injured in the United States—is enjoying its fraudulently transferred assets, remains free of the obligations bankruptcy imposes on those entities usually seeking the protection of the Bankruptcy Code and the bankruptcy courts, and saves many millions annually in defense and indemnity costs.

2.      Meanwhile, asbestos victims continue to suffer and die, while foreclosed from seeking compensation from a solvent company.

3.      The Debtor's proposed estimation serves no legitimate purpose, nor is it required by law.  The Court should not order an estimation and should look to other levers to shift this case toward a successful resolution.

**OBJECTION**

**I.    THE DEBTOR OFFERS NO COHERENT OR LEGITIMATE REASONS FOR AN ESTIMATION**

4.      The Debtor's stated reasons for seeking an estimation are, at best, vague.  The Debtor maintains that an estimation "will provide critical information to assist the parties in negotiating, formulating, and confirming a consensual section 524(g) plan of reorganization." Estimation Motion at 3.  The exercise, it claims, will help the parties "achieve a better understanding" and "gather information on relative strengths and weaknesses of the parties' respective estimation methodologies." *Id.*  The Debtor specifically states that it is "not requesting an estimation for distribution purposes, nor is the Debtor seeking to use estimation to establish a non-consensual 'cap' on its asbestos liabilities." *Id.* at 16.  The Debtor later suggests estimation

would help formulate a plan that is "fair and equitable" to future claimants and that satisfies the "best interest of creditors" test. *Id.*[4]

5.      There is simply no need to engage in an estimation process to "achieve a better understanding." The parties do not need to be educated about the nature or extent of CertainTeed's asbestos liabilities. The parties are sophisticated and experienced, each has hired sophisticated and experienced asbestos liability experts and counsel, and each is capable of forming their own estimate of the Debtor's liability for asbestos-related claims using information already available. The litigation itself has been ongoing for nearly half a century. Since the 1970s, CertainTeed has faced hundreds of thousands of claims for asbestos-induced personal injury and wrongful death. Since 2002, CertainTeed reports that it has incurred approximately $2 billion defending and resolving over 300,000 personal injury lawsuits relating to asbestos exposure.[5] Spending another two years "learning" about this litigation is senseless.

6.      That not every fact about every single case is known either to CertainTeed or to asbestos claimants does not mean that this bankruptcy case must stop in its tracks and spend time and money in discovery of every pending case, particularly where the burden of that discovery is by design imposed principally on asbestos creditors. Both CertainTeed and asbestos claimants managed to resolve cases for decades without engaging in expensive litigation and discovery in every case.[6] CertainTeed's newfound enthusiasm for extensive and one-sided discovery should be viewed with skepticism now that, as a result of the Corporate Restructuring and this bankruptcy, there is no immediate prospect that CertainTeed will have to pay cases. Further, even if both parties desired detailed information about every mesothelioma case, there is no realistic way to achieve

---

[4] *See infra*, Section II, for a discussion of these rationales.

[5] *Declaration of Robert J. Panaro in Support of First Day Pleadings* [Docket No. 24] ¶ 27.

[6] *See, e.g.*, Starczewski Dep. Tr. 206:7-10, Apr. 30, 2021 (attached as Exhibit B).

such a thing. People exposed to CertainTeed asbestos are diagnosed with mesothelioma and other diseases continuously, every week, every month, every year. It is a process that no estimation program focused on individual cases could keep up with.

**A.** **Subjecting Asbestos Creditors to "Discipline" in the Form of Years of Expense, Delay, and Inconvenience Is Not a Legitimate Purpose**

7.      While the formal reasons the Debtor offers in its brief make little sense, the brief also reveals the Debtor's actual motivation—to subject the asbestos creditors to harassment, expense and delay. In its motion, the Debtor says "[t]he discovery process and the ***discipline of litigation*** will encourage and assist negotiations." Estimation Motion at 3 (emphasis added). But the proposed estimation will "litigate" nothing. The discovery and "discipline" directed at the asbestos creditors, the years of claim-by-claim discovery, is the point. Indeed, later in its motion, the Debtor suggests that an estimation ***result*** itself might be superfluous. It posits that the mere "discipline" of imposing costly and intrusive discovery on asbestos creditors while CertainTeed sits happily protected from litigation might be enough. "As occurred in a number of the cases cited above, these efforts could result in a settlement prior to the conclusion of the estimation process." *Id.* at 17.

8.      This idea of using what purports to be a section 524 bankruptcy to punish asbestos creditors is perverse. The delay, expense and inconvenience that would be imposed on the asbestos creditors contravenes the aims of bankruptcy and undermines the very policy favoring prompt payment of asbestos victims that is embodied in section 524(g). *See In re Thorpe Insulation Co.*, 671 F.3d 1011, 1023 (9th Cir. 2012) ("In the § 524(g) context, delay not only disrupts a debtor's efforts to reorganize, but also affects the rights of countless asbestos claimant creditors, for whose benefit in part § 524(g) was enacted.").

4

9.      The Court should not indulge the Debtor's impulse to "discipline" creditors. Estimation might in some limited contexts in other cases serve a legitimate purpose, but it would not do so here.

**B.      Estimation Results Historically Have Little Relationship to Actual, Negotiated Funding of 524(g) Plans**

10.     The Debtor's acknowledged template for the proposed estimation proceeding here is *Garlock*—an estimation conducted before this Court over seven years ago—whereby the Court ultimately concluded that Garlock's aggregate liability for present and future mesothelioma claims totaled **$125 million**.[7]  Garlock's years-long process cost the debtors' estates more than $120 million in professional fees—a number that actually fails to include or account for the additional expenses imposed on Garlock's asbestos victims during that time period.  The *Garlock* estimation was irrelevant to the resulting settlement number—**$500 million**[8]—which was jointly negotiated by the Committee, the debtor, and the FCR and included in the plan of reorganization confirmed ***over two years after*** the Court issued the *Garlock* estimation decision.

11.     Contrary to the Debtor's arguments in the Estimation Motion, it is obvious that there was no correlation between the *Garlock* estimation and the *Garlock* plan confirmation. Instead of a quick plan process following estimation, Garlock confirmed a plan with a trust contribution ***four times greater*** than the Court's estimated liability ***forty-one months—almost***

---

[7] *In re Garlock Sealing Techs., LLC*, 504 B.R. 71, 97 (Bankr. W.D.N.C. 2014).

[8] *See Disclosure Statement for Modified Joint Plan of Reorganization of Garlock Sealing Technologies LLC, et al. and OldCo, LLC, Proposed Successor by Merger to Coltec Industries Inc.*, at ii, *In re Garlock Sealing Techs., LLC*, No. 10-31607 (Bankr. W.D.N.C. July 29, 2016) [Dkt. No. 5444].  Under the plan that was confirmed in *Garlock*, the Debtors retained their right to insurance actions and settlements, and even had the right "to seek reimbursements for their contributions to the Asbestos Trust under the plan." Id. at 55.  *Modified Joint Plan of Reorganization of Garlock Sealing Techs. LLC, et al. and OldCo, LLC, Successor by Merger to Coltec Indus. Inc.,* art. 7.3.10, *In re Garlock Sealing Techs. LLC*, No. 10-31607 (Bankr. W.D.N.C. May 19, 2017) [Dkt. No. 5965-1] (the "Garlock Plan").  The Garlock Asbestos Personal Injury Trust received only a limited right of 50% of any insurance recovered by Coltec in excess of $25 million, but it did not have the right to bring or prosecute such an action.  Garlock Plan art. 7.3.10. Further, $20 million of the total settlement was earmarked to pay Canadian government agencies for Canadian liability subrogation rights.

_**four years**_—after the Court issued the *Garlock* estimation decision.  For the Debtor here to pretend

that the *Garlock* estimation process impacted its plan settlement discussions is simply an attempt

to recast history, institutionalize delay, and hold the Debtor's asbestos creditors—the true victims

of this bankruptcy case—hostage to a wasteful and cynical ploy.

12.     This Court should not feel compelled to spend years overseeing contentious

litigation that would result in, at best, an advisory opinion of dubious utility.  *See*, *e.g.*, *Trustgard*

*Ins. Co. v. Collins*, 942 F.3d 195, 200 (4th Cir. 2019) ("That courts may not issue advisory opinions

is one of the most long-standing and well-settled jurisdictional rules.").

## II.     <u>ESTIMATION IS NOT REQUIRED</u>

### A.     **Section 502(c) Does Not Mandate Estimation in an Asbestos Bankruptcy**

13.     Section 502(c)(1) provides: "There shall be estimated *for purpose of allowance*

*under this section* . . . any contingent or unliquidated claim, the fixing or liquidation of which, as

the case may be, *would unduly delay the administration of the case*."  11 U.S.C. § 502(c)(1)

(emphasis added).  In a section 524(g) case, there is no need to estimate any asbestos claims for

allowance purposes because § 524(g) provides an alternate path for resolving present and future

asbestos claims.  There are, therefore, no asbestos claims that require liquidation during the course

of the bankruptcy, and thus no predicate for the application of § 502(c).  Indeed, here estimation

itself would delay the administration of the case.

14.     Moreover, asbestos personal injury claims cannot lawfully be estimated for

allowance purposes.  The asbestos claimants' Seventh Amendment right to a jury trial is preserved

in bankruptcy cases.  *See* 28 U.S.C. § 1411(a); *see also A.H. Robins Co. v. Piccinin*, 788 F.2d 994,

1012 (4th Cir. 1986) ("The bankruptcy court thus is without authority . . . over 'the liquidation or

estimation of contingent or unliquidated personal injury or wrongful death claims against the estate

for purposes of distribution under Title 11.'" (quoting 28 U.S.C. § 157(b)(2)(B))).  Personal-injury

and wrongful-death claimants are "ultimately entitled, if they elect to do so, to have a jury trial of

their claim in the district court.  Section 157(b)(5) gives them that right."  *Id.*[9]  Estimating asbestos

claims for allowance purposes would violate the claimants' rights to a trial by jury, and therefore

cannot be done.

15.    Estimating asbestos claims for allowance purposes would also violate the

claimants' constitutional due process rights because the merits of each individual and

individualized claim would not be evaluated and tried.  No matter how sophisticated, no matter

how many bells and whistles are employed, the very nature of an estimation means that the

estimate would contain shortcuts based on samples or averages and would extrapolate from that

basis to assign value to claims.  This is inconsistent with extensive case law holding that asbestos

personal injury claims cannot be decided *en masse*; the pervasive factual disputes underlying

asbestos claims are too individualized.  In the *Georgine* litigation, for example, the Third Circuit

concluded that the putative class of future asbestos claimants could not lawfully be certified for

class action treatment under Rule 23 of the Federal Rules of Civil Procedure because the individual

claims were so disparate on their facts.  *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 626 (3d

Cir. 1996), *aff'd sub nom. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).  "Causation of

plaintiff's injury by defendant's product and plaintiff's resultant damages must be determined *as

to 'individuals, not groups.'*" *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 313 (5th Cir. 1998)

(emphasis added) (quoting *In re Fibreboard Corp.*, 893 F.2d 706, 711 (5th Cir. 1990)); *see also

Malcolm v. Nat'l Gypsum Co.*, 995 F.2d 346, 350-54 (2d Cir. 1993) (disapproving consolidation

---

[9] *See also In re Dow Corning Corp.*, 211 B.R. 545, 569 (Bankr. E.D. Mich. 1997) ("These claims must be liquidated via a jury trial if the claimant requests one, and they cannot be estimated by a bankruptcy judge for purposes of distribution unless all parties consent.").

for trial of forty-eight asbestos cases because too many different individual exposures, jobs, job sites, and diseases were involved).

    **B.**    **Estimation Is Not Required to Determine Whether the Best Interest of Creditors Test Is Satisfied in This Case**

16.    Section 1129(a)(7) requires that each creditor in an impaired class who does not accept the plan receive under the plan property of a value that is not less than what the creditor would receive in a chapter 7 liquidation. 11 U.S.C. § 1129(a)(7)(A)(ii).

17.    Here, there would be no need for an estimate to determine whether this "best interest" test is satisfied. As a result of the Corporate Restructuring, and if it is accepted as valid for this purpose, the Debtor's satisfaction of the "best interests" test under section 1129(a)(7) is virtually predetermined because the Debtor is a stripped-down version of the former CertainTeed. The Debtor estimates the fair market value of Millwork & Panel to be approximately $150 million, with an expected EBITDA in 2020 of $16 million and $15 million in 2021. In addition, the Debtor's cash-on-hand as of January 23, 2020 (the petition date) was $25 million. So, the total value of the Debtor, when combining cash on hand with Millwork & Panel's fair market value, is approximately $175 million.

18.    If the Court were to accept a low-ball estimate of CertainTeed's aggregate asbestos liability propounded by the Debtor (*e.g.*, $125 million), the value of the Debtor's assets available to fund a trust would most likely be equivalent to, if not more than, the value of distributable assets in a chapter 7 case. On the other hand, if the Court were to accept a higher estimate of the aggregate liability (*e.g.*, more than $175 million), then, under the Debtor's theory, the best interests test would be satisfied because the Debtor's fair market value in chapter 11, combined with funding

from New CT under the Funding Agreement, would surpass the Debtor's value in liquidation under Chapter 7.[10]

### C.    Estimation Is Not Required to Determine Whether the "Fair and Equitable" Requirement of Section 524(g) Is Satisfied

19.    This Court need not estimate present and future claims to determine whether the "fair and equitable" requirement under section 524(g) is satisfied.  Section 524(g) requires that a channeling injunction protecting identified parties be "fair and equitable" to future demand holders in light of the benefits provided, or to be provided, to the trust by or on behalf of those protected parties.  11 U.S.C. § 524(g)(4)(B)(ii).

20.    But the FCR, on behalf of future demand holders, typically provides evidence as to whether a proposed 524(g) plan satisfies the "fair and equitable" standard.  If the FCR needs to understand the Debtor's aggregate asbestos liability in order to evaluate the "benefits," the FCR can look to and rely on the estimate developed by his own professionals or experts.  The FCR does not require the Court to generate an estimate after a contested hearing.

21.    Accordingly, it is not necessary for this Court to estimate the aggregate liability in order for the FCR to weigh in on whether the "fair and equitable" requirement is satisfied.

### D.    Many Asbestos Bankruptcies Have Resolved Successfully Without Estimation

22.    The idea that every asbestos bankruptcy requires an estimation is belied by the fact that numerous asbestos bankruptcies have resolved without any contested estimation process at all, or if one was contemplated at some point, without a formal estimation result being produced by the courts in those cases.  For example, among the many section 524(g) cases without an estimation result, are the *ACandS*, *G-I*, *Kaiser Aluminum*, *Pittsburgh Corning*, and *W.R. Grace*

---

[10] Under the terms of the Funding Agreement, there would be not funding in a chapter 7 context.

bankruptcies, as well as the very recent *Kaiser Gypsum*, *Paddock* (formerly known as Owens-Illinois), and *Imerys* bankruptcies.[11]   Myriad other asbestos-related cases similarly resolved without an estimation.[12]   An asbestos estimation is thus the exception, not the rule.

## III.   DEBTOR'S INTENTION TO USE "ESTIMATION" AS A WAY TO LITIGATE AND LIMIT INDIVIDUAL CLAIMS IS CONTRARY TO LAW

23.     Estimation, as proposed by the Debtor, directly implicates the procedural rights of the individual claimants: the Debtor argues that section 502(c) permits the Court to enter findings regarding the validity or amount of any individual claim through some type of one-sided mass estimation process, without affording the individual claimants the constitutionally and statutorily protected right to a jury trial in a state court or in an Article III federal court or indeed without any participation by the claimants themselves in the adversary process.   As explained earlier, *supra* at paragraph 14, this is false.

24.     The Debtor, however, is seeking an estimation that will circumvent the individual claimants' rights to a jury trial by substituting its own determination of the merits of each plaintiff's claim for that of a jury.   Indeed, Dr. Charles Bates, the Debtor's estimation expert, ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮.[13] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[11] *See ACandS, Inc.*, No. 02-12687 (Bankr. D. Del. 2002); *In re G-I Holdings, Inc.*, No. 01-30135, 01-38790 (Bankr. D.N.J. 2006); *In re Kaiser Aluminum Corp.*, No. 02-10429 (Bankr. D. Del. 2002); *In re Pittsburgh Corning Corp.*, No. 00-22876 (Bankr. W.D. Pa. 2000); *In re W.R. Grace & Co.*, No. 01-01139 (Bankr. D. Del. 2001); *In re Kaiser Gypsum Co., Inc.*, No. 16-31602 (Bankr. W.D.N.C. 2016); *In re Paddock Enter., LLC*, No. 20-10028 (Bankr. D. Del. 2020); *In re Imerys Talc Am., Inc.*, No. 19-10289 (Bankr. D. Del. 2019); *In re The Flintkote Co.*, No. 04-11300 (Bankr. D. Del. 2004); *In re Quigley Co., Inc.*, No. 04-15739 (Bankr. S.D.N.Y. 2004); *In re Yarway Corp.*, No. 13-11025 (Bankr. D. Del. 2013); *In re Sepco Corp.*, No. 16-50058 (Bankr. N.D. Ohio 2016); *In re Geo V. Hamilton, Inc.*, No. 15-23704 (Bankr. W.D. Pa. 2015); *In re Duro Dyne Nat'l Corp.*, No. 18-27963 (Bankr. D.N.J. 2018); *In re The Fairbanks Co.*, No. 18-41768 (Bankr. N.D. Ga. 2018); *In re Maremont Corp.*, No. 19-10118 (Bankr. D. Del. 2019).

[12] *Supra* n.11.

[13] *See* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████████████████████.[14] ████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████.[15] Of course, on a practical

level, this "estimation" process simply quantifies the Debtor's preferences, hypothetical outcomes

in the Debtor's ideal litigation environment.  Presumably the Debtor contemplates the Committee

presenting its own simulated trials of 4,000 pending mesothelioma cases and unknown future

cases, using its own cadre of experts, with the Court somehow choosing between the imagined

case-by-case jury verdicts presented by the Debtor and those presented by the Committee.  This is

not a blueprint for developing a quick, consensual resolution to this bankruptcy case.

25.     The cases cited by the Debtor do not support anything remotely approaching this

quixotic endeavor.   For example, even setting aside the lack of authority to estimate claims

distribution recognized by the case, *A.H. Robins* does not support the Debtor's program because

the *Robins* court conducted an estimation to determine whether "a fair reorganization of the debtor

can be achieved."  *A.H. Robins*, 788 F.2d at 1012.  Because the Debtor has assured the claimants—

---



(emphasis added)) (attached as Exhibit C).

[14] *Id.*, 45:19-47:17.

[15] *Id.*,58:17-59:7.

and this Court—that this is a full-pay case, the rationale justifying estimation in *A.H. Robins* is not present here.

26.     The Debtor's reliance on the *USG* and *G-I Holdings* asbestos bankruptcy cases to support their argument that an estimation proceeding should assess the Debtor's legal liability under applicable non-bankruptcy law for such claims is also unfounded.  In neither case was an estimation ever held.  The cited decisions are therefore theoretical at best, and the cases stand more clearly for the proposition that an estimation is simply not necessary.  In *USG*, the court was highly concerned with the financial status of the debtor as USG had a finite amount of money available to pay claims.  *In re USG Corp.*, 290 B.R. 223, 224 (Bankr. D. Del. 2003).  Despite this concern, the *USG* court stated that the court would "reject unsubstantiated claims, bogus medical evidence and fanciful theories of causation," ***only*** "within the context of the law binding upon it and upon the claims before it."  *Id*. at 225.  The court recognized that "[i]t is basic that federal bankruptcy jurisdiction does not oust state law governing claims on a debtor's estate."  *Id*. (citing *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20 (2000) ("[B]asic federal rule' in bankruptcy is that state law governs the substance of claims.")).  The *USG* court further noted that "[t]he Bankruptcy Code only creates a forum for dividing inadequate assets among competing claims; it says nothing about the law under which those claims arise.  An unbroken line of authority holds that state law claims remain governed by state law, even after the debtor invokes federal bankruptcy protection."  *Id*.  Furthermore, although the *USG* court did state that the debtors would be permitted to present their defenses in an estimation hearing upon the passing of the cancer-only bar date, the court assured that it would "entertain such applications only to the extent they do not interfere with the claimants' constitutional and legal rights as prescribed by law."  *Id*. at 227.  And here, the Debtor asserts that adequate assets exist to pay all claims in full.

12

27.    Furthermore, the *G-I Holdings* court determined that it was far more practical to estimate the universe of cancer claimants by themselves initially than to undergo a merit-based estimation of all of the tort claimants.  *In re G-I Holdings, Inc.*, 323 B.R. 583, 625 (Bankr. D.N.J. 2005).  As in *A.H. Robins*, the court concluded that the asbestos claimants do in fact possess constitutional and statutory jury trial rights for purposes of liquidating their respective claims against the G-I Holdings bankruptcy estate.  *See generally id.* at 600-17.

28.    In *In re Genesis Health Ventures, Inc.*, 112 F. App'x 140 (3d Cir. 2004), also cited by the Debtor as support, the court estimated a *single* claim at zero because the *qui tam* plaintiff failed to raise any genuine issue of material fact.  Nor was the claim a personal injury claim.  Moreover, with respect to the pending claims of the asbestos claimants, there is no shortage of disputed material facts that must be addressed at trial before such claims can be liquidated—or even estimated.

29.    The Debtor further cites to *Chaussee v. Lyngholm (In re Lyngholm)*, 24 F.3d 89 (10th Cir. 1994).  The *Lyngholm* court, however, disallowed a single claim originally arising from a state court foreclosure proceeding *based on prior instructions issued by an appellate court on remand* on how to value the claim.  Rather than lifting the automatic stay, the bankruptcy court liquidated the individual claim based on a review of the original trial court proceedings as well as the appellate record.  *In re Lyngholm* at 90-91.  Nor was it a personal injury claim.  For this Court to conduct a similar estimation would be next to impossible—many of the pending claimants' cases were not even tried prior to the Debtor's bankruptcy filing, much less subject to appellate instructions.

30.    The Debtor further asserts that in *Bittner v. Borne Chem. Co., Inc.,* 691 F.2d 134 (3d Cir. 1982) supports a bankruptcy court's right to estimate mass tort claims at no value.  In

*Bittner*, the bankruptcy court's decision to value the claims of the stockholders at zero rested on the policy concern that to value them otherwise would grant the claimants a "significant, if not controlling" voice in the reorganization, "despite the fact that the state court might ultimately decide against those interests after the reorganization." *Id.* at 137. Nor were those personal injury claims. Here, there is no similar concern regarding the claimants' voice in the reorganization. In fact, the Debtor has structured the bankruptcy case to ensure that the asbestos claimants are the *only* creditors impacted by the filing.

31.     Importantly, the sole example cited by the Debtor for the principle that the bankruptcy court can zero-value individual personal injury claims based on an aggregate estimation of tort claims is clearly distinguishable from the claimants in this case. In *In re Cont'l Airlines Corp.* the claims assigned a zero value were those for "mental anguish" arising from the debtors' bankruptcies. 64 B.R. 858, 860 (Bankr. S.D. Tex. 1986), *aff'd in part, vacated in part*, 901 F.2d 1259 (5th Cir. 1990). The court assigned these claims a zero value because the plaintiffs' alleged intentional infliction of emotional distress was purportedly the result of actions "required by the policies of the Bankruptcy Code" as part of Continental Airlines' debtor-in-possession fiduciary duties. *Id.* at 861. Essentially, the *Continental Airlines* court concluded that actions required by the Bankruptcy Code "may not also amount to actionable torts" because of the Supremacy Clause of the United States Constitution. *Id.* (citing *Nash v. Fla. Indus. Comm.*, 389 U.S. 235, 239-40 (1967)). By contrast, CertainTeed's asbestos victims are not asserting torts based on the Debtor's bankruptcy-related actions; the asbestos claimants' tort claims are based on contracting an always-fatal form of cancer uniquely caused by exposure to asbestos, including CertainTeed's asbestos-containing products. Of course, the Fourth Circuit's decision in *A.H. Robins* controls here.

14

32.     This case is not *Garlock*.  This chapter 11 case was filed *10 years after* Garlock

filed for bankruptcy protection and *six years after* this Court issued the *Garlock* estimation

decision.  During the intervening years, changes have occurred in asbestos litigation.  For example,

revised state discovery rules and case management orders requiring the disclosure of trust claims

as part of a plaintiff's initial disclosures were enacted through the efforts of asbestos defendants.

The *Garlock* decision and the allegations about manipulation of the system were widely discussed

in defense articles, at conferences and in connection with proposed legislation.  The Debtor hired

Jones Day LLP as bankruptcy counsel and Robinson Bradshaw & Hinson, P.A., as special

corporate and litigation counsel beginning in January 2017.  It also hired Bates White, LLC, the

liability valuation expert for Garlock and Bestwall—and an expert that CertainTeed had hired

several years before the Debtor's petition date to perform confidential work on asbestos claims[16]—

to advise DBMP in matters relating to the defense of asbestos-related claims in this bankruptcy

case.  Even if *Garlock* identified what the Debtor alleges is extensive "evidence suppression" by

the victimized asbestos plaintiffs—a claim that the Committee disputed in *Garlock* and strongly

disputes in this case—CertainTeed was certainly aware of the *Garlock* estimation decision and it

had every opportunity to conduct discovery and litigate case by case in state court *for six years*

*before filing* this bankruptcy case if CertainTeed thought such claims had merit.  Additionally,

most of the trusts for the larger "big dusties" referenced by the Debtor as part of what it terms "the

bankruptcy wave"[17] were created and began accepting claims during this time.

---

[16] *See* Bates Dep. Tr. 14:21-25 Apr. 16, 2021 ("I believe there was an engagement that was several years ago that was -- involved CertainTeed and some other parties.  It had to do with looking at claims.  I wasn't involved with that matter, but I'm aware that it existed."); *see also id.* at 19:22-25 ("**Q. So if I understand you correctly, prior to the filing, there were two separate engagements of your firm by CertainTeed?** A. That's my understanding."); *id.* at 20:1-7 ("**Q. Okay. And what is your understanding of the first engagement and what the scope of the work done was?** A. I think I can't say much beyond what I just did because it involves multiple parties with confidentiality agreements associated with it, but it involved asbestos claims.") (attached as Exhibit D).

[17] *See Informational Brief of DBMP LLC* [Dkt. No. 22], at 15 (hereinafter, "Informational Br.").

33.     Despite the stark differences between this case and *Garlock*, the Debtor seeks to embark on a *Garlock*-like process for the purposes of delay, intimidation and endless litigation with a goal of creating a new aggregate liability theory at the expense of asbestos claimants' due process and individual rights.  The Bankruptcy Code does not provide for this.  Indeed, the Debtor may not use the bankruptcy process to escape or discount its liability under state tort law.  *See Butner v. United States*, 440 U.S. 48, 56 (1979) ("[A] federal bankruptcy court should take whatever steps are necessary to ensure that a [claimant] . . . is afforded in federal bankruptcy court the same protection he would have under state law if no bankruptcy had ensued.").  Likewise, a bankruptcy court's equitable powers are not intended to provide a debtor with a valuation system different than that provided outside of bankruptcy.  *See U.S. v. Noland*, 517 U.S. 535, 541 (1996).

## IV.    ESTIMATION IS NOT NECESSARY BECAUSE, ACCORDING TO THE DEBTOR, THE CLAIMS CAN BE PAID IN FULL THROUGH A FUNDING AGREEMENT THAT PROVIDES THE DEBTOR WITH ALL THE PAYING POWER OF FORMER CERTAINTEED

34.     There is no need for an estimation in this case—the asbestos claimants are not faced with trying to divide or allocate a limited pool of funding and develop a payment percentage under proposed trust distribution procedures in order to determine whether the present creditors and the FCR will support a proposed plan.  DBMP has already stated that "the combination of assets owned by DBMP and a funding agreement that is in place with [current CertainTeed] ***ensures that DBMP has the same ability to satisfy asbestos claims that [former CertainTeed] had prior to the restructuring***."[18]  The Debtor also asserted that the "asbestos claimants' ***ability to recover on their***

---

[18] *See id.*, at 25 (emphasis added); *see also Motion Of The Debtor For An Order (I) Preliminarily Enjoining Certain Actions Against Non-Debtors Or, (II) In The Alternative, Declaring That The Automatic Stay Applies To Such Actions And (III) Granting A Temporary Restraining Order Pending A Final Hearing On The Merits*, at 13, DBMP LLC v. *Those Parties Listed On Appendix A To Complaint And John And Jane Does 1-1000*, No. 20-03004 (Bankr. W.D.N.C. Jan. 23, 2020) [Dkt. No. 2] ("[T]he design of the restructuring ensures that the Debtor has the same ability to fund the costs of defending and resolving present and future asbestos claims, both in state and federal courts and in connection with any chapter 11 filing, as Old CT did before the 2019 Corporate Restructuring.").

*claims has not been adversely impacted by the 2019 Corporate Restructuring*."[19]   Thus, it is

apparent that the Debtor's approach is designed to serve primarily CertainTeed's interests, as well

as the interests of CT Holding, SGC and Saint Gobain, the Debtor's owners, by promoting an

estimation process that wears down the asbestos creditors, so they will agree to an amount less

than what they deserve.

  35. A section 524(g) plan, the Debtor's stated goal, can only be reached by agreement.

A plan must either be consensual or satisfy the test that claimants will not receive less than they

would receive in a chapter 7 case.  Because CertainTeed is (i) independently and directly liable for

the mesothelioma claims, and (ii) "is contractually obligated to, among other things: (a) fund the

costs of the Chapter 11 Case, to the extent that any cash distributions from the Debtor's operating

subsidiary, Millwork & Panel LLC ("Millwork & Panel"), are insufficient; and (b) provide funding

for a section 524(g) trust in the full amount required by a confirmed plan of reorganization, to the

extent that cash distributions from Millwork & Panel and the Debtor's other assets are insufficient

to pay such amounts",[20] *it can only receive the benefits of 524(g) consensually*.  Further, as a

debtor-in-possession, the Debtor's duties lie with the debtor's estate and to its creditors, *i.e.*, the

current and future asbestos claimants.  *See LaSalle Nat'l Bank v. Perelman*, 82 F. Supp. 2d 279,

292 (D. Del. 2000) ("The debtor in a Chapter 11 bankruptcy has a fiduciary duty to act in the best

interest of the estate as a whole, including its creditors, equity interest holders and other parties in

interest."  (citations omitted)).  Because the asbestos-related liabilities are covered by the Funding

Agreement, the Debtor's effort to challenge its asbestos-related liabilities—liabilities that were

assigned to it on the day the Debtor was created—it is evident that the Debtor's sole focus is to

---

[19] Informational Br. at 25 (emphasis added).

[20] *Id.* at 8.

minimize the amount of money CertainTeed is required to pay through the Funding Agreement.[21] The Court should decline the Debtor's invitation to engage in an estimation designed for litigation advantage that deprives the claimants of their due process rights and overrides the Debtor's fiduciary duties to its estate.

## **CONCLUSION**

For reasons stated, the Court should enter an order (i) denying the Estimation Motion; and (ii) granting such other relief as is just and appropriate.

Respectfully submitted,

Dated: Charlotte, North Carolina
September 13, 2021

HAMILTON STEPHENS STEELE
+ MARTIN, PLLC

*/s/ Glenn C. Thompson*
Glenn C. Thompson (Bar No. 37221)
525 North Tryon Street, Suite 1400
Charlotte, North Carolina 28202
Telephone: (704) 344-1117
Facsimile: (704) 344-1483
Email:  gthompson@lawhssm.com

-and-

Natalie D. Ramsey (admitted *pro hac vice*)
Davis Lee Wright (admitted *pro hac vice*)
ROBINSON & COLE LLP
1201 North Market Street, Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Facsimile: (302) 516-1699
Email: nramsey@rc.com
        dwright@rc.com

---

[21] *See* Gross Dep. Tr. at 107:20-23 ("**Q. Did you understand that an estimation proceeding was part of the objective of the bankruptcy?** A. Of course."); *see also id*. at 108:8-16 (testifying that estimation was "what happened with Garlock to a favorable outcome.  And that, you know, was where the Bestwall matter was heading, and so . . . the understanding is that the *end objective is to obtain a final asbestos liability bill for less . . . than the tort system*." (emphasis added)).

-and-

Kevin C. Maclay (admitted *pro hac vice*)
Todd E. Phillips (admitted *pro hac vice*)
James P. Wehner (admitted *pro hac vice*)
Jeffrey A. Liesemer (admitted *pro hac vice*)
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle NW, Suite 1100
Washington, DC 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301
Email: kmaclay@capdale.com
          tphillips@capdale.com
          jwehner@capdale.com
          jliesemer@capdale.com

*Counsel to the Official Committee of Asbestos*
*Personal Injury Claimants*