**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re | Chapter 11 |
| DBMP LLC,[1] | Case No. 20-30080 (JCW) |
| Debtor. | |

**MOTION OF THE DEBTOR FOR AN ORDER AUTHORIZING IT TO**
**ENTER INTO SECOND AMENDED AND RESTATED FUNDING AGREEMENT**

DBMP LLC, the debtor and debtor in possession in the above-captioned chapter 11

case (the "Debtor" or "DBMP"), moves this Court for entry of an order, pursuant to sections 105(a)

and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), authorizing it to enter

into the Second Amended and Restated Funding Agreement (the "Second Amended Funding

Agreement"), which further amends the existing Amended and Restated Funding Agreement

(the "Funding Agreement") between the Debtor and CertainTeed LLC ("New CT").[2]  In support

of this Motion, the Debtor respectfully states as follows:

**Background**

1.      The Debtor commenced this chapter 11 case (the "Chapter 11 Case") in

good faith to negotiate, formulate and ultimately confirm a consensual plan of reorganization that

fairly and equitably resolves and pays current and future asbestos-related claims.  The Debtor's

goal, if achieved, will benefit all claimants by establishing a trust guided by agreed-upon trust

distribution procedures that will process and pay claims quickly and efficiently without the cost

---

[1]      The last four digits of the Debtor's taxpayer identification number are 8817.  The Debtor's address is
20 Moores Road, Malvern, Pennsylvania 19355.

[2]      A copy of the Funding Agreement, without its Schedule 2, which includes confidential bank account
information, is attached to the *Declaration of Robert J. Panaro in Support of First Day Pleadings* [Dkt. 24]
(the "First Day Declaration") as Annex 2.

and uncertainty of litigation.    Nevertheless, the official committee of asbestos personal injury claimants (the "Asbestos Committee") and the legal representative for future asbestos claimants (the "Future Claimants' Representative" and, together with the Asbestos Committee, the "Claimant Representatives") have repeatedly charged that the Debtor's objective in this case is the exact opposite: to harm and ultimately underpay asbestos claimants.    That charge is in large measure based on arguments and innuendo about the corporate restructuring (the "Corporate Restructuring") that occurred before the Chapter 11 Case was filed, including the Funding Agreement that was put into place in connection with that restructuring.

2.    On August 10, 2021, the Court, in its decision granting the Debtor's motion for a preliminary injunction (or, alternatively, a determination that the automatic stay applies) also expressed concerns about the Funding Agreement. *See Findings of Fact and Conclusions of Law Regarding Order: (I) Declaring That the Automatic Stay Applies to Certain Actions Against Non-Debtors, (II) Denying Motion of the Official Committee of Asbestos Personal Injury Claimants to Lift the Stay, and Alternatively (III) Preliminarily Enjoining Such Actions* [Dkt. 972; Adv. Pro. Dkts. 343, 345] (the "Injunction Findings and Conclusions"), and the *Order: (I) Declaring That the Automatic Stay Applies to Certain Actions Against Non-Debtors, (II) Denying the Motion of the Official Committee of Asbestos Personal Injury Claimants to Lift the Stay, and Alternatively (III) Preliminarily Enjoining Certain Actions* [Dkt. 973; Adv. Pro. Dkt. 344] (together with the Injunction Findings and Conclusions, the "Injunction Decision"). Among others, the Court expressed concerns about the enforceability of the Funding Agreement, the ability of the Debtor and the claimants ultimately to recover amounts owed by New CT under the Funding Agreement and the potential conditionality of New CT's obligations under the Funding Agreement.

3.      The Debtor has no intention of foregoing any of its rights under the Funding Agreement (or breaching its fiduciary duties in this case) and does not believe that New CT has any intention of avoiding its obligations under the Funding Agreement. Because of the concerns raised by the Claimant Representatives and by the Court, however, the Debtor and New CT engaged in discussions to amend the Funding Agreement to provide further assurances to the Claimant Representatives, the Court and all claimants that their intent in implementing the Corporate Restructuring was not to harm claimants but rather to protect them by ensuring, through the Funding Agreement, that the same assets that were available to pay claims before the Corporate Restructuring remained available after the Corporate Restructuring. As a result of these discussions, the Debtor and New CT have reached agreement on a series of amendments to the Funding Agreement that address the concerns raised by the Claimant Representatives and the Court. The Debtor respectfully requests that the Court authorize it to enter into the Second Amended Funding Agreement, which memorializes these amendments.

## Jurisdiction

4.      This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

5.      By this Motion, the Debtor seeks entry of an order pursuant to sections 105(a) and 363(b) of the Bankruptcy Code authorizing it to enter into the Second Amended Funding Agreement.

## Relevant Facts

6.      The Debtor and its predecessor, the former CertainTeed LLC ("Old CT"), have been the subject of asbestos-related claims since the 1970s, and this litigation is anticipated

to continue for decades more.  First Day Decl. ¶ 27; *see also* Injunction Findings and Conclusions ¶¶ 30, 36.  As of the commencement of the Chapter 11 Case, more than 60,000 asbestos-related claims and associated lawsuits were pending against DBMP in jurisdictions throughout the United States, with approximately 32,700 of them on active dockets.  First Day Decl. ¶ 28; *see also* Injunction Findings and Conclusions ¶ 35.

7.      In October 2019, Old CT underwent the Corporate Restructuring by completing a divisional merger under the Texas Business Organizations Code.  First Day Decl. ¶ 15; *see also* Injunction Findings and Conclusions ¶ 52.   As a result of the Corporate Restructuring, (a) Old CT ceased to exist and (b) two new companies were formed: (i) DBMP and (ii) New CT.  First Day Decl. ¶ 10; *see also* Injunction Findings and Conclusions ¶ 52.  As part of the restructuring, all of Old CT's asbestos liabilities and certain assets of Old CT were allocated to DBMP.  First Day Decl. ¶ 18.  All of Old CT's remaining assets and liabilities were allocated to New CT in the restructuring.  *Id.* ¶ 19.

8.      A key objective of the Corporate Restructuring was to make certain that DBMP has the same ability to fund the costs of defending and resolving present and future asbestos claims as Old CT had before the restructuring, including in connection with any chapter 11 filing. *Id.* ¶ 20.  Thus, as part of the Corporate Restructuring, DBMP and New CT became parties to the Funding Agreement.  *Id.* ¶ 15.  The Funding Agreement requires New CT to fund, without any corresponding repayment obligation, (a) the cost of the Chapter 11 Case, if and to the extent that cash distributions received by the Debtor from its non-debtor subsidiary are insufficient to pay these costs and expenses; and (b) a section 524(g) trust established under a confirmed plan of

reorganization, if and to the extent the Debtor's assets are insufficient to provide the requisite trust

funding. Funding Agreement at 5 (definition of Permitted Funding Use).[3]

9.      Since the Funding Agreement became effective, the parties have fully

complied with their obligations thereunder. *See* Injunction Findings and Conclusions ¶ 108 ("To

this point, [New CT] has performed under the Funding Agreement."); *Declaration of Mark. A.*

*Rayfield*, Adv. Pro. Dkt. 238, Ex. D (Feb. 18, 2021) (the "Rayfield Decl."), ¶ 13. Through July 31,

2021, New CT has provided the Debtor with a total of nearly $72.5 million of funding. *See*

Rayfield Decl. ¶ 13 (noting $64.5 million in funding as of February 18, 2021); *see also Monthly*

*Status Reports* for March 2021 [Dkt. 811 at 5] (identifying an additional $3 million in funding)

and June 2021 [Dkt. 953 at 5] (identifying an additional $5 million in funding).

10.     Notwithstanding this ongoing compliance with the terms of the Funding

Agreement, the Claimant Representatives from time to time have raised concerns about the terms

of the agreement. For example, during the hearing on the Debtor's preliminary injunction motion,

the Asbestos Committee raised concerns about the ability of New CT to issue dividends or forgive

intercompany loans and the limitation that fundable costs be "necessary or appropriate." *See* Hr'g

Tr. Mar. 1, 2021 at 54:23-56:2.

***The Second Amended Funding Agreement***

11.     On September 15, 2021, the Debtor and New CT agreed to the terms of the

Second Amended Funding Agreement, which is attached hereto as <u>Exhibit A</u> (without its

Schedule 2, which includes confidential bank account information). A blackline showing the

changes made to the Funding Agreement is attached hereto as <u>Exhibit B</u>. The Debtor and New CT

---

[3]      *See also* Hr'g Tr. Mar. 1, 2021 at 32:18-33:1 (counsel to the Debtor describing the Funding Agreement and noting that its purpose was to "ensure no diminution in the ability to pay asbestos claims," that it "is an uncapped agreement" and that "[t]here is no obligation [for the Debtor] to repay under that [F]unding [A]greement.").

also agreed to the form of an order approving the Second Amended Funding Agreement, which

agreed order is attached hereto as Exhibit C (the "Proposed Agreed Order"). The key terms of the

Second Amended Funding Agreement and the Proposed Agreed Order are summarized below.

### The Terms of the Second Amended Funding Agreement[4]

12.    The Second Amended Funding Agreement includes the following key

amendments to the Funding Agreement:

- *Removal of "Necessary or Appropriate" Language.* The definition of "Permitted Funding Use" has been modified to remove, in several places, the statement that amounts funded be "necessary or appropriate." Second Amended Funding Agreement at 6-7. A similar change was made in the description of New CT's funding obligation in Section 2(a) of the Second Amended Funding Agreement. *Id.* at 7 (removing the phrase "necessary for the Payee to fund"). The purpose of these changes is to eliminate any potential uncertainty regarding New CT's obligation to fund.

- *Plan Funding Available Without New CT's Consent or § 524(g) Protection.* In part (c) of the definition of "Permitted Funding Use," language has been added to make explicitly clear that funding under the Second Amended Funding Agreement will be available for a section 524(g) plan of reorganization, "regardless of whether such plan of reorganization provides that [New CT] will receive the protection of section 524(g) of the Bankruptcy Code and regardless of whether [New CT] supports such plan of reorganization."[5] *Id.* at 6.

- *Funding Available to the Debtor to Pursue Remedies.* The definition of "Permitted Funding Use" also has been revised to make clear that funding will be available for the payment of "any and all costs and expenses of the [Debtor] incurred in connection with the pursuit of available remedies to collect any unfunded Payments due and owing to the [Debtor] or otherwise to enforce the performance by [New CT] of any provision of this Agreement." *Id.* at 6 (new subpart (f) to the definition of Permitted Funding Use).

---

[4]    The description of the Second Amended Funding Agreement set forth herein is provided for the convenience of the Court and parties in interest and is qualified in its entirety by the Second Amended Funding Agreement. In the event of any inconsistency between the description herein and the Second Amended Funding Agreement, the Second Amended Funding Agreement shall govern in all respects.

[5]    The Debtor and New CT determined to add this clarification to the Funding Agreement to address concerns raised by the Court, *see* Injunction Findings and Conclusions at 23, despite the fact that the Funding Agreement did not require, as a condition to funding, that New CT obtain relief pursuant to section 524(g) or agree to the terms of a confirmed plan.

- *Providing Financial Information to the Claimant Representatives.* Section 4(a) of the Second Amended Funding Agreement has been modified to expressly allow for the Debtor to provide to counsel for the Claimant Representatives copies of the financial information received from New CT under the Second Amended Funding Agreement. *Id.* at 10. This change memorializes a practice that already has been in place. The Claimant Representatives have been provided with all such financial information to date, subject to the protective order in the Chapter 11 Case. *See* DBMP-BR_0162618-28, DBMP-BR_0194534-38, DBMP-BR_0195277-81, DBMP-BR_0198267-71, DBMP-BR_0198328-32 (New CT Quarterly and Annual Financial Statements covering 2020 through June 30, 2021).

- *Prohibition on Dividends.* Section 4(c)(i) of the Second Amended Funding Agreement is a new provision that provides that New CT "shall not make any Dividend."[6] Second Amended Funding Agreement at 12. The only exception is for distributions "solely to fund Payor Tax Liabilities;" *i.e.*, to pay federal income taxes on income for which New CT is responsible.[7] *Id.*

- *Prohibition on Forgiveness of Intercompany Debt.* Section 4(c)(ii) of the Second Amended Funding Agreement is a new provision that provides that New CT "shall not forgive any obligation owed to it by an Affiliate" and "shall cause each of its Subsidiaries not to forgive any obligation owed to such Subsidiary by an Affiliate." *Id.*

- *No Agreements Prohibiting Payments Under the Funding Agreement.* Section 4(d) of the Second Amended Funding Agreement is a new provision that provides that New CT "will not consensually enter into any contract that prohibits [it] from making Payments under this Agreement." *Id.*

- *No Indemnification During the Chapter 11 Case.* Section 5 of the Second Amended Funding Agreement has been clarified, consistent with the parties' intent, to provide that the Debtor's obligations to perform its indemnification obligations to New CT are subject to the automatic stay in the Chapter 11 Case, such that the Debtor is not obligated to indemnify

---

[6]    Under the Second Amended Funding Agreement, "Dividend" means: "with respect to any entity, a distribution of cash or any other assets or properties made by such entity to such entity's member or parent company." *Id.* at 4.

[7]    Under the Second Amended Funding Agreement, "Payor Tax Liabilities" means: "the portion of any tax liabilities of the consolidated tax group of which the Payor is a member that arises from the income of the Payor, any Subsidiaries of the Payor that are disregarded entities for tax purposes, and any entities whose tax items are included in the Payor's tax items pursuant to the Amended and Restated Tax Item Allocation Agreement, effective as of October 23, 2019, to which the Payor and the Payee are parties." *Id.* at 5-6. This exception therefore allows only Dividends that are for the purpose of funding a tax liability of the parent or member of New CT arising from the income of New CT, any of its subsidiaries that are disregarded entities for tax purposes (*i.e.*, LLCs) and the entities (*i.e.*, DBMP and its subsidiary, Millwork & Panel LLC) whose tax items are included in New CT's tax items under the Amended and Restated Tax Item Allocation Agreement.

New CT during the pendency of this Chapter 11 Case as a condition to obtain funding. *Id.*

- *Shortening New CT's Cure Periods for Defaults.* Section 6(b) of the Second Amended Funding Agreement was modified to substantially shorten (by two-thirds) the periods for New CT to cure certain defaults to promote prompt compliance with the agreement. *Id.*

- *Jurisdiction of the Bankruptcy Court to Enforce the Agreement.* Section 9 of the Second Amended Funding Agreement was modified to make clear that, during the pendency of the Chapter 11 Case, the parties submit to the jurisdiction of this Court in connection with any legal proceeding seeking to enforce any provision of, or based on any matter arising under, the Second Amended Funding Agreement. *Id.* at 14.

### The Terms of the Proposed Agreed Order

13.    The Debtor and New CT also have agreed on the terms of the Proposed

Agreed Order, which, among other things, provides for the following:

- *Enforceable Agreement.* A finding that "the Second Amended Funding Agreement is a valid contract, enforceable in accordance with its terms." Proposed Agreed Order at 2.

- *Timely Distribution of Financial Information to Claimant Representatives.* Delivery by the Debtor to counsel for the Claimant Representatives of copies of the financial information received from New CT under Section 4(a) of the Second Amended Funding Agreement within five business days after receiving such information, to ensure no delay in the distribution of that information. Proposed Agreed Order ¶ 3. As noted, the Debtor has been providing such information to the Claimant Representatives during this case.

- *Contract Notices Provided Timely to Claimant Representatives.* Delivery by the Debtor to counsel for the Claimant Representatives of copies of (a) any notices received from New CT under the Second Amended Funding Agreement within five business days after receiving such notice and (b) any notices given by the Debtor to New CT (including any Notices of Default) under the Second Amended Funding Agreement within three business days after giving such notice. Proposed Agreed Order ¶ 4. This will allow the Claimant Representatives to timely monitor the implementation of and compliance with the agreement.

- *Funding Requests and Proof of Funding Provided Timely to Claimant Representatives* Delivery by the Debtor to counsel for the Claimant Representatives of (a) copies of all funding requests under Section 2(b) of the Second Amended Funding Agreement within three business days of the Debtor making such request and (b) copies of proof of funding of each such

funding request within five business days of such proof becoming available to the Debtor. Proposed Agreed Order ¶ 5. This will allow the Claimant Representatives to timely monitor the implementation of and compliance with the agreement.

- *Claimant Representatives' Right to Enforce the Agreement.* If, upon an Event of Default under Section 6 of the Second Amended Funding Agreement, the Debtor fails to take action to enforce its remedies against New CT, then the Debtor and New CT agree that the Claimant Representatives may take such actions as are necessary or appropriate on behalf of the Debtor to pursue remedies in this Court after first giving the Debtor 10 business days' advance written notice.[8] Proposed Agreed Order ¶ 6.

## Basis for Relief Requested

14.     The Second Amended Funding Agreement does not require any direct expenditure of estate funds or result in the reduction of any assets available to the estate; indeed, the opposite is true. Nevertheless, the Debtor seeks approval for this agreement because of (a) the importance of the Funding Agreement to this Chapter 11 Case, (b) the fact this agreement is with a non-debtor affiliate of the Debtor and (c) the need for the Court's approval of the enforcement provisions set forth in the Proposed Agreed Order. The Debtor thus believes it is appropriate for the Court to enter an order, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, authorizing the Debtor to enter into the Second Amended Funding Agreement and granting the other relief included in the Proposed Agreed Order.

15.     Section 105(a) of the Bankruptcy Code provides that the Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). This section thus grants bankruptcy courts broad authority and discretion to enforce the provisions of the Bankruptcy Code either under specific

---

[8]     Pursuant to the Proposed Agreed Order, any disagreement between the Debtor and the Claimant Representatives about whether there is an Event of Default under the Second Amended Funding Agreement will be resolved by this Court. Proposed Agreed Order ¶ 6.

statutes or under equitable common law principles.   Courts, both within and outside the Fourth

Circuit, have exercised the grant of authority under section 105(a) in a wide variety of situations

within the confines of the Bankruptcy Code.   *See In re Tate*, 253 B.R. 653, 667 (Bankr. W.D.N.C.

2000) (citing cases which approved, under section 105, damages for violations of Bankruptcy Code

sections, stayed proceedings and enjoined transfer of claims as examples); *see also In re Pier 1

Imports, Inc.*, 615 B.R. 196, 201 n.7 (Bankr. E.D. Va. 2020) (recognizing broad equitable powers

of the bankruptcy court under section 105 to delay debtors' payment of certain accrued but unpaid

rent).   And these situations include approval of agreements between the Debtor and non-debtor

parties.   *See In re Georgetown Steel Co., LLC*, 306 B.R. 549, 559 (Bankr. D.S.C. 2004) (approving

retention plan proposed by the debtor under sections 105 and 363 of the Bankruptcy Code).

   16. Section 363(b) of the Bankruptcy Code provides that a debtor "after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate."   11 U.S.C. § 363(b)(1).   Under applicable case law in this and other circuits, a court may

authorize the use, sale or lease of a debtor's property outside of the ordinary course of business

under section 363(b)(1) of the Bankruptcy Code where a sound business purpose exists for doing

so.   *See, e.g.*, *In re MCSGlobal Inc.*, Case No. 15-11674-BFK, 2017 Bankr. LEXIS 16, *12 (Bankr.

E.D. Va. Jan. 4, 2017) ("Courts generally look to the trustee's business judgment in analyzing

asset sales under Section 363(b)."); *In re Century Drive LHDH, LLC*, Case No. 10-01253-8-SWH,

2010 Bankr. LEXIS 1453, *4 (Bankr. E.D.N.C. Apr. 28, 2010) ("court should consider whether

the debtor-in-possession has exercised sound business judgment such that approval of

the proposed course of action is warranted.").

   17. When a debtor articulates a valid business justification, "[i]t has been

recognized that courts should approve the exercise of a debtor's business judgment unless it is 'so

manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, whim or caprice.'" *See Georgetown Steel Co.*, 306 B.R. at 555 (quoting *In re Aerovox, Inc.*, 269 B.R. 74, 80 (Bankr. D. Mass. 2001)).  Indeed, under the business judgment standard, courts "will generally not entertain objections to the debtor's conduct" if the debtor "articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously)." *See Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

18.    Here, the Funding Agreement is a critical asset of the estate and the proposed amendments and clarifications contained in the Second Amended Funding Agreement will strengthen that agreement for the benefit of the chapter 11 estate and its stakeholders.  The changes included in the Second Amended Funding Agreement are intended to address concerns expressed by the Court and the Claimant Representatives during the course of this Chapter 11 Case. *See supra*, ¶¶ 2, 10.  These changes provide further assurances that the promised benefits of the Funding Agreement will be available and enforceable by the estate for the benefit of stakeholders, including those represented by the Claimant Representatives.  As detailed above, among other things, the Second Amended Funding Agreement:  (a) removes any uncertainty in the language of the Funding Agreement about its availability to fund all amounts needed by the Debtor (*e.g.*, by removing the phrase "necessary or appropriate" as a qualifier to available funding); (b) makes clear that funding is available for a section 524(g) plan regardless of whether New CT approves of the plan or obtains the benefit of channeling injunction thereunder; (c) prohibits certain transactions that potentially could impact New CT's ability to provide funding, including by prohibiting New CT from issuing Dividends or New CT and its subsidiaries from forgiving intercompany debt; (d) provides for the submission to the jurisdiction of this Court

to enforce the agreement; and (e) clarifies that any costs incurred by the Debtor to pursue remedies for breach of the agreement can be funded by draws under the Funding Agreement. *Supra*, ¶ 12. In addition, the Proposed Agreed Order makes clear that, in the event the Debtor fails to enforce its remedies against New CT during an Event of Default, the Claimant Representatives may take such actions on behalf of the Debtor to enforce those remedies, and further ensures that the Claimant Representatives receive notices related to the Funding Agreement to assist them in monitoring compliance. *Supra*, ¶ 13.

19.     The Debtor submits that the terms of the Second Amended Funding Agreement are fair and reasonable and entry into the Second Amended Funding Agreement constitutes a sound exercise of the Debtor's business judgment. The amendments, together with the terms of the Proposed Agreed Order, clarify and/or bolster the protections afforded by the Funding Agreement, without imposing any obligations on the Debtor (except to provide information to the Claimant Representatives). The amendments and the terms of the Proposed Agreed Order also make clear that the Second Amended Funding Agreement is enforceable and subject to the jurisdiction of this Court for that purpose. Accordingly, approval of the Second Amended Funding Agreement and entry of the Proposed Agreed Order are in the best interests of the Debtor's estate and creditors and are appropriate.

## Notice

20.     Consistent with the *Order Establishing Certain Notice, Case Management and Administrative Procedures* [Dkt. 27] (the "Case Management Order"), notice of this Motion has been provided to: (a) the Office of the United States Bankruptcy Administrator for the Western District of North Carolina; (b) counsel to the Asbestos Committee; (c) counsel to the Future Claimants' Representative; (d) counsel to New CT; and (e) the other parties on the Service List

established by the Case Management Order. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be provided.

## **No Prior Request**

21. No prior request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtor respectfully requests that the Court enter the Proposed Agreed Order granting (a) the relief requested herein and (b) such other and further relief to the Debtor as the Court may deem proper.

Dated: September 15, 2021
     (Charlotte, North Carolina)

Respectfully submitted,

*/s/  Garland S. Cassada*
Garland S. Cassada (NC Bar No. 12352)
David M. Schilli (NC Bar No. 17989)
Andrew W.J. Tarr (NC Bar No. 31827)
ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina  28246
Telephone:  (704) 377-2536
Facsimile:  (704) 378-4000
E-mail:  gcassada@robinsonbradshaw.com
       dschilli@robinsonbradshaw.com
       atarr@robinsonbradshaw.com

Gregory M. Gordon (TX Bar No. 08435300)
Amanda Rush (TX Bar No. 24079422)
JONES DAY
2727 North Harwood Street, Suite 500
Dallas, Texas  75201
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100
E-mail:  gmgordon@jonesday.com
       asrush@jonesday.com
(Admitted *pro hac vice*)

Jeffrey B. Ellman (GA Bar No. 141828)
JONES DAY
1221 Peachtree St. NE, Ste. 400
Atlanta, Georgia  30361
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330
E-mail:  jbellman@jonesday.com
(Admitted *pro hac vice*)

ATTORNEYS FOR DEBTOR AND
DEBTOR IN POSSESSION

## **EXHIBIT A**

## SECOND AMENDED AND RESTATED FUNDING AGREEMENT

This SECOND AMENDED AND RESTATED FUNDING AGREEMENT, dated as of September 15, 2021 (as it may be amended, restated, modified or supplemented from time to time, this "Agreement") is between CERTAINTEED LLC, a Delaware limited liability company ("Payor"), and DBMP LLC, a North Carolina limited liability company ("Payee").

## RECITALS

A.      Prior to and in contemplation of the conversion of CertainTeed LLC, a Delaware limited liability company ("Old CT (DE)"), to a Texas limited liability company (as such, "Old CT (TX)") and the subsequent divisional merger of Old CT (TX) pursuant to Chapter 10 of the TBOC (the "Divisional Merger"), CertainTeed Holding Corporation, a Delaware corporation ("CT Holding"), as payor, and Old CT (DE), as payee, executed and delivered a Funding Agreement, dated as of October 22, 2019 (the "Original Funding Agreement").

B.      Immediately after the execution of the Original Funding Agreement and prior to the Divisional Merger, Old CT (DE) converted from a Delaware limited liability company into a Texas limited liability company, Old CT (TX), pursuant to Section 18.216 of the Delaware Limited Liability Company Act and Section 10.102 of the TBOC (the "TX Conversion").

C.      Immediately following the effectiveness of the TX Conversion, CT Holding, in its capacity as the sole member of CT (TX), approved a Plan of Divisional Merger contemplating the Divisional Merger (the "Plan of Divisional Merger").

D.      At the effective time of the Divisional Merger, (1) certain property of CT (TX), as set forth on Schedule 5(b)(i) to the Plan of Divisional Merger and certain liabilities and obligations of CT (TX), as set forth on Schedule 5(c)(i) to the Plan of Divisional Merger (collectively, the "Allocated Assets and Liabilities") were allocated to a new Texas limited liability company created upon the effectiveness of the Divisional Merger ("DBMP (TX)"), (2) the remaining property, liabilities and obligations of CT (TX) were allocated to another new Texas limited liability company created upon effectiveness of the Divisional Merger ("New CT (TX)"), and (3) CT (TX) ceased to exist.

E.      Immediately following the effectiveness of the Divisional Merger, CT Holding assigned to New CT (TX), and New CT (TX) assumed from CT Holding, all rights and obligations of CT Holding under the Original Funding Agreement (such assignment and assumption, the "Post-Merger Assignment"), whereupon CT Holding was released from its obligations, and ceased to have any further obligations, under the Original Funding Agreement.

F.      Following the Divisional Merger and the Post-Merger Assignment, (1) New CT (TX) effected a conversion (the "DE Conversion") into Payor, a Delaware limited liability company, and (2) DBMP (TX) effected a conversion (the "NC Conversion") into Payee, a North Carolina limited liability company.

G.      In connection with the allocation to DBMP (TX) of the Allocated Assets and Liabilities, CT Holding and its successors and assigns agreed, pursuant to the Original Funding Agreement, to provide funding to Old CT (DE) and, after the TX Conversion, CT (TX), and,

after the Divisional Merger, DBMP (TX) and, after the NC Conversion, DBMP, sufficient to pay the costs of operations of DBMP's business and other liabilities and obligations included in the Allocated Assets and Liabilities as and when they become due.

H.     The Allocated Assets and Liabilities included the rights and obligations of CT (TX) (as successor to Old CT (DE) in the TX Conversion) under the Original Funding Agreement, and, at the effective time of the Divisional Merger, pursuant to the terms and conditions of the Plan of Divisional Merger, the rights and obligations of CT (TX) under the Original Funding Agreement were allocated to DBMP (TX) such that, following the effectiveness of the Divisional Merger, DBMP (TX), and, following the NC Conversion, DBMP, had assets having a value at least equal to its liabilities and had financial capacity sufficient to satisfy its obligations as they become due in the ordinary course of business, including any Asbestos Related Liabilities.

I.     Payor and Payee then amended and restated the Original Funding Agreement to reflect that the Merger, the Post-Merger Assignment, the DE Conversion and the NC Conversion had occurred and Payor, a Delaware limited liability company having the name "CertainTeed LLC," and Payee, a North Carolina limited liability company having the name "DBMP LLC," were the parties to such agreement (as so amended and restated, the "<u>Amended and Restated Funding Agreement</u>").

J.     Payor and Payee now desire to amend and restate the Amended and Restated Funding Agreement to incorporate certain changes intended to clarify the terms hereof and further enhance the rights of Payee consistent with the purposes of this Agreement.

AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, the parties hereto agree as follows:

1.     <u>Definitions</u>.  As used in this Agreement, the following terms have the meanings herein specified unless the context otherwise requires:

"<u>Affiliate</u>" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.  For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"<u>Allocated Assets and Liabilities</u>" has the meaning specified in the recitals to this Agreement.

"<u>Amended and Restated Funding Agreement</u>" has the meaning specified in the recitals to this Agreement.

"Asbestos Related Liabilities" has the meaning specified in Schedule 1 to this Agreement.

"Bankruptcy Case" means any voluntary case under chapter 11 of the Bankruptcy Code commenced by the Payee in the Bankruptcy Court.

"Bankruptcy Code" means title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"Bankruptcy Court" means the United States Bankruptcy Court where the Bankruptcy Case is commenced.

"Base Rate" means, for any day, a fluctuating interest rate per annum as shall be in effect from time to time, which rate per annum shall at all times be equal to the greater of (a) the rate of interest established by Bank of America, N.A from time to time, as its "prime rate," whether or not publicly announced, which interest rate may or may not be the lowest rate charged by it for commercial loans or other extensions of credit, and (b) the Federal Funds Effective Rate in effect from time to time, determined one Business Day in arrears, plus 1/2 of 1% per annum.

"Board" means: (a) with respect to a corporation, the board of directors of the corporation or any committee thereof; (b) with respect to a partnership, the board of directors, the managing member or members or the board of managers, as applicable, of the general partner of the partnership; (c) with respect to a limited liability company, the managing member or members or the board of managers, as applicable, of the limited liability company; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"Business Day" means each day other than a Saturday, a Sunday or a day on which banking institutions in Charlotte, North Carolina or at a place of payment are authorized by law, regulation or executive order to remain closed.

"Capital Stock" means: (a) in the case of a corporation, corporate stock; (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock; (c) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person; but excluding (in each case of (a) through (d) above) any debt securities convertible into such equity securities.

"Contractual Obligation" means, as to any Person, any obligation or similar provision of any security issued by such Person or any agreement, instrument or other undertaking (excluding this Agreement) to which such Person is a party or by which it or any of its property is bound.

"CT (DE)" has the meaning specified in the recitals to this Agreement.

"CT Holding" has the meaning specified in the recitals to this Agreement.

"CT (TX)" has the meaning specified in the recitals to this Agreement.

"DBMP" has the meaning specified in the recitals to this Agreement.

"DBMP (TX)" has the meaning specified in the recitals to this Agreement.

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"DE Conversion" has the meaning specified in the recitals to this Agreement.

"District Court" means the United States District Court in the district of the Bankruptcy Court.

"Dividend" means, with respect to any entity, a distribution of cash or any other assets or properties made by such entity to such entity's member or parent company.

"Divisional Merger" has the meaning specified in the recitals to this Agreement.

"Event of Default" has the meaning specified in Section 6.

"Federal Funds Effective Rate" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York.

"Funding Account" means the account of the Payee listed on Schedule 2 to this Agreement, into which the proceeds of all Payments made under this Agreement shall be deposited, or such other account designated in writing by the Payee to the Payor from time to time.

"Funding Date" has the meaning specified in Section 2(b).

"Funding Request" has the meaning specified in Section 2(b).

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, in effect from time to time, consistently applied.  If at any time any change in GAAP (including any adoption of International Financial Reporting Standards) would materially affect the computation of any amount required to be computed under this Agreement, the Payor may give written notice to the Payee of its intent to preserve the original intent of this Agreement and upon delivery of such notice, such amounts shall be calculated in accordance with GAAP as in effect at the end of the fiscal period ended immediately prior to such change in GAAP.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority,

instrumentality regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"NC Conversion" has the meaning specified in the recitals to this Agreement.

"New CT" has the meaning specified in the recitals to this Agreement.

"New CT (TX)" has the meaning specified in the recitals to this Agreement.

"Organizational Documents" means: (a) with respect to any corporation, its certificate or articles of incorporation and bylaws; (b) with respect to any limited liability company, its certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation of such entity.

"Original Funding Agreement" has the meaning specified in the recitals to this Agreement.

"Payee" has the meaning specified in the first paragraph of this Agreement.

"Payee Affiliate" means any wholly owned Affiliate of the Payee (and in no case includes the Payor or any Payor Affiliate).

"Payee Material Adverse Effect" means: (a) a material impairment of the rights and remedies of the Payor under this Agreement, or of the ability of the Payee to perform its material obligations under this Agreement; or (b) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payee.

"Payment" has the meaning specified in Section 2(a).

"Payor" has the meaning specified in the first paragraph of this Agreement.

"Payor Affiliate" means any wholly owned Affiliate of the Payor (and in no case includes the Payee or any Payee Affiliate).

"Payor Material Adverse Effect" means: (a) a material adverse change in, or a material adverse effect upon, the business, assets, liabilities (actual or contingent) or financial condition of the Payor and its Subsidiaries, taken as a whole; (b) a material impairment of the rights and remedies of the Payee under this Agreement, or of the ability of the Payor to perform its material obligations under this Agreement; or (c) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payor.

"Payor Tax Liabilities" means the portion of any tax liabilities of the consolidated tax group of which the Payor is a member that arises from the income of the Payor, any Subsidiaries

of the Payor that are disregarded entities for tax purposes, and any entities whose tax items are included in the Payor's tax items pursuant to the Amended and Restated Tax Item Allocation Agreement, effective as of October 23, 2019, to which the Payor and the Payee are parties.

"Permitted Funding Use" means each of the following:

(a) the payment of any and all costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee) at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee;

(b) the payment of any and all costs and expenses of the Payee incurred during the pendency of any Bankruptcy Case, including the costs of administering the Bankruptcy Case and any and all other costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee);

(c) the funding of any amounts to satisfy (i) the Payee's Asbestos Related Liabilities established by a judgment of a court of competent jurisdiction or final settlement thereof at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee; (ii) following the commencement of any Bankruptcy Case, the Payee's Asbestos Related Liabilities in connection with the funding of a trust under section 524(g) of the Bankruptcy Code for the benefit of existing and future claimants that is included in a plan of reorganization for the Payee confirmed by a final, nonappealable order of the Bankruptcy Court and the District Court (for the avoidance of doubt, regardless of whether such plan of reorganization provides that the Payor will receive the protection of section 524(g) of the Bankruptcy Code and regardless of whether the Payor supports such plan of reorganization); and (iii) in the case of either (i) or (ii), any ancillary costs and expenses of the Payee associated with such Asbestos Related Liabilities and any litigation thereof, including the costs of any appeals;

(d) the funding of any amounts necessary to cause the Funding Account to contain at least $5,000,000 at such time;

(e) the funding of any obligations of the Payee owed to the Payor or any Payor Affiliate, including any indemnification or other obligations of the Payee under any agreement provided for in the Plan of Divisional Merger; and

(f) the payment of any and all costs and expenses of the Payee incurred in connection with the pursuit of available remedies to collect any unfunded Payments due and owing to the Payee or otherwise to enforce the performance by the Payor of any provision of this Agreement;

in the case of clauses (a) through (f) above, solely to the extent that any cash distributions theretofore received by the Payee from its Subsidiaries are insufficient to pay such costs and expenses and fund such amounts and obligations in full and further, in the case of

clause (c)(ii) above, solely to the extent the Payee's other assets are insufficient to satisfy the Payee's Asbestos Related Liabilities in connection with the funding of such trust.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"Plan of Divisional Merger" has the meaning specified in the recitals to this Agreement.

"SEC" means the Securities and Exchange Commission.

"Subsidiary" means any Person a majority of the outstanding Voting Stock of which is owned or controlled by the Payor or by one or more other Subsidiaries and that is consolidated in the Payor's accounts.

"TX Conversion" has the meaning specified in the recitals to this Agreement.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of such Person.

2.      Funding Obligations and Procedures.

(a)      Funding Obligations.   The Payor hereby agrees, on the terms and conditions set forth in this Agreement, upon the request of the Payee from time to time in accordance with the requirements of Section 2(b), to make payments to the Payee (each, a "Payment"), the proceeds of which shall be used by the Payee for any Permitted Funding Use.  Nothing in this Agreement shall obligate the Payor to make Payments under this Agreement that in the aggregate exceed the aggregate amount of all Permitted Funding Uses, and nothing in this Agreement shall obligate the Payor to make any individual payment under this Agreement that exceeds the amount requested by the Payee in the applicable Funding Request.

(b)      Funding Requests.  To request a Payment, the Payee shall deliver to the Payor a written request (which written request may be a .pdf delivered via email) for such Payment in a form reasonably acceptable to the Payor and signed by the Payee (each, a "Funding Request").  Each Funding Request shall specify (i) the amount of the requested Payment, which shall be no less than $500,000, and (ii) the date of the requested Payment, which shall be the date that is five Business Days following the delivery of such Funding Request (each such date, a "Funding Date").  Each Funding Request by the Payee shall constitute a representation and warranty by the Payee that the conditions set forth in Section 2(d) have been satisfied.  Except as required to comply with the minimum requirements in Section 2(b)(i), Payee shall not deliver a Funding Request for an amount in excess of the aggregate amount necessary for the Payee to fund all current Permitted Funding Uses and all projected Permitted Funding Uses over the 30 days following the date of such Funding Request.

(c)      Payments.  Subject only to the satisfaction of the conditions set forth in Section 2(d), on any Funding Date, the Payor shall pay or cause to be paid to the Payee

an amount equal to the amount of the requested Payment specified in the applicable Funding Request. All Payments shall be made by wire or other transfer of immediately available funds, in United States dollars, to the Funding Account.  In the event that the Payor does not make any Payment within the time period required by this <u>Section 2(c)</u>, the amount of the requested Payment shall bear interest at a rate per annum equal to the Base Rate *plus* 2% until such Payment is made and the Payor shall include any interest accruing pursuant to this <u>Section 2(c)</u> in the next Payment made to the Payee.

(d)      <u>Conditions to Payments</u>.  The Payor's obligation to make any Payment is subject to the satisfaction of the following conditions as of the date of the Funding Request relating to such Payment (i) the representations and warranties of the Payee set forth in <u>Section 3(b)</u> shall be true and correct without regard to the impact of any Bankruptcy Case, including any notices or other actions that may be required therein, and (ii) there shall have been no violation by the Payee of the covenant set forth in <u>Section 5</u>.

3.      <u>Representations and Warranties</u>.

(a)      <u>Representations and Warranties of the Payor</u>.  The Payor represents and warrants to the Payee that:

(i)      <u>Existence, Qualification and Power</u>.  The Payor (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement, and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payor Material Adverse Effect.

(ii)      <u>Authorization; No Contravention</u>. The execution, delivery and performance by the Payor of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payor Material Adverse Effect.

(iii)      <u>Governmental Authorization; Other Consents</u>.  No approval, consent, exemption, authorization or other action by, or notice to, or filing with,

any Governmental Authority or any other Person is necessary or required in connection with the execution delivery or performance of this Agreement by, or enforcement against, the Payor.

(iv)    Binding Effect.    This Agreement has been duly executed and delivered by the Payor.  This Agreement constitutes a legal, valid and binding obligation of the Payor, enforceable against the Payor in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

(b)    Representations and Warranties of the Payee.  The Payee represents and warrants to the Payor that:

(i)    Existence, Qualification and Power.  The Payee (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(ii)    Authorization; No Contravention.  The execution, delivery and performance by the Payee of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(iii)    Governmental Authorization; Other Consents.  No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution delivery or performance of this Agreement by, or enforcement against, the Payee.

(iv)    Binding Effect.  This Agreement has been duly executed and delivered by the Payee.  This Agreement constitutes a legal, valid and binding

obligation of the Payee, enforceable against the Payee in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

4.      <u>Covenants of the Payor</u>.

(a)      <u>Provision of Financial Information</u>.

(i)      The Payor will furnish to the Payee, no later than 90 days after the end of each fiscal year (in the case of annual financial statements) and 60 days after the end of each fiscal quarter other than the last fiscal quarter (in the case of quarterly financial statements), unaudited annual and quarterly consolidated financial statements prepared in accordance with GAAP (subject to the absence of notes to the financial statements and related disclosures, and, with respect to quarterly financial statements, normal year-end audit adjustments).

(ii)      By accepting such financial information, the Payee will be deemed to have represented to and agreed with the Payor that: (A) it will not use the information in violation of applicable securities laws or regulations; and (B) it will not communicate the information to any Person, including in any aggregated or converted form, and will keep the information confidential, other than where disclosure of such information is required by law, regulation or legal process (in which case the Payee shall, to the extent permitted by law, notify the Payor promptly thereof); *provided however*, that the Payee may deliver a copy thereof to counsel for any official committee of asbestos claimants and any future claimants' representative appointed in any Bankruptcy Case on a confidential basis under a protective order entered in such Bankruptcy Case.

(iii)      Notwithstanding the foregoing, the financial statements, information and other documents required to be provided as described in <u>Section 4(a)(i)</u>, may be, rather than those of the Payor, those  of any direct or indirect parent of the Payor.  Notwithstanding the foregoing, the Payor may fulfill the requirement to distribute such financial information by filing the information with the SEC within the applicable time periods required by the SEC.  The Payor will be deemed to have satisfied the reporting requirements of <u>Section 4(a)(i)</u> if any direct or indirect parent of the Payor has filed such reports containing such information with the SEC within the applicable time periods required by the SEC and such reports are publicly available.  To the extent a direct or indirect parent of the Payor provides financial statements, information and other documents pursuant to the first sentence of this <u>Section 4(a)(iii)</u> or such parent files such report with the SEC pursuant to the third sentence of this <u>Section 4(a)(iii)</u>, and if the financial information so furnished relates to such direct or indirect parent of the Payor, the same shall be accompanied by consolidating information that explains in reasonable detail the difference between the information relating to such parent on the one hand, and the information relating to the Payor and its Subsidiaries on a standalone basis, on the other hand.

(b)      <u>Successor to the Payor upon Consolidation or Merger</u>.

(i)      Subject to the provisions of <u>Sections 4(b)(ii)</u> and <u>4(b)(iii)</u>, nothing contained in this Agreement shall prevent any consolidation or merger of the Payor with or into any Person, or successive consolidations or mergers in which the Payor or its successor or successors shall be a party or parties, or shall prevent any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all the property of the Payor (for the avoidance of doubt, calculated by including any equity interests held by the Payor), to any Person; *provided*, *however*, and the Payor hereby covenants and agrees, that, if the surviving Person, acquiring Person or lessee is a Person other than the Payor, upon any such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, all of the Payor's funding obligations under this Agreement and the observance of all other covenants and conditions of this Agreement to be performed by the Payor, shall be expressly assumed by an amendment to this Agreement or such other documentation in form reasonably satisfactory to the Payee, executed and delivered to the Payee by the Person formed by such consolidation, or into which the Payor shall have been merged, or by the Person which shall have acquired or leased such property.  This covenant will not apply to (A) a merger of the Payor with an Affiliate solely for the purpose of reincorporating the Payor in another jurisdiction within the United States, (B) any conversion of the Payor from an entity formed under the laws of one state to the same type of entity formed under the laws of another state, or (C) any conversion of the Payor from a limited liability company to a corporation, from a corporation to a limited liability company, from a limited liability company to a limited partnership or a similar conversion, whether the converting entity and the converted entity are formed under the laws of the same state or the converting entity is formed under the laws of one state and the converted entity is formed of the laws of a different state.  Notwithstanding the foregoing, this <u>Section 4(b)(i)</u> will not apply to any consolidation or merger, or any sale, assignment, transfer, conveyance, lease or other disposition of assets, between or among Payor and its Subsidiaries.

(ii)      Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the assets, of the Payor (for the avoidance of doubt, calculated by including any equity interests held by the Payor) in a transaction that is subject to, and that complies with, the provisions of the preceding clause (i), the successor Person formed by such consolidation with the Payor or into which the Payor is merged, or to which such sale, assignment, transfer, lease, conveyance or other disposition is made, shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, lease, conveyance or other disposition, the provisions of this Agreement referring to the "Payor" shall refer instead to the successor Person and not to the Payor), and may exercise every right and power of, the Payor under this Agreement with the same effect as if such successor Person had been named as the Payor herein.  In the event of a succession in compliance with this <u>Section 4(b)(ii)</u>, the predecessor Person shall be relieved

from every obligation and covenant under this Agreement upon the consummation of such succession.

(iii) Any consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition referred to in the preceding clause (i) shall not be permitted under this Agreement unless immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing.

(c) <u>Financial Limitations</u>.

(i) The Payor shall not make any Dividend; *provided*, *however*, that nothing in this <u>Section 4(c)(i)</u> shall prohibit the Payor from making any Dividend solely to fund Payor Tax Liabilities.

(ii) The Payor shall not forgive any obligation owed to it by an Affiliate of the Payor and shall cause each of its Subsidiaries not to forgive any obligation owed to such Subsidiary by an Affiliate of such Subsidiary.

(d) <u>Limitation on Payment Prohibitions</u>. The Payor will not consensually enter into any contract that prohibits the Payor from making Payments under this Agreement.

5. <u>Covenants of the Payee</u>. The Payee shall not use the proceeds of any Payment made under this Agreement for any purpose other than a Permitted Funding Use. The Payee will perform its indemnification obligations owing to the Payor under the agreements provided for in the Plan of Divisional Merger in all material respects, subject, in the event that a proceeding under the Bankruptcy Code is pending with respect to the Payee, to the resulting automatic stay under section 362 of the Bankruptcy Code.

6. <u>Events of Default</u>. Each of the following events constitutes an "<u>Event of Default</u>":

(a) the Payor defaults in its funding obligations pursuant to <u>Section 2</u> and such default continues for a period of 10 Business Days;

(b) the Payor defaults in the performance of, or breaches, any covenant or representation or warranty of the Payor in this Agreement (other than a covenant or representation or warranty which is specifically dealt with elsewhere in this <u>Section 6</u>) and such default or breach continues for a period of 30 days, or, in the case of any failure to comply with <u>Section 4(a)</u> of this Agreement, 60 days, in each case after there has been given, by registered or certified mail, to the Payor by the Payee a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(c) the Payor, pursuant to or within the meaning of the Bankruptcy Code or any similar federal or state law for the relief of debtors, (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it or for all or substantially all of its

property, (iv) makes a general assignment for the benefit of its creditors, or (v) generally is not paying its debts as they become due; and

        (d)       a court of competent jurisdiction enters an order or decree under the Bankruptcy Code or any similar federal or state law for the relief of debtors that (i) is for relief against the Payor, (ii) appoints a custodian of the Payor for all or substantially all of the property of the Payor, or (iii) orders the liquidation of the Payor, and, in each case of (i) through (iii) above, such order or decree remains unstayed and in effect for 60 consecutive days.

Upon becoming aware of any Default or Event of Default, the Payor shall promptly deliver to the Payee a statement specifying such Default or Event of Default.

7.     Remedies.  Upon the occurrence of any Event of Default, and at any time thereafter during the continuance of any such Event of Default, the Payee may pursue any available remedy to collect any unfunded Payments due and owing to the Payee or to enforce the performance of any provision of this Agreement.

8.     Notices.  All notices required under this Agreement, including each Funding Request and any approval of or objection to a Funding Request, shall be delivered to the applicable party to this Agreement at the address set forth below. Unless otherwise specified herein, delivery of any such notice by email, facsimile or other electronic transmission (including .pdf) shall be effective as delivery of a manually executed counterpart thereof.

Payor:

CERTAINTEED LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attention: Mark A. Rayfield, President and Chief Executive Officer
Email: Mark.A.Rayfield@saint-gobain.com

with a copy to:

CERTAINTEED LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attention: R. Craig Smith, Divisional Counsel
E-mail: Craig.Smith@saint-gobain.com

Payee:

DBMP LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attention: Joseph N. Bondi, President
Email: Joseph.N.Bondi@saint-gobain.com

13

with a copy to:

DBMP LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attn: Michael T. Starczewski, Chief Legal Officer
E-mail: Michael.T.Starczewski@saint-gobain.com

9.     <u>Governing Law; Submission to Jurisdiction</u>. This Agreement shall be governed and construed in accordance with the laws of the State of North Carolina. Any legal proceeding seeking to enforce any provision of, or based on any matter arising under, this Agreement may be brought: (a) at any time there is not a proceeding under the Bankruptcy Code pending with respect to the Payee, in state or federal court in Charlotte, North Carolina; or (b) at any time there is a proceeding under the Bankruptcy Code pending with respect to the Payee, in the Bankruptcy Court. Each of the Payor and the Payee hereby irrevocably and unconditionally submits to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such legal proceeding.

10.     <u>No Implied Waiver; Amendments</u>. No failure or delay on the part of the Payee to exercise any right, power or privilege under this Agreement, and no course of dealing between the Payor, on the one hand, and the Payee, on the other hand, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege. No notice to or demand on the Payor in any case shall entitle the Payor to any other or further notice or demand in similar or other circumstances, or constitute a waiver of the right of the holder of this Agreement to any other or further action in any circumstances without notice or demand. The remedies provided in this Agreement are cumulative and not exclusive of any remedies provided by law. No amendment or waiver of any provision of this Agreement, nor consent to any departure by the Payee therefrom, shall in any event be effective unless the same shall be in writing, specifically refer to this Agreement, and be signed by the Payor and the Payee, and then such amendment or waiver shall be effective only in the specific instance and for the specific purpose for which given. A waiver on any such occasion shall not be construed as a bar to, or waiver of, any such right or remedy on any future occasion.

11.     <u>Counterparts; Entire Agreement; Electronic Execution</u>. This Agreement may be executed in separate counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersedes, in its entirety, the Amended and Restated Funding Agreement. This Agreement shall become effective when it shall have been executed by each party hereto and each party hereto shall have received counterparts hereof which, when taken together, bear the signatures of each of party hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy, .pdf or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

12.    <u>Severability</u>.  If any one or more of the provisions contained in this Agreement are invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of all the remaining provisions will not in any way be affected or impaired.  If any one or more provisions contained in this Agreement are deemed invalid, illegal or unenforceable because of their scope or breadth, such provisions shall be reformed and replaced with provisions whose scope and breadth are valid under applicable law.

13.    <u>Transfer; Assignment</u>.  This Agreement shall be binding upon the Payor and its successors and assigns, and the terms and provisions of this Agreement shall inure to the benefit of the Payee and its successors and assigns.  The Payor's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payee; *provided*, *however*, that no such consent of the Payee shall be required in connection with any transfer effected in compliance with <u>Section 4(b)</u>.  The Payee's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payor.

14.    <u>Construction</u>.  The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement. The word "including" means without limitation by reason of enumeration. The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless specifically stated otherwise, all references to Sections and Schedules are to the Sections and Schedules of or to this Agreement.

15.    <u>Rights of Parties</u>.  This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**CERTAINTEED LLC**, a Delaware limited liability company, as the Payor

By: _____
        Mark A. Rayfield
        President and Chief Executive Officer

**DBMP LLC**, a North Carolina limited liability company, as the Payee

By: _____
        Joseph N. Bondi
        President

*[Signature Page to Second Amended and Restated Funding Agreement]*

NAI-1520705123

**SCHEDULE 1**

**Definition of Asbestos Related Liabilities**

For purposes of this Agreement, "<u>Asbestos Related Liabilities</u>" means all Liabilities (as defined below) of the Payee related in any way to asbestos or asbestos containing materials.

Capitalized terms that are used in this <u>Schedule 1</u> have the following meanings:

(a)    "<u>Cause of Action</u>" means any claim, judgment, cause of action, counterclaim, crossclaim, third party claim, defense, indemnity claim, reimbursement claim, contribution claim, subrogation claim, right of set off, right of recovery, recoupment, right under any settlement Contract and similar right, whether choate or inchoate, known or unknown, contingent or noncontingent.

(b)    "<u>Contract</u>" means any contract, agreement, arrangement, lease, indenture, mortgage, deed of trust, evidence of indebtedness, License, Plan, guarantee, understanding, course of dealing or performance, instrument, bid, order, proposal, demand, offer or acceptance, whether written or oral.

(c)    "<u>Governmental Authority</u>" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational governmental, legislative, administrative or regulatory authority, agency, court, arbitration tribunal, board, department or commission, or other governmental or regulatory entity, including any competent governmental authority responsible for the determination, assessment or collection of taxes.

(d)    "<u>Law</u>" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational statute, law, ordinance, decree, order, injunction, rule, regulation, directive, constitution, code, edict, writ, judgment, opinion, decree, injunction, stipulation, award or other document or pronouncement having the effect of law (including common law) of any Governmental Authority, including rules and regulations of any regulatory or self-regulatory authority with which compliance is required by any of the foregoing.

(e)    "<u>Liability</u>" shall mean any claim, demand, offer, acceptance, action, suit, liability or obligation of any kind, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, choate or inchoate, asserted or unasserted, known or unknown, including (i) those arising or that may arise under any past, present or future Law or Contract or pursuant to any Cause of Action or Proceeding and (ii) all claims for economic or noneconomic damages or injuries of any type or nature whatsoever (including claims for physical, mental and emotional pain and suffering, loss of enjoyment of life, loss of society or consortium and wrongful death, as well as claims for damage to property and punitive damages).

NAI-1520705123

(f)      "<u>License</u>" means any license, sublicense, agreement, covenant not to sue or permission.

(g)      "<u>Person</u>" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, benefit plan, unincorporated organization, business, syndicate, sole proprietorship, association, organization, labor union or other entity or Governmental Authority.

(h)      "<u>Plan</u>" means, with respect to any Person, (i) any "employee benefit plan" (as defined in Section 3(3) of ERISA), (ii) all specified fringe benefit plans as defined in Section 6039(D) of the Internal Revenue Code, and (iii) any other plan, program, policy, agreement or arrangement, whether or not in writing, relating to compensation, employee benefits, severance, change in control, retention, deferred compensation, equity, employment, consulting, vacation, sick leave, paid time off, salary continuation, disability, hospitalization, medical insurance, life insurance, scholarship programs, incentive compensation or bonus compensation, in each case that is sponsored, maintained or contributed to or required to be sponsored, maintained or contributed to by, or otherwise covering, such Person.

(i)      "<u>Proceeding</u>" means any action, appeal, arbitration, assessment, cancellation, charge, citation, claim, complaint, concurrent use, controversy, contested matter, demand, grievance, hearing, inquiry, interference, investigation, litigation (including class actions and multidistrict litigation), mediation, opposition, re-examination, summons, subpoena or suit, or other case or proceeding, whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private, commenced, brought, conducted or heard by or before, under the supervision or direction of, or otherwise involving, any Governmental Authority or arbitrator or other agreed-upon tribunal or dispute resolution mechanism.

NAI-1520705123

**<u>EXHIBIT B</u>**

**SECOND** AMENDED AND RESTATED FUNDING AGREEMENT

This SECOND AMENDED AND RESTATED FUNDING AGREEMENT, dated as of October 23, 2019September 15, 2021 (as it may be amended, restated, modified or supplemented from time to time, this "Agreement") is between CERTAINTEED LLC, a Delaware limited liability company ("Payor"), and DBMP LLC, a North Carolina limited liability company ("Payee").

**RECITALS**

A.      Prior to and in contemplation of the conversion of CertainTeed LLC, a Delaware limited liability company ("Old CT (DE)"), to a Texas limited liability company (as such, "Old CT (TX)") and the subsequent divisional merger of Old CT (TX) pursuant to Chapter 10 of the TBOC (the "Divisional Merger"), CertainTeed Holding Corporation, a Delaware corporation ("CT Holding"), as payor, and Old CT (DE), as payee, executed and delivered a Funding Agreement, dated as of October 22, 2019 (the "Original Funding Agreement").

B.      Immediately after the execution of the Original Funding Agreement and prior to the Divisional Merger, Old CT (DE) converted from a Delaware limited liability company into a Texas limited liability company, Old CT (TX), pursuant to Section 18.216 of the Delaware Limited Liability Company Act and Section 10.102 of the TBOC (the "TX Conversion").

C.      Immediately following the effectiveness of the TX Conversion, CT Holding, in its capacity as the sole member of CT (TX), approved a Plan of Divisional Merger contemplating the Divisional Merger (the "Plan of Divisional Merger").

D.      At the effective time of the Divisional Merger, (1) certain property of CT (TX), as set forth on Schedule 5(b)(i) to the Plan of Divisional Merger and certain liabilities and obligations of CT (TX), as set forth on Schedule 5(c)(i) to the Plan of Divisional Merger (collectively, the "Allocated Assets and Liabilities") were allocated to a new Texas limited liability company created upon the effectiveness of the Divisional Merger ("DBMP (TX)"), (2) the remaining property, liabilities and obligations of CT (TX) were allocated to another new Texas limited liability company created upon effectiveness of the Divisional Merger ("New CT (TX)"), and (3) CT (TX) ceased to exist.

E.      Immediately following the effectiveness of the Divisional Merger, CT Holding assigned to New CT (TX), and New CT (TX) assumed from CT Holding, all rights and obligations of CT Holding under the Original Funding Agreement (such assignment and assumption, the "Post-Merger Assignment"), whereupon CT Holding was released from its obligations, and ceased to have any further obligations, under the Original Funding Agreement.

F.      Following the Divisional Merger and the Post-Merger Assignment, (1) New CT (TX) effected a conversion (the "DE Conversion") into Payor, a Delaware limited liability company, and (2) DBMP (TX) effected a conversion (the "NC Conversion") into Payee, a North Carolina limited liability company.

G.      In connection with the allocation to DBMP (TX) of the Allocated Assets and Liabilities, CT Holding and its successors and assigns agreed, pursuant to the Original Funding

Agreement, to provide funding to Old CT (DE) and, after the TX Conversion, CT (TX), and, after the Divisional Merger, DBMP (TX) and, after the NC Conversion, DBMP, sufficient to pay the costs of operations of DBMP's business and other liabilities and obligations included in the Allocated Assets and Liabilities as and when they become due.

H.     The Allocated Assets and Liabilities included the rights and obligations of CT (TX) (as successor to Old CT (DE) in the TX Conversion) under the Original Funding Agreement, and, at the effective time of the Divisional Merger, pursuant to the terms and conditions of the Plan of Divisional Merger, the rights and obligations of CT (TX) under the Original Funding Agreement were allocated to DBMP (TX) such that, following the effectiveness of the Divisional Merger, DBMP (TX) and, following the NC Conversion, DBMP, had assets having a value at least equal to its liabilities and had financial capacity sufficient to satisfy its obligations as they become due in the ordinary course of business, including any Asbestos Related Liabilities.

I.     Payor and Payee ~~desire to amend and restate~~ then amended and restated the Original Funding Agreement to reflect that the Merger, the Post-Merger Assignment, the DE Conversion and the NC Conversion ~~have~~ had occurred and Payor, ~~now~~ a Delaware limited liability company having the name "CertainTeed LLC," and Payee, ~~now~~ a North Carolina limited liability company having the name "DBMP LLC," ~~are~~ were the parties to such agreement (as so amended and restated, the "Amended and Restated Funding Agreement").

J.     Payor and Payee now desire to amend and restate the Amended and Restated Funding Agreement to incorporate certain changes intended to clarify the terms hereof and further enhance the rights of Payee consistent with the purposes of this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, the parties hereto agree as follows:

1.     <u>Definitions</u>.  As used in this Agreement, the following terms have the meanings herein specified unless the context otherwise requires:

"<u>Affiliate</u>" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.  For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"<u>Allocated Assets and Liabilities</u>" has the meaning specified in the recitals to this Agreement.

"<u>Amended and Restated Funding Agreement</u>" has the meaning specified in the recitals to this Agreement.

"Asbestos Related Liabilities" has the meaning specified in Schedule 1 to this Agreement.

"Bankruptcy Case" means any voluntary case under chapter 11 of the Bankruptcy Code commenced by the Payee in the Bankruptcy Court.

"Bankruptcy Code" means title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"Bankruptcy Court" means the United States Bankruptcy Court where the Bankruptcy Case is commenced.

"Base Rate" means, for any day, a fluctuating interest rate per annum as shall be in effect from time to time, which rate per annum shall at all times be equal to the greater of (a) the rate of interest established by Bank of America, N.A from time to time, as its "prime rate," whether or not publicly announced, which interest rate may or may not be the lowest rate charged by it for commercial loans or other extensions of credit, and (b) the Federal Funds Effective Rate in effect from time to time, determined one Business Day in arrears, plus 1/2 of 1% per annum.

"Board" means: (a) with respect to a corporation, the board of directors of the corporation or any committee thereof; (b) with respect to a partnership, the board of directors, the managing member or members or the board of managers, as applicable, of the general partner of the partnership; (c) with respect to a limited liability company, the managing member or members or the board of managers, as applicable, of the limited liability company; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"Business Day" means each day other than a Saturday, a Sunday or a day on which banking institutions in Charlotte, North Carolina or at a place of payment are authorized by law, regulation or executive order to remain closed.

"Capital Stock" means: (a) in the case of a corporation, corporate stock; (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock; (c) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person; but excluding (in each case of (a) through (d) above) any debt securities convertible into such equity securities.

"Contractual Obligation" means, as to any Person, any obligation or similar provision of any security issued by such Person or any agreement, instrument or other undertaking (excluding this Agreement) to which such Person is a party or by which it or any of its property is bound.

"CT (DE)" has the meaning specified in the recitals to this Agreement.

"CT Holding" has the meaning specified in the recitals to this Agreement.

"<u>CT (TX)</u>" has the meaning specified in the recitals to this Agreement.

"<u>DBMP</u>" has the meaning specified in the recitals to this Agreement.

"<u>DBMP (TX)</u>" has the meaning specified in the recitals to this Agreement.

"<u>Default</u>" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"<u>DE Conversion</u>" has the meaning specified in the recitals to this Agreement.

"<u>District Court</u>" means the United States District Court in the district of the Bankruptcy Court.

"<u>Dividend</u>" means, with respect to any entity, a distribution of cash or any other assets or properties made by such entity to such entity's member or parent company.

"<u>Divisional Merger</u>" has the meaning specified in the recitals to this Agreement.

"<u>Event of Default</u>" has the meaning specified in <u>Section 6</u>.

"<u>Federal Funds Effective Rate</u>" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York.

"<u>Funding Account</u>" means the account of the Payee listed on <u>Schedule 2</u> to this Agreement, into which the proceeds of all Payments made under this Agreement shall be deposited, or such other account designated in writing by the Payee to the Payor from time to time.

"<u>Funding Date</u>" has the meaning specified in <u>Section 2(b)</u>.

"<u>Funding Request</u>" has the meaning specified in <u>Section 2(b)</u>.

"<u>GAAP</u>" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, in effect from time to time, consistently applied.  If at any time any change in GAAP (including any adoption of International Financial Reporting Standards) would materially affect the computation of any amount required to be computed under this Agreement, the Payor may give written notice to the Payee of its intent to preserve the original intent of this Agreement and upon delivery of such notice, such amounts shall be calculated in accordance with GAAP as in effect at the end of the fiscal period ended immediately prior to such change in GAAP.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"NC Conversion" has the meaning specified in the recitals to this Agreement.

"New CT" has the meaning specified in the recitals to this Agreement.

"New CT (TX)" has the meaning specified in the recitals to this Agreement.

"Organizational Documents" means: (a) with respect to any corporation, its certificate or articles of incorporation and bylaws; (b) with respect to any limited liability company, its certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation of such entity.

"Original Funding Agreement" has the meaning specified in the recitals to this Agreement.

"Payee" has the meaning specified in the first paragraph of this Agreement.

"Payee Affiliate" means any wholly owned Affiliate of the Payee (and in no case includes the Payor or any Payor Affiliate).

"Payee Material Adverse Effect" means: (a) a material impairment of the rights and remedies of the Payor under this Agreement, or of the ability of the Payee to perform its material obligations under this Agreement; or (b) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payee.

"Payment" has the meaning specified in Section 2(a).

"Payor" has the meaning specified in the first paragraph of this Agreement.

"Payor Affiliate" means any wholly owned Affiliate of the Payor (and in no case includes the Payee or any Payee Affiliate).

"Payor Material Adverse Effect" means: (a) a material adverse change in, or a material adverse effect upon, the business, assets, liabilities (actual or contingent) or financial condition of the Payor and its Subsidiaries, taken as a whole; (b) a material impairment of the rights and remedies of the Payee under this Agreement, or of the ability of the Payor to perform its material obligations under this Agreement; or (c) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payor.

"Payor Tax Liabilities" means the portion of any tax liabilities of the consolidated tax group of which the Payor is a member that arises from the income of the Payor, any Subsidiaries of the Payor that are disregarded entities for tax purposes, and any entities whose tax items are included in the Payor's tax items pursuant to the Amended and Restated Tax Item Allocation Agreement, effective as of October 23, 2019, to which the Payor and the Payee are parties.

"Permitted Funding Use" means each of the following:

(a) the payment of any and all costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee) at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee;

(b) the payment of any and all costs and expenses of the Payee incurred during the pendency of any Bankruptcy Case that are necessary or appropriate in connection therewith, including the costs of administering the Bankruptcy Case and any and all other costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee);

(c) the funding of any amounts necessary or appropriate to satisfy (i) the Payee's Asbestos Related Liabilities established by a judgment of a court of competent jurisdiction or final settlement thereof at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee; (ii) following the commencement of any Bankruptcy Case, the Payee's Asbestos Related Liabilities in connection with the funding of a trust under section 524(g) of the Bankruptcy Code for the benefit of existing and future claimants that is included in a plan of reorganization for the Payee confirmed by a final, nonappealable order of the Bankruptcy Court and the District Court, (for the avoidance of doubt, regardless of whether such plan of reorganization provides that the Payor will receive the protection of section 524(g) of the Bankruptcy Code and regardless of whether the Payor supports such plan of reorganization); and (iii) in the case of either (i) or (ii), any ancillary costs and expenses of the Payee associated with such Asbestos Related Liabilities and any litigation thereof, including the costs of any appeals;

(d) the funding of any amounts necessary to cause the Funding Account to contain at least $5,000,000 at such time; and

(e) the funding of any obligations of the Payee owed to the Payor or any Payor Affiliate, including any indemnification or other obligations of the Payee under any agreement provided for in the Plan of Divisional Merger; and

(f) the payment of any and all costs and expenses of the Payee incurred in connection with the pursuit of available remedies to collect any unfunded Payments due and owing to the Payee or otherwise to enforce the performance by the Payor of any provision of this Agreement;

in the case of clauses (a) through (ef) above, solely to the extent that any cash distributions theretofore received by the Payee from its Subsidiaries are insufficient to pay such costs and expenses and fund such amounts and obligations in full and further, in the case of clause (c)(ii) above, solely to the extent the Payee's other assets are insufficient to ~~fund amounts necessary or appropriate to~~ satisfy the Payee's Asbestos Related Liabilities in connection with the funding of such trust.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"Plan of Divisional Merger" has the meaning specified in the recitals to this Agreement.

"SEC" means the Securities and Exchange Commission.

"Subsidiary" means any Person a majority of the outstanding Voting Stock of which is owned or controlled by the Payor or by one or more other Subsidiaries and that is consolidated in the Payor's accounts.

"TX Conversion" has the meaning specified in the recitals to this Agreement.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of such Person.

2.      Funding Obligations and Procedures.

        (a)     Funding Obligations.    The Payor hereby agrees, on the terms and conditions set forth in this Agreement, upon the request of the Payee from time to time in accordance with the requirements of Section 2(b), to make payments to the Payee (each, a "Payment"), the proceeds of which shall be used by the Payee for any Permitted Funding Use.  Nothing in this Agreement shall obligate the Payor to make Payments under this Agreement that in the aggregate exceed the aggregate amount ~~necessary for the Payee to fund~~ of all Permitted Funding Uses, and nothing in this Agreement shall obligate the Payor to make any individual payment under this Agreement that exceeds the amount requested by the Payee in the applicable Funding Request.

        (b)     Funding Requests.   To request a Payment, the Payee shall deliver to the Payor a written request (which written request may be a .pdf delivered via email) for such Payment in a form reasonably acceptable to the Payor and signed by the Payee (each, a "Funding Request").  Each Funding Request shall specify (i) the amount of the requested Payment, which shall be no less than $500,000, and (ii) the date of the requested Payment, which shall be the date that is five Business Days following the delivery of such Funding Request (each such date, a "Funding Date").   Each Funding Request by the Payee shall constitute a representation and warranty by the Payee that the conditions set forth in Section 2(d) have been satisfied.  Except as required to comply with the minimum requirements in Section 2(b)(i), Payee shall not deliver a Funding Request for an amount in excess of the aggregate amount necessary for the Payee to fund

all current Permitted Funding Uses and all projected Permitted Funding Uses over the 30 days following the date of such Funding Request.

(c)    <u>Payments</u>.  Subject only to the satisfaction of the conditions set forth in <u>Section 2(d)</u>, on any Funding Date, the Payor shall pay or cause to be paid to the Payee an amount equal to the amount of the requested Payment specified in the applicable Funding Request. All Payments shall be made by wire or other transfer of immediately available funds, in United States dollars, to the Funding Account.  In the event that the Payor does not make any Payment within the time period required by this <u>Section 2(c)</u>, the amount of the requested Payment shall bear interest at a rate per annum equal to the Base Rate *plus* 2% until such Payment is made and the Payor shall include any interest accruing pursuant to this <u>Section 2(c)</u> in the next Payment made to the Payee.

(d)    <u>Conditions to Payments</u>.  The Payor's obligation to make any Payment is subject to the satisfaction of the following conditions as of the date of the Funding Request relating to such Payment (i) the representations and warranties of the Payee set forth in <u>Section 3(b)</u> shall be true and correct without regard to the impact of any Bankruptcy Case, including any notices or other actions that may be required therein, and (ii) there shall have been no violation by the Payee of the covenant set forth in <u>Section 5</u>.

3.    <u>Representations and Warranties</u>.

(a)    <u>Representations and Warranties of the Payor</u>.  The Payor represents and warrants to the Payee that:

(i)    <u>Existence, Qualification and Power</u>.  The Payor (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement, and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payor Material Adverse Effect.

(ii)    <u>Authorization; No Contravention</u>. The execution, delivery and performance by the Payor of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in

clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payor Material Adverse Effect.

(iii)    Governmental Authorization; Other Consents.   No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution delivery or performance of this Agreement by, or enforcement against, the Payor.

(iv)    Binding Effect.   This Agreement has been duly executed and delivered by the Payor.  This Agreement constitutes a legal, valid and binding obligation of the Payor, enforceable against the Payor in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

(b)    Representations and Warranties of the Payee.  The Payee represents and warrants to the Payor that:

(i)    Existence, Qualification and Power.   The Payee (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(ii)    Authorization; No Contravention.   The execution, delivery and performance by the Payee of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(iii)    Governmental Authorization; Other Consents.   No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in

connection with the execution delivery or performance of this Agreement by, or enforcement against, the Payee.

(iv)    Binding Effect. This Agreement has been duly executed and delivered by the Payee. This Agreement constitutes a legal, valid and binding obligation of the Payee, enforceable against the Payee in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

4.    Covenants of the Payor.

(a)    Provision of Financial Information.

(i)    The Payor will furnish to the Payee, no later than 90 days after the end of each fiscal year (in the case of annual financial statements) and 60 days after the end of each fiscal quarter other than the last fiscal quarter (in the case of quarterly financial statements), unaudited annual and quarterly consolidated financial statements prepared in accordance with GAAP (subject to the absence of notes to the financial statements and related disclosures, and, with respect to quarterly financial statements, normal year-end audit adjustments).

(ii)    By accepting such financial information, the Payee will be deemed to have represented to and agreed with the Payor that: (A) it will not use the information in violation of applicable securities laws or regulations; and (B) it will not communicate the information to any Person, including in any aggregated or converted form, and will keep the information confidential, other than where disclosure of such information is required by law, regulation or legal process (in which case the Payee shall, to the extent permitted by law, notify the Payor promptly thereof).; *provided however*, *that the Payee may deliver a copy thereof to counsel for any official committee of asbestos claimants and any future claimants' representative appointed in any Bankruptcy Case on a confidential basis under a protective order entered in such Bankruptcy Case.*

(iii)    Notwithstanding the foregoing, the financial statements, information and other documents required to be provided as described in Section 4(a)(i), may be, rather than those of the Payor, those  of any direct or indirect parent of the Payor. Notwithstanding the foregoing, the Payor may fulfill the requirement to distribute such financial information by filing the information with the SEC within the applicable time periods required by the SEC. The Payor will be deemed to have satisfied the reporting requirements of Section 4(a)(i) if any direct or indirect parent of the Payor has filed such reports containing such information with the SEC within the applicable time periods required by the SEC and such reports are publicly available. To the extent a direct or indirect parent of the Payor provides financial statements, information and other documents pursuant to the first sentence of this Section 4(a)(iii) or such parent files such report with the SEC pursuant to the third sentence of this Section 4(a)(iii), and if

the financial information so furnished relates to such direct or indirect parent of the Payor, the same shall be accompanied by consolidating information that explains in reasonable detail the difference between the information relating to such parent on the one hand, and the information relating to the Payor and its Subsidiaries on a standalone basis, on the other hand.

(b)   <u>Successor to the Payor upon Consolidation or Merger.</u>

(i)   Subject to the provisions of <u>Sections 4(b)(ii)</u> and <u>4(b)(iii)</u>, nothing contained in this Agreement shall prevent any consolidation or merger of the Payor with or into any Person, or successive consolidations or mergers in which the Payor or its successor or successors shall be a party or parties, or shall prevent any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all the property of the Payor (for the avoidance of doubt, calculated by including any equity interests held by the Payor), to any Person; *provided*, *however*, and the Payor hereby covenants and agrees, that, if the surviving Person, acquiring Person or lessee is a Person other than the Payor, upon any such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, all of the Payor's funding obligations under this Agreement and the observance of all other covenants and conditions of this Agreement to be performed by the Payor, shall be expressly assumed by an amendment to this Agreement or such other documentation in form reasonably satisfactory to the Payee, executed and delivered to the Payee by the Person formed by such consolidation, or into which the Payor shall have been merged, or by the Person which shall have acquired or leased such property.  This covenant will not apply to (A) a merger of the Payor with an Affiliate solely for the purpose of reincorporating the Payor in another jurisdiction within the United States, (B) any conversion of the Payor from an entity formed under the laws of one state to the same type of entity formed under the laws of another state, or (C) any conversion of the Payor from a limited liability company to a corporation, from a corporation to a limited liability company, from a limited liability company to a limited partnership or a similar conversion, whether the converting entity and the converted entity are formed under the laws of the same state or the converting entity is formed under the laws of one state and the converted entity is formed of the laws of a different state.  Notwithstanding the foregoing, this <u>Section 4(b)(i)</u> will not apply to any consolidation or merger, or any sale, assignment, transfer, conveyance, lease or other disposition of assets, between or among Payor and its Subsidiaries.

(ii)   Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the assets, of the Payor (for the avoidance of doubt, calculated by including any equity interests held by the Payor) in a transaction that is subject to, and that complies with, the provisions of the preceding clause (i), the successor Person formed by such consolidation with the Payor or into which the Payor is merged, or to which such sale, assignment, transfer, lease, conveyance or other disposition is made, shall succeed to, and be substituted for (so that from and after the date of

such consolidation, merger, sale, lease, conveyance or other disposition, the provisions of this Agreement referring to the "Payor" shall refer instead to the successor Person and not to the Payor), and may exercise every right and power of, the Payor under this Agreement with the same effect as if such successor Person had been named as the Payor herein.  In the event of a succession in compliance with this Section 4(b)(ii), the predecessor Person shall be relieved from every obligation and covenant under this Agreement upon the consummation of such succession.

(iii)    Any consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition referred to in the preceding clause (i) shall not be permitted under this Agreement unless immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing.

(c)    Financial Limitations.

(i)    The Payor shall not make any Dividend; *provided*, *however*, that nothing in this Section 4(c)(i) shall prohibit the Payor from making any Dividend solely to fund Payor Tax Liabilities.

(ii)    The Payor shall not forgive any obligation owed to it by an Affiliate of the Payor and shall cause each of its Subsidiaries not to forgive any obligation owed to such Subsidiary by an Affiliate of such Subsidiary.

(d)    Limitation on Payment Prohibitions.  The Payor will not consensually enter into any contract that prohibits the Payor from making Payments under this Agreement.

5.    Covenants of the Payee. The Payee shall not use the proceeds of any Payment made under this Agreement for any purpose other than a Permitted Funding Use.  The Payee will perform its indemnification obligations owing to the Payor under the agreements provided for in the Plan of Divisional Merger in all material respects, subject, in the event that a proceeding under the Bankruptcy Code is pending with respect to the Payee, to the resulting automatic stay under section 362 of the Bankruptcy Code.

6.    Events of Default.  Each of the following events constitutes an "Event of Default":

(a)    the Payor defaults in its funding obligations pursuant to Section 2 and such default continues for a period of 10 Business Days;

(b)    the Payor defaults in the performance of, or breaches, any covenant or representation or  warranty of the Payor in this Agreement (other than a covenant or representation or warranty which is specifically dealt with elsewhere in this Section 6) and such default or breach continues for a period of ~~90~~30 days, or, in the case of any failure to comply with Section 4(a) of this Agreement, ~~180~~60 days, in each case after there has been given, by registered or certified mail, to the Payor by the Payee a written

notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(c)     the Payor, pursuant to or within the meaning of the Bankruptcy Code or any similar federal or state law for the relief of debtors, (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it or for all or substantially all of its property, (iv) makes a general assignment for the benefit of its creditors, or (v) generally is not paying its debts as they become due; and

(d)     a court of competent jurisdiction enters an order or decree under the Bankruptcy Code or any similar federal or state law for the relief of debtors that (i) is for relief against the Payor, (ii) appoints a custodian of the Payor for all or substantially all of the property of the Payor, or (iii) orders the liquidation of the Payor, and, in each case of (i) through (iii) above, such order or decree remains unstayed and in effect for 60 consecutive days.

Upon becoming aware of any Default or Event of Default, the Payor shall promptly deliver to the Payee a statement specifying such Default or Event of Default.

7.     Remedies.  Upon the occurrence of any Event of Default, and at any time thereafter during the continuance of any such Event of Default, the Payee may pursue any available remedy to collect any unfunded Payments due and owing to the Payee or to enforce the performance of any provision of this Agreement.

8.     Notices.  All notices required under this Agreement, including each Funding Request and any approval of or objection to a Funding Request, shall be delivered to the applicable party to this Agreement at the address set forth below.  Unless otherwise specified herein, delivery of any such notice by email, facsimile or other electronic transmission (including .pdf) shall be effective as delivery of a manually executed counterpart thereof.

Payor:

CERTAINTEED LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attention: Mark A. Rayfield, President and Chief Executive Officer
Email: Mark.A.Rayfield@saint-gobain.com

with a copy to:

CERTAINTEED LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attention: R. Craig Smith, Divisional Counsel
E-mail:  Craig.Smith@saint-gobain.com

Payee:

DBMP LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attention: Joseph N. Bondi, President
Email: Joseph.N.Bondi@saint-gobain.com

with a copy to:

DBMP LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attn: Michael T. Starczewski, Chief Legal Officer
E-mail:  Michael.T.Starczewski@saint-gobain.com

9.     Governing Law; Submission to Jurisdiction.  This Agreement shall be governed and construed in accordance with the laws of the State of North Carolina.  Any legal proceeding seeking to enforce any provision of, or based on any matter arising under, this Agreement may be brought: (a) at any time there is not a proceeding under the Bankruptcy Code pending with respect to the Payee, in state or federal court in Charlotte, North Carolina; or (b) at any time there is a proceeding under the Bankruptcy Code pending with respect to the Payee, in the Bankruptcy Court.  Each of the Payor and the Payee hereby irrevocably and unconditionally submits to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such legal proceeding.

10.     No Implied Waiver; Amendments.  No failure or delay on the part of the Payee to exercise any right, power or privilege under this Agreement, and no course of dealing between the Payor, on the one hand, and the Payee, on the other hand, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  No notice to or demand on the Payor in any case shall entitle the Payor to any other or further notice or demand in similar or other circumstances, or constitute a waiver of the right of the holder of this Agreement to any other or further action in any circumstances without notice or demand.  The remedies provided in this Agreement are cumulative and not exclusive of any remedies provided by law.  No amendment or waiver of any provision of this Agreement, nor consent to any departure by the Payee therefrom, shall in any event be effective unless the same shall be in writing, specifically refer to this Agreement, and be signed by the Payor and the Payee, and then such amendment or waiver shall be effective only in the specific instance and for the specific purpose for which given.  A waiver on any such occasion shall not be construed as a bar to, or waiver of, any such right or remedy on any future occasion.

11.     Counterparts; Entire Agreement; Electronic Execution.  This Agreement may be executed in separate counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersedes, in its entirety, the ~~Original~~Amended and Restated Funding Agreement.  This Agreement shall become effective

when it shall have been executed by each party hereto and each party hereto shall have received counterparts hereof which, when taken together, bear the signatures of each of party hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy, .pdf or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

      12.    <u>Severability</u>.  If any one or more of the provisions contained in this Agreement are invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of all the remaining provisions will not in any way be affected or impaired.  If any one or more provisions contained in this Agreement are deemed invalid, illegal or unenforceable because of their scope or breadth, such provisions shall be reformed and replaced with provisions whose scope and breadth are valid under applicable law.

      13.    <u>Transfer; Assignment</u>.  This Agreement shall be binding upon the Payor and its successors and assigns, and the terms and provisions of this Agreement shall inure to the benefit of the Payee and its successors and assigns.  The Payor's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payee; *provided*, *however*, that no such consent of the Payee shall be required in connection with ~~the Post-Merger Assignment or~~ any transfer effected in compliance with <u>Section 4(b)</u>.  ~~Upon giving effect to the Post-Merger Assignment, CT Holding will be released from its obligations as the Payor and will have no further obligations under this Agreement.  The DE Conversion shall not constitute an assignment of the Payor's rights and obligations under this Agreement.~~ The Payee's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payor. ~~None of the TX Conversion, the Divisional Merger or the NC Conversion shall constitute an assignment of the Payee's rights and obligations hereunder.~~

      14.    <u>Construction</u>.  The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement. The word "including" means without limitation by reason of enumeration. The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless specifically stated otherwise, all references to Sections and Schedules are to the Sections and Schedules of or to this Agreement.

      15.    <u>Rights of Parties</u>.  This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**CERTAINTEED LLC**, a Delaware limited liability company, as the Payor

By: _____

    Mark A. Rayfield
    President and Chief Executive Officer

**DBMP LLC**, a North Carolina limited liability company, as the Payee

By: _____

    Joseph N. Bondi
    President

**SCHEDULE 1**

**Definition of Asbestos Related Liabilities**

For purposes of this Agreement, "<u>Asbestos Related Liabilities</u>" means all Liabilities (as defined below) of the Payee related in any way to asbestos or asbestos containing materials.

Capitalized terms that are used in this <u>Schedule 1</u> have the following meanings:

(a)     "<u>Cause of Action</u>" means any claim, judgment, cause of action, counterclaim, crossclaim, third party claim, defense, indemnity claim, reimbursement claim, contribution claim, subrogation claim, right of set off, right of recovery, recoupment, right under any settlement Contract and similar right, whether choate or inchoate, known or unknown, contingent or noncontingent.

(b)     "<u>Contract</u>" means any contract, agreement, arrangement, lease, indenture, mortgage, deed of trust, evidence of indebtedness, License, Plan, guarantee, understanding, course of dealing or performance, instrument, bid, order, proposal, demand, offer or acceptance, whether written or oral.

(c)     "<u>Governmental Authority</u>" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational governmental, legislative, administrative or regulatory authority, agency, court, arbitration tribunal, board, department or commission, or other governmental or regulatory entity, including any competent governmental authority responsible for the determination, assessment or collection of taxes.

(d)     "<u>Law</u>" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational statute, law, ordinance, decree, order, injunction, rule, regulation, directive, constitution, code, edict, writ, judgment, opinion, decree, injunction, stipulation, award or other document or pronouncement having the effect of law (including common law) of any Governmental Authority, including rules and regulations of any regulatory or self-regulatory authority with which compliance is required by any of the foregoing.

(e)     "<u>Liability</u>" shall mean any claim, demand, offer, acceptance, action, suit, liability or obligation of any kind, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, choate or inchoate, asserted or unasserted, known or unknown, including (i) those arising or that may arise under any past, present or future Law or Contract or pursuant to any Cause of Action or Proceeding and (ii) all claims for economic or noneconomic damages or injuries of any type or nature whatsoever (including claims for physical, mental and emotional pain and suffering, loss of enjoyment of life, loss of society or consortium and wrongful death, as well as claims for damage to property and punitive damages).

(f)      "<u>License</u>" means any license, sublicense, agreement, covenant not to sue or permission.

(g)      "<u>Person</u>" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, benefit plan, unincorporated organization, business, syndicate, sole proprietorship, association, organization, labor union or other entity or Governmental Authority.

(h)      "<u>Plan</u>" means, with respect to any Person, (i) any "employee benefit plan" (as defined in Section 3(3) of ERISA), (ii) all specified fringe benefit plans as defined in Section 6039(D) of the Internal Revenue Code, and (iii) any other plan, program, policy, agreement or arrangement, whether or not in writing, relating to compensation, employee benefits, severance, change in control, retention, deferred compensation, equity, employment, consulting, vacation, sick leave, paid time off, salary continuation, disability, hospitalization, medical insurance, life insurance, scholarship programs, incentive compensation or bonus compensation, in each case that is sponsored, maintained or contributed to or required to be sponsored, maintained or contributed to by, or otherwise covering, such Person.

(i)      "<u>Proceeding</u>" means any action, appeal, arbitration, assessment, cancellation, charge, citation, claim, complaint, concurrent use, controversy, contested matter, demand, grievance, hearing, inquiry, interference, investigation, litigation (including class actions and multidistrict litigation), mediation, opposition, re-examination, summons, subpoena or suit, or other case or proceeding, whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private, commenced, brought, conducted or heard by or before, under the supervision or direction of, or otherwise involving, any Governmental Authority or arbitrator or other agreed-upon tribunal or dispute resolution mechanism.

## EXHIBIT C

## PROPOSED AGREED ORDER

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re | Chapter 11 |
| DBMP LLC,[1] | Case No. 20-30080 (JCW) |
| Debtor. | |

**AGREED ORDER AUTHORIZING THE DEBTOR TO ENTER**
**INTO SECOND AMENDED AND RESTATED FUNDING AGREEMENT**

This matter coming before the Court on the *Motion of the Debtor for an Order Authorizing It to Enter Into Second Amended and Restated Funding Agreement* [Dkt. __] (the "Motion"),[2] filed by the debtor and debtor in possession in the above-captioned case (the "Debtor"); the Court having reviewed the Motion and having considered the statements of counsel and the evidence adduced with respect to the Motion at a hearing before the Court (the "Hearing"); the Court finding that (a) the Court has jurisdiction over this matter pursuant to

---

[1]     The last four digits of the Debtor's taxpayer identification number are 8817.  The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19355.

[2]     Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

28 U.S.C. §§ 157 and 1334, (b) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and

1409, (c) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (d) notice of the Motion and

the Hearing was sufficient under the circumstances, (e) the Debtor's entry into the Second

Amended Funding Agreement is a reasonable exercise of the Debtor's business judgment and is

in the best interests of the Debtor's estate and creditors, (f) the terms of the Second Amended

Funding Agreement are fair and reasonable, and contain adequate protections for the Debtor's

estate and its creditors, and (g) the Second Amended Funding Agreement is a valid contract,

enforceable in accordance with its terms; the Debtor and New CT having stipulated and agreed to

the terms of this Agreed Order, as indicated by the signatures of their respective counsel below;

and the Court having determined that the legal and factual bases set forth in the Motion and at the

Hearing establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

1. The Motion is GRANTED.

2. Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtor

is authorized to enter into and perform all of its obligations, and receive all benefits, under the

Second Amended Funding Agreement, substantially in the form attached hereto as Exhibit A. All

transactions contemplated by the Second Amended Funding Agreement are approved.

3. The Debtor shall provide to counsel for the Claimant Representatives copies

of the financial information received from New CT under Section 4(a) of the Second Amended

Funding Agreement within five business days after receiving such information.

4. The Debtor shall provide to counsel for the Claimant Representatives copies

of (a) any notices received from New CT under the Second Amended Funding Agreement within

five business days after receiving such notice and (b) any notices given by the Debtor to New CT

(including any Notices of Default) under the Second Amended Funding Agreement within three business days after giving such notice.

5.     The Debtor shall provide to counsel for the Claimant Representatives (a) copies of all funding requests under Section 2(b) of the Amended Funding Agreement within three business days of the Debtor making such request and (b) copies of proof of funding of each such funding request within five business days of such proof becoming available to the Debtor.

6.     If, upon an Event of Default under Section 6 of the Second Amended Funding Agreement, the Debtor fails to take action to enforce its remedies as Payee against New CT as Payor, then the Debtor and New CT agree that the Claimant Representatives may take such actions as are necessary or appropriate on behalf the Payee to pursue remedies in this Court to address such Event of Default after first giving the Debtor and its counsel 10 business days' advance written notice.  Any disagreement between the Debtor and Claimant Representatives about whether there is an Event of Default under the Second Amended Funding Agreement shall be resolved by the Bankruptcy Court.

7.     The Debtor is authorized and empowered to take all actions necessary to implement the relief granted in this Order.

8.     This Court shall retain exclusive jurisdiction over any and all matters arising from or related to the implementation, enforcement or interpretation of this Order and, during the pendency of this case, the enforcement of the Second Amended Funding Agreement.


STIPULATED AND AGREED AS TO
FORM AND SUBSTANCE BY:

*/s/ Jeffrey B. Ellman*
Garland S. Cassada (NC Bar No. 12352)
David M. Schilli (NC Bar No. 17989)
Andrew W.J. Tarr (NC Bar No. 31827)
ROBINSON, BRADSHAW & HINSON,
P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina  28246
Telephone:  (704) 377-2536
Facsimile:  (704) 378-4000
E-mail:  gcassada@robinsonbradshaw.com
          dschilli@robinsonbradshaw.com
          atarr@robinsonbradshaw.com

Gregory M. Gordon (TX Bar No. 08435300)
Amanda Rush (TX Bar No. 24079422)
JONES DAY
2727 North Harwood Street, Suite 500
Dallas, Texas  75201
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100
E-mail:  gmgordon@jonesday.com
          asrush@jonesday.com
(Admitted *pro hac vice*)

Jeffrey B. Ellman (GA Bar No. 141828)
JONES DAY
1221 Peachtree St. NE, Ste. 400
Atlanta, Georgia  30361
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330
E-mail:  jbellman@jonesday.com
(Admitted *pro hac vice*)

ATTORNEYS FOR DEBTOR AND
DEBTOR IN POSSESSION

*/s/ Richard M. Wyner*
John R. Miller, Jr. (NC 28689)
RAYBURN COOPER & DURHAM, P.A.
227 West Trade Street, Suite 1200
Charlotte, North Carolina 28202
Telephone: (704) 334-0891
Facsimile: (704) 377-1897
E-mail: jmiller@rcdlaw.net

-and-

Richard M. Wyner (admitted *pro hac vice*)
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, D.C. 20036
Telephone: (202) 346-4244
Facsimile: (202) 346-4444
E-mail: rwyner@goodwinlaw.com

-and-

Howard S. Steel (admitted *pro hac vice*)
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 813-8840
Fax: (212) 409-8404
E-mail: hsteel@goodwinlaw.com

ATTORNEYS FOR CERTAINTEED LLC

This Order has been signed electronically.
The Judge's signature and Court's seal appear
at the top of the Order.

United States Bankruptcy Court

## EXHIBIT A TO AGREED ORDER

## SECOND AMENDED AND RESTATED FUNDING AGREEMENT

This SECOND AMENDED AND RESTATED FUNDING AGREEMENT, dated as of September 15, 2021 (as it may be amended, restated, modified or supplemented from time to time, this "Agreement") is between CERTAINTEED LLC, a Delaware limited liability company ("Payor"), and DBMP LLC, a North Carolina limited liability company ("Payee").

## RECITALS

A.     Prior to and in contemplation of the conversion of CertainTeed LLC, a Delaware limited liability company ("Old CT (DE)"), to a Texas limited liability company (as such, "Old CT (TX)") and the subsequent divisional merger of Old CT (TX) pursuant to Chapter 10 of the TBOC (the "Divisional Merger"), CertainTeed Holding Corporation, a Delaware corporation ("CT Holding"), as payor, and Old CT (DE), as payee, executed and delivered a Funding Agreement, dated as of October 22, 2019 (the "Original Funding Agreement").

B.     Immediately after the execution of the Original Funding Agreement and prior to the Divisional Merger, Old CT (DE) converted from a Delaware limited liability company into a Texas limited liability company, Old CT (TX), pursuant to Section 18.216 of the Delaware Limited Liability Company Act and Section 10.102 of the TBOC (the "TX Conversion").

C.     Immediately following the effectiveness of the TX Conversion, CT Holding, in its capacity as the sole member of CT (TX), approved a Plan of Divisional Merger contemplating the Divisional Merger (the "Plan of Divisional Merger").

D.     At the effective time of the Divisional Merger, (1) certain property of CT (TX), as set forth on Schedule 5(b)(i) to the Plan of Divisional Merger and certain liabilities and obligations of CT (TX), as set forth on Schedule 5(c)(i) to the Plan of Divisional Merger (collectively, the "Allocated Assets and Liabilities") were allocated to a new Texas limited liability company created upon the effectiveness of the Divisional Merger ("DBMP (TX)"), (2) the remaining property, liabilities and obligations of CT (TX) were allocated to another new Texas limited liability company created upon effectiveness of the Divisional Merger ("New CT (TX)"), and (3) CT (TX) ceased to exist.

E.     Immediately following the effectiveness of the Divisional Merger, CT Holding assigned to New CT (TX), and New CT (TX) assumed from CT Holding, all rights and obligations of CT Holding under the Original Funding Agreement (such assignment and assumption, the "Post-Merger Assignment"), whereupon CT Holding was released from its obligations, and ceased to have any further obligations, under the Original Funding Agreement.

F.     Following the Divisional Merger and the Post-Merger Assignment, (1) New CT (TX) effected a conversion (the "DE Conversion") into Payor, a Delaware limited liability company, and (2) DBMP (TX) effected a conversion (the "NC Conversion") into Payee, a North Carolina limited liability company.

G.     In connection with the allocation to DBMP (TX) of the Allocated Assets and Liabilities, CT Holding and its successors and assigns agreed, pursuant to the Original Funding Agreement, to provide funding to Old CT (DE) and, after the TX Conversion, CT (TX), and,

after the Divisional Merger, DBMP (TX) and, after the NC Conversion, DBMP, sufficient to pay the costs of operations of DBMP's business and other liabilities and obligations included in the Allocated Assets and Liabilities as and when they become due.

H.    The Allocated Assets and Liabilities included the rights and obligations of CT (TX) (as successor to Old CT (DE) in the TX Conversion) under the Original Funding Agreement, and, at the effective time of the Divisional Merger, pursuant to the terms and conditions of the Plan of Divisional Merger, the rights and obligations of CT (TX) under the Original Funding Agreement were allocated to DBMP (TX) such that, following the effectiveness of the Divisional Merger, DBMP (TX), and, following the NC Conversion, DBMP, had assets having a value at least equal to its liabilities and had financial capacity sufficient to satisfy its obligations as they become due in the ordinary course of business, including any Asbestos Related Liabilities.

I.    Payor and Payee then amended and restated the Original Funding Agreement to reflect that the Merger, the Post-Merger Assignment, the DE Conversion and the NC Conversion had occurred and Payor, a Delaware limited liability company having the name "CertainTeed LLC," and Payee, a North Carolina limited liability company having the name "DBMP LLC," were the parties to such agreement (as so amended and restated, the "<u>Amended and Restated Funding Agreement</u>").

J.    Payor and Payee now desire to amend and restate the Amended and Restated Funding Agreement to incorporate certain changes intended to clarify the terms hereof and further enhance the rights of Payee consistent with the purposes of this Agreement.

AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, the parties hereto agree as follows:

1.    <u>Definitions</u>.  As used in this Agreement, the following terms have the meanings herein specified unless the context otherwise requires:

"<u>Affiliate</u>" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.  For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"<u>Allocated Assets and Liabilities</u>" has the meaning specified in the recitals to this Agreement.

"<u>Amended and Restated Funding Agreement</u>" has the meaning specified in the recitals to this Agreement.

"Asbestos Related Liabilities" has the meaning specified in Schedule 1 to this Agreement.

"Bankruptcy Case" means any voluntary case under chapter 11 of the Bankruptcy Code commenced by the Payee in the Bankruptcy Court.

"Bankruptcy Code" means title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"Bankruptcy Court" means the United States Bankruptcy Court where the Bankruptcy Case is commenced.

"Base Rate" means, for any day, a fluctuating interest rate per annum as shall be in effect from time to time, which rate per annum shall at all times be equal to the greater of (a) the rate of interest established by Bank of America, N.A from time to time, as its "prime rate," whether or not publicly announced, which interest rate may or may not be the lowest rate charged by it for commercial loans or other extensions of credit, and (b) the Federal Funds Effective Rate in effect from time to time, determined one Business Day in arrears, plus 1/2 of 1% per annum.

"Board" means: (a) with respect to a corporation, the board of directors of the corporation or any committee thereof; (b) with respect to a partnership, the board of directors, the managing member or members or the board of managers, as applicable, of the general partner of the partnership; (c) with respect to a limited liability company, the managing member or members or the board of managers, as applicable, of the limited liability company; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"Business Day" means each day other than a Saturday, a Sunday or a day on which banking institutions in Charlotte, North Carolina or at a place of payment are authorized by law, regulation or executive order to remain closed.

"Capital Stock" means: (a) in the case of a corporation, corporate stock; (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock; (c) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person; but excluding (in each case of (a) through (d) above) any debt securities convertible into such equity securities.

"Contractual Obligation" means, as to any Person, any obligation or similar provision of any security issued by such Person or any agreement, instrument or other undertaking (excluding this Agreement) to which such Person is a party or by which it or any of its property is bound.

"CT (DE)" has the meaning specified in the recitals to this Agreement.

"CT Holding" has the meaning specified in the recitals to this Agreement.

"CT (TX)" has the meaning specified in the recitals to this Agreement.

"DBMP" has the meaning specified in the recitals to this Agreement.

"DBMP (TX)" has the meaning specified in the recitals to this Agreement.

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"DE Conversion" has the meaning specified in the recitals to this Agreement.

"District Court" means the United States District Court in the district of the Bankruptcy Court.

"Dividend" means, with respect to any entity, a distribution of cash or any other assets or properties made by such entity to such entity's member or parent company.

"Divisional Merger" has the meaning specified in the recitals to this Agreement.

"Event of Default" has the meaning specified in Section 6.

"Federal Funds Effective Rate" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York.

"Funding Account" means the account of the Payee listed on Schedule 2 to this Agreement, into which the proceeds of all Payments made under this Agreement shall be deposited, or such other account designated in writing by the Payee to the Payor from time to time.

"Funding Date" has the meaning specified in Section 2(b).

"Funding Request" has the meaning specified in Section 2(b).

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, in effect from time to time, consistently applied. If at any time any change in GAAP (including any adoption of International Financial Reporting Standards) would materially affect the computation of any amount required to be computed under this Agreement, the Payor may give written notice to the Payee of its intent to preserve the original intent of this Agreement and upon delivery of such notice, such amounts shall be calculated in accordance with GAAP as in effect at the end of the fiscal period ended immediately prior to such change in GAAP.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority,

instrumentality regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"NC Conversion" has the meaning specified in the recitals to this Agreement.

"New CT" has the meaning specified in the recitals to this Agreement.

"New CT (TX)" has the meaning specified in the recitals to this Agreement.

"Organizational Documents" means: (a) with respect to any corporation, its certificate or articles of incorporation and bylaws; (b) with respect to any limited liability company, its certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation of such entity.

"Original Funding Agreement" has the meaning specified in the recitals to this Agreement.

"Payee" has the meaning specified in the first paragraph of this Agreement.

"Payee Affiliate" means any wholly owned Affiliate of the Payee (and in no case includes the Payor or any Payor Affiliate).

"Payee Material Adverse Effect" means: (a) a material impairment of the rights and remedies of the Payor under this Agreement, or of the ability of the Payee to perform its material obligations under this Agreement; or (b) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payee.

"Payment" has the meaning specified in Section 2(a).

"Payor" has the meaning specified in the first paragraph of this Agreement.

"Payor Affiliate" means any wholly owned Affiliate of the Payor (and in no case includes the Payee or any Payee Affiliate).

"Payor Material Adverse Effect" means: (a) a material adverse change in, or a material adverse effect upon, the business, assets, liabilities (actual or contingent) or financial condition of the Payor and its Subsidiaries, taken as a whole; (b) a material impairment of the rights and remedies of the Payee under this Agreement, or of the ability of the Payor to perform its material obligations under this Agreement; or (c) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payor.

"Payor Tax Liabilities" means the portion of any tax liabilities of the consolidated tax group of which the Payor is a member that arises from the income of the Payor, any Subsidiaries

of the Payor that are disregarded entities for tax purposes, and any entities whose tax items are included in the Payor's tax items pursuant to the Amended and Restated Tax Item Allocation Agreement, effective as of October 23, 2019, to which the Payor and the Payee are parties.

"Permitted Funding Use" means each of the following:

(a) the payment of any and all costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee) at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee;

(b) the payment of any and all costs and expenses of the Payee incurred during the pendency of any Bankruptcy Case, including the costs of administering the Bankruptcy Case and any and all other costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee);

(c) the funding of any amounts to satisfy (i) the Payee's Asbestos Related Liabilities established by a judgment of a court of competent jurisdiction or final settlement thereof at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee; (ii) following the commencement of any Bankruptcy Case, the Payee's Asbestos Related Liabilities in connection with the funding of a trust under section 524(g) of the Bankruptcy Code for the benefit of existing and future claimants that is included in a plan of reorganization for the Payee confirmed by a final, nonappealable order of the Bankruptcy Court and the District Court (for the avoidance of doubt, regardless of whether such plan of reorganization provides that the Payor will receive the protection of section 524(g) of the Bankruptcy Code and regardless of whether the Payor supports such plan of reorganization); and (iii) in the case of either (i) or (ii), any ancillary costs and expenses of the Payee associated with such Asbestos Related Liabilities and any litigation thereof, including the costs of any appeals;

(d) the funding of any amounts necessary to cause the Funding Account to contain at least $5,000,000 at such time;

(e) the funding of any obligations of the Payee owed to the Payor or any Payor Affiliate, including any indemnification or other obligations of the Payee under any agreement provided for in the Plan of Divisional Merger; and

(f) the payment of any and all costs and expenses of the Payee incurred in connection with the pursuit of available remedies to collect any unfunded Payments due and owing to the Payee or otherwise to enforce the performance by the Payor of any provision of this Agreement;

in the case of clauses (a) through (f) above, solely to the extent that any cash distributions theretofore received by the Payee from its Subsidiaries are insufficient to pay such costs and expenses and fund such amounts and obligations in full and further, in the case of

clause (c)(ii) above, solely to the extent the Payee's other assets are insufficient to satisfy the Payee's Asbestos Related Liabilities in connection with the funding of such trust.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"Plan of Divisional Merger" has the meaning specified in the recitals to this Agreement.

"SEC" means the Securities and Exchange Commission.

"Subsidiary" means any Person a majority of the outstanding Voting Stock of which is owned or controlled by the Payor or by one or more other Subsidiaries and that is consolidated in the Payor's accounts.

"TX Conversion" has the meaning specified in the recitals to this Agreement.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of such Person.

2.      Funding Obligations and Procedures.

(a)      Funding Obligations.   The Payor hereby agrees, on the terms and conditions set forth in this Agreement, upon the request of the Payee from time to time in accordance with the requirements of Section 2(b), to make payments to the Payee (each, a "Payment"), the proceeds of which shall be used by the Payee for any Permitted Funding Use.  Nothing in this Agreement shall obligate the Payor to make Payments under this Agreement that in the aggregate exceed the aggregate amount of all Permitted Funding Uses, and nothing in this Agreement shall obligate the Payor to make any individual payment under this Agreement that exceeds the amount requested by the Payee in the applicable Funding Request.

(b)      Funding Requests.  To request a Payment, the Payee shall deliver to the Payor a written request (which written request may be a .pdf delivered via email) for such Payment in a form reasonably acceptable to the Payor and signed by the Payee (each, a "Funding Request").  Each Funding Request shall specify (i) the amount of the requested Payment, which shall be no less than $500,000, and (ii) the date of the requested Payment, which shall be the date that is five Business Days following the delivery of such Funding Request (each such date, a "Funding Date").  Each Funding Request by the Payee shall constitute a representation and warranty by the Payee that the conditions set forth in Section 2(d) have been satisfied.  Except as required to comply with the minimum requirements in Section 2(b)(i), Payee shall not deliver a Funding Request for an amount in excess of the aggregate amount necessary for the Payee to fund all current Permitted Funding Uses and all projected Permitted Funding Uses over the 30 days following the date of such Funding Request.

(c)      Payments.  Subject only to the satisfaction of the conditions set forth in Section 2(d), on any Funding Date, the Payor shall pay or cause to be paid to the Payee

an amount equal to the amount of the requested Payment specified in the applicable Funding Request. All Payments shall be made by wire or other transfer of immediately available funds, in United States dollars, to the Funding Account.  In the event that the Payor does not make any Payment within the time period required by this <u>Section 2(c)</u>, the amount of the requested Payment shall bear interest at a rate per annum equal to the Base Rate *plus* 2% until such Payment is made and the Payor shall include any interest accruing pursuant to this <u>Section 2(c)</u> in the next Payment made to the Payee.

(d)    <u>Conditions to Payments</u>.  The Payor's obligation to make any Payment is subject to the satisfaction of the following conditions as of the date of the Funding Request relating to such Payment (i) the representations and warranties of the Payee set forth in <u>Section 3(b)</u> shall be true and correct without regard to the impact of any Bankruptcy Case, including any notices or other actions that may be required therein, and (ii) there shall have been no violation by the Payee of the covenant set forth in <u>Section 5</u>.

3.    <u>Representations and Warranties</u>.

(a)    <u>Representations and Warranties of the Payor</u>.  The Payor represents and warrants to the Payee that:

(i)    <u>Existence, Qualification and Power</u>.  The Payor (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement, and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payor Material Adverse Effect.

(ii)    <u>Authorization; No Contravention</u>. The execution, delivery and performance by the Payor of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payor Material Adverse Effect.

(iii)    <u>Governmental Authorization; Other Consents</u>.  No approval, consent, exemption, authorization or other action by, or notice to, or filing with,

any Governmental Authority or any other Person is necessary or required in connection with the execution delivery or performance of this Agreement by, or enforcement against, the Payor.

(iv)    <u>Binding Effect</u>.    This Agreement has been duly executed and delivered by the Payor.  This Agreement constitutes a legal, valid and binding obligation of the Payor, enforceable against the Payor in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

(b)    <u>Representations and Warranties of the Payee</u>.  The Payee represents and warrants to the Payor that:

(i)    <u>Existence, Qualification and Power</u>.  The Payee (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(ii)    <u>Authorization; No Contravention</u>.  The execution, delivery and performance by the Payee of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(iii)    <u>Governmental Authorization; Other Consents</u>.    No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution delivery or performance of this Agreement by, or enforcement against, the Payee.

(iv)    <u>Binding Effect</u>.  This Agreement has been duly executed and delivered by the Payee.  This Agreement constitutes a legal, valid and binding

obligation of the Payee, enforceable against the Payee in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

4.     Covenants of the Payor.

(a)     Provision of Financial Information.

(i)     The Payor will furnish to the Payee, no later than 90 days after the end of each fiscal year (in the case of annual financial statements) and 60 days after the end of each fiscal quarter other than the last fiscal quarter (in the case of quarterly financial statements), unaudited annual and quarterly consolidated financial statements prepared in accordance with GAAP (subject to the absence of notes to the financial statements and related disclosures, and, with respect to quarterly financial statements, normal year-end audit adjustments).

(ii)     By accepting such financial information, the Payee will be deemed to have represented to and agreed with the Payor that: (A) it will not use the information in violation of applicable securities laws or regulations; and (B) it will not communicate the information to any Person, including in any aggregated or converted form, and will keep the information confidential, other than where disclosure of such information is required by law, regulation or legal process (in which case the Payee shall, to the extent permitted by law, notify the Payor promptly thereof); *provided however*, that the Payee may deliver a copy thereof to counsel for any official committee of asbestos claimants and any future claimants' representative appointed in any Bankruptcy Case on a confidential basis under a protective order entered in such Bankruptcy Case.

(iii)     Notwithstanding the foregoing, the financial statements, information and other documents required to be provided as described in Section 4(a)(i), may be, rather than those of the Payor, those of any direct or indirect parent of the Payor.  Notwithstanding the foregoing, the Payor may fulfill the requirement to distribute such financial information by filing the information with the SEC within the applicable time periods required by the SEC.  The Payor will be deemed to have satisfied the reporting requirements of Section 4(a)(i) if any direct or indirect parent of the Payor has filed such reports containing such information with the SEC within the applicable time periods required by the SEC and such reports are publicly available.  To the extent a direct or indirect parent of the Payor provides financial statements, information and other documents pursuant to the first sentence of this Section 4(a)(iii) or such parent files such report with the SEC pursuant to the third sentence of this Section 4(a)(iii), and if the financial information so furnished relates to such direct or indirect parent of the Payor, the same shall be accompanied by consolidating information that explains in reasonable detail the difference between the information relating to such parent on the one hand, and the information relating to the Payor and its Subsidiaries on a standalone basis, on the other hand.

(b)    Successor to the Payor upon Consolidation or Merger.

(i)    Subject to the provisions of Sections 4(b)(ii) and 4(b)(iii), nothing contained in this Agreement shall prevent any consolidation or merger of the Payor with or into any Person, or successive consolidations or mergers in which the Payor or its successor or successors shall be a party or parties, or shall prevent any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all the property of the Payor (for the avoidance of doubt, calculated by including any equity interests held by the Payor), to any Person; *provided, however*, and the Payor hereby covenants and agrees, that, if the surviving Person, acquiring Person or lessee is a Person other than the Payor, upon any such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, all of the Payor's funding obligations under this Agreement and the observance of all other covenants and conditions of this Agreement to be performed by the Payor, shall be expressly assumed by an amendment to this Agreement or such other documentation in form reasonably satisfactory to the Payee, executed and delivered to the Payee by the Person formed by such consolidation, or into which the Payor shall have been merged, or by the Person which shall have acquired or leased such property.  This covenant will not apply to (A) a merger of the Payor with an Affiliate solely for the purpose of reincorporating the Payor in another jurisdiction within the United States, (B) any conversion of the Payor from an entity formed under the laws of one state to the same type of entity formed under the laws of another state, or (C) any conversion of the Payor from a limited liability company to a corporation, from a corporation to a limited liability company, from a limited liability company to a limited partnership or a similar conversion, whether the converting entity and the converted entity are formed under the laws of the same state or the converting entity is formed under the laws of one state and the converted entity is formed of the laws of a different state.  Notwithstanding the foregoing, this Section 4(b)(i) will not apply to any consolidation or merger, or any sale, assignment, transfer, conveyance, lease or other disposition of assets, between or among Payor and its Subsidiaries.

(ii)    Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the assets, of the Payor (for the avoidance of doubt, calculated by including any equity interests held by the Payor) in a transaction that is subject to, and that complies with, the provisions of the preceding clause (i), the successor Person formed by such consolidation with the Payor or into which the Payor is merged, or to which such sale, assignment, transfer, lease, conveyance or other disposition is made, shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, lease, conveyance or other disposition, the provisions of this Agreement referring to the "Payor" shall refer instead to the successor Person and not to the Payor), and may exercise every right and power of, the Payor under this Agreement with the same effect as if such successor Person had been named as the Payor herein.  In the event of a succession in compliance with this Section 4(b)(ii), the predecessor Person shall be relieved

from every obligation and covenant under this Agreement upon the consummation of such succession.

(iii)    Any consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition referred to in the preceding clause (i) shall not be permitted under this Agreement unless immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing.

(c)    Financial Limitations.

(i)    The Payor shall not make any Dividend; *provided*, *however*, that nothing in this Section 4(c)(i) shall prohibit the Payor from making any Dividend solely to fund Payor Tax Liabilities.

(ii)    The Payor shall not forgive any obligation owed to it by an Affiliate of the Payor and shall cause each of its Subsidiaries not to forgive any obligation owed to such Subsidiary by an Affiliate of such Subsidiary.

(d)    Limitation on Payment Prohibitions.  The Payor will not consensually enter into any contract that prohibits the Payor from making Payments under this Agreement.

5.    Covenants of the Payee. The Payee shall not use the proceeds of any Payment made under this Agreement for any purpose other than a Permitted Funding Use.  The Payee will perform its indemnification obligations owing to the Payor under the agreements provided for in the Plan of Divisional Merger in all material respects, subject, in the event that a proceeding under the Bankruptcy Code is pending with respect to the Payee, to the resulting automatic stay under section 362 of the Bankruptcy Code.

6.    Events of Default.  Each of the following events constitutes an "Event of Default":

(a)    the Payor defaults in its funding obligations pursuant to Section 2 and such default continues for a period of 10 Business Days;

(b)    the Payor defaults in the performance of, or breaches, any covenant or representation or  warranty of the Payor in this Agreement (other than a covenant or representation or warranty which is specifically dealt with elsewhere in this Section 6) and such default or breach continues for a period of 30 days, or, in the case of any failure to comply with Section 4(a) of this Agreement, 60 days, in each case after there has been given, by registered or certified mail, to the Payor by the Payee a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(c)    the Payor, pursuant to or within the meaning of the Bankruptcy Code or any similar federal or state law for the relief of debtors, (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it or for all or substantially all of its

property, (iv) makes a general assignment for the benefit of its creditors, or (v) generally is not paying its debts as they become due; and

        (d)      a court of competent jurisdiction enters an order or decree under the Bankruptcy Code or any similar federal or state law for the relief of debtors that (i) is for relief against the Payor, (ii) appoints a custodian of the Payor for all or substantially all of the property of the Payor, or (iii) orders the liquidation of the Payor, and, in each case of (i) through (iii) above, such order or decree remains unstayed and in effect for 60 consecutive days.

Upon becoming aware of any Default or Event of Default, the Payor shall promptly deliver to the Payee a statement specifying such Default or Event of Default.

    7.    <u>Remedies</u>.  Upon the occurrence of any Event of Default, and at any time thereafter during the continuance of any such Event of Default, the Payee may pursue any available remedy to collect any unfunded Payments due and owing to the Payee or to enforce the performance of any provision of this Agreement.

    8.    <u>Notices</u>.  All notices required under this Agreement, including each Funding Request and any approval of or objection to a Funding Request, shall be delivered to the applicable party to this Agreement at the address set forth below.  Unless otherwise specified herein, delivery of any such notice by email, facsimile or other electronic transmission (including .pdf) shall be effective as delivery of a manually executed counterpart thereof.

    <u>Payor</u>:

    CERTAINTEED LLC
    20 Moores Road
    Malvern, Pennsylvania 19355
    Attention: Mark A. Rayfield, President and Chief Executive Officer
    Email: Mark.A.Rayfield@saint-gobain.com

    with a copy to:

    CERTAINTEED LLC
    20 Moores Road
    Malvern, Pennsylvania 19355
    Attention: R. Craig Smith, Divisional Counsel
    E-mail:  Craig.Smith@saint-gobain.com

    <u>Payee</u>:

    DBMP LLC
    20 Moores Road
    Malvern, Pennsylvania 19355
    Attention: Joseph N. Bondi, President
    Email: Joseph.N.Bondi@saint-gobain.com

with a copy to:

DBMP LLC
20 Moores Road
Malvern, Pennsylvania 19355
Attn: Michael T. Starczewski, Chief Legal Officer
E-mail: Michael.T.Starczewski@saint-gobain.com

      9.     <u>Governing Law; Submission to Jurisdiction</u>.  This Agreement shall be governed and construed in accordance with the laws of the State of North Carolina.  Any legal proceeding seeking to enforce any provision of, or based on any matter arising under, this Agreement may be brought: (a) at any time there is not a proceeding under the Bankruptcy Code pending with respect to the Payee, in state or federal court in Charlotte, North Carolina; or (b) at any time there is a proceeding under the Bankruptcy Code pending with respect to the Payee, in the Bankruptcy Court.  Each of the Payor and the Payee hereby irrevocably and unconditionally submits to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such legal proceeding.

      10.    <u>No Implied Waiver; Amendments</u>.  No failure or delay on the part of the Payee to exercise any right, power or privilege under this Agreement, and no course of dealing between the Payor, on the one hand, and the Payee, on the other hand, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  No notice to or demand on the Payor in any case shall entitle the Payor to any other or further notice or demand in similar or other circumstances, or constitute a waiver of the right of the holder of this Agreement to any other or further action in any circumstances without notice or demand.  The remedies provided in this Agreement are cumulative and not exclusive of any remedies provided by law.  No amendment or waiver of any provision of this Agreement, nor consent to any departure by the Payee therefrom, shall in any event be effective unless the same shall be in writing, specifically refer to this Agreement, and be signed by the Payor and the Payee, and then such amendment or waiver shall be effective only in the specific instance and for the specific purpose for which given.  A waiver on any such occasion shall not be construed as a bar to, or waiver of, any such right or remedy on any future occasion.

      11.    <u>Counterparts; Entire Agreement; Electronic Execution</u>.  This Agreement may be executed in separate counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersedes, in its entirety, the Amended and Restated Funding Agreement.  This Agreement shall become effective when it shall have been executed by each party hereto and each party hereto shall have received counterparts hereof which, when taken together, bear the signatures of each of party hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy, .pdf or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

12.    <u>Severability</u>.  If any one or more of the provisions contained in this Agreement are invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of all the remaining provisions will not in any way be affected or impaired.  If any one or more provisions contained in this Agreement are deemed invalid, illegal or unenforceable because of their scope or breadth, such provisions shall be reformed and replaced with provisions whose scope and breadth are valid under applicable law.

13.    <u>Transfer; Assignment</u>.  This Agreement shall be binding upon the Payor and its successors and assigns, and the terms and provisions of this Agreement shall inure to the benefit of the Payee and its successors and assigns.  The Payor's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payee; *provided*, *however*, that no such consent of the Payee shall be required in connection with any transfer effected in compliance with <u>Section 4(b)</u>.  The Payee's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payor.

14.    <u>Construction</u>.  The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement. The word "including" means without limitation by reason of enumeration. The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless specifically stated otherwise, all references to Sections and Schedules are to the Sections and Schedules of or to this Agreement.

15.    <u>Rights of Parties</u>.  This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**CERTAINTEED LLC**, a Delaware limited liability company, as the Payor

By: _____
       Mark A. Rayfield
       President and Chief Executive Officer

**DBMP LLC**, a North Carolina limited liability company, as the Payee

By: _____
       Joseph N. Bondi
       President

# SCHEDULE 1

## Definition of Asbestos Related Liabilities

For purposes of this Agreement, "<u>Asbestos Related Liabilities</u>" means all Liabilities (as defined below) of the Payee related in any way to asbestos or asbestos containing materials.

Capitalized terms that are used in this <u>Schedule 1</u> have the following meanings:

(a)     "<u>Cause of Action</u>" means any claim, judgment, cause of action, counterclaim, crossclaim, third party claim, defense, indemnity claim, reimbursement claim, contribution claim, subrogation claim, right of set off, right of recovery, recoupment, right under any settlement Contract and similar right, whether choate or inchoate, known or unknown, contingent or noncontingent.

(b)     "<u>Contract</u>" means any contract, agreement, arrangement, lease, indenture, mortgage, deed of trust, evidence of indebtedness, License, Plan, guarantee, understanding, course of dealing or performance, instrument, bid, order, proposal, demand, offer or acceptance, whether written or oral.

(c)     "<u>Governmental Authority</u>" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational governmental, legislative, administrative or regulatory authority, agency, court, arbitration tribunal, board, department or commission, or other governmental or regulatory entity, including any competent governmental authority responsible for the determination, assessment or collection of taxes.

(d)     "<u>Law</u>" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational statute, law, ordinance, decree, order, injunction, rule, regulation, directive, constitution, code, edict, writ, judgment, opinion, decree, injunction, stipulation, award or other document or pronouncement having the effect of law (including common law) of any Governmental Authority, including rules and regulations of any regulatory or self-regulatory authority with which compliance is required by any of the foregoing.

(e)     "<u>Liability</u>" shall mean any claim, demand, offer, acceptance, action, suit, liability or obligation of any kind, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, choate or inchoate, asserted or unasserted, known or unknown, including (i) those arising or that may arise under any past, present or future Law or Contract or pursuant to any Cause of Action or Proceeding and (ii) all claims for economic or noneconomic damages or injuries of any type or nature whatsoever (including claims for physical, mental and emotional pain and suffering, loss of enjoyment of life, loss of society or consortium and wrongful death, as well as claims for damage to property and punitive damages).

(f)      "<u>License</u>" means any license, sublicense, agreement, covenant not to sue or permission.

(g)      "<u>Person</u>" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, benefit plan, unincorporated organization, business, syndicate, sole proprietorship, association, organization, labor union or other entity or Governmental Authority.

(h)      "<u>Plan</u>" means, with respect to any Person, (i) any "employee benefit plan" (as defined in Section 3(3) of ERISA), (ii) all specified fringe benefit plans as defined in Section 6039(D) of the Internal Revenue Code, and (iii) any other plan, program, policy, agreement or arrangement, whether or not in writing, relating to compensation, employee benefits, severance, change in control, retention, deferred compensation, equity, employment, consulting, vacation, sick leave, paid time off, salary continuation, disability, hospitalization, medical insurance, life insurance, scholarship programs, incentive compensation or bonus compensation, in each case that is sponsored, maintained or contributed to or required to be sponsored, maintained or contributed to by, or otherwise covering, such Person.

(i)      "<u>Proceeding</u>" means any action, appeal, arbitration, assessment, cancellation, charge, citation, claim, complaint, concurrent use, controversy, contested matter, demand, grievance, hearing, inquiry, interference, investigation, litigation (including class actions and multidistrict litigation), mediation, opposition, re-examination, summons, subpoena or suit, or other case or proceeding, whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private, commenced, brought, conducted or heard by or before, under the supervision or direction of, or otherwise involving, any Governmental Authority or arbitrator or other agreed-upon tribunal or dispute resolution mechanism.