**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

|  |  |
|---|---|
| In re: | : |
|  | : |
|  | : Chapter 11 |
| DBMP LLC,[1] | : |
|  | : Case No.  20-30080 |
| Debtor. | : |
|  | : |

**THE ESTATE OF PETER L. BERGRUD'S MOTION FOR RELIEF FROM THE
AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)**

Pursuant to 11 U.S.C. § 362(a)(1), Cheryl L. Bergrud, individually and as Personal

Representative for the Estate of Peter L. Bergrud ("Mrs. Bergrud" or "Movant") requests

relief from the automatic stay to quantify her state law claims against DBMP.[2]

## I.      INTRODUCTION

*If you choose not to decide, you still have made a choice.*

---

[1] The last four digits of the Debtor's taxpayer identification number are 8817. The Debtor's address is 20 Moores Road, Malvern, Pennsylvania 19335.

[2] This Court issued thorough Findings of Fact and Conclusions of Law in ruling on the preliminary injunction on August 11, 2021. *See* Case No. 20-30080, Adv. Pro. Case No. 20-03004, Adv. Pro. Dkt. 972 ("Findings"). CertainTeed Corporation ("Old CertainTeed" or "Old CT") manufactured building products containing asbestos for decades.  *See* Findings at ¶ 1. On October 23, 2019, Old CertainTeed divided itself into two new entities: CertainTeed LLC ("New CertainTeed" or "New CT") and DBMP LLC ("DBMP" or the "Debtor").

Forty-four years ago, the iconic Canadian band, Rush, immortalized in song the concept first articulated by the American philosopher and psychologist William James that "not to act on one belief, is often equivalent to acting as if the other belief were true."[3]

This Motion implores the Court to decide whether DBMP filed its petition in bad faith and whether this is grounds to lift the stay, as well-established precedent in the Fourth Circuit demonstrates. If so, then even if dismissal cannot be granted at this time, due to this Court's evaluation of "objective futility" under *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989), individual claimants who seek relief must ***not*** continue to be subjected to the devastating effects of the automatic stay.

Over six years and several cases into the Texas Two-Step debacle in this District, no court has addressed whether these wealthy and fabricated debtors, all of whom boast the ability to pay all claims in full, have filed for Chapter 11 in subjective bad faith. In *Aldrich*, this Court denied the motions to dismiss without reaching this issue, finding those two debtors "were designed to meet [*Carolin*'s] objective futility standard, and they do." *Aldrich* Dismissal Order at 63.[4] Nor has Judge Beyer ruled on Bestwall's subjective bad faith, despite being urged to do so recently by plaintiff Wilson Buckingham.[5]

---

[3] James, *Some Problems of Philosophy*: *Beginning of an Introduction to Philosophy*, p. 223, Longmans, Green, and Co. (1911). Rush, *Freewill*, from the album Permanent Waves, Anthem Records, January 14, 1980.

[4] *Order Denying Motions To Dismiss* (Hon. J. Craig Whitley), entered December 28, 2023, Case No. 20-30608-JCW (Dkt. No. 2047) ("*Aldrich* Dismissal Order").

[5] *See In re Bestwall LLC*, 605 B.R. 43, 50-51 (Bankr. W.D.N.C. 2019) ("Because the Court concludes that this case is not objectively futile, it need not (and does not) reach the issue of whether this case was filed in subjective bad faith."); *In re Bestwall LLC*, 71 F.4th 168, 182 (4th Cir. 2023)("In this appeal, by contrast, [claimants] do not make the arguments raised by the claimants in *LTL Management LLC*" where motions to

Only yesterday, despite this Court's thoughtful and thorough dismissal opinion and certification ruling in Aldrich, the Fourth Circuit declined to take interlocutory review. *See* U.S.C.A4 Appeal No. 24-128, Dkt. 50. The subjective bad faith of Two-Step debtors must be addressed, and Mrs. Bergrud urges this Court not to put off for another day what can and should be decided *now*:

> Is it a proper use of the Bankruptcy Code for a massively profitable and non-financially troubled company to manipulate its corporate structure on the eve of bankruptcy to isolate a single class of creditor, remove all the productive assets of its business from the reach of the bankruptcy court, and file for Chapter 11 in an admitted attempt to leverage the automatic stay into judicially compelled re-negotiations of state law liabilities, and for relief which that debtor is not entitled to under controlling law outside of bankruptcy?

> If the answer is "no," then this proceeding is in bad faith and the stay must be

lifted for those who ask. *See In re Premier Automotive Servs., Inc.*, 492 F.3d 274, 281–82 (4th Cir. 2007) (bankruptcy courts' "powerful equitable weapons" should not be wielded by "financially healthy companies with no need to reorganize"); *Carolin Corp. v. Miller*, 886 F.2d 693, 702 (4th Cir. 1989) (it is bad faith for a debtor to file for Chapter 11 "merely for the purpose of invoking the automatic stay…").

Saint-Gobain, New CertainTeed, and DBMP insist they can pay asbestos plaintiffs in full in the tort system. So *why* are we here? Because they prefer to pay less. Being *cheap*

---

dismiss were filed based on a lack of financial distress); *In re Bestwall LLC*, 2024 WL 721596, *21 (Bankr. W.D.N.C. 2024) (declining to dismiss due to law of case doctrine and divestment rule based on prior ruling, and rejecting Official Committee's argument of the court's lack of constitutional subject matter jurisdiction).

is not a valid reason to file for bankruptcy. Nor is dissatisfaction with the refusal of Congress and state legislatures to statutorily restrict the rights of asbestos victims. This is bankruptcy court, not tort-reform court.

Prior rulings on lift stay motions have turned on an understandable but erroneous premise that conflates dismissal with frustrating the debtor's (improper) bankruptcy purpose. While it is certainly true that if the Court were to lift the stay for many (or all) claimants, DBMP's primary goal in this proceeding—to homogenize victims and collectively estimate the value of their claims without a jury—would fail.  But frustrating a bad-faith multi-billionaire's goal is *not* the same as dismissal.

Permitting Mrs. Bergrud to liquidate her claims against DBMP before a jury and a trial judge will certainly displease DBMP and frustrate the agenda of its tail-wagging parents in France and Pennsylvania, but that's not a proper factor in deciding this motion and is simply not the same as dismissing the case. The bankruptcy case will continue— but with the value of Mrs. Bergrud's claims conclusively established by a jury—to which she is statutorily and constitutionally entitled.

Nor can ruling on the question of good faith in the context of this lift stay motion be properly avoided by determining that *Carolin*'s objective futility prong has not been satisfied. Objective futility is plainly *not* a factor in lifting the stay. Stay relief is to be given "for cause" (11 U.S.C. § 362(d)(1)), and this Court is authorized "to determine

4

whether, with respect to the interests of a creditor seeking relief, a debtor has sought the protection of the automatic stay in good faith." *Carolin*, 886 F.2d at 699.

While Mrs. Bergrud recognizes that Judge Beyer, in *Bestwall*, recently applied *Carolin* in the denial of Mr. Buckingham's lift stay motion, that decision was contrary to well-established law that bad faith lift stay motions are judged on a different and more relaxed standard than bad faith dismissal motions; otherwise, there would be no need for bad faith lift stay motions as all such cases would be dismissed outright. *See In re Dixie Broadcasting, Inc.*, 871 F. 2d 1023, 1024, 1027 (11th Cir. 1989) (affirming the bankruptcy court's lifting the stay for specific creditors who moved for relief after the bad faith debtor filed its petition "despite [its]apparent good financial health..." and with an "intent to abuse the judicial process and reorganization provisions.").

If the Court disagrees with Mrs. Bergrud, and rules that DBMP filed in subjective good faith, that is better than not ruling at all, as at least an appeal can be taken. *See Official Committee of Asbestos Claimants v. Bestwall LLC*, 3:19-cv-00396-RJC, 2023 WL 7361075, *2 n.2 (W.D.N.C. Nov. 7, 2023) (referencing the denied petition for direct appeal in 2019 and an "unknown error" that resulted in the District Court not ruling on the interlocutory appeal until years later).

DBMP will oppose this motion. DBMP will argue that if a single plaintiff is permitted to pursue the Debtor in the tort system, the 'floodgates' will be open to more and more requests and granting those will be 'akin to a dismissal.' DBMP will say Mrs.

Bergrud and her lawyers are 'relitigating' issues that have already been decided (they have not).

DBMP will do this because *its* purpose is to globally resolve every single current and future asbestos claim against it in bankruptcy court from a capped limited fund, despite being non-distressed, massively wealthy, and fully capable of paying all claims in full, and despite having performed a Texas Two-Step manipulation on the eve of its petition to isolate and discriminate against its asbestos victims. Saint-Gobain, New CertainTeed, and DBMP's purpose in launching this ongoing abuse of Chapter 11 is contrary to purposes of the Bankruptcy Code as defined by the Fourth Circuit and as applied by it in *Carolin* and *Premier Auto*.[6]

The Code's purpose, its "statutory objective," is "'resuscitating a financially troubled [debtor],'" which DBMP is *not*. *Carolin*, 886 F.2d at 701 (citing *In re Coastal Cable TV, Inc.*, 709 F.2d 762, 765 (1st Cir. 1983)). The Fourth Circuit has specifically and directly rejected the premise that companies that are not in financial distress can file for bankruptcy for the purpose of forcing judicial negotiations and seeking a result not permitted by controlling state law, all while protected by the automatic stay. *See Premier Auto*, 492 F.3d at 281–82. Imposing a stay on *all* claimants—even those who seek relief based on the specific facts of their claims, as the Fourth Circuit recently recommended in

---

[6] *See* Dkt. 22, Informational Brief at 16.

*Bestwall*—when DBMP filed its petition in subjective bad faith does not further the purposes of the Code.

In addition to DBMP's subjective bad faith being sufficient to grant Mrs. Bergrud this relief, the *Robbins* factors are satisfied: (1) all issues pending in their litigation against DBMP involve state law; (2) liquidating their claims in state court will not interfere with this proceeding and will promote judicial economy; and (3) the DBMP's bankruptcy estate is protected because this Court will decide when the Movant's liquidated claims will be paid. *In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992). *See In re Claughton*, 140 B.R. 861, 867-68 (Bankr. W.D.N.C. 1992).

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Nearly three years ago, this Court wrote that it "remains to be seen" whether DBMP, New CertainTeed, and Old CertainTeed had acted in "good faith," and extended to them the protections of the automatic stay and preliminary injunction. Findings at ¶ 248. What has not been before this Court—until now—is whether DBMP filed its petition in subjective bad faith. *See* Findings ¶¶ 149-50 (noting the exacting *Carolin* dual prong requirements and that a motion to dismiss was not before the Court).

While recognizing at the time that the ACC predicted asbestos claimants would never agree to a plan, this Court found it was "simply too early to tell." Findings at ¶ 264. Several legal and factual developments since 2021 are relevant to deciding Mrs. Bergrud's motion now.

**A.      Prior Motions to Lift the Stay in Two-Step Cases in This District.**

This is the first individual action seeking relief from stay in *DBMP*, the first presented to this Court since the Fourth Circuit ruled in *Bestwall*, the first asking this Court to rule on whether DBMP filed in subjective bad faith, and the first to ask whether this is grounds, by itself, to lift the stay for an individual plaintiff. Three prior lift stay motions were denied in Two-Step cases, two in *Bestwall* and one in *Aldrich*.

**1.      *In re Aldrich Pump LLC/Murray Boiler LLC.***

In denying Robert Semian's motion for relief in March 2023, this Court reasoned: "I have no doubt . . . that if I grant relief from stay to one creditor to liquidate the claim, all of the claimants will—not all—but a substantial number of the claimants, enough to wreck the bankruptcy case, will seek like measure and that effectively precipitates a *de facto* dismissal of the case." Ex. 1, *Aldrich* Tr. 3/30/23 at 67. This Court denied Mr. Semian's subsequent motion to dismiss *Aldrich* and certified its ruling for direct appeal. *See Aldrich*, Certification Order, Dkt. 2111.

**2.      *In re Bestwall LLC.***

Richard and Joan Dale's motion before Judge Laura T. Beyer (Case No. 17-31795-LTB) was denied in October 2023. Ex. 2, *In re Bestwall*, Tr. 10/19/23 at 69-70. The Dales did not raise bad faith directly as grounds to lift the stay. Despite finding that—"strictly speaking"—the Dales satisfied the *Robbins* factors and recognizing that "bankruptcy courts . . . often [grant such motions] so that a state court can liquidate claims that are

8

based on state court causes of action," Judge Beyer denied the motion. *Bestwall* Tr. 10/19/23 at 69-70. Judge Beyer made what she admitted was the "speculative . . . assum[ption] that granting the Dales' motion . . . would result in a wave of similar motions." *Id.*

Second, Wilson Buckingham and his wife, Angelika Weiss, moved for relief (*Bestwall*, Dkt. 3242), in December 2023, arguing Bestwall's bad faith was grounds, by itself, to lift the stay. Judge Beyer denied this motion "in large part [based upon] the same reasons [she] denied the Dales' motion for relief from stay." *See* Ex. 3, *Bestwall*, Tr. 1/18/24 at 77.  Judge Beyer reasoned it would be improper to apply a standard for bad faith lift stay motions that was less stringent than the standard for bad faith dismissal under *Carolin*, notwithstanding precedent directly to the contrary. Judge Beyer later denied Mr. Buckingham's motion to certify her denial of his motion for relief from stay for direct appeal.

**B.**    **Old CertainTeed Negligently Caused Mr. Bergrud's Mesothelioma.**

Old CertainTeed negligently and unnecessarily exposed Peter Bergrud to deadly asbestos dust on a sustained, regular basis for decades. Mr. Bergrud died of malignant pleural mesothelioma in April 2019. He was also diagnosed with asbestosis and an asbestos body was found in his lung tissue, both indications of heavy exposure to asbestos dust. *See* Ex. 4, Tarin Report at 3.

9

**1.** *CertainTeed knew its asbestos-cement pipe was hazardous for decades before exposing Mr. Bergrud.*

By the mid-1960s, at the latest, Old CertainTeed knew that asbestos exposure caused mesothelioma and that crocidolite asbestos—the type of asbestos used in its cement pipe—had a higher potency in causing cancer than other forms of asbestos. Ex. 7, Lloyd Ambler Dep. 8/20/2014 at 208:17-209:15.[7] Fellow Two-Step debtors Aldrich, Murray and Bestwall agree; all contend amphibole asbestos fibers (i.e. crocidolite and amosite) are many times more "potent" at causing mesothelioma than the chrysotile fibers found in their products.[8]

Old CertainTeed knew that cutting its asbestos-cement pipe with an abrasive saw—like the one Mr. Bergrud regularly used—generated levels of asbestos dust up to six times higher than OSHA's exposure limit, but Old CT did nothing to warn workers of these hazards.  Knowing these hazards, Old CertainTeed internally took steps to protect its own employees, but did *nothing* to warn or protect end users like Mr. Bergrud.

---

[7] Old CertainTeed took over the asbestos-cement pipe manufacturing business of Keasbey & Mattison in 1962. Leon Horowitz was an industrial hygienist with K&M who remained in this capacity at Old CertainTeed. *See* Ex. 5, Leon Horowitz Dep. 6/30/1980 at 5-30. By 1960, he and Old CertainTeed were well aware of the connection between asbestos exposure and cancer. Ex. 5, at 39:20-21; Ex. 6, Lloyd Ambler Dep. 8/27/2009 at 126:8-20.

[8] *See In re Aldrich*, Informational Brief at 14 (Case No. 20-30608-JCW, Dkt. 5). Aldrich contends amphibole forms of asbestos (i.e., crocidolite and amosite) are much more likely to cause mesothelioma. *Id.* at 2. There is a "broad consensus" that crocidolite and amosite are far more toxic than chrysolite. *Id.* at 3,15. Aldrich argues "amphiboles" are "500 times more potent" in causing mesothelioma than the chrysotile asbestos in gaskets found in Aldrich pumps. *Id.* at 16. *See In re Bestwall*, Informational Brief at 4 (Case No. 17-31795-LTB, Dkt. 12). Bestwall claims chrysotile asbestos in its products has potency "substantially lower" than amphibole asbestos. Amphibole containing products have "proven toxicity." *Id.* at 4. Bestwall argues amphiboles are "100 to 1,000" more potent than chrysotile asbestos refers to them as "dangerous amphibole-containing products." *Id.* at 26.

Ex. 5, Leon Horowitz Dep. 6/30/1980 at 49.[9] Only in 1985 did Old CT—allegedly—first

include a warning about its asbestos-cement pipe. Ex. 6, at 137:9-317:2.[10] And Old

CertainTeed continued to manufacture, market, and sell this product, made of a known

human carcinogen, well into the ***1990s.***

2. ***Mr. Bergrud was exposed to asbestos from Old CertainTeed's pipe on a sustained, regular basis for over forty years.***

Mr. Bergrud worked for various construction companies in the state of

Washington throughout his career. [11] Over the course of his career, Mr. Bergrud primarily

worked with Old CertainTeed and Johns-Manville asbestos-cement pipe. *See* Ex. 10, Juan

Bergrud Dep. 10/16/19 at 36:23-37:5. During these years, Mr. Bergrud regularly cut,

beveled, and tapped (drilled) asbestos-cement pipe, all of which created heavy amounts

of respirable dust. *See* Ex. 11, at 112:14-19. None of the witnesses who worked with Mr.

---

[9] In March 1977, the Asbestos Cement Pipe Producers Association, of which CertainTeed was a member, found that cutting asbestos-cement pipe with an abrasive disc saw generated asbestos dust concentrations which "greatly exceeded the current OSHA standard for short term or peak exposures." Ex. 8, Deposition of Lloyd Ambler 8/28/2009 at 41-43. In fact, CertainTeed was producing peak exposure levels of up to six times OSHA's permissible exposure limit, and up to ten times the limit when wet-down procedures were implemented. The study also revealed that all methods of cutting asbestos-cement pipe released respirable asbestos fiber. *Id.*

[10] This is not a comprehensive recitation of facts supporting Old CertainTeed's negligence and liability for punitive damages. However, it shows the unique recklessness with which the Company behaved in manufacturing and selling its asbestos-cement pipe well into the 1990s, over twenty years after OSHA was enacted.

[11] For example, Mr. Bergrud and his younger brother, Juan Bergrud ("Juan"), worked together for Universal Construction from 1965 to 1968 installing underground water lines. Ex. 9, Juan Bergrud Dep. 10/15/19 at 52:10-18. Mr. Bergrud's other employers included (but were no limited to) Almon Lawler in 1968 and 1969, and Shoreline Construction from 1969 to 1972. Ex. 9, at 48-50. Mr. Bergrud's stepson, Richard Trumbull, worked his entire career in underground utility construction, and started working with Mr. Bergrud as a teenager. Mr. Trumbull installed underground water, sewer, and storm lines with Mr. Bergrud, and the only brands of asbestos pipe they used were Old CertainTeed and Johns-Manville.[11] Ex. 11, Richard Trumbull Dep. 11/18/19 at 111:12-22.

11

Bergrud recalled seeing an asbestos warning on any CertainTeed materials. As a result, Mr. Bergrud was unknowingly exposed to ultra-hazardous levels of asbestos from Old CT's pipe for decades.

### 3. *Mr. Bergrud's exposure to Old CertainTeed's asbestos-cement pipe caused his mesothelioma.*

Dr. Carl Andrew Brodkin reviewed Mr. Bergrud's exposure and medical history and opined that his malignant pleural mesothelioma was caused by occupational exposure to asbestos-cement pipe. Ex. 12, Brodkin Report at 1, 7-11. Christopher DePasquale, MPH, CIH, found Mr. Bergrud suffered high occupational levels of asbestos exposure from working with Old CT's pipe. Ex. 13, DePasquale Report at 5.[12]

### C. CertainTeed's and DBMP's Subjective Bad Faith.

Saint-Gobain and Old CertainTeed were never overwhelmed by asbestos liabilities. They both could and can pay asbestos plaintiffs what they owe in the tort system. Profitable and non-distressed companies attempting to transform this Court into tort-reform policy court—after Congress and state legislatures have repeatedly refused to enact comprehensive legislation to address asbestos-litigation—is ***not*** a proper purpose under the Code. Trying to 'overcome the tort system' by wasting the bankruptcy courts' time and attention, sidestepping the absolute priority rule, and avoiding the many other safeguards built into the Code to prevent abuse ***is*** bad faith.

---

[12] Old CT's pipe generally contained between ten (10%) and twenty-five (25%) percent asbestos by weight. Ex. 13, at 5, 14.

1. *Saint-Gobain and Old CertainTeed's secret bankruptcy scheme.*

As early as 2018, having studied the *Garlock* and *Bestwall* bankruptcies, Old CertainTeed began discussing "a plan to isolate [its] asbestos liabilities in a new company, with minimal assets, that would file for bankruptcy." Findings at ¶¶ 40-42. The shell entity would shield "the CertainTeed Enterprise from Old CertainTeed's asbestos liabilities." *Id*. at ¶ 46. This plan, codenamed "Project Horizon[,]" was a closely guarded corporate secret "driven not by businesspeople, but by lawyers." Findings at ¶¶ 41, 43.

2. *Old CertainTeed was massively profitable and able to pay all liabilities without financial strain.*

Old CertainTeed "was a profitable going concern whose assets significantly outweighed its combined operating and asbestos liabilities." Findings at ¶ 44. Indeed, "on Old CertainTeed's publicly disclosed financial statements, [it] had almost $3 billion in assets and less than half of that in all liabilities." Findings at ¶ 57. The company was never in distress and was settling cases in the tort system without financial strain (Findings at ¶ 188), as such Old CT "never entertained a bankruptcy filing for itself." Findings at ¶ 44.

3. *With the Funding Agreement DBMP is a non-distressed, multi-billionaire, and able to pay all asbestos claims in full.*

After the divisive merger, New CertainTeed was "essentially a mirror image of Old CertainTeed: a fully operating company which retained all of Old CertainTeed's employees, the bulk of its assets and operations, and all of its non-asbestos creditors."

13

Findings at ¶ 1. DBMP, however, was "quite different," being "allocated 100% of Old CertainTeed's considerable asbestos liabilities."[13] Findings at ¶ 1.

DBMP and New CertainTeed executed a "Funding Agreement" wherein New CertainTeed committed to providing DBMP with the funds to, among other things, "satisfy the Debtor's 'Asbestos Related Liabilities' in connection with funding a § 524(g) trust." Findings at ¶¶ 65-66. The Funding Agreement is central to DBMP's and New CertainTeed's assertion that the Debtor has "the same ability" to defend and resolve "present and future asbestos claims" in the tort system as Old CertainTeed. Findings at ¶ 61.

The Funding Agreement "is not a loan," it does not impose "repayment obligations" on DBMP, and it is *not* capped. Findings at ¶¶ 66-67. While this Court correctly expressed concern about the enforceability of the Funding Agreement (i.e., New CertainTeed must approve any 524(g) plan),[14] DBMP can pay Mrs. Bergrud and all

---

[13] New CertainTeed received approximately 97% of Old CertainTeed's assets, most of its operations, and all its employees in the divisional merger. Meanwhile, only 3% of Old CertainTeed's assets were left to give to DBMP. Among these assets was approximately $25 million in cash, Old CertainTeed's asbestos liabilities, and the ability to draw from "a Funding Agreement" paid for by New CertainTeed. *See* Findings at ¶¶ 53, 65.

[14] While only DBMP can enforce this agreement, as this Court recognized, that will only happen if New CertainTeed approves. *See* Findings at ¶ 69. Ultimately, "the Funding Agreement is not an unconditional promise to pay the DBMP Asbestos liabilities. It is instead a conditional agreement which is dependent on New CertainTeed's approval." Findings at ¶ 77. Mrs. Bergrud asks this Court to take New CertainTeed at its word for purposes of this motion.

claimants what it owes them *in full*.[15] Given its massive wealth and ability to pay, DBMP simply filed its petition to leverage the automatic stay and benefit its corporate parents.

## III.   ARGUMENT

DBMP cannot file its petition in subject bad faith and be shielded from all individual claims brought by all individual claimants for years on end, simply because its reorganization is not *yet* objectively futile. Taken to its logical conclusion, DBMP's position is that the *more* money a debtor has, the *more* entitled to bankruptcy protection it is.

Even if that is how the Fourth Circuit intends "objective futility" to be interpreted, this has no relevance to a lift stay motion, nor does the straw man the Debtor will raise about permitting one plaintiff to liquidate her claims eventually leading to a 'de-facto dismissal.' These are *not* factors, under *Carolin* or *Robbins*, to be considered in ruling on individual lift stay requests.

### A.     Individual Actions for Relief from Stay Are Proper.

This Court knows well the lack of progress in Two-Step cases. *See Aldrich* Dismissal Order at 21. The Court also recognizes that in the case of a "solvent asbestos defendant"—like Aldrich or Bestwall or DBMP—"due process requires that a 'plaintiff [must] be provided an opportunity to remove himself'"—i.e., opt-out—"from the aggregate

---

[15] Further, funding a trust is expressly conditioned upon New CertainTeed receiving a channeling injunction. Findings at ¶ 72. Thus, "while the Funding Agreement may provide funding for a plan, it will do so only if New CertainTeed favors that Plan. And that favor is dependent on New CertainTeed receiving permanent injunctive relief from the DBMP Asbestos Claims – whether it is entitled to it or not." *Id* at ¶ 74.

resolution." *Aldrich* Dismissal Order at 37-38 (citing *Ortiz*, 527 U.S. at 848 (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985))).[16]

Given the way in which *Carolin* has been interpreted in *Aldrich* and *Bestwall*, DBMP's inevitable bankruptcy failure—due to *Ortiz* or multiple other issues at confirmation—is, at best, years away. [17] What remedy, then, is available to Mrs. Bergrud in the meantime? The Fourth Circuit answered this question last June: "rather than waiting for plan confirmation, claimants can bring individual actions for relief based on the specific facts of a particular claim. That is done in bankruptcy proceedings on a **<u>routine basis</u>** where appropriate." *In re Bestwall LLC*, 71 F.4th 168, 183 (4th Cir. 2023)(emphasis added).[18]

### 1.   *Granting individual actions relief is not akin to dismissal.*

Recognizing that granting individual actions relief from stay is "routine," the Fourth Circuit did *not* say that lifting the stay for one claimant based on the "specific facts of a particular claim" might open the floodgates or be 'akin to a dismissal,' or that these factors have any relevance in lifting the stay for an individual action.

---

[16] While leaving these issues for "another day," this Court noted the Supreme Court found that a "mandatory 'no-opt-outs' settlement of a defendant's aggregate mass-torty liability is unconstitutional if the defendant's resources are sufficient to fully pay all claims." *Aldrich* Dismissal Order at 37 (discussing *Ortiz v. Fibreboard*, 527 U.S. 815, 817-18 (1999)). Depriving individual asbestos claimants of their due process rights to exclude themselves from the class action in *Ortiz* "can only be justified if the defendant's resources were insufficient to fully pay all claims." *Id.* (citing *Ortiz*, 527 U.S. at 837).

[17] *North Carolina Judges Are Shaping 'Two-Step' Bankruptcy Future,* Bloomberg, Evan Ochsner, April 10, 2024, available at https://news.bloomberglaw.com/bankruptcy-law/north-carolina-judges-are-shaping-two-step-bankruptcy-future

[18] On June 20, 2023, the Fourth Circuit upheld Judge Beyer's extension of the preliminary injunction to Georgia-Pacific.

While it is true that allowing liquidation of individual claims will defeat DBMP's primary goal—depriving claimants of the right to uncapped state-law remedies before juries, which will make any plan more difficult—frustrating DBMP's *illegitimate* bankruptcy purpose is not akin to frustrating a *legitimate* purpose of the Code. The Code specifically provides for liquidation of individual personal injury claims before a jury and the Constitution provides that individual jury trial rights cannot be impaired in the absence of a legitimate limited fund. *See* 11 U.S.C. § 1129(a); 28 U.S.C. § 157(b); U.S. Const. Amend. VII; *Amchem Products Inc. v. Windsor*, 521 U.S. 591 (1997); *Ortiz v. Fibreboard*, 527 U.S. 815 (1999).

What is *not* routine is a non-distressed billionaire, contentedly wallowing in bankruptcy with no incentive to reorganize and weaponizing the automatic stay to please its multi-billionaire parents. In instances such as these, multiple motions to lift stay should be expected and should be granted. If doing so frustrates the objectives of DBMP's corporate overlords because Saint-Gobain's bad faith scheme depends on overriding individual rights, so much the better. Frustrating a *bad* faith bankruptcy scheme is a *good* thing. The most important facts are indisputable: DBMP can pay all claimants what it owes them, and the only burden if the stay is not lifted is on the sick people and their families.

Lifting the stay for claimants who seek relief and frustrating Saint-Gobain's bad faith scheme is not akin to dismissal. The Debtor will remain in bankruptcy and this

17

proceeding will continue. The substantive consolidation and fraudulent conveyance litigation will continue, as well as any other alternative relief sought by claimants or the ACC. Similarly, DBMP and its corporate puppet-masters could propose a plan that protected the rights of claimants rather than impairing or trampling on them.  While it seems clear DBMP will not do this—since overriding individual rights is its express goal—a clear finding from this Court on the issue of subjective bad faith is likely the only way these cases will ever move forward.  Lifting the stay—for one, ten, or all claimants— is not dismissal.

This Court retains jurisdiction to rule on individual stay requests, first on whether the debtor filed in bad faith, and second whether the specific facts of each request justify lifting the stay.  And most importantly, DBMP can pay everyone in *full*, so whatever it costs to defend and pay any judgment or settlement to Mrs. Bergrud will not reduce what it is able to pay everyone else, including the armies of bankruptcy professionals.

This Court has the equitable powers to decide whether to lift the stay and for whom, given that DBMP filed in bad faith. *See In re Dixie Broadcasting, Inc.*, 871 F. 2d 1023, 1024, 1027 (1Ith Cir. 1989) (affirming the bankruptcy court's lifting the stay for specific creditors who moved for relief after the debtor filed its petition "despite [its]apparent good financial health..." and with an "intent to abuse the judicial process and reorganization provisions."). *See also* 11 U.S.C. § 105.

18

Alternatively, the Court could end the stay for all claimants and appoint a trustee to enforce the Funding Agreement, or find that the Agreement is enforceable and must be enforced (thus removing the threat of an improper collusion between DBMP, New CertainTeed and Saint-Gobain, as occurred between Johnson & Johnson and LTL Management), or order that the Debtor's remaining assets be liquidated for payment of claims and permit a pass through the tort system against New CertainTeed.

### 2.    *Objective futility is not a factor in deciding individual actions for relief.*

When Judge Beyer ruled against Mr. Buckingham in *Bestwall*, she recognized that nowhere in *Carolin* did the Fourth Circuit say that "objective futility" should be considered in ruling on whether to lift the stay. *Bestwall*, Tr. 1/18/24 at 79-80. While it "defied logic" to Judge Beyer that a less stringent test should apply to motions to lift stay (*id.*) than to motions to dismiss, nowhere in *Robbins*, which post-dated *Carolin*, did the Fourth Circuit set forth that the two-pronged *Carolin* dismissal standard, principally objective futility, had any bearing in ruling on individual motions for relief from stay. The opposite is true; in *Carolin*, the Fourth Circuit recognized that in deciding these motions, Section 362(a)(1) empowers bankruptcy courts to determine whether a debtor has sought the protections of the automatic stay in "good faith." *Carolin*, 886 F.2d at 699.

That the bankruptcy court in *Dixie* compared lifting the stay to deciding the propriety of a preliminary injunction, simply because it was "fit to grant relief from the stay is **not** equivalent to a decision by that court that Dixie may not maintain its petition…

19

[t]he fact that preliminary relief is obtained does not mean that permanent relief also must be forthcoming." *Dixie*, 871 F.2d at 1029 (citing *University of Texas v. Camenisch*, 451 U.S. 390, 394–95 (1981) (decisions on preliminary injunctions are not "tantamount to decisions on the underlying merits"); *McArthur v. Firestone*, 817 F.2d 1548 (11th Cir.1987) (district court's denial of temporary restraining order did not constitute decision on merits of First Amendment claim).[19]

By not ruling on whether DBMP filed in bad faith, in either motions to dismiss or motions for relief from stay, Two-Step debtors and their corporate parents receive all the benefits of the stay while taking on none of the burdens. All because they say they want to fund a trust that is "equitable," but only ***after*** all victims waive their Constitutional rights and state law remedies and accept a pennies-on-the-dollar resolution. Saint-Gobain, New CertainTeed, and DBMP continue to get ***everything*** they want—indefinite delay, negotiating leverage, millions and millions saved, the continued death of mesothelioma claimants—and asbestos victims get ***nothing***.

The role that good faith has in seeking relief has been widely recognized. *See In re Sparklet Devices, Inc.*, 154 B.R. 544, 547 (Bankr. E.D. Mo. 1993) ("Generally, the factors used to demonstrate bad faith are the same whether the court is considering a motion for relief

---

[19] A panel of this Court stated in dicta in *In re Phoenix Piccadilly, Ltd.* that "what amounts to bad faith is the same for both proceedings." 849 F.2d, 1393, 1394 (11th Cir. 1988). We interpret that statement to mean that the factors used to demonstrate bad faith are the same in both contexts, but that a bankruptcy judge may nonetheless take into consideration the number of factors and their certainty in determining whether they constitute bad faith for dismissal purposes." *Dixie,* 871 F.2d at 1029.

20

or a motion to dismiss for lack of good faith"); *In re Anthony*, 481 B.R. 602, 620 (D. Neb. 2012) ("The bankruptcy court did not err in concluding that whether Anthony's petition was filed in good faith was pertinent to Cattle National's motion for relief from the bankruptcy stay"); *In re Bestwall LLC*, No. 17-31795, 2024 WL 721596 at *20 (Bankr. W.D.N.C. Feb. 21, 2024) ("The LTL Opinion is not the only example of a court using good faith to police against financially healthy debtors abusing the bankruptcy system").[20]

The United States District Court for the Southern District of South Carolina cited *Dixie* to support denying relief to Dunes Hotel Associates, reasoning that a "solvent debtor-in-possession should not be permitted to remain in bankruptcy for the sole purpose of being able to use the strong-arm clause of the Bankruptcy Code to strike down a bilateral contract to the detriment of its only remaining non-insider creditor." *Dunes Hotel Associates v. Hyatt Corp.*, 245 B.R. 492, 507 (D.S.C. 2000) (citing *Dixie*, 871 F.2d at 1028)

---

[20] In her dismissal opinion of February 21, 2024, Judge Beyer cited: *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 381 (8th Cir. 2000) ("Nor did the bankruptcy court abuse its discretion in dismissing Cedar Shore's petition. Congress designed Chapter 11 to give those businesses 'teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liability.'" (quoting *Furness v. Lilienfield*, 35 B.R. 1006, 1009 (D. Md. 1983))); *In re SGL Carbon Corp.*, 200 F.3d 154, 164 (3d Cir. 1999) ("SGL Carbon cites no case holding that petitions filed by financially healthy companies cannot be subject to dismissal for cause."). *Bestwall*, 2024 WL 721596 at *20. Judge Beyer continued: "Some courts even find 'cause' under section 362 to grant relief from the automatic stay when a debtor files a case in bad faith." *Id.* (citing *In re Corp. Deja Vu*, 34 B.R. 845, 850 (Bankr. D. Md. 1983) ("The petition was filed in bad faith. This bad faith constitutes cause to allow the secured creditor relief from the stay."); *Constitutional Limits, supra*, at 551 (citing *In re Dixie Broad., Inc.*, 871 F.2d 1023 (11th Cir.), *cert. denied*, 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989)).

21

("The Bankruptcy Code is not intended to insulate financially secure sellers or buyers from the bargains they strike.").

Nearly three years ago, when ruling on the ACC's[21] objection to the stay and preliminary injunction, staying all claims by all plaintiffs, this Court viewed the ACC's opposition as seeking an effective dismissal, noting *Carolin's* "exacting" two-pronged standard would be difficult to satisfy. Findings at ¶ 8. At that time, this Court reasoned the "perceived harm" on asbestos claimants was primarily delay, but such delay, "**within reason**" was not sufficient harm to end the Chapter 11 case near its inception. Findings at ¶ 223-24 (emphasis).

Having a desire to access a remedy found in Chapter 11, here, a Section 524(g) trust, which DBMP wants, and which may be sufficient to overcome dismissal in this District, must *not* be grounds for bad-faith debtors to benefit from an overt abuse of the automatic stay for years on end. Mrs. Bergrud's claims have now been delayed for over four years. This is no longer within reason.

## B.   DBMP Filed Its Petition in Subjective Bad Faith.

The admitted purpose of this case is not to further Chapter 11's "statutory objective of resuscitating a financially troubled debtor," *Carolin*, 886 F.2d at 701–02, but to avoid state law tort liabilities while shielding the profitable assets of the business from the rigors of bankruptcy, isolating a single class of creditors and allowing continuing and

---

[21] Official Committee of Asbestos Claimants ("ACC").

unfettered distributions of profits to equity while that one class of creditors is frozen by the stay.  These facts are not just undisputed. They are freely admitted and indisputable.

DBMP filed its petition to manipulate the Bankruptcy Code and use the automatic stay to exert pressure on tort claimants to accept a "settlement" the globally resolved all present and future individual state-law tort claims and channels any recovery to a limited fund artificially created by this proceeding. There is no dispute that such a mandatory global settlement is beyond what the Debtor and its affiliates are entitled to under controlling state and federal law. This is bad faith. *See Carolin*, 886 F.2d at 699, 702; *Premier Auto*, 492 F.3d at 279 (good faith requirement "prevents abuse…by debtors whose overriding motive is to delay creditors without benefitting them in any way…") (citing *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986)).

Just like *Premier Auto*, where that debtor had no right to force renegotiation of its lease on more favorable terms and its petition was dismissed for bad faith given its lack of financial distress, here, DBMP has no right to the force renegotiation of its state-law liabilities, especially absent financial distress. This is a wholly improper use of the automatic stay.

1.     *Saint-Gobain, New CertainTeed, and DBMP can pay all asbestos claimants in full and are not financially troubled or in need of resuscitation.*

This crucial and undeniable fact—that DBMP can pay every single claimant what it owes him/her in the tort system or in bankruptcy (i.e., "in full")—is relevant to every

issue in this case, including to whether DBMP filed in subjective bad faith, and, having

done so, whether it can be shielded by a universal litigation stay even when "individual

actions" for relief are made by plaintiffs like Mrs. Bergrud.

Blackletter law, uniformly applied by the federal appellate courts, including the

Fourth Circuit, forbids the wielding of bankruptcy courts' "powerful equitable weapons"

by "financially healthy companies with no need to reorganize." *Premier Auto*, 492 F.3d at

281–82.[22]

---

[22] *See Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) ("One of the primary purposes of the Bankruptcy Act is to relieve the honest debtor from *the weight of oppressive indebtedness*, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes.") (emphasis added); *Wetmore v. Markoe*, 196 U.S. 68, 77 (1904) ("Systems of bankruptcy are designed to relieve the honest debtor from the weight of indebtedness which has become oppressive…"); *In re Capitol Food Corp. of Fields Corner*, 490 F.3d 21, 25 (1st Cir. 2007) (reasoning that a debtor need not be insolvent before filing bankruptcy petition, but that it must be experiencing "some sort of financial distress"); *In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222, 228 (2d Cir. 1991) (debtor must "at least…face such financial difficulty that, if it did not file at that time, it could anticipate the need to file in the future"); *In re SGL Carbon Corp.*, 200 F.3d 154, 164–66 (3d Cir. 1999) (reversing the district court and dismissing the debtor's bankruptcy because, *inter alia*, "[t]he mere possibility of a future need to file, without more, does not establish that a petition was filed in 'good faith," and "Chapter 11 was designed to give those teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liabilities"); *In re Premier Auto. Servs., Inc.*, 492 F.3d 274, 280–81 (4th Cir. 2007) (dismissal upheld because debtor was not "experiencing financial difficulties;" the debtor's filings "reveal a solvent business entity," a fact that "alone may justify dismissal of [the debtor's] Chapter 11 petition"); *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072–73 (5th Cir. 1986) ("The 'new debtor' syndrome, in which a one-asset entity has been created … to isolate the insolvent property and its creditors, exemplifies … bad faith cases…Neither the bankruptcy courts nor the creditors should be subjected to the costs and delays of a bankruptcy proceeding under such conditions."); *In re Cook*, 104 F.2d 981, 985 (7th Cir. 1939) (no valid bankruptcy purpose where "proceeding was instituted not for the purpose of obtaining benefits afforded by the Act to a corporation in financial distress, but to enable appellees to escape the jurisdiction of another court where the day of reckoning … was at hand"; "A Federal Court should not extend its jurisdiction under such circumstances."); *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 380 (8th Cir. 2000) (affirming dismissal because, *inter alia*, the bankruptcy court found the primary motivation of the debtor—a healthy company "not in dire financial straits"—was to dispose of a state court lawsuit); *In re Marsch*, 36 F.3d 825, 829 (9th Cir. 1994) (no good faith where debtor "had the financial means to pay" its obligations, which posed no "danger of disrupting business interests"); *In re Stewart*, 175 F.3d 796, 811 (10th Cir. 1999) (affirming dismissal and recognizing that relieving "oppressive indebtedness" is "[o]ne of the main purposes of bankruptcy law"); *In re Waldron*, 785 F.2d 936, 940 (11th Cir. 1986) (rejecting a debtor's

24

DBMP's asbestos liabilities never caused it or Old CertainTeed financial strain, let alone distress. According to Old CertainTeed's "publicly disclosed financial statements, its assets greatly exceeded its combined operating and asbestos liabilities." Findings at ¶57. With almost $3 billion in assets (and liabilities totaling less than half of that), New CertainTeed possesses the capacity to enhance DBMP's ability to address its liabilities. Findings at ¶57.

By contrast, in the 1980s, the Fourth Circuit noted a "striking similarity" between *A.H. Robins* and *Johns-Manville*, two mass tort driven bankruptcies (*A.H. Robins Co. Inc. v. Piccinin*, 788 F.2d 994, 1007 (4th Cir. 1986)). Manville was a "financially besieged enterprise in desperate need of reorganization of its crushing debt, both present and future." *Kane*, 843 F.2d at 649 (citing *In re Johns-Manville Corp.*, 36 B.R. 727, 741 (Bankr. S.D. N.Y. 1984)).

A.H. Robins was "confronted, if not overwhelmed, with an avalanche" of actions related to its Dalkon Shield contraceptive device and the company had a "**limited fund**" to satisfy them. *A.H. Robins*, 788 F.2d at 996, 1008 (emphasis). *See also In re A.H. Robins*

---

bankruptcy because "[t]he bankruptcy laws are intended as a shield, not as a sword," and recognizing that the purpose of Chapter 11 is to give a fresh start to a "financially troubled debtor" rather than the "financially secure"). *See also Grogan v. Garner*, 498 U.S. 279, 286–87 (1991) ("This Court has certainly acknowledged that a central purpose of the Code is to provide a procedure by which *certain insolvent* debtors can reorder their affairs … But in the same breath that we have invoked this 'fresh start' policy, we have been careful to explain that the Act limits the opportunity for a completely unencumbered new beginning to the 'honest *but unfortunate* debtor.'").

*Company, Inc.*, 89 B.R. 555, 558 (E.D. Va. 1988) (recognizing the Dalkon Shield liability "caused a crucial depletion of the company's funds").

This is not the situation with DBMP. New CertainTeed's massive wealth—available to DBMP via the unlimited Funding Agreement—establishes there is no legally cognizable burden on any party for Mrs. Bergrud to liquidate her claims now and is grounds for this relief.

> **2.     *Saint-Gobain, New CertainTeed, and DBMP only filed for Chapter 11 to leverage the automatic stay and harm their creditors.***

Saint-Gobain and its puppets are acting in bad faith; their "real motivation" is to "abuse the reorganization process," "cause hardship," and "delay [to] creditors," "without intent or ability to reorganize," and Saint-Gobain—after being socialized to the idea—made DBMP file for Chapter 11 merely to invoke the automatic stay. *See Carolin*, 886 F. 2d at 702 (citing *In re Thirtieth Place, Inc.*, 30 B.R. 503, 505 (9th Cir. Bankr. App. 1983)).

Now, DBMP purports to wield the stay as a bargaining tool to force claimants into the Hobson's choice of either risking years of delay and potential destruction of some or all their rights, or accepting a bankruptcy-based resolution of their claims that limits and impairs victims' state-law rights. *See Premier Auto*, 492 F.3d at 279 (a petitioner's good faith is "'indispensable to proper accomplishment of the basic purposes of the Chapter 11 protection.'") (citing *Carolin*, 886 F.2d at 698).

Saint-Gobain's post-petition behavior is both revealing and offensive to the people its subsidiaries poisoned to death with asbestos. During 2022, the Compagnie gave away over $1,000,000,000 in voluntary dividends, 22% *more* than in 2021.[23] In 2023, Saint-Gobain had € 47.9 billion in sales, over € 3 billion in net income and free cash flow, and more than € 5 billion in operating income.[24]

Referencing the "Situation in the United States"—i.e., its embarrassing bad-faith billionaire bankruptcy scam—Saint-Gobain boasted that this proceeding was "expected to take up to approximately five to eight years" during which "all asbestos litigations [sic] have been stayed and all related costs suspended…" Ex. 15, 2023 Ann. Report at 44.

Apparently, Saint-Gobain believes DBMP's *total* current and future asbestos liabilities are $407 million.[25] A large number in the abstract (and disputed by Mrs. Bergrud), but a fraction of what the Compagnie de Saint-Gobain gives away in dividends in a single year.[26] Saint-Gobain had *a $1 billion,* didn't need it, and gave it away, all while opposing Mrs. Bergrud's request to merely *quantify* her claim against DBMP.  And the Compagnie intends to abuse the automatic stay for another 5 to 8 years.

---

[23] *See* Ex. 15, Compagnie de Saint-Gobain, *Statutory auditors' report on the consolidated financial statements*, "2023 Ann. Report" at 56. Saint-Gobain has over 506 million shares and paid out dividends of € 2.00 per share. The company paid out dividends in 2021 of € 1.63 per share. One Euro is approximately equal to $1.07.

[24] *See*, https://www.saint-gobain.com/en

[25] Saint-Gobain recorded a "provision corresponding to the amount of the estimated debt against DBMP amounting to € 407 million as of December 31, 2023," recognizing New CertainTeed's obligation to pay "debts" to DBMP. *See* Ex. 15, Ann. Report at 44. At present, on €1.00 is equal to $1.07.

[26] DBMP/Old CertainTeed's annual spend on asbestos litigation (defense and indemnity) from 2002 to 2019 was only $80 million to $160 million. Findings at ¶ 33.

Companies with billions in excess cash that intentionally identify, isolate, and then strand one class of creditor in bankruptcy —and aim to waste 5 to 8 more years, time their asbestos victims don't have—are not acting in good faith and should not benefit from the automatic stay, especially when individual plaintiffs set forth specific facts and seek relief, as here.

**C.      DBMP's Subjective Bad Faith Is Grounds to Lift the Stay.**

Bankruptcy courts have the power to modify, annul, or vacate the stay based on "the particular circumstances of the case [as] guided by considerations that under the law make for the ascertainment of what is just to the claimants, the debtor, and the estate." *Foust v. Munson Steamship Lines*, 299 U.S. 77, 83 (1936). Section 362(d)(1) authorizes modifying the automatic stay "for cause."

"Just as § 1112(b) inferentially permits inquiry into a debtor's good faith in the context of an interested party's motion to dismiss, § 362(d)(1)'s 'for cause' language authorizes the court to determine whether, with respect to the interests of a creditor seeking relief, a debtor has sought the protection of the automatic stay in good faith." *Carolin*, 886 F.2d at 699 (citing *Little Creek*, 779 F.2d 1068).

"Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings." *Little Creek*, 779 F.2d at 1072. "Like its predecessor statutes . . . the Bankruptcy Code of 1978 has been endowed with

28

requirements of good faith in the construction of many of its provisions….[n]umerous cases have found a lack of good faith to constitute 'cause' for lifting the stay" *Id*. This principle, that the debtor's bad faith is a factor which supports lifting the stay, is widely accepted.[27] DBMP's bad faith abuse of the Bankruptcy Code and perversion of the automatic stay is grounds to grant this motion. *See Carolin*, 886 F.2d at 699.

This Court has recognized that lifting the stay "for cause" is a "flexible concept" and should be evaluated on a case-by-case basis. Findings at ¶ 208. In 2021, the Court denied the ACC's opposition to the preliminary injunction and automatic stay, but that pertained to **all** asbestos claimants and that was over 30 months ago. *See* Findings at ¶ 208, 211.

This is different. Mrs. Bergrud asks this Court to rule first on whether DBMP filed in subjective bad faith (based all on the evidence *supra*), and second, whether this is grounds to lift the stay for her individual action to proceed, especially considering the specific facts of her case, as set forth *supra*. *See Bestwall*, 71 F.4th at 183.

**D.**     **Mrs. Bergrud Satisfies The *Robbins* Factors.**

---

[27] *See In re Thirtieth Place, Inc.*, 30 B.R. 503, 505–06 (Bankr.App. 9th Cir.1983); *In re Talladega Steaks, Inc.*, 50 B.R. 42, 43–44 (Bankr.N.D.Ala.1985); *In re Kinney*, 51 B.R. 840, 845–46 (Bankr.C.D.Cal.1985); *In re Silver*, 46 B.R. 772, 773–74 (D.Colo.1985); *In re Volpe*, 53 B.R. 46, 47–48 (Bankr.M.D.Fla.1985); *In re Martin*, 51 B.R. 490, 493–95 (Bankr.M.D.Fla.1985); *In re Setzer*, 47 B.R. 340, 344–45 (Bankr.E.D.N.Y.1985); *In re Port Richey Service Co.*, 44 B.R. 634, 635 (Bankr.M.D.Fla.1984); In re Winn, 43 B.R. 25, 28 (Bankr.M.D.Fla.1984); *Basin Elec. Power Co-op v. Midwest Processing Co.*, 47 B.R. 903, 908–10 (D.N.D.1984), aff'd, 769 F.2d 483 (8th Cir.1985); *In re Scott*, 42 B.R. 35, 38–39 (Bankr.D.Ore.1984); *Furness v. Lilienfield*, 35 B.R. 1006, 1010–13 (D.Md.1983); *In re Corp. Deja Vu*, 34 B.R. 845, 846–47, 850 (Bankr.D.Md.1983); *In re 299 Jack-Hemp Assoc.*, 20 B.R. 412, 413–14 (Bankr.S.D.N.Y.1982); *In re Lotus Inv., Inc.*, 16 B.R. 592, 595–96 (Bankr.S.D.Fla.1981); *Winshall Settlor's Trust*, 758 F.2d 1136, 1137 (6th Cir. 1985); *In re Albany Partners, Ltd.*, 749 F.2d 670, 673–74 (11th Cir.1984).

DBMP's subjective bad faith and the specific facts of Mrs. Bergrud's action are sufficient to lift the stay. In addition, she satisfies the *Robbins* factors: (1) all issues pending in Movant's litigation against the Debtor involve state law; (2) liquidating Movant's claims in state court will interfere with this proceeding and will promote judicial economy; and (3) the Debtor's bankruptcy estate is protected because this Court will decide when Movant's liquidated claims will be paid. *In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992); *see In re Claughton*, 140 B.R. 861, 867-68 (Bankr. W.D.N.C. 1992).

Under *Robbins*, this Court should "harmonize the interests of both debtor and creditors while preserving the debtor's assets for repayment and reorganization of his or her obligations." 964 F.2d at 345. However, maintaining the automatic stay to protect the Debtor's ability to reorganize is not the same thing as upholding the preliminary injunction as to non-debtor affiliates. Nor does it address whether this Court can decide Movant's claims against DBMP, or whether issues pending in litigation involve only state law, such that the expertise of the bankruptcy court is unnecessary.

DBMP's anticipated objection to this request on grounds that this Court should estimate all claims or that a trust claim with an artificially capped Section 524(g) trust is the remedy available to the Bergruds, would render 28 U.S.C. § 157 meaningless and subordinate individual statutory rights and state law remedies to the whims of wealthy tortfeasors who prefer to avoid the civil jury system by manipulating the Bankruptcy Courts. The number of individual claimants that decide to liquidate their personal injury

30

claims in front of juries and trial courts with power to hear these cases will have no impact on this case, because, *unlike* in *Manville, A.H. Robins*, and many other mass tort bankruptcies, DBMP is fully funded, non-distressed, and can pay all claimants 100% of their claims' tort system value.

This Court's expertise related to the Bankruptcy Code and the payment of liquidated claims is not needed to allow Mrs. Bergrud to try her state law claims to verdict. Further, she admits that once her claims are liquidated only this Court can decide when it will be paid.

**1.** ***Whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court.***

Mr. Bergrud and his wife, Cheryl Bergrud, filed suit against all entities they believed contributed to his contracting mesothelioma, including Old CertainTeed. Ex. 14, Complaint, filed on April 9, 2019. Under Washington law, the Bergruds have two primary claims against DBMP, one for manufacturing an unsafe product and one for negligence. DBMP's bankruptcy petition stayed their action against Old CT, New CT, and the Debtor. Between May 7, 2020, and November 29, 2021, Mrs. Bergrud resolved with all defendants and trusts who had *not* filed a bad-faith Texas Two-Step multi-billionaire bankruptcy.

If relief is granted, Mrs. Bergrud will file a second suit in Washington state against only DBMP. This second suit should have been unnecessary and is entirely the fault of

31

Saint-Gobain and New CertainTeed. This is an example of the adverse impact on judicial

economy that Two-Step bankruptcies inflict on state courts throughout the country. But

for its Two-Step, Old CertainTeed would have resolved Mrs. Bergrud's claims years ago

in her first case in Washington state.

Mrs. Bergrud will *never* vote on a plan of reorganization until she knows the

liquidated value of her claims against DBMP. *See* 11 U.S.C. § 1129(a)(7)(A) and 28 U.S.C.

§ 157(b). To know the liquidated value, she must quantify these claims before a jury or

negotiate them at arm's length before trial. There is no burden on any party for her to do

so now, as opposed to later.

There is no legitimate reason to delay determining the value of Mrs. Bergrud's

claims now while Saint-Gobain, New CertainTeed, and DBMP continue to demand this

Court's attention and waste their victims' time in navigating through estimation related

proceedings. An estimation which will result in an advisory opinion the claimants will

ignore.

DBMP can provide no legitimate reason—the fact that it does not want to, is not a

legitimate reason—why liquidating claims in state court and then coming back to this

Court to allow those liquidated claims later would interfere with the bankruptcy case.

**2.** *Whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court.*

Mrs. Bergrud is not asking the Court to enforce her claims against the Debtor. She seeks only to liquidate them through arm's length settlement or jury trial in a Washington state court. Whatever the specific value owing to her from the Debtor, she agrees that amount will not be paid until this Court allows it.[28] There is no harm to the Debtor's bankruptcy estate by granting this request.

**3.** *Whether the issues pending in Movant's litigation against the Debtor involve state law*

All the Movant's claims are based on Washington law. The Debtor will likely attempt to sidestep this explicit limitation on this Court's jurisdiction, effectively arguing that while this Court cannot estimate *any* of these claims, it should estimate *all* of them. However, even if the Court estimates claims against the Debtor in aggregate, Mrs. Bergrud's right to pursue uncapped state law remedies against DBMP before a jury is indisputable under the United States Constitution, the United States Bankruptcy Code, and Washington law.[29]

---

[28] It is no defense for the Debtor to argue that in a jury trial some claimants may lose and get nothing. In that instance, those claimants will have been determined to not have a valid claim and, accordingly, suffer no legal harm.

[29] "The right of trial by jury [in Washington state] shall remain inviolate." Wash. Const. art. 1, § 21. It does "not diminish over time and must be protected from all assaults to its essential guarantees." *Thorley v. Nowlin*, 542 P.3d 137, 154 (2024).

This Court lacks jurisdiction to estimate or quantify these claims. *See* 28 U.S.C. §§ 157(b) and 1411(a). "If the bankruptcy court lacks jurisdiction to adjudicate a claim, relief from the automatic stay is **<u>required</u>** so that the claim can be adjudicated in a court that does have jurisdiction." *In re Nifong*, 2008 WL 2203149, *4 (Bankr. M.D.N.C. 2008) (citing *In re Erickson*, 330 B.R. 346 (Bankr. D. Conn. 2005) (emphasis added).[30]

Mrs. Bergrud will *never* vote in favor of a plan to reorganize a bad-faith debtor in a manufactured bankruptcy until after she knows the full liquidated value of all her state law claims. There is no prejudice to anyone in proceeding now, and only ongoing undue prejudice to Mrs. Bergrud in proceeding later. The bankruptcy case will not be interfered with by DBMP having to—for the first time over 48 months—retain counsel to defend it in the tort system for a limited number of cases. Nor will allowing a few cases to proceed in the tort system be a distraction to this bankruptcy case or the adversary proceedings.

Disregarding state law and the Constitutional rights of claimants, DBMP will no doubt argue that resolution with all claimants requires the tools contemplated by Section 524(g). But Section 524(g) demands that an operating, good faith debtor, overwhelmed by asbestos liabilities, subject itself to bankruptcy court jurisdiction. DBMP and New CertainTeed are none of these, and no part of the Bankruptcy Code, including Section

---

[30] Absent consent, a United States District Court "should retain control over all aspects of personal injury tort claims under section 157." *Moore v. Idealease of Wilmington*, 358 B.R. 248, 252 (E.D.N.C. 2006). *See Stokes v. Southeast Hotel Properties, LTD.*, 877 F. Supp. 986 (W.D.N.C. 1994) ("The decision where a personal injury claim will be adjudicated is clearly reserved for attention of the district court.").

524(g), can override Mrs. Bergrud's individual state law remedies and Constitutional

rights. This Court's expertise is not needed to allow Mrs. Bergrud to try their claims to

verdict in state court.[31]

Mrs. Bergrud also satisfies the more comprehensive *Curtis* factors. These narrower

but more numerous factors subsume the broader factors of *Robbins* and provide a more

nuanced examination of "cause" under Section 362.[32] *See In re Curtis*, 40 B.R. 795, 799-800

(Bankr. D. Utah 1984); *Sonnax Industries, Inc. v. Tri Component Products Corp. (In re Sonnax*

*Industries, Inc.)*, 907 F.2d 1280 (2nd Cir. 1990); *Jim's Maintenance & Sons, Inc. v. Target*

---

[31] "[A] determination of the validity and amount of [the Movants'] claim must be made either in the state court or this court. The court is satisfied that the proper forum for such a determination is the state court. The claims alleged in the State Court Action all involve solely state law issues. There are no issues in any of the claims that require bankruptcy expertise. It also is clear that if the stay is lifted, the Debtor and the bankruptcy estate can be protected adequately by a requirement that the Movants seek enforcement of any judgment obtained through the bankruptcy court. The modification of the stay will permit the Movants only to reduce their claims against the Debtor to judgment and will specifically provide that any judgment against the Debtor obtained in the State Court Action may not be enforced against the Debtor or property of the bankruptcy estate unless and until further relief from the automatic stay has been granted by the bankruptcy court. Allowing the claims to be pursued in this fashion will not change the status or priority of the claims but will result in a determination of the nature and amount of the Debtor's liability. Also, allowing all of the claims to be determined in one proceeding in state court promotes judicial economy and avoids the hardship on the Movants that would result if they were required to litigate some of the claims in state court and some of them in this court. It is true that some of the claims in the State Court Action do not involve the Debtor. However, any additional burden on the Debtor resulting from this circumstance is far outweighed by the factors that weigh in favor of lifting the stay and allowing the State Court Action to proceed. *In re Joyner*, 416 B.R. 190, 192–93 (Bankr. M.D.N.C. 2009).

[32] "The court must balance potential prejudice to the bankruptcy debtor's estate against the hardships that will be incurred by the person seeking relief from the automatic stay if relief is denied." *See In re Peterson*, 116 B.R. 247, 249 (D.Colo.1990) (discussing balancing test). The factors that courts consider in deciding whether to lift the automatic stay include (1) whether the issues in the pending litigation involve only state law, so the expertise of the bankruptcy court is unnecessary; (2) whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court; and (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court." *In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992), as amended (May 27, 1992).

*Corporation (In re Jim's Maintenance & Sons, Inc.)* 418 Fed. App'x 726 (10th Cir. 2011).

Whether applying the twelve *Curtis* factors or the three *Robbins* factors, the stay should

be modified to allow Movants to liquidate their claims.

Broadly, the greater balance of hurt is unquestionably born by Mrs. Bergrud if the

requested relief is denied. DBMP will not be impacted if she liquidates her claims outside

of bankruptcy now, and Mrs. Bergrud agrees to have her claims paid from the Debtor's

bankruptcy estate only when allowed by this Court.

## IV.   CONCLUSION

Mrs. Bergrud urges this Court to rule on whether DBMP filed its petition in bad

faith. Avoiding this issue is akin to finding good faith. If DBMP is found to have filed in

bad faith, that constitutes grounds to lift the stay, which she asks this Court to do.

Respectfully submitted, this the 18th day of April, 2024.

**WALDREP WALL BABCOCK
& BAILEY PLLC**
*/s/ Thomas W. Waldrep, Jr.*
Thomas W. Waldrep Jr. (NC State Bar No. 11135)
James C. Lanik (NC State Bar No. 30454)
Ciara L. Rogers (NC State Bar No. 42571)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1280
Facsimile: 336-717-1340
Email: notice@waldrepwall.com

-and-

36

**MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC**

*/s/ Clayton L. Thompson*

Clayton L. Thompson (NY Bar No. 5628490)

John Louis Steffan IV (Missouri Bar No. 64180)

150 W. 30th Street, Suite 201

New York, NY 10001

Telephone: (800) 358-5922

Email: CThompson@mrhfmlaw.com

Pro Hac Vice Admission Pending


*Counsel for Movants*

37

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing THE ESTATE OF PETER L. BERGRUD'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d) was filed in accordance with the local rules and served upon all parties registered for electronic service and entitled to receive notice thereof through the CM/ECF system.

Respectfully submitted, this the 18th day of April, 2024.

**WALDREP WALL BABCOCK
& BAILEY PLLC**

/s/ *Thomas W. Waldrep, Jr.*
Thomas W. Waldrep Jr. (NC State Bar No. 11135)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: (336) 717-1280
Facsimile: (336) 717-1340
Email: notice@waldrepwall.com

*Counsel for Movants*