UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

IN RE:                              :    Case No. 20-30080-JCW

DBMP LLC,                           :    Chapter 11

    Debtor,                         :    Charlotte, North Carolina
                                         Thursday, May 23, 2024
                                    :    9:33 a.m.
: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

OFFICIAL COMMITTEE OF               :    AP 21-03023 (JCW)
ASBESTOS PERSONAL INJURY
CLAIMANTS and SANDER L.             :
ESSERMAN, etc.,

                                    :
    Plaintiffs,

                                    :
        v.

                                    :
DBMP LLC and CERTAINTEED LLC,

                                    :
    Defendants,

                                    :
: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

OFFICIAL COMMITTEE OF               :    AP 22-03000 (JCW)
ASBESTOS PERSONAL INJURY
CLAIMANTS and SANDER L.             :
ESSERMAN, etc.,

                                    :
    Plaintiffs,

                                    :
        v.

                                    :
CERTAINTEED LLC, CERTAINTEED
HOLDING CORPORATION, and            :
SAINT-GOBAIN CORPORATION,

                                    :
    Defendants,

                                    :
: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

OFFICIAL COMMITTEE OF          :     AP 22-03001 (JCW)
ASBESTOS PERSONAL INJURY
CLAIMANTS, on behalf of        :
the estate of DBMP LLC,

                               :

    Plaintiff,

                               :

        v.

                               :

COMPAGNIE DE SAINT-GOBAIN
S.A., *et al.*,                :

    Defendants.               :

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :


                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE J. CRAIG WHITLEY,
                  UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Debtor/Defendant,          Robinson, Bradshaw & Hinson, P.A.
DBMP LLC:                      BY:  DAVID SCHILLI, ESQ.
                               101 N. Tryon Street, Suite 1900
                               Charlotte, NC  28246


Audio Operator:                COURT PERSONNEL


Transcript prepared by:        JANICE RUSSELL TRANSCRIPTS
                               1418 Red Fox Circle
                               Severance, CO  80550
                               (757) 422-9089
                               trussell31@tdsmail.com


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

APPEARANCES (continued):

For Debtor/Defendant,        Jones Day
DBMP LLC:                     BY:  JEFFREY B. ELLMAN, ESQ.
                             1221 Peachtree Street, N.E., #400
                             Atlanta, GA  30361

                             Jones Day
                             BY:  JAMES M. JONES, ESQ.
                             250 Vesey Street
                             New York, NY  10281

For Plaintiff, ACC:          Robinson & Cole LLP
                             BY:  RYAN M. MESSINA, ESQ.
                             1201 N. Market Street, Suite 1406
                             Wilmington, DE  19801

                             Robinson & Cole LLP
                             BY:  ANDREW A. DePEAU, ESQ.
                             280 Trumbull Street
                             Hartford, CT  06103

                             Winston & Strawn LLP
                             BY:  CARRIE HARDMAN, ESQ.
                             200 Park Avenue
                             New York, NY  10166-4193

                             Winston & Strawn LLP
                             BY:  KATHERINE PRESTON, ESQ.
                             800 Capitol Street, Suite 2400
                             Houston, TX  77002-2925

                             Caplin & Drysdale
                             BY:  NATHANIEL MILLER, ESQ.
                             One Thomas Circle, N.W.,
                             Washington, DC  20005

                             Hamilton Stephens
                             BY:  ROBERT A. COX, JR., ESQ.
                             525 North Tryon St., Suite 1400
                             Charlotte, NC  28202

4

APPEARANCES (continued):

For Plaintiff, FCR        :        Young Conaway
                                   BY:  FELTON E. PARRISH, ESQ.
                                   227 West Trade Street, Suite 1910
                                   Charlotte, NC  28202

                                   Young Conaway
                                   BY:  SEAN GREECHER, ESQ.
                                   1000 North King Street
                                   Wilmington, DE  19801

For Defendants, CertainTeed   Rayburn Cooper & Durham, P.A.
LLC, *et al.*:                BY:  JOHN R. MILLER, JR., ESQ.
                                   MATTHEW TOMSIC, ESQ.
                              227 West Trade Street, Suite 1200
                              Charlotte, NC  28202

                              Goodwin Procter LLP
                              BY:  GABRIELLE L. GOULD, ESQ.
                                   DOUGLAS H. FLAUM, ESQ.
                                   STACY DASARO, ESQ.
                              620 Eighth Avenue
                              New York, NY  10018

For Michael and Ann Herlihy:  Waldrep Wall
and Mrs. Peter L. Bergrud:    BY:  DIANA SANTOS JOHNSON, ESQ.
                              370 Knollwood Street, Suite 600
                              Winston-Salem, NC  27103

For Defendants, Compagnie de  Hughes Hubbard & Reed, LLP
Saint-Gobain S.A., *et al.*:  BY:  WILLIAM J. BEAUSOLEIL, ESQ.
                              One Battery Park Plaza, 16th Flr.
                              New York, NY  10004-1482

APPEARANCES (via telephone):

For Plaintiff, ACC:           Winston & Strawn LLP
                              BY:  DAVID NEIER, ESQ.
                              200 Park Avenue
                              New York, NY  10166-4193

For Michael and Ann Herlihy:  Maune Raichle
                              BY:  CLAYTON L. THOMPSON, ESQ.
                              150 West 30th Street, Suite 201
                              New York, NY  10001

APPEARANCES (via telephone):

For Mrs. Peter L. Bergrud:     Ruckdeschel Law Firm, LLC
                               BY:  JONATHAN RUCKDESCHEL, ESQ.
                               8357 Main Street
                               Ellicott City, MD  21043


                               SANDER L. ESSERMAN
                               Future Claimants' Representative
                               2323 Bryan Street, Suite 2200
                               Dallas, TX  75201-2689

6

P R O C E E D I N G S

(Call to Order of the Court)

THE COURT:  Have a seat, all.  Good morning.

(Counsel greet the Court)

THE COURT:  Let's just stay off record for a moment.  As many of you know --

(Off record from 9:33 a.m., until 9:36 a.m.)

THE COURT:  If the clerk wants to call the case.

THE COURTROOM DEPUTY:  Okay.  No. 1, DBMP LLC, Case 20-30080, continued hearing on motion on the Estate of Peter L. Bergrud for relief from the automatic stay; continued hearing on Michael N. and Ann Herlihy for relief from the automatic stay.  And in the Adversary Proceedings 21-3023, 22-3000, 22-3001, we have motions to compel that are also being heard today.

THE COURT:  All right, very good.

Let's get appearances, starting with the Debtors.  Who do we have?

MR. ELLMAN:  Good morning, your Honor.  Jeffrey Ellman from Jones Day on behalf of the Debtor.  Also here with me, Jim Jones from Jones Day and David Schilli from Robinson Bradshaw.

THE COURT:  All right.

MR. MILLER:  Good morning, your Honor.  Jack Miller, Rayburn Cooper & Durham, on behalf of CertainTeed and certain other Non-Debtor Affiliates.  With me from RCD, is Matt Tomsic.

And I'd like to introduce the Court to Jack Reynolds.  He's going to spend the summer with us.  He's a rising --

THE COURT:  All right.  Welcome.

MR. MILLER:  -- 3L at Wake Forest.

And then from Goodwin Procter we've got Gabrielle Gould, Stacy Dasaro, Mr. Flaum, and I don't see Mr. Steel here yet, but Howard Flaum as well.

Thank you.

THE COURT:  Okay, very good.

All right.  How about on the ACC's side?

MS. HARDMAN:  Good morning, your Honor.  Carrie Hardman from Winston & Strawn on behalf of the Committee and with me is Katie Preston as well from Winston & Strawn.  I believe Mr. Neier is on the phone as well.

And I will try to do this justice and if somebody needs to correct me, by all means.

We have Rob Cox from Hamilton Stephens Steele & Martin.  We have Nate Miller from -- Nathaniel Miller.  Excuse me -- from Caplin & Drysdale.  We also have Ryan Messina and Andrew DePeau from Robinson & Cole.

THE COURT:  All right, very good.

FCR?

MR. GREECHER:  Thank you.  Good morning, your Honor. Sean Greecher from Young Conaway, here with my partner, Felton Parrish.  And Mr. Esserman, the FCR, is on the phone.

THE COURT:  Okay, very good.

Anyone else in the courtroom needing to announce?

MS. JOHNSON:  Yes.  Good morning.  Diana Santos Johnson with Waldrep Wall Babcock & Bailey.  We're local counsel for the movants for the motions to lift stay and they are on the phone.  And I think they would like to announce for themselves.

THE COURT:  All right.  We'll get telephone appearances in a second.

Yes, sir.

MR. BEAUSOLEIL:  Good morning, your Honor.  Bill Beausoleil from Hughes Hubbard & Reed for Compagnie de Saint-Gobain.

THE COURT:  All right, very good.

Anyone else in the courtroom?

(No response)

THE COURT:  All right.  Let's see if we can get this done.  Telephonic appearances?  I'm just going to call it Debtor instead of Plaintiffs or Defendants and the like.

Anyone on the phone that needs to announce on behalf of the Debtors?

(No response)

THE COURT:  Okay.

Do we have anyone else for the ACC?

Star 6 unmutes, by the way.

MR. THOMPSON:  Good morning, your Honor.  Clay Thompson with Maune Raichle Hartley French & Mudd on behalf of the Herlihy and, Herlihy Plaintiffs and the Bergrud Estate. And Jonathan Ruckdeschel is also on the line with me.

Thank you for allowing us to appear telephonically today.

THE COURT:  Yes, sir.

Anyone else?  F, FCR reps?

(No response)

THE COURT:  Affiliates?  Anyone else on the telephone?

(No response)

THE COURT:  Okay, very good.

Are there any preliminaries?  We've got the agenda, of course, that I'm looking at, Docket 2799, but I think it's filed in the adversaries as well as the base case.

Any preliminaries before we get to what we've got on the calendar today?  Good-of-the-order announcements and the like or --

MS. HARDMAN:  Your Honor, I think we just have a few updates relative to discovery, generally, but I think we can take those in connection with the motion to compel.

THE COURT:  All right.

Anyone else?  We're good?

(No response)

THE COURT:  Okay.  I guess the first order of business

is what to do with the Bergrud and Herlihys' motions for relief from stay.  So I guess I get to start out by boring you with long talk, but here's where we are.

Both have relief from stay motions.  It probably won't surprise anyone that I think that the motions have to be denied for the reason that we've had substantially identical requests for relief that I think have been entertained at least four times between the three so-called "two-step" cases in this District and on each occasion the motions were denied.

Back at the outset of this case we had a motion by the ACC for relief from stay and in conjunction with the preliminary injunction and on August the 12th I entered Findings and Conclusions at that time that did a number of things, but effectively, with regard to the relief from stay, denied the request.  The ACC then was seeking relief to permit all 60,000 plus claimants, or however many there are, to individually liquidate their tort claims, both against the Debtor and as against the new company, New CertainTeed, in the tort system.

My ruling then was premised on three or four different points.  First, that there wasn't cause to, to grant relief from stay because it would greatly prejudice the estate and the harm to the Debtor and its estate would outweigh any hardship occasioned to the asbestos claimants, which was almost entirely delay harm; that causing the tort system to be flooded with

11

asbestos cases, even as the chapter 11 case remained pending wouldn't serve judicial economy and in fact, that the asbestos claims arose under state law didn't support relief from stay because it involved individual claimants getting their claims determined in state court as opposed to in the bankruptcy case; that it also would imperil the ability for the Court to treat consistently and fairly all similarly situated claimants in a 524(g) plan, particularly those that are future claimants; and that to grant relief from stay would, would effectively destroy the bankruptcy case.  There would be no chance of a successful reorganization.  It would be, effectively, tantamount to dismissal of the chapter 11 case and without meeting the standards for a bad faith dismissal under the Carolin case.

I noted then that delay itself is not generally considered to be a reason to grant relief from stay because it takes time to work through the bankruptcy process and get a, a confirmed plan and that if there was delay, that bankruptcy was not the only forum that presented a prospect, that effectively the state court system with so many cases that were filed more than ten years ago also involves delay, given the number of these claims, but that, on the other hand, if there was good faith and cooperation, that the parties might actually be faster in bankruptcy by, by agreeing on a number and treatment under a trust and plan.

Back then, the ACC, and now the movants, decried the

Texas twostep and the follow-on bankruptcy as being, *per se*, a fraud perpetrated by the Debtor's predecessors against the asbestos claimants.  Of course, the Debtor and those allied with the Debtor deny this.  They say they're in bankruptcy just to access the trust mechanisms offered under 524(g) and those are only available in chapter 11 and they also say they plan to pay every meritorious claim, that effectively, they believe this would be fairer and more efficient because they wouldn't be paying bogus claims because it's too expensive to try the cases to verdict.

Back then when we were talking about this, the ACC wanted to allow the claimants to attack New CT as well.  That was problematic for a variety of reasons, not just the interference with the reorganization, but also legally because the individual claimants were then talking about pursuing for their individual benefit claims that we would consider in the Fourth Circuit first crack avoidance claims and that would interfere with the bankruptcy resolution of those claims.  Now I don't see that in the present motion, but I wasn't entirely clear whether that was in the back of someone's mind.

But for whatever reason, I have since recognized there is, in fact, an estate claim there.  There's a right for creditors to challenge the divisional merger and with the Debtor in bankruptcy, under Circuit precedent those estate claims had to be prosecuted by the estate and I've since

allowed the ACC to assert and they have asserted those claims. So granting relief from stay on a wholesale basis would undermine the effort.

So that was the reason the ACC motion was denied.

As you know, we got the same type of motion again in Aldrich and Murray filed by the Maune Raichle firm and on behalf of Mr. Semian. And I, again, denied a similar motion for relief from stay for basically the same reasons as I did early on in this case, that if the Court were to grant relief from stay to one creditor to liquidate the claim, then all of the creditors would seek that, or most of them, at least enough to wreck the bankruptcy case and that would, effectively, precipitate a *de facto* dismissal.

Then in the fall of last year in Bestwall, Judge Beyer's case, same firm filed on behalf of a similarly cited asbestos claimant, Dale, for the same relief from Judge Beyer. And again, it was denied on simple, similar reasons. Judge Beyer in October said that she was sympathetic to the claimant, but couldn't find cause, that if you only had one claim and you viewed it in isolation under the Robbins factors, which are the factors that we have controlling in our Circuit for relief from stay, a court might find cause to grant the motion. However, Bestwall was a mass tort case involving thousands and thousands of claimants all with legally similar claims and to grant the one motion would result in a wave of like motions. If granting

this one, she would have to grant all future motions for relief from stay and again, we end up with a *de facto* dismissal of the case.  So she denied that motion.

She denied it, also, in -- she granted the PI, the preliminary injunction request, early in the case and that was affirmed by the Fourth Circuit.  The Fourth Circuit did say in dicta that "rather than waiting for confirmation, that claimants can bring individual claims for relief based on the specific facts of a particular claim."  The problem she found there with Dale was that the Dales didn't have any, any unique facts.  And again, allowing them to litigate in state court would cause irreparable harm, defeat the purpose of the bankruptcy case, and effectively, be akin to dismissal.

Then again, another motion filed in, in Bestwall in January, almost identical to Dale was on behalf of Buckingham. And in her January 23rd bench ruling Judge Beyer denied that as well.  She basically went through the Robbins factors at this point in time and noted that the second, that modifying the stay will promote judicial economy, was not met and frankly, that there would be greater interference by granting the motion than if the stay were not lifted and said that those weighed against filing.

She reiterated that you couldn't look at granting Buckingham relief from stay to liquidate without considering what, that the same relief would have to be granted to almost

all.  And while she says that Carolin, notes that Carolin had a brief possibly dicta statement about 362 being an alternate relief for the creditor, that it was not appropriate to grant that.  It made no sense to say a case, relief from stay should be granted for subjective bad faith if it was going to lead to dismissal when the Fourth Circuit has already said that the standard, and as reiterated in these cases, that the standard is two prong and you cannot dismiss the case for bad faith unless there is subjective futility, which, of course, doesn't exist.

So she denied that and then warned counsel against repeatedly filing motions which present the same grounds and theories as those previously rejected.

But here we are again, Rounds 2 and 3 in the DBMP case with the same firm pressing the same rejected relief and theories and it will not surprise you that I'm denying the motions again.  I'd say nothing really has changed since my first ruling in this case with, on the ACC motion.  It looks like maybe trying out the new relief from stay arguments on a different judge, but the fact is I agree with Judge Beyer's analysis.  I believe under Carolin if we're going to start granting relief from stay en masse, then you're back under Carolin and we can't on the basis of subjective bad faith, if that exists, warrant, effectively, tubing the whole case.  That's to do, effectively, indirectly what I am not permitted

to do directly.

Now the movants have suggested that thinking that there's an avalanche of motions coming is speculative, but I would disagree with all that.  I disagreed before.  I've presided over now, I think, a half dozen or maybe eight asbestos cases and been doing this for a decade and while I don't know as much as all of you about those cases, I would say that from what I've experienced it is an absolute certainty that to grant these two motions would lead to hundreds, if not thousands, of more.

As we all know, there are thousands and thousands of claimants, but most of them are represented by a dozen or so asbestos firms across the country, firms that are knowledgeable about bankruptcy law, well informed about what's going on in each of these cases, many serving on the ACC indirectly, and are creditor firms that are aggressive in representing their clients and protecting their rights.  The firms have heavy influence over voting.  Just witness the Garlock and Kaiser case.  The claimants were all opposed to the Debtors' proposal, but when a deal was struck with the ACC in, in those cases the result became a, almost a hundred-percent vote in favor.  And all of that experience tells me that if I were to grant these two motions for relief from stay, even just to liquidate the claims, by month's end I'd have dozens of claimants making the motions and by the end of the summer there'd be tens of

17

thousands.

So my prior ruling and reasoning in the ACC relief from stay matter and the dismissal matters, especially the denial of dismissal, I'm readopting here today.

I also agree, generally, with the Debtor's arguments, except for those few occasions where the Debtor starts talking about things that I may have decided otherwise in the preliminary injunction and a couple of things that, like saying that Ortiz doesn't apply in these cases.  If you read the Aldrich decision, well, it might.  So that's not for today.

But otherwise, I generally agree with where the Debtors and Affiliates are coming from on this.

I do want to say a couple words about specific arguments that were raised just for the benefit of a reviewing court, if there is one.  The movants are saying that the twostep in bankruptcy were take, undertaken in subjective bad faith.  I don't feel comfortable making that conclusion today, not on this record or at this stage in the case.  That same basic argument was made in the manufacturing jurisdiction and PI arguments in Bestwall, and, as you know, the District Court and then the Fourth Circuit effectively rejected those.  The Panel even scolded the claimants for delaying the bankruptcy case and the Fourth Circuit didn't overturn their ruling.  And since then, Judge Beyer and I both have encouraged direct appeals of our dismissal rulings to the Circuit, but twice

those have been denied.

It is obvious that the ACC thinks that if a profitable conglomerate breaks off part of itself to use chapter 11, that's, *per se*, bad faith and that the filing, a filing to overcome the tort system is a fraud, but the Debtors think just the opposite, that this is an efficient way of dealing with an intractable problem.  And by the way, they owe less than what the claimants think and they think they've been abused by bogus claims in the tort system.  The Debtors also maintain they intend to pay all allowed claims.  They just don't think they owe as many of them.

So they, from their vantage point, say they're not just stranding the asbestos claims.  And it's, of course, true that they'd like a capped plan.  Every asbestos debtor to date practically has and they'd like to avoid punitive damage awards, etc., etc., and they'd like to protect their affiliates.  But there's nothing new about any of that.  Are those aspirations, *per se*, bad faith?  It seems to me that right now the Fourth Circuit doesn't seem to, nor does our District Court.

I've mentioned the differences of opinion about whether a non-distressed solvent company can use bankruptcy tools.  In the Aldrich order denying dismissal, I gave you my take about where I see the landscape and the potential issues lying ahead.  No change there today because a higher court than

this one will ultimately make the call.  But can I find today that this filing is subjective bad faith because it's sought by a solvent non-distressed entity and does that dismiss, justify dismissal?  I'd say the answer in this Circuit at the moment appears to be no.

And moreover, we are currently litigating the propriety of the, of the divisional merger and the bankruptcy filing in the adversary proceedings and whether those events were detrimental to creditors.  And that also cautions against trying to determine the same matters, like subjective bad faith in this current motion.  But even if subjective bad faith lies, I don't think it's the standard.  At most, it's a factor.  The standard for relief from stay is cause and the controlling case in our Circuit is Robbins.  Robbins involves a balancing test and as I, both I and Judge Beyer have held, here relief from stay would lead to case dismissal, which under Carolin is not attainable for simply subjective bad faith.

So I'm not going to try to do indirectly something that I'm not permitted to do or not inclined to do under existing law.  I am bound by the Carolin decision.

Now movants seem to think the Court invited this motion.  I didn't.  I try to listen to the issues that y'all present and consider the evidence and make the findings from, that support the decisions and answer the questions fairly.  On occasion, I have been known to talk a little longer than

shorter because I think in some ways it helps you on trying to understand how your jury is seeing the case as it goes along and maybe helps you on settlement grounds.

But bottom line is the Court's not on anybody's side. I'm not an activist and I'm not trying to engineer any particular result. On the facts found in the PI ruling, I held that the bankruptcy stay applied, that dismissal wasn't permitted, and the third-party injunction was required. That's a preliminary ruling, but that's what I thought and that hasn't changed today.

There were some more arguments that were just rehashes of arguments previously made and rejected in the PI and the ACC relief from stay motions as well as in the two cases, like arguing that Premier is the standard, not Carolin. I'm not going to go back through all of that, again. But I would say this. We've been through this at least four times. Repeating this exercise for different claimants with the same identical legal posture is a waste of everyone's time. It's not very likely to work and your vexation of not being able to get to the Circuit or getting a ruling that you like doesn't justify increasing your opponent's costs and everyone's workload.

So like Judge Beyer before me, I would suggest not continuing to try to beat your head against a rock. That's not going to change the outcome, but it could end up with you being sanctioned for pressing the same rejected theories time and

again.  So we've got enough problems to deal with and I'm just going to leave that as a word to the wise, recognizing that my time here is short.

So bottom line is the motions are denied.  I would call upon the opponents, the Debtors primarily, to draw a short order that just makes reference to the verbal findings and conclusions and run it by everyone else for comments and send it on down.

Got that, Mr. Ellman?

All right.  Everyone ready to move on?  Do you need a moment or we, we ready to launch into the next matter?

(No response)

THE COURT:  Okay.  Then we will move on, if I can find the page, to the motion of the Committee to compel and the responses filed thereto.  It's not just the Committee, Committee and the FCR to compel.  Excuse me.

All right.  Who's going to be arguing for the movants?

MS. HARDMAN:  Morning, your Honor.  Carrie Hardman from Winston & Strawn on behalf of the Committee and the Plaintiffs, unless Mr., Mr. Greecher says otherwise.

So thank you for hearing from us today.  I did say I think we had a few status updates relative to discovery, generally.  I will start with one that I'm going to start with intentionally in case there's any clarification that's needed from the other side of the table here.

We have motions to seal before your Honor for both our motion to compel as well as our reply.  We did that in an abundance of caution.  We recognize good swaths of what we protected was likely not needed for redaction purposes, but we did that in, in the interest of time to make sure that the parties had an opportunity to --

THE COURT:  Sure.

MS. HARDMAN:  -- review and dedesignate.

We spoke with the Debtor and the Defendants as well this morning and I believe we reached agreement on how to treat those two motions, both the motion and the reply, as well as all of the attachments or exhibits there.

THE COURT:  Okay.

MS. HARDMAN:  I believe we are down to one issue that would remain redacted and we are fine with this.

THE COURT:  Okay.

MS. HARDMAN:  Mr. Greecher is nodding for the sake of the record.  So both Plaintiffs are in agreement on this.  And that is to redact, there is a Footnote 29 in our opening motion.  It references certain amounts relative to loans that are, I would say, upstreamed is just --

THE COURT:  Right.

MS. HARDMAN:  -- the way I would characterize it. Folks can disagree with that, but the idea is that there are specific amounts there that need to remain redacted.  I believe

that would effectively be redacting of the first parentheses in that footnote, but if the parties felt differently about the breadth of that redaction, we can certainly talk about it.  But that was my interpretation of what we discussed.

I pause to say if we need to revisit this at the end of the oral argument this morning, your Honor, give parties an opportunity.  I just thought I'd start with that so that we could give them a long chance to decide if that's exactly where we are.  But either way, we can work that out.

THE COURT:  Anyone want to respond there?

Ms. Gould.

MS. GOULD:  Your Honor, Gabrielle Gould from Goodwin Procter on behalf of the Non-Debtor Affiliates.  Good morning.

THE COURT:  Good morning.

MS. GOULD:  We agree with Ms. Hardman that the numbers which require redacting seem to be located in the initial parentheses in Footnote 29 of Plaintiffs' moving brief.  And so if that is the, if that remains under seal, then we are fine with the rest of the brief being placed on the public docket as well as the exhibits.

THE COURT:  Okay.

Are we going to refile it with that redaction made?

MR. COX:  Your Honor, Rob Cox appearing on behalf of the ACC.

In the past, we've usually filed it under a notice

that, of a filing of kind of unredacted or un, unsealed documents.

THE COURT:  Right.

MR. COX:  We'll just follow that same procedure if that works for the Court and parties.

THE COURT:  Well, it beats me having the clerks trying to figure out how to blank out something in an existing filing, so.  All right.

MR. COX:  We'll take care of it, your Honor.

THE COURT:  Okay, very good.

Any other --

MS. HARDMAN:  Thank you, Mr. Cox.

Because I did not have the answer to that question, your Honor.

So that, that covers the first ground and the first motion.  I think that probably, or there is one of the motions on your agenda, your Honor.

THE COURT:  Right.

MS. HARDMAN:  With respect to the status update, I just had a few other aspects of --

THE COURT:  Hang on one moment so I can --

MS. HARDMAN:  Of course.

THE COURT:  -- instruct the clerk.

So that would be Contested No. 3E, Motion of the Committee to Under Seal.  These were noticed for a different

day, I think, so.

And then there was another one, was there not, or is that the only one?

MS. HARDMAN:  There should be one for the reply as well, I believe, your Honor.

THE COURT:  Right.  Okay.

MS. HARDMAN:  And I do not have it in front of me, but --

THE COURT:  I thought there were two motions to seal, but I may be wrong.

In any event, that's what it relates to, Madam Clerk.

THE COURTROOM DEPUTY:  Got it.

THE COURT:  All right.  Go ahead.

MS. HARDMAN:  There should be one for the motion, one for the reply --

THE COURT:  Right.

MS. HARDMAN:  -- I, I believe.  We will, can confirm if we, if need be.

Thank you.  So thank you for indulging me.  We have just a few updates relative to discovery.  We've talked about a number of these items with respect to various status conferences over the last couple of months with your Honor and I think the few items I just wanted to tick through are a status update on search terms, mobile device certification, steps in furtherance since your last ruling on the status

conference motion that we filed, and a subpoena that we've issued to the French parent, is how I would say that just easily here today.

Of course, it's never a good start when I'm starting with search terms, your Honor, as an update, but alas, here we are.

Plaintiffs produced an initial set of search terms to the Defendants on March 6th. Back on March 7th, the day after that, we had a hearing before your Honor in the *seriatim* hearings on the motion for a status conference where the Debtor indicated that they've been waiting for our search terms, but were ready to promptly run them since they had gotten them the day before.

It's been 11 weeks, I believe by my count, since we've sent those search terms and today, we still don't have what we call the hit reports. We were told on March 25th we'd see that report in the coming weeks before all of the documents would be collected and that they'd send us some feedback that they deemed un, unnecessary search terms, or the like. We did ask for those search terms to be run on the business custodians to start.

This is not a perfect process, this hit report process. It doesn't need to be perfect. It's a matter of pushing a handful of buttons once you have the discovery --

THE COURT: Uh-huh (indicating an affirmative

response).

MS. HARDMAN:  -- to spit out an Excel file that tells you how many hits are on a particular term.  Sometimes you see there's no hits.  Sometimes you see there's millions of hits and you want to craft your --

THE COURT:  Uh-huh (indicating an affirmative response).

MS. HARDMAN:  -- search terms, accordingly.  It helps various parties to try to get to something that makes some sense in terms of search terms.

All that said, the Defendants have told us they want to wait to run the search terms until they have all of the collection of the subject custodians.  I, I will raise this to say, relatedly, the parties are at an impasse on some time limitation issues.  I think you've heard some of those temporal limitation issues that have come up once or twice so far, your Honor, this year.  There is one related to the document production, which is still in discussion among the parties.  It is an issue that, hopefully, we can resolve.  But if not, need to address before the Court at some point.

In the interest of time, we recommended to the Defendants that they pull all of the documents for those custodians going back to our broader search time frame just because if we end up in a dispute, you'd rather have all of it collected in the first instance and then narrow from there,

rather than have to then go back and pull a broader swath later.  It makes it a bit of an inefficient process.

So we made that suggestion.  Defendants have said that they will not do that.  They'll run based on the time limitations that they believe apply.

So your Honor, we're trying to avoid these issues, but eventually, we may have to get some of those time issues in front of your Honor before we even get to search terms.  But I'll come back to that in a moment.

When it comes to mobile device certification, while we're working out that search term list, the parties have been working to finalize a certification that the custodians will each review and sign to address whether they've used their mobile devices for business purposes during the relevant time period.  The certification will help us figure out which mobile phones need to be located, searched as part of the discovery process.

As part of the Defendants' duty under the Federal Rules to produce responsive documents, they must search all of available locations for those responsive documents.  That includes these cellphones, texts, chats, notes that otherwise might not be available on a computer, but might be available on these phones.

We've learned in the Rule 30(b)(6) depositions, which we'll discuss in a bit, that the company issues employee-issued

phones or -- excuse me -- company-issued phones to employees. So it wouldn't be surprising to us that the custodians would have on these company-issued phones texts or chats or other communications that they use for business purposes on a regular basis. And it's no reason to think that if they do that in their ordinary course, that they stopped during the corporate restructuring.

So we have to think that we might have --

THE COURT: Uh-huh (indicating an affirmative response).

MS. HARDMAN: -- some responses relative to the mobile device certification.

I believe I mentioned at one of our prior conferences that we are at an impasse on mobile device certification on a particular issue. Of course, that issue involves the time frame applicable to the mobile device certification. We understand Defendants want a more narrowed time frame than the Plaintiffs do and of course, for the reasons we will discuss in a bit, we do believe the longer time frame is appropriate, particularly when it comes to discovery of the facts and circumstances of the corporate restructuring and the resulting DBMP bankruptcy. We know when these things occurred. So it shouldn't be a dispute as to that relevant time period, but we'll try our best to reach a resolution.

Therefore, to the extent we don't reach a resolution,

we plan to bring some of these issues before your Honor.  And I actually had a note that we are cognizant of your time frame and are certainly glad to hear that you will be with us a little bit longer.  But we don't want to add to your already full plate.  I know that you have a --

THE COURT:  Uh-huh (indicating an affirmative response).

MS. HARDMAN:  -- lot going on to try and work through some of your case, cases as it is.  But we will do our best to try and narrow our issues and get a finite set of, of these issues before your Honor.

As a status update since our last meeting with your Honor related to the motion for a status conference, as you know, we filed that motion on February 15th.  Your Honor permitted Rule 30(b)(6) depositions to take place so we could get to the heart of the issues that we believed remain unanswered.  As to the dispute regarding the time frame occurred applicable to those depositions, your Honor ruled that the narrower time frame should apply.  On April 25th, we took the depositions of Mr. Thomas Pier, who was the Chief Technology, is the Chief Technology Officer, and an Associate General Counsel, Ms. Sheri Brutsch.

From a discovery dispute perspective, we faced an additional set of speaking objections and instructions not to answer that were disguised as answers in your personal capacity

and even a mid-break counsel discussion while the witness remained under oath.  Some of those objections were lodged at aiming to keep Plaintiffs within the time frame limitations, yet Defendants asked questions in redirect that were well outside of that time frame that your Honor set at their request.  So even -- so we're not entirely sure what limitations apply when it comes to time frames except for when the Defendants instructed us not to answer, instructed not to answer on that basis.

Plaintiffs, again, are considering the various issues that rely, relate to these time frame issues, including those as to what is the relevant time frame and we are likely to revert with motion practice, to the extent that these seem to be a common theme.

THE COURT:  Okay.

MS. HARDMAN:  Finally, as an update, we served subpoena on the French parent.  You will no doubt hear about the existence of this subpoena in short order when it comes to the motion to compel, but just wanted to raise it as a status update.

In responding to an inquiry to delay the deadline to set, serve responses and objections from the French parent, Plaintiffs made a direct request of the French parent to confirm that they actually intend to produce documents to us. Otherwise, we're just extending that deadline to respond to

receive, effectively, nonanswers, from our perspective.

Counsel for the French parent responded to our direct inquiry

about the intention for production of documents indicating they

will respond regarding potential document productions.  You can

call me a cynical New Yorker if you'd like, your Honor, but we

interpret "potential productions" to mean there's a distinct

possibility that there'll be no productions.  But happy to be

corrected on that score if CSG, the parent, is willing to

confirm responsive documents will be produced.

Despite what we interpret as a nonanswer to our

question or a noncommitment, we agreed as a gesture of good

faith to extend their deadline to respond to our subpoenas by

about two weeks.  It's coming due the first week of June or so.

We're happy to further extend that deadline if there's

confirmation that documents responsive to our request will be

produced.  Our interpretation of this non-commitment response,

unfortunately, further validates our need to file and proceed

with our motion here today, your Honor.

With that, we do have a set of slides.  So I'm going

to pause a moment.

THE COURT:  Let's see if anyone else wants to make an

update --

MS. HARDMAN:  Sure.

THE COURT:  -- statement or --

MS. HARDMAN:  That sounds good.

THE COURT:  -- a rebuttal statement under the circumstances.

Before you start, Ms. Gould, let me say this.

I should have mentioned as well that anticipating that you're likely stuck with me for a few more months, we're not changing at the moment any of our dates.  We've got those dates reserved for you and I know you plan on them.  We'll try to keep those as much as we can.

But for the next few months if you're noticing something, just do it on the normal date, okay?

All right.  Ms. Gould.

MS. HARDMAN:  Thank you, your Honor.

MS. GOULD:  Thank you, your Honor.  Just some brief response to some of the purported updates that Ms. Hardman provided.

THE COURT:  Sure.

MS. GOULD:  With respect to search terms, as, as the Non-Debtor Affiliates and the Debtors had made clear, given the number of custodians that we've agreed to it makes sense to gather not a hundred percent of the data, but a large majority of the data before you run the search terms.  Otherwise, when you're going to run the search terms and see what the hit reports are, it's not very effective if you don't know that it's run through the entire amount of data.  I suspect, in the end, there will be some overbroad search terms when we run it.

I think one of Plaintiffs' search terms was North Carolina.

So I expect that we will have some back and forth, but we've been working diligently to gather, again, the majority of the data and I think we're very close to being able to run search terms.

In terms of the time limitation issues, we're happy to work with counsel for Plaintiffs to see if we can come to any agreements before an impasse is declared and we need to spend more of the Court's time on motion practice.  So we certainly are happy to meet and confer with Plaintiffs in good faith on those issues as well as the mobile device certification.

The one part where we have to make sure the record is clear is with respect to the depositions that took place on April 25th of Mr. Pier and Ms. Brutsch.  Ms. Hardman referred to instructions not to answer.  That is false.  That is flatly false.  There was one instance where we cautioned the witness if there was a privilege object, you know, if there was privilege involved, not to answer, but the witness, I believe, answered the question.  There -- that was one in all of the two depositions that lasted the entire day of April 25th.

The objections that took place were because, as Ms. Hardman noted, the Court had specifically ruled on the time frame, that the depositions were only to, to cover the time frame from August 23, 2021 to the present.  Very frequently Plaintiffs' counsel went well beyond that time frame in the

35

questioning, which was inappropriate of the 30(b)(6) witnesses. So when that took place, we noted that we objected to the time frame.  It was outside the scope of the Court's order and the witness would be answering in his or her personal capacity, not as a designated corporate representative on behalf of the company.  Those were the objections made.

As far as the subpoena concerning Compagnie de Saint-Gobain, we do understand that finally, a year after we told Plaintiffs that we could, "we," the Defendants, could not produce documents of Compagnie de Saint-Gobain, that that subpoena was finally served.  I personally have not seen the subpoena.  So I can't comment any further on that or the conversations between Plaintiffs' counsel and counsel for Compagnie de Saint-Gobain.  But we do understand that subpoena has finally been served.

Thank you.

THE COURT:  Thank you.

Anyone else?

Mr. Ellman.

MR. JONES:  Your Honor, Jim Jones for the Debtor.

We were not anticipating the argument that you just heard.  We were anticipating an argument on an actually filed motion to compel.

We concur with Ms. Gould that we are working diligently on both search terms trying to iron out the

appropriate dates and the time intervals that were discussed.

And we also understand that a subpoena has, was served the day the motion to compel that we are here to argue was filed and Mr. Beausoleil can confirm that and his arrangements, if any, with the ACC because he's with us today.

THE COURT:  Yes, sir.

MR. BEAUSOLEIL:  Good morning.  I can come up.

THE COURT:  You better come around --

MR. BEAUSOLEIL:  Yes.

THE COURT:  -- if we want to get you recorded, Mr. Beausoleil.

MR. BEAUSOLEIL:  I get farther and farther back.  Hate people yell.

Good morning, your Honor.  Bill Beausoleil, counsel for Compagnie de Saint-Gobain.

Again, you know, we, no motion has been filed against us.  We finally got the subpoenas two weeks ago.  The condition -- and I've never seen this in over 25 years of practice -- to get an extension you have to commit to produce documents. We're looking at it and everything else.  It's particularly egregious here. They are asking me to confirm something that if I did it, I would be committing a crime or abetting a crime under federal French law.

There are ways to -- the, the French blocking statute has been amended in 2022.  There are ways to do it.  We re

doing it quickly.  Specifically, you send, send the subpoenas in with a letter to the Sisse, S-I-S-S-E.  That's been done. It's confirmed.  Until you get through that process, you can't say you're going to or not going to -- well, you could say you're not going to -- you can't say you're going to do something that would be in violation of the French blocking statute.

That's, that's where we're at.  I, you know, we're months away from responding, meeting and conferring, doing all these, the other things.  We intend to do that in good faith, but on that narrow issue that I won't even confirm I'll produce documents, I don't want to go to jail in France.

THE COURT:  Okay.  Thank you, Mr. Beausoleil.

I think we can all do without any of us going to jail. So we've got enough things to talk about now.  All right.

MS. HARDMAN:  Yes, your Honor.  And for the record, no one on the Plaintiffs' side wants to see Mr. Beausoleil go to jail or any party, for that matter, including his clients.

The idea was simply to move along with respect to responses.  To the extent that their response is, in fact, the French blocking statute does not permit us to produce documents, that's a rather clear answer to us and at least that's what I'm interpreting right now, your Honor.  That's what we expected.  It's what we've been told all along would be a response that we'd receive.

So we're just trying to move forward.  And with respect to that subpoena, that's what we anticipated might be the response.

THE COURT:  Okay.

Folks, I don't want y'all to give Judge Edwards the wrong impression here.  It has become traditional -- and I think the Debtor started in these cases -- to have general case updates.  We don't need to be arguing about things that aren't before us today.  I understand you've got some frustrations and you're working with one another and each of you has a different perspective.  We'll deal with those if, if --

MR. JONES:  Thank you, your Honor.

THE COURT:  -- you need to, okay?  All right.

MS. HARDMAN:  Thank you, your Honor.

THE COURT:  Why don't we hear the motions that we do have before us.

Is there anything else that needs to be known, good-of-the-order type announcements about the cases?  Any other -- I view these as watching the future attractions before the main movie starts.  But thank you for letting me know what's going on.

How about we turn to the current motion.

MS. HARDMAN:  Sounds good, your Honor.

We do have slides.  So I believe that they're being e-mailed to the parties and we have hard copies if your Honor

wouldn't mind if we approach?

THE COURT:  Please.

MS. HARDMAN:  Thank you.

(Slide presentation provided to the Court)

THE COURT:  Thank you.

MS. HARDMAN:  All right, your Honor.  We are here today on some certain discovery disputes and, and we're here today on, as Plaintiffs in three adversary proceedings, what we call, colloquially, the subcon proceeding and, as well as our role as estate representatives in the fraudulent transfer and fiduciary duty proceedings.

We are here on the Plaintiffs' motion to compel what is discovery that should have been produced to the Plaintiffs back in the PI proceeding years ago at this point, let alone now in the adversary proceedings.  Before we get into all this, I do want to point out that we did just walk through only some of what have been the disputes at this point.  From our perspective, it has been a time-consuming and expensive process to, to just pull teeth to get this discovery from the Defendants here.  This slide shows some of what we've been up against in discovery in these adversary proceedings.  I'm not going to walk through this for the sake of everyone involved.  It is a demonstrative just to get to my one overarching point, your Honor.

My one overarching point is there's a bigger-picture

question here, from our perspective.  We hear time and again from the Defendants, including the Debtor, the Non-Debtor Affiliates, that there's no there there with respect to Plaintiffs' claims, how the corporate restructuring and DBMP's bankruptcy were always on the up and up, then why not let us pressure test it?  If the transactions and decisions making up the corporate restructuring and the resulting DBMP bankruptcy were all completely defensible, nothing to see here, as Defendants have stated in their opposition papers today and generally throughout the case, why hide behind these discovery tactics?  It can't just be about costs because going through all these disputes involves an expense as well.

We are the estate representatives here conducting an investigation into the events that the Defendants, again, claim are entirely defensible.  Why in that case would discovery be subject to so much hinderance and delay?  We aren't asking for irrelevant information here.  This is solely about the corporate restructuring that created DBMP and the filing of DBMP for bankruptcy.  By extension for today's purposes, if the French parent were involved on such a limited basis, as the Defendants claim, then why hide behind all these rules or policies to avoid production of responsive information?  Wouldn't that information, if available, just prove their point?  Again, the bigger question comes back to me.  Why are all these tactics used if there's nothing to hide?

For today's round of disputes, what our request boils down to is rather simple. We ask the Court to require the Defendants to comply with the Federal Rules, to produce documents within their possession, custody, or control. We believe that those documents include documents from the French parent. We may call them CSG today or the French parent. As we noted in our second footnote in the motion, we do not seek a specific court order requiring particular documents to be produced today. Rather, what we envision in your ruling, if you were to agree with us, is it would inform the Defendants of what their obligations are in terms of the retrieval of documents and other discovery that is respontive, responsive to Plaintiffs' already pending requests. This will, of course, be subject to reasonable search parameters, search terms where appropriate, aspects that the parties will search out after your ruling on these issues.

So first, we are talking about possession, custody, and control, something you've seen probably referred to as PCC all over the place here. I'm just largely going to rely on our papers to spell out the --

THE COURT: Uh-huh (indicating an affirmative response).

MS. HARDMAN: -- applicable law here. Just wanted to demonstrate what the law says, generally. Rule 34 of the Federal Rules that's applicable here requires parties to the

litigation to produce documents within their possession, custody, or control. That usually means you go first to the party in litigation because that's, because what they have in their possession, custody, or control should be the first stop for relevant or responsive documents. The primary focus and purpose of Rule 34 is to ensure that proper disclosure of facts are made and the truth is obtained in an effort to resolve disputes.

PCC is possession, custody, or control. We only need to demonstrate one. The Defendants have focused on possession or custody to demonstrate that we somehow failed to establish what we seek, yet we are focused largely on control. We believe that under the applicable authority Defendants certainly have control over documents responsive to our requests whether they happened to originate in the U. S. or France. Control does not require physical possession and includes more than just the legal right to demand documents. It is also found when there is a practical ability to obtain those documents from a nonparty.

Now I say "nonparty," which is a somewhat triggering word among this group. I want the record to reflect, your Honor, that the Plaintiffs do not agree that CSG is a nonparty. We understand the position from the Defendants on that score and, of course, of CSG, but Plaintiffs simply don't support treating CSG, who's a beneficiary of a PI, who actively

participated in the discovery protocols and the Case Management Order in these, these adversaries, who fought alongside the Defendants to stay the fiduciary duty action, and who are here today to truly be a nonparty.  The fiduciary duty action may be stayed, but, from our perspective, Compagnie de Saint-Gobain hardly fits the definition of a nonparty.

And I'm sure you'll recognize on this slide that there's one case we cited in our source information down below -- it's again in our motion practice as well -- because it's your own work, your Honor.

THE COURT:  Uh-huh (indicating an affirmative response).

MS. HARDMAN:  I'll do my best not to put words in your mouth.  Just want to note that the BK Racing case introduced, included the same standard for determining control, that it "need not be limited to a legal right to obtain documents, but, rather, can be found when there's a practical ability to obtain them from a nonparty."

The Uniden case, which is cited throughout our briefs, is a Middle District of North Carolina case.  We cite it in our papers.  It spoke on this issue in the context of a parent-sub relationship as well and indicated that while a subsidiary may not have the right to demand turnover of documents, a subsidiary is required to respond to Rule 35 [sic] requests, which can include the production of parent company's documents.

So I'll go to the next slide here.  Back to the determination about whether control exists when one has the practical ability to obtain.  There are factors considered by courts in the Fourth Circuit.  The six of them are shown here. There's been some discussion in the papers about whose burden it is today, your Honor.  Whether it's Plaintiffs on control or Defendants in refusing to comply with their discovery obligations, it doesn't really matter for today's purposes, from our perspective.  Plaintiffs have amply demonstrated that the Defendants have the requisite control over the responsive discovery documents that are held by CSG.

I will try to power walk through these factors in a, in a short while, but the long and the short of it is while we're not required to show all six of these factors, we do believe all six support the determination that the Defendants have possession, custody, or control over French documents and e-mails that would be responsive to our discovery demands.

A minor point, your Honor.  I will say "documents" a lot today.  "Documents" includes e-mails and all sorts of other discovery material.  I just want to be clear about that so that there's no confusion.

The facts that we've laid out in our pleadings we'll describe at a high level today and we'll describe at a high level today will demonstrate one central point.  Access to the French parent's documents is absolutely available to the

Defendants when there is a justified business purpose and apparently not when there might be a, a, a lack of desire to produce.  And that may include a legal process.  It's clear the Defendants are using their ability to access documents on a selective basis using access as both a sword and a shield when it comes to this litigation.

I can't help but see a pattern here, your Honor. First, we're talking about selective assertions of privilege in the PI discovery that is incorporated here and then more recently, we've been talking about the selective assertions of time frame limitations, which are waived when the testimony is desired on a particular issue.  And now, we're talking about selective assertions of access to discovery.  It's discretionary discovery here, your Honor, at the Defendants' discretion, cherry picking when to produce and when to claim foreign laws prevent production or their access has been blocked.

While there are a number of factual points laid out in our pleadings, the few key facts are shown here, which demonstrate that the Defendants have control warranting ex, warranting the exercise to obtain discoverable documents under Rule 34.  French parent's employees are sent to work in the U. S. whether on secondment or as an expatriated employee and during that period they maintain access to their e-mails no matter what.  Certain of them retain access to their files as

well, but they certainly retain access to their e-mails no matter what.

That's no surprise from a practical perspective. Compagnie de Saint-Gobain is a $40 billion global enterprise with thousands of employees, including a good chunk in the U. S.  It is no surprise they'd spend substantial time here in the U. S. and figure out a whole program to make that happen. Ms. Brutsch let us know that Mr. Phelizon, who was also involved in the corporate restructuring, was one of those secondees.  I'll discuss that in a short while as well.  He was a sort of hybrid who had maintained access to some files as well as his e-mail.

Mr. Pier, the Chief Technology Officer, let us know that visiting employees of Compagnie de Saint-Gobain would maintain their access to their French documents and e-mails while conducting business here in the U. S.  One such instance would have likely come into play when a number of those high-level executives came to Goodwin Procter's New York City offices for a significant Project Horizon meeting back in October of 2019.  That is the referenced Bates stamps here that you see.

At a high level, the Saint-Gobain enterprise shares the same wide-area network where all of their files and programs reside.  Everything, as I understand it, is on this W -A-N or WAN, WAN, separated by firewalls, including one that

separates North America from France.  However, Mr. Pier testified that any separation between North America and France can be broken if there's a business need.  He explained that the firewall can be overridden to allow connectivity where there's a business requirement or a business need to share information and that there's a process through which the override can be requested, reviewed and, if approved, it can be implemented.

So as I mentioned before, it appears there are policies and rules in place which can be overridden when needed, whether by request of the U. S. employees, or otherwise.

Well, what about specific documents?  When it comes to actual document storage, you got to talk about e-mails as well as electronic documents.  First, e-mails of all Defendants and French employees are exclusively held in the French Technology Department.  If a Defendant in the U. S. wanted their old e-mail files that they didn't have access to, they'd actually have to ask the French IT system for permission.  If a Defendant wanted the French files, they'd have to do the exact same thing.  And while I initially was surprised to hear this, I gave it a bit more thought and it makes complete sense.  Of course, this massive enterprise, which is ultimately run by a French parent, centralizes their e-mail and all of their data in one entity in France.

So all of the e-mails that have already been produced in these cases reside in some way, shape, or form at the French parent's IT servers, or IT system. I'm sorry. I'm probably going to use the wrong technology term today, your Honor, but it is not intentional. In addition, I'm sure there's some cost saving there to the enterprise to have everything centralized. It would make complete sense. You also then have some, you know, centralized oversight and control by centralizing their e-mails.

But more than that, it's clear that the Saint-Gobain enterprise holds itself out as one enterprise. Mr. Pier, the company's Chief Technology Officer in North America, said it best, saying, "There's no notion of French e-mails versus U. S. e-mails. They're one and the same. It's one company. E-mails are maintained by one company." So how does one enterprise share its files across all of it's affiliates? As I said before, it's by simply lodging a request and filling out a form. At least that's the on-paper procedure here, your Honor. It's a formal process, a request of documents if needed. Such request is reviewed by the French IT Department and if needed, by higherups in the company.

But of course, with tens of billions of dollars in corporate transactions that are occurring every year, it is no surprise that there's extensive back and forth between the North American affiliates and the French entities. No one is

suggesting that the Defendants ignore their protocols that may be in place for the company to obtain documents.  In fact, we submit that it's the Defendants' duty under Rule 34 to at least lodge the request to the French parent, but they have not done so.  In fact, we would hope that the French parent would be more receptive and responsive to its own affiliates than it would, perhaps, a subpoenaing party.

It appears to us that the Defendants and, and CSG would rather Plaintiffs, instead, go through endless hoops of relying on third-party discovery to fulfill the Defendants' obligations to produce responsive documents, a process that while it exists, in reality does not exist on an ordinary-course basis for the Defendants and Compagnie de Saint-Gobain when it comes to their everyday operations.

We've talked about e-mails.  Discovery also includes documents.  We've learned in the 30(b)(6) depositions that the enterprise operates just as many companies do.  Their employees share information and work collaborative, collaboratively on documents and other projects.  Given their enormous size and extensive operations, of course they share information and collaborate every single day.  This seems obvious, but when a group works on a particular project we learned that the project can involve individuals both domestically here in the U. S. as well as in France or elsewhere.

So how do they do that?  Well, the wonders of the

internet, of course, but, more specifically here, the company utilizes a few different programs to share documents and other information.  Of course, there's the exchange of e-mails which can include the exchange of documents that are attached, then there's also something called OneDrive or SharePoint, which are programs, as I understand it, to share files in a, or have a shared folder.  It's a document exchanging type program.

And then the final one that I'll discuss here, your Honor, which we use a lot in this courthouse, actually, and in my office as lately, as well is Microsoft Teams.  It turns out that Teams has far more capabilities than even I know how to use or have at least, maybe I missed the, the instructional day on how to use Teams, but there's probably a lot more to it even on my program than I notice.

That is what this company has actually figured out.  The things I don't know yet, they have figured out.  I received a lesson from Mr. Pier in his deposition about the program's capabilities in the context of what the Saint-Gobain enterprise uses Teams for.  He explained that folks from any office in the company can open up a shared project, which he called a Teams Group.  I'm sure it's probably called a Teams.  I'm not sure.  It's a sort of virtual conference room, your Honor, where folks can save documents.  They can exchange documents.  They can even work and edit in tandem on there.  They can have a chat conversation, all of which is saved so that they can refer to

it if they need to go back and revisit a discussion that they've been having on a particular issue.  It all makes complete sense.  It's a way for folks virtually to work together as if they are sitting right next to one another. Mr. Pier even explained that these Teams Groups that he belongs to, some of which are project based, include French employees.

So this is how the company is able to claim that there are all these walls to access, but the practical reality is that they routinely circumvent those walls through OneDrive, SharePoint, or what sounds to be the most common, these Teams Groups.  There may be other ways, but these were the ones that were discussed the most with the company's representatives.

Now back to the factors and I will do my best to make this as speedy as possible, your Honor.  We're talking about the practical ability to obtain.  There are six factors here, your Honor.  And while, again, we don't have to demonstrate every factor, we do believe each one does speak to the practical ability for the Defendants to obtain documents from the French parent.

So as to the first factor, it's called The Corporate Structure, Common Relationships, Financial Relationships, your Honor.  Defendants have pointed to each finding here to make a suggestion that each one alone, each one of our enumerated factors alone, isn't sufficient.  Even if that were true, we aren't arguing them separately.  We are arguing them together,

your Honor.  And when we talk about these factual points we think they all support finding of this factor together.

The wholly owned subsidiary relationship between the French parent and the Defendants here, your Honor, Defendants appear to rely, again, on the corporate formality to suggest that the parent-sub relationship alone does not establish control.  Sure, we agree with the fact that if that were the case, the parent-sub relationship alone doesn't rule the day.  However, Plaintiffs submit there is more present on this factor that warrants a finding of control.  Courts within this Circuit have found control where there is a sub-parent relationship.  The Steele case that we've cited in our briefs -- it's a District of Maryland case --

THE COURT:  Uh-huh (indicating an affirmative response).

MS. HARDMAN:  -- from 2006 -- says:

"The specific form of corporate relative involved doesn't matter, whether it's a parent, sister, or subsidiary corporation.  Courts are able to disregard the corporate form to prevent, among other things, 'misleading actions whereby corporations try to hide documents and make discovery of them difficult.'"

Courts within the Fourth Circuit order subsidiary defendants to produce documents from a foreign parent.  We cited another couple of cases as well to support that, the

Ultra-Mek case, the Estate of Colombia, I believe, and the Mt. Hawley case.

Additionally, your Honor, control over documents of a foreign parent has also been found where the foreign parent was, quote unquote, responsible for the preparation of consolidated financial statements that included a U. S. subsidiary.

Your Honor, we had a slide at one point that I could demonstrate that they filed consolidated financial statements, but I thought I'd spare you the graphic and --

THE COURT:  Okay.

MS. HARDMAN:  -- I imagine that is not a disputed fact here, your Honor.

Defendants do claim in response that consolidated financials alone are insufficient to show control.  Again, we're citing more than that to support a finding of control here.  And again, this is only about discovery obligations.  We are not currently at this moment talking about substantive consolidation.  This is not a bigger-picture issue.  We're just talking about discovery.

THE COURT:  Uh-huh (indicating an affirmative response).

MS. HARDMAN:  In fact, as noted in our motion, a significant amount -- and I am not saying the number because it would otherwise be redacted -- a significant amount of funds is

upstreamed in unpaid loans from the Defendant New CT to Saint-Gobain Finance Corporation, which we understand ultimately filters up at the end of the day to the French parent.

So there's clearly a relationship between these entities. And there is, again, as you see here on this chart, overlapping management at the French parent and the Defendants. Defendants suggest the roles of these overlapping senior management is either meaningless or irrelevant or that there's some temporal limitation to this analysis. Clearly, we disagree with that characterization and have not seen a case to support the idea that the current positions of these management folks are all that matter here.

As to the second factor, the connection of the French parent to the transactions at issue, your Honor, on this factor courts have found that the exchange of documents, collaboration, or a close working relationship are enough to establish this factor. And we think this factor is established easily. Documents were exchanged. Compagnie de Saint-Gobain collaborated with their U. S. subsidiaries, the Defendants here, your Honor, on Project Horizon and a former member of the Legal Department even indicated that the French parent was responsible for authorizing the restructuring and the DBMP bankruptcy.

These next few slides are just demonstratives, your Honor -- I'm not going to sit on them too long -- to support

our findings.  Here, you see this is an e-mail about Project Horizon and it says, "The Current Thinking."  And what I will say is it's got a slide deck that went to Pierre André.  Mr. Chalendar is the Chairman and CEO of the French parent.  I would consider this both an exchange of documents and collaboration.

Next, we have an image of what we call the "working list" or the "working group list" for Project Horizon and it's quite a long list.  The document that goes behind the front-facing e-mail here is the original top of this e-mail and then you see the continuation.  There's an, there's a set of ellipses there where the U. S. list was and at the bottom of it was the list of the Paris folks on the working group list.  You see French employees, eight of them here, I believe.  As I understand it, in my own daily work life when we call something a "working group," it usually consists of the people who actually work on a project, collaborate, exchange documents, and the like.

Finally, as I referenced today, on the screen is the e-mail referencing the big meeting in New York City in October that included a full team for Project Horizon.  Again, more exchange of information, collaboration, and clearly a close working relationship.  This is one of multiple examples.  The French flew to New York to discuss Project Horizon.  Therefore, we believe the facts establish this second factor.

On to the third factor, halfway through, your Honor. Whether Compagnie de Saint-Gobain will benefit if the Defendants prevail in the adversary proceedings.  We've cited case law in our motion that supports a finding of this factor in the parent-subsidiary context.  And now, as to whether the French parent will benefit if the Defendants prevail in the adversary proceedings here, your Honor, well, Compagnie de Saint-Gobain is relying heavily on the Defendants' success in conducting, completing, and defending the corporate restructuring and the resulting DBMP bankruptcy.  Let's start with the obvious.

Compagnie de Saint-Gobain will benefit from Defendants' prevailing in these adversary proceedings because the fiduciary duty action is clearly tied to what we do in the fraudulent transfer action.  Compagnie de Saint-Gobain also claims a common legal interest that if the Defendants remain successful in the challenges of these adversary proceedings, then such claims will protect Compagnie de Saint-Gobain's involvement here.

And when it comes to the benefits of the French parent as to the positions espoused by the Defendants here, there's something very important to note, the injunctive relief.  It is all tied to the propriety of the corporate restructuring and the DBMP bankruptcy, which is challenged in these adversary proceedings.  This injunctive relief, this issue distinguishes

the case from the very typical interest that a parent might just have in a subsidiary's litigation.  Compagnie de Saint-Gobain benefits from the preliminary injunction granted at the outset of this case that was intended to carry to the permanent injunction afforded by 524(g) contemplated and considered by filing this bankruptcy case in the first place.  Should Defendants find success, the continued preliminary injunction turned permanent injunction will protect Compagnie de Saint-Gobain from very significant asbestos liability.  The Defendants have admitted their liability here is at least $500 million.  We, of course, think it's billions.  But in any case, these are significant sums that if the Defendants and the Debtor are successful, they'll insulate Compagnie de Saint-Gobain from such liability.

Shown here on the next slide, you'll see how the protections of the corporate restructuring and the injunction of asbestos liability is a foremost benefit for the French parent, given how involved they are and the updates on the meso, mesothelioma liabilities and Project Horizon here. Clearly, the French parent recognizes the importance of what they perceive as shedding their asbestos liabilities and how beneficial it would be to them if they were successful in this bankruptcy process through their subsidiaries.

I'm going to try and short circuit at least one set of factors here, your Honor, and combine them.  They are somewhat

related and intertwined.  Listed out here, your Honor, are a number of factual supports supporting both Factor 4, which is the exchange of documents in the ordinary course and agreements that permit the exchange of documents.

We want to note that the sixth factor refers to agreements, but it's broader than that.  That factor, the point of that factor is whether the parties actually exchange and share documents to meet business needs, which they do here on a routine basis.

There's a few factors, there's a few points of factual support I've mentioned already a few times, but the factors, of course, overlap a bit in their considerations.  E-mails are exchanged in the ordinary course of business.  Documents and communications are exchanged in the ordinary course of business by Teams, OneDrive, or SharePoint.  Mr. Pier testified in order to gain access to those documents in these ways you simply have to ask a Teams Group leader for access.  It's not the same process as going to French IT for permission.  You simply ask one to the other.  For instance, your Honor, if I had a Teams Group, all I'd have to do is send you an e-mail or you would say, "I want to join," and I would send you that invite.  This is not subject to the same policies or procedures of having to go to French IT to get access.

The company has also established a secondee program and an expat program that they employ in their ordinary course

of business.  These folks are imported from France or another office to North America to work alongside their North American colleagues.  While the Defendants' witness to testify on the secondees and, and expatriates issues was not able to provide detail regarding the particular secondees or expats that are working at the moment, including any of their names or what their projects that they came here for are, generally speaking, the secondees appear to join the team for a very specific project with more limited interaction with the U. S.  They're here for about a year.  In fact, Ms. Brutsch testified that the secondees come to the States, still connected to their French system, and supposedly don't cross over at all with the North American systems.

So they come to work side-by-side with other U. S. employees, but each don't have access to one another's systems. It seems very strange on, on its face, but the reality is the various workarounds that are afforded by Teams or OneDrive or SharePoint as well as e-mail sharing in the ordinary course of business is how these folks operate in the ordinary course.

As far as the expats go, for which there are many as you see here -- and they stay quite a while -- Ms. Brutsch testified that these folks are cut off from their French systems when they reach the Americas, except, of course, their e-mail remains the same.

So there is some continuity here.  They are given

American computers and American phones.  Again, to avoid what I imagine is likely continuity concerns, there are the workarounds we've discussed to ensure that they can continue their operations when they come to the U. S., Teams sharing, e-mail exchange of documents, sharing of files on One Drive or SharePoint, again.

All that said, we were told that despite these general rules, Mr. Phelizon, who was a secondee to the U. S. who was involved in the corporate restructuring, is some sort of hybrid between these two concepts.  He came over, maintains access to his e-mails, but also brought a flash drive of files with him from France.  So he's sort of in between here.  The Defendants volunteered this information in deposition despite going back beyond the requested limited time frame.  So I guess it was selectively helpful for us to understand that.

Next slide.

Ms. Brutsch testified that employees exchange e-mails with the French parent in the ordinary course of business.

Next slide.

Ms. Brutsch also testified that the exchange of documents occurred in the ordinary course by a Teams Group for collaboration and editing.  This also speaks to the second factor about connection between the French parent and the Defendants.

And Mr. Pier backed up Ms. Brutsch's testimony about

sharing documents with the French and North American companies via Teams.

Mr. Pier explained that the same rings true for the firewall.  As mentioned before, if there's a business requirement or need to share information across two sites, the firewall rule can be established to allow connectivity between the French and the North American sites.  All you need is a business requirement or a business need.  I posit that a litigation discovery request qualifies as a requirement of doing business.

On Factors 4 and 6, I leave you with some precedent case law cited in our motion practice that supports the finding of control in circumstances analogous to this one.

And on to the final, though fifth of the six factors, is whether Compagnie de Saint-Gobain has participated in these adversary proceedings.  I've lifted, listed some factual support here, all of which I know your Honor is well aware of except, perhaps, the last two.  And of course, one added bullet today, your Honor.  We welcome Mr. Beausoleil, as you've heard from him already this morning, your Honor.

Compagnie de Saint-Gobain has participated in numerous meet and confers to establish a Case Management Order in these adversary proceedings.  They litigated whether or not the fiduciary duty action would remain stayed.  They participated in five court hearings on that front.  They participated in the

62

oral argument before Judge Bridges and they have participated in the Rule 30(b)(6) depositions.  For that reason, we do believe the fifth factor is established here, your Honor.

Finally, just to address some points made by the Defendants that I would call the miscellaneous at this point, there are a number of other points that are addressed which we've addressed, in turn, here.  I think there's probably two, I think.  One is that the foreign laws restrict production of documents.  You've heard it from Mr. Beausoleil this morning and we have heard that all along for the last nine months to a year at this point.

On this score, Defendants' position raised toward the end of their responses is that, raised without a reference to a single case because this, this is simply not the supported law. The Supreme Court has recognized that it is well-settled that such statutes do not deprive an American court of the power to order a party, to subject it to the jurisdiction to produce evidence even though the act of production may violate that statute.  And that is the Societe Internationale case from 1987.

As the Supreme Court has held in that case, the French blocking statute is not dispositive of a question whether the party should produce discovery through the Hague Procedures or the Federal Rules.  That is the Delaware case of In re Global Power Equipment Group, also cited in our pleadings.

Finally, courts within the First Circuit, Fourth Circuit agree even in the face of a blocking statute, the Supreme Court does not require folks to first resort to the Hague Convention Procedures or other foreign procedures when discovery is sought from a foreign litigant.  And that is the Eastern District of Virginia case, MeadWestvaco Corp.

Finally, Compagnie de -- the Defendants take an interesting position that because we served the Defendant -- excuse me -- because we served a subpoena on the French parent, they no longer need to be in the middle of all this.  I say it's interesting because -- but I guess I should say it's consistent.  Defendants all point to one another, utilize their purported corporate separateness when advantageous and not when convenient.  In the PI, it was easier to respond together as one unit.  Now in litigation that the Plaintiffs commenced, they are separate and we need to ensure all formalities are followed.  If we're talking about formalities here, your Honor, forgive me for standing on ceremony, but a party has a duty under the Federal Rules to produce documents within their possession, custody, and control under Rule 34.  Serving a nonparty has no bearing on whether that duty has been fulfilled.  And normally, of course, when documents are in the possession, custody, and control of a party that's where you'd obtain them in the first instance.  Third-party subpoenas would not be necessary.  Defendants have turned this Rule upside down

in their pleadings.  Even if that were somehow true, even if Defendants' interpretation were somehow true, our interpretation of the French's failure to commit to even production at this point further validates our need to proceed with the relief we seek here today, your Honor.

For these and other reasons in our motion and our reply, we submit that the motion should be granted.

THE COURT:  Okay.  Thank you.

MS. HARDMAN:  Thank you, your Honor.

THE COURT:  Is that all for this side?  I was going to suggest we take our mid-morning break, but how long do you think you'll be, Mr. --

MR. GREECHER:  I was thinking maybe 15, 20 minutes.

THE COURT:  Why don't we take a break for comfort and we'll come back in about 15 minutes and hear you.

MS. HARDMAN:  Thank you, your Honor.

MR. GREECHER:  Thank you, your Honor.

THE COURT:  Thank you.

(Recess from 10:54 a.m., until 11:11 a.m.)

AFTER RECESS

(Call to Order of the Court)

THE COURT:  Have a seat, all.

Mr. Greecher, ready to go?

MR. GREECHER:  I am, your Honor.  Thank you.  Sean Greecher from Young Conaway on behalf of the FCR.

The FCR joins in the arguments made by Ms. Hardman and the ACC.  I'll do my best to not be repetitive in my comments.

Your Honor's faced with what we see as a pretty straightforward legal question here.  Does the Defendants' ability to obtain documents from its French parent demonstrate control over such documents for purposes of obligating the Defendants to respond to appropriate, relevant discovery in the adversary proceedings?  Now sadly, it took us months of avoidable obstruction and delay to uncover the underlying facts and circumstances to bring this question to the Court.  In our prior meet and confers and colloquies with the Court, the Defendants simply provided a conclusory statement that the Defendants can't produce because they do not have formal agreements obligating CSG to turn over documents housed in France.  Back in March, counsel advised your Honor, "We're not aware of any agreements that permit or otherwise allow Defendants to obtain documents from Compagnie de Saint-Gobain."

Further, when the Plaintiffs pushed on more granular questions about the nature of the Saint-Gobain enterprise's IT operations and communications that went to this issue of control, the questions were rebuffed as "irrelevant."  For example, they refused to answer specific questions about the nature of how e-mail was maintained across the enterprise stating that "further questions concerning e-mail are unnecessary and can only be viewed as an attempt to create a

66

discovery dispute where none exists."  Now thankfully, the

Court offered us an opportunity to take formal discovery of the

company witnesses to test the Defendants' conclusions of law

here and we now see the picture more clearly and frankly, quite

differently than how the Defendants portrayed the facts.

So back to the legal principle.  Party must produce

documents in their possession, custody, or control.  We'll take

Defendants at their word -- and Mr. Pier's testimony supports

this -- that, for example, the North American Defendants don't

have possession or custody of the e-mail inboxes or other

documents of other French parent custodians.  All of the e-mail

inboxes in the Saint-Gobain domain, whether there inboxes of

French employees or U. S. employees, Canadian, Mexican,

Croatian, Thai, Vietnamese, they're all maintained through

Microsoft systems administered centrally through the French

parent.

And further, at present, there are firewalls in place

that the French parent erected so that if, for example, a

U. S.-based employee in Malvern, Pennsylvania tries to access a

file generated in France, he or she quite well might not be

able to click a button and have that document appear on their

screen.

So we focus today on control and "control" means

right, authority, or practical ability to produce, or obtain

documents.  We cited any number of cases and in each case this

is a disjunctive test.

So when counsel told your Honor they're unaware of agreements, their answer really didn't fully answer that control test.  At best, it relates to two of those three indicia of control.  It certainly didn't speak to practical ability.  And the deposition testimony was clear.  Even if there are no formal agreements, there is a regular practice by which the parent and subsidiary communicate and share information.  And there's an established formalized protocol that the parent and subsidiary have put in place to obtain across, documents across the entity divide.

So again, that employee in Malvern, Pennsylvania can get access of a file generated in France, as Mr. Pier testified, if there's a business need.  At that point, that Malvern employee can click a button and have that file on their screen through any number of types of software that the entity has at its disposable, disposal.  This protocol, for whatever reason, the Defendants have not chosen to employ so that the Plaintiffs can conduct a full investigation and pursue challenges to the corporate restructuring in which French custodians played a significant part based upon the discovery that the, the Plaintiffs have received in connection with the preliminary injunction.

Now both objections passionately advocate for what, I think, the Defendants would like the law to be with respect to

this issue.  They would like the question of control to be answered by whether or not the Defendants have a legal right to demand the documents, but that is not the law in the Circuit and your Honor stated exactly that in the BK Racing case. Control is not even limited to a legal right to obtain documents.  Right, authority, or practical ability is sufficient.

And the cases that Defendants cite suggest some sort of ground swale in the other direction would suggest quite the opposite is true.  The vast majority of the cases of the most recent vintage in the Fourth Circuit are in line with your Honor's BK Racing opinion.  Control is not limited to a legal right to obtain documents.  And if your Honor is so inclined to dig into the purported authority that our friends on the other side have cite, cited, you'll see how far they've had to stretch to find any whispers of support for their argument here, that the wholly owned subsidiary Defendants don't have control over relevant documents of the French parent.  They cited cases of an insured being asked to obtain documents from their entirely unrelated insurer.  They cited a case about an international trade union being asked to produce documents from a local operating under the union's organizational charter, but having absolutely no organizational or management connection between the two entities.  They've cited a case about an organization that establishes international engineering

standards being asked to obtain records from a company that was a member of the standard-setting organization.  They cited a case of a party litigant in an environmental matter who was asked to obtain technical reports from an entirely independent environmental contractor that did work on the property.  Those aren't this case, your Honor.

As noted in the motion, the Defendants have the burden to show that the, that the documents requested are inaccessible.  They provide no such evidence and, and, and they can't because they testified at the 30(b)(6) depositions they've never even tried to obtain the documents.

Your Honor, the motion goes through the factors established by the DuPont case for estab, for determining a subsidiary's practical ability to obtain documents of a parent, such that it could be found as having control over the documents.  We put those up again.  I'll briefly step through them again.

The first one is what I call the structural factor. Courts don't require a finding that the entities are corporate alter egos.  We're not asking for that today.  Rather, the Court merely needs to find (1) a close working relationship and (2) a means by which the subsidiary could obtain the documents when it's in its interest to do so.  Both of these are clearly the case here based upon the testimony.  The French parent and the subsidiary regularly share employees as secondees or

expatriated employees. Financially, the parties are tied together by consolidated financial reporting and the transfer of funds that are passing from the subsidiaries to the parent, amounts listed in Footnote 29 of the motion.

Second factor, I call it the at-issue factor. Was the parent involved in the transactions at issue in the litigation? Absolutely, it was. The French parent's executive leadership was part of the Project Horizon team. The preliminary injunction document production shows numerous e-mails between North American and French parent employees and evidence of various meetings among the groups and their consultants, discussions of various documents that were shared among those parties. The French were the ones who gave the ultimate approval of that transaction. It's, frankly, surprising to us that the Defendants even argued this factor on behalf of their parent here.

The third factor, the, what I call the pecuniary factor. Will the parent benefit from a certain outcome of this case? Again, absolutely. That's not the case with respect to the environmental consultant. They had no pecuniary interest in the case. But the French parent is and has been admittedly portrayed as having a common legal interest with the Debtor in resolving asbestos liability. So much so that it is a beneficiary of the preliminary injunction granted by the Court, this Court, at the outset of the case. Its interest in seeing

the structure established through the corporate restructuring, one of the Defendants argue, has isolated the asbestos liabilities squarely on the shoulders of the newly formed DBMP is an enormous one.  Once again, Defendants' arguments on this point are just not credible.

The next factor, what I call the ordinary-course factor.  Did the parent exchange documents with the subsidiary in the ordinary course?  Deposition testimony, your Honor, is clear that they did.  Though the Defendants' 30(b)(6) witness was a bit inconsistent on this point, the testimony showed that in condition, in addition to communicating regularly by e-mail, the Defendants and the French parent collaborate regularly on a project-by-project basis and they certainly collaborated on the Project Horizon corporate restructuring and bankruptcy filing preparations.  Ms. Brutsch testified that there's an established protocol in place so that the U. S. affiliates can obtain materials from the French parent.  The Defendants and the French parent communicate freely through Microsoft Teams sites through which the North American and French participants in the project have free access to the group documents.

Next, the relationship to the litigation factor.  And this is different from the question of whether the parent's involved in the transaction.  This factor determ, examines whether the parent has a relationship to the litigation.  And again, it certainly does.  The, the Plaintiffs allege that the

parent's and its directors' and officers' role in authorizing and orchestrating the corporate restructuring gives rise to independent claims and causes of action, that counsels participated and appeared in the adversary proceedings and various discovery matters in these proceedings and the fiduciary duty action against the French parent and the various officers and directors is plainly connected to the litigation into the propriety of that corporate restructuring.  If the restructuring was an appropriate corporate action, then the fiduciary counsel related to those parties' orchestration of the restructuring fall away.  There's a clear relationship and connection here.

And finally, this legal rights and authority factor. Again, the Defendants have denied that they're aware of any agreements, but the course of conduct, as evidenced by the Defendants' testimony, shows a formal process.

In the objection, the Debtor makes much of an alleged concession that because the U. S. Defendants have to request access to documents that are maintained by the French parent's IT operation, this means the U. S. Defendants don't have control.  That's simply not the law and it neglects to engage in the analysis undertaken by the court, the court in the DuPont case and the numerous cases similarly analyzing the factors of control.  This argument essentially is the same as the argument that the only way the U. S. affiliates have

control is if the French parent is legally compelled to turn over the documents.  The testimony is the affiliates can and do regularly request documents under an established protocol and that's enough, we think, your Honor, to satisfy the factors.

So your Honor, I believe you can dispense with the arguments our friends make that you can simply look at whether the French parent has a legal obligation to provide access. All of the other factors point clearly to the practical ability to obtain the withheld documents.

The Defendants say that they have possession or custody of the e-mail inboxes of the North American custodians because those custodians access their e-mail on devices that the Defendants maintain and so they can direct these custodians to provide access to their sent and received e-mails.  But in an absolute sense, all of the e-mails of all Saint-Gobain international employees are maintained globally through systems managed by the French.  There's no notion of French e-mails or U. S. e-mails, as Defendants testified through Mr. Pier.

Finally, I'd like to go back to this issue of efforts to obtain documents from France.  We first, as Ms. Hardman said, reject the principle that a party litigant can or should be permitted to defer their obligations to produce documents in favor of a third party or, as they also argue in their objection, an alleged nonparty.  Party litigants don't get a free pass from production obligations under the Federal Rules

just because there is another potential avenue of access and particularly here where that other avenue would be far more onerous.  If your Honor is going to credit the notion that CSG is a nonparty, then that first principle, that party litigants are obligated to produce everything in their possession, custody, or control, is critically important.

And second, with respect to the pursuit of a subpoena, yes, we have pursued a subpoena.  Unsurprisingly, we continue to meet further headwinds.  We expect that the North American -- we expected that the North American Defendants would have appropriately pursued access to these documents in accordance with the protocol they have in place for obtaining documents from the French parent.  As noted in the motion, we were taken aback that the Defendants simply didn't bother trying.  So now that we've done what we believe the Defendants should have done and still should have, should have done and still should do in order to obtain those documents, we've been given no assurance that the French parent will consent to produce a single document related to their involvement in the restructuring.

Your Honor, this is vexing for at least two reasons.  First, the document requests were issued in June of 2023.  The Defendants took no action for nearly a year, simply made no effort to obtain the documents that are purportedly behind this French iron curtain.  And after we served a subpoena, the

French parent is only now pressing forward with these efforts to engage with the French bureaucracy to obtain clearance that they believe is required to ensure the disclosure is not prohibited by a French block, blocking statute.  And again, we're not here to argue whether or not the French blocking statute applied, but the point is, your Honor, that we clearly needed to do something to get things moving, which is why we filed both the motion and also the subpoena to avoid this continued inaction.

A second reason that this is somewhat vexing, your Honor, is the Defendants' refusal to comply with their obligations to pursue communications necessary to the prosecution of the French parent's subsidiary's pursuit of a chapter 11 proceeding.  Let me say it again.

The fact --

THE COURT:  Try that one again.  I didn't get it.

MR. GREECHER:  Yeah, no.  I, I lost it myself, your Honor.

This, this chapter 11 proceeding is undertaken by the French parent's wholly owned subsidiary and the refusal of the Defendants to comply with their obligations to pursue communications related to a key pillar of that restructuring, this, you know, this fraudulent transfer action, really does have an impact on, on how this proceeding moves forward.  And we would suggest that, you know, whether the action, whether,

whether the requests are coming by virtue of a subpoena or by virtue of an obligation of the non, of the nondebtor and the Debtor to produce documents within their possession or custody or control may have a very significant difference in how that request is perceived by the French Government agency that Mr. Beausoleil was talking about. It really suggests two different postures. One would be the French parent's provision of documents in furtherance of a restructuring strategy they initiated or the French parent's productions of documents under compulsion of a U. S. subpoena as a nonparty.

Now I don't know if this will make a difference in the mind of a bureaucrat sitting in Paris, but it certainly seems plausible that this Court not directing the Defendants to produce these documents and the extent such documents are being produced under applicable law increases the risk that the French parent will attempt to weaponize that French blocking statute against the Plaintiffs.

So what I'm trying to suggest, your Honor, is to the extent you view the question here as a tossup, we'd humbly request that your Honor not adopt a position that would tend to erect or maintain a further impediment to the Plaintiffs' right to obtain these documents, which we believe will allow for a thorough investigation of the intentions of all the decisionmakers, French or domestic, as they engaged in this Texas restructuring and U. S. bankruptcy filing.

Now there very well may still be issues that we all need to deal with in connection with claims of applicability of the French blocking statute.  Your Honor ruling that the U. S. Defendants need to cooperate with producing the documents because they're within the U. S. Defendants' control certainly doesn't mean that you're taking away parties' ability to press that potential dispute as to the applicability of the statute down the road.  Again, we're not looking for anyone to risk going to jail over a document production.  It simply, your Honor, in our view, streamlines and maybe simplifies the path to that particular implement of torture, which is the discussion of the French blocking statute before your Honor. We'd suggest that an order compelling the production of documents within the Defendants' control would assist us in that effort to move things forward.

Your Honor, unless you have any questions, we would request that your Honor approve the motion.

THE COURT:  Not at the moment.  Thank you, Mr. Greecher.

MR. GREECHER:  Thank you, your Honor.

THE COURT:  Do you need a few moments?

MS. GOULD:  Thank you, your Honor.  We do have a slide deck as well we'd like to hand out at this time.  And --

THE COURT:  All right, please.

MS. GOULD:  -- if it's okay, we'd like to approach the

bench with one as well.

THE COURT:  You may.

(Slide presentation provided to the Court)

THE COURT:  Thank you, Mr. Miller.

For housekeeping reasons, we will be able to run up as late as about 1:00 before we need to take a lunch recess.  I don't know what you've got in mind, Ms. Gould, but --

MS. GOULD:  Very good.  Thank you, your Honor.

THE COURT:  Very good.

MS. GOULD:  Okay.  Thank you, your Honor.

Your Honor, again, we represent the Non-Debtor Affiliates, which are Saint-Gobain Company Corporation, CT Holding, and CT LLC.  For ease of convenience, I will just refer to Defendants.

THE COURT:  Okay.

MS. GOULD:  Of course, counsel for the Debtor is here and can let --

THE COURT:  Right.

MS. GOULD:  -- the Court know whether they agree with all of what I'm about to say.

For almost one year the Defendants have told Plaintiffs they do not have possession, custody, or control over documents of its ultimate parent in France, Compagnie de Saint-Gobain, which I will refer to as CSG.  Dating back to the preliminary injunction proceeding in 2020, Defendants have

produced any responsive, non-privileged documents from CSG that are in Defendants' files.  For example, if someone sent an e-mail to Defendants and it's in their files and is not privileged, it has been produced.  To the extent Plaintiffs are trying to show through this litigation that CSG was involved in the corporate restructuring and subsequent bankruptcy filing by DBMP, these communications with CSG and the U. S. Defendants in the files of the U. S. Defendants would be the best evidence and they either got that doc, those documents in the preliminary injunction or will be getting them through the implemented search terms to be run.

As Ms. Hardman's argument and the parties' briefs make clear, this is a complicated issue with various views of the law, which is not always consistent and lacks certain Fourth Circuit precedent.  While we are prepared to go through all the issues and evidence or the lack thereof in detail, none of this is really necessary where, as here, Plaintiffs finally served a subpoena upon the nonparty, the non-U. S. parent.  The issues concerning the production of documents by CSG should be resolved in connection with that subpoena and not by motion practice with any other party.  And what only can be litigation gamesmanship, Plaintiffs waited until literally minutes before serving the motion before the Court to serve a subpoena on CSG through their counsel at Hughes Hubbard despite Defendants telling Plaintiffs for one full year that Defendants cannot

either access or demand the documents from CSG that Plaintiffs seek.  And we further told the Plaintiffs, as we laid out in our brief, that they should reach out to Hughes Hubbard on this issue.  We told them that last fall.  Given that Plaintiffs have now finally served the subpoena, the issue of what, if any, CSG documents can or should be produced should be argued by CSG.  They should have taken this simple step a year ago.

Defendants have continually made clear that e-mails of French custodians are subject to foreign privacy and data protection laws.  As stated in our brief last fall, we told Plaintiffs to reach out to Hughes Hubbard.  Plaintiffs' assertion in their briefs that Defendants somehow didn't ask counsel for CSG whether they would provide Defendants with the documents is baseless.  It's pure speculation, as are the majority of their arguments you've heard today.  Defendants confirmed with CSG's counsel months ago that they would, indeed, not give the documents to counsel for Defendants. Plaintiffs' speculation that Defendants can somehow get documents from CSG because recovery, discovery is a business need is both, again, just that, speculation, but also not true. Instead, Plaintiffs have forced the parties and the Court to spend time on letters, motions, deposition notices, and briefing.  Plaintiffs took two depositions in the aid of their motion and at the end of the day, Plaintiffs have proffered zero evidence to refute what Defendants have maintained all

along, that Defendants do not control documents of their ultimate parent, CSG, whether they be e-mail boxes of CSG custodians or documents created by employees of CSG which reside on share drives at CSG.

As was demonstrated in our brief -- and we'll walk the Court through today -- Plaintiffs have failed to meet their burden -- and we will show the Court it is indisputably their burden of showing through evidence.  Again, they lack evidence, not rank speculation or inferences -- that U. S. Defendants have control.  No matter in the end the lens that this Court chooses to view control, it is a fact-specific determination and Plaintiffs have offered no facts.  Plaintiffs' request should be flatly denied.

So let's start with the legal standard.  It's Rule 34, possession, custody, or control.  That's not in dispute, but what we don't agree is whether control exists and the standards that the Court should look at for control.  There are two standards that have been set forth for the Court in the briefing:  The legal right to obtain documents upon demand and the practical ability to obtain documents.  But before I get into the legal standards, I want to focus on the facts and that's because, again, it's a fact-specific inquiry.  So let's look at some of the dispositive evidence.

As you heard, your Honor, Defendants deposed Tom Pier, who is the Chief Technology Officer of Saint-Gobain North

America, as well as Shari Brutsch, an Associate General Counsel for Defendant Saint-Gobain Corporation who's been employed as an in-house counsel for 12 years.  And Mr. Pier testified as follows with respect to Defendants' lack of control. Defendants don't have access to e-mails of employees of CSG.  I think you heard Mr. Greecher say they do.  It's speculation. It's contrary to evidence.  Defendants don't have access to share drives of CSG.  Defendants don't have access to hard drives or backups of hard drives of employees at CSG.  The testimony by Mr. Pier, again the Chief Technology Officer, makes clear Defendants are not able to obtain CSG's documents.

Again, Plaintiffs today stated when CSG, that CSG documents are available when there is a business purpose.  That is flatly contradicted by the evidence, including the testimony of Mr. Pier and Ms. Brutsch.

The deponents provided further testimony, again evidence, concerning lack of control.  Mr. Pier testified he's not aware of any instance where Defendant has requested access to e-mail of CSG employees or whether any such request for e-mails of a CSG employee have been granted.

Ms. Brutsch similarly said she's never been involved in a request for CSG e-mails or documents.

And then again, Mr. Pier said Defendants cannot access documents or ESI -- that's electronically stored information -- of CSG unless specifically granted access, specifically granted

access.

Ms. Brutsch, with respect to obtaining CSG e-mails, explained this.  She testified there are rules, EU rules that need to be complied with with respect to getting CSG e-mails and documents.  That is why employes from the U. S. cannot get French documents.  They're all aware.  They work at a company, at a conglomerate where the ultimate parent is based in France.  They're all aware of the EU and French rules which apply here to documents.

Further and notably, Ms. Brutsch testified that CSG has not produced documents in any U. S. litigation.  This is an important fact, your Honor.  There are cases which look at, well, gee, did, did the foreign parent ever produce documents to help themselves in an earlier proceeding?  The answer, the only evidence here is no.  This is unrebutted evidence.

But even if the Court chooses to under -- these facts are enough for the Court to decide, just as the Court did in the Smith v. O'Haro case where the Court looked at the facts and said, "Without undertaking some analysis, the facts on their face lead to an outcome that there was no control over the documents," that could easily be decided by your Honor the same way here.  However, even if the Court chooses to undertake a legal analysis, the outcome is the same.

So let's turn to the standard to be applied for control.  We didn't hear much about the standard.  Again,

84

Fourth Circuit hasn't interpreted control and within the Fourth Circuit there are certain courts, North Carolina District Courts, that have adopted the legal right test and rejected the practical ability test where, as here, in the same exact circumstances before this Court information is readily available through a subpoena *duces tecum*.  No compelling reason exists to expand the definition of "control" under Rule 34 to accommodate the more broad practical ability test.  That is North Carolina District Court law in the same circumstances we have in this case, your Honor.

And Plaintiffs glossed over that today.  You didn't hear anything about that, not surprisingly.  Their only response was to cite to a case, Ultra-Mek, where the court decided it was not going to apply the legal right test because there was no subpoena.  It said, "Neither party has informed the court that a subpoena *duces tecum* has been served."  We started today with talking about the subpoena, your Honor.

So Ultra-Mek's inapplicable and that is the standard this Court should follow.

Now let's talk about burden.  Under either standard, any standard the Court chooses to apply, Plaintiffs have not met their burden to demonstrate through evidence that Defendants  have control over CSG's documents and Plaintiffs have tried mightily to escape this burden, your Honor.  They did it in their briefs and they did it again today.  I think I

85

actually heard one of the lawyers say the burden doesn't matter.  Burdens do matter, your Honor.  They do.  There's no question.  The law in this Circuit is clear that the party seeking production of documents that it contends are in the other party's control has the burden of proof on this issue. This is actually a quote from a case heavily relied upon by Plaintiffs, the Ultra-Mek case.  Rather, the cases cited by -- oh, sorry.

As we explained in our moving brief, the cases upon which Plaintiffs rely to either say the burden somehow shifted or there is no burden here, if your Honor looks at those cases -- and we provided distinguishing parentheticals -- they are completely inapplicable.  They concern motions to compel discovery under Federal Rules 26 and 33.  They are not concerning the question of establishing control under Rule 34, which is the only issue before this Court today.

So there's no question that the burden is Plaintiffs and they haven't met it.

Now, again we submit that the legal right test is the appropriate test for this Court to follow, given that there's a subpoena served in this case.  To prove that a party has the legal right to obtain documents on demand, Plaintiffs must show that Defendants can command the release of the documents by the entity that actually possesses them and the evidence before this Court is that Defendants cannot command CSG to produce the

documents before them.  Effectively, Plaintiffs have conceded this argument.  There's nothing in their briefs.  They didn't argue it today and that's why they incorrectly ask this Court to ignore this test, to just bypass it.  But given that there was a subpoena served, this is the correct standard and there's no question that they can't show control through legal right.

Lacking proof to meet the legal right test, Plaintiffs point out that some courts within this Circuit where there is no outstanding subpoena -- again not this case -- have looked at whether the party has the practical ability to obtain documents from the nonparty using a number of factors.  The Court has the factors.  I won't look through them.  The only difference between the case we cited, Suh, which was an Eastern District of North Carolina case, and the case that Plaintiffs cite, DuPont, is that DuPont has an extra sixth factor, agreements.  We believe the Suh case with the five factors is the right one, should the Court decide to look at it.  There's no such DuPont test that's followed in this Circuit, as Plaintiffs would indicate.  But either way, the factors are, are not vastly different.  But when you look at those factors, it's the same result.  Plaintiffs still have not met their burden of showing control.

Now part of the reason they haven't met their burden to prove practical ability is because they haven't provided actual facts as evidence, that the factors of control are

present.  Speculation and inferences, as Plaintiffs offer, are not enough.  And we quote here the Princeton Digital case, which I'll try, in general, not to read a lot of cases to your Honor, but this one bears pausing on for a moment:

"The Court notes upfront its decision here is not and cannot be based on what might possibly be or what one might assume to be the relationship between the U. S. defendant and its foreign-affiliated entity with regard to the instant litigation.  It has to be based on the current record before the Court, and what that record actually demonstrates."

And so Plaintiffs have to show evidence.  They have to, they cannot show inference and speculation.

Your Honor, at this point I'm going to pause to say that Defendants maintain that the legal right standard is appropriate and given the subpoena Plaintiffs have finally served upon CSG and for the reasons already discussed, we believe your Honor can decide Plaintiffs' motion under that standard without any further argument.  However, if your -- so if your Honor agrees with us on that point, we can stop here.  Otherwise, we are prepared to argue the practical ability standard for control and why Plaintiffs haven't met that burden, their burden under that standard.

THE COURT:  I can't give you a ruling at the moment.  Keep going.

MS. GOULD:  Very good, your Honor.  I thought you might say that.

Plaintiffs have based a number of their arguments with respect to the practical ability factors based on impermissible speculation, which should be rejected.  We'll look at the factors.

The first factor to determine control is whether the party and nonparty share a sufficiently close connection that it evidences control.  That's an important part.

So Plaintiffs first talk about that we're part of the same corporate structure in their motion.  But clearly, just being part of the same corporate structure can't suffice.  And we site the Provost v. Kia case for that point.

So then Plaintiffs try to make an argument on this factor claiming that there were not just common relationships, but significant ones between Defendants and CSG via their overlap of directors, officers, and employees.  They go so far as to claim there's an interlocking governance structure in their motion, big, big words.  But when you strip away Plaintiffs' rhetoric, they have no evidence to back up these claims.  The roles held by three individuals to which Plaintiffs refer -- and you saw them on Ms. Hardman's slide moments ago -- do not support a finding that Defendants control CSG's documents.  Courts evaluating common relationships for purposes of determining whether control exists look at whether

the party seeking discovery has shown that the party and the nonparty have interlocking management, whether they're intertwined.  They're not just trying to decide does one person work for one company and that same person has a title at another company.  That's not what the standard is set by the cases.

So first, Plaintiffs point out that Mark Rayfield, the CEO of Saint-Gobain North America, is a member of a committee, that he's a member of CSG's global Executive Committee.  So they're trying to make something of the fact that a gentleman who is a head of a region sits on a global Executive Committee with other heads of regions.  That is not the overlap that the courts require.  There's also no case law cited that committee membership is remotely relevant to the issue of control.

Second, they point to Mr. Kinisky.  He held, essentially, the same roles as Mr. Rayfield, but he ended those roles in 2020.  So not only is that not even any evidence of current overlap, there, both the fact of his roles don't matter and it's not current.

And finally, Plaintiffs bring up Mr. Jean-Francois Phelizon, which also provides no support.  He was employed by Compagnie de Saint-Gobain in France until 2017 when he came to work in the U. S. and he still works here today.  Plaintiffs point, again, to his role on a committee in 2017, which is not relevant.  And as Ms. Brutsch testified, he had no access --

when he came here to the United States he had no access to Compagnie de Saint-Gobain information other than his own prior e-mails when he was working for Saint-Gobain in the U. S.

And also, your Honor, the Court should know Mr. Phelizon happens to be an agreed-upon custodian.  And so we will be collecting his documents and running the aforementioned search terms through them.

And just pausing on e-mails for a moment.  It makes sense for people to be able to access their own prior e-mails. It doesn't mean you can access anyone else's e-mails or you have access to an e-mail server or an e-mail box.  If you're moving from one part of a company to another and you're going to be there for a long time, it'd be very hard to do a job if you couldn't look at your e-mails from the day before you moved, right?  Makes common sense.  Plaintiffs tried to make much ado of it, but there's nothing to make.  It's common business practice.

Plaintiffs complain that the U. S. Defendants don't provide any detail as the role held by these individuals.  But again, that's because Plaintiffs mistake their burden.  It's their burden to provide evidence that these common relationships demonstrate an interlocking management or, in the Colomb case they cited, a complete unity of control.  Again, these few instances of a title here, a title there is far from what the standard requires.  Again, even though Saint-Gobain

North America has 15,000 employees, Plaintiffs desperately refer to the handful of employees -- and it is a handful -- who are seconded or expatriated from Compagnie de, Compagnie de Saint-Gobain to Saint-Gobain North America.  They don't even just, they're not even seconded or expatriated to the Defendants.  It's anywhere within Saint-Gobain North America.  They try to point to these relationships as common relationships showing evidence of control, but not so.

And I want to put up a slide to just look at the difference because it's been, it was miscited.  It's misconstrued throughout their presentation.  It's also evidence of nothing because it's a -- a -- it's the top of the head of the pin.  It's a very small number of people in connection with 15,000 U. S. employees.

So just, so just quickly.  Expatriated employees, there are about 16-to-30 per year.  Those are people who are there for a longer term.  So if they're there for a longer term, they get a new U. S. laptop.  They cut off access to their French documents, again other than they need to use their e-mails to continue to work.  And they're removed from all access to CSG systems.

Secondees, there's one-to-two per year.  They're on short-term assignments of less than a year because they're here on a short-term assignment.  They bring their French laptop. They only use their French laptop and they do not get any

access to U. S. systems.  That -- we cited all the testimony. That is the testimony.  It's not, it's not anything that you heard from Plaintiffs today.   That is the testimony about secondees and expatriated employees.  This is far -- the, the, you know, 15 or so people per year that come over to the 15,000-employee company, it's far from the overlap of management and decisionmakers in the Ultra-Mek case that Plaintiffs rely upon.

Quickly, the cases Plaintiffs cite are distinguishable.  We cite them in our brief.  We won't belabor the Court here about them.  And then Plaintiffs cite an additional case in their reply, the AFL Telecomms. case, which also provides no further support for their position.  And there, notably, the court actually adopted the legal control test that we're asking your Honor to adopt, so.

Plaintiffs fail in their attempt to show, they try to then -- switching gears on this same factor -- they try to demonstrate financial relationships, again, that evidence control.  You can't look at anything in a vacuum.  It's not just financial relationships that matter.  They actually have to evidence control.  Plaintiffs point to the fact that CSG has consolidated financial statements, which include U. S. subsidiaries, which includes Defendants, CT LLC and SGC.  But again, a global company's mere use of a consolidated financial statement in accordance with governing securities and

accounting rules does not evidence control.  If that were the standard, every global company that has a consolidated financial statement would have a problem.  Plaintiffs cite to Ultra-Mek for their support, but in that case the consolidated financials were in addition to an overlap of corporate officers that demonstrated the sub was essentially a pass-thru.  I don't think there's been any allegation here that the U. S. entities are essentially pass-thrus for Compagnie de Saint-Gobain, nor could there be.

So then Plaintiffs, grasping at straws, reference loan documents between CT LLC and a separate entity, Saint-Gobain Finance Corp.  Shows nothing more than that  There are intercompany loans at a large conglomerate.  They are well documented and recorded.  They claim that this is a mechanism through which the U. S. entity provides financial support to, to Compagnie de Saint-Gobain.  Again, this is all rank speculation and argument.  There is no evidence before the Court on any of this.  And again, as I cited in the Princeton Digital case that we looked at, that is far from insufficient.

In any event, the Plaintiffs don't explain how an ordinary course intercompany transaction at a large conglomerate evidences that a sub has the practical ability to obtain documents from a parent.  They're still missing that link, which is critical.

So again, they have shown nothing with respect to the

first factor.  Let's move to the second factor.

So Plaintiffs have, have to show and have failed to show that CSG has a sufficient connection to the corporate restructuring.  So they seek to lower the bar here, as set forth in the briefing.  Case law confirms that the connection to the litigation must be extensive and supported by substantial or overwhelming evidence.  That's what it is.  You can't, you can't just argue it.  It actually has to have evidence.  And this is made clear by the case cited by Plaintiffs, Baby Jogger.

Baby Jogger was a patent infringement case where plaintiff sought to compel the defendant to produce documents in possession of non-party affiliates related to the design and manufacture of the stroller at issue in the case.  The court found there was overwhelming evidence.  There was intimate involvement.  Employees of the defendant and the non-party affiliates were heavily involved in the product development.  And the types of documents that were looked at here, there were spreadsheets identifying the tasks to be carried out by each employee.  There were all kinds of documents showing involvement in the design and development of the product.

Here, there is no evidence that CSG designed or implemented the corporate restructuring, nor could there be.  It didn't happen.  But in any event, Plaintiffs have always argued to the contrary.  As this Court's well aware,

Plaintiffs' position has been that the corporate restructuring is a lawyer-driven strategy, that it was driven by lawyers, internal and external, for Old CT.  Not our position, but that's Plaintiffs' position, which is wholly inconsistent the position they're taking today.  There is no evidence in the record that CSG was involved in the planning and execution of the corporate restructuring, let alone evidence to meet the heavy or intimate involvement necessary.

Again, the other cases cited by Plaintiffs where courts granted motion to compel have significant involvement of the nonparty.  Those are listed in our brief.  There's a high bar here that Plaintiffs must meet.

So what have Plaintiffs shown?  They, they basically show a bunch of e-mails which are not evidence before the Court.  They're e-mails where Plaintiffs are arguing snippets from documents and what Plaintiffs believe they show and what they're trying to show is that it's some kind of high-level coordination or high level -- high level -- they had a meeting. The documents show there was a meeting that took place, but high-level coordination, even if that was shown, even if that was evidence, among a party and a non-party affiliate is not sufficient involvement in the underlying transaction.  And that's made clear from the Shell case that we cited in our brief.

So they, they rely on these e-mails and they argue and

then they seek to create impermissible inferences, rather than presenting facts.   They show nothing more than CSG personnel scheduling meetings and receiving status updates regarding the potential restructuring of the U. S. companies that CSG owned. Plaintiffs cite to no evidence demonstrating that CSG conceived, designed, or implemented the corporate, corporate restructuring because it didn't happen.   What the evidence is is that Eric Placidet, the CFO, testified that "status meetings on Project Horizon informed people in Paris of what the status of the project was, knowing that, obviously, the project was managed locally under the local responsibility."   That's evidence.   Plaintiffs attempt to provide speculation about what documents meant or showed is insufficient to meet their heavy burden on this factor.

Okay.   Factor 3.   Plaintiffs fail to demonstrate any of the Defendants and non-party CSG exchanged documents in the ordinary course of business.   So a lot of what you heard today where Ms. Hardman talked about Teams and a wide-area network, I'll talk about each of those in particular, but it all misses the mark.   Plaintiffs' position is that Defendants have control of CSG's documents based on a claimed ordinary exchange of documents, that, that people in different areas of the company can have a Teams meeting.   That certainly can't be the standard.   It fails based on the law and the facts.   Defendants have cited clear legal authority requiring that any exchange of

documents that is demonstrated for this factor must be with respect to the subject matter of the litigation.  It can't be they're allowed to have a Teams meeting or they're allowed to send an e-mail to one another and in fact, they do send, you know.  Oh, in a giant company people send e-mails to one another.  That's can't be the standard.  It is not the standard set by the cases we have in our brief.  It has to be exchange of documents with respect to the subject matter of the communication.

We've cited the In re Takata Airbag case that your Honor can review and again, the Shell case.  For example, in the Shell case the court denied the motion to compel where it says there's no evidence that the entity's coordinator, St. Jacquemin's (phonetic) "regarding the preparation and prosecution of patent applications, filings, and renewals." That's the kind of exchange of documents that courts look at in evaluating this factor.

The -- even the cases cited by Plaintiffs follow this standard.  For example, the Baby Jogger case.  In Baby Jogger, when they looked at the communications they said did the communications relate to the issues in the litigation, not just can you, can you Zoom with somebody from another office.

So in their reply Plaintiffs success, unsuccessfully -- excuse me -- unsuccessfully try to remedy this error by pointing to the same e-mails that they cited as evidence of

Compagnie de Saint-Gobain's substantial involvement.  There's just some group of e-mails they put together and they're trying to say this shows that they were e-mailing each other.  However, again, two problems.  One, the e-mails are not before the Court and not evidence.  They're just arguing based upon e-mails from snippets of them.  But in any event, all the e-mails do are talk about setting up meetings.  They, they said one, oh, here's a Teams list.  That is not the kind of documents related to the litigation that courts look at.  Courts look at are there documents relating to the preparation of the patents that are not at, now at issue in the litigation, things like that.  This falls far short of the standard necessary.

Despite these clear legal standards, Plaintiffs continue to rely on this general use by employees of e-mails and file-sharing platforms, such as Teams, SharePoint, which I didn't even know what SharePoint was until, until this case, which is actually a, a place within Teams where documents can be stored, and OneDrive, which OneDrive is, essentially, a way to send an e-mail with attachments when the attachments are too large.  Sometimes you try to send an e-mail, then the attachment gets bounced back or it says it, it can't even get sent.  All OneDrive is is a way to send a larger file in a way that will somehow get through.

However, these standard, modern technologies are (1) wholly irrelevant to the standards courts use for this factor,

including the cases Plaintiffs cite, and (2) commonplace in today's world.  It can't be the law that one entity could control the documents of another simply based on communications about matters unrelated to the litigation because the entities use modern technology methods, such as Microsoft Teams.  If that were the standard, corporate affiliates would always be deemed to be in control of documents of one another and no analysis would be necessary.

So let's talk about the testimony of Mr. Pier, in any event, just to clear up what he talked about about technology, even though this entire subject is untethered to the subject matter of the litigation.  So although it's irrelevant, we want to make sure the record is clear.

The undisputed evidence is that Defendants do not have the practical ability to obtain or access CSG documents through technological means unless someone from CSG chooses to send or share a document with an employee of Defendants.  It's the points that we looked at before.  Mr. Pier testified Defendants, nor IT Services North America have access to e-mails, share drives, hard drives, backups of hard drives, or employee mobile phones or tablets of employees of CSG.

So again, even though it's not relevant, I want to also just look at what was Mr. Pier's testimony about Teams.  As Ms. Hardman admitted today, she said her office uses it, the Court uses it, we all use it.  It's commonplace, not relevant.

So there's zero evidence that anyone at the U. S. Defendants or Compagnie de Saint-Gobain used Teams to collaborate with respect to the corporate restructuring or the subsequent bankruptcy filing, nor can there be since Teams wasn't even rolled out at Saint-Gobain North America until mid-2020, just as it was for so many people during the pandemic. There's no evidence in the record that Teams was even in use. It's just irrelevant.

Second, both Mr. Pier and Ms. Brutsch testified that access to a particular workspace in Teams is limited to those individuals who are sent an invitation to join or they can request and have their request either approved or denied.  So again, it's not some free-for-all.  It's, there may be a small team on a small workspace to get some work done and then you can give a small number of people to get access.

And let's talk about Mr. Pier's testimony.  After all their cutting and pasting of sound bites from Mr. Pier's testimony in their reply, all Plaintiffs have shown is that Mr. Pier testified that if someone from CSG wanted to share a document by Teams with an employee of a U. S. Defendant, it is technologically possible to do that.  That's like saying somebody could send you an e-mail with a document attached, if they wanted to.  It is evidence of nothing.

In any event, Mr. Pier never testified there's any broad sharing of documents, generally, between Defendants and

CSG either in general or through, he talked about how IT professionals -- he's a part of a group of working IT professionals implementing IT.  So he said sometimes he collaborates with his colleagues on topics to share information, such as migration from Windows 10 to Windows 11.

So being in a -- Mr. Pier having a Teams Group where he talks to French IT colleagues about how they're going to implement Windows 10 is hardly evidence that the Defendants here have control over the documents of Compagnie de Saint-Gobain.

And let's look at some of Mrs. Brutsch's testimony.  Although none of the communications she referenced concerned the subject of the underlying litigation and are not instructive, we should be clear on what she said.  Plaintiffs point to the fact that Defendants report financial information to CSG as evidence of a regular exchange of documents in the ordinary course of business.  Again, reporting financial information to a parent company can't be evidence of practical ability to obtain documents on demand from that company, right?  You're providing information up to the parent.  It doesn't mean that we can then get their documents.  Ms. Brutsch testified this is not an exchange of information.  She explained, right, there's some monthly reporting that gets done.  Accounting gets done here in the U. S. and then there's a system by when the, the closed month-end accounting gets sent to CSG.  She said

102

there's no exchange of data from CSG back to Eric, referring to Placidet, the CFO, and his controllers in that monthly close process.  She testified it's a one-way street.  Defendants can't access documents or data of CSG through the financial reporting tools that are used to report information.  It's a one-way flow.

So in short, Defendants and CSG did not have any exchange of documents concerning the issues in the underlying case, let alone an exchange sufficient to show that control is evidence here.

Factor 4.  Plaintiffs have failed to demonstrate that CSG benefits to the necessary degree from the outcome of the adversary proceeding.  So Plaintiffs refer to a benefit. They've said there's a benefit and they even called it an "enormous" benefit, but the hyperbole doesn't make it so.  And again, they failed to offer any evidence.  While Plaintiffs try to walk away from the Afros case they cited -- if you look in their reply, they had cited it initially and then they walked away by claiming it's an out-of-Circuit case -- that case makes clear that Plaintiffs have to show a direct benefit.  That's the standard, a direct benefit.  You can't just say, oh, a benefit.  That'd be too easy to prove.

The point is also made clear by the DuPont case, relied upon by Plaintiffs on their so-called DuPont factors, refers to this factor as the degree to which the nonparty will

benefit from the outcome of this case.  So even DuPont assumes there's some baseline benefit to prevailing in a litigation if you're a related company.  There's got to be something more.  What is the degree of that benefit?  If Plaintiffs' arguments concerning a purported benefit to CSG, which arguments boil down to nothing more than arguing financial consequences present in every single litigation, are accepted by this Court, which they should not be, it would eviscerate the need for courts to evaluate this factor at all.

So let's look at what are the standards set by the courts?  Well, different courts have said -- the Afros case said there needs to be the direct benefit.  We covered that. Two other courts, the Humana v. Teva court and In re Zantac, said if the movant fails to establish that a nonparty is potentially liable for a verdict against the party from whom discovery is sought or otherwise has a financial interest in the case, courts have found there's no significant benefit for determining control.  So those courts have said there has to be a significant benefit and it's basically got to be the level of being liable for a verdict.

Hampton Hall, the case relied upon by Plaintiffs, is distinguished.  The court there found that the -- sorry -- oh. They were closely related entities which were created to be involved in the development and management of the plaintiff and given the close corporate structure, they found that there

could be an affect.  There's no claim that CSG was created to be involved with Defendants, nor could there be.

So again, if we go back to the Princeton case that we looked at before in connection with the requirements of facts and not inferences, the court at one point considered whether the non-party Japanese-affiliated corporation which developed the video games benefited financially from the U. S. affiliate which distributed the video games and, if so, to what degree. And in considering these questions the court said:

"Again, the Court might assume that the answer to this question is 'yes' in light of the fact that Konami Japan developed the games, but it would prefer not to assume or guess when making such significant decisions-it needs a record to support a conclusion in Plaintiff's favor here."

So Plaintiffs have only put forth speculation argument.  That cannot be the basis for such a conclusion.  The benefit must be direct, it must be significant, and it must be more than just a mere financial benefit that can be claimed with respect to any nonparty affiliated entity.  Courts should not assume or guess when making such decisions.

So what evidence have Plaintiffs offered?  So here are two statements, one from Plaintiffs' moving brief and one from their reply.  From the moving brief, Plaintiffs say:

"CSG will benefit enormously if it prevails in these

adversary proceedings since the purpose of it, purpose of the corporate restructuring and ensuing bankruptcy filing was to isolate and deal with asbestos-related lawsuits and liabilities with minimal impact on its affiliates and other ordinary-course creditors, all of which impact CSG's bottom line, in addition to the bottom line of the U. S. Defendants."

That is 100 percent argument and speculation, zero evidence.

Now let's look at their reply.  Plaintiffs assert:

"It's hard to imagine how the parent entities of an enterprise with enormous asbestos liabilities would receive no benefit from the attempted relief from that liability contemplated by the corporate restructuring and resulting DBMP bankruptcy."

Again, no evidence there, either.  It's pure argument on the part of Plaintiffs.

So Plaintiffs somehow, then, try to switch gears and assert that a common legal interest shared by Defendants and CSG is somehow an acknowledgment of a direct benefit from the outcome of the adversary proceedings.  So this argument is both illogical and contrary to evidence.  The letter cited from counsel for DBMP to which Plaintiffs rely plainly states on its case there are financial consequences, as there are in most legal matters, but the interests are decidedly legal.  Again,

the financial consequences present in every litigation do not suffice.

So again, not only are Plaintiffs' arguments just that, arguments and speculation, but they're also contrary to facts.  Here, CSG will not be liable for a verdict as in the cases that I just pointed out if Plaintiffs prevail in the adversary proceedings.  In the adversary proceedings, Plaintiffs seek to avoid the corporate restructuring and consolidate the bankrupt, bankrupt estate of DBMP with New CT. In this case, the adversary proceedings are part of a larger bankruptcy proceeding in connection with which the size of a liability is to be determined, the size of liability of DBMP is to be determined.  Sizing a liability is not the same as deriving a benefit from a litigation by defeating a claim.

Here, estimating DBMP's liability will enable the funding of a Section 524(g) trust to pay claims.  It is not a win-loss proposition, like the litigations referenced in the relevant case law where a direct benefit from prevailing in a case means paying a verdict or losing a significant amount of sales.  That's what, that's what the cases cover.

In any event, none of the arguments advanced by Plaintiffs form a basis for this Court to conclude -- again, all of these factors have to be tethered to does it show control.  It does not show that Defendants have practical control over CSG's documents or that they could compel their

production when, as here, a nonparty -- sorry -- when as -- in -- as it could be in the cases where a nonparty is liable for the party's verdict.

Factor 5.  CSG has not participated in the adversary proceedings.  In their reply brief, Plaintiffs again try to evade standards set by the courts, again saying that they are outside of the Fourth Circuit.  However, Plaintiffs, who bear the burden, have failed to cite a single case in or out of the Fourth Circuit that either (1) explains the standards necessary to show a nonparty's participation in the litigation or (2) rebuts the two cases that Defendants cited, Alimenta and Afros, which make clear that it's, again for this standard, it's actual involvement in the litigation.

Their entire rebuttal is saying that these cases are 40 years old, which is irrelevant and a point with which Plaintiffs must agree since they affirmatively cited Afros in their moving brief.  And so we cited the Alimenta and Afros cases, right, where, for example, in Afros the court found a nonparty's involvement in the key decisions regarding the litigation, including the decision to counterclaim, were made by the non-party employee with no direct connection with the defendant.  Those are the kind of things, that's the kind of participation in the litigation that we're talking about here, right?  In the Alimenta case, the court found that the nonparty had been intimately involved in the discovery process,

108

including participating in plaintiff's answers to interrogatories.  That's not present here.

Plaintiffs rely on the fact that CSG is a party to the fiduciary duty proceeding, however, they can't provide any support for their proposition that being named simply as a defendant rises to the level of participation.  They claim that CSG's counsel, Mr. Beausoleil, attended the 30(b)(6) depositions, which concerned the exchange of documents with CSG.  He made appearances at court hearings -- they allege he made appearances at court hearings, but at none of these did he argue or take any positions or ask any questions.  There's no evidence of participation under the standards set forth in Alimenta and Afros which have not been rebutted.

Plaintiffs again assert the common legal interest. They try that one again here with CSG.  It's also insufficient to demonstrate CSG's participation.  And finally, in their reply brief Plaintiffs pull out a statement made by counsel for CSG from approximately a year-and-a-half ago at a court conference where parties were discussing the stay in the fiduciary duty proceeding and counsel, counsel says they're relying on that "CSG would participate if it was appropriate," some statement made by CSG in that, in that transcript. However, the statement by counsel for CSG that CSG might participate in discovery cannot be evidence that CSG has participated in discovery.

In any event, again, once again, Plaintiffs' arguments, not evidence, but arguments miss the mark because they're untethered to the idea that Defendants control CSG documents.

Factor 6.  So as I mentioned upfront, the Suh case to which we cite for the practical ability standards does not have this factor.  We don't believe it's appropriate or necessary to look at it, but for the sake of completeness we'll discuss it today.

Not all courts look at this factor about agreement, whether agreements among the entities reflect the party's legal rights or authority to obtain certain documents as part of the analysis of control.  Plaintiffs rely upon DuPont and Baby Jogger, neither or which actually analyze this factor.  Suh doesn't consider it, either, and there's no reason this Court should.

So first, I think it's indisputable there are no actual agreements between the entities with respect to the production of documents, as this factor would seem to require on its face.  If there was, I think we would have heard about that front and center.

So Plaintiffs make three arguments, none of which are relevant or demonstrate control.  First, Plaintiffs point to the process through which e-mails are sought by a request to the Paris-based IT team.  This is most definitely, first of

all, not an agreement and it does not evidence control. There's also zero evidence and, that any Defendant has ever requested or received approval for accessing e-mails or documents from CSG. Rather, the evidence is clear that Defendants could not secure materials from CSG to meet their own business needs, the standard Plaintiffs cite. Ms. Brutsch explained this. She explained that the reason documents are not requested from CSG is because CSG will not turn them over because there are rules that need to be complied with with respect to getting Compagnie de Saint-Gobain e-mails. She said rules, EU rules, that need to be complied with. In addition, Ms. Brutsch again testified CSG documents have not been produced in any U. S. litigation proceeding.

Plaintiffs' second throwaway point in this section again goes back to the seconded and expatriated employees. I won't belabor it. I explained already that expatriated employees are cut off from their CSG documents when they come here. And there are only few of them. This, this idea of secondees and expatriates showing control goes nowhere.

And third, Plaintiffs twist the idea that there is a, it's called a wide-area network -- again a topic I knew nothing about until this case -- which is actually technology that connects offices, data centers, and Cloud applications together to make a false, sweeping statement that U. S. Defendants and CSG are connected to the same global wide-area network. That

part's true, but here's the rub.  It says "through which U. S. Defendants can obtain access to materials uploaded by foreign affiliates based on a business need."  That's not true and there's no evidence of it.  A wide-area network is simply a commonly used telecommunications network.  Saying a company is connected through one is meaningless.

I have been wracking my brain for weeks to try to think of an analogy for the Court on a wide-area network and it actually came to me on the break before because I was staying in a hotel last night, that I'm staying in a hotel and I have Wi-Fi, which I accessed this morning.  Everybody in the hotel has access to Wi-Fi.  There's some Wi-Fi network in this hotel. That does not mean that I can access documents or information of another hotel guest staying in another hotel room.  Because in general, we're all on the same Wi-Fi network of the hotel. It's the same idea.

So again, it's false and it's meaningless.  When -- and it's false because when asked if it was his understanding that Saint-Gobain North America cannot access anything loaded by a non-North American affiliate to the wide-area network, Mr. Pier answered, "The default implementation of firewall rules prevents access among sites."  There's a network.  I don't know.  It's given power, whatever the right word is, but then they put up firewalls to prevent everyone from going outside of where they're supposed to.  He testified he was not

aware of any request to modify firewalls to access documents outside of North America to anywhere, not just France.  There are firewalls.  You can't get them by being on a wide-area network.  You cannot get documents outside of the U. S.

Your Honor, Defendants thank you for your time spent listening to the presentation today.  However, none of this really had to be.  Plaintiffs served CSG with a subpoena only when they filed this motion.  Now that it has been served, the issue of getting documents from CSG should be between Plaintiffs and CSG and that process should play out.  All the effort and time and money was unnecessary.  However, if the Court still intends to decide Plaintiffs' motion, the proper standard for the Court to follow is the similar in-Circuit cases where a subpoena was also served.  In those cases, given the fact of the subpoena being served upon the nonparty, the North Carolina District Courts declined to expand the test for determining control past the legal right test.

Here, Defendants do not have the legal right to documents of CSG and Plaintiffs have not demonstrated any evidence to the contrary.  The Court should deny Plaintiffs' motion to compel.

Thank you.

THE COURT:  Thank you.

All right.  We're now at about 12:20.  Do we want to hear the Debtor's arguments?  Can we get that done before 1:00,

or should we break now?

Mr. Jones?

MR. JONES:  We can certainly get my argument done before 1:00, your Honor.

THE COURT:  Okay.  All right.  Let's see what we can do.

MR. JONES:  May I approach, your Honor?

THE COURT:  You may.

(Slide presentation provided to the Court)

THE COURT:  Thank you.

MR. JONES:  Thank you.  Thank you, your Honor.  Jim Jones again for the Debtors.  And we thank you for your time today.  I will be relatively brief.  I will try to be other than repetitious as the lunch hour approaches and as my colleagues will tell you, lunch is my favorite time of the day.

Let's stick with control very briefly.  We know what Rule 34 requires, possession, custody, or control.  Control has been the term, if we search the record today, that would turn back the most hits.  We've talked about hit reports.  Control would win the prize.

Possession, custody, or control.  Control, we've heard is either the legal right or in some Circuits' and in some courts' views the practicable, practical ability to obtain, one or the other.  Some courts use both.  But control still means control and I think the courts got it right when those

definitions before you were read into those opinions. Possession, custody, or control requires, at a minimum, the practical ability to obtain the materials sought on demand, on demand.

I also think the American Heritage got it right when in the dictionary it says "legal right and practical control both require the ability to exercise authoritative or dominating influence over; to direct."  And here, it would be the sought-after material.

So whether or not we're talking about legal right or whether or not we're talking about practical ability to obtain, we're talking about control and I think the DuPont factors may be interesting and some courts may have thought them help, thought them helpful.  But neither really matter here and neither, they're just not met.  Neither do they matter or, nor are they met.  Because control means control.

CSG did not -- rather, the subsidiaries here do not have control over CSG's documents.  I think that has been made quite clear by Ms. Gould, whose argument I join.  CSG did not decide whether the corporate restructuring would have been entered into.  That's clear in the record, evidence before you. CSG was informed about a restructuring.  That's a part of the record and in fact, the slide that was presented to you by our friends on the other side of the room to suggest CSG was more involved than CSG was included -- I think it was Slide 12 of

the ACC's deck -- included the word "update" in the sentence.

CSG was receiving an "update."

So yes, they were informed.  Yes, they were updated. They were not the decisionmakers here and Mr. Rayfield's testimony, Mr. Bondi's testimony, and the testimony we set forth at Page 8 and 9 of our brief, your Honor, makes that clear.

Sure, there are shared networks.  I think Ms. Gould's analogy just presented is as compelling as any about why that is not evidence of control.  In our brief, I'll let Mr. Wilson, who was, who came up with, at our firm, with the analogy take the credit here, but I think it's, it's a good analogy as well, which is folks who share a parking garage, share spaces in that parking garage, don't, don't have the right to take each other's cars when they leave at the end of the business day. That's what a share, that's what sharing a network is.  It is not evidence of control.

Sure, there were personnel that communicated back and forth with those in France.  That's a part of the record here. To the extent those documents were in the files of U. S. custodians, they were produced in the preliminary injunction proceeding.  They've all been produced three or four years ago.

Sure, there may be some financial interest on the part of the ultimate parent in the outcome of the proceeding. That's what equity ownership means, your Honor.  It doesn't

mean that subsidiaries have control of that parent, that parent's documents.

And the common-interest doctrine was cited in the brief of our adversaries on their side of the room as somehow implicating that the subsidiaries control the documents of the parent.  Without doubt, the parent and the intermediate parents of DBMP share a common legal interest in connection with these proceedings and that no more shows that the subsidiaries control the documents in the position, possession of the ultimate French parent than would it show that two codefendants who are not commonly owned but merely are both on the same side of the "V" in a typical lawsuit who assert common interest control one another's documents.

So com, the common-interest doctrine as protective of privileged communications does not inform this argument today, your Honor, about whether subsidiaries control the documents within the possession of their ultimate parent.

So we need not today and you need not over the course of days to come wrestle really more about this, in my judgment, and that's because CSG has agreed to accept service of a subpoena that was served on it the morning that the ACC and the FCR filed the motion to compel in this case.  Mr. Beausoleil has risen this morning -- I guess it's the afternoon now -- but has risen earlier today to tell us that, yes, indeed, they have the subpoena.  Yes, indeed, they have taken the first steps

with the French authorities to assist in processing a response to that subpoena and that is now underway.

Now it cannot be laid, if that's the right past tense and I always screw it up, at the feet of DBMP or the Non-Debtor Affiliates who are not CSG that our friends at the ACC and the FCR took so long to serve that subpoena.  They have known for quite some time that CSG would receive and accept service because it was stipulated, I think, as a part of the negotiations over the scheduling orders in these adversary proceedings.

So when, as the court -- and I think it's Bleecker -- "when information," said, "When information is readily available," or, rather, "attainable through a subpoena *duces tecum*, no compelling reason exists to expand the definition of control."  I agree with the authors of the court there and I commend that to your Honor.  We don't need to arm wrestle over things, exert any more perspiration than we already have.  We know now who controls the documents and we know that because CSG, they're CSG's documents and CSG can now respond to that subpoena, as it must, pursuant to Rule 45 and whatever French or other international conven, French regulatory regime or international convention indicates that it should.

So just a moment, your Honor, on --

THE COURT:  Uh-huh (indicating an affirmative response).

MR. JONES:   -- a, a few things quickly with respect to timing.  We've been charged here today, that is, those on this side of the courtroom, with hinderance, delay tactics, being vexing, among other things.  I will try to bear up, nonetheless, but I think it's important to look at the schedule and the timeline here when we talk about delay.

Four years after the folks with us today applied, for the ACC applied to be special litigation international counsel and informed the Court about the Paris office there and its abilities to assist in international discovery; 2-1/2 years after suing a French company, CSG, and other French citizens in one of the adversary proceedings pending before your Honor; 2 years after CSG stipulated, as I mentioned, it would accept service of, of a subpoena for the documents sought now; about a year after serving document requests on the U. S. Defendants for those documents, we assume, but we haven't seen the subpoena; 9 months after the U. S. Defendants responded and said they would produce their own documents, but would not produce CSG's documents; and then after serial meet and confers, a few conferences with your Honor, and the corporate rep deps about which you've heard, only then was the subpoena served on CSG.

So the timeline is as we've set forth here, and when your Honor has a moment, you may review the deadlines and the dates and the activities set forth beneath those dates, if you

choose.

Your Honor, I put up this because we've been charged both in the papers and I think further today with a few things, three or four of which I've already mentioned. But in the papers we were charged with "posturing and manipulating and needlessly creating discovery disputes through the claim that we are distinct entities for purposes of discovery when such discovery was completed collectively in the PI proceeding."

Well, your Honor, I, I put the e-mail before you to me from counsel for the ACC because we did our best there to be appropriate and efficient in discovery, as we have done in all of these adversary proceedings, and that is with the domestic affiliates mentioned in my e-mail we agreed to gather and produce documents to facilitate efficient discovery in that hurry-up preliminary injunction proceeding without the necessity of, of forcing the ACC to serve subpoenas on the domestic U. S. affiliates of the Debtor. And we did that after we asked them to agree that they would not charge us with lack of corporate separateness because we were trying to be facilitative, if that's an adjective. And here we are today being, at least roughly, so charged.

Your Honor, the motion itself sort of, in my judgment, reveals the goal of, of its filing and that is to avoid the burden of compliance with Rule 45 and foreign law if and to the extent it should apply. And that's at reply brief, the reply

brief at Paragraph 10.  And it suggests that in that, in that paragraph that it would be burdensome and time consuming to do what a party must to secure documents from a French corporation.  If the subpoena that was served earlier this month had been served at the outset of these adversary proceedings, your Honor, much of what we're talking about today may not have been necessary and that, again, is not through the fault of any of the Debtor or its Non-Debtor Affiliates.

Your Honor, the one other thing I wanted to mention is because it's not in the papers and I think it was counsel for the FCR that suggested that the PI was entered or was sought and entered for the benefit of CSG.  The PI was sought and entered for the benefit of the Debtor however many years ago, your Honor.  It applies to the, the Debtor's affiliates for the reasons you know and were set forth in the ruling you wrote, I think, in August of '21.  And there would have been no basis to sue the French parent for that which the PI was imposed.

So I wanted to mention that just because it was not a part of the papers and had not been anticipated until I heard it.

Your Honor, that's all I have and if, if I help us get to lunch a little sooner than we otherwise would have, I'm glad that I did.

THE COURT:  Do we have arguments --

Thank you, Mr. Jones.

Do we have arguments completed at least on the respondents' side?

(No response)

THE COURT:  Are we ready to move to rebuttal?

MS. GOULD:  Oh.  Yes, thank you, your Honor.

THE COURT:  Okay.

Any time prognostications at this point?  We're about 20 minutes to 1:00 when I'll feel obliged to stop, but if we're going to be very short, then maybe we launch into that and maybe we take a break instead.

MS. HARDMAN:  Your Honor, I, I will, unfortunately, admit I have a stack of Post-Its over here.  So I, I would love to say that I think I'll be done in less than 20 minutes, but I worry my, my Post-Its will end up causing me to wax a little more poetic than I wish.

So I actually might be able to make it even shorter when we get back, if I have --

THE COURT:  Sure.

MS. HARDMAN:  -- the benefit of a few minutes to collect my thoughts.

THE COURT:  Anyone opposed to taking a break now?

(No response)

THE COURT:  All right.  We'll take our lunch recess and try to pick up about a quarter till.  Give you five minutes more under the circumstances.

If any of you are not making arguments, apparently the ACC baseball tournament is going on next door.  So you can spend the lunch hour over there, I suppose.

We'll take a break.  Court's in recess.

MS. HARDMAN:  Thank you, your Honor.

(Lunch recess from 12:39 p.m., until 1:48 p.m.)

AFTER RECESS

(Call to Order of the Court)

THE COURT:  Have a seat.

Okay.  I don't know if it's even colder here than it was before in the morning, so.

Ms. Hardman, we're back to you, I believe.

MS. HARDMAN:  Your Honor, yes.  Carrie Hardman from Winston & Strawn on behalf of the Committee and Plaintiffs, again unless Mr. Greecher says otherwise.

I was going to actually comment and say thank you.  I felt a little bit warmer since we've gotten back, but maybe that's in my head.  I guess give me five more minutes and if I'm shivering, I apologize.

I did want to raise a few points in response.  We have heard a lot from both sides today.  I will try to be as brief as I can.  And I tried my best to distill my Post-Its, but I still have a few left because tacos took a little bit of precedent over my, my handwriting.

So I apologize for that, your Honor, but I will do my

best to make it as seamless as possible.

I will start at the beginning here, your Honor.  I think we have agreement among the parties that Rule 34 does apply here.  We're talking about parties in discovery and active litigation.  It's the party to this litigation that has the obligation to produce documents within its possession, custody, and control.  Much ado has been made about the subpoena that we have sent to the French parent.  I, I don't know what that has to do with an obligation of a party to respond to their discovery demands.  It certainly doesn't absolve their liabilities and their obligations under Rule 34.

Much has been made about the timeline in which we served that subpoena as well as sort of a, "Hey, look over here at this."  There's a very long timeline.  Your Honor, Plaintiffs have never hidden the ball on this issue.  We have told your Honor.  We've been very forthright about what we thought might happen if we served that subpoena and we've gotten the beginnings of exactly what we thought might happen. We're not required to serve third-party subpoenas, especially if we believe the parties have the discovery we're seeking.  We did think it was going to be futile if we served this subpoena because of the positions that the Defendants have taken all along.

Nonetheless, your Honor suggested at one of our recent conferences that maybe we should lob that subpoena over and

that's exactly what we did and the response we received thus

far, while it might be the cynic in me, is aligned with what I

thought might happen and that is Mr. Beausoleil does not want

to get arrested.  Your Honor, we understand the position that

Compagnie de Saint-Gobain believes that they're in.  We take a

differing position with respect to documents that are within

the possession, custody, and control of U. S. parties.

We also are setting aside for another day the position

that Compagnie de Saint-Gobain takes about being a nonparty

here, but that is, again, a discussion for another day.

I will say that there's been mention today that

Mr. Beausoleil made of some steps that he's taken in response

to the subpoena, including going, beginning with steps related

to the French process, is what I guess I'll call it.

Interestingly, not once has it been raised by the Defendants in

this action that they either asked their French counterparts to

start that process in response to their subpoenas, if that's

what they believe is required.  We don't think it is, but if

that's what they believe, then why did that process not start

when we actually served them document demands?

All that said, we still don't think that process is

even required here because the law in the U. S. is clear.  If

there is possession, custody, and control of documents by U. S.

entities, even if they're foreign documents, that those rules,

the French blocking statutes and other applicable rules, don't

apply in this circumstance.  We don't have to go through that process.

We've talked about the burden and Ms. Gould said one of the lawyers said that the burden doesn't matter.  I was one of those lawyers, if we're going to be clear about that for the record.  What I really meant to say was not that the burden doesn't matter, but the burden issue and the dispute we were having about burden doesn't matter here, your Honor, 'cause we believe we've met our burden, if we have that burden.  We have provided you ample evidence, I believe, both in our motion practice as well as in our presentation today of facts that support each of the various factors to find possession, custody, and control.

Ms. Gould referenced that there's a high burden of proof when we talk about that burden.  Your Honor, I respectfully disagree.  We're talking about discovery here.  We're not talking about a burden of proof to determine the underlying substance of a particular matter.  The test here is simple.  If you have possession, custody, and control of the document, then you must produce it.

The Debtor seems to agree with us that there is these, there's two tests and maybe the practical ability to obtain test that could apply here, your Honor.  I know your Honor has mentioned it in your rulings.  I understand that other Defendants take the position that it certainly doesn't apply

and can't apply and has been rejected.  I don't think the law in this Circuit is that clear.  We do certainly think it applies here.  It could be either/or and we rely on that test.

A few grandiose statements were also made today, your Honor.  There was no evidence on our side whatsoever, nothing to see here.  In fact, we've proved nothing and that we can't, they cannot access documents.

With respect to demonstrating that there was no evidence on our side, I, as a demonstrative I would put up both sets of slides to show you that we almost cited some of the same facts to support each of our positions.  Now we take differing positions on those issues, but we cite the same facts when we talk about secondees or expatriates, when we talk about the documents, or discussion about relative access issues, whether it's Teams or SharePoint or OneDrive.  We're both citing the same facts.  We talk about two, two testimonial -- excuse me -- two depositions taken that provided ample evidence that supported both of our sides here, your Honor, and I think, from our perspective --

THE COURT:  Uh-huh (indicating an affirmative response).

MS HARDMAN:  -- and our, and position and what we interpreted with respect to the information provided in there was certainly ample evidence to support our position.

Ms. Gould went through a list of the kinds of

documents that the Defendants simply cannot access, whether that's e-mails or hard drive or share drives.  Your Honor, I'll talk about it, again.  The general gist here is simple.  Yes, we understand that there is a default rule with respect to the company about access.  However, what we've discovered in the discovery that's been taken thus far is that the default rule, yes, it exists and no one disputes that.  But that, in reality and in practice, that rule is circumvented, overridden.  There's ways around it that have been met for business needs for the company here.  Said simply, if that's the case, why is this also not a business need?  A, a subpoena or a document demand of a party should in, in all circumstances be part of that business need.

Ms. Gould mentioned that we've been going at this for about a year with respect to their position and that their position hasn't changed.  And she's right.  What Plaintiffs have heard for about a year is the conclusory statement, "Take our word for it.  There isn't anything to see here.  We can't access it."  Yet, when we take the documents and we do the discovery here we do learn that there, in fact, is some evidence to demonstrate that there is access and what I've learned, if anything, from my limited time with my own clerkship is I was told, without divulging anything from behind the bench, is "look at the footnotes."  That's where some of the most important things exist.  And in Footnote 11 -- we talk

about there's nothing to see here, there's nothing to see here -- but in Footnote 11 of the Non-Debtor Affiliates' response, it indicates no documents are exchanged, nothing's exchanged except they maintain their e-mails in the ordinary course of business.

So they do, in fact, maintain their e-mails in the ordinary course of business.  I will admit I'm guilty of hiding things in footnotes, too, but it's there.  These are facts for us to demonstrate that there is, in fact, possession, custody, and control.

There's been an indication by, I believe, counsel to the Debtor that the French parent, we believe, is more involved in the process of corporate, the corporate restructuring and the DBMP bankruptcy than they were, in fact.  "Take our word for it again.  They weren't as involved as you think they were."  Okay.  Well, the evidence doesn't just show that there's a meeting here or there.  The testimony that we've received thus far has indicated that they were involved.  It indicates that they provide not just updates, but they provided feedback.  Why fly all the way to New York if all you're doing is getting an update?  Seems expensive, maybe, you know.  I can't speak for the eight French folks that came over here, but I imagine it wasn't just for a quick jaunt to the, to the United States.

There was a discussion about the Bleecker case that

with, when it comes to some of the factors that we're dealing with here, your Honor, that if a subpoena *duces tecum* would provide readily available documents, that there's no need to pursue the practical ability to obtain test. What I will say about that is the Ultra-Mek case that we did cite says the subpoena here would not be factored in if it's clear that the documents are not "readily attainable." And what I haven't heard today, your Honor, is that if we serve Compagnie de Saint-Gobain, those documents are going to magically appear in my inbox tomorrow. I don't think that's going to happen. I think Mr. Beausoleil's made that clear that he can't do that under threat of, perhaps, being wanted in France.

So I think, from our perspective, they aren't readily attainable. Therefore, that rule from Bleecker doesn't necessarily apply here or kick in.

Again, our position from the Committee's side here is that the French blocking statute or other applicable U. S., foreign statutes would not apply when possession, custody, and control is found in the U. S. Again, we've mentioned that these documents are not readily attainable.

Finally -- no, not finally. I got more, I got more Post-Its. I apologize.

The Non-Debtor Affiliates have mentioned that to establish the level of control needed here the Defendants must be able to command the release of documents, putting up,

effectively, a much higher threshold.  As we said in our reply, the case Uniden says otherwise.  Even if a subsidiary can't order a parent to produce documents, they may still have to produce what's available to them in their possession, custody, and control under Rule 34.

There was a discussion about the benefit standard where, perhaps, Compagnie de Saint-Gobain would benefit from the Defendants' position here if they are successful.  The discussion about that benefit point here has been lodged by the Defendants to suggest that it must be a direct benefit.  DuPont said it could be a degree of benefit -- and I know Ms. Gould referenced that as well -- or a likely benefit as the Hampton case we cite indicates.

This is not pure speculation at all.  Compagnie de Saint-Gobain, while not the one who sought the relief, does receive relief from the preliminary injunction in these cases, that if we are successful in challenging the underlying merits through these actions, that such benefit is no longer available.  And I would imagine that Compagnie de Saint-Gobain would agree that billions of dollars of asbestos liability would certainly be a significant impact to them in terms of a benefit to avoid, if that's what they're going for.

Again, there's been an indication that we provided no evidence and only inferences here or there, yet we spent much time going over factual slides on both sides citing many of the

same matters.  And as I mentioned before, the secondees, the expat, the expats, we talked, we both talked about the loans that are funneled up to Compagnie de Saint-Gobain.  There has not been an indication that those funds that end up at another entity don't ultimately filter up to Compagnie de Saint-Gobain and there has been no indication that the consolidated financial statements that I mentioned somehow don't exist. Again, when it comes to the loans that we've talked about that filter up from New CT ultimately up to Compagnie de Saint-Gobain, there's been no dispute that those funds flow that direction.

On Page 17 of Ms. Gould's slides, Ms. Gould mentioned that Mr. Phelizon pro, came over to the U. S. with nothing but his e-mails.  Again, when we talk about footnotes or the small print, that's not entirely true.  In fact, Ms. Gould set up a line of inquiry in the deposition of Ms. Brutsch where she ended up indicating that he came over with a flash drive in his hand.  So we know he at least had some documents.  I don't know what they're about.  I don't know if they're related to the corporate restructuring or not, but they're here.  So wouldn't we examine that to find out if those documents are, in fact, responsive?

There was much made about our reference to Teams and, in fact, indicated, you know, it's just a Teams meeting. That's -- as I mentioned before, your Honor, Teams has much

more capability than even I utilize or realize and it certainly has abilities that my law firm as a practice is not going to maintain, but companies do because they want to maintain their files.  You can save lots of things in there for a very long time, unless you're a law firm, and those things are able to be saved, shared, exchanged, in the ordinary course.  So it's not "just a Teams meeting."

Ms. Gould referenced that this Teams practice at the company is very commonplace.  Ordinary course of business, your Honor.  One thing she did mention, though, was a fact that was brand new to us today, your Honor, and that is that the Teams program was not utilized during the time of the corporate restructuring.  Your Honor, the time of the corporate restructuring was back in October of 2019, is when it was consummated, right?  We've talked about how it goes back even years prior to that in terms of the planning.

The discussion about Teams was also deemed irrelevant today, your Honor.  What I will say about this is we argued before your Honor a few months, few weeks ago, few months ago at this point, with respect to the possession, custody, and control topics that would be going forward in the Rule 30(b)(6) depositions.  Defendants indicated at that point that the relevance to the corporate restructuring is not a factor when you talk about possession, custody, and control.  In fact, your Honor, ruled that the time frame should be much shorter in

terms of what we can even ask about when it comes to those 30(b)(6) depositions and yet today we have learned something brand new that we couldn't ask about in those depositions, that Teams was not used back then.  Why?  Because I can't ask that question in the deposition, your Honor, because it's outside of the scope that the Defendants so hard fought to keep.

So your Honor, I, I have to say that it's in line with what happened during the deposition as well when inquiries were made about Mr. Phelizon that go back in time as well.  They're using the time frames to their advantage and not when none available.  So you know, at some point I would certainly like to ask questions related to the Teams process.

What I will say about that is if we had been permitted to ask questions, I think some of the questions I would have asked, your Honor, is, "Okay.  First, was Teams used during the corporate restructuring process?"  If the answer is "No," as the Defendants have now told us today, "Okay.  Did the company use some other process, some other program?"  If the answer was "No," so are we suggesting that this company all of a sudden for the first time began collaborating in a way that they use on an ordinary course basis for the first time back in 2020 when Teams is introduced?  I bet the answer to that question is, no, they probably used something else.  I don't know what it is because I wasn't allowed to ask questions about this issue, your Honor, because it goes back before August 23 of

2021.

Ms. Gould mentioned that employees that come from France maintain access to their French e-mails. It's just practical, she said. That's what we want to focus here on, your Honor, practical. Practical ability to obtain documents. There's lots of rules. There's lots of default rules here. Of course there are. Every company should have them, but practically, that is not how it has been working for a company, a multi-billion dollar conglomerate that needs to coordinate among its various offices and its various facilities to ensure that they have a successful business.

So while it's not the way things should be, the way things are is what we think your Honor needs to examine and rule on with respect to possession, custody, and control.

And with that, I think I've covered my ground and Mr. Greecher will probably save the day, your Honor.

Thank you.

THE COURT:  Mr. Greecher.

MR. GREECHER:  Let's not, let's hope it's not up to that, up to me, your Honor.

Sean Greecher again, your Honor. Just a couple things I'd like to touch on.

First, with respect to the statements from Ms. Gould indicating that the communications between or among the U. S. and the French parties, that there's a lack of evidence that,

that, that demonstrates anything other than much more than scheduling meetings and, and, and the like.

Your Honor, I do have a copy of a document I think maybe we could walk through. If I can approach, I have --

THE COURT: Please.

(Document provided to the Court)

THE COURT: Thank you.

MR. GREECHER: Your Honor, if I could briefly just step through this. What -- what I -- what this indicates is that it's, it is, indeed, at the end, if you go to the last page, it is a, an invite to a Webex meeting. It's a Webex meeting that was scheduled for January 21, 2020.

You go to the next page toward the front and there's an, it's an e-mail from a Saint -- Dina Pokedoff at Saint-Gobain to a various number of parties, including a number of parties who are French affiliates. This e-mail says, "For our call at 11:00 a.m., please log in to the Webex so that we can all review/discuss documents together."

You then flip forward a number of pages, you see a number of redacted entries. And if you go to the second page and you look at the Subject line at the top of that, the Subject line is Paris' Minor Edits to Final Release - Privileged and Confidential. And again, we've, you've been prohibited from seeing the, you know, the, the nature of that.

But your Honor, my point here is simply that there are

more than simply invitations to meetings, one.  Two, there was a process by which documents were shared and collaborated upon, even before Teams.  Apparently, it was through Webex.  And three, there were comments to documents, comments to -- as -- as -- if you note on the very last page, it would appear to be a press release from CSG, a press release from DBMP, and DBMP Investor Relations Q&A on January 22, 2020, a pretty important day with respect to the chapter 11 process.

So we reject the suggestion that there's no evidence.

Second, I, I wanted to talk a little bit about what, what sort of the default implementation is.  I think that's an important term here, your Honor, and to the extent that you're interested in it, I think it's on Page 142 of Mr. Pier's deposition where he talks about the note, this notion of a default implementation of the rules of -- of -- of the rules of the game here and Mr. Pier indicated that access could be granted if there was a business need.  And your Honor, we'll suggest that you take a look at that.  We believe that it demonstrates that there is, in fact, an opportunity for the rules of the game, the default implementation, to be changed as and when the need arises.

I, you know, I, I was wrestling with the, the analogy that was in the Debtor's paper and, you know, full marks to Mr. Jones' associate.  I, I thought it was creative and the same, and the same sort of analogy from Ms. Gould today.  I

don't think they quite hit the mark, you know.  The, the suggestion that, you know, that if, if, if Ms. Gould is in a hotel and her, you know, she's using the Wi-Fi, that other parties can't get access to that.  Well, that might be the default implementation, but to the extent that there is a crime that was committed in the hotel, let's just say that it was on, I don't know, October 23, 2019, just picking a date.  For sure, there would be an opportunity for parties to investigate what was going on at the hotel, whether there was a crime committed in the hotel, that folks would have access.  Yes, the default implementation is that parties don't, don't have access, generally, to the,  you know, the, the document or the communications of others, but that's not necessarily a hard-and-fast rule.

And with respect to the car analogy, I think it's a bit hyperbolic.  I think the more apt version of that one might be that to the extent a company regularly lets employees drive the company cars and one of the employees potentially committed a crime on, I don't know, let's use October 23, 2019 again, investigators should have the opportunity to examine all the company cars and understand who did what, when, and where.

That's what we're asking for here, to understand who did what, where.  That's what we've been asking for since the outset of this, this proceeding and we believe that this is an important step, your Honor, to allow us to undertake that

investigation.

Thank you.

THE COURT:  All right.

Has that got it?  Ms. Gould.

MS. GOULD:  Your Honor, may I respond very briefly?
Just a few points.

So first, just to close the door on e-mails.
Accessing your own -- so there's a @saintgobain.com e-mail
address and just because you can access your own e-mails if you
move from France to the U. S. does not mean you can access
anybody else's.  I think that's pretty clear.  So I don't think
we need to belabor that.

Second, Ms. Hardman mentioned that Mr. Phelizon not
only had access to his e-mails, he actually brought a stick
of --

THE COURT:  Uh-huh (indicating an affirmative
response).

MS. GOULD: -- jump drive or a flash drive.  That's
true and we have collected the documents from that drive to be
searched with the search terms and produce.  There's no issue
with respect to that stick or drive.

And third, I think -- just want to point out one
statement Ms. Hardman made because it encapsulates my entre
presentation when I said that their entire presentation is
based on speculation and inferences, not facts.

And the document that Mr. Greecher just handed you is actually, it was not attached to their papers as in, you know, with a declaration or otherwise.  It's not evidence.  It's not in the record.

But Ms. Hardman made the statement when she was looking at saying, "I imagine their meeting wasn't just for a quick jump to the U. S."  That is pure speculation about the meeting and it is not anything that this Court can base an order of control on.

So again, we ask that the Court denies the Plaintiffs' motion.

Thank you.

THE COURT:  Mr. Jones.

MR. JONES:  Thank you, your Honor.  Two quick points.

The first one is there was nothing prohibiting the ACC from serving document requests on the Debtor and the Non-Debtor Affiliates that are a party to the adversary proceeding in which we gather today and serving a subpoena on CSG contemporaneously.  They chose not to.  And the timeline that I have suggested might be worthy of your review in Chambers will show the delay that occurred because they chose not to.

Second, I don't think there's anything in this record, nor is there anything that occurs to me that suggests that the Debtor and the Non-Debtor Affiliates who are not CSG had any obligation to seek from anyone what is not theirs, nor am I

aware of any procedure by which the Debtor and/or the Non-Debtor Affiliates who are not CSG could have started any process in France to gather documents were they so inclined.

And then last, on the press release, invitation of discussion of what appears to be a press release, the documentation of which you were handed up moments ago by Mr. Greecher, if you look at the very last page of the document, which has a Bates number ending in 639, it does show that, apparently, either attached or otherwise and perhaps the topic of discussion -- again, this is a little bit of speculation on my part because the document's been redacted for privilege, it appears -- you see at the bottom of the page these words, "CSG Press Release, DBMP Press Release," and then something "DBMP_Investor Relations QA Draft."

So what we have here is of the, roughly, 4,000, I think it was, documents produced in the case, a single meeting invitation that appears to have involved at least the attachment of, if not the discussion of, separate press releases, one for CSG as something that may have required notice to the public apparently was impending and one from DBMP.  I don't know that that has any other pertinence, if it -- if it had -- I don't know that that has any pertinence to the inquiry before your Honor.

That's all I have,

THE COURT:  You don't suppose that might have been

'cause they were in different languages?

MR. JONES:  Perhaps.

THE COURT:  Okay.

Anyone else?  We done?

MS. HARDMAN:  Your Honor, I only have one last point on those issues raised by the Defendants, your Honor.  And I think Mr. Greecher hit the nail on the head with this.

Your Honor, I could probably produce to you every single invitation of meetings that happened that involved the French to demonstrate how frequently this happened.  It seems an exercise that may not be worth its salt to show you a whole bunch of invitations.

But one thing I will say that we lawyers all probably can agree with.  At some point in our careers we've recommended to our clients that, "Maybe it's best that you just meet in person on certain issues.  Maybe all the real work gets done when you meet in person."  And maybe that's what happened here.  We're talking about a lawyer-driven strategy, your Honor.  The entire corporate restructuring was driven by lawyers.  I'm a lawyer.  I would instruct my clients it'd do better by having a conversation in person about something, especially something this sensitive.

So from, from our perspective, yes, our evidence is that there's a number of meetings.  We would like to ask questions about those meetings and we'd like to get a full

understanding of what happened.  Again, we're just testing our theory here.  We're testing our position on these issues.  We believe that what we've seen so far in the evidence supports our position.

Your Honor, we think that that means that there's probably more there and given the fight that we're, we're putting up every step of the way here, your Honor, we think that maybe there is some there there after all.

Thank you, your Honor.

THE COURT:  Now done?

(No response)

THE COURT:  Okay.

I'm going to have to work my way through this and as there are quite a few things competing for attention at the moment, I'm not exactly sure when I will be through.  I'm not talking about a period of months, but it may be a couple weeks before you hear back from me on this regard.  And at that point I'll either announce this at one of our hearings or, if we decide to write it, we'll, we'll try to put it up.

But I'll send out an e-mail to the group when I know which way we're going with it.

If there's nothing else, I think I should recess this as quickly as possible.  'Cause I imagine it's a mob scene out at the airport and quite a few of you are going to have to fight your way to, on the plane.

So why don't we go ahead and recess at this juncture.

And I'll let you know as soon as I can, all right?

MS. HARDMAN:  Thank you, your Honor.

MR. GREECHER:  Thank you, your Honor.

MS. GOULD:  Thank you.

THE COURT:  All right.

(Proceedings concluded at 2:19 p.m.)


CERTIFICATE

I, court-approved transcriber, certify that the

foregoing is a correct transcript from the official electronic

sound recording of the proceedings in the above-entitled

matter.

/s/ *Janice Russell*                    May 28, 2024

Janice Russell, Transcriber                    Date