FILED & JUDGMENT ENTERED

Christine F. Ramsey

March 16 2026

Clerk, U.S. Bankruptcy Court
Western District of North Carolina



_____
Ashley Austin Edwards
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| In re:<br><br>　　DBMP LLC,<br>　　　　Debtor. | Case No. 20-30080<br>Chapter 11 |
| OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS, and SANDER L. ESSERMAN, in his capacity as Legal Representative for Future Asbestos Claimants,<br>　　　　Plaintiffs,<br>　　v.<br><br>　　DBMP LLC and CERTAINTEED LLC<br>　　　　Defendants, | Adv. Proc. No. 21-03023 |
| OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS, and SANDER L. ESSERMAN, in his capacity as Legal Representative for Future Asbestos Claimants, each on behalf of the estate of DBMP LLC,<br>　　　　Plaintiffs,<br>　　v. | Adv. Proc. No. 22-03000 |

1

CERTAINTEED LLC,
CERTAINTEED HOLDING
CORPORATION, and SAINT-GOBAIN
CORPORATION,
        Defendants,

OFFICIAL COMMITTEE OF
ASBESTOS PERSONAL INJURY
CLAIMANTS, and SANDER L.
ESSERMAN, in his capacity as Legal
Representative for Future Asbestos
Claimants, each on behalf of the estate of
DBMP LLC,
        Plaintiffs,
        v.

COMPAGNIE DE SAINT-GOBAIN
S.A., SAINT-GOBAIN CORPORATION,
SAINT-GOBAIN DELAWARE
CORPORATION, CERTAINTEED LLC,
CERTAINTEED HOLDING
CORPORATION, JOSEPH BONDI, SEAN
KNAPP, LAWRENCE RAYBURN,
MICHAEL STARCZEWSKI, VINCENT
DINENNA, ROBERT PANARO, DONALD
MELROY, PIERRE-ANDRÉ DE
CHALENDAR, BENOIT BAZIN,
ANTOINE VIGNIAL, HUBERT
REICHARDT, DANIEL BIARNEIX,
SREEDHAR NATARAJAN, GUILLAUME
TEXIER, THOMAS KINISKY, CAROL
GRAY, JOHN SWEENEY, ERIC
PLACIDET, MARK RAYFIELD, and
KEITH CAMPBELL,
        Defendants.

Adv. Proc. No. 22-03001

**ORDER PARTIALLY GRANTING AND SUSTAINING AND PARTIALLY
DENYING PLAINTIFFS' PRIVILEGE MOTION AND DEFENDANTS' OBJECTION**

**THIS MATTER** is before the Court upon the (1) *Motion of the Official Committee of
Asbestos Personal Injury Claimants and the Future Claimants' Representative to Compel
Discovery Pursuant to the Crime-Fraud Exception and / or Waiver of the Attorney Client Privilege*

2

*and Work Product Protection* [Doc. No.[1] 1006] (the "Privilege Motion"), filed on August 23, 2021,

by the Official Committee of Asbestos Personal Injury Claimants (the "ACC") and Sander L.

Esserman, the legal representative for future asbestos-related personal injury claimants (the

"FCR," and, together with the ACC, the "Plaintiffs"); (2) the *Discovery Referee Report and*

*Recommendation No. 1* [Doc. No. 2706; Consolid. Adv. Pro. Doc. No. 216; Fraud. Transf. Adv.

Pro. Doc. No. 190; Fid. Duties Adv. Pro. Doc. No. 160] (the "First Report"), filed on February 16,

2023, by Judge Forrest 'Don' Bridges (the "Referee"), the Court-appointed discovery referee in

the active proceedings,[2] and making various recommendations as to the Privilege Motion, and the

*Final Discovery Referee Report and Recommendation [Redacted]* [Doc. No. 3139; Consolid. Adv.

Pro. Doc. No. 370; Fraud. Transf. Adv. Pro. Doc. No. 306; Fid. Duties Adv. Pro. Doc. No. 276]

(the "Final Report," which, together with the First Report, the "Reports"), filed by the Referee on

---

[1] "Doc. No." refers to the docket numbers for either the above captioned debtor's bankruptcy base case (the "Base Case"), for which this order is entered, or to the docket numbers for one of four adversary proceedings arising from the Base Case which have progressed, one of which has terminated and three of which are ongoing and in which this order is also entered. More specifically, "Doc. No." refers to the docket in (1) Case # 20-3008, the Base Case, when "Doc. No." is by itself, (2) Case # 20-03004 (the "Injunction Proceeding") when it is preceded by "Inj. Adv. Pro.," (3) Case # 21-03023 (the "Consolidation Proceeding") when it is preceded by "Consolid. Adv. Pro.," (4) Case # 22-03000 (the "Fraudulent Transfer Proceeding") when it is preceded by "Fraud. Transf. Adv. Pro.," or (5) Case # 22-03001 (the "Fiduciary Duties Proceeding," and collectively, the "Proceedings") when it is preceded by "Fid. Duties Adv. Pro." The Proceedings are four of seven total Adversary Proceedings (as defined below) arising from the Base Case, which additionally include Case # 22-00300, Case # 22-00302, and Case # 22-03045, which have not progressed. The Injunction Proceeding concluded with an order from this Court granting the Defendants requested relief in that proceeding. *See Findings of Fact and Conclusions of Law Regarding Order: (I) Declaring that the Automatic Stay Applies to Certain Actions against Non-Debtors, (II) Denying Motion of the Official Committee of Asbestos Personal Injury Claimants to Lift the Stay, and Alternatively (III) Preliminarily Enjoining Such Actions* [Doc. No. 972; Inj. Adv. Pro. Doc. No. 343] (the "Injunction Order").

[2] *See Order Appointing Judge Forrest D. Bridges as Discovery Referee and Establishing Protocol for Resolution of Crime-Fraud/Waiver Motion* [Doc. No. 2290; Consolid. Adv. Pro. Doc. No. 200; Fraud. Transf. Adv. Pro. Doc. Nos. 171 & 172; Fid. Duties Adv. Pro. Doc. Nos. 146 & 147] (the "Referee Order"); *see also Amended Order Appointing Discovery Referee and Establishing Protocol for Resolution of Crime-Fraud/Waiver Motion* [Doc. No. 3133; Consolid. Adv. Pro. Doc. No. 365; Fraud. Transf. Adv. Pro. Doc. No. 300; Fid. Duties Adv. Pro. Doc. No. 270].

April 24, 2025, and making various further recommendations; and (3) the *Objection to Referee Reports and Recommendations* [Doc. No. 3212; Consolid. Adv. Pro. Doc. No. 383; Fraud. Transf. Adv. Pro. Doc. No. 292; Fid. Duties Adv. Pro. Doc. No. 321] (the "Defendants Objection"), filed by the above captioned "Defendants" on July 25, 2025, and objecting to the Reports. The Court conducted a hearing on the Privilege Motion on September 24, 2025, to address the arguments set forth in the Privilege Motion, the Opening Briefs, and the Reply Briefs (the "Privilege Motion Hearing") and thereafter took the matters under advisement.

The Privilege Motion seeks compelled disclosure of various materials and testimony withheld for discovery in these proceedings by the Defendants on the basis of privilege. The Privilege Motion seeks such disclosure on the basis that any privilege protections do not exist either because (1) the communications suffice for the crime-fraud exception to apply and/or (2) the Defendants have committed an at-issue waiver. For the reasons and in the manner set forth below, the Court will grant the Privilege Motion and sustain the Objection in part, and deny them each in part. As to the Privilege Motion's second basis for compelled disclosure, the Court finds that a limited at-issue waiver occurred. As to the Privilege Motion's first basis, the crime-fraud exception, the Court provides guidance but ultimately declines to decide the question at this time for the reasons set forth herein. Additionally, the Court finds that (1) privilege was waived as to certain materials due to draft waiver and (2) certain other materials and testimony are simply not protected by attorney-client privilege.

Specifically, with respect to the 3,091 Documents (as defined below) that the Defendants continue to wholly block disclosure on the basis of attorney-client privilege,[3] the Court has

---

[3] 3,019 represents the Documents, out of the roughly 4,100 documents originally claimed as privileged, which (1) the Defendants did not (a) redesignate as not privileged and/or (b) disclose in part as redacted, or (2) were not corrupt files.

reviewed each document in camera and determined that 2,518 of the Documents are privileged and that such privilege has not been waived. The remaining 573 of the Documents are subject to disclosure, in whole or in part, because the materials are not privileged or because privilege has been waived. As to the one hundred and forty-three Deposition Objections, the Defendants has withdrawn forty-one of the objections and the Court overrules an additional thirty-two, requiring the Depositions be reconvened for testimony on these seventy-three questions consistent with this order. Filed contemporaneously with this order is Appendix A, the Deposition Rulings, and Appendix B, the Documents Rulings, both are incorporated herein by reference.

## I.      CASE HISTORY

### A. Introduction and Overview

1.      Faced with mounting asbestos litigation in the state court system, the Defendants executed a Texas two-step (as defined below) by (1) effectuating a divisional merger under Texas law that created two new entities, one allocated the asbestos liabilities and the second allocated all other assets and liabilities and (2) filing for bankruptcy in the Western District of North Carolina for the entity allocated the asbestos liability with the intent to establish a § 524(g) trust pursuant to the Bankruptcy Code while insulating their core operations from the consequences of an enterprise-wide bankruptcy ("Defendants' Texas Two-Step"). Plaintiffs allege the Defendants' Texas Two-Step constituted a fraudulent transfer as it was executed in bad faith to hinder or delay asbestos claimants' recoveries. In a variety of procedural postures described herein, Plaintiffs moved to compel the production of documents related to the Defendants' Texas Two-Step, which Defendants assert are protected by attorney-client privilege. Plaintiffs now seek to pierce that privilege, primarily by invoking the crime-fraud exception and at-issue waiver doctrine, among others. Following an in camera review of the originally 3,573 Documents, *see supra* note 3, and

5

143 deposition objections to evaluate the asserted privilege, the Court addresses the arguments related to the Defendants' assertion of attorney client privilege and the Plaintiffs' assertions of the various applicable waivers of the same.

**B.  Context of the Case**

    **1.  Asbestos Litigation Generally**

    2.      Asbestos was used for thousands of years and, by the 19th century, had become ubiquitous in building materials.[4] Asbestos was favored for its exceptional heat and fire resistance, thermal insulation, and strength.[5] Because few alternatives could match any of these capacities, and none at the particularly low cost of asbestos, it was described as a "miraculous" mineral.[6]

    3.      Asbestos exposure causes mesothelioma, a particularly aggressive cancer.[7] While it is possible for mesothelioma to arise absent asbestos exposure, such cases are incredibly rare and often linked to unconfirmed asbestos exposure.[8] Although asbestos was long treated as essentially safe or at least manageable, medical warnings began surfacing in the 1920s and 1930s.[9] By the 1960s, the link between asbestos and mesothelioma became clear.[10] Notwithstanding this established link, some entities continued to defend the use of asbestos,[11] arguing that the associated

---

[4] *Matter of Celotex Corp.*, 196 B.R. 973, 980 (Bankr. M.D. Fla. 1996).

[5] *See Id.*

[6] *See Id.* (quoting G. PETERS & B. PETERS, SOURCEBOOK IN ASBESTOS DISEASES: MEDICAL, LEGAL AND ENGINEERING ASPECTS xiii (1980).

[7] *Connor v. Covil Corp.*, 996 F.3d 143, 145 (4th Cir. 2021).

[8] *Robbins v. Wake Cnty. Bd. of Educ.*, 151 N.C. App. 518, 522 (2002) (accepting testimony stating that "mesothelioma is very rare among the general population, and that it is estimated that there exist only one or two cases per million people per year where mesothelioma develops without asbestos exposure").

[9] *Bragg v. Owens-Corning Fiberglas Corp.*, 734 A.2d 643, 651 (D.C. 1999).

[10] *Pfeifer v. John Crane, Inc.*, 220 Cal. App. 4th 1270, 1282 (2013) ("By 1960, it was generally accepted that exposure to asbestos caused mesothelioma.").

[11] *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1089 (5th Cir. 1973) ("The utility of an insulation product containing asbestos may outweigh the known or foreseeable risk to the insulation workers and thus justify its marketing.").

risks could be controlled through methods such as 'locking in' the asbestos.[12] However, this claim has since been virtually universally rejected; instead, the modern consensus is that preventing asbestos-related disease requires stopping exposure altogether, since no amount of asbestos exposure is safe.[13]

4.      In the United States, asbestos claims began accelerating in the 1970s. By the early 1980s, asbestos plaintiffs filed tens of thousands of personal injury and wrongful death claims attributing mesothelioma to asbestos exposure. By the turn of the 21st Century, the total number of asbestos claims since the 1970s was estimated at nearly one million, costing businesses and insurers more than $70 billion. A substantial driver of these costs, and a striking feature of asbestos liability, is the long latency period between asbestos exposure and injury. Because asbestos-related diseases may remain dormant for years before manifesting, defendants face potentially significant but uncertain future liability that is difficult to predict and manage.

5.      In response to these costs, asbestos defendants engaged in various collective efforts beginning in the mid-1980s to effectuate final settlements, most notably by forming the Center for

---

[12] *See* Selikoff, Irving J., *Partnership for Prevention – The Insulation Industry Hygiene Research Program*, 39 INDUS. MED. 4, 164 (Apr. 1970) (quoted in *Informational Brief of DBMP LLC* [Doc. No. 22] (the "DBMP's Information Brief"), p. 6) (stating that it is "fortunate that the greatest part of [the asbestos in construction materials] has been in products in which the asbestos is locked in—that is, it is bound with cement or plastics or other binder so that there is no release, certainly no significant release, of asbestos fiber in either working areas or general air."); *Loose Asbestos Fiber Seen As Cancer Threat To Men In Building Trades*, ENGINEERING NEWS-RECORD Apr. 2, 1970, at 11 (quoted in same) (quoting Dr. Selikoff, the author of the article in the preceding citation in this string cite, as stating "'products in which asbestos has been bonded into the material, such as floor and ceiling tiles, roofing, siding and pipe, are not considered a cause of cancer.'").
[13] *Gore v. Air & Liquid Sys. Corp.*, 2018 WL 4558182 (E.D.N.C. Sept. 21, 2018) (allowing expert testimony stating "[t]he consensus scientific opinion … is that no amount of exposure to asbestos above the background levels present in ambient air has been established as too low to induce mesothelioma. The mainstream scientific community is in consensus that there is no safe level of exposure to asbestos.").

Claims Resolution (the "<u>CCR</u>") in 1988.[14] The CCR managed to "minimize the substantial defense costs required to investigate … or to litigate" asbestos claims[15] and to resolve all pending and future claims against its members through class action settlements.[16] However, after the Supreme Court rejected the CCR's settlement in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) and a similar attempt for a class action settlement in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), the CCR dissolved sometime around 2001. Thereafter, most of its defendants left the tort system to seek bankruptcy protection.[17]

6.      Congress responded to the unique complexities of asbestos liability cases by enacting § 524(g) of the Bankruptcy Code.[18] Notably, due to the extended latency period for asbestos-related diseases,[19] "Congress was concerned that future claims by presently unknown claimants could cripple the debtor's reorganization."[20] Furthermore, Congress intended for § 524(g) to "ensure that everyone unfortunate enough to contract asbestos-related illnesses as a result of exposure to a bankruptcy debtor's products … be subject to substantially the same treatment in bankruptcy."[21] At the same time, § 524(g) was designed to "allow a debtor to emerge from bankruptcy free and clear of asbestos liability, and thus enable the debtor to grow the pie available to victims."[22]

---

[14] *See* DBMP Information Brief, p. 15. This was the second such group formed by asbestos defendants to resolve their asbestos claims, after forming the Asbestos Claims Facility in the mid-1980s, which was dissolved by the late 1980s due to settlement disagreements. *See id.*

[15] *See id.*

[16] *See id.*

[17] *See id.*, p. 16.

[18] *Truck Ins. Exch. v. Kaiser Gypsum Co., Inc.*, 602 U.S. 268, 273 (2024).

[19] *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 598 (1997).

[20] *In re Grossman's Inc.*, 607 F.3d 114, 126–27 (3d Cir. 2010).

[21] *In re Flintkote Co.*, 486 B.R. 99, 127 (Bankr. D. Del. 2012).

[22] *In re W.R. Grace & Co.*, 729 F.3d 311, 325 (3d Cir. 2013) (quoting 140 Cong. Rec. S4521–01 (daily ed. Apr. 20, 1994) (statement of Sen. Brown) (citation modified)).

7.     Accordingly, § 524(g) "furthers two goals: ensuring the equitable resolution of present and future asbestos claims, and enabling corporations saddled with asbestos liability to obtain the fresh start promised by bankruptcy."[23] Based on the Manville Trust,[24] § 524(g) accomplishes these goals by allowing debtors "to establish and fund a trust that assumes the debtor's liability for 'damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.'"[25] All present and future claims are then channeled to the trust and a representative is appointed to protect the interest of future claimants,[26] thus balancing the debtor's need for a fresh start with the due process rights of future claimants.[27]

### 2. The Texas Two-Step and Its Treatment in the Fourth Circuit

#### a. The Texas Divisional Merger Statute

8.     Texas has allowed divisional mergers under its business codes for more than three decades, in which one corporation splits into two or more entities.[28] Under the current iteration of the pertinent statute (the "Texas Divisional Merger Statute"), when the original entity does not survive, all of the entity's "liabilities and obligations … are allocated to one or more of the . . . new organizations in the manner provided by the plan of merger."[29] Except as otherwise provided, "no other . . . entity . . . created under the plan of merger is liable for the debt or other obligation."[30] The Texas Divisional Merger Statute purports that it does not to affect creditors' pre-divisional

---

[23] *W.R. Grace & Co.*, 729 F.3d at 320 (internal quotations omitted).

[24] *Grossman's Inc.*, 607 F.3d at 126 ("The Manville Trust was the basis for Congress' effort to deal with the problem of asbestos claims on a national basis."); *see also In the Matter of Johns–Manville Corp.*, 68 B.R. 618 (Bankr.S.D.N.Y.1986).

[25] *Truck Ins. Exch.*, 602 U.S. at 273 (quoting 11 U.S.C. § 524(g)(2)(B)(i)(I)).

[26] *Id.*, at 274.

[27] *W.R. Grace & Co.*, 729 F.3d at 323.

[28] *Compare* Tex. Bus. Corp. Act Ann. art. 5.06A(2), (3) (Vernon Supp. 1990) with Tex. Bus. Orgs. Code Ann. § 10.008(a)(2), (3).

[29] *See* Tex. Bus. Orgs. Code Ann. § 10.008(a)(3).

[30] *See* Tex. Bus. Orgs. Code Ann. § 10.008(a)(4).

merger rights. This intent is codified in every iteration of the statute[31] and supported both by its legislative history and proponents.[32]

   b. <u>The Texas Two-Step in the Western District of North Carolina</u>

  9. Courts in the Western District of North Carolina have upheld the use of the Texas Two-Step inclusive of its Chapter 11 filings, even where the debtor is solvent, as demonstrated in *Bestwall* and *Aldrich and Murray*. In *Bestwall*, the debtor filed Chapter 11 in the Western District of North Carolina after having a parent entity isolated its asbestos liabilities in the debtor via the Texas Divisional Merger Statute while transferring most other assets into a newly created entity— a process commonly referred to as a "<u>Texas Two-step.</u>"[33] The debtor sought § 524 injunctive relief to shield the unencumbered debtor entity from these liabilities.[34] The bankruptcy court denied the claimants' motion to dismiss,[35] which was later affirmed by the district court,[36] as well as by the

---

[31] *See* Tex. Bus. Orgs. Code Ann. § 10.901 (providing that merger provisions do not "abridge any right or rights of any creditor under existing laws"); *See* Texas Business Corporations Act § 5.15 (the predecessor statute stating that "[n]othing contained in Part 5 of this Act shall ever be construed as affecting, nullifying or repealing the Anti-trust laws or as abridging any right or rights of any creditor under existing laws.").

[32] *See* H. COMM. ON BUS. & COM., BILL ANALYSIS, H.B. 472, 1989 Leg., 71st Reg. Sess., at 23 (Tex. 1989) (stating that "[c]reditors' rights would not be adversely affected by the proposed amendment, and creditors would continue to have the protections provided by the Uniform Fraudulent Transfer Act and other existing statutes that protect the rights of creditors."); *see generally* Curtis Huff, *The New Texas Business Corporation Act Merger Provisions*, 21 ST. MARY'S L.J. 109 (1989) (stating that (1) "multiple surviving entities" mergers were meant for "greater flexibility," not to change "existing rights of creditors," (2) because creditor-protection laws still "remain in force and apply," especially the UFTA, UFCA, and "Bankruptcy Code," (3) and even if a merger isn't a "transfer" "in the traditional sense," the "allocation of assets" should still be a "transfer" and "conveyance," (4) while the "allocation of liabilities" is "the incurrence of obligations," (5) so creditors can challenge divisional-merger allocations as fraudulent transfers (e.g., insolvency, lack of reasonably equivalent value/fair consideration, undercapitalization, or intent to "hinder, delay, or defraud"), (6) and if a claim is allocated to an "inadequately capitalized or insolvent" survivor, the creditor may sue, (7) with courts able to "reallocate" the liability or make "some or all" survivors liable).

[33] *In re Bestwall LLC*, 605 B.R. 43, 46–49 (Bankr. W.D.N.C. 2019).

[34] *Id.*

[35] *Id.*, at 54.

[36] *In re Bestwall LLC*, No. 3:20-CV-103-RJC, 2022 WL 67469, at *9 (W.D.N.C. Jan. 6, 2022).

Fourth Circuit.[37] The claimants challenged the bankruptcy filing on the basis that the case was filed in bad faith due to the debtor not being insolvent.[38] The bankruptcy court rejected this argument, holding instead that "[a]ttempting to resolve asbestos claims through 11 U.S.C. § 524(g) is a valid reorganizational purpose, and filing for Chapter 11, especially in the context of an asbestos or mass tort case, need not be due to insolvency."[39] When the Court rejected their insolvency argument and denied their appeal, the claimants next argued that the case should be dismissed because the debtor not being insolvent meant that the bankruptcy court had no subject matter jurisdiction.[40] In addressing this issue on appeal, the Fourth Circuit affirmed the denial of the motion to dismiss, holding that the Bankruptcy Code allows for petitions from solvent debtors.[41]

10.     Similarly, in *Aldrich and Murray*, the debtor underwent a Texas Two-Step inclusive of filing for Chapter 11 in the Western District of North Carolina.[42] Claimants argued that the case should be dismissed (1) as a bad faith filing because of the debtor's solvency, or alternatively, (2) due to various issues stemming from the Texas Two-Step, including allegations of manipulation and unreasonable delays.[43] The Court rejected these arguments, holding that financial distress is not a necessary requirement for filing a Chapter 11 case and not finding bad faith since pursuing seeking to invoke the § 524(g) process is not objectively futile.[44]

---

[37] *Bestwall LLC v. Off. Comm. of Asbestos Claimants of Bestwall, LLC*, 148 F.4th 233, 243 (4th Cir. 2025).
[38] *Bestwall*, 605 B.R. at 46.
[39] *Id.*, at 49.
[40] *Bestwall*, 148 F.4th at 238.
[41] *Id.*, at 236.
[42] *In re Aldrich Pump LLC*, No. 20-30608, 2023 WL 9016506, at *1 (Bankr. W.D.N.C. Dec. 28, 2023).
[43] *Id.*, at *2.
[44] *Id.*, at *33.

11

11.     For the present case, jurisdiction is established in the Western District of North Carolina by virtue of the Defendants contributing a North Carolina plant to DBMP.[45] The North Carolina plant was one of several plants located throughout the country and was ostensibly selected for this purpose.[46] As is the case here, and prior to executing the Texas Two-Step, the debtors in both *Bestwall* and *Aldrich and Murray* were represented by Jones Day.[47]

## C.  Factual History of the Case: Old CT, the Restructuring, and New CT and DBMP

### 1.  Old CT and Its Asbestos Litigation Background

      *i.  Old CT's General History and Overview*

12.     The CertainTeed Corporation ("Old CT") was formed in 1904 as an entity engaged in the manufacture and sale of asphalt roofing products.[48] Over the next forty or so years, Old CT expanded its business to various other construction products.[49] In 1967, Old CT engaged in a joint venture with a French company, Compagnie de Saint-Gobain ("CSG").[50] CSG became a minority shareholder of Old CT in 1972 and then a majority shareholder in 1976.[51] In 1988, Old CT became a wholly-owned subsidiary of CSG.[52]

---

[45] *See* Injunction Order, ¶ 51.

[46] *See id.* n. 43 ("Presumably, the attraction to this judicial district stems from Judge Hodges' groundbreaking claims estimation decision in *Garlock* and the injunctive relief provided in *Bestwall*.").

[47] *Bestwall*, 605 B.R. at 45; *In re Aldrich Pump LLC*, No. 20-30608, 2021 WL 3729335, at *43 (Bankr. W.D.N.C. Aug. 23, 2021).

[48] *See Declaration of Robert J. Panaro in Support of First Day Pleadings* [Doc. No. 24] (the "2020 Panaro Declaration"), ¶ 9; *History*, CERTAINTEED, https://www.certainteed.com/about-us/history (last visited Jan. 13, 2026).

[49] *See History*, CERTAINTEED, https://www.certainteed.com/about-us/history (last visited Jan. 13, 2026).

[50] *See Our History of Innovation,* SAINT-GOBAIN N. AM., https://www.saint-gobain-northamerica.com/who-we-are/history (last visited Jan. 13, 2026). CSG's history can be directly traced to the 1600s. *See Our History*, SAINT-GOBAIN, https://www.saint-gobain.com/en/group/our-history (last visited Jan. 19, 2026).

[51] *See* Panaro 2020 Declaration, ¶ 9.

[52] *See id.*

      *ii.  Old CT's Asbestos Products*

13.     Old CT manufactured and sold various products in the construction and building industries, some of which contained asbestos.[53] Old CT's most prominent products underpinning its asbestos litigation are Old CT's (1) asbestos cement pipe ("AC Pipe") and (2) asbestos-containing asphalt roofing products ("Asphalt Roofing Products").[54] Old CT manufactured and sold AC Pipe from 1962 to 1993, during which time it was aware of the AC Pipe's capacity for harm but was allegedly operating under the now-debunked belief that any such harm could be controlled.[55] Old CT manufactured and sold most of its Asphalt Roofing Products until the mid-1970s but continued to sell some of these products until the mid-1980s. Old CT was aware of the

---

[53] *See* Injunction Order, ¶ 6 (citing Starczewski Decl. ¶ 8).

[54] *See* DBMP's Information Brief, p. 1. Although Old CT sold a few other asbestos-containing products until the mid-1970s, such products "figured far less prominently in the litigation against Old CT than AC Pipe and [A]sphalt [R]oofing [P]roducts." *See id.*, pp. 14–15.

[55] *See id.*, p. 4. One fact that aggravates Old CT's culpability for its asbestos liability is that Old CT deliberately designed its AC Pipe to contain crocidolite fibers beginning in the early 1970s despite knowing that these fibers were far more harmful than other options but choosing them nonetheless in service of the bottom line. *See id.* & p. 4. n. 8 (noting how Old CT's AC Pipe contained 10% to 15% crocidolite fibers after Old CT attempted to manufacture AC Pipe using only chrysotile fiber but decided that chrysotile-only AC Pipe was not lucrative enough due to "quality issues" and that AC Pipe was "not… strong enough").

     However, various facts also mitigate Old CT's asbestos culpability, at least in comparison to other asbestos defendants. First, these crocidolite fibers were encapsulated in cement, which one researcher asserted as late as the 1970s precluded harmful exposure. *See supra* note 12; DBMP's Information Brief, p. 8. Second, the number of possible individuals exposed to asbestos from Old CT's AC Pipe is fewer than those for other asbestos defendants. *See id.*, p. 8 (noting how the number of individuals potentially exposed to asbestos from Old CT's AC Pipe, somewhere above a thousand and below twenty thousand, is thus between less than a hundredth and a fifth of the number of individuals exposed by a different notable asbestos defendant's products). Third, any actual exposure from Old CT's AC Pipe (1) occurred through practices evaluated as (a) causing exposure that was potentially not ubiquitous or (b) causing exposure within federal limits as late as the late 1970s, and (2) was potentially minimized due in part to actions Old CT took. *See id.*, pp. 6–8. Similarly, after some buyers of AC Pipe, including buyers of Old CT's AC Pipe, began utilizing cutting practices for AC Pipe in the early to mid-1970s that increased exposure beyond the federal guidelines (which would eventually ban such practices outright in the mid-1980s), Old CT took steps in the late 1970s and early 1980s to discourage these practices by disseminating warnings about the increased danger within the industry and placing a warning label on its AC Pipe. *See id.,* pp. 8–11.

13

Asphalt Roofing Products' potential for harm during this time but allegedly believed that any such harm was unlikely or minimal because such products were designed to contain only chrysotile fibers encapsulated in asphalt, and some research as late as the 1990s suggested that this design would have precluded or sufficiently minimized exposure.[56]

### iii. Old CT's Early Claims

14. Although Old CT began facing asbestos claims in the 1970s, the cost of these claims remained relatively low through the end of the 1990s.[57] During this period, Old CT participated in various collective efforts by asbestos defendants to resolve their asbestos claims, including membership in CCR.[58] However, Old CT's claim payouts were proportionately low in comparison to other CCR defendants.[59]

15. Old CT's asbestos liabilities increased dramatically around 2002 after the CCR dissolved, because Old CT remained in the tort system and did not seek bankruptcy protection,

---

[56] *See id.*, pp. 11–13. *See id.*, pp. 13–14 (quoting ANDERSON, P.H. ET AL., U.S. ENV'TAL PROTECTION AGENCY, SRI INTERNATIONAL, ANALYSIS OF FIBER RELEASE FROM CERTAIN ASBESTOS PRODUCTS 39 (1982); 2 DUPRE, J. STEPHAN ET AL., ROYAL COMMISSION ON ASBESTOS IN ONTARIO, REPORT OF THE ROYAL COMMISSION ON MATTERS OF HEALTH AND SAFETY ARISING FROM USE OF ASBESTOS IN ONTARIO 633 (1984); GOOD, WILLIAM A., NATIONAL ROOFING CONTRACTORS ASSOCIATION, OBJECTIVE DATA DEMONSTRATION FOR CERTAIN ROOFING MATERIALS AND OPERATIONS UNDER OSHA'S 1994 ASBESTOS STANDARD 2-3 (Dec. 14, 1994); *Occupational Exposure to Asbestos; Corrections*, 60 Fed. Reg. 33,974, 33,976 (June 29, 1995) (codified at 29 C.F.R. pts. 1910, 1926); and *Asbestos Information Ass'n/North America v. Reich*, 117 F.3d 891, 893 (5th Cir. 1997) ("[T]here is no evidence in the record that asbestos fibers ever escape from roofing sealants and become airborne; in fact, the evidence indicates that they cannot.").

[57] *See id.*, p. 15 ("In the 1990s, Old CT spent less than $10 million per year—and usually substantially less—in indemnity to resolve mesothelioma claims.").

[58] *See id.*, p. 15 (describing how Old CT was a member both of the Asbestos Claims Facility during its short lifespan and of the CCR from 1988 to 2001).

[59] *See id.*, pp. 15–16 (describing Old CT as "a minor defendant in the CCR" whose "share of [] cases settled by the CCR was less than 3%" "[f]rom 1990 to 2001," and who "participated in the settlement of approximately 200 [] cases per year").

14

unlike most CCR defendants.[60] In the years immediately prior to the Petition Date, suits against Old CT represented a majority of all asbestos claims in the United States.[61]

16.      Although Old CT managed to resolve many of these claims, they generated large defense costs,[62] allegedly forcing Old CT to settle "with little, if any, consideration for the merit[s] … [t]o minimize [its] costs."[63] From 2002 to 2019, Old CT incurred between $80 million and $160 million annually in asbestos liability costs, totaling approximately $1.5 billion.[64] As of the Restructuring Date (as defined herein), Old CT faced approximately 60,000 active asbestos-related claims pending on court dockets.[65]

### iv.  Old CT Immediately Prior to the Restructuring

(1)   Corporate Structure, Liabilities, and Assets

17.      Sometime after 1988 and prior to the Restructuring Date, CSG formed a subsidiary, Saint-Gobain Corporation ("SGC") as an intermediate parent of CSG's North American

---

[60] *See id.*, pp. 16–17 (discussing how the number Old CT's asbestos claims increased by approximately 750% in the first two years after the CCR dissolved compared to the number of claims in the 1990s, and how although this number did decrease in the mid-2000s, it is still approximately 600% greater than Old CT's number in the 1990s).

[61] *See* Panaro Declaration, ¶ 29.

[62] *See id.*, p. 17 (discussing how, for most of Old CT's asbestos claims after 2001, Old CT managed to get approximately 60% dismissed and settled approximately 20% for less than $50,000, and of those claims that went to trial, although Old CT won most, "the cost of defending [] through trial was extremely high").

[63] *See id.*, p. 17.

[64] *See id.*, pp. 17–18; Panaro Declaration ¶ 27. The Defendants also claim that these costs were exacerbated by at least some Plaintiffs prosecuting claims against Old CT without legal basis or through suspect methods. *See* DBMP's Information Brief, pp. 18–24; Panaro Declaration ¶ 26 (stating that (1) "[i]n many other cases,… , the plaintiff's identification of Old CT's product was proven false after investigation by Old CT, but often only after substantial defense costs were incurred," (2) he suspects "Old CT's products were falsely identified in many other cases, although Old CT did not search for or did not," and (3) "Old CT was sued in certain cases where the plaintiffs did not disclose, or did not fully disclose, their potential exposure to asbestos-containing products of bankrupt manufacturers").

[65] *See* DBMP's Information Brief, p. 2; Panaro Declaration, ¶ 28.

subsidiaries, including Old CT.[66] By the Restructuring Date, Old CT's direct parent was the Saint-Gobain Delaware Corporation ("SGDC"),[67] whose direct parent was and is SGC.[68] Additionally, as of the Restructuring Date, Old CT and multiple affiliates and subsidiaries comprised what was called CertainTeed Enterprises ("CT Enterprises").

18.     Prior to the Restructuring Date, Old CT's assets totaled around $3 billion, whereas its liabilities were estimated at half that amount.[69] Additionally, sometime prior to the Restructuring Date, Old CT acquired a manufacturing plant located in Claremont, North Carolina (the "North Carolina Plant").[70]

(2)   Personnel

19.     SGC and Old CT, either directly or through subsidiaries, employed various individuals during and throughout the relevant pre-Restructuring period who would either (1) serve as corporate representatives to the Court and as witnesses during these Proceedings, or (2) otherwise become relevant to the Proceedings, with many becoming particularly relevant to the discovery disputes.

20.     Two individuals have occupied the roles of Chief Executive Officer ("CEO") for Old CT and SGC during the relevant period. First, Tom Kinisky served as SGC's CEO and President since 2017, as well as on CSG's management committee; additionally, Mark Rayfield was appointed CEO of Old CT, and in early 2019, Rayfield replaced Kinisky as SGC's CEO.[71]

---

[66] *Cf.* Injunction Order, ¶ 39; *In Re Application Pursuant to 28 U.S.C 1782 of SGC to take discovery of Corning Incorporated*, 5:21-cv-00320-DCR (E.D. Ky. Dec. 27, 2021), Doc. No. 7, p. 1.

[67] *See* Injunction Order, ¶ 50.

[68] *Cf. Chizniak v. Certainteed Corp.*, 1:17-CV-1075 (N.D. N.Y. Jan. 30, 2020), Doc. No. 53, p. 2.

[69] *See* Injunction Order, ¶ 50.

[70] *See* Injunction Order, ¶ 51.

[71] SAINT-GOBAIN N. AM., *Tom Kinisky Named President and CEO of Saint-Gobain North America*, https://www.saint-gobain-northamerica.ca/node/728 (last visited Jan. 14, 2026).
  Additionally, M. Mark Rayfield was appointed CEO of Old CT, and in early 2019, Rayfield replaced Kinisky as SGC's CEO. Thus, Rayfield served as the CEO of both SGC and Old CT

Thus, Rayfield served as the CEO of both SGC and Old CT simultaneously, while Kinisky remained at SCG in another position.

    b.  The Restructuring

21.    In October 2019, Old CT executed various transactions (the "Restructuring") which shifted Old CT's assets and asbestos liabilities, engendered DBMP and CertainTeed, LLC ("New CT") and led to DBMP filing the Petition.[72]

    i.  *Project Horizon and Planning for the Restructuring*

22.    Planning for the Restructuring began sometime prior to February 2018 under the codename "Project Horizon," which explicitly sought "'[t]o facilitate [Old CT's] ability to pursue a section 524(g) resolution' in bankruptcy 'without subjecting the entire. . . enterprise to chapter 11.'"[73] By early 2019, Project Horizon called for isolating Old CT's asbestos liabilities in a minimally capitalized new entity "that would file bankruptcy."[74]

---

simultaneously, while Kinisky remained at SCG in another position. *Mark Rayfield Appointed CEO of Saint-Gobain North America*, USGLASS MAG. & USGNN NEWS (Mar. 1, 2019), https://www.usglassmag.com/mark-rayfield-appointed-ceo-of-saint-gobain-north-america/. The Court will note that Kinisky passed away May 30, 2025. *See Thomas Kinisky Obituary - Bradenton, FL*, DIGNITY MEM'L, https://www.dignitymemorial.com/obituaries/bradenton-fl/thomas-kinisky-12398480 (last visited Jan. 14, 2026) (obituary). Accordingly, his deposition will not be reconvened, contrary to the Debtor's designation of voluntary reconvening incorporated into Appendix A.

    Mr. Robert Panaro also served in SGC's leadership during this period, first as SGC's Senior Vice-President ("SVP") and Chief Financial Officer ("CFO") since early 2018, then as SGC's SVP and Chief Operating Officer since early 2019. Additionally, M. John Sweeney served as SGC's VP and Treasurer since 2004. Prior to taking on that role, Sweeney had led various offices and divisions of Old CT since 1982 and had been serving as a SGC VP since 1995.

    As to Old CT's leadership during this period, M. Michael Starczewski served as Old CT's Associate General Counsel since 2015 after working for SGC as a Senior Counsel since 2003. M. Joseph N. Bondi served as a VP and group General Manager ("GM") for Old CT since 2018. Additionally, M. Vince Dinenna worked as the Assistant Treasurer for both Old CT since 2009 and SGC since 2007, functioning as Old CT's CFO and assisting SGC's CFO.

[72] *See* Injunction Order, ¶ 37.

[73] *See id.*, ¶ 38 (quoting Rayfield Dep., at 103:7-12, and Starczewski Dep., at 72:16-74:22, Oct. 1, 2020).

[74] *See id.*, ¶ 40 (citation omitted).

23.     Project Horizon was closely guarded,[75] much like the underlying causes for its inception.[76] Project Horizon involved both Old CT's senior management and SGC employees since February 2018 at the latest,[77] but was generally an "attorney-created and implemented strategy" that "was driven not by businesspeople, but by lawyers."[78] Project Horizon meetings discussed the *Garlock* and *Bestwall* evolution in this Court and how a § 524(g) plan could cost less than continuing in the tort system.[79]

24.     Old CT never considered a bankruptcy filing for the entire CT Enterprise since such a filing "would have serious negative consequences" given that CT Enterprise's assets "significantly outweighed its combined operating and asbestos liabilities."[80] Instead, Project Horizon's plan was to put a single affiliate with the asbestos liabilities into Chapter 11 and to seek a § 524(g) injunction protecting the CT Enterprise, similar to *Bestwall* and *Aldrich and Murray*.[81] By April 2019, Project Horizon had earmarked the North Carolina Plant.[82] Ultimately, Mark

---

[75] *See id.*, ¶ 41 (discussing how (1) Old CT's employees working on Project Horizon "were required to sign [NDAs]," (2) "[t]he number of employees privy to [Project Horizon] was initially small," and (3) although this number "grew as [Project Horizon] took shape. . . [L]ower-echelon employees working on certain discrete parts" were unaware of certain aspects of Project Horizon, "such as the involvement of outside counsel" or how it was "to address [Old CT's] asbestos liabilities" (citation omitted)).

[76] *See id.*, ¶ 42 ("As when these meetings began, several CertainTeed business managers learned for the first time about CertainTeed's experience in the tort system.").

[77] *See id.*, ¶ 39 (citation omitted).

[78] *See id.*, ¶ 38; *id.*, ¶ 43 (discussing how at least one lawyer, either in-house or from Goodwin Proctor or Jones Day, attended every meeting (citation omitted)).

[79] *See id.*, ¶ 42 (citation omitted).

[80] *See id.*, ¶¶ 44-45 (citing testimony at a hearing from one of DBMPs' proffered witness, Stephen Coulombe of Berkeley Research Group, LLC, outlining that a hypothetical October 2019 filing for the entire CT Enterprise would (1) financially harm Old CT's trade creditors and vendors, (2) risk Old CT significantly losing sales and customers, (3) likely cause departures of key people, (4) trigger financing defaults under various agreements, and (5) add substantial costs due to case complexity, and discussing how although this is retrospective, Old CT's management would have seen the same risks); *id.*, ¶ 45 ("Coulombe was assessing the situation retrospectively, after this case was filed. However, the landscape would have appeared the same to Old CT's management and directors.").

[81] *See id.*, ¶ 46.

[82] *See id.*, ¶ 51 (citation omitted).

Rayfield, Old CT's sole director, authorized the Restructuring based on the Project Horizon team's advice.[83]

### ii. Implementation/Execution

25.    Old CT used the Texas divisional merger to isolate all asbestos liabilities in DBMP and move nearly all assets and non-asbestos liabilities to New CT, described internally as the "[s]plitting of CertainTeed legal entity… (Carving out two locations to isolate Asbestos liability)."[84] On July 2019, Old CT reserved the name 'DBMP' in North Carolina.[85] On October 22, 2019, SGDC formed CertainTeed Holdings and contributed all of Old CT's stock in exchange for full ownership of CertainTeed Holdings, whereas Old CT converted from a Delaware corporation to a Delaware LLC and formed Millwork & Panel LLC ("Millwork & Panel"), to which it contributed (1) a North Carolina bank account containing approximately $25 million, (2) the North Carolina Plant, and (3) another manufacturing plant in Georgia.[86]

26.    On October 23, 2019 (the "Restructuring Date"), 9:00 a.m. Central Time, Old CT became a Texas LLC.[87] At 9:30 a.m., Old CT executed a divisional merger under the Texas Business Organizations Code, creating New CT and DBMP and terminating Old CT's existence.[88] The plan of the Restructuring gave New CT approximately 97% of Old CT's assets, most operations, and all employees.[89] DBMP received approximately 3% of Old CT's assets (including approximately $25 million in cash and Millwork & Panel equity), "no operating business or employees" "[a]part from its [Millwork & Panel] subsidiary," and "all of [Old CT's] asbestos

---

[83] *See id.*, ¶ 48 (citation omitted).
[84] *See id.,* ¶ 49 (citation omitted).
[85] *See id.*, ¶ 50.
[86] *See id.*, ¶ 50-51.
[87] *See id.*, ¶ 52 (citation omitted).
[88] *See id.*, ¶ 52 (citation omitted).
[89] *See id.*, ¶¶ 53-54.

liabilities."[90] DBMP also received the purported funding under the Funding Agreement, as well as a purported obligation to indemnify New CT and hold it harmless from and against all losses relating to those liabilities.[91] Thus, DBMP is "but a holding company"[92] that, absent the Funding Agreement, had "assets [that] were not then, and are not now, sufficient to satisfy its liabilities."[93]

27.     At 10:00 a.m. on the Restructuring Date, New CT converted to a Delaware LLC, and at 12:49 p.m., DBMP converted to a North Carolina LLC.[94] None of these entities gave notice to their asbestos creditors as to the Restructuring.[95] This Court described the Restructuring as "unorthodox" and without "any precedent or business rationale" absent "a few recent asbestos cases (four currently pending in this District)."[96] Since the Restructuring, New CT has continued to make and sell Old CT's legacy products and to pay non-asbestos creditors in the ordinary course.[97] DBMP and New CT contend that the Restructuring was intended to give DBMP the same ability to fund the defense and resolution of present and future asbestos claims in court and in any Chapter 11 via the Intercompany Agreements (as defined below) executed at the time.[98]

### iii. Agreements

28.     In furtherance of the divisional merger, Old CT drafted several Intercompany Agreements (as defined below) among the not-yet-formed DBMP, New CT, their prospective successors, and certain other affiliates. All agreements were dated "as of" the Restructuring Date and purported to establish contractual relationships and obligations between the entities. These

---

[90] *See id.*, ¶¶ 53-54.
[91] *See id.*, ¶¶ 53-54.
[92] *See id.*, ¶ 53.
[93] *See id.*, ¶ 57.
[94] *See id.*, ¶ 55.
[95] *See id.*, ¶ 59.
[96] *See id.*, ¶ 59.
[97] *See id.*, ¶ 60.
[98] *See id.*, ¶ 61.

were not arm's-length agreements, as they were "negotiated" by Old CT and CT Holdings for entities that did not yet exist and were later revised and ratified by New CT through signatories serving both entities or their parent.[99] These agreements, among others, include the Funding Agreement, the Support Agreement, the Secondment Agreement, and various Millwork and Panel Agreements (all defined in the Injunction Order, and collectively, the "Intercompany Agreements").

29.     Importantly, the Funding Agreement provides that New CT will transfer funds to DBMP for any "Permitted Funding Use," defined to include (1) Chapter 11 administrative costs, (2) amounts necessary to satisfy DBMP's "Asbestos Related Liabilities" in connection with funding a § 524(g) trust, and (3) DBMP's indemnification obligations to New CT under agreements in the Funding Agreement.[100] As this Court found, the Funding Agreement is not a loan: there is no repayment obligation nor a cap.[101]

30.     However, the funding pursuant to the Funding Agreement as executed is contingent in at least six ways. First, two of the Permitted Funding Use obligations depend on Millwork & Panel's cash distributions' insufficiency, and one obligation depends on DBMP's other assets' insufficiency and may require DBMP's liquidation.[102] Second, New CT is obligated to DBMP, wherefore only DBMP can enforce the Funding Agreement.[103] Third, the Funding Agreement limits New CT's obligations to costs that are "necessary or appropriate," a vague standard with no specified categories and no dispute-resolution mechanism if New CT denies a request from

---

[99] *See id.*, ¶ 63.
[100] *See id.*, ¶ 66.
[101] *See id.*, ¶¶ 67-68.
[102] *See id.*, ¶ 68.
[103] *See id.*, ¶ 69 (pointing out how since DBMP has no employees of its own and relies on personnel borrowed from SGC, if necessary, SGC officers would be enforcing DBMP's rights against an SGC affiliate).

DBMP.[104] Fourth, the Funding Agreement is assignable only with the counterparty's consent, so assignment under a creditor plan could not occur without New CT's approval.[105] Fifth, New CT will fund any plan only if it receives § 524(g) relief, an unresolved question.[106] Sixth, DBMP's access to funding also depends on New CT's continued financial health: the obligations are unsecured, not guaranteed by SGC or CSG, and New CT remains free to incur senior debt, forgive material intercompany receivables (including from SGC and CSG), merge or consolidate, transfer substantially all assets, and pay dividends to its parent, CT Holdings.[107]

31.     Originally drafted and executed by their predecessors, the Support Agreement was later assigned to and ratified by DBMP and New CT.[108] It requires DBMP to indemnify and hold New CT harmless from all asbestos-related "Losses" and "Proceedings" to which New CT may become subject, even though DBMP received few of Old CT's assets but all of its asbestos liabilities, while New CT inherited nearly all of the same's assets, operations, and employees.[109] If Millwork & Panel's cash distributions are insufficient for DBMP to meet its indemnity obligations, the Funding Agreement compels New CT to provide funds to DBMP so DBMP can indemnify New CT, creating a circular transfer of money: should DBMP's cash flow prove inadequate, New CT supplies the very funds that DBMP then pays back to New CT on the effective date of a confirmed Chapter 11 plan.[110] As this Court described, the Support Agreement "is an unorthodox transaction with no apparent business purpose other than facilitating this bankruptcy and securing injunctive relief for the Protected Parties."[111]

---

[104] *See id.*, ¶ 70.
[105] *See id.*, ¶ 71.
[106] *See id.*, ¶¶ 72-74.
[107] *See id.*, ¶¶ 75-77.
[108] *See id.*, ¶ 78.
[109] *See id.*, ¶ 78.
[110] *See id.*, ¶¶ 79-80.
[111] *See id.*, ¶ 81.

32.     Additionally, Old CT structured DBMP to have no employees or operations and drafted a Secondment Agreement with SGC to second five individuals to work for DBMP.[112] Old CT also caused DBMP to enter into a Contribution Agreement, a Sales and Marketing Agreement, an IP License Agreement, and a Secondment Agreement with its subsidiary, Millwork & Panel.[113] Under the Secondment Agreement, all of Old CT's former employees and New CT's current employees at the North Carolina and Georgia plants that were transferred to Millwork & Panel were seconded to the same.[114] Post-merger, New CT is Millwork & Panel's only customer, and the prices at which Millwork & Panel supplies goods to New CT are fixed by the Sales and Marketing Agreement.[115]

### iv. Personnel

33.     DBMP has no employees or operations; its activities are limited to managing asbestos liabilities and overseeing its equity interest in Millwork & Panel. The majority of DBMP's board owes duties to both SGC and New CT.[116]

### c.   Post Restructuring Events to DBMP's Filing

34.     On January 23, 2020 (the "Petition Date"), ninety-one days after its creation, DBMP filed a voluntary Chapter 11 petition (the "Petition") in this Court, which initiated the Base

---

[112] *See id.*, ¶¶ 82-83.
[113] *See id.*, ¶ 84.
[114] *See id.*, ¶ 85.
[115] *See id.*, ¶ 85.
[116] *See id.*, ¶¶ 87-88. DBMP's board consists of three board members: Joseph Bondi, Sean Knapp, and Lawrence Rayburn. *Id.* Both Bondi and Knapp are SGC employees, and Bondi is also the president of both DBMP and Millwork & Panel, as well as a vice president of New CT. *Id.* Most of DBMP's C-suite owe duties to SGC and New CT as well: Vincent DiNenna III is DBMP's treasurer and an assistant treasurer for of SGC and New CT, Donald J. Melroy is an assistant treasurer for DBMP, SGC, and New CT, and Robert J. Panero is DBMP's Chief Restructuring Officer and Vice President, as well as a Senior Vice President and the Chief Operating Officer of SGC. *Id.* Michael Starczewski is DBMP's Vice President, Secretary, and Chief Legal officer, and is ostensibly unaffiliated with any of DBMP's affiliates. *Id.* Starczewski is the only one of DBMP's three employees who works full-time on DBMP matters; the others devote one-third of their time or less to DBMP. *Id.*

Case. The DBMP Board met six times between the Restructuring Date and Petition Date. One of those meetings occurred on January 22, 2020, the night before the Petition Date.[117]

35.     Since the merger, New CT has essentially continued Old CT's business—producing the same products, using the same executive team, and operating from the same facilities—and Project Horizon has had no net effect on its operations.[118] To date, New CT has honored the Funding Agreement; as of February 18, 2021, it has funded all of DBMP's requests (primarily bankruptcy administrative costs) totaling $64.5 million.[119] It has also affirmed its commitment to future contractual obligations under the Funding Agreement, including any authorized requests to fund a § 524(g) trust under a confirmed Chapter 11 plan.[120] Currently, New CT has the financial capacity to do so, as shown by its substantial owners' equity and profitable operations.[121]

36.     Following the Restructuring, individual asbestos claimants began naming New CT and other non-debtor affiliates in newly filed or previously filed DBMP asbestos claims.[122] More than 170 complaints or amended complaints were filed in the roughly three months between the Restructuring and the Petition Date, and another 40 were filed after.[123] At least one complaint asserts an alter-ego theory, and others allege the Restructuring was a fraudulent conveyance.[124]

---

[117] *See id.,* ¶ 90.
[118] *See id.,* ¶ 107.
[119] *See id.,* ¶ 108.
[120] *See id.,* ¶ 109.
[121] *See id.,* ¶ 109.
[122] *See id.,* ¶¶ 110-111.
[123] *See id.*
[124] *See id.,* ¶ 112.

### D.  **Procedural History of the Case**

#### 1.  **DBMP's Early Filings**

37.     On the Petition Date, in addition to the Petition and Injunction Proceeding complaint,[125] *inter alia*, DBMP made three informational filings: (1) an information brief on the history of Old CT, its asbestos liability, and the Restructuring,[126] (2) a declaration from Panaro,[127] and (3) a declaration from Starczewski.[128] The Injunction Motion contained three prayers for relief, two of which were in the alternative: either (1) an injunction enjoining any claimant from pursuing their asbestos claims against any affiliate while the Base Case remains pending[129] or (2) a declaration that any claimant so doing would violate the automatic stay under 11 U.S.C. § 362(a);[130] and (3) a temporary restraining order ("TRO") prohibiting such action until the Court had decided the merits of the Injunction Motion Prayers.[131] The Court appointed the ACC on February 14, 2020,[132] and the FCR on June 1, 2020.[133]

#### 2.  **Early Discovery**

38.     On June 25, 2020, the Court entered a case management order related to the Injunction Motion, which set deadlines for the completion of document productions and

---

[125] *Motion for Preliminary Injunction /Motion of the Debtor for an Order (I) Preliminarily Enjoining Certain Actions Against Non-Debtors Or, (II) In the Alternative, Declaring that the Automatic Stay Applies to Such Actions and (III) Granting a Temporary Restraining Order Pending a Final Hearing on the Merits* [Inj. Adv. Pro. Doc. No. 2] (the "Injunction Motion").

[126] *See Informational Brief of DBMP LLC* [Doc. No. 22] (the "DBMP's Information Brief").

[127] 2020 Panaro Declaration.

[128] *Declaration of Michael T. Starczewski in Support of Complaint for Injunctive and Declaratory Relief and Related Motions* [Inj. Adv. Pro. Doc. No. 3] (the "2020 Starczewski Declaration").

[129] *See* Injunction Complaint, ¶¶ 27–38.

[130] *See id.*, ¶¶ 39–45.

[131] *See id.*, ¶¶ 46–48.

[132] *See Order Appointing the Official Committee of Asbestos Personal Injury Claimants* [Doc. No. 155].

[133] *See Order Granting Motion Appointing Sander L. Esserman as Legal Representative for Future Asbestos Claimants* [Doc. No. 310].

depositions by the end of the summer and set a hearing on the Injunction Motion in early September.[134] However, after DBMP was unable to meet these deadlines and after disagreement on how to proceed,[135] the Court entered an amended case management order on September 3, 2020, extending the deadlines and resetting the Injunction Motion hearing for mid-December.[136] During briefing, DBMP asserted it was hampered by extensive privilege considerations given how privilege inhered in the facts for which the Plaintiffs sought discovery.[137]

39.     Prior to the consent orders, on June 19, 2020, DBMP provided the Plaintiffs with an initial privilege log (the "Original Privilege Log"), which included the common interest agreements (the "Common Interest Agreements") as protected by attorney-client privilege.[138] The Original Privilege Log identified these agreements only by the privilege claimed, the general agreement type, and the obliged parties.[139] After the Plaintiffs argued with DBMP over several

---

[134] *Case Management Order.* [Inj. Adv. Pro. Doc. No. 79] p. 3, decretal ¶¶ 2–3.

[135] *See Motion for Entry of Case Management Order* [Inj. Adv. Pro. Doc. No. 100], ¶ 17 (providing DBMP's email outlining that they expected to be able to provide all documents by the end of August and a privilege log by the end of September); *id.,* ¶¶ 19–27 (outlining the Plaintiffs' rejection of DBMP's postponement of the hearing to mid-January and DBMP's rejection of the Plaintiffs' counter of postponing to mid-November); *id.,* ¶¶ 2–3 (accusing DBMP of seeking unfair delay in order to "convert the interim preliminary injunction into a more long-lasting one"); *Response /Objection of the Debtor to Motion of the Official Committee of Asbestos Claimants for Entry of Case Management Order* [Inj. Adv. Pro. Doc. No. 108] ("DBMP Objection to the Case Management Motion"), ¶ 4 (asserting that postponement was required for DBMP to comply due to Plaintiffs' "broad and burdensome discovery requests").

[136] *Amended Case Management Order* [Inj. Adv. Pro. Doc. No. 115], pp. 2–4, decretal ¶¶ 2, 7, & 10–14.

[137] *See* DBMP Objection to the Case Management Motion, ¶ 8 ("The Debtor now continues its work to prepare and serve the balance of its rolling privilege log installments. This effort, too, will not be small. Requests that go to the purpose of a corporate restructuring or the plans for a bankruptcy filing are matters that, not surprisingly, involve the work of and a material number of communications with counsel.").

[138] *See Joint Motion of the Official Committee of Asbestos Personal Injury Claimants and the Future Claimants' Representative to Compel the Production of Common Interest and Confidentiality Agreements* [Inj. Adv. Pro. Doc. No. 134] (the "Plaintiffs 2020 Motion to Compel Document Production"), ¶ 13.

[139] *See id.*

weeks as to the sufficiency of these agreements' privilege designations, DBMP persisted in its claim but amended the designations to also claim work product protection.[140]

40.    Following these discussions, the Plaintiffs made their first of many attempts during these Proceedings to pierce DBMP's privilege. On October 9, 2020, Plaintiffs moved to compel production of the Common Interest Agreements or, alternatively, for an in camera review to determine whether the agreements were indeed privileged, and, if so, whether "any privilege has been waived or otherwise is inapplicable," for which the Plaintiffs could present arguments.[141] The Plaintiffs argued that review or outright production of these agreements was warranted because (1) the designations' detail did not satisfy DBMP's obligations for a privilege log,[142] (2) common interest agreements are generally not privileged,[143] and (3) the Plaintiffs needed these agreements to sufficiently litigate the Proceedings.[144] DBMP objected to the Plaintiffs' motion as untimely and both factually and legally incorrect,[145] but independently moved for an in camera review of the

---

[140] *See id.*, ¶¶ 14–16.

[141] *See id.*, ¶¶ 18–19; *see also id.*, ¶ 24 n. 6 (asserting that a detailed privilege log was particularly required here, "where is it likely that certain subjects of legal advice have been put at issue such that any privilege has been waived").

[142] *See id.*, ¶¶ 21–25.

[143] *See id.*, ¶¶ 25–26.

[144] *See id.*, ¶ 25 (noting how these agreements were the only restructuring documents relating specifically to the asbestos claims and the only ones that were withheld, and describing them as "highly relevant" since "the propriety of the arrangement the Debtor and its predecessors engineered to handle asbestos liabilities is at issue").

[145] *See Response /Objection of the Debtor to the Motion to Compel the Production of Common Interest and Confidentiality Agreements* [Inj. Adv. Pro. Doc. 140], ¶¶ 1–5, 7, 21–27 (objecting on the basis that (1) the Plaintiffs' 2020 Motion to Compel Document Production was untimely as it was filed too long after receipt of the initial privilege log, (2) the privilege designations as to the Common Interest Agreements were sufficient under applicable law as evinced by the fact that Plaintiffs were able to challenge such privilege claims, (3) the agreements were properly asserted as protected by privilege since they were prepared in anticipation of litigation, and (4) the Plaintiffs had failed to show these agreements' relevancy since the Plaintiffs had access to DBMP's First Day Filings, which primarily concerned the asbestos claims, as well as three restructuring agreements which made at least one reference to the same).

Common Interest Agreements to corroborate DBMP's assertions.[146] After granting DBMP's request and conducting this review,[147] the Court denied the Plaintiffs' motion.[148] Two weeks later, on November 17, 2020, the Court entered a second amended case management order extending the deadline for the depositions by two months and resetting the hearing for early March 2021.[149]

41.    On December 1, 2020, the Plaintiffs filed their second motion to pierce DBMP's privilege.[150] Specifically, they moved for the Court to (1) appoint a discovery mediator to resolve privilege disputes between the parties, or (2) in the alternative, to (a) require full responses from DBMP as to the requests they deemed overbroad, and (b) overrule the privilege claims as to the depositions and the document productions.[151] Plaintiffs argued that DBMP (1) waived any privilege by either (a) having "put[] its attorney-client communications at issue" or (b) having "shared the information with outside parties," or that (2) DBMP's privilege was otherwise excepted on the basis of either (a) the crime-fraud exception or (b) DBMP having not conducted a thorough search for relevant documents, wherefore DBMP should be compelled to provide a more detailed privilege log.[152]

---

[146] *See* Ex Parte Motion *of the Debtor to Submit Common Interest and Confidentiality Agreements for In Camera Inspection* [Inj. Adv. Pro. Doc. No. 139].

[147] Ex Parte Order *Granting In Camera Inspection of Common Interest and Confidentiality Agreements* [Inj. Adv. Pro. Doc. No. 141].

[148] *See Order Denying Plaintiffs 2020 Motion to Compel Document Production* [Inj. Adv. Pro. Doc. No. 153]; *Transcript for Hearing/Trial held on 10/23/2020* [Inj. Adv. Pro. Doc. No. 149], 15:7–15:14 (describing the Court's review of the Common Interest Agreements as displaying that DBMP's description "properly characterized" the agreements since they contain "no extraneous agreements" and are "purely joint defense agreements" which incorporate "no settlements," "tolling arrangements," or "other business matters," and "don't serve multiple purposes").

[149] *Second Amended Case Management Order* [Inj. Adv. Pro. Doc. No. 160, pp. 2–4, decretal ¶¶ 2–7 & 9.

[150] *See Motion for an Order [I] Appointing a Discovery Mediator to Resolve Discovery Disputes; or, in the Alternative, [II] for an Order [A] Compelling Production of Documents, [B] Propounding Additional Deposition Testimony, and [C] Producing a Privilege Log That Complies With Applicable Rules; and [III] for Related Relief* [Inj. Adv. Pro. Doc. 164] (the "2020 Privilege Motion").

[151] *See* 2020 Privilege Motion, p. 13.

[152] *See id.*

42.     On December 23, 2020, the Plaintiffs withdrew their 2020 Privilege Motion because there was insufficient time prior to the upcoming Injunction Motion hearing for a resolution or hearing on the motion, and even less so for the disclosure and review of materials should the Court ultimately grant such motion.[153] However, the Plaintiffs reserved the right to renew the 2020 Privilege Motion or reraise any similar arguments, including at the Injunction Motion hearing.[154] On January 7, 2021, DBMP filed a response to this withdrawal reserving its right to object to any such reraising as untimely and disputing assertions made in the 2020 Privilege Motion and its withdrawal.[155]

43.     On February 24, 2021, the Plaintiffs filed motions in limine to preclude Defendants' testimony relating to the purpose and motives underlying the Restructuring and Funding Agreement.[156] Plaintiffs argued that Defendants' counsel improperly instructed the Defendants' representatives not to answer questions regarding these transactions[157] such that if Defendants provided witness testimony on such matters it would allow the Defendants to use attorney-client privilege as both a sword and shield.[158] On February 24, 2021, DBMP objected to Plaintiffs' limine

---

[153] *See Notice of Withdrawal of Document* [Inj. Adv. Pro. Doc. No. 186], pp. 1–2.

[154] *See id.* (stating that the Plaintiffs would continue to "urge [DBMP] to meet its outstanding discovery obligations and the burdens it voluntarily assumed when it chose to move this Court for a preliminary injunction" and reserving the right to argue at the Injunction Hearing that DBMP not having done so meant it failed to satisfy its burden).

[155] *See Response of the Debtor to Notice of Withdrawal of Discovery Related Motion* [Inj. Adv. Pro. Doc. No. 187], ¶¶ 3–5 (asserting that the insufficient time for resolving the 2020 Privilege Motion was DBMP's and rejecting that DBMP needed "urging" to do so since it had timely complied with all its discovery obligations).

[156] *See Motion in Limine to Preclude Certain Witness Testimony Regarding the 2019 Corporate Restructuring and Funding Agreement* [Doc. No. 240]; *Motion in Limine to Exclude Expert Testimony by Charles E. Bates* [Doc. No. 241]; *Motion in Limine Regarding the Debtor's Declarations in Support of Motion for Preliminary Injunction* [Doc. No. 242].

[157] *See id.* at p. 2.

[158] *See id.* at p. 3.

motions[159] arguing that excluding evidence is a remedy only available after a party disobeys a

discovery dispute that had been fully litigated and decided, which is not the case here, [160] and that

the limine motions are untimely and meritless.[161]

44.    A hearing was held from March 1 to March 3, 2021, on several issues including the

limine motions. On July 20, 2021, the Court granted the Plaintiffs' motion and the Defendants'

request, admitting the deposition testimony of Amiel Gross, former in-house counsel at SGC, and

the rebuttal declaration of Starczewski.[162]

### 3.   The Injunction Proceeding

a.   Defendants Submissions on the DBMP's Filing Decision

45.    In DBMP's early informational filings, DBMP made various assertions regarding

the purposes behind the Restructuring and the decision for DBMP to file for bankruptcy.

Specifically, DBMP asserted (1) that Old CT executed the Restructuring "to provide [] flexibility

[in] address[ing] its asbestos-related claims" through various possible options, including, but not

limited to, DBMP filing for bankruptcy,[163] and (2) that "DBMP, through its board of managers,

ultimately chose to seek such resolution" "[a]fter considering the circumstances."[164] Further, on

---

[159] *See Response /Debtor's Opposition to Official Committee of Asbestos Personal Injury Claimants' and Future Claimants' Representative's Motion in Limine to Preclude Certain Witness Testimony Regarding the 2019 Corporate Restructuring and Funding Agreement* [Inj. Adv. Pro. Doc. No. 246]; *(Corrected) Debtor's Opposition to Official Committee of Asbestos Personal Injury Claimants' and Future Claimants' Representative's Motion in Limine to Preclude Certain Witness Testimony Regarding the 2019 Corporate Restructuring and Funding Agreement* [Inj. Adv. Pro. Doc. No. 247].
[160] *See id.* at p. 2.
[161] *See id.* at p. 3.
[162] *See Order Granting Joint Motion to Reopen the Record* [Inj. Adv. Pro. Doc. No. 341].
[163] *See* Panaro 2020 Declaration, ¶ 15; DBMP's Information Brief, p. 25 (stating that Old CT executed the Restructuring "[t]o facilitate its ability to pursue a section 524(g) resolution"); Injunction Complaint, ¶ 15.
[164] *See* DBMP's Information Brief, p. 26; Panaro 2020 Declaration, ¶ 36 (stating that "[a]fter careful consideration of the status of its asbestos litigation and potential options to resolve asbestos-related claims, [DBMP] determined that the filing of a chapter 11 case in this Court was appropriate and

February 23, 2021, in support of their Injunction Motion, the Defendants filed five additional

declarations,[165] repeating the same assertions about DBMP's decision to file for bankruptcy.

   b.   The Injunction Order

   46.   Ultimately, in August 2021, the Court granted the Defendants' Injunction Motion

on the grounds that DBMP met the required factors and made several key findings. First, the Court

found that DBMP appeared to have access to sufficient resources to eventually pay claimants in

whatever trust or plan was established. Second, it found that a successful reorganization of DBMP

using the §524(g) trust mechanism would serve the purpose Congress intended for asbestos

bankruptcies since doing so would provide an efficient and equitable system to resolve tens of

thousands of current and future asbestos claims, rather than leaving those claims to be litigated

individually over time. Third, although it recognized that a preliminary injunction would delay

asbestos claimants from obtaining recoveries in the short term, it characterized this harm as

relatively limited because claimants typically had other defendants in the tort system and the

DBMP trust (once established) would ultimately pay claimant's damages. In the Court's view, this

delay was not an extreme hardship given the framework for paying claims in bankruptcy. Fourth,

---

necessary," and "offered the best alternative under the circumstances — in fact, the only alternative — to permanently, globally and fairly resolve the asbestos claims against it"); Injunction Motion, p. 14 (citing *id.*).

[165] *See Notice of Filing of Declarations in Support of the Debtor's Preliminary Injunction Motion* [Inj. Adv. Pro. Doc. No. 238] (the "Defendants' Second Declarations"). Bates' declaration was attached to the Defendants' Second Declarations as Exhibit A, with an additional Exhibit 1 consisting in an Export Report from Bates, on pp. 3–57 (the "Bates Declaration"), Bondi's declaration was attached as Exhibit B on pp. 58–65 (the "Bondi Declaration"), Panaro's second declaration was attached as Exhibit C on pp. 66–77 (the "Second Panaro Declaration"), Rayfield's declaration was attached as Exhibit D on pp. 78–84 (the "Rayfield Declaration"), and Starczewski's second declaration was attached as Exhibit E on pp. 84–107 (the "Second Starczewski Declaration").

31

the Court expressed concerns about the fairness or good faith of the Restructuring and the Funding Agreement.[166]

47.     Additionally, the Court also rejected the Defendants' filing decision claims as "contrary to the evidence" in the Injunction Order.[167] The Court noted that the Defendants' submissions underpinning their filing decision claims were "largely untested" due to Defendants' privilege claims, but to prevent "further delaying matters to reopen discovery," the Court "disregarded this self-serving testimony to the extent it is inconsistent with other available evidence as to the Defendants' actions and the inferences that flow therefrom."[168]

48.     This Court found that Old CT, spurred by *Bestwall*, was exploring transferring asbestos liabilities to a new company that would file for bankruptcy by early 2018 and had engaged Jones Day by June 5, 2019.[169] The Defendants' Texas Two-Step closely tracked Jones Day's strategy employed in *Bestwall* and *Aldrich and Murray*.[170] The Court found that against this backdrop, the claim that bankruptcy was merely one option "strains credulity."[171] At the board meeting held on December 20, 2019, Starczewski outlined three "alternatives": (1) remain in the tort system (the status quo), (2) transfer the asbestos liabilities to a third party, or (3) file Chapter 11 to pursue a 524(g) trust.[172] Transferring the asbestos liabilities to a third party was not seriously considered.[173] Had that been viable, Old CT could have used it instead of the disruptive

---

[166] However, this Court later clarified in a subsequent October 2021 hearing that these critical remarks in the Injunction Order were intended to prompt the parties toward negotiations. This Court indicated those critiques were not binding findings on the merits of the Defendants' Texas Two Step—essentially treating them as dicta.

[167] *See* Injunction Order, ¶ 47; *id.*, ¶ 94.

[168] *See id.*, ¶ 99 (citation modified).

[169] *See id.*, ¶ 100.

[170] *See id.*, ¶ 101.

[171] *See id.*, ¶ 102.

[172] *See id.*, ¶ 103.

[173] *See id.*, ¶ 104.

32

Restructuring; furthermore, following the Texas divisional merger, those liabilities were already isolated in DBMP.[174] Bankruptcy thus remained the only practical path, as DMBP's representatives have acknowledged.[175] Thus, this Court found that the decision to file for Chapter 11 was made before the Restructuring and before DBMP existed.[176]

### c.   Post-Injunction Order and the Three Adversary Proceedings

49.   None of the parties appealed the Court's decision granting the Preliminary Injunction or the denial of stay relief. Instead, the Plaintiffs filed three adversary proceedings challenging aspects of the corporate restructuring that preceded the bankruptcy: (1) the Consolidation Proceeding, which sought to substantively consolidate DBMP with its former parent company (which would effectively undo the separation and avail the parent's assets to asbestos claimants); (2) the Fraudulent Transfer Proceeding, which alleged that the Restructuring was a fraudulent transfer designed to isolate asbestos liabilities in DBMP, leaving that entity insolvent and unable to meet claims; (3) the Fiduciary Duties Proceeding, which alleged breaches of fiduciary duty and civil conspiracy by DBMP's previous and current managers and affiliates in executing the Restructuring (collectively, the "Adversary Proceedings").[177]

50.   On October 25, 2021, the Defendants moved to dismiss the complaint in the Consolidation Proceeding.[178] The Plaintiffs replied on December 3, 2021, arguing that the Defendants' motion should be denied because their complaint for Consolidation Proceeding

---

[174] *See id.*, ¶ 104.

[175] *See id.*, ¶ 105 (citing Rayburn Dep., at 135:11-136:5).

[176] *See id.*, ¶ 106.

[177] As of the time of this order, discovery is ongoing in the Consolidation and the Fraudulent Transfer Proceedings, while the Fiduciary Duties Proceeding is stayed pending an outcome of the Fraudulent Transfer Proceeding.

[178] *Motion to Dismiss Adversary Proceeding and Brief in Support* [Consolid. Adv. Pro. Doc. No. 20]; *Motion to Dismiss Adversary Proceeding for Failure to State a Claim Upon Which Relief May Be Granted* [Consolid. Adv. Pro. Doc. No. 21]; *Brief in Support of Motion of the Debtor to Dismiss Adversary Complaint* [Consolid. Adv. Pro. Doc. No. 22].

presents plausible cases for substantive consolidation and unconscionability.[179] DBMP and Old

CT replied on December 12, 2021,[180] and on March 3, 2022, the Court entered an order partially

denying the motion as to the consolidation and partially granting the motion as to the declaratory

judgment of unconscionability.[181] On April 21, 2022, the Defendants filed their answer in the

Consolidation Proceeding, answering and asserting affirmative defenses as to the request for

substantive consolidation.[182]

51.    On May 6, 2022, the Defendants moved to dismiss the Fraudulent Transfer

Proceeding,[183] to which the Plaintiffs objected on June 3, 2022,[184] and for which the Defendants

filed a reply on June 14, 2022.[185] On June 22, 2022,the Court denied the Defendants motion to

dismiss the Fraudulent Transfer Proceeding.[186]

52.    On August 5, 2022, the Defendants filed their answer in the Fraudulent Transfer

Proceeding.[187] In their answer, Defendants argue that even if Plaintiffs' general allegations of fraud

were true, the Bankruptcy Code does not provide a statutory basis for rescinding the Restructuring,

which is the relief Plaintiffs seek.[188]

---

[179] *Response Plaintiffs' Opposition to Defendants' Motions to Dismiss* [Consolid. Adv. Pro. Doc. No. 25].
[180] *Response /Reply in Support of Motion of the Debtor to Dismiss Adversary Complaint* [Consolid. Adv. Pro. Doc. No. 26]; *CertainTeed LLC's Reply in Support of Motion to Dismiss Complaint* [Consolid. Adv. Pro. Doc. No. 27].
[181] *Order Denying in Part and Granting in Part the Motion of the Debtor to Dismiss the Adversary Complaint and CertainTeed LLC's Motion to Dismiss Complaint and Brief in Support* [Consolid. Adv. Pro. Doc. No. 49].
[182] *See Answer to Complaint* [Consolid. Adv. Pro. Doc. No. 76]; *Answer of Defendant CertainTeed LLC to Complaint* [Consolid. Adv. Pro. Doc. No. 77].
[183] *Motion to Dismiss Adversary Proceeding* [Fraud. Transf. Adv. Pro. Doc. No. 38].
[184] *Respect* [Fraud. Transf. Adv. Pro. Doc. No. 58].
[185] *Defendants' Reply in Support of Motion to Dismiss Amended Complaint* [Fraud. Transf. Adv. Pro. Doc. No. 67] (the "Defendants' Reply to Plaintiffs' Objection to Motion to Dismiss Fraudulent Transfer Complaint").
[186] Order Denying Motion to Dismiss Amended Complaint [Fraud. Transf. Adv. Pro. Doc. No. 89].
[187] *See Answer to Amended Complaint* [Fraud. Transf. Adv. Pro. Doc. No. 93].
[188] *See id.* at p. 2.

### 4. The Privilege Motion

53.     While the Injunction Proceeding was progressing, the parties also engaged in discovery. During this discovery, the Plaintiffs requested tens of thousands of documents of which Defendants withheld nearly half, claiming such documents were protected under attorney-client privilege and the work-product doctrine (the "Documents").[189]

54.     Additionally, during this period and for discovery, the Plaintiffs deposed thirteen individuals related to the Defendants (the "Depositions"). During the Depositions, the Defendants gave many instructions to deponents (the "Deponents") not to answer certain deposition questions on the grounds of privilege.

55.     Shortly after the entry of the Injunction Order, the Plaintiffs renewed their privilege challenge on August 23, 2021, by filing the Privilege Motion. The Privilege Motion sought an order "(i) compelling certain discovery pursuant to the crime-fraud exception; (ii) compelling discovery on certain topics because of a waiver of the attorney-client privilege and work product protection . . . , and (iii) granting such other and further related relief."[190] The Plaintiffs argued: (1) that DBMP's bankruptcy filing and the preceding Restructuring were tainted by wrongdoing, such that communications in furtherance of that plan should not be protected by privilege; and (2) that DBMP had waived any applicable privilege by putting certain matters at-issue in the case.

56.     DBMP and some of its non-debtor affiliates (who also held privilege over some documents) opposed the Privilege Motion. They maintained that their privilege assertions were proper and that no waiver or exception applied. On October 4 and 5, 2021, the Court conducted a hearing on the Privilege Motion and took the matter under advisement but gave the parties until

---

[189] *See* Hearing Transcript, at 15:6–9 (Plaintiff's statement).
[190] *See generally* Privilege Motion.

November 4, 2021, to settle the Privilege Motion. On December 16, 2021, the Court conducted a second hearing on the Privilege Motion and continued the matter to January 6, 2022.

57.     After conducting the limited in camera review, the Court indicated at the hearing on October 31, 2022, that the Court was willing to conduct a comprehensive review of the more than 4,000 assertedly privileged materials but acknowledged that such an endeavor would require a herculean effort and would take an extensive amount of time. The Court suggested that it may be appropriate to appoint a referee or mediator to assist with the disputes. The parties met and conferred after the hearing to discuss next steps, including the proposal to appoint a discovery referee.

58.     On January 5, 2022, the Plaintiffs filed a letter "narrow[ing] the relief requested in the . . . [Privilege] Motion."[191] Through the letter, the Representatives suggested that the Court appoint a discovery referee who would review the more than 4,000 documents that the Representatives sought to produce through the Privilege Motion and then "provide a report and recommendation to the Court for the Court's consideration and ruling." *Id.* On January 6, 2022, the Court conducted a third hearing on the Privilege Motion where the parties discussed the idea of appointing a discovery referee. The Court denied the Privilege Motion without prejudice and encouraged the parties to develop a mechanism to resolve the dispute over the assertedly privileged documents, noting that there had been no in camera review at that point. Following this hearing, the parties agreed to allow the Court to conduct an in camera review of a sample of fifty documents.

59.     Initially, the parties agreed that the Court would conduct an in camera examination of a sample set of withheld documents and some excerpts from depositions where privilege had

---

[191] *Letter to The Honorable J. Craig Whitley from counsel to the Official Committee of Asbestos Personal Injury Claimants and counsel to the Legal Representative for Future Asbestos Claimants* [Doc. No. 1280].

been asserted. This sample was meant to give the court a sense of the types of documents being withheld and the legitimacy of the privilege claims. After reviewing the sample, the Court confirmed that continuing to review all disputed documents by itself would be impractical due to the sheer number of materials.

60.     At first, DBMP was cautious about this approach, noting that any referee's role must be clearly limited to avoid infringing on the Court's authority. However, with assurances from the Court that the referee would serve only as an advisor and that the bankruptcy judge would retain full authority and review all recommendations independently, DBMP consented to the appointment of a discovery referee after five hearings on the matter.

### 5.  The Discovery Referee

a.  The Referee Order

61.     After so agreeing, the Parties interviewed multiple candidates before ultimately selecting the Honorable Judge Don Bridges to serve as the Referee.[192] On February 16, 2023, the Court entered an order formally appointing the Referee (the "Referee Appointment Order"), as well as outlining the matters referred for recommendation (the "Reference") and the relevant protocols (the "Referee Protocols").[193] Explicitly, the Reference broadly outlined four disputes between the parties:

---

[192] *See* Hearing Transcript, 23:18–24:5. Judge Bridges is described as a "legal titan in North Carolina" who first had a distinguished 17-year-long career as a trial attorney litigating in a plethora of practice areas, including bankruptcy, before serving as a North Carolina Superior Court judge for 28 years, *see id.*, who thus presumably was no stranger to discovery procedures privilege. *Id.* After retiring, Judge Bridges continues to assist the progress of litigation and has sat on various committees and conferences that regulate or administer court procedures and the practice of law. *See id.*

[193] *See Order Appointing Judge Forrest D. Bridges as Discovery Referee and Establishing Protocol for Resolution of Crime-Fraud/Waiver Motion* [Doc. No. 2290; Consolid. Adv. Pro. Doc. No. 200; Fraud. Transf. Adv. Pro. Doc. Nos. 171 & 172; Fid. Duties Adv. Pro. Doc. Nos. 146 & 146].

- (1) whether the Privilege Log was sufficiently detailed (the "Privilege Log Dispute");
- (2) (a) whether the crime-fraud exception applied to the Privilege Claims, and, if so, (b) which, if any, Documents required any disclosure, in part or in whole, due its application (the "Crime Fraud Dispute"); and
- (3)(a) whether an at-issue waiver as to the Privilege Claims had occurred and, if so, (b) what the scope of such a waiver was, and (c) which, if any, Documents required any disclosure, in part or in whole, pursuant to such a waiver (the "At-Issue Waiver Dispute," and together with the Crime Fraud Dispute, the "Privilege Disputes");[194]

62.     Additionally, although the Referee Appointment Order did not explicitly include within the Reference whether the Deposition Objection validly asserted the privilege (the "Deposition Objection Dispute"), such was (1) evinced by directives for the Parties to provide the Referee with the Depositions and their competing recommendations as to the Deposition Objections,[195] and (2) inherent since any recommendations on the Privilege Legal Disputes for the Documents would likely be applicable to many of the Deposition Objections, given the wide overlap in the underlying facts between the Deposition Objections and the Documents.

b.  Process

63.     The Referee employed multiple law clerks to complete the Reference. The Referee chose to address all Privilege Disputes "simultaneously from the outset," in roughly three steps: (1) as to the Privilege Legal Disputes, by (a) receiving briefing on both the Crime-Fraud Disputes and the At-Issue Waiver Disputes, and then (b) deciding the Privilege Legal Disputes; (2) as to the Documents, by conducting an in camera review of them; then (3) by deciding, based on his decision in the first step, (a) whether the Deposition Objections validly asserted privileged, and (b) whether any privileged Documents required disclosure.[196]

---

[194] *See* Referee Appointment Order, pp. 4–5, decretal ¶ 6.
[195] *See id.* at p. 6, ¶ 9.
[196] *See* First Report, p. 4. However, the Referee also chose to submit recommendations to the Court not in the order of these steps. *See id.*

64.      The Referee started working in late February 2023.[197] After the Referee (1) set preliminary scheduling for resolving the Privilege Disputes and (2) received (a) the relevant filings, (b) the depositions, (c) the Documents, and (d) the Privilege Log as of then,[198] the parties submitted briefing on the Privilege Log Dispute in June and July 2023, and a hearing on this dispute was held in mid-July 2023.[199] The Referee set the briefing scheduling for resolving the Privilege Disputes in early August 2023, the Parties submitted briefing over the next three months, and a hearing was held on it in early November 2023.[200]

c.   The First Report

65.      The Referee filed the First Report on March 4, 2024, about four months after the Referee's second hearing.[201] The First Report contained a main document section proffering various recommendations and three appendices.[202] The First Report addressed only "a portion" of the Privilege Disputes.[203] Specifically, it addressed the Deposition Objections Dispute, but did not address the Privilege Disputes regarding the Documents.[204] The Referee filed the First Report "primarily to recommend that certain depositions be reconvened."[205]

---

[197] *See id.*, p. 4.

[198] *See id.*, pp. 4-5. After initially submitting the Privileged Documents and Privilege Log to the Referee, the Defendants submitted an amended version of the Privilege Log around a month later on April 11, 2023, which (1) withdrew privilege claims as to a number of documents, and (2) revising their privilege designations and redactions for forty-four documents. *See id.*

[199] *See id.*, p. 5.

[200] *See id.*, pp. 5–6.

[201] *Discovery Referee Report and Recommendation No. 1* [Doc. No. 2706; Consolid. Adv. Pro. Doc. No. 216; Fraud. Transf. Adv. Pro. Doc. No. 190; Fid. Duties Adv. Pro. Doc. No. 160].

[202] The First Report provided the First Report Recommendations in the main document section of the First Report on pp. 1–25, the First Report Appendix A on pp. 26–63, its Appendix B on pp. 64–69, and its Appendix C on pp. 70–73 (individually, the "First Report Appendix [#]" or, collectively, the "First Report Appendices").

[203] *See id.*, pp. 2 & 6.

[204] *See id.*, pp. 2 & 6.

[205] *See id.*, pp. 6–7 (asserting that the Referee could and should resolve the Deposition Objection Disputes then in the First Report on roughly two grounds: (1) the matter was ripe as the Parties had submitted full briefing on the Privilege Disputes regarding the Privilege Deposition Objections; (2) further depositions

66. First, the First Report recommended that various Deposition Objections be overruled based on "traditional evidentiary principles."[206] The First Report made this recommendation without addressing the Parties' arguments on the Crime Fraud Dispute and the At-Issue Waiver Dispute as to whether the Defendants had waived or excepted their privilege claims because certain Deposition Objections were simply incorrect as they blocked disclosure of non-privileged information[207] or constituted witness coaching.[208]

67. Second, the First Report considered the At-Issue Waiver Dispute, and, after making recommendations on the legal questions involved,[209] recommended that the Defendants had waived privileged as to the filing intent topic through their DBMP's intent assertion.[210] Although the First Report acknowledged possible disagreement with this recommendation,[211] it still

---

should occur as soon as possible because (a) depositions generally ought to be completed early in discovery, if possible, (b) continued delay could result in the information that further depositions would seek becoming less available or unavailable due to (i) reasonable memory lapse occurring over multiple years or (ii) deponents potentially becoming unavailable all together, and (c) depositions' veracity arises partly from their occurrence before extensive litigation has occurred which can affect or influence the deponents' submissions) (citation modified).

[206] *See id.*, p. 8.

[207] *See id.*, pp. 8-12; *id.*, pp. 20–21.

[208] *See id.*, p. 21. The First Report Appendix A delineated this recommendation against each Deposition Objection.

[209] *See id.*, pp. 12–15 (first canvassing the divide between *Hearn* and *Rhone*, second declaring that *Rhone is* "the appropriate standard" as it "is a more exacting standard that balances protection of attorney-client privilege with an investigation of the truth," and third noting that he "also has considered" *Tackett* and endorses *Tackett*'s resting at-issue waiver analysis on fairness and its desire to prevent objectors from being able to block movants from evaluating assertions the objector affirmatively submitted (all cases defined and discussed below)).

[210] *See id.*, pp. 15–18 (stating that the Defendants making their Only DBMP's Intent Assertion waived privilege as to the Filing Intent Topic since (1) this Court in the Injunction Order rejected the Defendants' Only DBMP's Intent Assertion and found for the Intent Prior to Restructuring Assertion, (2) the Defendants had no reason to make their Only DBMP's Intent Assertion since *Bestwall* blessed the Intent Prior to Restructuring Assertion being the case, and (3) allowing otherwise could effectuate the Defendants being able to make a fraud on the court with false submissions).

[211] *See id.*, p. 18 (stating the Court could reject this recommendation if the Court found that the Filing Intent Topic was "not sufficiently relevant to the issues in this case" or that the Defendants making Only DBMP's Intent Assertions "do not satisfy the Rhone-Poulenc standard").

recommended that Deposition Objections relating to this topic be overruled and Deponents be required to answer the underlying questions.[212]

68.     Lastly, the First Report noted that some of its recommendations on specific Deposition Objections may be unclear but should be deemed as not overruling the objection,[213] and recommended that further depositions "be monitored by a court-appointed proctor to rule on each objection as one is raised" for efficiency due to the Parties' "significantly different views of the standards to be applied" to the Deposition Objections.[214]

69.     On March 20, 2024, the Defendants moved to suspend the deadline for filing any formal objections to the Referee's Report, arguing that the Referee had exceeded his mandate regarding some of the First Report Recommendations while others were just substantively wrong.[215] The Plaintiffs disagreed, arguing that the Referee's findings regarding the deposition objections are ripe for adjudication and that any delay could negatively impact future depositions.[216] The Court ultimately agreed with the Defendants that it would be more efficient to address all of the Referee's findings at once and granted the Defendants' request to postpone any

---

[212] *See id.*, pp. 18–19 (defending this recommendation as to the Deposition Objections blocking questions related to the Filing Intent Topic on the grounds that (1) many were those that the First Report first recommended be overruled as they protected non-privilege information, (2) all prevented the Plaintiffs from obtaining virtually any information from the deponents on this topic, and (3) many constituted witness coaching, although noting the latter two were not always the case). The First Report Appendices B and C delineated this recommendation against each Deposition Objection.

[213] *See id.*, p. 24 (noting that such recommendations either sustained the Defendants' objection or would have recommended overruling but were rendered moot by the underlying questions being asked elsewhere without objection).

[214] *See id.*, p. 25.

[215] *See Motion of DBMP LLC to Suspend the Deadline to Object to Discovery Referee's Report and Recommendation*, p. 14 [Fraud. Transf. Adv. Pro. Doc. No. 240] (arguing that the Referee's First Overruling Objections Recommendations on the basis of "traditional evidentiary principles" (like relevance or form of the question) exceed the Reference as it authorized the Referee to only decide whether privilege had been waiver or excepted).

[216] *See Objection of the Official Committee of Asbestos Personal Injury Claimants and the Future Claimants' Representative to Motion of DBMP LLC to Suspend the Deadline to Object to Discovery Referee's Report and Recommendation*, pp. 2–3 [Fraud. Transf. Adv. Pro. Doc. No. 264].

briefing or rulings on the First Report until the Referee completed his final report covering all Privilege Disputes documents.[217]

d.  The Final Report

70.     On March 7, 2025, the Referee informed the Parties that he had completed a final report and recommendation addressing the remaining matters in the Reference. This report was filed with redactions on April 24, 2025, as the Final Report.[218] The Final Report contained a main document section proffering various recommendations and five appendices.[219]

71.     As to the Privilege Disputes regarding the Documents, the Final Report made recommendations on around 65% of the Documents and provided no recommendations for roughly 1,459 Documents.[220] First, the Final Report recommended disclosure of some of the Documents on grounds similar to the First Report's First Recommendation; namely, that such documents were just not privileged as their content was purely factual or involved non-legal discussions.[221] As to

_____

[217] *See Order Granting Motion of DBMP LLC to Suspend the Deadline to Object to Discovery Referee's Report and Recommendation*, p. 2 [Fraud. Transf. Adv. Pro. Doc. No. 304].

[218] The Parties disputed the procedure for submitting the Final Report to the Court, particularly concerning the disclosure of assertedly privileged and confidential information that may appear in the Final Report, including its appendices. The parties agreed to a briefing schedule on the matter, and the Court conducted a hearing on April 10, 2025. Following the hearing, the Court entered an order requiring that the Discovery Referee submit the unredacted final report and recommendation, including the appendices, to the Court and to the Debtor. The Debtor proposed redactions to the Final Report, not including its appendices, and submitted those proposed redactions to the Court. The Court found the proposed redactions to be appropriate and filed the redacted Final Report and an unredacted Appendix A to the Final Report. The Debtor did not propose any redactions to Appendix A to the Final Report. On June 11, 2025, the Debtor submitted proposed redactions to appendices B through E to the Final Report. The Court reviewed the proposed redactions, required that the Debtor remove some proposed redactions, and then filed the redacted appendices B through E to the Final Report on June 20, 2025.

[219] The Final Report provided the Final Report Recommendations in the main document section of the Final Report on pp. 1–81, and the Final Report Appendices A–E (individually, the "Final Report Appendix [#]" or, collectively, the "Final Report Appendices").

[220] *See Final Discovery Referee Report and Recommendation*, p. 81 [Fraud. Transf. Adv. Pro. Doc. No. 370].

[221] *See id.* at pp. 10–11. (discussing how such documents include those such as an email which might have been between business personnel but lacked any legal advice, or a document which might have already been shared outside the confidentiality of the attorney-client relationship).

the Crime-Fraud Dispute, which the Final Report described as the most difficult of its tasks under the Reference Order, the Final Report did not explicitly recommend any overarching conclusion beyond recommending that if the Court sides with the Plaintiffs on the fraudulent transfer question, than many Documents relating to the Funding Agreement topic are recommended for disclosure.[222] As to the At-Issue Waiver Dispute, the Final Report built on the First Report's recommendations, asserting that the Defendants had waived privilege for any documents regarding the decision for DBMP to file, and recommending such documents be disclosed.[223] The Final Report also addressed a few other discovery topics not explicitly outlined in the Reference Order.[224]

72.    In total, the Final Report recommended that, of the approximately 2,671 documents on which the Referee made a recommendation, around 40%, or approximately 1,089, should be disclosed in full or in part.[225] Of the remaining documents on which a recommendation was made, the Final Report recommended that approximately 1,291 documents remain withheld because they were properly privileged and no exception or waiver applied.[226] The Referee's recommendations on around 266 items were mixed or inconclusive.[227]

---

[222] *See id.* at pp. 47–48.

[223] *See id.* at p. 48 (asserting such documents are necessary to test the credibility of DBMP's narrative that bankruptcy was just one option considered and that the Restructuring was done in good faith and that the Defendants sought to shield behind privilege when asked for details on those points); *id.*, at Appendices B–E (discussing how some documents showed that the decision for DBMP to file bankruptcy was discussed internally as a planned strategy well before the bankruptcy happened, rather than being one option among many equal considerations. This could undercut DBMP's portrayal that the Chapter 11 filing was a last-resort or just one possible path, and how other documents indicated that officials from CSG were actively involved in planning the divisional merger and the handling of asbestos liabilities, which ran counter to suggestions that the parent company was hands-off or not part of the reorganization planning).

[224] *See id.* at p. 14 (discussing waiver when a party voluntarily discloses privileged material (perhaps to a government agency or in litigation) and whether that operates as a broader waiver); *id.*, at p. 35 (discussing testifying-expert waiver, which relates to whether sharing privileged information with an expert witness (who then testifies) waives privilege for that information).

[225] *See id.*, at Appendix A.

[226] *See id.*

[227] *See id.*

**6. Post-Referee Facts**

a. The Briefing and the Hearing

73.   After resolving the Parties disputes regarding the procedures for review of the Final Report, and following communications between the parties and the Court, the parties agreed to certain deadlines to allow the parties to challenge the Discovery Referee's conclusions in the Final Report which was entered as an order.[228] In accordance with the New Briefing Schedule, on July 25, 2025, the parties filed opening briefs addressing issues raised in the Motion and discussed in the Final Report.[229] On September 5, 2025, the parties filed responses to each other's Opening Briefs.[230] Thereafter, on September 24, 2025, the Court conducted the Motion Hearing.[231]

---

[228] *Second Amended Order Appointing Discovery Referee and Establishing Protocol for Resolution of Crime-Fraud/Waiver Motion* [Doc. No. 3188; Consolid. Adv. Pro. Doc. No. 381; Fraud. Transf. Adv. Pro. Doc. No. 319; Fid. Duties Adv. Pro. Doc. No. 289].

[229] The Defendants filed their opening brief as the main document within their Objection. *See* Defendants Objection, pp. 9–67 (the "Defendants Opening Brief"). The Defendants filed along with their Opening Brief, a preliminary brief they had submitted to the Referee, *see id.*, Exhibit A, pp. 68–91 (the "Defendants Preliminary Brief"), and a brief from the Non-Debtor Affiliates. *See id.*, Exhibit B, pp. 92–98 (the "Non-Debtor Affiliates Brief"). The Plaintiffs also filed with their opening brief, *see The Official Committee of Asbestos Personal Injury Claimants' and the Future Claimants' Representative's Opening Brief in Response to the Discovery Referee's Reports and Recommendations* [Doc. No. 3211; Consolid. Adv. Pro. Doc. No. 382; Fraud. Transf. Adv. Pro. Doc. No. 320; Fid. Duties Adv. Pro. Doc. No. 290] (the "Plaintiffs Opening Brief"), a preliminary brief they had submitted to the Referee. *See id.*, Exhibit C (the "Plaintiffs Preliminary Brief").

[230] *Defendants' Reply to Plaintiffs' Opening Brief on the Discovery Referee's Reports and Recommendations* [Doc. No. 3246; Consolid. Adv. Pro. Doc. No. 391; Fraud. Transf. Adv. Pro. Doc. No. 331; Fid. Duties Adv. Pro. Doc. No. 300] (the "Defendants Reply Brief"); *Plaintiffs' Response Brief Regarding Referee Reports and Recommendations* [Doc. No. 3247; Consolid. Adv. Pro. Doc. No. 392; Fraud. Transf. Adv. Pro. Doc. No. 330; Fid. Duties Adv. Pro. Doc. No. 299] (the "Plaintiffs Reply Brief," which, together with Defendants Opening, Preliminary, and Reply Briefs and the Plaintiffs Opening and Preliminary Briefs, the "Briefing").

[231] *Transcript for Hearing/Trial held on 9/24/2025* [Doc. No. 3272; Consolid. Adv. Pro. Doc. No. 404; Fraud. Transf. Adv. Pro. Doc. No. 343; Fid. Duties Adv. Pro. Doc. No. 312] (the "Hearing Transcript").

b. Recent Fourth Circuit Guidance in DBMP

74. On April 18 2024, Michael Herlihy, Ann Herlihy, and the estate of Peter Bergrud filed motions to lift the automatic stay only on their own behalf so that they could be allowed to pursue their own asbestos lawsuits against the Defendants in the appropriate state courts.[232] On February 11, 2026, while the Motion was under advisement with this Court and the Court was in the process of reviewing the Documents and Deposition Objections, the Fourth Circuit entered an Opinion on the Claimants' Motion for Relief from Stay (the "Fourth Circuit Opinion").[233] The Fourth Circuit Opinion states that "good faith is an *implied* requirement for obtaining an automatic stay and that a showing of lack of good faith, or bad faith, can therefore justify lifting the stay."[234]

75. Importantly for the case at hand, the Fourth Circuit held that "the record does not include evidence to suggest bad faith" and that DBMP was "legitimately seeking to invoke the §524(g) process" in the exact circumstance for which Congress enacted said statute.[235] The Fourth Circuit stated that although the DBMP may have been "profitable, non-distressed" prior to filing the Petition, this fact is irrelevant to the bad faith argument in that §524(g) does not require insolvency.[236] Specifically, the Fourth Circuit doubled down on the *Carolin* standard that "while what amounts to good faith or bad faith is ultimately contextual, it surely begins with resolution of the question whether the bankruptcy procedure is being used in accordance with its designed purpose."[237] The Fourth Circuit stated that "no asset from Old CertainTeed is protected from paying its asbestos claimants," assuming the validity of the "uncapped funding agreement[]

---

[232] *See Motion for Relief from Stay* [Doc. Nos. 2753 & 2755].
[233] *See Herlihy v. DBMP, LLC*, No. 24-2109, 2026 WL 376481 (4th Cir. Feb. 11, 2026).
[234] *Id.* at *6 (emphasis in original).
[235] *Id.* at *7.
[236] *Id* at *7.
[237] *Id.* at *6 (citing *Carolin Corp. v. Miller*, 886 F.2d 693, 698 (4th Cir. 1989)).

committing all of its assets to the payment of asbestos claims."[238] To the extent the Funding

Agreement operates in the future the way the Fourth Circuit asserts, "each claimant is given a

fairer opportunity for compensation, *including future claimants.*"[239] It is in the context of this

Fourth Circuit Opinion that the Court now renders its order as to the Privilege Motion.

II.       **DISCUSSION**

A. **Attorney Client Privilege and Work Product Generally**

   1. **Legal Discussion**

76.       Attorney client privilege is governed by federal common law on federal claims and

state law on state claims. *See* Fed. Rule Evid. 501. When no rules are binding, courts look to rules

and pertinent "principles of the common law as [] interpreted by the courts of the United States in

the light of reason and experience." *United States v. Zolin*, 491 U.S. 554, 562 (1989). This involves

considering various and varying approaches from appellate rules and trial court applications, and

assessing their similarities, differences, and bases.[240]

77.       The work product protection is governed by Federal Rule of Civil Procedure

26(b)(3), which protects materials prepared in anticipation of litigation from discovery. "The

policies of protecting work product and permitting liberal discovery are accommodated … by

[Fed. R. Civ. P. 26(b)(3)] protecting absolutely the 'mental impressions, conclusions, opinions,

[and] legal theories ... concerning the litigation' but permitting discovery of other work product

upon a showing of 'substantial need'." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet

Metal Co.*, 967 F.2d 980, 983 (4th Cir. 1992) (quoting Fed. R. Civ. P. 26(b)(3)). In *Hickman v.

Taylor*, the Supreme Court highlighted the force of this protection in that "[not] even the most

---

[238] *Id.* at *8.
[239] *Id.* at *8 (emphasis in original).
[240] As well as authoritative secondary literature such as Wigmore and other academic commentary.

liberal of discovery theories can justify unwarranted inquiries into the files and mental impressions of an attorney." 329 U.S. 495, 509 (1947).

a.   Attorney-Client Privilege and the Work Product Protections

78.   It is a general but basic rule of litigation that parties must disclose relevant evidence upon request. In practice, that can mean requiring parties to produce tangible evidence e.g., documents in their possession, or requiring witnesses to testify, even if they would prefer not to do so. The central reason for such required production is the legal system's desire that its decisions be based on the truth to the greatest extent possible as supported by evidence. When parties are allowed to pick and choose what information to disclose, "the rights of individual litigants [] are drained of vitality and the lawsuit becomes more of a battle of deception than a search for truth." *Hickman*, 329 U.S. at 507.

79.   However, this mandatory disclosure rule does not always apply, specifically, where the evidence is protected by a privilege. Privileges exist because the evidence arises from activities the law deems (1) are sufficiently desirable and (2) would be reasonably chilled if made subject to mandatory disclosure. In other words, the law tolerates potential truth obfuscation in particular cases for the broader benefit of society.

80.   When a party requests disclosure of evidence and the counterparty invokes a privilege, the default rule is that the counterparty may decline disclosure. But a privilege claim is not infallible, nor does it necessarily end the inquiry. When an entity asserts privilege (the 'privilege asserter'), other parties may object. A party who objects (the 'privilege objector') can challenge (1) the validity of the assertion, i.e., whether the privilege applies to the evidence at all (e.g., because the claim is overbroad), or (2) the applicability of an exception to the asserted privilege, i.e., a reason disclosure is required even if the privilege would otherwise apply (e.g.,

47

because any kind of waiver of any such privilege occurred). The two privileges discussed here are the attorney-client privilege and the work product privilege.[241]

81.     Attorney-client privilege "protects confidential communications between the client and the attorney." *United States v. Under Seal (In re Grand Jury Proceedings #5)*, 401 F.3d 247, 250 (4th Cir. 2005). As noted by the Supreme Court, this privilege is "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (citing 8 J. WIGMORE, EVIDENCE § 2290 (McNaughton rev. 1961)). Notably, American attorney-client privilege law can be directly traced to Elizabethan times. *See Duplan Corp. v. Deering Milliken, Inc.*, 370 F. Supp. 761, 767 (D.S.C. 1972) (citations omitted).[242]

82.     "Although the underlying rationale for the privilege has changed over time," *Zolin*, 491 U.S. at 562 (citation omitted), Supreme Court law currently provides that its goal is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice," *Upjohn* 449 U.S. at 389. This 'frank communication purpose' "requires that clients be free to 'make full disclosure to their attorneys' of past wrongdoings, … in order that the client may obtain 'the aid of persons having knowledge of the law and skilled in its practice'." *Zolin*, 491 U.S. at 562 (first quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976), then quoting *Hunt v. Blackburn*, 128 U.S. 464, 470 (1888)).

---

[241] The various other privilege types include, *inter alia*, spousal, deliberative, priest, accountant, Fifth Amendment, clergy, physician, trade secrets, state secrets, and reporter privilege. Although generally there are different rules for different privileges, privilege rules are portable between privileges as they widely share principles.

[242] Further, a principle of attorney-client privilege dates at least as far as the Roman Republic. *See* Max Radin, *The Privilege of Confidential Communication Between Lawyer and Client*, 16 CAL. L. REV. 487, 488 (1928)

83.     A corollary of this purpose is that the privilege cannot be unclear since an ability to be frank as to information necessitates knowing the boundaries of disclosure. *Cf., e.g., Upjohn*, 449 U.S. 383, 393 (1981) ("An uncertain privilege, or one which purports to be certain but results in widely varying applications, is little better than no privilege at all."). This can be described as a 'clarity goal' of the privilege, which strives for rules as to attorney-client privilege that are consistent and predictable. However, given the attorney-client privilege's potential for truth obfuscation, the law also provides that attorney-client privilege "'applies only where necessary to achieve its purpose'," *id.* (citations omitted),[243] which is often called the 'narrow construction' of the privileges' scope.[244]

84.     "The work-product privilege protects from discovery 'an attorney's work done in preparation for litigation'," in order to "protect[] 'not just the attorney-client relationship but the interests of attorneys to their own work product, [wherefore] the attorney, as well as the client, hold the privilege'." *Grand Jury Subpoena v. United States*, 870 F.3d 312, 316 (4th Cir. 2017) (quoting *Grand Jury*, 401 F.3d at 254).

---

[243] *See also Fisher*, 425 U.S. at 403 (1976) (stating that the privilege "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege"); *Saint Annes Dev. Co., LLC v. Trabich*, 2009 U.S. Dist. LEXIS 10257, at *7 (D. Md. Feb. 9, 2009) ("'[T]he invocation of [the attorney-client privilege] should be cautiously observed to ensure that its application is consistent with its purpose'" (quoting *Priest v. Hennessy*, 51 N.Y.2d 62, 68 (1980)).).

[244] *See generally* EDNA SELAN EPSTEIN, THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK-PRODUCT DOCTRINE, § 1.I.D (2015).

Clearly, a tension exists between this narrow construction being a limiting principle of looking past technicalities and going beyond formal following, and the clarity goal calling for clear rules that would necessarily be over-inclusive or under-inclusive.

b. <u>Test and Scope of Attorney Client Privilege</u>

85.     Virtually all courts, including the Fourth Circuit, have adopted the same test for attorney-client privilege (first delineated by a Massachusetts federal judge in the 1950s) which requires the following:

- (1) [T]he asserted holder of the privilege is or sought to become a client;
- (2) the person to whom the communication was made
    - (a) is a member of the bar of a court, or his subordinate and
    - (b) in connection with this communication is acting as a lawyer;
- (3) the communication relates to a fact of which the attorney was informed
    - (a) by the client
    - (b) without the presence of strangers
    - (c) for the purpose of securing primarily either
        - (i) an opinion on law or
        - (ii) legal services or
        - (iii) assistance in some legal proceeding, and
    - [d] not [] for the purpose of committing a crime or tort; and
- (4) the privilege has been
    - (a) claimed and
    - (b) not waived by the client.

*United States v. Under Seal (In re Grand Jury Subpoena)*, 341 F.3d 331, 335 (4th Cir. 2003) (quoting *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982) (in turn quoting *United States v. United Shoe Machinery Corp.*, 89 F. Supp. 357, 358–59 (Mass. 1950))). The requirements primarily at issue in this case are the following: (1) the 'legal purpose requirement;' (2) the 'crime fraud exception'; and (3) whether 'waiver' occurred.

86.     The privilege asserter bears the burden of showing that the attorney-client privilege applies. *See Jones*, 696 F.2d at 1072. For a corporate client, attorney-client privilege can protect

50

communications between any of the corporation's employees and its lawyers, *see Upjohn*, 449

U.S. at 389–92, including both retained and in-house counsel.[245]

87.     Attorney-client privilege does not extend to facts themselves but only to

"communication concerning that fact." *Upjohn,* 449 U.S. at 395–96 (1981) (illustrating how

answering "[w]hat did you say or write to the attorney?" is protected, whereas merely

incorporating certain facts into statements made to one's attorney does not prevent disclosure of

those facts (citations omitted)). "Clients cannot refuse to disclose facts which their attorneys

conveyed to them and which the attorneys obtained from independent sources." *Sedco Int'l, S. A.

v. Cory*, 683 F.2d 1201, 1205 (8th Cir. 1982) (citing *Hickman*, 329 U.S. at 508 and 8 WIGMORE,

---

[245] *See e.g.*, *Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Tr. No. 1B*, 230 F.R.D. 398, 411 (D. Md. 2005) ("As a threshold matter, the attorney-client privilege applies to "in-house" counsel just as it would to any other attorney" (citing *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 154 (1974)); *X Corp. v. Doe*, 805 F. Supp. 1298, 1305-06 (E.D. Va. 1992) ("It [is] well-settled that the privilege … attaches to in-house as well as outside counsel" (citing *Owens-Corning Fiberglas Corp. v. Watson*, 243 Va. 128, 141 (1992), *In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984), and *Machinery Corp.*, 89 F. Supp. at 360).); *cf. also e.g.*, *United States v. Under Seal (In re Grand Jury Proceedings)*, 33 F.3d 342, 349 n. 14 (4th Cir. 1994).

Some courts have applied heightened scrutiny in determining the test for attorney-client privilege as to in-house counsel since (1) such lawyers often have mixed roles and/or duties with regard to both the law and the business overall, and because (2) any privilege communications still must always satisfy legal purpose requirement, which can necessarily be diminished by the first fact as to their often mixed roles. *See, e.g.*, *Rossi v. Blue Cross & Blue Shield*, 73 N.Y.2d 588, 592–93 (1989) (discussing how "unlike the situation where a client individually engages a lawyer in a particular matter, staff attorneys may serve as company officers, with mixed business-legal responsibility," and even if "not officers, their day-to-day involvement in their employers' affairs may blur the line between legal and nonlegal communications," given the fact that "their advice may originate not in response to the client's consultation about a particular problem but with them, as part of an ongoing, permanent relationship with the organization;" holding that, based the narrow construction of privilege, there is a "heightened" "need [for] apply[ing] [privilege] cautiously and narrowly … in the case of corporate staff counsel, lest the mere participation of an attorney be used to seal off disclosure" (citation omitted)); *Marten v. Yellow Freight System, Inc.*, 1998 WL 13244 (D. Kan. 1998) (discussing how even with in-house counsel, attorney client privilege always "applies only to communications made to an attorney in his capacity as legal advisor" (citation omitted)); *see also* DAVID M. GREENWALD ET AL., TESTIMONIAL PRIVILEGES § 1:44 (3d ed. 2005) ("While courts state that they do not intend to weaken the privilege, they are mindful that corporate clients could attempt to hide mountains of otherwise discoverable information behind a veil of secrecy by using in-house legal departments as conduits of otherwise unprivileged information. As a result, many courts impose a higher burden on in-house counsel to 'clearly demonstrate' that advice was given in a legal capacity.").

*supra*, § 2317). Although attorney-client privilege is "arguably [the] most fundamental of the common law privileges recognized under Federal Rule of Evidence 501," it is "not absolute." *UMG Recording, Inc. v. Bertelsmann AG (In re Napster Copyright Litig.)*, 479 F.3d 1078, 1090 (9th Cir. 2007).

88.     However, despite the clarity goal, appellate guidance as to the limits and operation of attorney-client privilege remains sparse, partly because privilege determinations are ordinarily interlocutory and rarely subject to immediate review. Thus, unsettled questions abound in this context, such disputes can impose significant costs on parties and courts alike, due to their time-consuming nature.[246] In resolving such claims here, the Court undertakes a deliberate and painstaking review, fully aware of the inherent complexity and uncertainty that accompany these kinds of privilege determinations.

c.  Requirements and Elements of Work Product Privilege

89.     For materials to be eligible for any work product protection barring its discovery, such materials first must satisfy a legal purpose requirement for attorney-client privilege, namely, that the materials were produced "'in preparation for litigation'." *Grand Jury*, 870 F.3d at 316 (citation omitted).

90.     The Fourth Circuit, like all courts, "afford[s] greater protection to opinion work product than to fact work product," with the latter, defined as "a 'transaction of the factual events

---

[246] *See, e.g., In re Vioxx Products Liability Litigation*, 501 F. Supp. 2d 789 (E.D. La. 2007) (special master required to determine attorney-client privilege claims for 30,000 documents); *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices, & Prods. Liab. Litig.*, 2021 LEXIS 73009 (D.N.J. July 26, 2021) (special master's privilege determination following review of 1,300 documents); *see also A.B.A. Amicus Br. in Support of Petitioner* at 16, *In re Grand Jury*, No. 21-1397 (U.S.) (describing in camera review resolving and determining attorney-client privilege disputes as "'an awkward, time-consuming process'" which "become[s] even more difficult, unpredictable, and time-consuming" when courts add new rules and/or analyses to such determinations (quoting *PaineWebber Group, Inc. v. Zinsmeyer Trusts Partnership*, 187 F.3d 988, 992 (8th Cir. 1999)).

involved'," being "obtain[able] upon a mere 'showing of both a substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship'," *id.* (quoting *United States v. Under Seal (In re Grand Jury Proceedings*), 102 F.3d 748, 750 (4th Cir. 1996) (in turn quoting *Grand Jury*, 33 F.3d at 348)), whereas the former, defined as "'the actual thoughts and impressions of the attorney', [] is 'more scrupulously protected'. . . . '[E]njoying a nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances'." *Id.* (first quoting *Grand Jury,* 102 F.3d at 750, and then quoting *In re John Doe*, 662 F.2d 1073, 1080 (4th Cir. 1981) (in turn citing *In re Murphy*, 560 F.2d 326, 337 & 366 n. 19 (8th Cir. 1977))).

91.    In the Fourth Circuit, opinion work product is broadly defined to include, a "lawyer's recollection of a witness interview. . . . [regardless of] whether an attorney draws on her memories, as opposed to written notes, in recalling what was said," since "both require disclosure of the attorney's mental processes" because, "'[e]ven [] perfect [recollections] [] would be [] permeated with [] inferences'," whereas "imperfect recitations. . . would inevitably reveal what the attorney deemed important enough to remember." *Id.*, at 317–18 & 317 n. 2 (first citing *Upjohn*, 449 U.S. at 399-40 (explaining that "[f]orcing" disclosure of oral witness statements is particularly disfavored), then citing *Hickman*, 329 U.S. at 513 (explaining the impropriety of "forc[ing] the attorney to testify as to what he remembers or what he saw fit to write down regarding witnesses' remarks"), then citing *In re Green Grand Jury Proceedings*, 492 F.3d 976, 978-79, 982, & 997-99 (8th Cir. 2007) (concluding that answers to "questions relating to the origins of documents" do not constitute recollections on par with notes and are therefore fact work product, whereas an attorney's "recollections of conversations," which "would reveal the attorney's mental impressions and thought processes," qualify as opinion work product)).

d.   Legal Purpose Requirement and Business Elements

92.    The legal purpose requirements above for both the attorney-client privilege and the work product protection, and their resulting analyses, are complicated by the modern legal landscape. First, the reality that documents are often prepared for both legal and business purposes can muddy any such analysis. *In re Dominion Dental Servs. USA, Inc. Data Breach Litig.*, 429 F. Supp. 3d 190, 193 (E.D. Va. 2019) ("[T]here may be dual motives underlying the preparation of a particular document … [W]hen the document may be used both for litigation and for business purposes.").

93.    Application of these legal purpose requirements can be difficult, particularly as to the work product protection since even if the materials were produced with an eye towards potential litigation, "materials prepared in the ordinary course of business … or for other non-litigation purposes" do not suffice for Federal Rule of Civil Procedure 26(b)(3). *Nat'l Union*, 967 F.2d at 984. Instead, to qualify for work product protection, the document "must be prepared *because* of the prospect of litigation when the preparer faces an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation." *Id.* (emphasis in original).

94.    This specific required dimension requires the court to "determine 'the driving force behind the preparation of' the requested documents " by considering "whether the document would have been created in essentially the same form in the absence of litigation, or the alternative, whether the document 'would not have been prepared in substantially similar form but for the

prospect of that litigation.' " *In re Dominion Dental*, 429 F. Supp. 3d at 193 (first *quoting Nat'l Union*, 967 F.2d at 984, then citing *United States v. Adlman*, 134 F.3d 1194, 1195 (2d Cir. 1998)).[247]

95.     Additionally, the assertion of either the lawyer privileges (but particularly the attorney-client privilege) within the corporate context presents unique challenges, particularly where attorneys wear "dual hats" as advisors of both legal and business strategy. *See In re Grand Jury*, 23 F.4th 1088, 1090 (9th Cir. 2022); *see generally, supra* note 245; Garry W. Jenkins & Jon J. Lee, *Leadership Evolution: The Rise of Lawyers in the C-Suite*, 96 TUL. L. REV. 695 (2022). Corporate counsel frequently communicate for dual purposes, making it difficult to parse whether a communication was made primarily to provide legal advice (and thus privileged) or business guidance (and thus not). *Chamber of Com. Amicus Br. in Support of Petitioner* at 24, *In re Grand Jury*, No. 21-1397 (U.S.) ("In circumstances tragic and ordinary, involving issues mundane and groundbreaking, lawyers are called upon to advise businesses on problems with legal and nonlegal dimensions."); *In re Kellogg Brown & Root, Inc.*, F.3d 754, (D.C. Cir. 2014) ("[T]rying to find the one primary purpose for a communication motivated by two sometimes overlapping purposes (one legal and one business, for example) can be an inherently impossible task.").

---

[247] *Cf. also* 8 WIGMORE, *supra*, § 2296, at 566–67 (asserting first that "[i]t is not easy to frame a definite test for distinguishing *legal from nonlegal advice*" given how both (1) lawyers are "sometimes employed without reference to [their] knowledge and discretion in the law—as where [they are] charged with finding a profitable investment for trust funds," and (2) nonlawyers are "sometimes asked for legal advice—as where a policeman or a clerk of court is consulted;" asserting second that the incidence of "a particular [] transaction" can satisfy the legal purpose requirement even if the transaction "in itself [] were merely commercial in nature," so long as its "general purpose concerns legal rights and obligations," such "as where the financial condition of a shareholder is discussed in the course of a proceeding to enforce a claim against a corporation;" asserting third that, beyond such incidences, "the most that can be said by way of generalization is that a matter committed to a professional legal adviser *is prima facie so committed for the sake of the legal advice* which may be more or less desirable for some aspect of the matter, and is therefore within the privilege unless it clearly appears to be lacking in aspects requiring legal advice" (emphasis in original)).

96.     The difficulty of identifying a clear and workable standard to assess the privilege of dual-purpose communications is highlighted by *In re Grand Jury* (2022)*, in which a grand jury subpoena sought documents from a law firm that provided both legal and tax advice to a corporate client. 23 F.4th 1088. After granting certiorari, the Supreme Court considered the law firm petitioner's arguments urging adoption of the "significant purpose" test, under which any communications made with *a* significant legal purpose remain privileged*. See generally Brief for the Petitioner*, *In re Grand Jury*, No. 21-1397 (U.S.).

97.     The government respondent sought to uphold the Ninth Circuit's application of the widely adopted "primary purpose" test, which limits the privilege to communications made with *the* primary purpose of giving legal advice. *See In re Grand Jury*, 23 F.4th 1088, 1091 (9th Cir. 2022); *see also generally*, *Brief for Respondent United States*, *In re Grand Jury*, No. 21-1397 (U.S.). During oral argument, both the Justices and counsel grappled with articulating how the primary purpose test operates, and whether the significant purpose test would offer any greater clarity. *Cf. In re Grand Jury.*, 2023 WL 9375463, at *54 (U.S. Oral. Arg., 2023) (J. Gorsuch's statement: "I am really confused now."). The Court ultimately dismissed *In re Grand Jury* as improvidently granted, *see In re Grand Jury*, 598 U.S. 15 (2023), leaving the primary purpose test intact, but declining to resolve its underlying practical difficulties.

## 2. Application

### a. Application of Attorney Client Privilege and the Work Product Protection Generally to the Documents

98.     In ruling on the Documents via an in camera review, as more fully described in Appendix B, the Court independently evaluated each as to the applicable legal standards governing attorney-client privilege, work product, and various forms of waiver, as set forth herein. Most of

the Documents, approximately 2,500, were appropriately designated as privileged or redacted in accordance with general attorney-client privilege and work product law, setting aside waiver arguments as will be discussed herein. Specifically, as to the redacted documents, the Defendants often correctly redacted the legal discussions and disclosed the business portions of each of the communications. Still, the Court has now designated a couple hundred documents such as histories of mesothelioma, articles, meeting requests, and purely business emails as 'not privileged'.[248] The remaining documents the Court orders to be disclosed come in under application of waiver doctrines, but not inappropriate application of attorney-client privilege or work product doctrines on the part of the Defendants.

b.  Application to the Depositions and the Deposition Objections of Attorney Client Privilege and the Work Product Protection Generally

i.  *Depositions Generally*

99.    The prospect of reconvening the depositions is a primary consideration in addressing the disputes raised by the Deposition Objections. Between October 1, 2020, and June 2, 2021, the parties conducted sixteen deposition days compromised of thirteen witnesses.[249]

---

[248] The Court analyzed each numbered document as a stand-alone document without considering which may have been attachments to an otherwise privileged communication. This is due in part to the fact that the Court did not have the benefit of a discovery platform and reviewed each document individually without being able to assess parent/child relationships.

[249] For the reader's ease, the Court again delineates the various Deponents and their respective roles. The Deponents include:

- Amiel Gross, former in-house counsel for SGC;
- Mark Rayfield, Chief Executive Officer of SGC and President and Chief Executive Officer of New CT;
- Michael Starczewski, former in-house counsel for SGC and Chief Legal Officer, Vice President, and Secretary of DBMP;
- Keith Campbell, SAP Project Manager for New CT;
- Eric Placidet, Vice President and Chief Financial Officer of SGC and Vice President and Chief Executive Officer of New CT, formerly an officer of Old CT;

Pursuant to the Discovery Referee Order, the Plaintiffs provided a list of deposition instructions and objections that the Plaintiffs assert should be overruled if they were to prevail on the Crime-Fraud/Waiver Motion (the "Plaintiffs' Designations"). The Defendants were similarly directed to identify testimony that they contend provides context for the challenged instructions or objections (the "Defendants' Cross-Designations").[250]

100.   Plaintiffs thereafter submitted the relevant transcripts with marked references to both the Plaintiffs' Designations and the Defendants' Cross-Designations. In total, 143 Deposition Objections were identified, the majority of which involve assertions of attorney-client privilege and related instructions directing witnesses not to answer. In their Objection to the Reports, the Defendants purported to withdraw forty objections or instructions (the "Withdrawn Objections"). The Plaintiffs contend that the Withdrawn Objections remain ripe for adjudication.

101.   In ruling on the Deposition Objections, as more fully described in Appendix A, the Court independently evaluated each objection under the Federal Rules of Evidence and the applicable legal standards governing attorney-client privilege, including at-issue waiver, as set forth herein. Where the inquiry was not protected by privilege, the instruction not to answer was

---

- Joseph Bondi, Vice President and General Manager of the Sidings Product Group at New CT, President of Millwork & Panel, and President and board member of DBMP;
- Donald J. Melroy, Assistant Treasurer of SGC and DBMP;
- Robert Panaro, former Senior Vice President and Chief Operating Officer of SGC and Vice President and Chief Restructuring Officer of DBMP;
- Thomas Kinisky, former President and Chief Executive Officer, current Chairman of SGC;
- Sean Knapp, Vice President and Chief Financial Officer of DBMP, member of its board of managers, former Manager of Financial Planning and Analysis at Old CT and New CT, and Vice President and Chief Financial Officer of Millwork & Panel;
- John J. Sweeney, III, Vice President and Treasurer of SGC, New CT, and CT Holding;
- D. Lawrence Rayburn, former in-house counsel for SGC and member of DBMP's board of managers; and
- Vincent DiNenna, Treasurer of DBMP.

[250] *See* Defendants Objection, Appendices 2-A through C.

improper. In those instances, the objection will be overruled and, where the witness was prevented from answering, the deposition will be reconvened. In some cases, although the instruction was improper, the witness ultimately provided the requested testimony; those objections are deemed moot and no further examination is required.

102.    The Court's rulings are summarized as follows:

- Total Deposition Objections: 143
- Overruled Objections requiring reconvening: 14
- Withdrawn Objections requiring reconvening: 41
- Sustained Objections: 47
- Moot (answered): 23
- Waiver requiring reconvening: 18

103.    In total, seventy-three objections will require reconvened examination (the "Reconvened Depositions"), forty-one of which the debtor voluntarily agreed to withdraw the objection and reconvene (the Withdrawn Objections), fourteen of which due to obtrusive and inappropriate objections or witness coaching, and the remaining eighteen are due to waiver of attorney-client privilege. By way of illustration as to witness coaching and obtrusive objections, Placidet testified that any understanding he had of the document derived from counsel and that he had not developed an independent understanding before signing or from reviewing the document during the deposition.[251] As a result, no substantive factual testimony regarding the document was elicited. In a second example, during the deposition of John Sweeney, examining counsel asked Mr. Sweeney, as vice president and treasurer of Saint-Gobain Corp. and former vice president and treasurer of Old CT, if he had any understanding at all of the restructuring and its purpose outside of advice from legal counsel.[252] After multiple objections and lengthy debates between counsel,

---

[251] *See* Placidet Dep., at 230:3-231:21.
[252] *See* Sweeney Dep., at 218:3-222:23.

the questions become very distorted and Mr. Sweeney indicates that based upon advice of counsel he cannot answer. These lines of inquiry will therefore be reopened.

104.   By contrast, in the deposition of Keith Campbell, although an objection was interposed to questioning concerning whether Campbell knows where DBMP is located or incorporated, Campbell ultimately provided responsive testimony regarding his understanding.[253] Because the factual record on that topic is complete, no further examination is required, and the Court has marked instances similar to this as moot. The Court's rulings resolve the objections as presented; however, additional guidance is necessary to ensure that the reconvened depositions proceed in accordance with the Federal Rules of Civil Procedure and the limitations set forth herein.

105.   Although the parties have briefed extensively on the scope and application of the attorney-client privilege and potentially relevant waivers, the disputes surrounding the deposition objections do not uniformly require resolution at that level. Many of the objections atissue may be resolved through the straightforward application of traditional evidentiary principles governing relevance, form, and the permissible scope of deposition objections, without needing to determine whether a waiver of the attorney-client privilege has occurred in each instance.

106.   The purpose of depositions is to preserve testimony and to obtain information that may be used at trial, narrow or eliminate issues, or inform decisions regarding the future course of the litigation. One of the primary objectives of the discovery rules is to elicit the relevant facts before trial and to memorialize witness testimony before recollections fade or "it has been altered by … helpful suggestions of lawyers." *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 277 F.R.D.

---

[253] *See* Campbell Dep., at 249:18-250:17.

286, 297 (E.D. Va. 2011) (quoting *Hall v. Clifton Precision*, 150 F.R.D. 525, 528 (E.D. Pa. 1993));

*see* First Report at 6-7.

107.    Federal Rule of Civil Procedure 30 provides clear guidance regarding the proper conduct of depositions. Rule 30(c)(1) directs that the examination and cross-examination of a deponent should proceed as it would at trial. Rule 30(c)(2) further provides that objections "must be noted on the record, but the examination still proceeds; the testimony is taken subject to any objection," and that objections must be stated "concisely in a nonargumentative and nonsuggestive manner." These requirements are designed to prevent depositions from being "unduly prolonged, if not unfairly frustrated, by lengthy objections and colloquy, often suggesting how the deponent should respond." Fed. R. Civ. P. 30 advisory committee's note to 1993 amendment.

108.    Consistent with these principles, an instruction not to answer is permitted only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3). Otherwise, objections "should be kept to a minimum during a deposition." *Id.* Objections that suggest an answer to the witness, commonly referred to as "speaking objections," are improper under Rule 30(c)(2). *Specht v. Google, Inc.*, 268 F.R.D. 596 (N.D. Ill. 2010) (citations omitted). Speaking objections may improperly communicate counsel's desired answer, prompt the witness to adopt counsel's objection, signal that a question seeks harmful information, or otherwise disrupt the orderly flow of the examination. *Mitnor Corp. v. Club Condos.*, 339 F.R.D. 312, 318 (N.D. Fla. 2021).

109.    The deposition record here reflects repeated instances of such conduct. This pattern was not uniform across all depositions but was concentrated in certain examinations. In several instances, counsel asserted overly broad objections and claims of attorney-client privilege in response to foundational or factual questions. For example, when a witness was asked, "What is

your understanding of the Funding Agreement?", counsel instructed the witness that, "to the extent you have an understanding, whether the understanding comes from counsel, you should not disclose that."[254] While instructing a deponent once in this way may be reasonable, counsel often repeated this warning after almost every question in certain Depositions. This pattern of objections and instructions not to answer can be described as amounting to "witness coaching," particularly where witnesses were led to assert that "all of my knowledge comes from counsel."[255] The cumulative effect of this approach materially interfered with the deposition process and impeded the development of a factual record, independent of whether the underlying information was ultimately privileged.[256]

110.    In support of their at-issue waiver argument, Plaintiffs designated multiple lines of inquiry from depositions of individuals involved in the transactions central to this case. The Court has carefully reviewed Plaintiffs' Designations and Defendants' Cross-Designations. In many instances, deponents were effectively prevented from providing substantive testimony due to objections and instructions not to answer, without regard to whether the anticipated response would have required disclosure of a privileged communication. In other instances, however, witnesses offered partial testimony sufficient to warrant consideration of waiver. Where the factual context provided an adequate foundation to evaluate waiver, including situations in which a witness provided incomplete testimony on a subject, the Court undertook that analysis. In certain instances, the Court concludes that a waiver occurred as discussed more specifically herein in the waiver

---

[254] Placidet Dep. 218:2-4.

[255] Placidet Dep. 219:2-4.

[256] 2020 Privilege Motion, p. 5 (noting that witnesses produced by the Defendants were instructed not to answer more than 200 times on the basis of privilege)

section. Each such determination is reflected in Appendix A, together with any recommendation for additional examination.

### ii. *Specific Deposition Questions and Objections*

111.   Because certain depositions will be reconvened, it is helpful to examine the categories of objections that arose and the effect they had on the development of the record. Understanding these patterns is essential to guide the reconvened depositions and ensure responsive testimony within the limited scope of discovery permitted under this decision.

#### (1)   Decision to File for Bankruptcy

112.   A significant number of objections arose in connection with questioning regarding the Debtor's decision to file for bankruptcy. These inquiries included questions concerning the timing of the filing, the corporate decision-making process, the individuals involved in that process, the restructuring timeline, and when witnesses first became aware that a bankruptcy filing was being considered. Questioning also extended to the objectives of the restructuring and the reasons underlying the decision to pursue relief in bankruptcy.

113.   Objections in this category frequently invoked the attorney-client privilege on the ground that the decision to file was made in consultation with counsel. In several instances, privilege was asserted in response to questions concerning a witness's understanding of the restructuring timeline, when bankruptcy first became an option under consideration, and the goals sought to be achieved through the filing. Some objections extended to inquiries identifying whether attorneys participated in discussions.

#### (2)   Corporate Restructuring and Venue in the Western District of North Carolina

114.   A related but distinct category of objections arose in response to questioning concerning the Debtor's formation, restructuring steps, and connections to the Western District of

63

North Carolina. Unlike the prior category addressing the general decision to seek bankruptcy relief, this line of questioning focused specifically on the Debtor's corporate restructuring, its conversion into a North Carolina limited liability company, and the creation and capitalization of its subsidiary, Millwork & Panel, in North Carolina. Related questions explored the factual steps surrounding the 2019 divisional merger and restructuring, such as the decision to reserve the DBMP name in North Carolina months before the merger, the formation of Millwork & Panel and the contribution of assets from North Carolina and Georgia, the subsequent conversion of DBMP into a North Carolina LLC, and whether these actions were undertaken, in whole or in part, to establish venue in the Western District of North Carolina for a future bankruptcy filing.

115.    Objections frequently invoked attorney-client privilege in response to inquiries concerning the rationale for those restructuring steps, including "why" questions regarding the selection of North Carolina as DBMP's state of organization. Some objections extended beyond communications reflecting legal advice and foreclosed inquiry into underlying factual matters, such as the dates of discrete events.

(3)   Funding Agreement

116.    Finally, a subset of objections arose during questioning concerning the Funding Agreement. This line of inquiry focused on the structure, purpose, and operation of the Funding Agreement and its impact on the Debtor's ability to address current and future asbestos liabilities. Questions explored, among other things, the circumstances under which the Funding Agreement was negotiated and executed, the individuals involved in its development and approval, the witnesses' understanding of how the agreement would function in practice, and the extent to which the agreement was intended to support a future bankruptcy filing or claims resolution process.

117. Objections were frequently asserted on attorney-client privilege grounds when questioning turned to the rationale for including particular provisions, the perceived sufficiency of the funding commitment, or the objectives the agreement was designed to achieve. In some instances, objections were framed broadly enough to foreclose inquiry not only into communications with counsel, but also into factual matters such as the sequence of drafting and approval, the corporate participants involved, and the witnesses' non-counsel originated understanding of the agreement's operation.

*****************************************

118. Across these areas, the Court observes a recurring pattern, repeated assertions of attorney-client privilege and instructions not to answer sometimes framed witnesses' knowledge as entirely derived from counsel. Where this pattern truncated follow-up questioning and impeded the factual record, discovery was materially curtailed. At the same time, the Court recognizes that not every overly broad objection resulted in prejudice; where witnesses ultimately provided the requested testimony, the record remains intact and the Court finds that the related objections are moot.

119. Accordingly, the depositions will be reconvened to allow the Defendants to answer questions in accordance with the guidance provided herein. The purpose of reconvening is strictly limited to complete lines of inquiry materially truncated by prior objections and ensure the development of a complete factual record. Reconvening is not intended to reopen discovery more broadly, revisit topics fully explored, or permit cumulative examination. Questions must be narrowly tailored to address lines of inquiry curtailed by prior objections, and Plaintiffs may not use the reconvened depositions to pursue overly expansive questioning.

120.     The Defendants are required to provide responsive testimony to non-privileged factual questions within this scope. Legitimate claims of attorney-client privilege may be asserted, but objections must be concise, nonargumentative, and nonsuggestive. Instructions not to answer are limited to circumstances permitted under Rule 30(c)(2). A witness's understanding may be informed in part by counsel, but this does not preclude testimony regarding underlying facts or personal knowledge; privilege protects communications, not the facts themselves. Similarly, Plaintiffs must tailor their questioning to the deficiencies identified herein, exercising specificity and restraint. While zealous advocacy for their clients is expected, such advocacy must remain within the limits established by this decision and the Federal Rules of Civil Procedure.

121.     The parties are expected to confer in advance regarding the topics to be addressed and to conduct the examinations efficiently, professionally, and in good faith. Adherence to these principles, together with the guidance provided herein concerning privilege, is intended to promote an orderly deposition process and minimize the likelihood of further disputes. Conduct that unduly interferes with the deposition process may warrant remedial measures, regardless of how privilege issues are ultimately resolved.

## B.  **The Crime-Fraud Exception**

### 1.  **Legal Standards**

#### a.   The Crime-Fraud Exception Generally

122.     The crime-fraud exception "vituperates" attorney-client privilege and the work product doctrine to require disclosure of otherwise privileged and protected materials when the materials further a crime or fraud. *See Taylor v. Wolbert (In re Wolbert)*, 2010 Bankr. LEXIS 6406, *20 (W.D.N.C. 2010). The policy rationale underlying the crime-fraud exception rests on the principal that the justification for the attorney-client privilege protection—"the centrality of open

client and attorney communication to the proper functioning of our adversary system of justice—

'ceas[es] to operate … where the desired advice refers not to prior wrongdoing, but to future

wrongdoing.'" *See, e.g., Zolin*, 491 U.S. at 562 (quoting 8 WIGMORE, *supra*, § 2298 at 573).[257] At

the same time, given the fundamental importance of the attorney-client privilege, "determinations

on the crime-fraud exception should be approached with great caution." Final Report, p. 33.

123.    The crime-fraud exception has undergone various evolutions over the last century.

*See* THOMAS E. SPAHN, THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK PRODUCT DOCTRINE:

A PRACTITIONER'S GUIDE § 18.12 (3d ed. 2013) (discussing how courts originally limited the

crime-fraud exception to *malum per se* crimes but later expanded it to *malum prohibitum* crimes).

Like most attorney-client privilege topics, the dimensions of the crime-fraud exception are

"surprisingly unclear." *Napster*, 479 F.3d at 1091.[258]

---

[257] *See also* EPSTEIN, *supra*, § 1.V.C.1 (7th ed. 2025) (explaining "society has every interest" (1) in encouraging people to seek legal advice so their conduct "conform[s] to the law" and (2) in "protecting the innocent" which requires that even the guilty receive representation for "completed crimes and frauds;" however "[s]ociety [] has no interest in facilitating [] contemplated but not yet committed crimes and fraud," wherefore society should "[p]rotect[] communications made to facilitate legitimate goals" since doing so "facilitates the accomplishment of those goals," while also "[r]evealing communications made to facilitate prohibited ends," since doing so "will discourage, to some extent, the ends sought to be forestalled" (citing 8 WIGMORE, *supra*, § 2298 at 573)).

[258] The Supreme Court first recognized the crime-fraud exception and the prima facie showing in dictum from two early cases. *See Alexander v. United States*, 138 U.S. 353, 359–60 (1891) (citing *Queen v. Cox* (1884) 14 Q.B.D. 153); *Clark v. United States*, 289 U.S. 1, 14 (1933). Since Hoover was President, the Supreme Court has only taken one other crime-fraud exception case, *Zolin* (1989). Similarly, many Fourth Circuit cases on the topic provide little to no factual details underpinning their analysis, which apparently reflects how the crime-fraud exception usually arises in the grand jury context, where heightened confidentiality protections limit public disclosure. *See, e.g., Grand Jury*, 870 F.3d at 315 (noting it "provide[s] only a general recitation of the facts to preserve the confidentiality of the ongoing grand jury proceedings"); *Union Camp Corp. v. Lewis*, 385 F.2d 143 (4th Cir. 1967) (4th Cir. 1967) (providing no details of the facts); *In re Grand Jury Proceedings*, 674 F.2d 309, 310 (4th Cir. 1982) (same); *In re Grand Jury Subpoena*, 884 F.2d 124 (4th Cir. 1989) (same), *Doe*, 662 F.2d at 1076 (same).

*i. Elements*

124. Supreme Court and Fourth Circuit precedent requires a prima facie showing that a crime or fraud occurred to invoke the crime-fraud exception.[259] While the standard for a prima facie showing is not clearly delineated, *see infra* ¶ 134, courts have provided clearer guidance regarding the applicable procedures.

125. The prima facie showing requires evidence that: "'(1) the client was engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel to further the scheme and (2) the documents containing [the privileged materials] . . . bear a close relationship to the client's existing or future scheme to commit a crime or fraud'." *Grand Jury*, 870 F.3d at 319 (quoting *Chaudhry v. Gallerizzo*, 174 F.3d 394, at 403 (4th Cir. 1999) (in turn citing *Murphy*, 560 F.2d at 338 and *Grand Jury*, 33 F.3d at 349 n. 13 (quoting *Murphy*, 560 F.2d at 338, favorably))).

126. The first prong, which can be called the 'scheme prong', establishes the basis for the crime-fraud exception and can be delineated into roughly three dimensions: (1) the existence of a crime or fraud; (2) the client's engagement in the crime or fraud; and (3) the client's pursuit of legal advice to further the crime or fraud. The second prong, which can be called the 'relationship prong', on the other hand, narrows the crime-fraud exception by limiting the disclosure of privileged materials to only materials that are central to and particularly further the crime or fraud.

---

[259] *See Zolin*, 491 U.S. at 563 n. 7 (1989) (citing *Clark*, 289 U.S. at 14, James A. Gardner, *The Crime or Fraud Exception to the Attorney-Client Privilege*, 47 A.B.A. J. 708, 710-711 (1961), Susan F. Jennison, *The Crime or Fraud Exception to the Attorney-Client Privilege: Marc Rich and the Second Circuit*, 51 BROOK. L. REV. 913, 918-919 (1984), and *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1039 (2d Cir. 1984)); *id.*, 567 n. 10; *Grand Jury*, 870 F.3d at 319 (quoting *Chaudhry*, 174 F.3d at 403 (in turn citing *Grand Jury*, 33 F.3d at 348 (in turn citing *Grand Jury* , 33 F.3d at 127 (in turn citing *Grand Jury*, 674 F.2d at 310 (in turn citing *Doe*, 662 F.2d))))); *see also Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215, 1220 (4th Cir. 1976); *Union* 385 F.2d at 144-45 (citing *United States v. Bob*, 106 F.2d 37, 40 (2d Cir. 1939), cert. denied, 308 U.S. 589 (1939), *Clark*, 289 U.S. at 15, and *O'Rourke v. Darbishire* (1920) A.C. 581, 604, 614, 622, 631).

68

127.    The scheme prong applies to both attorney-client privilege and the work product doctrine. For the crime-fraud exception to apply to attorney-client privilege protected materials, "the attorney need not be aware of the illegality involved" since "it is the client's knowledge and intentions that are of paramount concern because the client is the holder of the privilege." *Grand Jury*, 401 F.3d at 251 (citing *Grand Jury*, 102 F.3d at 751). Fact work product similarly does not require showing the attorney's awareness since such materials enjoy less protection than opinion work product. *See id.*, at 252 (citing *Doe*, 102 F.3d at 1080, *Grand Jury*, 102 F.3d at 752, *In re Grand Jury Proceedings*, 867 F.2d 539, 541 (9th Cir. 1988), *In re Antitrust Grand Jury Advance Publ'ns, Inc.*, 805 F.2d 155, 163–64 & 168 (6th Cir. 1986), and *In re Special Sept.1978 Grand Jury (II)*, 640 F.2d 49, 63 (7th Cir. 1980)).[260]

128.    However, applying the crime-fraud exception to opinion work product does require the privilege objector to show, beyond the required elements above, "that the 'attorney in question was aware of or a knowing participant in the criminal conduct'" since both the attorney and the client "ha[ve] the right to assert [that] privilege." *Id.* (citing and quoting *Doe*, 102 F.3d at 1079-80, and *Grand Jury*, 33 F.3d at 348-49).

    *ii.  Procedures*

129.    There are two separate routes for a privilege objector to make a prima facie showing of a crime or fraud. The route that is utilized depends on the case's posture, the privilege objector's prayer, and the circumstances as judged by the court.

130.    The first route requires the privilege objector to satisfy the prima facie showing based on evidence wholly independent of privileged materials and without an in camera review

---

[260] Additionally, where the crime-fraud exception does apply to fact work product, the movant need not "demonstrate the[ir] substantial need" for the materials, since the crime-fraud exception "exempt[s] [such materials] from the work-product [doctrine]." *Grand Jury*, 870 F.3d at 320 n. 5.

69

piercing attorney-client privilege (the 'no in camera review route'), at least as to the scheme prong. *See Grand Jury*, 401 F.3d at 254-55 (rejecting the privilege asserter's argument on appeal that the trial court "erred by not examining the allegedly privileged documents in camera," because, regarding the scheme prong, the privilege objector's evidence demonstrated that application of the crime-fraud exception based on the evidence was not an abuse of discretion); *cf. Zolin*, 491 U.S. at 574 n.12.[261]

131.    Under the second route, the court supplements the privilege objector's evidence by conducting an in camera review (the "in camera review route"). To trigger this review, the movant must make a "threshold showing," which is "a lesser evidentiary showing ... than is required" for the prima facie showing and is "not [] stringent." *See Zolin*, 491 U.S. at 570–72. The threshold showing "'require[s] a showing of a factual basis adequate to support a good faith belief by a reasonable person',," "that in camera review of the materials may reveal evidence" sufficient for a prima facie showing. *Id*. (citation omitted).

132.    Once a privilege objector satisfies the threshold showing, it is within "the sound discretion of the [trial] court" "whether to engage in in camera review" based upon the facts and circumstances of the case, including, *inter alia*, (1) "the volume of materials submitted [] for review," (2) "the importance of the [] privileged [materials] to the case," and (3) "the likelihood that the evidence [] through in camera review, together with other available evidence [], will establish that the crime-fraud exception does apply." *Id*. However, even if the privilege objector has made a threshold showing, a trial court is "free to defer its in camera review if it concludes

---

[261] The no in camera review route requires at least some evidence identifying specific privileged materials, such as "the contents of the[] [privileged] documents," which does not necessarily entail court "examin[ation] [of the] allegedly [privileged materials] (or summaries thereof)" but does entail some "means" for determining that such materials "are connected to a crime or fraud such as through testimony or a reliable [privilege objector] proffer." *Grand Jury*, 401 F.3d at 255.

that additional evidence in support of the crime-fraud exception may be available" without applying the crime-fraud exception. *Id*.

133.    The privilege asserter may rebut the privilege objector's evidence under either route, and "if the court finds the explanation satisfactory, the privilege remains." *In the Matter of Feldberg*, 862 F.2d 622, 625 (7th Cir. 1988); *see also, e.g.*, *In re Grand Jury Subpoena*, 642 F. App'x 223, 226–27 (4th Cir. 2016) (discussing the privilege asserter's ability to "counter" the privilege objector's evidence). However, a privilege objector's inability to satisfy the prima facie showing at one stage of a case does not foreclose the privilege objector from satisfying it later. *See Duplan* 540 F.2d at 1221–22 (4th Cir. 1976) (although holding that the privilege objector did not satisfy the showing, stating (1) that "[i]t may well be that during the trial of this case [they] will be able to present sufficient evidence," since (a) the crime fraud exception holding did not "forecloses that possibility" and (b) the trial "will have the advantage of seeing [] witnesses testi[mony]," and (2) that if the privilege objectors were ultimately successful as to the merits of their claim, they "might again seek disclosure of the documents now sought").[262]

        *iii.  The Prima Facie Showing*

134.    The contours of what constitutes a prima facie showing have long confounded courts since the Supreme Court first used the term in *Clark*.[263] Continued confusion is evinced by different courts employing different standards for what the prima facie showing requires. One commentator has delineated as many as seven different approaches employed by courts as to "the

---

[262] Lastly, a trial court's determination regarding the prima facie showing is within the court's sound discretion and upheld on appeal "'absent [] clear [] abuse of discretion'." *Grand Jury*, 870 F.3d at 319 (quoting *Grand Jury*, 401 F.3d at 254 (in turn quoting *Grand Jury*, 884 F.2d at 127 (in turn quoting *In re Grand Jury Investigation*, 842 F.2d 1223, 1226 (11th Cir. 1987), *In re Sealed Case*, 754 F.2d 395, 399-400 (D.C. Cir. 1985), *United States v. Dyer*, 722 F.2d 174, 179 (5th Cir. 1983))))).
[263] *See generally* Gardner*, supra*.

level of proof—or at least on how to describe the level of proof—required to make the prima facie showing"[264] and thus concluded that "the proof required … depends on the court."[265]

135.    The Supreme Court in *Zolin* explicitly acknowledged that its "use… of the phrase 'prima facie case' to describe the showing needed to defeat the privilege has caused some confusion" ambiguity, but declined to provide any clarity. *See Zolin*, 491 U.S. at 563 n. 7. "Despite continuing confusion in the lower courts, the [Supreme] Court has not revisited the crime-fraud exception to the attorney-client privilege since *Zolin*." *Napster*, 479 F.3d at 1091.

136.    The Fourth Circuit has provided little substantive guidance on the prima facie showing through its rule statements.[266] However, the Court gleans from the handful of cases where

---

[264] *See* Douglas R. Richmond, *Understanding the Crime-Fraud Exception to the Attorney-Client Privilege and Work Product Immunity*, 70 S.C. L. REV. 1, 21–23 (Fall 2018) (canvassing the varying approaches as evidence that is: (1) "'a reasonable basis to believe'" or "'suspect',," which "'is more than suspicion but less than a preponderance of [the] evidence';" (2) a "'probable cause to believe';" (3) ""'on its face … sufficient to establish a given fact, though it can ultimately be rebutted or contradicted'";" (4) "'suffic[ient] until contradicted and overcome by other evidence'" and "'sufficient proof to that stage where it will support [a] finding if evidence to the contrary is disregarded';" (5) "'sufficient [] to justify … requiring the [privilege asserter] to come forward with an explanation for the evidence offered against it'" or ""'a factual basis adequate to support a good faith belief by a reasonable person that in camera review of the materials may reveal evidence"'" sufficing for the ultimate merits; (6) "'if believed by the trier of fact[,] [] establish[es] the elements" for the ultimate merits; (7) sufficient for "a preponderance of the evidence standard" (citations omitted)).

[265] *See id.*, at 23–24 ("Such a result is unremarkable, considering that 'prima facie' is 'among the most rubbery of all legal phrases; it usually means little more than a showing of whatever is required to permit some inferential leap sufficient to reach a particular outcome'" (quoting *In re Grand Jury Proceedings*, 417 F .3d 18, 22-23 (1st Cir. 2005) (in turn citing BLACK'S LAW DICTIONARY (8th ed. 2004))).).

[266] For example, the Fourth Circuit in *Union* (1967) proffered that the privilege objector was not "required to prove the crime or fraud in order to secure the evidence." 385 F.2d at 144–45 (quoted in *Duplan*, 540 F.2d at 1220 & 1220 n. 5 (stating the prima facie showing "need not be such as to actually prove the disputed fact"); cited in *Grand Jury*, 401 F.3d at 251 ("[P]roof either by a preponderance or beyond a reasonable doubt of the crime or fraud is not required.")). This proffer from *Union* and its later versions do not offer much help because, like all negative definitions of a thing, their explicit non-focus on their referent minimizes, if not forecloses, any guidance as to that thing—i.e., knowing what something is not only limitedly helps in figuring out what it is.

About a decade later, the Fourth Circuit in *Duplan* (4th Cir. 1976) offered that a prima facie showing must "subject the opposing party to the risk of non-persuasion if the evidence as to the disputed fact is left unrebutted," such that it "may justify a finding in favor of the offering party, [but] it does not necessarily compel such a finding." 540 F.2d at 1220 & 1220 n. 5 (citing *Rehm v. United States*, 183 F.

72

the Fourth Circuit considered applying of the crime-fraud exception that such application requires more than bare allegations and/or possible impropriety to constitute the crime/fraud, especially when any suspect conduct is specifically let,[267] but is met by concrete and/or direct evidence of such a crime/fraud having occurred.[268]

---

Supp. 157 (E.D. N. Y. 1960), *Wright v. Rockefeller*, 376 U.S. 52, 57 (1963), and 1 MORGAN, BASIC PROBLEMS OF EVIDENCE 18–19 (1954)). But that sentence seems to just describe any non-conclusive evidentiary burden, and thus really only defines the larger group of burdens lower than the applicable ultimate merits burden. And although the prima facie showing does fall into such a group, the definition still does not delineate the prima facie showing at all. *Cf. also supra* note 265.

    About a decade ago, the Fourth Circuit in *Grand* (2005) stated that a prima facie showing as to the scheme prong required "evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed," and, as to the relationship prong, "a showing of a close relationship between the attorney-client communications and the possible criminal or fraudulent activity." 401 F.3d at 251 (first citing *Grand Jury*, 842 F.2d at 1226, *In re Sealed Case*, 676 F.2d 793, 815 (D.C. Cir. 1982), and *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1242 (5th Cir. 1982), then citing *Chaudhry*, 174 F.3d at 403). Of course, the former only describes the result of the prima facie showing but gives no guidance as when it is sufficiently established, whereas the latter simply adds 'possible' to the relationship prong's established description.

[267] *Cf. Duplan*, 540 F.2d at 1220–21 (considering whether the prima facie showing for a violation of antitrust laws was met by a settlement agreement and evidence indicating "bad faith"; holding that the privilege objector had not met their burden because settlement agreements only violate antitrust laws when they are "entered into in bad faith and are utilized as part of a scheme to restrain or monopolize" and thus makes "an expression of opinion from an attorney or representative that it might prevail [] insufficient, without more, to make out a prima facie showing that the settlement was collusively entered into with an anti-competitive intent" (citation omitted)); *Chaudhry*, 174 F.3d at 401, 403, & 406 (4th Cir. 1999) (considering whether the privilege objector, who sought unredacted legal bills and research, satisfied the prima facie showing for a Fair Debt Collection Practices Act violation based on the allegation that the privilege materials displayed that the privilege asserters were attempting to collect excessive fees from the privilege objector; holding that the privilege objector had not satisfied their burden because they "produced no evidence addressing either [prong] of the required showing" and the evidence merely suggested that the Defendant engaged in legitimate, legal conduct).

[268] *Cf. United States v. Ruhbayan*, 406 F.3d 292, 295-96 & 299 (4th Cir. 2005) (considering whether the privilege objector satisfied the prima facie showing for perjury based on (1) the privilege asserter's girlfriend confession that she gave false testimony to obtain the privilege asserter's prior acquittal in a different case and letter, and (2) letters from the privilege asserter to his girlfriend, to allow the privilege objector, the government, to subpoena the lawyer; holding that this evidence satisfied the prima facie showing that the privilege asserter "used his attorney to dupe the court and jury."); *Grand Jury*, 870 F.3d at 315 & 319–20 (considering whether the privilege objector satisfied the prima facie showing for fraud on the court through forgery and/or spoilation based on a trial exhibit that was suspected to be falsified; holding that the evidence satisfied the prima facie showing as to both require prongs).

b.  The Crime-Fraud Exception in the Context of Fraudulent Transfers

(1)  Actual Fraudulent Transfers in General

*(a) Compared to Constructive Fraudulent Transfers*

137.   A debtor's transaction constituting a fraudulent transfer renders the transaction void and possibly reversable by courts under both the Bankruptcy Code as well the statutory schemes of all fifty states—including the three states under which the Plaintiffs bring their actions: Delaware, North Carolina, and Texas. *See generally,* 11 U.S.C. § 548; 6 Del. C. § 1304; N.C. Gen. Stat. § 39-23; Tex. Bus. & Com. Code Ann. § 24.005. To ultimately succeed on a fraudulent transfer action, parties must "prove the elements of [a fraudulent transfer] by a preponderance of evidence." *Ballantyne* 135 (Bankr. W.D.N.C. 2023) (quoting *Bay Vista* 221 (Bankr. E.D. Va. 2010)).

138.   Under these statutory schemes, creditor can bring claims to void and reverse transactions and/or or courses of conduct that satisfy the elements for at least one of two kinds of fraudulent transfers:[269]

- (1) actual fraudulent transfers, which comprise transactions that the debtor made "with actual intent to hinder, delay, or defraud" as to the debtor's creditors, *see* 11 U.S.C. § 548(a)(1)(A), 6 Del. C. § 1304(a)(1), N.C. Gen. Stat. § 39-23.4(a)(1) (omitting "actual"), Tex. Bus. & Com. Code Ann. § 24.005(a)(1); or
- (2) constructive fraudulent transfers, which comprise transactions from the debtor that occurred (a) for less than 'reasonably equivalent value' and (b) either (i) occurred while the debtor was insolvent, (ii) caused such insolvency or left the debtor with unreasonably small capital and/or assets to pay debts, or (iii) was between insiders, *see* 11 U.S.C. § 548(a)(1)(B), 6 Del. C. § 1304(a)(2) (removing concurrent insolvency and insider relationships from sufficing for the second requisite part), N.C. Gen. Stat. § 39-23.4(a)(2) (same), Tex. Bus. & Com. Code Ann. § 24.005(a)(2).

While actual fraudulent transfers and constructive fraudulent transfers can often involve mirroring facts, a key difference is that actual fraudulent transfers exclusively require specific allegations of

---

[269] Although bipartite, fraudulent transfers generally and/or operationally comprise which treat or otherwise affect a debtor's liabilities, either purposefully or sufficiently in fact, to an extent which the law

the debtor's actual intents as to the transaction. *See Whitaker v. Mortg. Miracles, Inc. (In re Summit Place, LLC)*, 298 B.R. 62, 70 (Bankr. W.D.N.C. 2002) (discussing how an "actual fraudulent [transfer] requires a purposeful act" (citation omitted)). *But see infra* note 284. More specifically, actual fraudulent transfers require the debtor had one the 'fraudulent intents' as to one of the 'fraudulent objectives'—i.e. delay, hindrance, or defraudation, as to their creditors related to the transaction.

### (b) Fraudulent Intent and Objectives

139.    Actual fraudulent transfers do not require that the fraudulent objective be "the debtor's primary, active, controlling purpose," and can arise when a fraudulent objective was only "one of the purposes which was entertained, either directly or as incidental to a more active

---

deems sufficiently unfair or negative as to the debtor's creditors as to constitute fraud. *See Fraudulent Transfer*, BALLENTINE'S LAW DICTIONARY (3d ed. 1969) ("A transfer voidable in bankruptcy because made with actual intent to hinder, delay, or defraud existing or future creditors, or a transfer fraudulent in law, without reference to an actual fraudulent intent on the part of the bankrupt, because of the insolvency of the bankrupt at the time of the transfer and the absence of a fair consideration" (citing 9 Am J2d Bankr § 1115).); *see also Fraudulent Conveyance*, *id.* ("A conveyance in fraud of creditors. A transaction by means of which the owner of real or personal property has sought to place the land or goods beyond the reach of his creditors, or which operates to the prejudice of their legal or equitable rights, or a conveyance which operates to the prejudice of the legal or equitable rights of other persons, including subsequent purchasers" (citing 37 Am J2d Frd Conv § 1).); *cf. also generally*, *Fraud*, THE LAW DICTIONARY (Anderson Publ'g, 2001) ("[A] broad term for all kinds of acts which have as their objective the gain of an advantage to another's detriment, by deceitful or unfair means. It may be (a) actual, where there is deliberate misrepresentation or concealment, or (b) constructive, where the court implies it either from the nature of the contract or from the relation of the parties. Some courts are reluctant to define this term, because of the myriad forms which it can take. Fraud is a ground for setting aside a transaction, at the option of the person prejudiced by it, or for recovery of damages.").

Of course, any bare resulting creditor impairment does not suffice since a debtor's actions can impair their creditors without it being fraudulent given, *inter alia*, the realities that (1) debtors are free to directly transact liabilities, and (2) virtually any course of conduct taken by a debtor has the potential to affect their liabilities, either purposefully or not. Thus, the law limits sufficing transfers either to (1) those specifically intending non-lawful impairment of creditors' interests, namely, actual fraudulent transfers, or to (2) those actually impairing creditors' interests so objectively and significantly to per se constitute fraud regardless of the intent (i.e., the 'res ipsa loquitur' fraudulent transfer), namely, constructive fraudulent transfers,

purpose." *Coleman v. Cmty. Tr. Bank (in Re Coleman)*, 285 B.R. 892, 908 (Bankr. W.D. Va. 2002).[270]

140.    Assuming the existence of intent as to a fraudulent objective, the greater question often arises what suffices for the fraudulent objectives. Unfortunately, "[t]he [Bankruptcy] Code does not define the phrase 'intent to delay, hinder, or defraud'," wherefore, courts must look elsewhere. *In re Agnew*, 355 B.R. 276, 284 (Bankr. D. Kan. 2006). Of course, this analysis must at least begin with the ordinary meaning of the phrase, as is always the case for statutory interpretation. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning.").

141.    However, ordinary meaning does not necessarily end the analysis. First, the ordinary meaning considered is, to a certain extent, what was "commonly understood … at the time [of] enact[ment]" and not merely as of today. *New York v. Nat'l Highway Traffic Safety Admin.*, 974 F.3d 87, 95 (2d Cir. 2020).[271] Second, but related, this ordinary meaning must be considered "with a view to [the phrases'] place in the overall statutory scheme." *Id.*[272] These required considerations necessitate courts view undefined phrases according to any dictionary

---

[270] *See also, e.g.*, *JENCO LC v. SJI LLC*, 2023 UT App 151, ¶ 31 (discussing how actual fraudulent transfers do not require that the fraudulent intent was "'the sole or even primary motive' of the debtor," only that "'at least one of the [debtor's] motives was an impermissible one'" (citation omitted)). Similarly, intended hindrance, delay, or defraudation renders a transaction an actual fraudulent transfer even if, "despite the debtor's best efforts, the transaction failed to harm any creditor." *Tavenner v. Smoot*, 257 F.3d 401, 407 (4th Cir. 2001) (citation omitted).

[271] *But cf. generally Bostock v. Clayton County*, 590 U.S. 644 (2020).

[272] *See also Whitaker*, 298 B.R. at 70 (notwithstanding the plain text, the fraudulent objective "phrase[s] must be read consistently and with the intent of the law in mind" (citing *Stratton v. Sioux Falls Paint and Glass (In re Stratton)*, 23 B.R. 284, 287 (Bankr. S.D. 1982)); *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context."); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 70 (2012) (explaining that because "[m]ost common English words have a number of dictionary definitions" and "[m]any words have more than one ordinary meaning," "[o]ne should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise").

76

definitions and/or authoritative case-law published around when a statute was passed, on top of following, of course, any precedential interpretation of the statute post-enactment. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000).

142.    Third, the use of phrases constituting legal terms of art can denote specialized and sometimes even non-ordinary meanings that are only gleanable from specific authorities for such terms of art. *See FAA v. Cooper*, 566 U.S. 284, 292 (2012) (discussing how statutory use of a legal term of art allows presuming that the legislature """"knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken"""" (quoting *Molzof v. United States*, 502 U.S. 301, 307 (1992) (in turn quoting *Morissette v. United States*, 342 U.S. 246, 263 (1952)))).[273] Thus, in interpreting the fraudulent objective phrases, the Court considers their ordinary meaning both with regard to their history and their specialized contexts.

143.    Turning to the specific phrases, the Court begins by noting that the three fraudulent objectives are "distinct" and "disjunctive" requirements for an actual fraudulent transfer. *See Whitaker v. Mortg. Miracles, Inc. (In re Summit Place, LLC)*, 298 B.R. 62, 70 (Bankr. W.D.N.C. 2002) (discussing how "a finding of any one would satisfy the requirements" (citation omitted)); *accord, e.g.*, *Wiggains v. Reed (In re Wiggains)*, 848 F.3d 655, 661 (5th Cir. 2017). Thus, each describe different types of fraudulent objectives. Their differences exist notwithstanding the fact courts often elide the three. Such elision arises, however, due to natural and purposeful overlaps between the three objectives.

---

[273] One court has described these considerations as resulting in at least some of 11 U.S.C. § 548(a)(1)'s fraudulent objective phrases being "subject to a very important judicial gloss," specifically for purpose of. *In re Duncan & Forbes Dev., Inc.*, 368 B.R. 27, 34 (Bankr. C.D. Cal. 2007); *see also In re Karpuleon*, 2024 Bankr. LEXIS 2921, *16 (Bankr. C.D. Ill. Dec. 6, 2024) (describing the fraudulent objective as "ancient phrase[s] that def[y] that sort of 'plain meaning' approach to statutory interpretation" (citing *Duncan*, 368 B.R. at 34 n.12)).

144. For example, adhering to the phrases' ordinary meaning, courts have held that a debtor "act[ing] with '[] an intent to impede or obstruct' creditors'" satisfies hindrance, whereas a debtor "act[ing] with '[] an intent to slow or postpone creditors'" satisfies delay. *Wiggains v. Reed (In re Wiggains)*, 2015 Bankr. LEXIS 1460, at *64 (Bankr. N.D. Tex. Apr. 27, 2015) (citing 1 NEW SHORTER OXFORD ENGLISH DICTIONARY 1236 (1993), *id.*, at 623, *In re Lobell*, 390 B.R. 206, 219 (Bankr. M.D. La. 2008) and *In re Boudrot*, 287 B.R. 582, 586 (Bankr. W.D. Ok. 2002)). Of course, however, since obstruction definitionally comprises postponement, hindrance can comprise delay; however, the converse does not seem true given the phrase' plain meanings,[274] despite some courts holding otherwise.[275]

145. Thus, hindrance comprises a broader category within which delay can fall but still can be distinct. And, indeed, hindrance functions as a broad category that can conceivable comprise any nonlawful obstruction of creditors. Crucially, however, sufficient "hindrance or delay must be fraudulent" in that "the debtor attempts to prejudice the legal or equitable rights of creditors,"

---

[274] 'Hindrance' means "any action or object that makes difficult or impossible a person's travel, activity, assertion of a right or interest, use of property, performance of a contract, or any other action or legal benefit." *Hindrance (Hinder)*, THE WOLTERS KLUWER BOUVIER LAW DICTIONARY DESK EDITION (2012). 'Delay', on the other hand, means "a halt in some process or activity for a period of time of any duration, so long as the process or activity is presumed to recommence." *Delay*, THE WOLTERS KLUWER BOUVIER LAW DICTIONARY DESK EDITION (2012) ("Delay is).
   Conduct that 'delays' creditor action definitionally makes such action at least both 'impossible' for the delayed period or difficult overall (i.e., causing 'hindrance'); however, conduct encumbering creditor action (i.e., 'hindrance') does not necessarily 'delay' action, such as where the encumbrance simply requires more work. Similarly, making an action impossible precludes presuming recommencement will occur. Accordingly, although delay may always also constitute hindrance, hindrance clearly can exist without delay.

[275] *See e.g.*, *In re Duncan & Forbes Dev., Inc.*, 368 B.R. 27, 34 (Bankr. C.D. Cal. 2007 ("Under fraudulent transfer law, 'hinder' and 'delay' have the same meaning" (citation omitted).); *In re Braus*, 248 F. 55, 64 (2d Cir. 1917) ("[T]here is no distinction between delaying and hindering.").

wherefore the bare fact of hindrance or delay cannot suffice. *Whitaker*, 298 B.R. at 70 (citing *Stratton*, 23 B.R. at 287).[276]

146.   Defraudation is similar but can be more difficult in elucidation, given not only ambiguity as to how it relates to the other fraudulent objectives, but also because the proffered definitions for defraudation can be even more vacuous than those for hindrance or delay. At its broadest, defraudation can encompass any unfair or nonlawful impairment of creditors interest given how defraudation, generally, "refer[s] 'to wronging one in his property rights by dishonest methods or schemes', and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching'." *See McNally v. United States*, 483 U.S. 350, 358 (1987) (citation omitted).[277] Defraudation so construed would function similarly to a broad construction of hindrance.[278]

---

[276] *See also Coder v. Arts*, 213 U.S. 223, 243 (1909) (a transfer can be without a fraudulent intent to hinder or delay "notwithstanding the effect may be that it hinders or delays creditors by removing from their reach assets of the debtor"); *Hefner v. Metcalf*, 38 Tenn. 577, 579 (1858) ("The words 'hinder and delay' are to be taken in their legal or technical, and not their literal sense .... The statute only refers to an improper or illegal hinderance or delay—not such as is reasonable and fair in the exercise of [a] well established right"); *Dance v. Seaman*, 52 Va. 778, 782 (1854) (rejecting literal meaning, because "[e]very conveyance to trustees interposes obstacles in the way of the legal remedies of the creditors, and may, to that extent, be said to hinder and delay them").

[277] *See also e.g.*, *Defraud*, BALLENTINE'S LAW DICTIONARY (3d ed. 1969) (defining "defraud" as "acts, omissions or concealments, which involve a breach of legal or equitable duty, trust, or confidence justly reposed, and are injurious to another, or by which an undue and unconscionable advantage is taken of another").

[278] *See Clayton v. Clark*, 76 Kan. 832, 835 (1907) (citation omitted) (describing 'defraud' as "'the most generic term' " when combined with 'hinder' or 'delay' and as "'really includ[ing] [] the others'," since hindering or delay creditor action "'are only different modes of "defrauding" him of his rights, and these words are used merely as more specific statements of various forms of fraud' "). *But see Ferrari v. Bar-Land Corp. (In re Zenox, Inc.)*, 173 B.R. 46, 49 (Bankr. D.N.H. 1994) ("[I]t is sufficient [] that the intent [] was to hinder and delay creditors and not necessarily to defraud creditors"); *In re Condon*, 198 F. 947, 950 (S.D.N.Y. 1912) ("[A]n intent to hinder or delay is adequate even if it be not an intent to defraud" (citation omitted)).

Adopting a broader meaning for defraudation based on these definitions would suggest that sufficient hindrance or delay always also constitute defraudation since hindrance or delay of creditor action necessarily injures such creditors and so long as such hindrance or delay suffices itself as a fraudulent objective. Contrarily, so adopting would suggest that defraudation does not always also

147.    Granted, some courts narrow defraudation. For example, one court described sufficient intended defraudation as limited to only where the purpose is part of any overall "scheme to … not to pay [creditors]s at all." *Duncan*, 368 B.R. at 36. First, the Court notes that that case's authority, even only as persuasive authority, is suspect.[279] Regardless, accepting arguendo that defraudation specifically could require an intent to pay creditors nothing, an intent to pay creditors less may still suffice as hindrance so long as that hindrance if sufficiently nonlawful. That decreased total payments may suffice for hindrance is true not only *ex facie* based on the ordinary and specialized meaning of hindrance, *see supra* ¶¶ 144–145, but also confirmed by the multitude of courts finding decreased payments sufficed as a fraudulent objective for an actual fraudulent

---

constitute hindrance, so long as hindrance is limited to obstruction as to creditor enforcement and does not affect and/or modify the enforceable interests themselves—i.e., since defraudation could exist where any creditor action is no less available, but materially altered.

[279] First, as the Plaintiffs note, *Duncan* has been abrogated by statute and rejected by appellate opinions in its circuit. *See Plaintiffs Reply Brief*, ¶ 30 & ¶ 30 n. 44 (discussing how *Duncan* "applied a now-revised version of section 362(d) of the Bankruptcy Code" and how *Lira v. Wells Fargo Bank, N.A. (In re Lira)* "specifically reject[]" *Duncan* (first citing 2015 WL 4641600, at *6 n. 12 (B.A.P. 9th Cir. Aug. 4, 2015) (discussing how *Duncan* construed the pre-2010 version of section 362(d), which required a showing of intent to "'delay, hinder and defraud'"), then *id.* (concluding that no showing of unlawfulness is required by section 362(d))).

Furthermore, *Duncan* provides no cite for the proposition that defraudation is so limited. The only possible authority *Duncan* could be relying on is a cite for a related proposition, that "[a] scheme to defraud creditors, in the fraudulent transfer context, means a scheme to avoid paying them," citing 4 JAMES WILLIAM MOORE, COLLIER ON BANKRUPTCY P 67.37 (14th ed. 1978). *Duncan*, 368 B.R. at 35. While the Court has not been able to check whether that specific version supports that second proposition (it is a rare edition of Collier's costing tens of thousands of dollars to access), the Court notes first that other editions of that source do not support that proposition. Second, the Court notes that even if the source did support that second proposition, that proposition would still not further entail the first proposition as to *Duncan's* asserted limit on defraudation.

transfer,[280] as well as arguably demanded by the purposes behind fraudulent transfer laws, both historical and modern.[281]

### (c) Badges of Fraud

148.    Inherent to any state of mind showing, displaying a debtor's fraudulent intent directly from the source is difficult, wherefore the law allows "'badges of fraud' to support" an actual fraudulent transfer claim. *Sharp Int'l Corp. v. State Street Bank and Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005). 'Badges of fraud' are "circumstantial evidence of a debtor's subjective state of mind, " 5 Collier on Bankruptcy ¶ 548.04(1)(b) (16th ed. 2023), comprised of "circumstances," the "presence" of which legally "gives rise to an inference of [a

---

[280] *See e.g.*, *In re Roco Corp.*, 701 F.2d 978, 984 (1st Cir. 1983) (rejecting the defendant's argument that hindrance or defraudation was not satisfied due to the defendant's attempts to ensure the debtor had some assets for paying their creditors, at least where (1) other evidence was overwhelming and (2) the debtor remaining somewhat solvent benefitted the defendant, based on the fact that "[f]raudulent intent does not require an intent to run the company aground," only "an intent to hinder or defraud creditors"); *Firmani v. Firmani*, 332 N.J. Super. 118, 123-24 (2000) (rejecting the defendant's argument that hindrance was not satisfied because the transfer "'deprive [the creditor] of assets sufficient to satisfy [their] judgment'," but rather "'merely changed the type of asset against which [they] could assert" their claim because such satisfaction, despite paying the creditor something, (1) would be of depleted assets and (2) would only occur after clearing various hurdles, if it did happen, as well was overall less guaranteed than before since its occurrence was now subject to wider approval. contingencies, and/or prerequisites, even beyond such depletion and if such hurdles were cleared); *Empire Lighting Fixture Co. v. Practical Lighting Fixture Co.*, 20 F.2d 295, 297 (2d Cir. 1927) (rejecting the defendant's argument that hindrance, delay, or defraudation was not satisfied due to the debtor's receipt of assets possibly sufficient for paying their creditors since creditors now were restricted as to what assets and/or how the creditors could collect on their interests which "was the obvious purpose and result of the contrivance, which it was the design of the statute to defeat").

[281] *Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*, 12 F.4th 171, 204 (2d Cir. 2021) (discussing the Elizabethan statute that progenerate modern fraudulent transfer statutes and from which the three fraudulent intents phrasing derives; discussing how that statute "prevented debtors from shortchanging creditors by squirreling away assets out of their creditors' reach," and was more directed at carte blanche impairment than piecemeal impairment); Unif. Voidable Transactions Act § 4 cmt. 2, at 21-22 (Unif. L. Comm'n 2014) ("The phrase "hinder, delay, or defraud" in § 4(a)(1), carried forward from the primordial Statute of 13 Elizabeth, is potentially applicable to any transaction that unacceptably contravenes norms of creditors' rights … 'Hinder, delay, or defraud' is best considered to be a single term of art describing a transaction that unacceptably contravenes norms of creditors' rights. Such a transaction need not bear any resemblance to common-law fraud" (citations omitted).).

fraudulent] intent," *Sharp*, 403 F.3d at 56 (citation omitted),[282] or at least can be "use[d] as a basis

for" such an inference. *Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504, 1509 (1st Cir.

1987).[283] Unlike some direct fraudulent intent proof, badges of fraud "are objective criteria,"

*Boston*, 835 F.2d at 1509, which can relieve some of the difficulty of actual fraudulent transfer

claims.[284]

---

[282] *See also Schilling v. Heavrin (In re Triple S Restaurants, Inc.)*, 422 F.3d 405, 414 (6th Cir. 2005)
(same (citation omitted)).

[283] The fraudulent inference is allowed because these factual circumstances are "so commonly associated
with fraudulent transfers." *Sharp*, 403 F.3d at 56 (citation omitted); *Schilling* v, 422 F.3d at 414 (same
because they are "so frequently attending fraudulent transfers" (citation omitted)).

[284] Because badges permit an inference of fraudulent intent, the practical distinction between constructive
and actual fraudulent-transfer claims can instead turn more on the fact that fraudulent intent must be
formally alleged for an actual fraudulent-transfer. Consequently, proof may rest on the same objective
criteria sufficing for a constructive fraudulent-transfer claim.

149.    Such badges include whether:

- (1) the transfer or obligation was to an insider (the "insider badge");
- (2) the debtor retained possession or control of the property transferred after the transfer (the "debtor retention badge");
- (3) the transfer or obligation was disclosed or concealed (the "concealment badge");
- (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit (the "impending suits badge");
- (5) the transfer was of substantially all the debtor's assets; the debtor absconded; the debtor removed or concealed assets (the "substantial assets badge");
- (6) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred (the "inequivalent value badge");
- (7) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred (the "resulting insolvency badge");
- (8) the general chronology of events and transactions under inquiry (the "catchall badge");
- (9) the transfer occurred shortly before or shortly after a substantial debt was incurred (the "proximate debt incurrence badge"); and
- (10) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor (the "insider intermediary badge").

See 6 Del. C. § 1304(b); N.C. Gen. Stat. Ann. § 39-23.4(b); Tex. Bus. & Com. Code Ann. § 24.005(b); *Allman v. Wappler (In re Cansorb Indus. Corp.)*, 2009 Bankr. LEXIS 3840, at \*25 (Bankr. M.D.N.C. Nov. 20, 2009);[285] *cf. also* 11 U.S.C. § 544(b).

150.    The fraudulent intent inference does not require showing every badge and a showing of multiple badges can suffice to ultimately prove an actual fraudulent transfer claim. *See Off. Comm. of Unsecured Creditors of Toy King Distribs. v. Liberty Sav. Bank (In re Toy King Distribs., Inc.)*, 256 B.R. 1, 128 (Bankr. M.D. Fla. 2000) (noting the "confluence of several" badges

---

[285] Critically, the badges that permit such inferences are not delineated by case law but rather are explicitly and specifically provided for and canvassed by the same state statutes giving rise to actual fraudulent transfer claims, and thus could be described as elements of an actual fraudulent transfer claim.

is sufficient for "conclusive evidence of an actual intent to defraud" (quoting *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254-55 (1st Cir. 1991))).

151.    However, the bare presence of badges neither "compel a finding of actual [fraudulent] intent," 5 Collier on Bankruptcy ¶ 548.04(1)(b) (16th ed. 2023), nor "create a presumption of fraudulent intent." *Bear, Stearns Securities Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 10 n.13 (S.D.N.Y. 2007) (citation omitted).[286] Rather, the Court must consider the "facts surrounding" the challenged transaction in order to assay any badge's fraudulent intent inferences "in full context rather than in a vacuum." *Stermer v. Old Republic Nat'l Title Ins. Co. (In re ATIF, Inc.)*, 160 F.4th 1124, 1140 (11th Cir. 2025) (citation omitted). Consequently, the fraudulent intent inference is not always obliged (and/or allowed), such as when "a debtor had legitimate or independent reasons or purposes for making the transfer." *Woodard v. Stewart (In re Stewart)*, 280 B.R. 268, 283 (Bankr. M.D. Fla. 2001) (citation omitted).

(2)   Crime-Fraud Exception in the Fraudulent Transfer Context

152.    Courts routinely apply the crime-fraud exception in the actual fraudulent transfer context to compel disclosure of otherwise privileged materials based solely on the presence of the badges of fraud. First, a showing of multiple badges can suffice for the prima facie showing of an actual fraudulent transfer claim. *See, e.g.*, *Eox Tech. Sols. v. Galasso*, WL 8116774, at *3 ( S.D. Fla. Nov. 22, 2023), *In re SAM Industrias S.A.* 653 B.R. 196 (Bankr. S.D. Fla. 2023); *Cendant Corp. v. Shelton*, 246 F.R.D. 401, 405 (D. Conn. 2007); *Off. Comm. of Asbestos Claimants of G-1 Holdings, Inc. v. Heyman*, 342 B.R. 416, 427 (S.D.N.Y. 2006); *In re Andrews*, 186 B.R. 219, 224

---

[286] *See also Whitaker*, 298 B.R. at 70 ("The presence of a single badge of fraud is not sufficient to establish actual fraudulent intent; however, the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent significantly clear evidence of a legitimate supervening purpose. Mere suspicion of fraudulent intent does not suffice (citing *In re McLaren*, 236 B.R. 882, 899 (Bankr. D.N.D. 1999) and *Bumgardner v. Ross*, 151 B.R. 984 (Bankr. S.D. Fla. 1993)).").

(Bankr. E.D. Va. 1995), *Argyle Online, LLC v. Nielson (In re GGW Brands, LLC*), 504 B.R. 577, 605 (Bankr. C.D. Cal. 2013), *Moyer v. Rosich (In re Rosich)*, 561 B.R. 668, 670 (Bankr. W.D. Mich. 2016).[287] However, a showing of multiple badges does not suffice where there are legitimate reasons underpinning certain badges and/or certain badges are only conclusorily asserted. *Cf., e.g., generally Baldwin v. United States*, 2018 WL 4372560 (C.D. Cal. June 14, 2018); *In re Okean B.V.* 60 F. Supp. 419, 431 (S.D.N.Y. 2014); *Guzman v. Pinch (In re Guzman)*, 2011 Bankr. LEXIS 357 (Bankr. N.D. Cal. Feb. 4, 2011); *United Bank v. Buckingham*, 301 F. Supp. 3d 547 (D. Md. 2018); *In re Atif, Inc.*, 2019 Bankr. LEXIS 4079 (Bankr. M.D. Fla. Nov. 1, 2019).

c.   The Crime-Fraud Exception in the Context of Unsettled Law

153.   Generally, most crime-fraud exception cases involve alleged conduct that, if true, would clearly constitute a crime or fraud under the law. *Cf., e.g.*, *supra* notes 267–268. Few cases, and none from the Fourth Circuit, address the crime-fraud exception where, even accepting all the privilege objectors' factual assertions as true, it remains legally uncertain whether the conduct amounts to a crime or fraud. However, of such cases which do exist, many courts counsel against applying the crime-fraud exception in such circumstances.

154.   First, even when courts have concluded that a client and their lawyer broke the law or violated ethical duties, some courts are still reticent to apply the crime-fraud exception if the conduct occurred when the law was unsettled or unclear. For example, in *City of Rome v. Hotels.com, LP* (N.D. Ga. July 28, 2011), the Georgia Supreme Court had already found, in an independent case, that the privilege asserter's business model violated existing tax law. 2011 U.S. Dist. LEXIS 163450, at *27. Nevertheless, when a privilege objector brought a separate action

---

[287] *See also Andrews*, 186 B.R. at 224 n.3 (noting that applying the crime-fraud exception does not require a determination that "the debtor intended to defraud his creditors").

against the privilege asserter and sought to compel disclosure of privileged materials on the basis of the crime-fraud exception applying due to that tax law violation, the court declined to apply it because (1) although the privilege asserter "and counsel knew there was a substantial risk that they could be held liable, they did not know that they would be held liable," (2) "it [was] not clear that [the privilege asserter] actually committed a crime or fraud," since the holding that the privilege asserter "should have been paying taxes on the retail rate, not the wholesale rate, [] did not establish that [the privilege asserter] acted fraudulently or committed a crime," and (3) the privileged materials "analyze the risk of liability and propose arguments and strategies to avoid payment and prevail in litigation," which "is precisely the type of analysis that lawyers perform on a regular basis." *Id.,* at *31–33.[288]

155.    Similarly, other courts have declined to apply the crime-fraud exception where the privilege objector and privilege asserter "dispute[d] [] the proper application of a legal standard to the facts of this case," because such "complex issues … will have to be faced in this litigation" and ultimately decided "on a full record." *Danisco A/S v. Novozymes A/S*, 427 F. Supp. 2d 443, 450–51 & 451 n. 9 (S.D.N.Y. 2006). In *SLS Props. Three, Ltd. Liab. Co. v. Arevalo*, the court "decline[d] to engage in an in camera [review]" because, *inter alia*, deciding whether the privilege

---

[288] *See also Durand v. Hanover Ins. Grp.*, 294 F. Supp. 3d 659, 691-92 (W.D. Ky. 2018) (holding that the privilege objector had not satisfied the prima facie showing where the conduct allegedly constituting a crime or fraud could so constitute but was still "arguably within the limits of what the law permits"); *Med. Lab. Mgmt. Consultants v. ABC, Inc.*, 30 F. Supp. 2d 1182, 1206-07 (D. Ariz. 1998) (same where the privilege objector argued the privilege asserter's conduct violated law that was "far from settled" and "'present[ed] a new kind of fraud …[which] few courts have had to grapple with," wherefore the evidence did not show that the privilege asserters "'knew or should have known' that they would be liable for fraud," but rather that they, "recognizing the uncertainty in the law, sought the advice of staff counsel to assist in designing the [conduct] so that it would conform with the law"); *Mfg. Automation & Software Sys. v. Hughes*, 2017 U.S. Dist. LEXIS 235846, at *35-37 (C.D. Cal. Dec. 1, 2017) (same despite the fact that it was "undisputed that [the privilege asserter] should not have made under cover contact with a represented party" since, *inter alia*, "no authority … suggests that an ethical violation of this nature is sufficient to invoke the crime-fraud exception to destroy the attorney-client privilege").

objector had satisfied the prima facie showing was "inextricably intertwined with the merits" as "the same allegations of wrongdoing" underpinned the privilege objector's complaint and their motion to compel. 2017 LX 62822, at *9 (S.D. Fla. Feb. 24, 2017) (citations omitted). The court outlined that finding that the prima facie showing was satisfied "would be premature" because it "must still make determinative rulings that are germane to the application of the crime-fraud exception" and was "being called upon to preemptively decide that [the privilege asserter's] actions in this case were fraudulent and/or criminal," which "would essentially amount to a trial on the papers'." *Id.*

156. Granted, some courts facing similar situations have nonetheless chosen to decide and apply the crime-fraud exception at least for the threshold showing.[289] Additionally, dicta from

---

[289] *See Linde v. Arab Bank, PLC*, 608 F. Supp. 2d 351, 359–362 (E.D.N.Y. 2009) (noting that the underlying law "is in dispute" and that finding for the privilege objector "would have implications for any later decision by this court regarding [the privilege asserter's] civil liability" so as to make it "precipitous for this court to weigh in one way or another on the matter until it is properly presented;" nonetheless holding, "in an abundance of caution," that the privilege objector satisfied the preliminary burden so as to warrant an in camera review); *Yourga v. City of Northampton*, 2018 U.S. Dist. LEXIS 250486, at *6-10 (D. Mass. July 9, 2018) (noting that the privilege objector's evidence "depend[ed] in significant measure on credibility and the inferences that a fact finder will ultimately draw to resolve questions of fact that are very much in dispute" which, if true, would "amount to fraud that may satisfy the crime-fraud exception;" holding, first, to "[g]iv[e] [the privilege objector] the benefit of the doubt," that they satisfied the preliminary burden; holding, second, that the in camera review did not satisfy the prima facie showing so the crime-fraud exception did not apply); *Atl. Anesthesia, P.A. v. Lehrer*, 2020 N.H. Super. LEXIS 21, 2020 LX 34636, at *5 (noting that that the New Hampshire Supreme Court has not yet weighed in on whether "a breach of fiduciary duty is sufficient to trigger the [crime-fraud] exception," which was and open and dispute question, but finding that the privilege objector had nonetheless satisfied the preliminary burden to warrant an in camera review), *rev'd*, *Atl. Anesthesia, P.A. v. Lehrer*, 177 N.H. 582, 588, 594–96 (2025) (discussing how the trial court, ostensibly based on the in camera review, had found some privileged materials as falling under the crime-fraud exception; reversing the trial court's determination because the pursuit dimension was not met, while "declin[ing] to answer" whether the crime-fraud exception applied to a "'breach of fiduciary duty or tortious interference' " because 1.) "[a]n affirmative answer [] would expand the exception beyond the plain meaning of [] 'fraud', and … would [] 'chill[] the ability of [privilege asserters] to seek legal advice'," whereas 2.) a "negative [answer] would preclude the application of the exception in cases in which there is a reasonable basis to conclude that the [privilege asserter] used the attorney to perpetrate a fraud, simply because a claim of fraud has not been included in the complaint").

the Fourth Circuit suggests courts can and should decide whether the crime-fraud exception applies even when the issue is the same as the ultimate merits question of the case.[290]

157.   Nevertheless, application of the crime-fraud in such situations is troubling and challenges the very purpose of legal representation. Indeed, as courts have recognized, "[t]here is a difference between going to a lawyer and asking the lawyer to tell you whether the course of action you want to pursue is arguably within the limits of what the law permits and going to a lawyer and asking the lawyer to assist you in violating the law or to show you how to violate the law." *Williams v. Duke Energy Corp.*, 2014 U.S. Dist. LEXIS 109835, at *10 (S.D. Ohio Aug. 8, 2014); *see also State ex rel. N. Pac. Lumber Co. v. Unis*, 282 Or. 457, 464 (1978) ("Good-faith consultations with attorneys by clients who are uncertain about the legal implications of a proposed course of action are entitled to the protection of the privilege, even if that action should later be held improper.").[291]

---

[290] *Union*, 385 F.2d at 144-45 (stating that the prima facie showing meant that the privilege objector was "not at this stage of the proceedings required to prove the crime or fraud in order to secure the evidence," which led the court "to add, perhaps unnecessarily, that in denying the writ, we express no opinion upon the facts or law touching upon the merits of the case"); *Doe*, 662 F.2d at 1080 (holding that the privilege objector had satisfied the prima facie showing but that the court "of course, make[s] no judgment as to the merits of the case, as the prima facie showing of fraud on the court was all that was required to support the trial court's action compelling compliance with the subpoena duces tecum"); *United States v. Myers*, 593 F.3d 338, 347 n.14 (4th Cir. 2010), 347 n.14 (4th Cir. 2010) ("[O]ur deciding whether the crime-fraud exception applies would require delving into factual and legal considerations enmeshed in the merits of the underlying dispute. For that reason, the collateral order doctrine cannot apply" (citations omitted).); *Duplan*, 540 F.2d at 1221-22 (4th Cir. 1976) ("[W]e are of opinion that, assuming that there is a crime, fraud or tort exception to Rule 26(b)(3), a matter which we do not decide here, [privilege objectors satisfied the prima facie showing].").

[291] *See also generally* Norman W. Spaulding, *Compliance, Creative Deviance, and Resistance to Law: A Theory of the Attorney-Client Privilege*, 2013 J. PROF. LAW. 135 (2013) (arguing that "the privilege should [] protect the client's right to make informed decisions about compliance or non-compliance, even when contemplating actions at the margins of the law" and that "the expansion of the crime-fraud exception [is] a threat to the privilege's integrity").

**2.      Arguments and Analysis**

158.    Here, Plaintiffs have asserted the crime-fraud exception on the basis that the Defendants' Texas Two-Step constitutes an actual fraudulent transfer under the Bankruptcy Code and Delaware, North Carolina, and Texas law.[292]

  *i.   Plaintiff's Burden: Sufficiency of Badges of Fraud, Actual Intent, and Unlawfulness*

159.    While the Plaintiffs acknowledge that showing multiple badges of fraud does not always establish the sufficient fraudulent intent,[293] they also foreground their arguments as why they have met their burden on the fact that several badges can be sufficient both to make a prima facie showing for a fraudulent transfer and, ultimately, to prove the claim.[294] That emphasis is not wholly misplaced. But at times, Plaintiffs appear to go further and argue that a showing of at least nearly all the badges—or all of them—necessarily, or at least irrebuttably, establishes a prima facie case.[295]

160.    The Defendants disagree with the Plaintiffs as to the role a showing of several badges can play here. At bottom, the Defendants argue that although several or all badges may suffice for a colorable theory of fraudulent transfer, such a showing could never suffice for a prima

---

[292] *See* Plaintiffs Preliminary Brief, ¶ 16 (citing 11 U.S.C. § 544(b); 6 Del. C. § 1304(b); N.C. Gen. Stat. Ann. § 39-23.4(b); Tex. Bus. & Com. Code Ann. § 24.005(b))

[293] *See* Plaintiffs Preliminary Brief, ¶ 15 n. 35 ("[T]he presence of any of the badges of fraud does not compel [] finding [actual intent]" (quoting In re TMST, Inc., 610 B.R. 807, 826-27 (Bankr. D. Md. 2019) (in turn quoting *Andrews v. RBL, L.L.C. (In re Vista Bella, Inc.)*, Adv. Pro. No. 12-00060-MAM, 2013 WL 2422703, at *15 (Bankr. S.D. Ala. June 4, 2013))).).

[294] See Plaintiffs Preliminary Brief, ¶ (citing *Andrew* 224, n.3 (Bankr. E.D. Va. 1995)); Hearing Transcript, at 53:17–54:11 (discussing how """several badges of fraud can constitute clear and convincing evidence of actual intent"'," which is an even higher standard than the standard the Plaintiffs must meet (quoting *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 10 n.13 (S.D.N.Y. 2007) (in turn quoting *In re Actrade Financial Techs. Ltd.*, 337 B.R. 791, at 809))).

[295] *Cf* Hearing Transcript, at 121:6– 14 (rebutting the Defendants' argument, that the Plaintiffs' badges (discussed below) fail to satisfy the burden since multiple badges do not always suffice, as ignoring that the Plaintiffs' badges comprise all or almost all possible badges).

facie showing of the Plaintiffs' claims.[296] However, the Defendants' exact bases for this are muddled. One clear basis raised by the Defendants is the crucial point that badges constitute circumstantial evidence.[297] However, additionally, the Defendants prominently submit that roughly two dimensions exist as to the Plaintiffs' fraudulent transfer claims that must be specifically accounted for in satisfying their burden, and which preclude any combination of badges from independently sufficing for the prima facie showing.

161.    The Defendants' first required dimension is a showing of unlawfulness.[298] The Defendants base their first dimension partially on the settled and noncontroversial points that hindrance or delay must be fraudulent or nonlawful to suffice as a fraudulent objective. For example, the Defendants argue that "'incidental effect is not enough'" since allowing otherwise "would 'prove too much' and "threaten the availability of bankruptcy relief altogether" given that "'the bankruptcy stay causes payment delay to every unsecured creditor in every bankruptcy case.'"[299]

162.    The Defendants' second required dimension is a type of specific intent and proof of the same. More specifically, the Defendants suggest that the Plaintiffs must proffer (1) some

---

[296] *See* Hearing Transcript, at 77:16–78:10 (Defendants' statement: "Colorable theory may be enough to support derivative standing …. But that colorable theory is not enough to make out a prima facie case of actual fraud … [Plaintiffs] present no evidence of actual intent. The crime-fraud argument should end there.").

[297] Defendants Reply Brief, pp. 6–7. The Defendants additionally argue that the badges are insufficient when countered by evidence of good intent. *See* Hearing Transcript, at 80:5–10 (Defendants' statement because the funding agreement was "inten[ded] … to pay what is owed, … [it] renders the supposed badges meaningless"). The Court considers this specific argument below. *See infra* ¶ 178.

[298] Defendants Preliminary Brief, pp. 4–6; Defendants Opening Brief, p. 16; Defendants Reply Brief, pp. 3–6.

[299] Defendants Opening Brief, p. 16 (first citing *Duncan*, 368 B.R. at 33, then *id.*, at 34, then quoting *Mayo v. Pioneer Bank & Tr. Co.*, 270 F.2d 823, 831 (5th Cir. 1959), and *Duncan*, 368 B.R. at 34). However, the Defendants additionally base their asserted unlawfulness showing on the specific context here of a Texas Two Step and/or given *Bestwall*.

direct evidence as to the alleged fraudulent intents,[300] as well as (2) a heightened form of the fraudulent intents, particularly, something akin to 'malice' as to the Claimants.[301] More particularly, one the Defendants' bases for their direct evidence assertion appear to be simply the fact that the Plaintiffs' claim is "an actual (not constructive) fraudulent transfer."[302] The Defendants' bases for the their heightened malign intent assertion are (1) a more than hundred-years old Second Circuit case holding that "hindrance or delay '"must also be devised and contrived of malice, fraud, covin, collusion, or guile"'," and (2) *Duncan's* holding that sufficient defraudation is limited to "'a scheme to avoid paying [creditors]', thus 'requir[ing] an intent not to pay creditors at all'," which courts recognize a bankruptcy filing "by itself, 'would not constitute'."[303]

163.    The Plaintiffs object to the Defendants required unlawfulness dimensions because showing unlawfulness is not required (1) specifically at this stage since the prima-facie showing explicitly disclaims an ultimate merits showing, as well as (2) generally for their claims because legal transfers can constitute fraudulent transfers, whereas illegal transfers are simply void and do not require fraudulent transfer actions.[304] Plaintiffs also assert that their argument is not just about

---

[300] *See* Hearing Transcript, at 77:16–78:10 (Defendants' statement: "[Plaintiffs] present no evidence of actual intent. The crime-fraud argument should end there.").

[301] Defendants Preliminary Brief, pp. 3–6; Defendants Opening Brief, pp. 15–16; Defendants Reply Brief, pp. 6–7.

[302] Defendants Preliminary Brief, pp. 3–4; *see also* Defendants Opening Brief, pp. 15–16.

[303] Defendants Opening Brief, p. 16 (first quoting *In re Braus*, 248 F. 55, 64 (2d Cir. 1917) and citing *United Bank v. Buckingham*, 301 F. Supp. 3d 547, 554 (D. Md. 2018), then quoting *Duncan*, 368 B.R. at 35–36, and *United States v. Huebner*, 48 F.3d 376, 379 (9th Cir. 1994)).

[304] *See* Hearing Transcript, at 38:3–15 (Plaintiffs' statement: "Defendants suggest that the subjective fraud must be unlawful and again, show actual intent to commit a crime or defraud in order to establish crime-fraud. Yet, the Fourth Circuit in *In re Grand Jury Subpoenas* … says the opposite. 'Neither a crime, nor a fraud is required to overcome the attorney-client privilege.' …. Defendants cited cases like *Duncan* to support this position. They've been specifically rejected by the appellate court which concluded that no showing of unlawfulness is actually required."); *id.*, at 53:2–13 (Plaintiffs' statement: "[T]here's all sorts of legal transfers that, nevertheless, form the basis of a fraudulent transfer … [illegal] transactions are just void as a matter of law.").

the Petition, but the Restructuring combined the Petition, which, in essence, is the Defendants' Texas Two-Step.[305]

164.    First, as to whether the badges of fraud can suffice or whether direct proof of fraudulent intent is required, the Court believes that actual intent evidence is not required. While the Defendants are of course correct that the Plaintiffs' claim is not a constructive fraudulent transfer but rather an actual fraudulent transfer, which requires showing one of the fraudulent objectives, these facts do not negate the settled law that badges can suffice for such intents. Thus, the Plaintiffs' burden for a prima facie showing does not per se require any kind of direct evidence proof. Defendants' emphasis on the type of Plaintiffs' fraudulent transfer vituperates the very purpose why badges exist and suffice, namely, the difficulty of obtaining such direct proof of intent. *See supra* ¶ 148.[306]

165.    Second, the Court does not believe that there is any heightened intent requirement of any kind of malice or malign intents as to the Claimants, beyond what already suffices for the fraudulent intents.

166.    As to the unlawfulness argument, (1) the Plaintiffs are not required to prove the ultimate merits of their claim that the Defendants' Texas Two Step constituted an actual fraudulent transfer and (2) an alleged actual fraudulent transfer need not be clearly illegal or pursuant to some clearly illegal endeavor. Thus, the Court agrees with the Plaintiffs to the extent they argue that they

---

[305] *See* Hearing Transcript, at 52:6–9 (Plaintiffs' statement: "[I]t's not the bankruptcy filing by itself. The basis of the claim is that in anticipation of that bankruptcy filing, they transferred assets so that those assets would not be subject to this Court's jurisdiction.); *id.*, at 116:16–21 (Plaintiffs' statement: "[W]e aren't suggesting it's just a filing for bankruptcy that is causing a hindrance, a delay, or a defraud on our clients. In fact, we say it is just the last step in a, a calculated process to get there where that step was necessary to complete that hindrance, that delay, and the defrauding.").
[306] It would be illogical to require a higher burden for the prima facie showing of a fraudulent transfer than for the ultimate proof of the fraudulent transfer itself. The crime-fraud exception exists to allow privilege objectors an opportunity to be able to potentially succeed on their claim through fulsome discovery.

are not required to show a preponderance of evidence that the Defendants' Texas Two Step was a fraudulent transfer, and that a transaction can appear legal, but still be a fraudulent transfer pursuant to the Bankruptcy Code.

167.    However, the Court disagrees to the extent the Plaintiffs suggest that conduct that courts have recognized as lawful, combined with bare allegations of wrongdoing, suffices to establish a prima facie showing. Badges of fraud are circumstantial evidence of fraudulent intent such that their probative value arises because they are ordinarily absent from legitimate transactions. See *supra* ¶ 151.

168.    Accordingly, where purported badges of fraud are an inherent or ordinary feature of the transaction type, under the law, satisfying the prima facie showing for a fraudulent transfer requires more than simply badges and bare allegations. This is because, where a purported badge of fraud is an inherent feature of the transaction type, its probative value is diminished unless the movant can identify facts showing the feature was deployed for a fraudulent objective rather than for the transaction's ordinary function. Essentially, while badges of fraud can suffice, they do not always suffice;[307] and context matters.[308] Thus, whenever the badges of fraud are commonplace or innocuous for the type of transaction at issue, a movant must rely on more than badges alone to satisfy the prima facie showing for a fraudulent transfer,

---

[307] This principle similarly applies to the Plaintiffs' argument that because a showing of several badges suffices as clear and convincing evidence of a fraudulent transfer, it must suffice for a prima facie showing of the same.

[308] The Plaintiffs seem to accept this. *See* Plaintiffs Preliminary Brief ¶ 15 ("[T]he badges of fraud are used as a guide in assessing fraudulent intent given the facts and circumstances of each case."); *id.* n. 35 (citing *Jones v. Tauber & Balser, P.C.*, 503 B.R. 162, 184 (N.D. Ga. 2013); *In re TMST, Inc.*, 610 B.R. 807, 826-27 (Bankr. D. Md. 2019) (quoting *Andrews v. RBL, L.L.C.* (*In re Vista Bella, Inc.*), 2013 WL 2422703, at *15 (Bankr. S.D. Ala. June 4, 2013)) ("[n]o specific combination of badges is necessary for a finding of actual intent and the presence of any of the badges of fraud does not compel such a finding")).

ii. *Plaintiff's Evidence*

(1)  The Plaintiffs Badges of Fraud

169.     Having found that the badges of fraud could, but not necessarily, suffice to make a prima facie showing, the Court turns to the Plaintiffs' proffered evidence. Plaintiffs proffer the existence of at least eight badges of fraud,[309] which they note this Court has already recognized,[310] and argue the presence of these badges "far exceeds" what the prima facie showing requires, especially given this Court's recognition of their Fraudulent Transfer claims as "colorable" and denial of Defendants' motion to dismiss them.[311]

170.     The badges of fraud the Plaintiffs proffer are as follows:

- (1) the impending suits badge, given 1.) the hundreds of thousands of suits against Old CT prior to the Restructuring, as well as 2.) Old CT's "unique" role as "the 'debtor' in its capacity as predecessor to DBMP and, thus, the enterprise" for this badge;[312]
- (2) the asset removal and the substantial assets removal badges, based on various facts this Court has found regarding the Corporate Restructuring, including that it allocated 97% of Old CT's assets to New CT whereas it allocated 3% of those asserts and all Old CT's asbestos liabilities to DBMP;[313]

---

[309] Plaintiffs Preliminary Brief, ¶¶ 17-25.

[310] *Id.*, ¶¶ 16 n. 37 (citing July 7, 2022 Hr'g Tr. at 27:7-10 (ruling that creditors put forth "sufficient" allegations on "insolvency and . . . for the other counts")).

[311] *Id.*, ¶ 25.

[312] *Id.*, ¶ 17 & ¶ 17 n. 40 (discussing how this Court has rejected, and the Defendants have waived, the Defendant's counter argument that this badge "was not applicable because Old CertainTeed and not DBMP was the transferor" (citing July 7, 2022 Hr'g Tr. at 23:15–24 (holding that the Claimants had standing and "there [we]re transfers within the Bankruptcy Code" because creditors have the right to challenge a divisive merger prejudicial to their interests where the Texas-Two Step debtor "effectively, is, for fraudulent conveyance purposes, standing as" the predecessor entity), and *Agreed Order Resolving Matters Related To Receivership Proceeding* [Adv. Pro. No. 22-03045, Dkt. 28] at 7 (holding that the Defendants to the Fraudulent Transfer Proceeding "permanently and irrevocably waiv[ing]" "the No DBMP Transfer Allegations" "with prejudice the right to assert in" that adversary proceeding or for any appeals)).

[313] *Id.*, ¶ 18 (citing Injunction Order ¶¶ 46, 49 ("[The Restructuring] put all of its asbestos liabilities into one company, DBMP, and virtually all of its assets and all of its non-asbestos liabilities, into another, New CT."), 53 ("DBMP was but a holding company."), 56 ("[I]n a matter of hours and without notice to

94

- (3) debtor retention badge, as Old CT's successors, SGC and CTE possess and retain control the vast majority of Old CT assets and operations, with nothing having changed save the Claimants' in-access ;[314]
- (4) insider intermediary badge, on the basis that Old CertainTeed and its bifurcated successors, DBMP and New CertainTeed were and are all wholly owned by CTE;[315]
- (5) concealment badge, given this Court's finding that Old CT and CTE guarded the existence of Project Horizon and the corporate reorganization, such as with the use of non-disclosure agreements;[316]
- (6) inequivalent value,[317]
- (7) resulting insolvency badges, on the basis that DBMP took on all of Old CertainTeed's asbestos liabilities, for which creditors can no longer reach Old CertainTeed's assets, and received in return few assets and the Funding Agreement;[318] and
- (8) catchall badge, noting the "general chronology of events and transactions under inquiry" due to the Defendants' Texas Two-Step.[319]

171.     The Court acknowledges the aberrant number of the Plaintiffs Badges would, at least outside of the context of a Texas Two-Step, provide a sufficient case for a fraudulent transfer on the ultimate merits, and thus likely satisfy for a prima facie showing of a fraudulent transfer.

---

any [Claimants] Old [CT] separated virtually all of its business, assets, and employees from its asbestos liabilities, transferring those liabilities to DBMP.")).

The Plaintiffs additionally argue that the Restructuring allocating the bulk of Old CT's assets to New CT establishes a further badge, that the Defendants "absconded," because it took the "good" assets and "placed them out of the direct reach of the" Claimants. *See* Plaintiffs Preliminary Brief, ¶ 18 n. 43 (citing Injunction Order ¶ 46 ("[T]he Project Horizon plan was to isolate the asbestos liabilities in a single affiliated corporation and file it in chapter 11. That entity could then seek Section 524(g) injunctive relief shielding [CTE] from Old [CT's] asbestos liabilities"), and ¶ 56)).

[314] *Id.*, ¶ 19.

[315] *Id.*, ¶ 20 (citing Injunction Order, ¶ 61, n. 59 (stating that DBMP "has no employees of its own," that "the same officers and directors of Old [CT] [] are the officers and directors of New [CT]," and that DBMP and New CertainTeed "speak with one voice")).

[316] *Id.*, ¶ 21.

[317] *Id.*, ¶ 22 (alleging that the Funding Agreement "amount[s] to nothing more than a 'conditional promise to pay'" (quoting Injunction Order, ¶ 77)).

[318] *Id.*, ¶ 22 (citing the Plaintiffs' allegation that the Funding Agreement is insufficient and this Court's conclusion that "absent the Funding Agreement the Debtor remains more than $300 million underwater even under its own estimate of asbestos liabilities").

[319] *Id.*, ¶ 23-24 (noting the corporate reorganization's swift operation without notice to asbestos creditors and DBMP's filing 92 days later, being as a whole calculated towards defrauding asbestos creditors).

However, because at least some of the Plaintiffs Badges are an inherent feature of this transaction type, their probative value is diminished unless the Plaintiffs can identify some other evidence.

172.   Plaintiffs use of the impending suits badge, the substantial assets badge, the debtor retention badge, the insider intermediary badge, and the concealment badge reflects features inherent in the purpose of a Texas-Two Step, which *Bestwall* held and the Fourth Circuit has affirmed, is a proper bankruptcy purpose. As to the impending suits badge, such litigation is not only the central purpose of a Texas Two-Step but also constitutes the very thing that the Texas Two-Step's predecessor entity transfers to the liability encumbered debtor entity. As to the substantial assets badge, the predecessor entity only reaps the benefits of not subjecting the entire corporate enterprise to bankruptcy if a substantial part of its assets is transferred to, and thus insulated within, the non-debtor successor entity. As to the debtor retention badge, the assets remaining part of the greater corporate enterprise ensures that such assets are so insulated. Similarly, as to the insider intermediary badge, the divisional merger's intra-enterprise nature is inherent to the Texas Two-Step. These facts demand these badges carry limited weight for a Texas Two-Step.

173.   Furthermore, as to the concealment badge, any corporation planning or executing a transaction like a Texas Two-Step, such as an uncontroversial acquisition of or merger with another corporate entity, could similarly use non-disclosure agreements when planning and executing the transaction for non-fraudulent, intra- or inter-business justifications. Here, the Defendants' use of non-disclosure agreements is similarly explainable given the value of the consolidation of all asbestos liability into one forum for payment.

174.   On their own, these particular badges cannot constitute a fraudulent transfer, at least on the ultimate merits in the Fourth Circuit, because a Texas Two-Step cannot simultaneously serve

a proper bankruptcy purpose that does not warrant a bad faith dismissal and also give rise to a prima facie case for a fraudulent transfer. Accepting Plaintiffs' position would engender a rule that is inherently contradictory. This is not to suggest that a Texas Two-Step can never constitute a fraudulent transfer; rather, given the controlling Fourth Circuit standards, the prima facie showing must rest on indicia beyond the structural features inherent to the transaction.

175.    Essentially, the Plaintiffs argue that if something looks like a duck, walks like a duck, and quacks like a duck, it is a duck (or at least a prima facie case of one). However, the "duck test," like all abductive reasoning, only works when those three observations are the only facts known. If it is also known that the purported duck could plausibly be, instead, an American coot, the test cannot reliably establish that it is a duck based on those three facts.

176.    Of course, the Court is not rejecting that the Defendants' Texas Two-Step could be a fraudulent transfer. Nor is the Court suggesting that Texas two-steps are, by definition, immune from fraudulent transfer claims; no court has resolved that question, and the Court declines to do so here. Similarly, even if it was the case that a Texas two-steps are generally lawful, that would not preclude a particular Texas two-step, or a particular transaction within or pursuant to a Texas two-step, being fraudulent. Again, any individual transaction can fall within a broadly legal transaction type yet still be illegal in its specific application.

177.    One of Plaintiffs' proffered badges which is not inherently present in every Texas Two-Step is the claim that there was not reasonably equivalent value for the transfer of Old CT's assets to New CT in exchange for New CT entering into the Funding Agreement with DBMP. In response, the Defendants argue that a breach of contract cannot constitute a badge of fraud, meaning a plausible future breach of the Funding Agreement by New CT cannot suffice.[320]

---

[320] Defendants Opening Brief, p. 21.

(2)   The Plaintiffs General Evidence of Intent

178.   The Plaintiffs do not rest their prima facie case of a fraudulent transfer solely on their badges but also make general arguments why evidence specific to this case and its context evinces the fraudulent objectives. Much of these arguments arose, or were fully elucidated, at the Hearing, rather than in the Briefing. These arguments include:

- The Plaintiffs proffer evidence based on the Defendants' knowledge and constructive knowledge of technical hindrance or delay as to the Claimants' recovery,[321] relying primarily on the Supreme Court's decision in *Shapiro v. Wilgus*, 287 U.S. 348 (1932).[322]
  - The Defendants also challenge the factual bases of the Plaintiffs' delay argument. Specifically, the Defendants argue that, even if such knowledge of incidental delay could theoretically satisfy actual intent to delay, it would not satisfy it here for various reasons. First, the Defendants argue that the evidence displays, in opposition to the Plaintiffs conclusion, that they do not desire delay of the resolution of DBMP's Bankruptcy Case but prefer it speedily occurs.[323] Second, the Defendants argue that, assuming the Defendants' Texas Two Step did cause some delay, such delay 1.) would not be "undue delay" since many of the Claims have existed in the tort system for years "whereas § 524(g) trusts have a record of expeditiously paying valid claims," or 2.) would "be[] merely incidental."[324]

---

[321] *Cf.* Plaintiffs' Opening, ¶ 41 (stating that the Defendants' knowledge of the delay to Claimant recovery during the pendency of DBMP's case "further establishes a prima facie case of an actual intent to hinder or delay creditors[,] … '[E]ven if [Defendants'] actual motive is not to hinder, delay, or defraud such creditors'," so long as "'the 'natural consequence of [the Defendants'] actions' " is delay); Plaintiffs Reply Brief, ¶ 32 (stating that the crime fraud exception was satisfied based on 1.) evidence that the Defendants' Texas Two Step was "deliberately designed to hinder, delay, or defraud [C]laimants," and 2.) "[t]he result of this orchestrated effort" being that Claimants are, inter alia, "delayed from receiving recovery while the [DBMP] winds through a manufactured and self-imposed bankruptcy process" due to the automatic stay); Hearing Transcript 57:19–59:1 (arguing that Defendants alleged desire to pay creditors cannot absolve the Defendants' Texas Two Step being a fraudulent transfer given 1.) the hindrance the Restructuring's insulation of assets caused, and 2.) the delay the Filing caused due to it "put[ting] in place" the "automatic stay" as to the Claims).
[322] Hearing Transcript, at 56:8–60:5; *id.*, at 132:17–133:24.
[323] Defendants Opening Brief, p. 17–18.
[324] *See id.*

- The Plaintiffs state that this Court has already found that the Corporate Restructuring and Petition sufficiently harmed the Plaintiffs in a way to potentially satisfy their prima facie burden.[325]
    - The Defendants object that this Court has held that the Defendants' Texas Two Step sufficed for the prima facie burden as only dicta.[326]
- The Plaintiffs argue that the Corporate Restructuring as well as the Petition constitutes a fraudulent transfer because the Plaintiffs no longer know exactly where Old CT's assets are and will be.[327] The Defendants counter that these concerns have been addressed and that generally such movements of money are standard business practice.[328]
- The Defendants generally object that any allegation of "actual intent to defraud asbestos claimants" as underlying the Defendants' Texas Two Step "is particularly unsupportable" given their Texas Two Step "'closely paralleled'" *Bestwall's* Texas Two Step,[329] since this Court and the Fourth Circuit blessed *Bestwall's* Texas Two Step' purpose and funding agreement and the Fourth Circuit has recognized the asserted benefits of the Texas Two Step.[330]

---

[325] *See* Hearing Transcript, at 51:8–15 (Plaintiffs' statement: "And Judge Whitley… described the negative impacts of that divisional merger on asbestos creditors. 'Asbestos creditors were placed one step beyond the assets and made dependent on DBMP's willingness to press its rights under the funding agreement. … It appears that the divisive merger had a material negative effect on the asbestos creditors' ability to recover on their claims.'").

[326] *See id.*, at 76:17–25 (Defendants' statement: "Judge Whitley [] never found that a prima facie showing had been made and he had already rejected plaintiffs' attempt to mischaracterize the Court's previous statements. He said … what he had said about the timing of the decision making, about these events 'should be considered dicta', and he said as well in connection with his in camera review that he was not saying 'there was a prima facie showing of crime-fraud waiver.'").

[327] *See id.*, at 162:7–12 (Plaintiffs' statement: "[W]ho knows where the cash is at any given point? … But just given how cash management systems work, is it unreasonable to think that some cash generated by New CertainTeed is now held by a French entity that doesn't believe it's subject to the jurisdiction of this Court?").

[328] *See id.*, at 150:2–3 (Defendants' statement: "[Cash management arrangements are] common with enterprises like this.").

[329] Defendants Opening Brief, p. 18 (quoting Injunction Order, ¶ 100–01).

[330] Defendants Opening Brief, p. 18 (discussing how this Court held, and the Fourth Circuit has declined to review affirmed, that *Bestwall's* Texas Two Step 1.) was not "filed in bad faith," 2.) "had 'a valid reorganizational purpose'," and 3.) had "'the full ability to meet all of its obligations' " "with its funding agreement and other asset" (first quoting Injunction Order ¶¶ 100-01, and then Bestwall, 605 B.R. at 43, and then citing Bestwall 606 B.R. 243, 255)); *id.* (discussing how the Fourth Circuit, in affirming a *Bestwall* ruling, recognized the Texas Two Steps proffers the benefit of "equitable, streamlined, and timely resolution of claims in one central place [as] compared to the state tort system" (quoting Bestwall, 71 F.4th at 183)).

The Defendants are confusing the extent that this *Bestwall* law precludes the Defendants having an intent to defraud the Claimants because that law 1.) absolves any underlying intent the Defendants

- The Defendants argue that the fact that the Funding Agreement fully funds all Claims refutes any assertion that Defendants want "to avoid paying" Claimants, which leaves "no basis" for showing intent "to defraud" on the Defendants' part.[331] The Defendants contend that intent to defraud cannot exist based on questions regarding the Funding Agreement's "execution, validity and enforceability" since it is "valid, enforceable, and fully protective of claimants' payment interests" as evinced by New CertainTeed's compliance with it so far and a lack of evidence "warranting any fear that this will change," especially given Defendants agreed stipulations regarding the Funding Agreement. The Defendants also argue that "[e]ven some yet-uncovered defect in the 'validity or enforceability' of the" or "some later-in-time breach of" it "would [not] establish that any Defendants committed a 'crime or fraud'" through their Texas Two Step.[332] They conclude any rule otherwise would diminish attorney client privilege "in the corporate-transaction context, where it is not unusual for breaches to be alleged and for litigation to follow."[333]

- The Defendants also assert that the amended Funding Agreement is the dispositive part of the analysis, which absolves any issues with the original Funding Agreement that may have occasioned earlier rulings from this Court.
  - The Plaintiffs argue that the amended Funding Agreement does not cure the original Funding Agreement's issues, because only the latter is relevant to this part of the analysis,[334] and suggest that even the original Funding Agreement could not have absolved the Defendants' Texas Two Step since one generally cannot fix a fraudulent transfer with a contract.[335] Further, the

---

have that would otherwise be problematic or fraudulent (i.e., the Defendants intended to material affect the Claimants rights, but desiring such effects is allowed), or because 2.) it can and was reasonably relied on by the Defendants to conclude their Texas Two Step would not be found to defraud the Claimants since the law in this Court currently seems to posit that the Texas Two Step's intent is nonfraudulent (i.e., regardless of whether or not the Texas Two Step defrauds the Claimants, the Defendants reasonably assumed it did not).

[331] Defendants Opening Brief, pp. 18–19 (stating that "[e]ven the Third Circuit's [] dismiss[al of] the LTL Management bankruptcy [] accord[s] because that court reasoned the debtor was too well funded for bankruptcy," and a "full funding" "guarantee [] of claims cannot be a 'scheme' done with the actual intent 'to avoid paying' those claims" (first citing In re LTL Mgmt., LLC, 64 F.4th 84, 109 (3d Cir. 2023), then quoting Duncan, 368 B.R. at 35-36)).

[332] Defendants Opening Brief, pp. 20-21

[333] Defendants Opening Brief, p. 21.

[334] See Hearing Transcript, at 134:3–4 (Plaintiffs' statement: "[T]he funding agreement [was] executed at a time when they anticipated a bankruptcy filing."); id, at 118:22–23 (Plaintiffs' statement: "[T]he operative agreement is the one that was entered [into] at the time.").

[335] See id., at 119:2–6 (Plaintiffs' statement: "[T]here is no defense under 548 or state laws that are applicable here … that a post-transaction, quote unquote, cure of the issues that would have created a fraudulent transfer somehow is a defense to a fraudulent transfer.").

Plaintiffs argue that they can show hindrance even under the amended Funding Agreement even if it was relevant to the analysis. Specifically, they point to (1) the Funding Agreement's violability due to its funding being (a) contingent on confirmation of DBMP's Bankruptcy Case[336] and (b) just a promise[337] that depends on DBMP pressing the obligations,[338] and (2) the Defendants' Texas Twp Step's effect on the Claimants, in that (a) the Corporate Restructuring removed the Plaintiffs one step away from Old CT's assets[339] and (b) provided in return only the Funding Agreement which does not even identify the claimants.[340] Plaintiffs add that although the Defendants claim the Funding Agreement is not important to the analysis,[341] the fact that they have focused their defense on the Funding Agreement suggests otherwise.[342]

- The Defendants argue that the Plaintiffs statement during the DBMP Stay Appeal that "DBMP is not in financial distress" negates the Plaintiffs' claim that the Defendants intended to defraud creditors,[343] since an assertion that paying power

---

[336] *See id.*, at 134:8–20 (Plaintiffs' statement: "[The funding agreement] only provides for advancements to be made for a certain number of delineated permitted purposes, one of which is to fund a 524(g) trust. It's entirely unclear what happens under that funding agreement if no 524(g) trust is ever created.").

[337] *See id.*, at 118:1–2 (Plaintiffs' statement: "A written promise to pay is not the same as hard assets for which you can levy.").

[338] *See id.*, at 118:3–10 (Plaintiffs' statement: "[U]nder the funding agreement, … in order for our clients to recover directly, they would have to first seek those funds from DBMP. DBMP … would have to call on the funding agreement.").

[339] *See id.*, at 117:4–10 (Plaintiffs' statement: "[T]he corporate restructuring effectuated a swapping of assets, … They removed the assets one step away from our clients."); *id.* at 118:16–17 (Plaintiffs' statement: "It's not just one step away. It's multiple. Suggesting that is the same ability to pay is just simply not the facts here.").

[340] *See id.*, at 118:13–15 (Plaintiffs' statement: "[The Plaintiffs are] a step removed as a beneficiary of an agreement. They're not even in the agreement.").

[341] *See id.*, at 134:21–24 (Plaintiffs' statement: "[O]ne of [the Defendants'] primary arguments … was that the funding agreement was nothing more than a, quote unquote, backstop.").

[342] *See id.*, at 135:7–11 (Plaintiffs' statement: "[The Defendants'] continued reference to the funding agreement in response to our arguments today simply shows why Judge Bridges was correct, at least to the extent, he said, 'At least with respect to issues related to the funding agreement, you've got to produce those documents.'").

[343] *See id.*, at 110:11–23 (Defendants statement that the Plaintiffs' statement "can't [be] square[d] [] with the [Plaintiffs'] arguments [] today [that] there's an actual fraud, there's an intent to harm claimants, there's an intention to not pay claimants" on the Defendants' part, and "belie[s]" the Plaintiffs' case); *id.*, at 152:22–25 (Defendants' statement: "If you're taking steps to harm creditors and that's the basis for a crime-fraud exception, I don't know how at the same time you can say, 'This debtor is not in financial distress.'").

has changed is only materially true where the change was from an ability to pay to a complete inability to pay.[344]

    o   The Plaintiffs counter that (1) the Plaintiffs are not asserting that the Defendants do not want to pay the Plaintiffs at all, but rather that the Defendants want to pay the Plaintiffs less than they would outside of bankruptcy court,[345] and (2) financial distress does not matter.[346]

    o   The Defendants reject Plaintiffs' claim that the Defendants want to pay a lesser total amount.[347]

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

179.    Ultimately, the Court declines to decide the crime-fraud exception question, for reasons laid out below. First, however, the Court will respond to some of these arguments which the Court feels do not deserve detailed briefing and can be quickly disposed.

180.    First, the Court rejects the Plaintiffs' argument that constructive knowledge of the time required to obtain confirmation in bankruptcy suffices to establish an intent to delay for purposes of a prima facie fraudulent transfer showing. Plaintiffs' reliance on *Shapiro* is misplaced. *Shapiro* does not support either conclusion Plaintiffs draw from it: it does not render the Defendants' Texas Two-Step a fraudulent transfer based on delay, because the record lacks

---

[344] *See id.*, at 153:10–16 (Defendants' statement: "[the Plaintiffs] claim[] they're not saying '[the Defendants] [a]re not going to pay at all', but then they say, '[DBMP] don't have the same paying power'. Well, if you don't have the same paying [] power, isn't that kind of another way of just saying, 'You're not able to pay claims'? And that's what the fraud is. And again, I don't see how you can do that and at the same time say there's no financial distress.").

[345] *See id.*, at 114:18–22 (Plaintiffs' statement: "[T]here's not a circumstance today in which I have said there was an intention to not pay our clients, to not pay our creditors here. It is a matter of what claims we're talking about and how much they're getting evaluated at that is at issue for all of us."). The Plaintiffs argue that actual intent to defraud can be inferred from evidence suggesting that Defendants pursued the Texas Two-Step to obtain a "bankruptcy discount" or to otherwise impair Claimants. *See id.*, at 54:21–55:1 (Plaintiffs' statement: "[W]hen [the Defendants] say they intend or would like to pay asbestos claims in full, there needs to be an asterisk at the end of that statement. Because when they say 'payment in full', what they mean to say is, 'We want to pay asbestos claimants in full, so long as payment in full means whatever reduced amount we're willing to pay.'"); *id.*, at 119:16–17 (Plaintiffs' statement: "Claims in a bankruptcy are different than claims in the tort system. They're valued differently."); *id.*, at 159:6–11

[346] *See id.*, at 133:17–19 (Plaintiffs' statement: "[F]inancial distress is not the test for whether you had intent to hinder or delay. And that is the crux of the claim here.").

[347] *See id.*, at 150:18–25

evidence comparable to that in *Shapiro*, nor does it support a theory of hindrance, because *Shapiro*'s rule was limited to delay.

181.   It is true that *Shapiro* held that a desire to eventually pay one's creditors cannot absolve a transfer done for the purpose to delay creditor recovery. Generally, debtors must seek a bankruptcy resolution, not the incidental delay necessary for such a resolution and implemented by the automatic stay. This was not the case in *Shapiro*, where the debtor explicitly sought the delay associated with pursuing a bankruptcy resolution. *Cf. Shapiro*, 287 U.S. at 353. While it is true that the *Shapiro* debtor's good faith intention to eventually pay creditors did not cure the delay issue, that was because the debtor deliberately sought and intended the delay, not merely because delay would inevitably occur, as some of Plaintiffs' own cited case law evinces.[348]

182.   Plaintiffs do not, in fact, allege that Defendants intended to delay payment to Claimants, only that Defendants knew delay would occur. Moreover, the record suggests the opposite: Defendants have sought to reach their desired conclusion, estimation and a confirmation of a § 541(g) trust, as expeditiously as possible. Thus, the evidence that compelled the holding in *Shapiro* is absent here, and the Plaintiffs have not sufficiently established that Defendants sought to delay a recovery for the Claimants.

183.   Plaintiffs' attempt to rely on *Shapiro* also fails to the extent they argue that its holding, that a debtor's a desire to pay ultimately pay creditors does not excuse intentionally sought delay, extends to hindrance. Every bankruptcy petition necessarily hinders creditors to some

---

[348] *See* Plaintiffs Reply Brief, ¶ 31 n. 45 ("*See, e.g.*, *In re Tronox Inc.*, 503 B.R. 239, 279 (Bankr. S.D.N.Y. 2013) (citing Shapiro and stating that 'the Supreme Court made it clear that the debtor's scheme did not have to be undertaken for nefarious or malicious purposes but merely with the purpose of hindering or delaying creditors'); *In re MarketXT Holdings Corp.*, 376 B.R. 390, 408–409 (Bankr. S.D.N.Y. 2007) (citing Shapiro for the proposition that an intent 'to delay creditors is not immunized by the transferor's conviction that it is for the creditors' good and the debtor, if only given time, will be able to recover enough to pay them all. The possible reward does not justify the transaction where there is intent to delay creditors').").

degree. The premise of Chapter 11 is that such temporary hinderance is justified because debtor claims (and must prove) that they can sufficiently benefit their creditors who will get paid under a confirmed plan. The Plaintiffs cannot so elide case law. *Shapiro* was about intent to delay; it cannot extend to hindrance as at least some intent to hinder is inherent to the bankruptcy process.

184.   Furthermore, while the Court is not ruling as to whether Plaintiffs have successfully made a prima facie showing now, the Court rejects the Defendants' argument that their performance under the Funding Agreement thus far would sufficiently rebut such a showing. If there were ever a time for the Defendants to perform, it would be while they are under the Court's watchful eye. A driver observing the speed limit when followed by a patrol car is no indication of the driver's speed once the patrol car exits the highway. Additionally, the Defendants' current performance is in their best interest, as it allows them to reap the benefits of the automatic stay and reduced litigation costs in comparison to the tort system. These circumstances and benefits under the Defendant's current performance are not true of the Defendants' ultimate obligation to perform at the critical moment. Accordingly, the former is no guarantee of the latter.

185.   Lastly, the Court finds that as to the inequivalent value badge, the Plaintiffs may be able to present plausible evidence that the value DBMP received for all of Old CT's asbestos liabilities is not reasonably equivalent since the enforceability and validity of the Funding Agreement is in question. This is true even if only due to the fact, as this Court has already found, that it was not negotiated at arm's length, which is required for valid, binding contracts.

186.   However, on the whole, the Court declines to decide the Crime-Fraud Exception Dispute and holds that such a decision is not required at this junction. The Court so holds because the Court is ordering the disclosure of assertedly privileged evidence pursuant to the Court's decisions as to the At-Issue Waiver Dispute below, and because such evidence bears significantly

on the Crime-Fraud Exception Dispute. The Supreme Court in *Zolin* has held courts may decline to decide the crime fraud waiver within the court's own discretion, and regardless of a privilege objector's particular showing for the preliminary burden or the prima facie showing, when additional evidence relevant to the alleged crime or fraud has or may become available without applying the crime-fraud exception. *See supra* ¶ 132. Accordingly, application of the crime-fraud exception would be, at a minimum, unessential at this stage. Thus, the Court will exercise this discretion for three reasons.

187.    First, the law is unclear as to what level of persuasion is required for a prima facie showing, in any context, but also specifically for the facts here. In the Court's view, the delineations for the prima facie showing provided by the Fourth Circuit do not provide sufficient guidance, *see supra* note 266, and deciding the Crime-Fraud Exception Dispute would require briefing specifically outlining and recommending as to the different more substantive approaches by other circuits and courts.[349]

188.    Second, the Court is persuaded by the courts and scholars counseling against applying the crime-fraud exception when doing so requires resolving undecided, debated, or unclear law. *See supra* ¶¶ 153–157. While the Court acknowledges the crime-fraud exception has been extended over the years to cover conduct that is undesirable but not per se illegal, the Court queries the extent that courts doing so before a thorough and adversarial consideration of the issue

---

[349] At this stage, the parties have provided little guidance so far as to what constitutively or integrally the prima facie showing, besides quoting the marginally helpful Fourth Circuit statements discussed above. *Cf.* Plaintiffs Preliminary Brief, ¶ 14 (quoting *Grand Jury* (4th 2005)'s version of *Union's* proffered rule statement, *see supra* note 266); *Hearing Transcript*, at 50:4–9 (Plaintiffs' statement: same); *cf. also id.*, at 37:24–38:1 (Plaintiffs' statement: "We don't have to get to clear and convincing here, … [J]ust [] to a prima facie showing of a colorable claim."); Plaintiffs Preliminary Brief, ¶ 14 n. 33 (quoting *Grand Jury* (4th Cir. 1994) quoting Duplan's proffer, *see supra* note 266); Defendants Preliminary Brief, p. 3 (same).

on the full merits risks backdoor determinations without clear legal guidance.[350] Clients and lawyers should be able to develop or advance the law without fear of losing their attorney client privilege or work product protections—of course, to a limit.[351] Accordingly, the Court declines to use the crime fraud exception as the vehicle for resolving novel or unsettled questions that may be addressed later on a full record, with adversarial briefing, and with the benefit of any appellate guidance.

189.    Third, substantive briefing on the validity of the Funding Agreement would be required for the Court to find that the crime-fraud exception applies by relying primarily on the equivalent value badge. Similarly, the Court would require substantive on all the other topics canvassed above which the Court does not dispose of.

190.    Plaintiffs may pursue numerous challenges to the Texas Two-Step and the Defendants' Texas Two-Step. Those issues, however, are more appropriately addressed through a fulsome consideration of the merits after discovery, rather than prior to the Plaintiffs having "looked under the hood." Plaintiffs remain free to return and assert the crime fraud exception after reviewing evidence produced pursuant to the application of at-issue waiver in this order.[352]

---

[350] Indeed, there are conceptual issues with applying the crime-fraud exception in situations such as these. Lawyers must make calls when the law is unclear; it is why they exist. And lawyers making such calls and bringing them before decisionmakers is what generates the positive law whose compliance with which we expect and ultimately rationalizes the crime-fraud exception upon. How then, can a lawyer violate law (and suffer legal consequences because of) by their attempts to engender the same?

[351] The Court acknowledges that this does, at least in a way, turn the prima facie showing on its head, as Plaintiffs argue. To require more settled law for the Plaintiffs to be able to satisfy their burden does negate how the prima facie showing is definitionally a lower burden as to the ultimate merits. Effectively, it punishes the Plaintiffs' case for being one of the first involving a Texas Two-Step. However, the acknowledged subversion of our judicial process that the crime-fraud exception requires should be approached with caution and at least warrants avoiding it, where doing so is not required, as is the case here.

[352] Before the Court, the Plaintiffs only raise as a basis for applying the crime-fraud exception their actual fraudulent transfer claim. However, the Court notes that the Referee raised in his Final Report a different separate basis. More specifically, the Referee intimated that the crime-fraud exception could also apply on

## C. **Waiver to Attorney-Client Privilege**

### 1. **Legal Background**

#### a. Waiver Generally

191.    There are various types of waivers that may apply to a party's assertion of attorney-client privilege. Although each type has distinct rules and contours, some rules and principles apply across all types. First, "[r]egardless of the type of waiver alleged, the [privilege asserter] 'must establish ... that the privilege was not waived'." *Dudley v. City of Kinston*, 2021 U.S. Dist. LEXIS 64211, at *7 (E.D.N.C. Mar. 31, 2021) (quoting *Jones*, 696 F.2d at 1072, and *Zeus Enters. v. Alphin Aircraft, Inc.*, 190 F.3d 238, 244 (4th Cir. 1999)). Thus, the burden regarding waiver rests with the privilege asserter—in the case at hand, the Defendants.

---

the basis that the Defendants' Filing Decision submissions (as defined below) constitute fraud on the Court due to evidence as to their inaccuracy. *See* Final Report, p. 57.

Although the Defendants most prominently object to such application on the basis that their Filing Decision submissions were not inaccurate, *see infra* ¶¶ 302–303, the Defendants also object on the basis that these submissions, even if they were inaccurate, do not suffice for the requisite standard for fraud on the Court. *See* Defendants Opening Brief, p. 22. And, indeed, the standard does not appear met based on these facts crucially.

Fourth Circuit courts do routinely apply the crime-fraud exception to conduct alleged to be fraud on the court. *See, e.g.*, *Kandasamy v. Advanced Software Sys.*, 2019 U.S. Dist. LEXIS 3062; *SunTrust Mortg., Inc. v. AIG United Guar. Corp.*, 2011 U.S. Dist. LEXIS 33118; *Doe*, 662 F.2d 1073. However, in these cases, the privilege objector was still required to meet the high bar for the allegation itself; i.e., although the burden of proof may be lessened as to what shows the privilege objector's allegation is, the requisite severity of their allegation is not diminished. *See Peerless Indus., Inc. v. Crimson AV LLC*, 2013 WL 6050006, at *5 (N.D. Ill. Nov. 14, 2013). Consequently, a prima facie showing of fraud on the court cannot be satisfied simply by submissions that can be arguably construed as only lawyer argument. Even where statements are misleading, fraud on the court ordinarily requires an intentional scheme to corrupt the judicial process itself, not merely overzealous advocacy or arguable characterization of events.

However, the Court also notes that it ultimately rejects and finds contrarily as to the Defendants' Filing Decision submissions below. *See infra* ¶ 305–310. Thus, notwithstanding the submissions' insufficiency for the crime-fraud exception, the Court will state that it does not view the Defendants' Filing Decision submissions as wholly innocent, given (1) that although they may be technically accurate, they are indeed misleading, *see id.*, as well as the fact (2) that this Court has already at least effectively rejected these submissions, *see id.*, wherefore the Defendants reraising them before the Court now is troubling, even if they do not rise to the level of fraud on the court. The Court does not intend to revisit this issue further.

192.    Second, and critical to the Court's analysis here, the privilege asserter's intent to waive, or not waive, privilege does not control whether waiver has occurred. *See Duplan Corp. v. Deering Milliken, Inc.*, 397 F. Supp. 1146, 1162 (D.S.C. 1974) ("[I]f a client, through his attorney, voluntarily waives certain communications, but guarded with a specific written or oral assertion at the time of the waiver that it is not its intention to waive the privilege as to the remainder of all similar communications, the privilege, as to the remaining undisclosed communications, is nevertheless waived.").[353] Accordingly, waiver may occur even where the privilege asserter expressly disclaims any waiver, and it may occur 'by accident'. This principle applies to explicit waiver, including partial, substantial, or draft explicit waiver, as well as when any form of explicit waiver results in subject matter waiver, and to any implied waiver (all as defined herein or below).

193.    Third, the frank communication purpose of the attorney-client privilege cannot itself justify waiver, unlike the crime-fraud exception. Instead, waiver is justified by considerations independent of that purpose, such as "fairness and consistency." *See* WIGMORE, *supra*, § 2327 (cited in *Duplan Corp. v. Moulinage et Retorderie de Chavanoz*, 509 F.2d 730, 735 (4th Cir. 1974)). For example, for some waiver types, both the client's intent to disclose privilege materials and/or the purpose for which counsel was employed are factors for determining whether confidentiality was expected and whether attorney-client privilege would attach.[354] This is limited by *Upjohn*'s command that special protection from disclosure is afforded to work product revealing an attorney's mental processes and such work product cannot be disclosed simply on a

---

[353] *See also* 8 WIGMORE, *supra*, § 2327 ("Regard must be had to the double elements that are predicated in every waiver, i.e. not only the element of implied intention, but also the element of fairness and consistency. A privileged person would seldom be found to waive, if his intention not to abandon could alone control the situation. There is always also the objective consideration that when his conduct touches a certain point of disclosure, fairness requires that his immunity shall cease whether he intended the result or not.").

[354] *See infra* ¶¶ 211–217.

showing of substantial need or inability to obtain the equivalent without undue hardship. 449 U.S.

at 401.[355] Thus, the waiver analysis can present competing considerations in which the privilege's

underlying purpose does not invariably prevail.

194.    Fourth, an initial waiver can sometimes require further waiver, often

referred to as "subject matter waiver." Federal Rule of Evidence 502 governs subject matter waiver

and is, in fact, the only Federal Rule of Evidence governing any waiver. However, the opening

paragraph of Rule 502 limits its application to explicit waiver where disclosure has. *See* Fed. R.

Evid. 502. Importantly, Rule 502 expressly does not affect implied waiver and intimates its

allowance.[356] Rule 502 provides that where explicit intentional waiver (as defined below) has

occurred, privilege is also waived as to "undisclosed communications or information concern[ing]

the same subject matter" as what was disclosed where the disclosed and undisclosed materials

"ought in fairness to be considered together." Fed. R. Evid. 502(a).

195.    Fifth, courts agree that the privilege asserter's deponents' mere references

to privilege materials or attorney advice is not sufficient for waiver (i.e., it cannot function as a

gating requirement) for the occurrence of a waiver. The basis for this rule is the recognition that

"a talented lawyer … can nearly always arrange for the deponent to concede that he or she acted

on legal advice." SPAHN, *supra*, § 28.1303 (quoting, *inter alia*, *Alers v. City of Phila.*, 2011 U.S.

Dist. LEXIS 137446, at *7 (E.D. Pa. Nov. 29, 2011) (finding that (1) the privilege objector "not

---

[355] *See also Hickman v. Taylor*, 329 U. S. 495 (1947).

[356] *See* Fed. R. Evid. 502 advisory committee's note to 2007 revision (explaining:

The rule governs only certain waivers by disclosure. Other common-law waiver doctrines may result in a finding of waiver even where there is no disclosure of privileged information or work product. *See, e.g., Nguyen v. Excel Corp.*, 197 F.3d 200 (5th Cir. 1999) (reliance on an advice of counsel defense waives the privilege with respect to attorney-client communications pertinent to that defense); *Ryers [Byers] v. Burleson*, 100 F.R.D. 436 (D.D.C. 1983) (allegation of lawyer malpractice constituted a waiver of confidential communications under the circumstances). The rule is not intended to displace or modify federal common law concerning waiver of privilege or work product where no disclosure has been made.).

[the privilege asserter] brought up the subject" "to set up a 'gotcha' moment when [the privilege objector] could then utilize the privileged memorandum," and that (2) the privilege asserter had "not … put the reliance on advice of counsel into issue").[357] Importantly, however, deposition testimony is not wholly irrelevant to waiver considerations and is a particularly important component of at-issue waiver. *See infra* ¶ 286.

   b. Explicit Waiver[358]

196.    It is settled law that otherwise privileged materials, and their substance, are not protected when the materials have been disclosed or revealed to entities outside the privilege relationship, or 'third parties'. *See In re Grand Jury Subpoena*, 341 F.3d 331, 336 (4th Cir. 2003) (citing *Hawkins*, 148 F.3d at 384 n.4 (citation omitted)).[359] Such circumstances are often labeled "explicit waiver."[360]

---

[357] *See also Pritchard v. Cnty. of Erie (In re Cnty. of Erie)*, 546 F.3d 222, 230 (2d Cir. 2008) (rejecting that "[t]he deposition testimony … waive the privilege" because (1) the privilege asserter's lawyer "properly terminated the inquiries when [the deponent] began to elaborate on the specifics of the advice received by" the privilege asserter's lawyers, as well as (2) because privilege objector "ha[d] not been placed in a disadvantaged position at trial" since "the deponent was not before a 'decisionmaker or fact finder' when he made the statements claimed [] to have triggered the waiver" and thus the privilege asserter had "[n]ot[] … yet waived the privilege by 'an assertion of fact to influence the decisionmaker' " (quoting *John Doe Co. v. United States*, 350 F.3d 299, 306 (2d Cir. 2003))).

[358] Much of this law is not applicable and does not engender any of the relief the Court directs in this Order because it involves facts that did not occur here. The Court canvasses this law because it represents rules that constitute or underpin much of the law the Plaintiffs and Defendants cite for waiver.

[359] *See also Grand Jury*, 33 F.3d at 354 (quoting *Under Seal*, 748 F.2d at 875) ("If a client communicates information to his attorney with the understanding that the information will be revealed to others, that information ... will not enjoy the privilege."); *Fisher v. Halliburton*, 2009 U.S. Dist. LEXIS 152887, at *2 (S.D. Tex. June 9, 2009) ("[T]he privilege may be waived through voluntary—and sometimes involuntary—disclosure to a third person lacking a common legal interest."); *Green v. Crapo*, 62 N.E. 956, 959 (Mass. 1902) (Holmes, J.); 8 WIGMORE, *supra*, § 231.

[360] The Court notes that the extent to which explicit waiver operates is unclear because the privilege does not exist, or because the privilege exists but has been waived. Ultimately, this taxonomical difference does not matter for the specific analysis of whether explicit waiver has occurred. However, the Court acknowledges it complicates importing rules between different waiver types.

197.    Explicit waiver can take various forms, but all forms generally involve and require the disclosure or description of specific privileged material.[361] The disclosure or description is most commonly to the opposing party or other entities involved in the litigation where the privilege objector is bringing the explicit waiver claim. However, sometimes, the disclosure or description is to a third party wholly unrelated to the litigation and can have occurred years before the litigation began or before any dispute arose. Such disclosure or description to third parties unrelated to the litigation is often labeled 'selective waiver'.[362] Additionally, disclosure can be both intentional, in that the privilege asserter knew that they were disclosing the privilege materials and had decided and intended to do so, or inadvertent, in that the privilege asserter disseminated the privilege materials without knowing they were doing so by accident.

198.    Most commonly, the disclosure or description consists of disseminating the entire privileged material itself. When that occurs, the analysis is straightforward: the disseminated material is no longer protected. *See Grand Jury*, 341 F.3d at 336. At times, only part of a privileged material is disclosed—for example, unredacted portions of an email or certain documents within a larger group. This is often labeled 'partial waiver' and can engender a subject matter waiver.[363] Under Fourth Circuit law, "the disclosure of any significant part of a communication waives the privilege and requires the attorney to disclose the details underlying the data which was to be published." *Grand Jury*, 33 F.3d at 355.[364] In other instances, a party discloses by describing the

---

[361] By "specific," the Court means identifiable ex ante of any disclosure.

[362] *But see, e.g.*, T. Maxfield Bahner & Michael L. Gallion, *Waiver of Attorney–Client Privilege via Issue Injection: A Call for Uniformity*, 65 DEF. COUNS. J. 199, 200 (April 1998) (identifying "selective disclosure" as "occur[ing] when a litigant discloses a portion of the confidential communication, while invoking the privilege to shield the remainder," (citations omitted)).

[363] *See, e.g.,* SPAHN, *supra* § 25.2 (describing "partial waiver" as arising where "the disclosing part of a privileged communication does not automatically waive the remaining portion's privilege.")

[364] *See also United States v. (Under Seal)*, 748 F.2d 871, 871 (4th Cir. 1984) (describing these details as including "the communications relating the data, the document, if any, to be published containing the

contents or substance of privileged materials—for example, what was discussed in a meeting between the privilege asserter and their lawyer, or what a privileged document contains. This is often called 'substantial waiver' and can also engender a subject matter waiver.[365]

199.    As to timing, the disclosure that gives rise to explicit waiver can be (1) coterminous with the creation of the privileged material, such as a meeting between the privilege asserter and their lawyer where a third party was present, (2) subsequent to the creation, such as when an email is later disseminated, or (3) even non-occurring, so long as disclosure is the ultimate intent behind the privileged materials, which can labeled as 'draft waiver'.[366]

200.    Additionally, the Fourth Circuit has also held that proving explicit waiver does not require direct evidence that disclosure occurred from the facts of the case but can be proven by objective assumptions as to a wider context. *See Jones*, 696 F.2d at 1073 (finding explicit waiver because, *inter alia*, it could be assumed that the privilege asserters "obtained the [] law

---

data, all preliminary drafts of the document, and any attorney's notes containing material necessary to the preparation of the document.").

[365] Substantial waiver is also called 'gist' disclosure waiver. *See* SPAHN, *supra*, § 25.7.

The Fourth Circuit has recognized substantial explicit waiver. In *United States v. Under Seal (In re Grand Jury Subpoena)*, the privilege asserter made an assertion in a public document that they knew was false. 341 F.3d 331, 334 (4th Cir. 2003). During the privilege objector's interrogation of the privilege asserter about that assertion, and after revealing that the privilege objector knew the assertion was false, the privilege objector asked why the privilege asserter had made the assertion. *Id*. The privilege asserter responded that they had done so "'under the advice of counsel'." *Id*. The district court granted the privilege objector's request to compel testimony from the privilege asserter's lawyer to determine whether counsel had in fact advised the privilege asserter regarding the assertion, reasoning that the privilege asserter's response during the interrogation constituted implied waiver. *Id*. On appeal, the privilege asserter argued that their response "did not constitute a waiver of the attorney-client privilege because they merely revealed his conduct—i.e., that he had acted in a particular way relying on the legal advice of an attorney—rather than disclosing the substance of that advice." *Id*., at 337. The Fourth Circuit rejected "[t]he distinction," explaining that the response "clearly stated to a third party" what he had been advised and conveyed the "same information [that] is the subject of" what the privilege objector sought to compel. *Id*.

[366] *See In re Grand Jury Proceedings*, 727 F.2d 1352, 1358 (4th Cir. 1984) (stating that it "is of no relevance" if the waived privileged material was never so disclosed); *see also Neuberger Berman Real Estate Income Fund v. Lola Brown Trust No. 1 et al*, 230 F.R.D. 398 (Dist. Md. 2005).

opinions for the ultimate use of persons other than themselves" since "the success of [the privilege asserters'] business venture depended upon convincing potential investors that purported [] benefits existed in fact, and this rested on interpretation of the [] law").

## 2. Application

### a. Joint Interest

201.    An exception to these explicit waiver rules is found in the joint privilege doctrine which occurs when "communication does not lose its character as attorney-client privileged if it is shared only with persons sharing a common interest in the protection of the privilege." Final Report, p. 20 (citing *Neuberger Bennan Real Estate Income Fund v. Lola Brown Trust No. IB*, 230 F.R.D. 398 (D. Md. 2005); *In re Sanchez Energy Corp.*, 2022 Bankr. LEXIS 3507 (S.D. Tx. 2022).[367] For this to apply, "all members of the community must share a common legal interest in the shared communication." *Jeld-Wen, Inc. v. Nebula Glasslam Int'l Inc.*, 2008 U.S. Dist. LEXIS 18821, at *11 (quoting *Visual Scene, Inc. v. Pilkington Bros.*, PLC, 508 So. 2d 437 (Fla. 3d DCA 1987)).

202.    Parties sharing a common interest in the protection of a privilege often enter into confidentiality agreements to protect such an interest. Final Report, p. 20. These agreements "may require a review of the document in camera to determine whether the agreement serves more than one purpose, whether any purpose other than the preservation of privilege upon sharing among parties with a common interest is properly discoverable and, if so, whether the agreement

---

[367] *Takata Airbag Products Liability Litigation*, 2017 U.S. Dist. LEXIS 76100 (S.D. Fla. 2017) ("The joint defense doctrine is an extension of the work product doctrine and allows parties facing a common litigation opponent to exchange privileged communications and attorney work product in order to prepare a common defense without waiving either privilege."); *see also Fojtasek v. NCL (Bahamas) Ltd.*, 262 F.R.D. 650, 654 (S.D. Fla. 2009); *Warren Distributing*, 2008 U.S. Dist. LEXIS 71320, at *2 ("Under the common interest doctrine, 'litigants who share unified interests [may] exchange ... privileged information to adequately prepare their cases without losing the protection afforded by the privilege'.").

113

is segregable so that only that portion can be produced." Final Report, p, 21 (discussing how although an agreement may memorialize the interest, "if the agreement also includes a settlement agreement resolving adverse interests of issues previously in dispute or other substantive business information, those portions would be properly discoverable," whereby, "it may be appropriate for a redacted version of the agreement to be produced" (citing *Jeld-Wen*, 2008 U.S. Dist. LEXIS 18821, at *9)).

203.    This Court previously ruled that the Common Interest and Confidentially Agreement between DBMP, New CT, and SGC did not need to be produced.[368] The Plaintiffs argue that this conclusion and ruling was narrowly tailored to the discoverability of the agreement itself and did not speak to whether the Defendants have a common interest or the scope of any such common interest. *See* Plaintiffs Opening Brief, ¶ 59–60. Furthermore, the Plaintiffs argue that, to the extent that the non-debtor affiliates shared documents with DBMP after the Restructuring Date, such sharing constituted a waiver. *See id*., ¶ 61. Thus, while the Plaintiffs do not challenge the decision to not produce the agreement, they request clarification on the parameters of the common legal interest claims to determine whether (1) the claims are proper, and (2) if so, if any claims have been waived by the further dissemination of information between DBMP and the non-debtor affiliates.[369]

204.    The Defendants argue that the Plaintiffs' request is improper because the Plaintiffs have not filed a related motion or requested a meet-and-confer, despite the Defendants' having addressed the Plaintiffs' concerns in a series of letters in early 2023.[370] Further, the Defendants argue that not only is the Plaintiffs' request unrelated to the Final Report or the Defendants'

---

[368] *See* Oct. 23, 2020 Hr'g Tr. at 14–15.
[369] *See id*., ¶ 62.
[370] *See* Defendants Reply Brief, p. 14.

objections, it also improperly shifts the burden to them to defend designations that Plaintiffs have not yet objected to.[371]

205.    Given the procedural posture of this matter as a whole and the global objective of resolving all privilege issues related to the Documents and Depositions, the Court does not believe a separate motion is required or that the Plaintiffs' request is otherwise improper. However, for the reasons stated below, the Court finds that on and after the Restructuring Date (1) a common interest exists between DBMP and the non-debtor affiliates, and, therefore, (2) the sharing of documents between DBMP and the non-debtor affiliates has not resulted in a waiver of any privilege claims.

206.    The rationale underlying the common interest rule is that "persons who share a common interest in litigation should be able to communicate with their respective attorneys and with each other to more effectively prosecute or defend their claims." *In re Grand Jury Subpoenas, 89-3 & 89-4, John Doe 89-129*, 902 F.2d 244, 249 (4th Cir. 1990). Courts have extended this protection to "civil co-defendants, companies that had been individually summoned before a grand jury who shared information before any indictment was returned, potential co-parties to prospective litigation, plaintiffs who were pursuing separate actions in different states, and civil defendants who were sued in separate actions." *Id.* (internal citations omitted).

207.    In *Grand* (4th Cir. 1990), the movant raised joint privilege protection to prevent disclosing documents shared by the movant to a third party that was once an unincorporated division of movant. *Id.* at 245. The movant also objected to the third party's unilateral voluntary waiver of documents in which the movant maintained a privileged interest. *Id.* at 248. The movant and third party were engaged in litigation against another party regarding matters that arose prior to the entities separating. *Id.* at 245–46. Having found that the parties shared a common interest in

---

[371] *See Id.*, pp. 14–15.

115

litigation and "no principled basis upon which to distinguish Movant's relationship with [the third party] from similar situations in which courts have upheld the privilege," the Fourth Circuit held that the movants' sharing of the documents with the third party was protected by joint privilege and that the third party "may not waive unilaterally" such privilege. *Id.* at 249–50.

208.    The Court finds *Grand* both particularly illustrative and binding as to this case at hand. As in *Grand*, the Court finds no basis here to distinguish DBMP's relationship with the non-debtor affiliates from other applications of the privilege. The parties have a common interest in the litigation claims regarding the Restructuring because (1) the Restructuring was intended to help resolve the asbestos liabilities affecting the Defendants, and (2) the Defendants' interests remain intertwined after the Restructuring via the Funding Agreement and other Intercompany Agreements. Preventing them from sharing otherwise privileged information without waiving that privilege would undermine their ability to effectively litigate their interests, which is the express purpose of the common interest doctrine. Furthermore, arguing that issues as to whether the entities exist pre- or post-Restructuring should negate these interests "promotes form over substance," and such arguments are therefore unpersuasive. *Id.* at 249.

209.    Accordingly, the Court holds that the scope of the common interest extends to all of the relevant Documents prepared in anticipation of potential or ongoing litigation shared between DBMP and the non-debtor affiliates on or after the Restructuring Date. Therefore, the act of sharing documents between DBMP and the non-debtor affiliates on or after the Restructuring Date does not in itself waive applicable privilege over such Documents. Additionally, because no party can unilaterally voluntarily waive the privilege of another party, all parties with a common interest in a Document must consent to waiver of that privilege for that waiver to be effective.

b. <u>Draft Waiver</u>

210.     The Fourth Circuit has held that the attorney-client privilege extends to communications in which an attorney advises a client on what and how to publicly disclose something. Specifically, "all preliminary drafts of the document, and any attorney's notes containing material necessary to the preparation of the document," must be produced if the document was prepared at a client's direction "with the understanding that the information will be revealed to others." *United States v. (Under Seal)*, 748 F.2d 871, 875 n.7 (4th Cir. 1984). The draft document and the attorney's notes are part of "the details underlying the data which was to be published" and do not enjoy the attorney-client privilege. *See id*. The court has dealt with this in four cases.

211.     The Fourth Circuit, first in *In re Grand Jury Procs.* (4th Cir. 1984), considered whether attorney-client privilege precluded compelling testimony from an attorney regarding discussions between the attorney and their client about "the preparation of a prospectus to be used in the enlistment of investors," a prospectus which had never been published. *See* 727 F.2d 1352, 1353–54 & 1358. The district court had found that the crime-fraud exception applied after reviewing an Internal Revenue Service agent's affidavit. *See id*., at 1354. *Grand Jury* (1984) first recognized that the attorney-client privilege "is not favored by federal courts" because it "impedes the full and free discovery of the truth[] and is in derogation of the public's right to every man's evidence," wherefore "the privilege is to be strictly confined within the narrowest possible limits consistent with the logic of its principle." *Id*., at 1355 (citing, *inter alia*, *Herbert v. Lando*, 441 U.S. 153, 175 (1979)).

212.     Accordingly, *Grand Jury* (1984) outlined that the privilege only extends "to those communications which the client either expressly made confidential or which he could

117

reasonably assume under the circumstances would be understood by the attorney as so intended" as there is no "presumption of confidentiality." *Id.*, at 1355–56 (citation omitted). "Thus it is well established that communications between an attorney and his client, though made privately, are not privileged if it was understood that the information communicated in the conversation was to be conveyed to others." *Id.*, at 1357 (citation omitted).

213.   Applying this logic to the prospectus, *Grand Jury* (1984) found that it was

> irrelevant that no prospectus was ever actually issued in this case. The significant fact is that the information given [to] the petitioner was to assist in preparing such prospectus which was to be published to others and was not intended to be kept in confidence. That is the critical circumstance, to wit, the absence of any intent that the information was to be kept confidential.

*Id.*, at 1358. *Grand Jury* (1984) went on to hold that, if the attorney-client privilege is lost, that loss "extends to the substance of a communication, since the disclosure of any significant part of a communication waives the privilege and requires the attorney to disclose the details underlying the data which was to be published." *Id.*, at 1356 (citation omitted) (emphasis added).

214.   Later that same year, the Fourth Circuit in *United States v. (Under Seal)*, 748 F.2d 871 (4th Cir. 1984), expanded on the *Grand Jury* (1984) court's holding. *Under Seal* (1984) considered whether waiver allowed a grand jury subpoena requiring attorneys to "produce all records relating to any transactions between the[ir] law firm and the" targets of the proceeding notwithstanding attorney-client privilege in-part because "the information contained in the [non-privileged] documents either did not originate from these clients or was not intended by these clients to be kept in confidence." 748 F.2d at 873. *Under Seal* (1984) first recognized the antiquity of the attorney-client privilege the importance of its frank-communication purpose. *Id.*, at 874 (citing *Upjohn*, 449 U.S., at 389). To fulfill this purpose, the privilege also "protects the substance of communications," including "communications by the lawyer to his client, agents, or superiors

118

or to other lawyers in the case of joint representation, if those communications reveal confidential client communications;" but "only confidential client communications," namely, those "not intended to be disclosed to third persons other than in the course of rendering legal services to the client or transmitting the communications by reasonably necessary means." *Id*. (citation omitted).

215.    When deciding whether a client "intends or assumes that his communication will remain confidential," *Under Seal* (1984) discussed how a court must consider "the services which the attorney has been employed to provide and determine if those services would reasonably be expected to entail the publication of the clients' communications." *Id*., at 875 (citation omitted). For example, a client probably would not intend or assume that their communications would remain confidential if they "retained the[ir] attorneys primarily for the commercial purpose of obtaining . . . written tax opinions to include in . . . promotion brochures rather than for the purpose of obtaining legal advice for their own guidance as clients." *Id*. (quoting *Jones*, 696 F.2d at 1072–73).[372]

216.    The court in *Under Seal* (1984) reiterated the holding in *Grand Jury* (1984) that, "if a client communicates information to his attorney with the understanding that the information will be revealed to others, that information as well as 'the details underlying the data which was to be published' will not enjoy the privilege." *Id*., at 875 (quoting *Grand Jury*, 727 F.2d at 1356).[373] The *Under Seal* court clarified that:

> [t]he details underlying the published data are the communications relating the data, the document, if any, to be published containing the data, all preliminary drafts of the

---

[372] *See also In re Grand Jury Subpoena No. 2013r00691-009*, 201 F. Supp. 3d 767, 775 (W.D.N.C. 2016) (citing *Under Seal*, 748 F.2d at 875) ("A client communication made for the purpose of effectuating a real estate closing inherently must be made in contemplation of ultimate public disclosure. Therefore, no intention of confidentiality, and thus no privilege, exists.").

[373] *See also In re Grand Jury Proc., Thursday Special Grand Jury Sept. Term, 1991*, 33 F.3d 342, 354 (4th Cir. 1994) ("[T]he attorney-client privilege does not apply to communications in connection with a proposed public disclosure").

document, and any attorney's notes containing material necessary to the preparation of the document. Copies of other documents, the contents of which were necessary to the preparation of the published document, will also lose the privilege. If any of the non-privileged documents contain client communications not directly related to the published data, those communications, if otherwise privileged, must be removed by the reviewing court before the document may be produced.

*Id.*, at 875 n.7. Thus, courts in this circuit have repeatedly held that "[p]reliminary drafts of letters or documents which are to be published to third parties lack confidentiality" and are not shielded by the attorney-client privilege. *See N. Carolina Elec. Membership Corp. v. Carolina Power & Light Co.*, 110 F.R.D. 511, 517 (M.D.N.C. 1986) (citing *Under Seal*, 748 F.2d at 875).[374]

217.    In *United States v. Under Seal (In re Grand Jury Subpoena)*, the Fourth Circuit rejected the privilege objectors' argument that "the underlying communications between [the privilege asserter and his lawyer] regarding his submission of Form I-485 are privileged [due to] the fact that those communications may have assisted him in answering questions in a public document." 341 F.3d 331, 336 (4th Cir. 2003). *Grand Jury* (2003) so held because adopting such a position "would lead to the untenable result that any attorney-client communications relating to the preparation of publicly filed legal documents—such as court pleadings—would be unprotected." *Id.* Unless the privilege asserter "intended his communications with Counsel to be published," the privilege asserter publishing something "in a particular way on the advice of his attorney does not subject the underlying attorney-client communications to disclosure." *Id.* ("Only

---

[374] *Accord, e.g., In re Grand Jury Proc., Thursday Special Grand Jury Sept. Term, 1991*, 33 F.3d 342, 355 (4th Cir. 1994) (holding that the attorney-client privilege does not apply to attorneys' "drafts, notes, and memoranda generated in connection with audit responses to an outside auditor," nor does the privilege apply to "drafts of securities filings ultimately filed with the Securities Exchange Commission (SEC) and related documents"); *Santrade, Ltd. v. Gen. Elec. Co.*, 150 F.R.D. 539, 544 (E.D.N.C. 1993) (citation omitted) (holding that the attorney-client "[p]rivilege does not extend to drafts of patent applications"); *Republican Party of N. Carolina v. Martin*, 136 F.R.D. 421, 428 (E.D.N.C. 1991) (citation omitted) (requiring the disclosure of "drafts of letters and speeches, whose contents of necessity were intended to be disclosed to third parties").

120

when the attorney has been authorized to perform services that demonstrate the client's intent to have his communications published will the client lose the right to assert the privilege as to the subject matter of those communications" (citing *Under Seal*, 748 F.2d at 875-76, and *In re Grand Jury Proceedings*, 727 F.2d 1352, 1358 (4th Cir. 1984) (holding that information that clients provided to an attorney for preparation of an investment prospectus was not privileged because there was no "intent that the information was to be kept confidential"))).

218.    This Court, just sixteen years ago in *Taylor v. Wolbert (In re Wolbert)* (Bankr. W.D.N.C. Feb. 17, 2010), considered whether the attorney-client privilege extends to documents and information related to a bankruptcy filing, including preliminary drafts of a bankruptcy petition. 2010 WL 8971772. *Wolbert* considered this question in the context of where a paralegal for the privilege asserter debtors' attorney had prepared and filed the privilege asserter debtors' bankruptcy petition, statements, and schedules, but failed to list certain assets and transfers within the petition. *Id*., at *1. To investigate this matter, the Chapter 7 trustee subpoenaed the privilege asserter debtors and listed their attorney and the paralegal as potential case witnesses. *Id*., at *2. The privilege asserter debtors moved to quash the subpoena and to exclude such witness on attorney-client privilege. *Id*.

219.    This Court denied the motion. *Id*., at *8. Applying *Grand Jury* and *(Under Seal)*, this Court "conclude[d] that a debtor has no reasonable expectation that information disclosed to an attorney for the assembly of a bankruptcy petition and schedules will be kept confidential." *See id*. at *4 (citations omitted). "Of course, where the client has no reasonable expectation of confidentiality, the attorney-client privilege is unavailable." *Id*. (citations omitted). "Consequently, in appropriate instances, . . . courts have required production of: (1) prior drafts of the petition and interview notes; (2) all documents used to prepare the petition and schedules; and

even production of the debtor-attorney's entire bankruptcy file." *Id*. (citations omitted). "Similarly, both debtor's counsel and staff have been required to testify as to these matters." *Id*. (citations omitted).

220.   "Applying these authorities to" *Wolbert*, this Court held that "[t]he information the [privilege asserter debtors] disclosed in their initial conference with [their attorney] and [his paralegal] concerning their assets and transfers would clearly fall within the attorney-client privilege, at least at that point in time." *See id*., at *5. "Any communications between client and counsel during that meeting would also be privileged." *Id*. "However, after the decision was made that the [privilege asserter debtors] would file bankruptcy, under circuit precedent and the majority view of bankruptcy courts, the privilege was lost, at least as to matters required to be disclosed in the Petition." *Id*., at *6. This included "all preliminary drafts of the document, all documents necessary to the preparation of the Petition,[375] all communications relating to that data between the [debtors] and counsel or his staff;[376] and any attorney's notes containing material necessary to the preparation of the document." *Id*., at *6. This Court noted that it was "loathe to reach" this "eye opening conclusion," particularly because "bankruptcy attorneys [are] accustomed to treating all of their client communications as sacrosanct." *Id*. Nevertheless, such a result was mandated by "the aforementioned Fourth Circuit cases." *See id*.

221.   While not explicitly raised between the parties, the Court must resolve (1) whether drafts of disclosed documents are subject to any privilege from disclosure by virtue of being a draft and (2) what information might be subject to disclosure within a draft document.

---

[375] The *Wolbert* court defined the term "Petition" as the debtors' "bankruptcy [p]etition, statements and schedules." *Wolbert*, 2010 WL 8971772, at *1.

[376] The communications relating to that data include all "conversations between the [debtors] and [their attorney's] office concerning matters required [to be] disclos[ed] in the petition." *See id.* at *5.

222.     In this case, several of the Documents that the Court reviewed in camera appear to be drafts of other documents. Some draft documents that the Court reviewed were press releases, talking points, potential questions, and slideshows. As is explained, if the attorney-client privilege does not attach to the final version of these public documents, then the attorney-client privilege does not attach to preliminary drafts of these documents. Some of the Documents were actually published and disclosed to others, thereby waiving the attorney-client privilege. This includes press releases, letters to third parties, scripts, and other notifications to third parties. Because these documents are not privileged, preliminary drafts of these documents also do not enjoy the attorney-client privilege. For documents that would not necessarily be disclosed to others, such as potential questions with draft answers or talking points, the Court does not believe the attorney-client privilege is waived by the nature of such documents being drafts in that they were not certain be disclosed to third parties and the client would have an expectation for privilege as to their contents.

223.     One issue that the *Grand Jury* and *(Under Seal)* courts did not have the opportunity to address is the effect of what are commonly referred to as "tracked changes" on a document. This revision tool allows someone to immediately display changes across a document, including additions and removals from the document, which may have been used to convey communications between a client and their attorney. Although the *Grand Jury* and *(Under Seal)* courts did not have "tracked changes" in their cases, these editing processes are not a new concept in terms of a "redlining" approach. Thus, the Court finds that a draft document with "tracked changes" should generally be produced, however appropriate redactions should be made for any attorney-client privileged communications that may be made in commentary portions of the documents.

224.     This Court, as in *Wolbert*, is uncomfortable determining that many of these documents are not privileged. This is particularly relevant because many of them contain edits that may identify the attorney's and client's thought processes and, inherently, their communications with one another. Requiring that these documents be produced may prevent full and frank communication between attorneys and their clients going forward. It may also degrade public interests in the observance of law and administration of justice. However, the Fourth Circuit has been clear for more than forty years that such draft documents must be produced as data related to the details of non-privileged information. Therefore, this Court heeds to the Fourth Circuit's command and will require that these documents be disclosed, but will not allow disclosure of work product or what amounts to attorney communications located in draft comments.

## D.  **Implied Waiver and At-Issue Waiver**

### 1.  **Legal Discussion**

#### a.  Legal Background

225.     It is universally agreed that waiver can occur without disclosure for a variety of reasons and under various names, sometimes labeled 'implied waiver'. The rules for implied waiver are both unclear and divergent between courts.

##### i.   *At-Issue Waiver*

(1)   In General and Purposes

226.     Courts disagree widely as to what constitutes and what is required for what the Parties call, 'at-issue waiver',[377] to occur. There are two 'tests' for at-issue waiver that courts

---

[377] On the Court's view, at-issue waiver does not appear to be a coherent or rationally delineated concept in the law. Rather, it seems to be one of a hodgepodge of phrases, including, but not limited to, implied waiver, reliance waiver, issue injection waiver, offense use waiver, selective waiver (most confusingly, since this description is also used for a type of disclosure waiver), and forfeiture. These phrases are used to describe a variety of facts, some of which are similar but all of which lack a single unifying feature

generally and purportedly use based on their following either one of two cases: (1) *Hearn v. Rhay,*

a Washington trial court opinion and one of the earliest opinions attempting to delineate at-issue

waiver, 68 F.R.D. 574 (E.D. Wash. 1975); or (2) *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*,

a Third Circuit opinion explicitly rejecting *Hearn*, 32 F.3d 851 (3d Cir. 1994). After first discussing

at-issue waiver's bases below, the Court will then canvass *Hearn* and *Rhone* and their respective

treatments, including in the Fourth Circuit, and then a third approaches stemming from both *Hearn*

or *Rhone* and adopted in other courts, namely, a state-of-mind approach, illustrated by, *inter alia*,

various Second Circuit cases. Lastly, the Court will delineate the application of at-issue waiver as

to the work product protection and then conclude by discussing warranted remedies required when

a court finds an at-issue waiver.

227.     Generally, two related rationales underpin at-issue waiver.[378] First, and most

prominent, is the principle that parties may not use attorney-client privilege as both a "shield and

a sword" (the 'sword-shield principle'). Under the sword-shield principle, when a party wields

privileged communications against its opponent, it waives the attorney-client privilege. The sword-

shield principle predates modern American privilege doctrines and originates from general

evidentiary privileges.[379] This rationale usually functions more as a substantive requirement for

---

effectuating a waiver of attorney-client privilege and the work product protection. The Court uses 'at-issue waiver' since this is what the Plaintiffs and Defendants have so named the issue and the same believes this is the most illustrative moniker.

[378] These principles exist as to, and sometimes originate from, other types of waiver cases beyond at-issue waiver. The Court includes the discussion of it here to align it with the most disputed issue, namely, the different approaches to at-issue waiver.

[379] This 'sword-shield' metaphor appears to have originated at least as of around America's founding, given one case usage of the phrase regarding permissible arguments as to infancy rules from. *See John Collins' v. Rigua*, 1 Del. Cas. 141, 1797 Del. Lexis 17 (1797) (explaining that an infant's bond to convey land is merely voidable and that post-majority acts confirming the bond bar the infant from repudiating it in ejectment, because "[t]he privilege of infancy is not a sword, but a shield; they are not to commit frauds and act improperly."). The sword-shield principle was explicitly extended to attorney-client privilege around the turn of the Nineteenth Century. *See, e.g., Cerny v. Paxton & Gallagher Co.*, 83 Neb.

the privilege. Relatedly, but sometimes distinct, is the more policy-based rationale, as recognized

by the Supreme Court, that the selective presentment of evidence, whether acknowledged or

obscured, is generally disfavored.[380]

>   (2)   Approaches/Tests/Constitutive Rules

>   (a)   *Hearn*[381]

228.   In *Hearn*, the privilege objector, an incarcerated plaintiff, brought suit for

alleged Eighth Amendment violations against the privilege asserters, prison officials, who in turn

---

88, 92 (1908). The Court notes this history to point out that as ancient as attorney-client privilege is, the sword-shield principle underpinning any privilege waiver is just as old.

[380] *Cf. United States v. Nixon*, 418 U.S. 683, 709 (1972) (describing the "the adversary system['s] [] fundamental and comprehensive" "need to develop all relevant facts" since "judgments [] founded on a partial or speculative presentation of the facts" "defeat[]" "[t]he ends of [] justice" given "[t]he very integrity of … and public confidence in" "the judicial system … depend on full disclosure of all the facts, within the framework of the rules of evidence"); *United States v. Nobles*, 422 U.S. 225, 241 (1975) ("The District Court did not bar the investigator's testimony. *Cf. Washington v. Texas*, 388 U.S. 14, 19 (1967). It merely prevented respondent from presenting to the jury a partial view of the credibility issue by adducing the investigator's testimony and thereafter refusing to disclose the contemporaneous report that might offer further critical insights. The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system; one cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth. Deciding, as we do, that it was within the court's discretion to assure that the jury would hear the full testimony of the investigator rather than a truncated portion favorable to respondent, we think it would be artificial indeed to deprive the court of the power to effectuate that judgment.").

[381] *Hearn* was not the first 'test' advanced for at-issue waiver. Before *Hearn*, courts had applied what commentators have termed the 'automatic waiver' test, "which provide[d] that [the privilege asserter] automatically waives the privilege upon assertion of a claim, counterclaim, or affirmative defense that raises as an issue a matter to which otherwise privileged material is relevant." *See e.g., Frontier* 699 (citing *Independent Prods. Corp. v. Loew's Inc.*, 22 F.R.D. 266, 276–77 and *Fed. Deposit Ins. Corp. v. Wise*, 139 F.R.D. 168, 170–71 (D.Colo.1991)); *see also Independent*, 22 F.R.D. at 277-79 (S.D. N.Y. 1958) (considering whether the privilege asserter filing an antitrust suit and claiming conspiracy to obstruct the distribution of a motion picture waived any First and Fifth Amendment privileges as to their corporate executive's supposedly subversive beliefs and connections; holding that such waiver had occurred because the privilege asserters "have initiated the action and forced defendants into court," as holding otherwise would violate the sword-shield principle); *Lyons v. Johnson*, 415 F.2d 540, 542 (9th Cir. 1969); *Compagnie Francaise d' Assurance Pour Le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 25 n.2 (S.D. N.Y. 1984); *Ghana Supply Comm'n v. New England Power Co.*, 83 F.R.D. 586, 593–94 (Mass. 1979).
    The automatic waiver test was criticized as too rigid and harsh both before and after *Hearn. See, e.g., Frontier*, 136 F.3d at 701-702; *Remington Arms Co. v. Liberty Mut. Ins. Co.*, 142 F.R.D. 408, 414

raised, among other defenses, a good-faith defense and contended they were immune from

damages under qualified immunity. 32 F.3d, at 576–78.[382] The privilege objector sought to

discover both testimony and materials from the privilege asserters "concern[ing] legal advice" "on

_____

(D.Del.1992); *FDIC*, 139 at 171; *Greater Newbury Port Clam Shell Alliance v. Pub. Serv. Co.*, 838 F.2d 13, 19-20 (1st Cir. 1988); *Afro-Lecan, Inc. v. United States*, 820 F.2d 1198, 1205 (Fed. Cir. 1987); *Zenith Radio Corp. v. United States*, 764 F.2d 1577, 1580 (Fed. Cir. 1985) ("[P]rivileges involve subtle and sensitive questions and ordinarily should not be breached without a more penetrating analysis than the automatic waiver rule involves."); Bahner & Gallion, *supra*, at 201 (positing that the "[automatic waiver] test never gained widespread acceptance [] because it functions as too blunt an instrument" and arguing its rejection by courts implies "an unwillingness to achieve consistency at the expense of needlessly intruding into the attorney-client privilege" because not "consider[ing] the relative interests involved [] simply destroys a privilege" given that "privilege [] involves 'subtle and sensitive questions that should not be summarily ignored without a more penetrating analysis'; " describing this as "well-reasoned" because "[c]onsistency is simply too high a premium to pay for an exception that potentially would swallow the rule" and "the automatic waiver rule," "[c]arried to its ultimate conclusion, … would destroy the attorney-client privilege any time a litigant asserted a claim or defense" (citations omitted)). Generally, the automatic waiver test fell out of favor, and some commentary has called it "defunct," *see* Kenneth Duvall, *Rules, Standards, and the Attorney-client privilege: When the Privilege Is "At-Issue" in the Discovery Rule Context*, 32 N. ILL. U. L. REV. 1, 12–13 (2011), although the Court does not quite agree with that description, as the automatic waiver rule appears to have survived within anticipatory waiver.

　　　The Court notes this history not merely to situate *Hearn* among other waiver doctrines, but to emphasize a point frequently absent from its critiques: *Hearn* did not arise on a blank slate or craft a test *ex nihilo*. Rather, *Hearn* appears to have been attempting to constrain the more privilege-eroding automatic waiver approach. Imperfect as *Hearn* may be—and it is—*Hearn* was nevertheless an improvement over what came before. It sought to articulate a rule that would prevent the attorney-client privilege from being used as both sword and shield, while avoiding the drastic and overinclusive consequences associated with automatic waiver. That context also makes particularly striking the extent to which criticism of *Hearn* sometimes comes from courts that, in practice, adopt the reformulated automatic waiver, anticipatory waiver, *see generally infra* ¶¶ 267–270, on the grounds that *Hearn* does not sufficiently protect the privilege despite *Hearn's* evident aim of protecting the privilege from the extremes of that earlier approach. *Cf.* Laura B. Bartell, *The Implied Waiver Solution to the Problem of Privilege in the Individual Bankruptcy Case*, 20 BANKR. DEV. J. 25, 53 (discussing how "even courts that are the most protective of the privilege have indicated that they would disallow the privilege under the[] circumstances" occasioning anticipatory waiver (citing *Rhone*, 32 F.3d at 864; *Harter v. Univ. of Indianapolis*, 5 F. Supp. 2d 657, 664-65 (S.D. Ind. 1998); *Dixie Mill Supply Co. v. Cont'l Cas. Co.*, 168 F.R.D. 554, 559 (E.D. La. 1996); *Smith v. Kavanaugh, Pierson & Talley*, 513 So. 2d 1138, 1146 (La. 1987); *Remington Arms Co. v. Liberty Mut. Ins. Co.*, 142 F.R.D. 408, 416 (D. Del. 1992); *Aranson v. Schroeder*, 671 A.2d 1023, 1030 (N.H. 1995); *Pub. Serv. Co. of N.M. v. Lyons*, 10 P.3d 166, 173 (N.M. Ct. App. 2000); *State v. Hydrite Chem. Co.*, 582 N.W.2d 411, 419 (Wis. Ct. App. 1998))).

[382] At the time, qualified immunity required both objective and subjective analyses. *Id*. 578 (citing *Wood v. Strickland*, 420 U.S. 308, 322 (1975), overruled by *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)).

the legality of [the privilege objector's] confinement." *Id*. 577. To support that position, the privilege objector relied on analogies to waivers in other privilege contexts,[383] analogies which the *Hearn* court found "persuasive." *Id*. at 581.

229.    From these analogies, the *Hearn* court articulated what it described as a rule for when a privilege asserter's "own affirmative conduct" constitutes "implied[] waive[r]" (the "*Hearn* test"). *Id*. The test required three elements:

- (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party;
- (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and
- (3) application of the privilege would have denied the opposing party access to information vital to his defense.

*Id*. The *Hearn* court then applied its test and concluded that each element was satisfied.[384] The *Hearn* court justified its test by reference to "the policy of the privilege [] to protect" privileged materials "only to the extent that the injury the relationship would suffer from disclosure is greater than the benefit to be gained thereby." *Id.* at 582 (citing 8 WIGMORE, § 2285 at 527).[385] Lastly, The

---

[383] Those analogies included both (1) examples outside the attorney-client privilege context—"as where a plaintiff waives the physician-patient privilege by filing a suit that places his physical condition in controversy"—and (2) examples within it, such as (a) "where the attorney and client are themselves adverse parties in a lawsuit arising out of the relationship," (b) "where a plaintiff in a patent infringement suit put the validity of the patent at issue," and (c) circumstances in which courts have permitted waiver involving "a habeas corpus petitioner. . . contesting the constitutionality of his state court conviction. . . [I]n order to allow inquiry of the [privilege asserter's] attorney concerning deliberate bypass of the right to confidential communication," on the ground that the privileged matters "were the sole source of evidence on the issue of deliberate bypass." *Id*. 580–81 (citations omitted).

[384] The *Hearn* court held the first element was met despite the privilege asserter having not brought the suit, based on the privilege asserter having raised affirmative defenses. *Id.* As to the second and third elements, the *Hearn* court held that "the legal advice [the privilege asserters] received is germane to the qualified immunity defense they raised," and that upholding the privilege "deprive[s] [the privilege objector] of information necessary to 'defend' against [the privilege asserters'] affirmative defense, for the protected information is also germane to [the privilege objector's] burden of proving malice or unreasonable disregard of his clearly established constitutional rights." *Id.*

[385] In the *Hearn* court's view, that policy balance favored disclosure on its facts because the privileged materials were "inextricably merged with the elements of [the privilege objector's] case and [the privilege

*Hearn* court attempted to cabin its holding by emphasizing "a major limitation," namely, that any allowed waiver required "[a] substantial showing of merit to plaintiff's case." *Id*.

230.    Many courts adopted *Hearn's* test for at-issue waiver, and a substantial number of courts continue to follow *Hearn* today.[386] However, almost immediately, *Hearn* drew sustained criticism in the commentary and crucially, many courts have expressly rejected *Hearn* (or, arguably, their construction of *Hearn*) since the 1990s. *See infra* ¶¶ 234–238 (*Rhone*'s criticism); ¶¶ 245–250; ¶ 258 (Second Circuit criticism).[387] Commentary has criticized *Hearn's* test by arguing (1) that its first and second elements are toothless[388] and (2) that its third element (a) is inapplicable to attorney client privilege, (b) involves balancing violative of the consistency

---

asserter's] affirmative defense" due to the subjective element of the defendants' qualified immunity claim. *Id.* The court emphasized they were "not incidental to the case," but "inher[ing] in the controversy itself, [such that] to deny access to them would preclude the court from a fair and just determination of the issues" and "pervert [attorney client privilege's] essential purpose and transform it into a potential tool for concealment of unconstitutional conduct behind a veil of confidentiality." *Id.*

[386] It appears that *Hearn,* or a variant, has been adopted by or is applied in four (and at one point six) federal circuits, and has been adopted by or is applied in anywhere from ten to twenty-five states. *See* Douglas R. Richmond, *The Frightening At-Issue Exception to the Attorney-Client Privilege*, 121 PENN ST. L. REV. 1, 19 & n. 129 (2016) (discussing how *Hearn* had been adopted, as of 2016, by Alaska, Arizona, and Montan and by courts in Colorado, Kansas, Iowa, Oklahoma, South Carolina, Washington and West Virginia (citations omitted)); Duval 8–9 & ns. 39–56 (discussing how *Hearn* had been adopted, as of 2011, by the First, Fifth, Seventh, Ninth, Eleventh, and the Federal Circuits, by courts in the Eighth and Tenth Circuits, by Arizona, California, Colorado, Maryland, Nebraska, New York, and Texas, by courts in Florida, Indiana, and Tennessee, and by possibly Wyoming (citations omitted)); *id.*, 9–10 & ns. 57–61 (discussing how a variant of *Hearn* without its first injection element had been adopted, as of 2011, by the First Circuit and by Michigan (citations omitted)); *cf.* William T. Barker & Ronald D. Kent, *Bad Faith Litigation—"Other Insurance" Provisions*, in NEW APPLEMAN ON INSURANCE: CURRENT CRITICAL ISSUES IN INSURANCE LAW, at Appendix: State-by-State Analysis of "At Issue" Waiver of Attorney-Client Privilege (December 2007) (discussing how *Hearn* or some variant has been adopted, as of 2007, by courts in Connecticut, Delaware, District of Columbia, Illinois, Massachusetts, Michigan, Nebraska, New York, Tennessee, Texas, Washington, and Wyoming). Some courts who have adopted *Hearn* have done so with modifications to its rule. *See infra* ¶ 231.

[387] *See also, e.g.*, *In re Itron, Inc.*, 883 F.3d 553, 564 (5th Cir. 2018).

[388] Anonymous, *Development in the Law—Privileged Communication, Part VII*, 98 HARV. L. REV. 1629, 1640.

principle, and (b) is concerned with the wrong type of fairness.[389] One commentator has noted that, by focusing on "what the privilege-holder has to prove, not how he is going to prove it," the *Hearn* test "perverts waiver because it rests on the unfairness of having a privilege, rather than the unfairness of the act relied upon, to show a waiver."[390]

231.   Even among courts that continue to apply *Hearn*, some have attempted to mitigate its more troubling implications generally by retooling its first and second elements.[391] With respect to the first element, certain courts have heightened the required showing by demanding more affirmative conduct than the court in *Hearn* itself required in order to get at reliance.[392] With respect to the third element, some courts have required not only that the privileged materials be "vital," but also that they be dispositive or outcome determinative.[393]

*(b) Rhone*

232.   In *Rhone*, the privilege asserters sued the privilege objector, an insurance provider, alleging that it violated its obligations to defend and indemnify the privilege asserters' AIDS-related liabilities tied to a product the privilege asserters had purchased and later sold. 32 F.3d at 855. The privilege objector defended principally on the grounds that (1) the privilege

---

[389] *Id.*, at 1640-41; *see also* Bahner & Gallion, *supra*, at 203-204. *But see id.*, 206-07 (arguing that fairness limits at issue waiver and does not empower it).

[390] Richard L. Marcus, *The Perils of Privilege: Waiver and the Litigator*, 84 MICH. L. REV. 1605, 1641-42 (1986).

[391] It has been argued that courts have not attempted to improve *Hearn* via the second element, which commentators have argued is not possible. Duvall, *supra*, at 13 ("[T]he second prong offers little in cabining *Hearn's* possible deleterious effect with its open-ended requirement of 'relevance'."). While the Court does not disagree with that argument as to the second element's shortcomings, the Court disagrees that other approaches do not try to amend the second element.

[392] *See* Duvall, *supra*, at 13 & 13 n. 97 (citing *Pereira v. United Jersey Bank*, 1997 WL 773716 (S.D.N.Y. Dec. 11, 1997)).

[393] *See id.* & n. 98 (citing *Standard Chartered Bank PLC v. Ayala Int'l Holdings Inc.*, 111 F.R.D. 76 (S.D.N.Y. 1986)); *see also* Richmond (2016), *supra*, at 20–21 & 20–21 ns. 134–36.

asserters knew of the HIV transmission risk when they purchased the product and (2) their failure to disclose that knowledge made the insurance coverage wrongfully obtained. *Id.*, at 855-56.

233.    During a deposition, the privilege asserters' CEO testified that, in deciding whether to purchase the product, the company conducted an investigation and analysis which included obtaining advice from counsel regarding potential liabilities associated with HIV transmission. 856. He also described some of the advice he received. *Id*. Thereafter, the privilege objector sought production of all evaluations of potential HIV-related liability, including documents that would confirm or reflect the advice from counsel the CEO had described. *Id*. In response, the privilege asserters produced four documents, one of which was largely redacted. *Id.*, at 856–57. The privilege objector continued to seek the remaining privileged materials, contending that the privilege asserters had waived privilege through their conduct—both by filing suit and by placing these matters in issue. *Id.*, at 857. The lower court agreed and ordered disclosure. *Id.*, at 858–60.

234.    On appeal, the Third Circuit reversed and expressly rejected *Hearn*. The *Rhone* court began by acknowledging that a privilege asserter may waive the attorney-client privilege by "asserting claims or defenses that put his or her attorney's advice in issue in the litigation." *Id.*, at 863 (citations omitted). The court described examples of such waiver as when the privilege objector files a malpractice action against their counsel or when the privilege objector "assert[s] reliance on the advice of counsel as an affirmative defense," because in those circumstances they "have made the decision and taken the affirmative step in the litigation" that effects a waiver. *Id*.

235.    However, the *Rhone* court drew a sharp line that the *Hearn* court had not. It stated that "[a]dvice is not in issue merely because it is relevant, and does not necessarily become

in issue merely because the attorney's advice might affect the client's state of mind in a relevant manner." *Id*. Instead, the court held that waiver occurs "where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication." *Id*. (citing *North River Insurance Company v. Philadelphia Reinsurance Corporation*, 797 F. Supp. 363, 370 (D.N.J. 1992); *Pittston Company v. Allianz Insurance Co.*, 143 F.R.D. 66, 71 (D.N.J. 1992)).

236. To illustrate the distinction, the *Rhone* court discussed the patent infringement context in which the court described, a waiver does not occur merely because the privilege objector alleges willfulness and the alleged infringer's communications with counsel would be relevant to that allegation. *Id*. Rather, even in that setting, privileged advice remains protected "unless the infringer seeks to limit its liability by describing that advice and by asserting that he relied on that advice." *Id*. Only then "may [the privilege objector] explore facts that would make it more probable than not that the [privilege asserter] did not rely in good faith on that advice, including for example, what the advice was, when it was given, whether the alleged [privilege asserter's] conduct suggests he had relied on the advice and whether he had knowledge of facts that would have led him to believe it would not be reasonable to rely on that advice." *Id*. (citing *Underwater Devices Inc. v. Morrison-Knudsen Co.*, 717 F.2d 1380 (Fed. Cir. 1983)).

237. The *Rhone* court justified its rule as "consistent with the essential elements of the privilege." *Id*. It asserted that "leaving to the [privilege asserter] the decision whether or not to waive" "provide[s] certainty that [privilege materials] will not be disclosed unless the [privilege asserter] takes an affirmative step to waive the privilege[] and [] predictability for the client concerning the circumstances by which the client will waive that privilege," both of which

"encourage[s] clients to consult with counsel free from the apprehension that the communications will be disclosed without their consent." *Id.*, at 863-64.

238.    The *Rhone* court acknowledged that some courts had found waiver where "the [privilege asserter's] state of mind may be in issue in the litigation," and had ordered disclosure "to test the [privilege asserter's] contentions." *Id.* , at 864 (citing *Byers*, 100 F.R.D. 436 and *Hearn*, 68 F.R.D. 574). However, it described those cases as "of dubious validity" that "dress[] up their analysis with a checklist of factors" but ultimately "rest on a conclusion that the information sought is relevant and should in fairness be disclosed." *Id*. For the *Rhone* court, such relevance was a categorical error for any privilege consideration, stating "[r]elevance is not the standard for determining whether or not evidence should be protected from disclosure as privileged," even where "one might conclude the facts to be disclosed are vital, highly probative, directly relevant or even go to the heart of an issue." *Id*. The court found that a relevance standard, would chill clients' communications with their lawyer because, privilege asserters would "face the greatest risk of disclosure for what may be the most important matters" while simultaneously "hav[ing] no sense of certainty or assurance that the communication will remain confidential" or "may be relevant to some future issue," since relevance "may depend on the facts and circumstances of as yet unfiled litigation." *Id*.

239.    Applying that framework, the *Rhone* court held that, although "one matter in issue in this case is whether or not the [privilege asserters] knew, before they obtained coverage, that [the] products were causing the transmission of HIV," the privilege asserters "ha[d] not waived the attorney client privilege by filing this lawsuit or by placing its state of mind in issue." *Id*. The court reasoned that the privilege asserters had not "interjected the advice of counsel as an essential element of a claim in this case." *Id*.

240.    The *Rhone* court closed by emphasizing a limit of its ruling. It explained that its decision did not "preclude disclosure of the knowledge the insureds possessed at the time they obtained coverage," because "[f]acts are discoverable, [whereas] the legal conclusions regarding those facts are not." *Id*. Thus, a privilege asserter may not "shield from discovery the knowledge it possessed by claiming it has been communicated to a lawyer," nor may it "refuse to disclose facts simply because that information came from a lawyer." *Id*.[394]

241.    Including the Third Circuit, many Courts have adopted by multiple courts.[395] Many courts that follow *Rhone*, and those in the Third Circuit almost exclusively, cite it for the proposition that at-issue waiver only occurs when disclosure, description, or explicit waiver occurs, and that *Rhone* never allows implied waiver.[396] However, notwithstanding that, the Third Circuit has since cabined *Rhone's* rule to some extent. *See infra* ¶¶ 269–270.

---

[394] It additionally noted that because such waived privileged materials "may contain both discoverable and privileged information it would be appropriate, if not too burdensome, to redact them accordingly." *Id*. (citing *Bogosian v. Gulf Oil Corp.*, 738 F.2d 587, 595 (3d Cir. 1984); *In re Martin Marietta Corp.*, 856 F.2d 619, 626 (4th Cir. 1988)).

[395] It appears that *Rhone* has been adopted by three federal circuits and has been adopted by or is applied in anywhere from twelve to twenty-five states. *See* Duvall, *supra*, 11–12 & ns. 73–87 (discussing how *Rhone* had been adopted, as of 2011, by the Sixth Circuit, by courts in the District of Columbia, by Alabama, Connecticut, Louisiana, New Hampshire, Nevada, New Mexico, Ohio, and Rhode Island, and by courts in North Carolina, Pennsylvania, and Wisconsin (citations omitted)); *cf.* Barker & Kent, *supra* (discussing how a variant of *Rhone* adopted by courts in Alabama, Arizona, California, Colorado, Florida, Indiana, Iowa, Louisiana, Maine, Maryland, Montana, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, Ohio, Pennsylvania, Rhode Island, South Dakota, West Virginia, and Wisconsin) (citations omitted)).

[396] *See, e.g.*, *WLIG-TV, Inc. v. Cablevision Sys. Corp.*, 879 F. Supp. 229, 235 (E.D.N.Y. 1994) ("*Rhone–Poulenc* fits squarely into that line of cases offered by WLIG in support of its position that the doctrine of implied waiver of attorney-client privilege has been superseded by case law requiring an express waiver."); *but see Eubanks v. Amica Mut. Ins. Co.*, 2005 U.S. Dist. LEXIS 56156, at *3 n.3 (E.D. Pa. Apr. 25, 2005) (first, recognizing that *Rhone* "disapproved of finding that the attorney-client privilege has been waived when only 'the client's state of mind may be in issue'," but asserting that the rule "presume[d] that [the privilege objector] is seeking discovery about communications between its opponent and its opponent's attorney when the opponent has placed only its own state of mind at issue;" second, holding *Rhone's* rule does not apply where the privilege asserter "acted only through [their attorney] and that [attorney] acted as he did 'because' of" the attorney's state of mind, such that "there is no distinction between the attorney and the client" and the privilege asserter "put[ting] its state of mind [] at issue"

242.    Similar to *Hearn*, *Rhone* has drawn criticism. Commentators have argued that *Rhone* effectively treats the privilege as a "sword" only when privileged material is expressly invoked, when, rather, "explicit invocation … does not answer the question of whether privileged material has become a sword against the other party[,] only [] the question of whether the sword is in plain sight," since "[p]arties can, and surely do, rely upon legal knowledge from their counsel without saying that they are doing so."[397]

243.    Relatedly, it has been argued that *Rhone's* rule is sufficiently rigid that it invites manipulation by sophisticated litigants. *See Union Cnty., IA v. Piper Jaffray & Co.*, 248 F.R.D. 217, 222 n. 7 (S.D. Iowa 2008) (quoting Bahner & Gallion, *supra*, at 205 ("While at first glance [*Rhone*'s test] seems attractive, its application proves troublesome. First, the test rests on the faulty assumption that a party's intention to rely on advice of counsel is clearly revealed by the face of a party's claim or defense. Second, by requiring that clients must directly inject the advice of counsel into issue, the test overlooks claims involving indirect reliance. As such, this test's rigid approach can actually facilitate abuse of the privilege.").[398]

244.    Relatedly, commentary has criticized *Rhone's* explicit disallowance of considering fairness. Indeed, courts have declined to follow *Rhone* on the grounds that such disallowance would contravene long-held law that fairness is an important dimension of waiver.[399]

---

means "it cannot use the attorney-client privilege or the work product privilege to shield [the attorney's] mental impressions from disclosure.").

[397] *Duvall*, *supra*, at 17-18.

[398] *Cf. also* Duvall, *supra*, 11 ("Unlike *Hearn* [], *Rhone* is a clear rule. The trigger and the result, seen as the explicit reliance upon otherwise-privileged communications and the subsequent implied waiver, respectively, are anything but vague. In other words, everyone under this system knows *ex ante* what actions the holder of the privilege must take to waive the privilege."). Of course, where *Rhone* opponents see this as a bug, *Rhone* proponents would argue this is a (if not the) feature of *Rhone's* rule.

[399] *See, e.g.*, *Davenport v. Djourabchi*, 2020 WL 7042813, at *12 (D.D.C. Nov. 30, 2020) (declining to follow *Rhone* because "D.C. [waiver] law's emphasis on 'fairness' also conflicts with *Rhone's* more rigid, mechanical test" (citation omitted)); *Gefre v. Davis Wright Tremaine, LLP*, 306 P.3d 1264, 1280 (Alaska

Other courts have done so on the basis that the application of *Rhone* would result in unfairness that is *ex facie* undesirable, with one court stating *Rhone's* application would "make[] a mockery of the law" and does "not give[] the [privilege asserter] a metaphorical shield, as suggested [], nor is one needed, because the *Rhone*[] approach has deprived the [privilege objector] of a sword."[400] Courts have recognized the fairness component as a dimension of waiver for centuries.[401]

### (c)  The Fourth Circuit and At-Issue Waiver

245.    The Fourth Circuit has never directly addressed what constitutes at-issue waiver. On the one hand, the Fourth Circuit has cited to both *Hearn* and *Rhone* for illustrative purposes as to what can constitute an at-issue waiver. *See Shaheen v. WellPoint Cos.*, 490 F. App'x 552, 557 (4th Cir. 2012) (holding that no at-issue waiver occurred where there was no evidence that the privilege asserter relied on their attorney's advice in conducting the challenged actions (citing *Rhone,* 32 F.3d at 863, and *Hearn*, 68 F.R.D. at 581)).[402] However, these citations have not

---

2013) (declining to follow *Rhone* "[b]ecause we continue to believe fairness to the opposing party should be included in the implied waiver analysis.").

[400] *State Farm Mut. Auto. Ins. Co. v. Lee*, 199 Ariz. 53, 64–65 (Ariz. 2000) (rejecting "allow[ing] [the privilege asserter] to claim on the one hand that it acted reasonably because it made a legal evaluation from which it concluded that the law permitted it to act in a certain manner, while at the same time allowing [] [the privilege asserter] to withhold from [] [the privilege objector] and the factfinder information it received from counsel on that very subject and that therefore was included in its evaluation," because "[t]he sword and shield metaphor would truly apply" to such); *see also*, *e.g.*, *Union Cnty., IA v. Piper Jaffray & Co.*, 248 F.R.D. 217, 222 (S.D. Iowa 2008) (declining to follow *Rhone* because it "draws a bright-line rule that leaves no room for or consideration of fairness or equity, thus potentially facilitating abuse of the privilege it seeks to protect," which is "particularly evident where, as here, a defendant has no alternative means of defending a claim brought by the party asserting the privilege").

[401] *See e.g.*, 8 WIGMORE, *supra*, § 2388 (describing one form of waiver as "predicated … when the conduct (though not evincing that intention) places the [privilege asserter] in such a position, with reference to the evidence, that it would be unfair and inconsistent to permit the retention of the privilege" as privilege "is not to be both a sword and a shield").

[402] *Cf. also United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 377 n.8 (4th Cir. 2015) (citing *Rhone* for the proposition that asserting an advice of counsel defense waives privilege (citing *Rhone* 863)); *In re Mt. Hawley Ins. Co.*, 736 F. App'x 392, 395 (4th Cir. 2018) (certifying to the South Carolina Supreme Court whether *Hearn* should be adopted).

136

resulted in Fourth Circuit binding rules as to an exclusivity of either *Rhone* or *Hearn. See, e.g.*,

*SD3, LLC v. Black & Decker (U.S.), Inc.*, 2016 WL 4722001, at *4 (E.D. Va. July 29, 2016)

("While *Shaheen* suggests that the Fourth Circuit views *Rhone* favorably, … the Fourth

Circuit … has [not] adopted *Rhone*."), aff'd in part, rev'd in part on other grounds, 2016 WL

11784677 (E.D. Va. Sept. 12, 2016).[403]

246.    On the other hand, the Fourth Circuit has rejected that the relevance of a

privileged communication to a case cannot alone suffice to effectuate a waiver,[404] wherefore, the

determinate analysis considers the extent of reliance on privileged communications by a privilege

asserter.[405] However, such holdings do not *in toto* repudiate *Hearn* nor necessitate adopting *Rhone*.

Consequently, whereas some Fourth Circuit courts have adopted and applied *Hearn*,[406] others have

---

[403] *See also Dudley*, 2021 U.S. Dist. LEXIS 64211, at *15 & n. 8 (considering "whether either *Hearn* or *Rhone-Poulenc* support finding an at issue waiver" since "[w]hile the Fourth Circuit has cited *Rhone-Poulenc* with approval, it has not formally adopted one of these tests" (citing *Drakeford* 377 n.8)); *United States ex rel. Lutz v. Lab'y Corp. of Am. Holdings*, 2020 U.S. Dist. LEXIS 262715, at *11–12 (D.S.C. Dec. 28, 2020).

[404] *See Shaheen*, 490 Fed. App'x at 557 (holding that "the 'at issue' doctrine d[id] not apply" because the privilege asserter "never asserted advice of counsel as an affirmative defense" or "indicated that [it] relied on advice of counsel;" stating that "privileged information 'is not in issue merely because it relevant' " (quoting *Rhone*, 32 F.3d at 863)); *Scottsdale*, 40 F. Supp. 3d at 724 ("[T]he Court cannot pierce the attorney-client privilege simply because the information may be relevant to a party's claims.");

[405] *See In re Zetia Ezetimibe Antitrust Litig.*, 2022 U.S. Dist. LEXIS 171193, at *22 (E.D. Va. Aug. 15, 2022) ("The distinction between the two standards is whether relevance of privileged material alone is sufficient for waiver, or whether the asserting party must rely on the privileged material in asserting its position"); *id.*, at *27 (stating that "courts in the Fourth Circuit" "requir[e] reliance" on attorney advice to make a claim or defense when "considering the question of at-issue waiver"); *Elat v. Emandopngoubene*, 2013 U.S. Dist. LEXIS 37875, at *18-19 (D. Md. Mar. 15, 2013) (describing Fourth Circuit cases as "mak[ing] clear that the central inquiry in determining whether a [privilege asserter] has impliedly waived [] privilege is whether [they] affirmatively attempt[] to 'rely' on advice of counsel"); *Balt. Scrap Corp. v. David J. Joseph Co.*, 1996 U.S. Dist. LEXIS 18617, at *79–80 (D. Md. Sep. 17, 1996) (accepting that at-issue waiver analysis "should focus on whether or not the proponent of the privilege is relying upon the privileged communication to prove his or her case").

[406] *See United States ex rel. Lutz v. Lab'y Corp. of Am. Holdings*, 2020 U.S. Dist. LEXIS 262715, at *10–14 (D.S.C. Dec. 28, 2020); *Brown v. First Cmty. Bank*, 2019 U.S. Dist. LEXIS 231191, at *2-3 (W.D. Va. Sep. 16, 2019); *see also Harvey v. Ranson Golden Horseshoe, Inc.*, 2015 U.S. Dist. LEXIS 198491, at *12 (N.D.W. Va. Nov. 20, 2015) (not applying explicitly adopting *Hearn* or *Rhone* in holding that an at-issue waiver occurred because, "[w]hile [the privilege asserter] did not affirmatively assert an 'advice of

adopted and applied *Rhone*,[407] and one Fourth Circuit court has applied both.[408] Thus, there are no

at-issue waiver rules binding on this Court from the Fourth Circuit. However, three Fourth Circuit

cases have considered waiver premised on facts similar to the ones in this case and fit within the

tradition the Court discusses below on state of mind.

247.     *Shaheen v. Wellpoint Cos.* involved a privilege objector who had sued her

former employer, the privilege asserter, alleging defamation in the context of the privilege

objector's termination, and who sought disclosure of communications between the privilege

asserter's employees and counsel. 490 Fed. Appx. 552, 553–554 (4th Cir. 2012). On appeal, the

privilege objector argued that the at-issue waiver applied because the privilege asserter "put the

protected information at-issue by making it relevant to the case" through the employee's testimony

as the basis for the termination. *Id.* at 557. However, the *Shaheen* court rejected this argument

because the privilege asserter "never asserted advice of counsel as an affirmative defense," nor did

they "indicate[] that they relied on advice of counsel" in terminating the privilege objector. *Id.*

248.     *Sky Angel U.S. v. Discover Communs* involved a privilege objector, a

television distributor, who sued the privilege asserter, a media company, for breach of contract.

885 F.3d 271, 273. The dispute leading to the breach centered on whether the privilege objector

had a reasonable expectation that it could use the public internet to distribute the privilege

---

counsel defense,' they placed the advice of [their counsel] directly at issue in the factfinding process" and could no longer "use their attorney-client communications as both a sword and a shield to gain an unfair tactical advantage over [the privilege objector].").

[407] *See, e.g.*, *McCafferty's, Inc. v. Bank of Glen Burnie*, 1998 U.S. Dist. LEXIS 12859, at *13-14 (D. Md. Jan. 26, 1998); *Botkin v. Donegal Mut. Ins. Co.*, 2011 U.S. Dist. LEXIS 63871, at *18-19 (W.D. Va. June 15, 2011) (no waiver where defendant "neither pled advice of counsel as an affirmative defense, nor made it an element of its defense in this case" (citing, *inter alia*, *Rhone*, 32 F.3d at 863))

[408] *See, e.g., Dudley*, at *15 (considering "whether either *Hearn* or *Rhone-Poulenc* support finding an at issue waiver" and holding it was "[b]ased on both"); *cf. also Weyerhaeuser Co. v. Daniel Int'l Corp.*, 2024 U.S. Dist. LEXIS 115071, at *16 n. 14 (E.D.N.C. June 28, 2024) (citing both *Rhone* and *Hearn* as the authority illustrating at-issue waiver).

asserter's programming. *Id.* at 275. The privilege objector sought disclosure of the privilege asserter's privilege communications, including a memo addressing the privilege asserter's understanding of a certain distribution system that utilizes the public internet. *Id.* On appeal, the privilege objector argued that the privilege asserter "selectively disclosed privileged information and therefore waived the attorney-client privilege" when its employees testified that they were unsure if the privilege objector would use the public internet. *Id.* at 276. The *Sky Angel* court rejected this argument because while the memo may have related to the privilege asserter's knowledge of the distribution method, that does not mean that its employees' testimony was based on that memo. *Id.* Rather, the *Sky Angel* court held, there was "no record" to support that the testimony so relied, and "decline[d] to infer this fact merely because [the privilege objector] sought legal advice on the same topic as its employees' testimony." *Id.*

249.    *Smith v. Scottsdale Ins. Co.* involved a privilege objector who argued that the privilege asserter, an insurance company, "impliedly waived attorney-client privilege because the attorneys' communications are 'at issue'" related to asserted human rights violations based upon race in settlements. 621 F. App'x 743, 746 (4th Cir. 2015). Applying West Virginia law, the *Smith* court first noted that a party "may waive the attorney-client privilege by asserting claims or defenses that put his or her attorney's advice in issue" and that an attorney's legal advice "only becomes an issue where a client takes affirmative action to assert a defense and attempts to prove that defense by disclosing or describing an attorney's communication." *Id.* (internal quotation marks and citations omitted). The *Smith* court then rejected the privilege objector's argument, having found that the privilege asserter "did not assert any claim or defense based on counsel's advice," and, therefore, "did not affirmatively place any attorney-client privileged matters at issue." *Id.* Furthermore, the *Smith* court emphasized that "advice is not in issue merely because it

is relevant, and does not come in issue merely because it may have some affect on a client's state of mind." *Id*.[409]

250.    None of these cases from the Fourth Circuit preclude application of *Hearn* or require *Hearn's* repudiation; nor do they require the adoption of *Rhone*. Rather, these cases simply bar a relevance only approach or an approach based solely on relevancy to a state of mind. Additionally, these three cases can be argued to support implicitly allowing waiver outside of disclosure or description as *Rhone* strictly followed requires. Particularly, (1) *Shaheen* recognized a form of waiver beyond explicit waiver or an explicitly raised advice of counsel defense, *see Shaheen* at 557, (2) *Sky Angel* did not forbid ever inferring implied reliance absent explicit reliance, *see Sky Angel* at 276, and (3) *Smith* suggests state of mind can sometimes be pertinent to the analysis, *see Smith* at 746.

### (d)  State of Mind Submission Waiver and the Second Circuit

251.    While the debate for at-issue waiver is often framed as *Hearn* versus *Rhone*, there are intermediate positions between the two. One example is at-issue waiver as limited to the context of certain state of mind submissions relating to the law. Indeed, commentary has recognized that at-issue waiver may be more appropriate in this context,[410] but with sufficient

---

[409] The *Smith* court additionally rejected the privilege objectors argument that the privilege asserters put work product protected communications at-issue "because of the intimacy of the involvement of the attorneys and adjusters in determining the course of the civil rights lawsuit," since (1) the privilege asserter never contended that it relied upon the advice of counsel, wherefore the privilege asserter was "not 'attempt[ing] to use a pure mental impression or legal theory as a sword and as a shield in the trial of a case'," as well as because (2) such facts could "not demonstrated 'extraordinary circumstances' to overcome the 'nearly absolute immunity' afforded to opinion work product. " *Id.* (first quoting *Marietta*, 856 F.2d at 626, then quoting *Chaudhry*, 174 F.3d at 403).

[410] Duvall, *supra*, at 19–20 (2011) ("When we look at the privilege in situations where the legal knowledge of the client is at the heart of the case, or at least at the heart of the issue currently being litigated, the privilege seems to deserve less protection than in situations where legal knowledge is not at stake, which is most of the time, such as when police would like to know if a defendant confessed to his attorney.").

140

guideposts as to the state of mind submissions. The rationale for such rules rests on the basis that

(1) state of mind submissions are different from regular submissions due to the extent of their

subjectively (in the evaluative sense) requiring the ability to confirm reasonability based on

whatever is underpinning such state of mind, and (2) the capacity such submissions have against

more objective-based submissions from the opposing side.[411] Many courts recognize this rationale

(including, arguably, the Third Circuit with its version of anticipatory waiver) as validly requiring

disclosure of privileged materials absent any kind of explicit ex ante disclosure or description of

the materials themselves. The Second Circuit generally has adopted such an approach through a

handful of its cases—while crucially also rejecting the *Hearn* and a primarily relevance-based

approach.

### (i)  The Second Circuit

252.    In *Bilzerian*,[412] the first case subsequent to *Hearn* but prior to *Rhone*, the

court considered circumstances where the privilege asserter had engaged in various fraudulent

transactions in violation of securities laws. 926 F.2d 1285, 1290-91 (2d Cir. 1991). At trial, the

privilege asserter "argued that he did not intend to violate the securities laws, but believed [(1)] the

---

[411] *Cf., e.g.*, Sara Kropf, *Why the Good Faith Instruction Is the GOAT: The Autonomy Acquittals*, Kropf
Moseley Schmitt (July 2, 2024), https://kmlawfirm.com/2024/07/02/why-the-good-faith-instruction-is-
the-goat-the-autonomy-acquittals/. (first, discussing how "good faith" serves by permitting the "tell[ing]
of] a story about what happened" from the defendant, which is important despite the misconception that a
defense need "only to poke enough holes in the [opposing side's] theory to create reasonable doubt,"
since "every juror can understand the concept of acting in good faith," where an entity genuinely has a
specific state of mind as to something (1) which (a) ultimately is not true and (b) knowing such falsity
would satisfy a required *mens rea* for an action, but (2) knowing which does not constitute knowing such
falsity; second, discussing how such a state of mind (i.e., knowing something while not its truth-value) "is
a very human experience" whereby submitting it (1) lets "each juror [] put themselves in [the entity's]
shoes," as well as (2) can be supported selectively, that is without direct evidence as to the entity's
specific state of mind such as their testimony but objective submissions of evidence that can be argued do
and/or did support that belief).

[412] *Bilzerian* is uniquely one of the few at-issue court of appeals cases where a writ of certiorari to the
Supreme Court was made—and which, ultimately, was denied. *Bilzerian v. United States*, 502 U.S. 813,
112 S. Ct. 63 (1991).

financing structure of the transactions, utilizing trusts to borrow funds, would allow him legally to avoid disclosure regarding other investors, and [(2)] that describing the source of his funds as 'personal' was lawful." *Id.*, at 1291. The privilege asserter sought to testify to these two beliefs "without being subjected to cross-examination on communications he had with his attorney on this subject, discussions ordinarily protected by the attorney-client privilege." *Id*.

253.    The trial court denied privilege asserter's request, holding that his testimony "regarding his good faith regarding the legality of the disclosure [] would open the door to cross-examination with respect to the basis for his belief, and … allow inquiry into communications with his attorney." *Id*. Thus, the privilege asserter "did not testify regarding his good faith," but, on appeal, argued the denial "prejudiced his defense and infringed his constitutional right to deny each element of the charge against him." *Id*.

254.    The *Bilzerian* court noted that the benefits of the attorney-client privilege "may be great" where the advice sought was regarding how "to act within the confines of highly complex federal securities laws." *Id.* However, the court asserted that the sword-shield principle precluded "us[ing] the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes," which "may [constitute an] implicit[] waive[r] when [the privilege asserter] asserts a claim that in fairness requires examination of protected communications."[413] The Court held such waiver had occurred because the privilege asserter's "testimony that he thought his actions were legal would have put his knowledge of the law and the basis for his understanding of what the law required in issue," making the privileged materials

---

[413] *Id.*, at 1292 (first citing *In re von Bulow*, 828 F.2d 94, 103 (2d Cir. 1987); *see also Clark v. United States*, 289 U.S. 1, 15, (1933) ("The privilege takes flight if the relation is abused."), then citing *von Bulow*, 828 F.2d at 101-02, then citing *United States v. Exxon Corp.*, 94 F.R.D. 246, 249 (D.D.C. 1981) (claim of good faith reliance on governmental representations waived attorney-client privilege).

"regarding the legality of his schemes [] directly relevant in determining the extent of his knowledge and, as a result, his intent." *Id.*

255.   The *Bilzerian* court also made clear that the privilege asserter was limited to "testi[fying] as to his good faith [without] open[ing] the door to cross-examination … into otherwise privileged communications," but could "deny criminal intent either without asserting good faith or to argue his good faith defense by means of defense counsel's opening and closing statements and by his examination of witnesses."[414] However, the *Bilzerian* court also cabined this limit by stating that any testimony from the privilege asserter about his actions would effectuate a waiver as to the "reasons" for those actions, "because the topic would necessarily involve Bilzerian's state of mind" and "would be inextricably intertwined with Bilzerian's assertion of good faith," which, if asserted, "would [] entitle[]" "the jury [] to know the basis of his understanding that his actions were legal." *Id.*, at 1294.

256.   About twenty-five years after both *Hearn* and *Rhone*, the Second Circuit considered another at-issue waiver case in *Pritchard v. Cnty. of Erie (In re Cnty. of Erie)*, 546 F.3d 222 (2d Cir. 2008). *Erie* involved a lawsuit brought by the privilege objectors against the privilege asserters, various members of the Erie County sheriff office, for the sheriff office's policy of strip-searching all detainees allegedly violating the Fourth Amendment. *Id.*, at 224. The privilege asserters defended in part by arguing that the policy was protected by qualified immunity "based on an objectively reasonable belief that their actions were lawful and not in violation of any of any [] clearly established constitutional rights." *Id.*, at 226 (citation and internal quotations omitted).

---

[414] *See id.*, at 1291–93 (rejecting that allowing waiver here would infringe the "constitutional right to be carefully safeguarded" of "[d]enial of an essential element of the crime charged—here criminal intent.").

257.    However, privilege asserters' deponents revealed the existence of an internal memorandum regarding discontinuing the policy and ongoing discussions with counsel as to the policy's legality due to changes in the law that ultimately resulted in the policy's termination and rewriting. *Id.*, at 226-27. Based on this testimony, the privilege objectors sought disclosure of emails discussing the policy between the privilege asserters and their counsel based upon waiver of their attorney-client privilege. *Id.*, at 224-25. The trial court ordered disclosure because the privilege asserters had committed waiver "'by placing the information in those communications at issue in the litigation'." *Id.*, at 226 (citing *John Doe Co. v. United States*, 350 F.3d 299, 302 (2d Cir. 2003) and *Hearn*, 68 F.R.D. at 581). The trial court found a waiver occurred because the deposition testimony "'clearly indicates [the objectors'] reliance on privileged communications to support the contention that the strip search policy . . . was lawful'," and "'pleading conduct in conformity with the law, and then asserting privilege to protect from disclosure facts that might disprove this contention … placed the advice rendered by [the privilege asserter's] counsel about the legality of the [] policy directly in issue'." *Id.*, at 227.

258.    On appeal, the *Erie* court acknowledged previous Second Circuit cases, including *Bilzerian*, and had cited *Hearn* favorably in holding that (1) implied waiver was allowed and (2) fairness was a valid consideration for waiver, but asserted those cases did not adopt *Hearn in toto* only the parts coterminous with those holdings.[415] It recognized how Second Circuit courts, other courts, and commentary had criticized *Hearn* as lacking substance or limits and engendering

---

[415] *See id.* (citing *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000) (citing *Hearn* for the proposition that "a party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party"), and *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991)).

inconsistency.[416] Accordingly, the court asserted at-issue waiver should be limited to require "some showing by the [privilege objector] that the [privilege asserter] relies on the privileged communication as a claim or defense or as an element of a claim or defense,", of which, "assert[ing] [] an 'advice of counsel defense' " is "a 'quintessential example'." *Id.*, at 228.

259.    Still, the *Erie* court reaffirmed as good law *Bilzerian's* holding that the privilege asserter's assertion of good faith proved by state of mind constituted waiver at least when neither the assertion nor proving it so is required. *Id.*, at 228-229. It also reaffirmed fairness as a consideration for waiver but emphasized such consideration (1) was limited to acute unfairness, including, specifically, of state of mind subjections, and (2) was fact dependent. *Id.*, at 229. However, the *Erie* court also disclaimed adopting *Hearn in toto* due to *Hearn* being too broad and lacking the "essential reliance element" for an implied waiver, holding that such waiver required that the privilege asserter have "rel[ied] on privileged [materials] to make his claim or defense." *Id.*, at 229. The *Erie* court "decline[d] to specify or speculate as to what degree of reliance is required because (1) the privilege asserters "here do not rely upon [privileged materials] in the assertion of their defense in this action," since qualified immunity only involved an objective analysis, and thus the privilege asserters "do not claim a good faith or state of mind defense," "only that their actions were lawful or that any rights violated were not clearly established," making any

---

[416] *Id.*, at 227–28 (citing *Rhone*, 32 F.3d at 864. *Pereira v. United Jersey Bank*, 1997 U.S. Dist. LEXIS 19751, at *3 (S.D.N.Y. Dec. 11, 1997) ("*Hearn* is problematic insofar as there are very few instances in which the *Hearn* factors, taken at face value, do not apply and, therefore, a large majority of claims of privilege would be subject to waiver."), *Allen v. West Point-Pepperell, Inc.*, 848 F. Supp. 423, 429 (S.D.N.Y. 1994) (noting that district courts within this Circuit have reached conflicting decisions in the application of *Hearn*, and rejecting reliance "upon a line of cases in which courts have unhesitatingly applied a variation of the *Hearn* balancing test"), *Koppers Co., Inc. v. Aetna Cas. & Sur. Co.*, 847 F. Supp. 360, 363 (W.D. Pa. 1994) (rejecting the third *Hearn* factor for vagueness and overbreadth), and *Connell v. Bernstein-Macaulay, Inc.*, 407 F. Supp. 420, 422 (S.D.N.Y. 1976) ("The actual holding in [*Hearn*] is not in point because the party there asserting the privilege had expressly relied upon the advice of counsel as a defense to the plaintiff's action.")).

privilege materials "irrelevant to any defense so far raised," and because (2) the fairness consideration was not met. *Id.*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

260.    The result of *Bilzerian* and *Erie* places the Second Circuit somewhere between *Hearn* and *Rhone*; however, exactly where is unclear due to the *Erie* court intentionally declining to provide guidance as to the degree of reliance required.[417] However, *Erie* has been interpreted by Second Circuit trial courts as standing for the propositions, both in opposition to *Rhone*, that an implied waiver (1) does not always require disclosure or description of privileged communications.[418]

---

[417] Commentary has described the Second Circuit post-*Erie* as within the *Rhone* tradition, between *Hearn* and *Rhone*, or as an extension of *Hearn*. *Compare* Duvall, *supra*, at 12-13 & 13 n. 92 ("The Second Circuit [] has [] joined the Rhone camp" (citing *Erie*, 546 at 228).), *with* Scott J. Bogucki, *Good-Faith Affirmative Defenses and the "At Issue Doctrine"*, 38 AM. BANKR. INST. J. 14, 15 (November 2019) ("The test developed by the Second Circuit lies between those announced in *Hearn* and *[Rhone]-Poulenc*."), *with* Douglas R. Richmond, *Advice of Counsel and Insurance Bad Faith: Current Contours and Criticisms*, *in* III CURRENT CRITICAL ISSUES IN INSURANCE LAW § 57 (2011) ("Finally, there is the position adopted by the Second Circuit in *In re County of Erie*, which reflects the court's attempt to deal with one of the principal weaknesses of the *Hearn* waiver test, i.e., the lack of a reliance element.").

[418] *See also, e.g.*, *Parneros v. Barnes & Noble, Inc.*, 332 F.R.D. 482, 501 (S.D.N.Y. 2019) ("Waiver can occur even if the [privilege asserter] does not make direct use of the privileged communication itself when that party avers material facts at issue related to the privileged communication, and where the validity of those facts can only be accurately determined through an examination of the undisclosed communication" (internal quotation marks omitted).); *SEC & Exch. Comm'n v. Ripple Labs, Inc.*, 2021 U.S. Dist. LEXIS 102002, at *5 (S.D.N.Y. May 30, 2021) ("The critical question in deciding whether the attorney-client privilege is impliedly waived is whether it puts at-issue questions about the defendant's state of mind or their reliance on counsel's advice, regardless of whether the defense is stylized as 'good faith' or something else."); *United States ex rel. Omni Healthcare Inc. v. McKesson Corp.*, 2025 U.S. Dist. LEXIS 265686, at *8-9 (E.D.N.Y. Dec. 4, 2025) ("'A party does not have to use the phrase 'reliance on counsel' to put in issue attorney-client communications. Neither, however, does every claim of good faith open up inquiries into privileged communications ... the crucial inquiry' is 'whether the claim or defense asserted by a party implicates its knowledge of the law'" (citing *Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*, 1996 U.S. Dist. LEXIS 4630, at *4 (S.D.N.Y. Apr. 12, 1996).); *Favors v. Cuomo*, 285 F.R.D. 187, 199 (E.D.N.Y. 2012) (stating that Second Circuit courts, "relying on Bilzerian, have reaffirmed the broader principle that forfeiture of the privilege may result where the proponent asserts a good faith belief in the lawfulness of its actions, even without expressly invoking counsel's advice").

146

261.     For example, the court in the Southern District of New York in *MBIA Ins. Corp. v. Patriarch Partners VIII, Ltd. Liab. Co.* (S.D.N.Y. July 2, 2012), dealt with a situation where the privilege asserter argued the privilege objector had breached a contract, and, "[i]n opposing [the privilege objector's] summary judgment motion, [] sought to introduce various affidavits reflecting its witnesses' intent and interpretation of the [contract]." 2012 U.S. Dist. LEXIS 92435, at *20-22. Specifically, "one of the affidavits … made factual assertions about what '[the privilege asserter] expected [the privilege objector]' to do pursuant to the [contract], what [the affiant] 'believed' about the relationship between [the contract provisions], and what [the affiant] 'intended' when she signed the [contact]." *Id*. A different affidavit "offered similar factual assertions about [the affiant's] intent and interpretation of the [contract]," and another "made factual assertions about [the affiant's] 'understanding' of the [contact] as well as what was 'intended' by the parties in the [contract]." *Id*. The court held through these actions the privilege asserter "placed the opinion of counsel at issue and impliedly waived the attorney-client privilege," in part since "[d]isclosure of the documents withheld [] as privileged will permit [the privilege objector] a fair opportunity to assess and challenge [the privilege asserter's] factual assertions at trial." *Id*. (citations omitted).[419]

262.     Thus, Second Circuit courts recognize that an at-issue waiver can arise due to the privilege asserter's submission of their state of mind that is (1) subjective both in the sense of (a) being about their state of mind, and in the sense of (b) being elastic and/or protean (i.e. susceptible to stress testing),[420] as well as when (2) fairness demands the privilege objector be able

---

[419] *See also id.*, at *26 (S.D.N.Y. July 2, 2012) ("[The privilege asserter's] decision to proffer evidence of subjective intent to rebut [the privilege objector's] contentions put the opinion of counsel 'at issue' and waived the attorney-client privilege.")

[420] *Compare United States ex rel. Omni Healthcare Inc. v. McKesson Corp.*, 2025 U.S. Dist. LEXIS 265686, at *8–*13 (E.D.N.Y. Dec. 4, 2025) (first, holding that the privilege asserter's proffered witness testimony supporting the privilege asserter having a certain state of mind as to the legal status of conduct

---

satisfied an affirmative good faith legal state of mind submission under *Erie* and *Bilzerian* because it (1) effectively functioning as a good faith defense despite the privileged asserter explicitly disclaiming such and (2) did not simply deny the privilege objector's allegation of the requisite mens rea; second, holding that such submissions so sufficed despite the facts that (1) the testimony did not explicitly refer to counsel or privileged communications and that (2) "it [was] not clear from the [] testimony whether the [witnesses] … relied on the advice of counsel to form their legal opinions," because (a) the "'crucial inquiry on the question of implied waiver'" and (b) the testimony "do implicate knowledge of the law" since their use of the exact legal terms satisfying requisite legal elements in the case "necessarily raises the question of how the [witnesses] understood the term[s] [] and the requirements of federal law, and what informed that understanding" (citation omitted)), *with 2002 Lawrence R. Buchalter Alaska Trust v. Phila. Fin. Assur. Co.*, 2016 U.S. Dist. LEXIS 31771, at *4–*9 (S.D.N.Y. Mar. 11, 2016) (stating "such implied reliance is confined to situations involving a [privilege asserter's] state of mind concerning a question of law, such as the party's belief as to the lawfulness of its conduct"; finding no waiver of privilege where the analysis was (1) subjective as to the privilege asserter's state-of-mind regarding a legally relevant fact, but not subjective in the sense of elastic due to its bipartite answer options, and/or (2) objective as to what the privilege assert should have known based on objective surrounding facts and information).

to pierce privilege due to (a) the dispositiveness of the submissions to the issues at hand, and (b) the

necessity of piercing privilege to stress-test the submission.[421] The Second Circuit is one of

multiple courts, that adopt such a rule, including state courts[422] and federal courts.[423]

---

[421] *See also, e.g.*, *Xuedan Wang v. Hearst Corp.*, 2012 U.S. Dist. LEXIS 179609 (S.D.N.Y. Dec. 19, 2012); *Enea v. Bloomberg L.P.*, 2015 U.S. Dist. LEXIS 111901 (S.D.N.Y. Aug. 20, 2015); *Evans v. Sabre Cos., LLC*, 2018 U.S. Dist. LEXIS 218208, at *7–13 (N.D.N.Y. July 9, 2018); *Scott v. Chipotle Mexican Grill, Inc.*, 67 F. Supp. 3d 607, 611 (S.D.N.Y. 2014); *Leviton Mfg. Co. v. Greenberg Traurig LLP*, 2010 U.S. Dist. LEXIS 128849, at *3 (S.D.N.Y. Dec. 6, 2010) ("Courts have recognized that a party need not explicitly rely upon advice of counsel to implicate privileged communications. Instead, advice of counsel may be placed in issue where, for example, a party's state of mind, such as his good faith belief in the lawfulness of his conduct, is relied upon in support of a claim of defense. Because legal advice that a party received may well demonstrate the falsity of its claim of good faith belief, waiver in these instances arises as a matter of fairness"); *Doe*, 350 F.3d at 304 ("[I]n *Bilzerian*, because the legal advice the defendant in fact received might well have demonstrated the falsity of his claim to the jury about his belief, he could not fairly both assert testimony that implicitly communicated his version of the legal advice he received and simultaneously withhold disclosure of the legal advice he actually received."); *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 488 (S.D.N.Y. 1993) ("[E]ven if a party does not attempt to make use of a privileged communication, he may waive the privilege if he asserts a factual claim the truth of which can only be assessed by examination of a privileged communication.").
      The Court is aware of the possibility that other cases from the Second Circuit applying *Erie* and/or *Bilzerian* may suggest otherwise from this rule canvassed above and applied below. For clarity's sake, the Court does not 'adopt' the Second Circuit's approach *in toto*. Rather, the Court first simply recognizes that circuit's support for a state of mind approach that explicitly addresses the unallowable issues of *Hearn* while not necessitating the extreme allowances of *Rhone*. Second, the Court accepts such an approach as appropriate specifically for the unique facts and law of this case.

[422] *See, e.g., Deutsche Bank Tr. Co. of Ams. v. Tri-Links Inv. Tr.*, 2007 NY Slip Op 4187, ¶ 7 (App. Div.) ("'At issue' waiver of privilege occurs where a party affirmatively places the subject matter of its own privileged communication at issue in litigation, so that invasion of the privilege is required to determine the validity of a claim or defense of the party asserting the privilege, and application of the privilege would deprive the adversary of vital information").

[423] Where only a few words, or even a single word, made the submission subjective and not objective, courts have rejected privilege asserters' arguments that waiver based on such are "too inadvertent to constitute the type of voluntary and willful injection of the substance of the communications between the attorney and the client to constitute a waiver." *Henry v. Quicken Loans, Inc.*, 263 F.R.D. 458, 467 n.5 (E.D. Mich. 2008). Courts have so rejected since (1) parties (especially when represented by talented lawyers) should consider and think about the consequence of what they are submitting to a court and (2) courts reasonably should suspect parties know what they are doing and should not allow parties to, legally, have their cake and eat it to. *Cf., e.g., generally, id.*

(3)   At-Issue Waiver and the Work Product Doctrine

263.   Unfortunately, "there are far fewer cases dealing with the 'at issue' doctrine in the work product context than in the attorney-client privilege context." SPAHN, *supra*, § 48.11. However, such cases do exist.[424] Some cases suggest that the occurrence of an at-issue waiver of attorney-client privilege as to certain documents simultaneously waives any word product protection of such documents.[425] Additionally, overlap exists between (1) the substantial need showing required to pierce work product protection and (2) the fairness consideration for attorney client privilege.[426]

---

[424] *See also* RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 92 cmt. b (2000) ("A party waives work-product protection by putting the protected material into issue, including claims of reliance on counsel and of good faith evidenced by consultation with counsel. or where determining the truth of the party's allegation requires examination of work product. Such waivers, like the analogous waivers of the attorney-client privilege, are based on considerations of fairness.").

[425] *But see Dudley*, 2021 U.S. Dist. LEXIS 64211, at *20, *20 n. 9, & *25 (after first holding that an at-issue waiver had occurred such that the privilege asserter could not prevent the disclosure of certain documents on the basis that the documents were protected by attorney-client privilege, additionally holding the privilege asserter "may withhold all or parts of documents under the work-product doctrine" because the privilege objector had "presented no evidence supporting their claim of a substantial need for fact-work product"); *Rhone-Poulenc Rorer v. Home Indem. Co.*, 32 F.3d 851, 866 (3d Cir. 1994) (rejecting that "a finding that the [privilege asserters] had waived the attorney client privilege necessarily meant they had also waived the protection from disclosure for the work product of the firms that had represented and advised them" on the grounds that "one does not lead to the other" because (1) "if the state of mind of the [privilege asserters] is in issue, papers reflecting the work product of counsel that were not shared with or communicated to the clients are not relevant" as such "cannot affect the client's state of mind" and (2) "the protection stemming from the work product doctrine belongs to the professional, rather than the client, and that efforts to obtain disclosure of opinion work product should be evaluated with particular care" (citing Fed. R. Civ. P. 26(b)(3), *Hickman v. Taylor*, 329 U.S. 495, 509 (1947) ("Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney."), *Haines v. Liggett Group Inc.*, 975 F.2d at 94 ("This court has accorded an attorney's work product almost absolute protection from discovery."), and *In re Grand Jury Proceedings (FMC Corp.)*, 604. F.2d 798, 801 n. 4 (3d Cir. 1979) (right to assert the privilege belongs to the attorney)).).

[426] *See* SPAHN, *supra*, § 48.11 ("Several courts have analogized the court-created 'at issue' doctrine to the "substantial need" analysis under Rule 26(b)(3). The 'substantial need' analysis does not depend on the explicit or implicit disclosure or use of work product but instead examines in the abstract whether the party seeking an adversary's work product can show that it needs the work product to illuminate a critical issue in the case. Similarly, the 'at issue' doctrine allows the party seeking the work product to establish that the adversary has taken a position in litigation that in fairness calls for the disclosure of work product

(4)   Remedies for an At-Issue Waiver

264.   An at-issue waiver gives rise to a limited subject matter waiver which operates like relevance, but with a thumb on the scale for its materiality. A privilege asserter's conduct constituting an at-issue waiver does not necessarily consummate the facts pertinent to deciding whether an at-issue waiver occurred since "courts sometimes allow [the privilege asserter] to withdraw assertions that the courts have found create or might create 'at issue' waiver." *See* SPAHN, *supra*, § 29.11 (citing, inter alia, *Weizmann Inst. of Sci. v. Neschis*, 2004 U.S. Dist. LEXIS 4254, at *19 (S.D.N.Y. Mar. 16, 2004) (holding that privilege asserter's "invo[cation of] 'compulsion' as a defense to collateral estoppel" and their submissions which "can only be assessed by examination of … privileged communication[s]'," since their "understanding of the legal [topic], clearly implicates privileged communications," "dictates that [the privilege asserter] must waive attorney-client privilege and be subject to discovery with respect to the subject matter" of that topic, "*unless they agree to forego the defense*") (emphasis added)).[427]

265.   However, other courts have not allowed the privilege asserter to abnegate their submissions in order to countermand the at-issue waiver, at least when the privilege asserter "had already advanced, and benefited from," from those submissions. *Apple Inc. v. Samsung Elecs. Co.*, 2015 U.S. Dist. LEXIS 80954, at *86 (N.D. Cal. June 19, 2015) (holding that the privilege asserter "cannot now seek to withdraw those" submissions because it had "already put the contents

---

dealing with that position." (citing *Tribune Co. v. Purcigliotti*, 1997 U.S. Dist. LEXIS 228, at *29 (SD.N.Y. Jan. 10, 1997)).).

[427] *See also Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003); *Oracle America, Inc. v. Innovative Technology Distributors,* 2011 U.S. Dist. LEXIS 69192 (N.D. Cal. June 28, 2011). Courts allowing withdrawal of submissions engendering an at-issue waiver often are those that adopt *Hearn*. *See id*.

of these documents at issue, and already succeeded in avoiding greater sanctions" (citation omitted).).[428]

266.   Additionally, although some courts finding that an at-issue waiver occurred "prefer that [the privilege objector] try to obtain [the waived] information through a deposition before resorting to discovery of fact work product," courts also recognize that ordering depositions first "may not be a fruitful source of information if many years have passed since the events in question." *Dudley*, 2021 U.S. Dist. LEXIS 64211, at *17–18 (citing *Suggs v. Whitaker*, 152 F.R.D. 501, 507 (M.D.N.C. 1993) (recognizing that "if a party or witness has no recollection of the events" at-issue, "this loss of memory constitutes an inability to obtain the substantial equivalent of the facts in the report by other means" (in turn citing *Phillips v. Dallas Carriers Corp.*, 133 F.R.D. 475, 481 (M.D.N.C. 1990))), and Fed. R. Civ. P. 26(b)(3) advisory committee's notes to 1970 amendments (recognizing that "a lapse of memory" may justify a finding of substantial need)).

*ii.   Other Forms of Implied Waiver, Including Anticipatory Waiver*

267.   There are various allowed types of waivers that do not explicitly require and/or turn on disclosure or description, like explicit waiver that are not always labeled or grouped as at-issue waiver. One such type is anticipatory waiver, which arises "when one party pleads a claim or defense in such a way that he or she will be forced inevitably to draw upon a privileged communication in order to prevail." EPSTEIN, *supra*, § 1.IV.V.4. Courts have found anticipatory waiver met in a variety of scenarios, such as party asserting (1) claims or arguments of ineffective

---

[428] *See also Henry v. Quicken Loans, Inc.*, 263 F.R.D. 458, 467 n.5 (E.D. Mich. 2008) (rejecting the privilege asserter's request to "strike the word [] from [the privilege asserter's] arguments" which constituted the state of mind submission engendering the at-issue waiver because the court was "obligated to determine whether waiver occurred and go forward rather than to fix things should the facts add up to a waiver in the case.") (quoting *Genentech, Inc. v. United States International Trade Comm'n*, 122 F. 3d 1409, 1416 (Fed. Cir. 1997) ("Once the attorney-client privilege is waived, the privilege is generally lost for all purposes and in all forums.")).

or deficient counsel, either as a part of a larger claim (a) against their lawyer directly or (b) for other relief, including malpractice claims or as to assertedly involuntary plea agreements, or (c) in defense of their lawyer's conduct, (2) claims for attorney's fees, (3) and claims of equitable tolling.

268.    Anticipatory waiver, unlike at-issue waiver, is generally not controversial and is uniformly accepted. Anticipatory waiver is often purported to be distinct from at-issue waiver or at least *Hearn*,[429] and indeed, of the courts rejecting *Hearn's* test, all allow anticipatory waiver, including, crucially the Third Circuit. However, commentators argue that it is "dubious whether the change in label is one of substance" between anticipatory waiver and *Hearn*. EPSTEIN, *supra*, § 1.IV.V.4.[430]

---

[429] Courts such as the Third Circuit have adopted anticipatory waiver despite also explicitly disclaiming the *Hearn* test for its basis on relevance. *See, e.g. Smith v. Kavanaugh, Pierson & Talley*, 513 So. 2d 1138, 1145-46 (La. 1987) (describing the anticipatory waiver test as more restrictive because its focus is on the privilege asserter and "whether [they] ha[ve] committed [themselves] to a course of action that will require the disclosure of" privilege matters). Some commentary has, confusingly, describe *Rhone* as part of anticipatory waiver tradition. *See* Bahner & Gallion, *supra*, 204–205. Commentary also invariably describes anticipatory waiver as not raising the same issues or concerns with other forms of implied waiver or at-issue waiver. *See* SPAHN, *supra*, § 29.403; *see* Bartell, *supra,* at 52-53. For example, Anonymous argued that anticipatory waiver is no different than rules requiring a party to disclose during pre-trial proceedings any privilege materials it plans to disclose at trial. Anonymous, *supra*, at 1635-39. Anonymous argued these waivers guard against certain unfairness that is different from the type of unfairness *Hearn* and relevance guard against, *see id.*, at 1642-43, since anticipatory waiver only occurs where the privilege asserter bears the burden. *See id*, at 1639; *see also* D. Keith Wickenden, *Waiver of Privilege by Issue Injection*, 70 FLA. BAR J. 46, 47-48 (April 1996).

[430] Specifically, commentators have discussed how anticipatory waiver is functionally just *Hearn* and relevance as to the type and focus of the analysis, only differing as to the degree by requiring something beyond mere relevance, like 'super-relevance'. However, the purported line between anticipatory waiver and *Hearn's* relevance is more rhetorical than real. *Hearn* allows (but does not require, pursuant to its first and third elements) disclosure when the privilege materials is relevant to an issue. Anticipatory waiver requires disclosure when a party's pleaded theory makes reliance on a statement practically inevitable to win—which is just relevance in its most compelling, case-dispositive form. And because there is no principled, workable line that separates "mere relevance" from the kind of heightened relevance that becomes "inevitable reliance," it makes little sense to claim anticipatory waiver is meaningfully or materially distinct from *Hearn* in a way that addresses the concerns with *Hearn's* as to it lacking substance and engendering inconsistency. Thus, the anticipatory waiver is not a categorial alternative to *Hearn* as is asserted since in substance, the two occupy the same continuum.
Moreover, anticipatory waiver is quite different from *Hearn*, not just as to *Hearn's* relevance element, but also as to *Hearn's* first element, with anticipatory waiver being broader and less protective of

269.    First, the Third Circuit decided *Glenmede Tr. Co. v.* Thompson, just one year after *Rhone*. 56 F.3d 476 (3d Cir. 1995). The *Glenmede* court, after explicitly noting that *Rhone* limited implied waiver to when the privilege asserter "asserts reliance on the advice of counsel as an affirmative defense," described *Rhone's* state of mind disallowance as being "premised upon the unique facts of that case," since in *Rhone*, "advice of counsel was not raised as an affirmative defense *nor were there any acts evincing a clear intent to waive the attorney-client privilege by placing at issue reliance on the advice of counsel*." *Id.*, at 486 (first citing *Rhone*, 32 F.3d at 863, then *id.,* at 864) (emphasis added).[431]

270.    However, importantly, the Third Circuit seemed to adopt something like the anticipatory waiver test, or at least a restricted version, and thus explicitly abrogated *Rhone*. Two years after *Rhone*, in *Livingstone v. N. Belle Vernon Borough* (3d Cir. 1996), the Third Circuit cabined *Rhone's* disallowance of waiver as limited to where the privilege asserter "ma[k]e[s] reference to the advice of counsel in seeking to establish his state of mind" and where "only the client's state of mind, and not the substance of counsel's advice, was an explicit element of the relevant legal analysis," and held that it is not applicable where "advice of counsel [is] an explicit element of the [] analysis." 91 F.3d 515, 537 n. 36 (citing *Rhone* 32 F.3d at 864). For situations where attorney advice is such, *Livingstone* held waiver did occur as to the advice. *See id*. As a result, the Third Circuit broadened *Rhone* to allow for waiver where advice of counsel (or another topic the privilege objector argues is waived) is a required element.[432]

---

privilege in some ways than *Hearn*. This is because anticipatory waiver can occur without an affirmative act by the objector in the case at all and can arise simply by bringing a claim. For this reason, commentators have also argued anticipatory waiver is effectively just the automatic waiver test. *See* Steven P. Perlmutter, *The Implied Waiver of the Attorney-Client Privilege in Insurance Bad Faith Cases*, 41 BRIEF 46, 50 (Spring 2012).

[431] While *Glenmede* did not abrogate *Rhone*, it did describe the rule as not limited to requiring disclosure.

[432] *See also Dudley*, 2021 U.S. Dist. LEXIS 64211, at *19 (holding that where the objector brought a claim in which he "will eventually need to show that neither he nor his attorney knew about the allegedly

b.   Legal Analysis and Rule Selection

271.   In the case at hand, the Plaintiffs argue that the Defendants' conduct constitutes an at-issue waiver of any privilege as to various topics and requires disclosure of certain Documents and overruling certain Depositions. The Defendants argue no such at-issue waiver has occurred. As with the Crime-Fraud Legal Disputes, the Parties disagree extensively on, and litigate the most as to, the legal standards for the what an at-issue waiver requires.

   i.   *The Parties' Arguments as to Rhone and/or Rhone vs. Hearn*

272.   The Defendants assert this Court must adopt *Rhone's* rule, at least instead of *Hearn's* test, for two related reasons: precedent and policy. As to precedent, while the Defendants acknowledge that *Rhone* is not strictly and/or formally binding on this Court, they raise the argument that *Rhone* is circuitously and effectively binding through either (1) the law of this case here given this Court's previous description of *Rhone* as the "better" rule for at-issue waiver as compared to *Hearn*,[433] and/or (2) Fourth Circuit law, specifically due to Fourth Circuit cases (a) citing favorably to *Rhone,* (b) rejecting bare relevance as the determinate factor and centering the analysis around reliance, and/or (c) ignoring actions of a privilege objector as being allowed to precipitate a waiver.[434]

273.   The Defendants related policy-based reason is that *Rhone's* rule simply better functions to protect privilege through its "objective" at-issue waiver criteria that more than satisfy the consistency/predictability goal.[435] Contrarily, the Defendants argue, that goal is

withheld information" and thus "will need to rely on privileged information to prove his claim," "*Rhone* suggests" at-issue waiver occurred (citations omitted)).

[433] Defendants Preliminary Brief, pp. 13–14 (citing Sept. 17, 2021 Hr'g Tr. 133:7 ("*Rhone* is the better statement of the law")).

[434] *See* Defendants Preliminary Brief, pp. 12–14 (citing much of the cases canvassed above, *supra* 245–249).

[435] Defendants Opening Brief, p. 23 (stating that *Rhone* "fosters 'certainty and predictability' " and "prevents waiver by accident" (citing *Rhone*, 32 F.3d at 863)); Defendants Opening Brief, p. 26 (same by

eviscerated by any rule that, like *Hearn*, allows waiver to occur (1) that "'is contrary to the [privilege asserter's] actual intent'," and/or (2) upon fairness considerations, since both necessarily entail inconsistency and/or unpredictability, whereas "real fairness" is effectuated by *Rhone*'s concreteness and/or its clarity.[436]

274.    Relatedly, the Defendants argue adopting *Rhone* requires strictly construing and enforcing its disclosure or description requirement, which in turn requires never allowing a waiver absent an occurrence satisfying such requirement.[437] The Defendants argue this rule and its requirements is supported by subsequent Third Circuit law.[438]

275.    The Plaintiffs do not wholly dispute the Defendants' arguments as to *Rhone* or *Hearn*, at least the precedential reasons. First, the Plaintiffs seem to similarly embrace that reliance, rather than relevance, is the key dimension of an at-issue waiver.[439] However, the Plaintiffs disagree such reliance need always be "affirmative" and/or explicit; rather, they argue sufficient reliance can be implicit.[440] Similarly and crucially, the Plaintiffs argue that *Rhone* allows

---

"'leav[ing] to the client the decision whether or not to waive the privilege by putting the attorney's advice in issue'" (citing *Rhone*, 32 F.3d at 863)).

[436] Defendants Opening Brief, p. 27 (first citing *Rhone*, 32 F.3d at 864, *Upjohn*, 449 U.S. at 393, then *In re Schlumberger Tech. Corp.*, 818 F. App'x 304, 308 (5th Cir. 2020) ("benefits [of attorney-client privilege] dissipate if clients are not 'free from the consequences or the apprehension' that a court might order their confidential communications involuntarily disclosed"), then citing *Rhone*, 32 F.3d at 863 and *Drakeford*, 792 F.3d at 377 n. 8).

[437] *See* Defendants Opening Brief, p. 23; *id.*, p. 26; *id.*, pp. 30–32.

[438] Defendants Preliminary Brief, pp. 15–16 (describing the Plaintiffs' reliance on *Glenmeade* as "odd" because they "extensively quote it for support" but omit that the privilege asserter their acknowledged some waiver due to its affirmative defense but simply was contesting the scope of such a waiver (citing *Glenmede*, 56 F.3d at 479–80 (3d Cir. 1995)).

[439] *Cf.* Plaintiffs Preliminary Brief, ¶ 34 (quoting *Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254, 260 (Del. 1995)); Plaintiffs Reply Brief, ¶ 56 (same); *id.*, ¶ 43 n. 69 (citing *Gibbens v. Quality Rental Tools, Inc.*, 2014 WL 5432113, at *5 (E.D. La. Oct. 24, 2014)).

[440] *See* Plaintiffs Preliminary Brief, ¶ 38 & ¶ 38 n. 65 ("[W]hen [] parties rely on the advice of counsel to support an assertion of good faith, whether affirmatively or not, such reliance effectuates a waiver of the attorney-client privilege as such issues may only be effectively rebutted by consideration of the privileged information" (citations omitted)); Plaintiffs Reply Brief, ¶ 56 (citation omitted);

waiver absent disclosure, at least to the extent of their rule, wherefore the Plaintiffs view a choice

between *Rhone* and *Hearn* is immaterial here.[441] More specifically, the Plaintiffs argue that the

Defendants assert an unduly narrow reading of *Rhone* because disclosure or description is "merely

one pathway to waiver" and "not exclusive,"[442] as well as "no[t] [] the basis for waiver" the

Plaintiffs identify.[443]

276.    First, the Court begins by disclaiming that it does not adopt *Hearn* because

the Court agrees with the criticisms as to its as limited concreteness and amorphous or enigmatic

parameters, particularly its relevance element, *see supra* ¶¶ 230–231. A test whose crucial element

is 'relevance' is not really a test at all so long as 'relevance' remains the liberal and contentless

standard of today. Similarly, the Court agrees with the Defendants' arguments against an *in toto*

adoption of *Hearn* given the Fourth Circuit's rejection of bare relevancy as sufficing, *see supra*

245–250. Ultimately, however, the Court's opinion on *Hearn* does not matter as no party advocates

for its adoption. However, the Court does not wholly repudiate *Hearn* because the Court thinks

that (1) aspects of its reasoning demand consideration and (2) some of the criticism of it are wrong,

---

[441] Plaintiffs Reply Brief, ¶ 39 & n. 61.

[442] *Id.*, ¶ 41.

[443] *Id*; *see also id.*, ¶ 43 & n. 69 ("The appropriate test assesses whether [the privilege asserter] ha[s] placed the purportedly privileged communications at issue in this case, not whether they actually disclosed the underlying communications themselves" (citations omitted)).

*see infra* ¶¶ 279–281 (fairness consideration is not problematic), unfair,[444] or arguably

misrepresentative of *Hearn*.[445]

277.    Second, the Court disagrees that *Rhone* always allows, much less

encompasses, waiver absent disclosure or description, as the Plaintiffs argue. *Rhone's* plain terms

provide an express limit on waiver occurrence to only two factual gating requirements: disclosure

or description. These requirements from *Rhone* for an at-issue waiver, disclosure or description,

comprise rather perspicuous conduct, the presence of which should never, or at least rarely, be

debatable. Indeed, this concreteness is *Rhone's* key feature (and/or, its bug).[446] The authorities that

the Plaintiffs rely on to argue *Rhone* allows waiver absent disclosure or description are all

inapposite in some way or another.[447]

---

[444] On the Court's view, the vitriol occasionally slewed at *Hearn* appears misplaced. *Hearn* did not purport, nor does it seem the *Hearn* court intended, to create some comprehensive test for at-issue waiver, much less an indefectible, complete, or ideal test. The *Hearn* court, recognizing the negatives of the mechanical automatic waiver rule and probably also the consequences of any brightline rule, made a gallant attempt at providing some substance for an at-issue waiver. Similarly, *Hearn's* test is not worthless for guidance on at-issue waiver; its principles are sound and warrant consideration. Those who reject it *in toto* do so in error; one does not throw the baby out with the bathwater. *Hearn* was a good start, and its deficiencies do not warrant even its complete repudiation, much less retreating to an opposite extreme.

[445] *Cf.* Perlmutter, *supra*, at 46 ("The [*Hearn* and other] tests appear to be examples of a judicial exercise to see how many angels can dance on the head of a pin.").

[446] Similarly, the Plaintiffs arguments otherwise on the basis that their asserted waiver's bases are distinct from *Rhone's* bases, *see supra* notes 442–443 and accompanying text, misses *Rhone's* and its proponents' very point that, on their view, at-issue waiver should never be based on anything other than disclosure or description.

[447] For example, the Plaintiffs cite to *Jones* that "[s]elective disclosure for tactical purposes waives the [attorney-client] privilege," Plaintiffs Opening Brief, ¶ 33 (citing *Jones*, 696 F.2d at 1072). But *Jones* was an explicit waiver case where it was undisputed at least some disclosure had occurred and allegedly more disclosure had occurred, which the court ultimately agreed with based on assumptions. *See Jones*, 696 F.2d at 1073. *Compare also id*. n. 58 (citing *Taylor*, 2010 WL 8971772, and *United States ex rel. Lutz v. Berkeley Heartlab, Inc.*, 2017 WL 1282012 (D.S.C. Apr. 5, 2017)), *with* Taylor, 2010 WL 8971772, at *19 (canvassing the occurrence of disclosure of privileged communications), *and Lutz*, 2017 WL 1282012 at *3 (outlining the occurrence of an explicitly raised advice of counsel defense).

Similarly, the Plaintiffs, in arguing that *Rhone* "is similar to *Hearn*," quote *Dudley's* language that *Rhone* allows waiver "when the [privilege asserter] uses the privileged information, '*like* when it "attempts to prove [a] claim or defense by disclosing or describing an attorney client communication"'."

278.    However, exactly what *Rhone* requires is still immaterial since the Court declines to adopt *Rhone* for various reasons. First, the Court disagrees that the Defendants' precedential reasons necessitating *Rhone's* total, strict, or exclusive adoption for at-issue waiver. While the Fourth Circuit cases the Defendants cite do make reliance the key element and arguably preclude waiver based on *Hearn* (or at least *Hearn* construed as only requiring relevance), neither necessitate going to the opposite extreme *Rhone* requires.[448] Similarly, this Court's preference to *Rhone* over *Hearn* through its prior reference to *Rhone* as better remains unchanged. However,

---

Plaintiffs Preliminary Brief, ¶ 32 (quoting *Dudley*, 2021 U.S. Dist. LEXIS 64211, at *7 (in turn quoting *Rhone*, 32 F.3d at 863)) (emphasis added); *see also* Plaintiffs Reply Brief, ¶ 39 n. 61. However, *Dudley's* language literally modifies, without acknowledgement, *Rhone's* rule from a necessary conditional rule to a sufficient conditional rule, in opposition to *Rhone's* plain text.

    Granted the Third Circuit has weakened *Rhone's* strict requirement of disclosure or description, *see supra* ¶¶ 269–270. Thus, the Court disagrees with the Defendants' assertion that Third Circuit law after *Rhone* invariably supports *Rhone's* disclosure or description requirement. Nevertheless, such weakening has not broadened *Rhone* to the extents the Plaintiffs claim and would need if *Rhone* was the only available waiver route.

[448] On a different note, in support of the Plaintiffs' arguments for *Rhone* being broader, the Plaintiffs at the hearing raised the argument that broader allowances for waiver than just disclosure or description was necessitated lest at-issue become swallowed into explicit waiver. *See* Hearing Transcript, at 62:11–18 (Plaintiffs' statement:

> "[D]isclosure or description of a privileged communication, that's just waiver and it's always waiver. It's just waiver by disclosure. So for them to try to cabin at-issue waiver to a situation where there's been a disclosure or description of the document [] would mean that there's no separate thing as at-issue waiver. And we know that's not true.").

The Defendants' rebutted this argument from the Plaintiffs by arguing that the difference from their and *Rhone's* at-issue waiver and explicit waiver is that at-issue waiver leads to a further subject matter waiver. *See* Hearing Transcript, at 93:13–22 (Defendants' statement:

> I think it was one of my colleagues on the other side of the room who suggested that's just waiver. Yeah, it's waiver for that sentence, but if you use it, disclose it, and then use it affirmatively to establish the element of a claim of defense, then all other privileged communications and work product related to the issue on which you tendered the disclosed advice become a part of the subject-matter waiver. That's what at-issue waiver is about. We didn't do any of that. And that's why at-issue waiver can't apply or did not occur.).

The Court agrees with the Plaintiffs' argument itself, just not the Plaintiffs' further conclusion there from that *Rhone* thus allows more; that is an issue with *Rhone*, counseling against its wholesale adoption, but not a reason for misconstruing *Rhone's* own rule. The Court finds the Defendants' rebuttal unpersuasive since what they appear to be describing is simply a general subject matter waiver that can arise due to any kind of waiver. *See supra* ¶ 194.

that preference for *Rhone* did not and does not constitute an exclusive and unqualified adoption of

*Rhone*, for the simple reason that something being 'better' does not necessarily make it 'best'.[449]

279.   Second, the Court disagrees with the Defendants as to their policy reasons

for why *Rhone* must be adopted and enforced strictly. As to the Defendants predominant two bases

for this argument, that waiver should not be allowed where either (1) the client's intent does not

control or (2) any possibility of inconsistency exists, the Court rejects both. The first bases as to

the client's intent ignores the settled law that the client's actual intent as to waiver never controls.

*See supra* ¶ 192. As to the second, the Court does not agree because no law demands that the

consistency principle invariably trumps other validly considered principles. *See supra* ¶ 193. Such

inconsistency may caution against finding a waiver, but it does not dispositively prevent finding a

waiver.

280.   As to the Defendants' third bases for their policy reasons, that

considerations of fairness are inappropriate because they can engender inconsistency, the Court

disagrees for a variety of reasons. First, again, any inconsistency arguably inhered for any

consideration of fairness never *ab ovo* precludes finding waivers. More crucially, this argument is

a red herring (albeit one perennially made). It is true that rules based on elastic or protean concepts

like 'fairness' are disfavored, especially in the modern legal landscape. *See generally* Antonin

Scalia, *The Rule of Law as a Law of Rules*, 56 U. CHI. L. REV. 1175 (1989). However, this argument

against fairness' role in the *Hearn* and the Second Circuit approach is flawed in two keyways.

---

[449] Additionally, this Court cited *Tackett* in the Injunction Order for the sword-shield principle and at-issue waiver law generally, *see* Injunction Order, ¶ 98 n. 102, despite that fact that *Tackett* "is not compatible with [*Rhone's*] holding," as the Defendants themselves argue. Defendants Opening Brief, p. 40. This citation to *Tackett* given its incompatibility to *Rhone* further indicates that while *Rhone* is preferable to *Hearn*, it is not the only competent at-issue waiver approach available to this Court.

281.     First, situationally and crucially, it is absurd that those opposed to fairness'

inclusion are those who do so because it risks vitiating the attorney-client privilege, when the

fairness component is designed to function in favor of protecting privilege by adding a backstop

and a thumb on the scale of protection. Second, accepting *arguendo* the argument that fairness as

an element of a rule is per se bad, those who make this argument invariably take issue with such

rules where it functions as a permitting rule. Such permitting rules may be too discretionary,

especially when based on a non-concrete judgement such as fairness, so as to be problematic

because it is likely to engender bias or inconsistent results. Additionally, the fairness, as part of

*Hearn* and the Second Circuit's state of mind approach, is not wholly without substance as

occasionally argued. First, the fairness is directional with a thumb on the scale for one side, and

thus not a neutral comparison between fairness to two different sides. Further, such fairness is

often made more concrete by noting it goes to, first, the dispositiveness of the submission whose

subject matter is privilege, and, second, the necessity of piercing privilege to rebut the submission.

*See supra* ¶ 262.[450]

282.     Predictability in the law is indeed an important value that all courts should

strive for in crafting, choosing, and applying rules. However, predictability should not be the

singular goal sought at all costs. Perfectly predictable rules are invariably overinclusive or

underinclusive; the latter such rules can effectuate their own manipulation so that conduct which

clearly violates a rule's spirit is technically not encompassed by its terms.[451] On the Court's view,

---

[450] Additionally, while this point is not always mentioned by courts, the fairness some courts involve in at-issue waiver analysis is also based on what is best for the case progression and the efficiency of the judicial system overall. This is because one purpose of at-issue waiver is preventing parties from being able to litigate with 'their fingers crossed behind their back' through subjective submissions. Relatedly, it is about forcing parties to come as close as possible to the facts as shown by objective evidence. It is about getting close to the truth by minimizing selective proffers.

[451] *See, e.g., Holy Trinity Church v. United States*, 143 U. S. 457, 459 (1892) ("[A] thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention

161

*Rhone* is too easily manipulated, given the history of the case. Allowing a waiver to arise only where the client declared in court the magic words, "my attorney told me," would allow the same circumstances to arise that the legal system is protecting against with at-issue waiver, just without those magic words.

### ii. The Plaintiffs' Asserted Rule and the Defendants' Deposition Arguments

283.    In truth, it is unclear exactly what rule the Plaintiffs suggest. Throughout their briefing the Plaintiffs argue that their asserted at-issue waiver rule is met at least when a privilege asserter both (1) affirmatively "places privilege [communications] at-issue" and (2) ensuingly blocks inquiry those communications.[452] While the Plaintiffs expend copious briefing on the second step of their rule, they proffer little as to what constitutes or is required for the first step generally, beyond the conclusory description with a bare allegation that it has been met.[453] The Plaintiffs' arguments as to application of their asserted rule elucidate that at least parts

---

of its makers."); *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945) (Learned Hand, J., opinion of the court) ("[I]t is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary."); Cass R. Sunstein, *Problem with Rules*, 83 CAL. L. REV. 954, 995 (1995) ("Because rules have clear edges, they allow people to 'evade' them by engaging in conduct that is technically exempted but that creates the same or analogous harms. Rules, in short, are under-inclusive as well as over-inclusive if measured by reference to their background justifications. If judges cannot proceed by analogy, and extend the rule where the justification so suggests, people will be able to engage in harmful conduct because of a mere technicality.").

[452] *See* Plaintiffs Reply Brief, ¶ 41 ("At-issue waiver arises when a party affirmatively places the advice of counsel at issue in litigation (whether it be the bankruptcy case, or other adversary proceeding) and later shields it from inquiry or challenge under the guise of privilege" (citing *Livingstone*, 91 F. 3d at 537, and *Bilzerian*, 926 F.2d at 1292).); *id.*, ¶ 43 ("[T]he appropriate test assesses whether [the privilege assert] ha[s] placed the purportedly privileged communications at issue in this case").

[453] At times, the Plaintiffs intimate that although their at-issue waiver rule assertedly has two required steps, it can arise (1) based only on the second step, and/or (2) where the second step is so satisfied, that either (a) nothing is needed for satisfaction of the first step and/or (b) satisfaction can be inferred from the patent or flagrant satisfaction of the second step (i.e., based soley on the privilege asserter making any submission, of whatever kind or medium of evidence, that (i) are very advantageous to their case and disadvantageous to the privilege objector's case and (ii) could be negated by privileged communications). *See* Plaintiffs Preliminary Brief, ¶¶ 33–34 & ¶ 33 n. 59 (discussing how selective disclosure can give wise to waiver to prevent parties from gaining wielding privilege to their advantage and/or their opponent's disadvantage and how a party's injection of matters and/or their submissions on matters can sometimes

162

of their rule's first step can operate based upon a privilege asserter submitting as to their state of mind or affirmatively raising good faith defenses,[454] and the Plaintiffs' emphasis in the Hearing as to submissions of a legal state of mind confirmed they argue for waiver rules that at least in part resemble the state of mind approach canvassed above.[455]

284.    Besides arguing that the Plaintiffs' rule violates *Hearn*, the Defendants do not significantly contest whatever constitutes the first step Plaintiffs' rule. However, the Defendants do strenuously object to the role depositions can or do play for the Plaintiffs' rule. First, the Defendants argue that considering depositions results in a waiver occasionable by only (1) the privilege asserter's invocation of privilege and/or (2) any testimony from one witness on a topic which a different witness cannot testify due to privilege.[456] Neither are allowed, the

---

require their opponents have an ability to contest such injection and/or submissions (citations omitted)). Alternatively, it is possible the Plaintiffs are instead just arguing for two separate kinds of waiver for at-issue, one of which constitutes this analysis only requiring and/or involving a sufficient showing of unfairness to the privilege objector's specific case absent piercing privilege. *C.,* Plaintiffs Preliminary Brief, ¶¶ 35–38 & ¶¶ 39–41 (providing two separate sections for why an at-issue waiver occurred and titling one how the Defendants put their understandings at issue, and the other to how the Defendants' allegedly selective disclosure); Plaintiffs Reply Brief, ¶¶ 41–53 & ¶¶ 54–61 (providing a similar structure); *Cf.* Hearing Transcript, at 42:2–3 (Plaintiffs' statement: "We're talking at-issue waiver and selective waiver"); *id.*, at 34:10–12 (Plaintiffs' statement defending the Referee's recommendations that "at-issue waiver may have occurred, selective waiver may have occurred"); *id.*, at 120:5–8 (Plaintiffs' statement describing the Reference as "the crime-fraud analysis and the at-issue waiver and selective waiver analysis").

First, and just formally, 'selective waiver' clearly describes and is limited to what the Court labels as such above—namely, a specific type of explicit waiver, which requires disclosure or description. *See supra* ¶ 197. And since no such disclosure or description has occurred here, 'selective waiver' cannot assist the Plaintiffs.

Second, to the extent Plaintiffs are asserting such waiver occasioned on only fairness, the Court disagrees such a waiver ought to be adopted. While the Court wholeheartedly agrees that fairness is an important consideration validly involved in an at-issue waiver analysis, *see supra* ¶ 280–282, the Court disagrees such considerations can function as a gating requirement for a waiver. Such waiver would constitute the First Circuit's approach, *see generally Clam Shell*, 838 F.2d 13, which is even broader than *Hearn*, arguably. And given that the Court does not adopt *Hearn* due to it being too broad, adopting instead a broader approach would be irrational.

[454] *See infra* ¶ 291; *see also* Plaintiffs Preliminary Brief, ¶ 36 & ¶ 36 n. 62 (citing Bilzerian, 1294);
[455] Hearing Transcript, at 63:3–11 (Plaintiffs' statement); *id.*, at 136:9–17; *id.*, at 143:16–17.
[456] Defendants Opening Brief, p. 35.

Defendants argue, since (1) "[t]wo instances of non-waiver do not make a waiver" and (2) *Sky Angel* bars assuming testimony is implicitly relying on privileged materials absent any "'record support'" of the same.[457] Second, the Defendants argue that such consideration also violates the principle that only the privilege asserter, not the privilege objector, can cause a waiver, at least where the privilege asserter specifically objected.[458]

285.    These aspects of the Defendants' arguments are also unclear. To the extent that the Defendants simply are reasserting the noncontroversial and settled law that a deponent's responses precipitated by a privilege objector's questions cannot constitute submissions of attorney reliance sufficing for an at-issue waiver, the Court of course agrees. Similarly, to the extent the Defendants are arguing that objection to such questions cannot alone give rise to a waiver, again, the Court agrees.

286.    However, to the extent the Defendants are arguing that objecting so does not play any part within an at-issue waiver analysis, or, that such objections wholly immunize a privilege asserter committing any waiver, the Court disagrees. First, in a bare factual sense, waiver could never arise absent an invocation of privilege, since, otherwise, nothing could be waived. Second, deponent testimony can always practically cause a waiver factually and independently of a privilege invocation, for example, if the deponent disclosed the occurrence of an explicit waiver

---

[457] Defendants Opening Brief, pp. 35–36 (citing, inter alia, *Sky Angel*, 885 F.3d at 276).

[458] Defendants Opening Brief, pp. 36–37 (citing *Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, 1998 WL 1742589, at *6 (E.D.N.C Sept. 28, 1998) ("It cannot be possible for one party to justify piercing his adversary's attorney-client privilege by virtue of its own injection of the privilege into the lawsuit. A contrary result would enable a skillful questioner to render the privilege a nullity" (in turn citing *Chase Manhattan Bank v. Drysdale Sec. Corp.*, 587 F. Supp. 57, 58 (S.D.N.Y 1984).), and *In re Hillsborough Holdings Corp.*, 176 B.R. 223 (M.D. Fla. 1994) (rejecting that the privilege asserter "waived its attorney-client privilege because various [of their] officers and directors testified that they relied on representations by [their] legal department that asbestos liabilities were manageable," because the fact that such testimony was "elicited upon questioning by [the privilege objector's] counsel," to which the privilege asserter objected," meant this testimony did not "inject[] privileged matters into the case" so as to "waive[] the privilege")).

not previously known. Deponent testimony can likewise occasion a waiver legally for example, where such testimony could mitigate or limit the necessity of piercing privilege for a waiver that has been found, but just does not in the specific case for whatever reason—as the Court ultimately finds below.

### iii.  The Court's Rule Selection of State of Mind At-Issue Waiver

287.    Thus, the Court does not adopt *Hearn*, *Rhone*, or the Plaintiffs' rule. The Court rather starts with the acceptance that a legal state of mind submission can waive privilege as to the topic of that submission, which is accepted by courts rejecting parts of *Hearn's* test, and is somewhat accepted by even the Third Circuit under its version of anticipatory waiver. But, crucially, not every state of mind submission necessarily triggers a waiver under this rule.[459]

288.    Particularly, first, a state of mind submission where there is a legal nexus to the submission, such that it is *ex facie* and objectively assurable that their attorney's advice constitutes much of the information underpinning that submission. But, crucially, not even there yet. Then, fairness comes in to the privilege objector's, Defendants', benefit. Fairness is both about (1) the centrality of that submission to the dispositive or critical issues in a case, unless untested, and the (2) necessity of piercing privilege to rebut the assertion.[460]

289.    The Court believes this is line with the Fourth Circuit precedent of concrete consistent rules that are fact specific and case law specific to not be over-inclusive or under-inclusive.

---

[459] The Court disclaims that it does not think at-issue waiver occurs upon a party affirmatively raising good faith. Such a rule would suffer all the issues of *Hearn* or the automatic waiver test above and is too inherent in all bankruptcy cases.

[460] This may look like a cousin of the First Circuit approach, which is a version *Hearn*. The difference is that fairness is not gating, because this Court feels that if fairness was gating, it would look more like relevance. Still, the Court acknowledges that fairness is an appropriate component in the analysis when ordered correctly for our case (i.e., fairness tightens; it does not broaden.).

290.    The Court acknowledges this may not be the most concrete rule available; however, the Court adopts it in this case given two facts. First, the wide availability of warnings that a client receives regarding how putting their state of mind at-issue or affirmatively raising good faith can raise the possibility of waiver, both within bankruptcy specifically,[461] and outside of it.[462] Second, the Court's belief that the Defendants' lawyers knew, or should have known, about these warnings, given the quality and number of lawyers representing the Defendants, and thus must have informed the Defendants that taking these actions may result in a waiver of attorney-client privilege.

---

[461] *See, e.g.*, John D. Emmanuel, *Good Faith Affirmative Defenses Waiving Attorney-Client Privilege and Work-Product Protection Under the "At Issue" Doctrine*, BUCHANAN INGERSOLL & ROONEY PC (June 28, 2017), https://www.bipc.com/good-faith-affirmative-defenses-waiving-attorney-client-privilege-and-work-product-protection-under-the-at-issue-doctrine (warning "[p]ractitioners [to] be aware that raising common affirmative defenses," and specifically a good faith defense in the bankruptcy context, "may place certain documents 'at issue'" (citing *In re: Mongelluzzi*, 2017 WL 1843049 (Bankr. M.D. Fla. May 8, 2017))); Todd Presnell, *Good-Faith Defense to Fraudulent-Transfer Claims Results in At-Issue Waiver*, PRESNELL ON PRIVILEGES (May 23, 2017), https://presnellonprivileges.com/2017/05/23/assertion-of-good-faith-defense-to-fraudulent-transfer-claims-results-in-at-issue-waiver/ (discussing same principle specifically a privilege asserter affirmatively pleading good faith as a defense to a fraudulent transfer and submitted regarding their state of mind (citing same)).

[462] *See* Saul Ewing, *Words Can Come Back to Haunt You: Boilerplate Pleading Could Lead to Inadvertent Waiver of Attorney-Client Privilege*, JD SUPRA (Nov. 3, 2014), https://www.jdsupra.com/legalnews/words-can-come-back-to-haunt-you-boiler-96215/ (discussing how cases holding that the privilege asserter waived privilege by affirmatively pleading regarding its state of mind as to the legal status of its conduct displays that although clients "should continue to communicate freely with counsel, they should also think strategically when pleading affirmative defenses" and, specifically, "should consider the possibility" that "plead[ing] good faith compliance or another defense that negates a statute's mens rea requirement" may waive privilege as to privileged communications which "might inform the factfinder about the [privilege asserter's state of mind during the relevant time period," since privilege "is not impenetrable" (citing *U.S. ex rel. Barker v. Columbus Regional Healthcare System, Inc.*, No. 4:12-cv-108 (M.D. Ga. Aug. 29, 2014) and *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386 (11th Cir. 1994)); *see also* Michael Shaheen, Spencer Bruck & Michelle Chipetine, *Navigating the Attorney-Client Privilege Waiver Tightrope*, HEALTH LAW (July 22, 2024), https://www.cmhealthlaw.com/2024/07/navigating-the-attorney-client-privilege-waiver-tightrope/; Thomas E. Spahn, *Does Asserting a "Good Faith" Affirmative Defense Waive the Attorney-Client Privilege?: Parts I & 2*, MCGUIREWOODS (Sept. 2 & 9, 2015), https://www.mcguirewoods.com/client-resources/privilege-ethics/privilege-points/2015/9/asserting-good-faith-affirmative-defense-waive-privilege-i/ & https://www.mcguirewoods.com/client-resources/privilege-ethics/privilege-points/2015/9/asserting-good-faith-affirmative-defense-waive-privilege-ii/.

## 2. Application

a. In General: The Parties' Arguments as to the Scope and Sufficient Submission Source Material of an At-Issue Waiver

291.    The Plaintiffs argue that the Defendants' litigation conduct committed at-issue waiver and point to the Defendants (1) first putting topics at-issue by some combination of (a) the Defendants having explicitly raised good faith affirmative defense, and/or (b) the Defendants' various affirmative evidentiary submissions, memorialized in certain filings, as to the Defendants' states of mind with regard to their Texas Two-Step,[463] and (2) then blocking by invoking privilege in response to the Plaintiffs discovery requests and deposition testimony and on those topics.[464]

---

[463] *See, e.g.*, Plaintiffs Preliminary Brief, ¶ 35–36 (citing Defendants Fraudulent Transfer Complaint Answer, p. 35-37 (asserting that Plaintiffs' claims, if sufficient, are barred because "any [] transfer" constituting the Defendants' Texas Two-Step and sufficing as a transfer for a fraudulent transfer claim "was taken for value and in good faith, and is therefore protected by [11 U.S.C.§ 548(c); asserting same "because reasonably equivalent value was exchanged in good faith in or in connection with the [] Restructuring"), and Defendants Consolidation Complaint Answer, p. 19 (asserting same "because at all times, the [Defendants] acted in good faith, in compliance with applicable law, and with the goal to fund a section 524(g) trust that would fairly and efficiently satisfy the current and future asbestos-related claims against the Debtor and, as such, there is no basis")); Plaintiffs Reply Brief, ¶ 48 (same); Plaintiffs Preliminary Brief ¶¶ 41–42 (citing (1) 2020 Panaro Declaration and (2) various assertions the Plaintiffs argue go to (and/or are intended to go to) the Defendants' asserted good faith, incorporated as Exhibit C to the Plaintiffs Preliminary Brief); Plaintiffs Reply Brief ¶ 38 & ¶ 38 n. 60 (citing Defendants Opening Brief, p. 17 (stating that the [] Restructuring "served a long-recognized lawful purpose"), id., p. 18 (characterizing assertions of fraudulent intent as "unsupportable" because the Corporate Restructuring paralleled that in Bestwall), and *id.*, p. 20–21 (stating that the Funding Agreement is "fully protective of claimants' payment interests")).
[464] Plaintiffs Preliminary Brief, ¶ 37 (citing Deposition Objections questions, "for example, about the purpose of the [] Restructuring or their understanding of [the] transactions"); *id.*, ¶ 38 (asserting the Defendants' Privilege Objections "further obscure and unjustly limit Plaintiffs' right to discover and litigate, and the Court's ability to … determin[e] [the] Defendants' purported good faith," which, importantly, the Plaintiffs contest on various grounds); Plaintiffs Preliminary Brief, ¶ 42 (asserting that the Plaintiffs proffered various submissions display that the Defendants "selectively testified as to" the Defendants' Texas Two-Step "to the extent it benefited them," but then blocked the Plaintiffs discovery efforts on these topics, which waives privilege on these issues).

167

292. The Plaintiffs argue this conduct waived privilege as to any privileged communications bearing on the topics of "the purpose, reasons for, and effect of the" Defendants' Texas Two-Step, including, inter alia (1) "the [Defendants'] reasons for… the various transactions and agreements related to" it, (2) the Defendants knowledge of or state of mind as to its overall effects,[465] and more specifically, (3) the Defendants' views on *Bestwall's* meaning as to their Texas Two Step (the "the Defendants' *Bestwall* Views topic"),[466] and (4) the decisions behind the Texas Two Step, specifically, the decision for DBMP to File (the "the DBMP Filing Decision topic") both as to (a) the decision's timing vis-à-vis the Petition Date and the Restructuring and the decision to execute the same, and (b) the level of overall independence as to the filing decision from Old CT, New CT, or SGC/CSG.[467]

293. The Defendants counter that they never relied on statements regarding their good faith or purpose for the transactions because the (1) their submissions, at least as to the DBMP Filing Decision topic, occurred in the fact section of their brief and were not used to prove their case, as evinced by how the Injunction Order "disregard[ed]" the statements despite finding in Defendants' favor, and (2) the statements cannot be applied to the non-debtor affiliates who were not a party to the Injunction Proceeding.[468] Additionally, the Defendants also argue their deponents testified fully as to the topics.[469] Lastly, the Defendants object to any extrapolating to topics based on the privilege asserter's affirmative submissions as functionally just a relevance standard— which the Fourth Circuit explicitly bars.[470]

---

[465] Plaintiffs Preliminary Brief ¶¶ 35–36.
[466] Plaintiffs' Reply Brief, ¶¶ 35, 38 n. 60, & 60.
[467] Plaintiffs Preliminary Brief, ¶ 40.
[468] Defendants Opening Brief, pp. 29–30.
[469] Defendants Opening Brief, 30–34 (citing Starczewski and Panaro depositions).
[470] Defendants Opening Brief, pp. 38–39.

294.     As to the Defendants general argument that no statements can constitute their putting certain topics at-issue when the submissions occur in the fact sections of the Defendants' pleadings, the Court rejects this argument. First, and most importantly, the submissions the Court discusses below did not only occur in the fact sections. Many statements also appeared in the substantive argument sections of pleadings or within the substantive facts submitted by the Defendants' declarants. And indeed, their appearance there is critical given some of the statements regarded facts that, as the Court finds below for some, if left untested, may be dispositive for the Defendants. Additionally, the Defendants' lawyers likely drafted the fact section to comport with and support their substantive arguments.[471]

295.     Overall, the Court agrees with the Plaintiffs that the Defendants' subjective affirmative submissions, at least when combined with their explicitly raised good faith affirmative defenses, constituted an at-issue waiver for certain topics. However, the Court finds that the scope of the resulting waiver is much narrower than what the Plaintiffs argue for.

296.     Initially, while Defendants are right that a waiver as to one topic does not necessarily extend to a waiver of any related topic, the Court disagrees to the extent the Defendants take this point to also mean that any such extension or extrapolation is always disallowed. Rather, extrapolation is allowed but only as limited by the specific submissions causing the waiver in the first place, namely, the discrete topics to which such submissions explicitly and specifically report upon. Moreover, this allowed limited extrapolation does not automatically extend to all matters relevant or even highly relevant to the submission, but rather only those necessitated to rebut the

---

[471] *Cf., e.g.*, Touro L. Ctr., *Working With IRAC*, https://www.tourolaw.edu/adp/studyskills/irac.aspx (last visited Mar. 10, 2026) (instructing that good legal writing "work[s] from [the writer's] articulation of the[ir] rule to guide [their] application of the facts" and to "provide[] a blueprint to follow for [] discussion of the facts").

submissions. Consequently, the scope of any resulting waiver is exclusively a function whatever the privilege asserter affirmatively submits.

297.   First, as to the Plaintiffs' third and fourth asserted topics waived, regarding the Defendants' views on *Bestwall* and the DBMP Filing Decision question, the Court thinks the Plaintiffs' asserted scope of that waived topic accurately tracks the submissions that could necessitate a possible waiver as to that topic. However, the Court is less certain about the scope of the Plaintiffs' asserted waiver as to the first and third topics, the Defendants' purposes as to and knowledge of the effects of their Texas Two-Step, since the Plaintiffs appear at times to effectively argue for a resulting waiver of anything and everything related to the Defendants' Texas Two–Step limited only by what the Plaintiffs desire.[472] To the extent this is what the Plaintiffs are arguing for, the Court rejects such a possibility and disagrees it accurately represents the operation of an allowed at-issue waiver.

298.   Rather, the Court's adopted rule limits any waiver to specific details and fact dependent effects of the submissions. Thus, applying the rule submissions proffered by the Plaintiffs, the Court can delineate three general topics which the submissions, through their explicit references, have put at-issue: specifically, the Defendants' various subjective states of mind as to 1.) the Funding Agreement, both the as to its specific underpinning intents and known possible effects' (the "Funding Agreement Topic"), 2.) the Defendants' Texas Two-Step's overall effect on the Claimants (the "Claimant Treatment Topic"), and 3.) the inclusion of Millwork & Panel within DBMP (the "Millwork & Panel Topic").[473]

---

[472] *Cf. e.g.,* Plaintiffs Preliminary Brief, ¶ 36 (asserting that because the Defendants' good faith defenses were "with respect to the entirety of the [] Restructuring and resulting DBMP bankruptcy, they have waived privilege of privileged communications "concerning the facts and circumstances of the" Defendants' Texas Two Step "which would provide Plaintiffs an opportunity to test those assertions of good faith").

[473] *See generally* Plaintiffs' Preliminary Brief, Exhibit C.

299. The Court will proceed to consider whether these topics were waived and if so, to what extent and what is required thereof, first as to the DBMP Filing Decision Topic, then as to the Funding Agreement Topic, then the Claimant Treatment Topic, then the Millwork & Panel Topic, and then lastly the Defendants' *Bestwall* Views topic.

    i. *Filing Decision*

300. The Defendants submitted throughout these proceedings, and as late as in the Briefing, that (1) DBMP's Filing Decision was made (a) after and independently of Rayfield's Restructuring Decision -which was made sometime in 2019, (b) by the DBMP Board at the various Meeting, and independently of New CT, SGC, CSG, or any non-debtor affiliates, and that (2) DBMP's Filing was only one possible outcome for DBMP post-Restructuring out of multiple options that were (a) anticipated by Project Horizon as possible prior to the Restructuring and (b) genuinely and carefully considered by DBMP's Board before ultimately making DBMP's Filing Decision.[474]

301. As to this topic specifically, the Plaintiffs argue that (1) this Court has already found that the Defendants used "selectively used … privileged communications"[475] and that (2) "that [the] Plaintiffs could not fully test the Debtor's assertions" to support their case.[476]

302. The Defendants argue that these submissions cannot constitute an at-issue waiver for two reasons. The Defendants' first reason is that their DBMP's Filing Decision

---

[474] *See e.g.*, Defendants Reply Brief, p. 4.

[475] Plaintiffs Preliminary Brief, ¶ 39 (citing Injunction Order, ¶ 97 & ¶ 98)).

[476] Plaintiffs Preliminary Brief, ¶ 40 & n. 69 (citing Injunction Order, ¶ 94 ¶ 95)) (asserting that, for investigating and deciding an actual fraudulent transfer claim or any defenses thereto, "[a] complete inquiry into the transferee's understanding of the transferor's intent is essential (citing *Gold v. First Tenn. Bank Nat'l Ass'n (In re Taneja)*, 743 F.3d 423, 430 (4th Cir. 2014) (stating that evaluating such claims or defenses "require[s] consider[ing] whether the transferee actually was aware or should have been aware, at the time of the transfers and in accordance with routine business practices," of the fraudulent intents involved)).

submissions are not relevant to this case and thus should not give rise to any waiver. They argue

these submissions were not "rel[ied] on [] 'to prove' any element of" the Injunction Prayer"

because they "had no bearing on the standards" in the Injunction Proceeding, as evinced by this

Court's ability to "'disregard[]' " the submissions in the Injunction Order,[477] nor in the Fraudulent

Transfer Proceeding[478] or any proceeding involving good faith.[479]

303.    The Defendants second reason is that these submissions "were correct and

not contrary to the evidence."[480] They argue this on the grounds that (1) "[o]nly DBMP's *board*

could make the decision for DBMP to file for bankruptcy," "the board could only do that after

DBMP existed," and DBMP "did not until November 2019," wherein "[t]he board then authorized

the bankruptcy filing in January 2020,"[481] (2) the Privilege Documents support their DBMP's

Filing Decision submissions,[482] and (3) the asserted evidence against it (a) overstates either this

---

[477] Defendants Opening Brief, p. 29 (quoting Injunction Order, ¶¶ 94-99 (discussing the Defendants' "'flexibility' " and "'optionality' " statements)); *see also* Defendants Reply Brief, p. 3.

[478] *See* Defendants Opening Brief, p. 22 (asserting that the Fourth Circuit's permittance of a "'two-step approach to bankruptcy' "—which "is true regardless of the timing of either 'step' "—makes it so that "the timing of the bankruptcy decision is not an element of a claim or defense in this case," wherefore, "[e]ven if one of DBMP's non-debtor affiliates had concluded earlier that" DBMP would file, "[][] that decision would not establish" either (1) that the filing or the Funding Agreement were "fraudulent" or (2) "that there was any intent to defraud anyone in any way").

[479] *See* Defendants Opening Brief, p. 3 (refuting the Plaintiffs apparent "belie[f] that evidence of an 'early' plan to file for bankruptcy" and/or "of input from DBMP's corporate 'affiliates' or 'French parent'" "would now disprove" the Defendants' good faith defenses, []as "cit[ing] no law to support either proposition—because none exists," given that neither "[a]dvanced planning or preparation for a potential corporate bankruptcy filing" nor "the existence of input from a debtor's corporate affiliates" show "bad faith.").

[480] Defendants Opening Brief, p. 22.

[481] *Id.*

[482] *See* Defendants Opening Brief, p. 52 ("See, e.g., Docs. 2078, 2106, 2272, 3976 (all describing the restructuring or bankruptcy in terms of 'options' and 'optionality')."); Defendants Reply Brief, p. 4 (stating that "if the Court wishes to, it may verify the extent to which the withheld privileged documents further confirm the[] accuracy" of the Defendants' DBMP's Filing Decision submissions.).

Court's prior findings[483] or the Defendants' own proffered facts[484] or (b) was insignificant or off-point.[485]

304.    The Court is uncertain of the extent to which these submissions sufficed for the Court's Step 1 as a state of mind with a sufficient legal nexus. On the one hand, the submissions are clearly submitting the Defendants' subjective evaluation of various legal options and its belief that DBMP's filing bankruptcy was the best option, such that, at the least that dimension of the Defendants' DBMP's Filing Decision submissions satisfies Step 1.[486] On the other hand, the Defendants' DBMP's Filing Decision submissions primarily assert this as a fact to support the greater conclusion that DBMP made the decision based on the Board's evaluation of the options after the Restructuring at the various meetings and independently of any non-debtor affiliate.

---

[483] *See* Defendants Opening Brief, p. 22 (arguing that the Injunction Order's findings "that some of DBMP's statements about """flexibility""" were "'contrary to the evidence'" could not constitute "'fraud on the court' " because that was routine factfinding, hardly implying a """carefully executed scheme to defraud"'," (first quoting Injunction Order, ¶ 94, then *Asterbadi v. Leitess*, 2005 WL 5060455, at *3 (E.D. Va. Mar. 1, 2005), *aff'd*, 176 F. App'x 426 (4th Cir. 2006))).

It is unclear whether "routine factfinding" is the Defendants describing the Court's findings or their statements. If they mean the former, such would not be a competent legal argument. Findings of fact carry the same force as conclusions of law, at least within the case they were made; their application is not elective. *Cf., e.g., generally*, Kristen Fjeldstad, *Just the Facts, Ma'am – A Review of the Practice of the Verbatim Adoption of Findings of Fact and Conclusions of Law*, 44 ST. LOUIS U. L.J. (2000); Nevin Van de Streek, *Why Not Findings of Law and Conclusions of Fact and Opinions about Both*, 70 N.D. L. Rev. 109 (1994).

[484] *See* Defendants Reply Brief, pp. 3–4 (asserting that the fact that SGC and CSG were advised of the actions by Old CT, New CT, and DBMP did not negate their DBMP's Filing Decision submissions because the Defendants admitted this, but only such advisement and expressly disclaimed SGC's and/or CSG's involvement.) (citations omitted).

[485] *See* Defendants Opening Brief, pp. 51–52 (refuting the Referee's conclusion that the Defendants DBMP's Filing Decision submissions were rebutted by Document 1012—which he described as stating "'Bky is the only viable option' "—because this conclusion (1) omitted the critical words "'was probably'," (2) "fail[ed] to note [] the discussion in this document was [] from a Kirkland & Ellis analysis done in the early 2000s … that was not followed;" same by Document 715—which contained a slide on the Garlock and which the Referee stated "'provides strong evidence of early strategy for Bky filing in WDNC' "—because this conclusion ignores that "the slide solely discusses the outcome of the Garlock case," and does not[] indicate[] any decision to file bankruptcy, let alone 'strong evidence'.").

[486] This dimension of DBMP's Filing Decision Topic arguably also fits underneath the Claimant Treatment Topic.

Similarly, as to the first part of the Court's Step 2, the Court is uncertain. On the one hand, the Defendants' DBMP Filing Decision submissions do seem to bear on the Consolidation Proceeding,[487] but it is most assuredly not dispositive.[488]

305.    Nevertheless, the Court need not decide whether these submissions meet Step 1 or the first part of Step 2 because they clearly fail the second part of Step 2. Simply, there is no need to pierce privilege for the Plaintiffs' to be able to stress-test these submissions because the Court previously rejected the submission in part. Specifically, this Court found that, "while technically, the DBMP Board approved the formal resolution authorizing a bankruptcy filing by this company only on January 22, 2020, the decision that this newly formed corporation would file chapter 11 was made before the Corporate Restructuring and before the Debtor existed."[489]

306.    This finding is not only binding,[490] but sound. First, this Court's prior finding as the Defendants' Filing Decision submissions was based on extensive testimony regarding the viability of the 'alternative options' which the Defendants and DBMP purportedly genuinely considered and weighed against DBMP filing. *See supra* ¶ 48. Specifically, this testimony outlined that any such purported consideration would have been as to options that were unviable or impractical. *Id.*

---

[487] *Cf., e.g.*, *In re Ayers Bath (U.S.A.)*, 2021 Bankr. LEXIS 2628, at *140 n.26 (Bankr. C.D. Cal. Sep. 22, 2021) (discussing an alter ego claim brought based on, *inter alia*, certain "evidence [that] is some proof of [the parent entity's] knowledge and participation in the decision of [the debtor-subsidiary entity] to file for bankruptcy").
Thus, the Court rejects Defendants' argument that their DBMP Filing Decision submissions are not relevant at all to any proceeding. The Defendants' actual belief in these submissions' irrelevancy is belied by the Defendants (1) extensively raising these submissions prior to the Reference; (2) their reraising the submissions to the Referee, *cf., e.g.*, Defendants Preliminary Brief, pp 5–6; and (3) their continuing to reraise them today to this Court in their Briefing , *see supra* ¶¶ 301–303.
[488] *See Ayers*, 2021 Bankr. LEXIS 2628, at *142 (holding that the evidence of the parent entity's "participation in this litigation by initiating the bankruptcy case does not come close to outweighing" countervailing evidence).
[489] Injunction Order, ¶ 106.
[490] The Injunction Order findings are binding on this case, *see supra* note 483.

307.     Second, these submissions were unpersuasive even without considering such evidence, based on unavoidable realities for any significant and substantial corporation transaction such as the Defendants' Texas Two Step. Consider, first, one such submission averring that "[n]o decision to file for chapter 11 bankruptcy for DBMP was made until the authorizing resolution was approved" by the DBMP board.[491] While this is technically true, it is certainly misleading to assert that no decision could be made for DBMP to file a voluntary petition prior to the creation of DBMP since such a corporate entity has to exist to make such a voluntary decision.

308.     Consider, for example, the imagined spaceship launch where one person presses a button to launch the spaceship.[492] When a spaceship launches, does the person who presses the button decide to launch the spaceship? Of course not. It was done months if not years prior by the entities who decided to do all the preparation necessary to get to that stage. Entities do not spend the time, effort, and money it takes to prepare to launch a spaceship, just to wait for the decision of one person on whether they will press the button. If a launch later was learned to be some scheme or crime and the lawyers for the entities argued that it was the decision of the button-presser to launch the spaceship and that he is to blame, any court would immediately reject such statements. Crucially, the ultimate decision to press the button for such launch can only come after the spaceship is designed, assembled, and all the necessary components and personnel are in place. But that does not make the pressing the button the operative action that effectuated the launch. Rather, pressing the button is merely the consummation of a decision made long before.

309.     Thus, the Court rejects Defendants' arguments that their DBMP Filing Decision submissions are supported by evidence.[493] The record makes clear that the decision for

---

[491] *See, e.g.,* 2021 Bondi Declaration, ¶¶ 16–17.
[492] The Court is aware that is not actually how spaceship launches work.
[493] *See supra* ¶ 303. Specifically, the Defendants' first basis that only DBMP could file ignores the reality of the spaceship launch. The Defendants' second basis that certain documents discuss the other viable

DBMP to file bankruptcy was made much prior to the January 22 Meeting and at least as of the Restructuring Date. This conclusion follows from the objective facts in the record and does not require the Court to pierce any privilege. Indeed, the Court had effectively reached this conclusion in the Injunction Order.

310.    Accordingly, the Court finds that any meetings that 'occurred' between the Restructuring Date and the Petition Date to 'decide' for DBMP to file would have been perfunctory, both because (1) the decision had already been made and (2) any such 'decision' would have been made by the very same entities, or their subordinates, that made the effective decision. At least as of the Restructuring Date, ninety-one days prior to the Petition Date, the Defendants intended that DBMP would file bankruptcy. The Defendants' DBMP's Filing Decision submissions and arguments in support asserting otherwise misrepresents reality—not, so as to constitute perjury or ethical violations, but assuredly enough to allow rejection. Clever as they may be, they ultimately fail.

---

'options' ignores that the fact that other 'options' were formally discussed does not mean they were genuinely considered.

The Defendants' first part of their third basis, that the evidence against their DBMP Filing Decision submissions fails because it twists this Court's findings or the Defendants' argument, ignores that findings always preclude contrary submissions. *Cf. supra* note 490. The Court agrees with the Defendants' second part of their third basis, that advisement of SGC and CSG does not automatically constitute their involvement; however, this fact is not the primary reason for making a finding on the Defendants' DBMP Filing Decision.

The Court agrees with the Defendants' third part of their third basis, that the documents the Referee's Report recommended for disclosure were weak and tangential evidence refuting their DBMP Filing Decision. Specifically, the Court thinks these recommendations approached too close to a relevance standard and had the effect of not sufficiently upholding privilege. The Court agrees that this same effect resulted from the Referee's application of the topic of Defendants' DBMP Filing Decision to proceedings other than the Consolidation Proceeding, as the Defendants argue. Granted, it was the Defendants who reraised this to the Referee, *see supra* note 487, and the Referee was unable to provide a finding rejecting it in the same way the Court can.

### ii. *Funding Agreement*

311.   The Defendants have made countless submissions to the Court regarding the Funding Agreement throughout this case. The Defendants directly submitted the Funding Agreement to the Court within the 2020 Panaro Declaration.[494] First, DBMP's Four Information First Day Pleadings all submitted that the Defendants' intended for the Funding Agreement, as well as the inclusion Millwork & Panel, to achieve one central purpose behind the Restructuring: to ensure that DBMP has the same ability to fund Asbestos Liabilities as Old CT did prior to the Restructuring (the "Same Ability Goal").[495] The Defendants continued to make these submissions in the Injunction Proceeding in order to obtain the Injunction.[496] Related, the Defendants submitted that the Funding Agreement was intended to ensure that Claimants have the same availability to assets for paying their Claims from DBMP as they did from Old CT before the Restructuring (the "Same Availability Goal").[497] Additionally, the Defendants submitted that they would honor the

---

[494] *See* 2020 Panaro Declaration, Annex 2, pp. 34–51.

[495] *See* 2020 Panaro Declaration, ¶ 15 (stating the Restructuring's "key objective[,]… to make certain the Same Ability Goal, "was achieved by" the Funding Agreement and inclusion of Millwork & Panel); DBMP Information Brief, p. 25 (stating that DBMP's assets, including Millwork & Panel, and the Funding Agreement, "ensures" the Same Ability Goal); 2020 Panaro Declaration,, ¶ 37 (averring that DBMP "believes it has sufficient assets, including [] under the Funding Agreement, to fund a section 524(g) trust"); *id.*, ¶ 20 ("[T]he design of the [] Restructuring ensures" the Same Ability Goal); 2020 Starczewski Declaration, ¶ 10 (same); Injunction Complaint, ¶ 21 (same); 2020 Starczewski Declaration, ¶ 8 (stating the Funding Agreement "ensures" the Same Ability Goal); Injunction Complaint, ¶ 15 (same).

[496] Defendants' Objection to Plaintiffs' Motion to Lift Stay, ¶ 22 (stating that the Funding Agreement "was intended to ensure" the Same Ability Goal); 2021 Bondi Declaration, ¶ 20 (averring that through the Funding Agreement, DBMP "has sufficient assets … to fund a section 524(g) trust"); 2021 Panaro Declaration, ¶ 26 (same); *id.*, ¶ 12 (stating that "[a] key objective of [the R]estructuring, the Same Ability Goal, "was achieved" by the Funding Agreement and inclusion of Millwork & Panel); 2021 Starczewski Declaration, ¶ 20 (same by the Funding Agreement); *id.*, ¶ 21 (stating that the Funding Agreement "ensures" the Same Ability Goal); 2021 Panaro Declaration, ¶ 17 (stating that "[t]he design of the [] Restructuring ensures" the Same Ability Goal); 2021 Rayfield Declaration, ¶ 11 (stating that when deciding whether to execute the Restructuring, he "understood" that a funding agreement "would ensure" the Same Ability Goal).

[497] Defendants' Reply to the Plaintiffs' Objection to the Injunction Motion, p. 8 (stating that "the Funding Agreement … ensures the Same Availability Goal); *id.* at p. 8 (stating "that the Funding Agreement ensures claimants" (1) "'have the 'same ability to recover on their claims in [DBMP's] bankruptcy case as

Funding Agreement to effectuate the Same Ability and Same Availability Goals.[498] The

Defendants continued to make these submissions when attempting to dismiss both the

Consolidation Proceeding[499] and the Fraudulent Transfer Proceeding.[500]

> (1)   Step 1: Legal State of Mind Submission

312.   These Funding Agreement submissions constituted the Defendants

submitting subjective assertions regarding the Funding Agreement—i.e., as to their state of mind

as to the effect and meaning of the Funding Agreement—as evinced by, at a minimum, their use

of words describing a state of mind, like "objective', 'make certain', 'ensures', 'design', and

'believes'.[501] Additionally, it is unmistakably clear that the Defendants put the Funding Agreement

at-issue by these submissions. Critically, these submissions were not just as to the Defendants'

---

they would have had if Old CT had filed for bankruptcy',," (2) "'have access to the same assets and ability to pay before and after the restructuring',," and (3) "'weren't harmed'.") (quoting Coulombe Dep. Tr., 139:14-18).

[498] 2021 Rayfield Declaration, ¶¶ 12–13 (averring that the Funding Agreement "ensures" the Same Ability Goal, because, inter alia, "New CT will … comply with all of its contractual obligations under the Funding Agreement").

[499] Brief in Support of DBMP's Motion to Dismiss Consolidation Complaint, ¶ 36 (stating that the Funding Agreement "ensures" the Same Ability Goal) (citation omitted); *id*., ¶ 4 (submitting that the Funding Agreement "ensures" Same Ability Goal); New CT's Reply to Plaintiffs Objection to Motion to Dismiss Consolidation Complaint, ¶ 26 (same).

[500] Defendants' Motion to Dismiss Fraudulent Transfer Complaint; ¶ 20 (submitting that "[a] key element of the [Restructuring]" was, inter alia, the "provision of funding to DBMP to ensure" the Same Ability Goal, which was "provided" and "achieved" by the inclusion of Millwork & Panel and the Funding Agreement); *id*., ¶ 24 (submitting that "[t]he design of the [Restructuring] ensures" the Same Ability Goal through the inclusion of Millwork & Panel and the Funding Agreement); *id*., ¶ 27 (averring that, under the Funding Agreement, funding "will be available" for DBMP to pursue and fund a section 524(g) trust); *id*., ¶ 56 (stating that the Same Availability Goal has been achieved "given the Funding Agreement"); *id*., ¶ 61 (stating that the Funding Agreement "ensures" the Same Ability Goal); ¶ 126 (same); Defendants' Reply to Plaintiffs' Objection to Motion to Dismiss Fraudulent Transfer Complaint, ¶ 59 (stating that the Funding Agreement and inclusion of Millwork & Panel "preclude any reasonable inference other than" the Same Ability Goal).

[501] *See supra* notes 495–500. Granted, some of the Defendants' statements in these pleadings regarding the Funding Agreement were submissions about what the Funding Agreement objectively does or were at least closer to an objective assertion regarding it. *See, e.g.*, 2020 Panaro Declaration, ¶ 17 (describing how the Funding Agreement obligates some parties).

178

state of mind regarding the Funding Agreement's effect in a vacuum, but specifically regarding the intent of the entities who entered into it and its effect for this case. These statements constitute the Defendants telling the Court to trust the Defendants as to the effect (and implicitly, the enforceability) of the Funding Agreement, which is classic at-issue waiver.

313. These submissions are also susceptible to stress testing. What constitutes "same ability," since, as discussed above for the crime-fraud exception, an 'ability' to do something is not always congruent with the power to do something. Similarly, also as discussed above, to call everything the exact same for the Claimants' ability to access Old CT's assets is a judgement call since, in the barest factual sense, things have changed and same can only mean something like "substantially" same.

314. Similarly, there is a sufficient legal nexus to these submissions to reasonably assume, *ex facie*, that privileged communications substantially, if not predominately, constituted the Defendants' knowledge on these submissions' topic—namely, the effect of the Funding Agreement's provisions, either based on the express language or otherwise, as well as or including its overall effect and validity (the "Funding Agreement Topic"). This sufficient nexus is based (1) not only on the bare fact that the Funding Agreement is a legal contract effectuating legal obligations and regarding legal facts (i.e., the Asbestos Liabilities), which even the Defendants acknowledge can be assumed at least generally,[502] but also (2) its involvement in a massive legal

---

[502] The Defendants object to any waiver extrapolating to a topic due a subject matter link between it and any affirmative submissions from the Defendants. More specifically, the Defendants argue such an approach "def[ies] not only the law, but also common sense" since "[a]ll significant corporate transactions call for attorney advice, and corporate officers invariably learn things about those transactions from lawyers." Defendants Opening Brief, p. 39. This fact, Defendants argue, precludes waiver arising due to "one officer learning something privileged from lawyers about a transaction and trying to protect that privileged information," while "other parties testify to aspects of the transaction using non-privileged information," which is "inevitab[le] in a lawsuit about the transaction," because "[s]uch a rule would vitiate the privilege in virtually all lawsuits involving corporate transactions" given that "[i]n any engagement, lawyers and clients learn from each other." *Id.*

179

maneuver, and (3) the Funding Agreement's (a) uniqueness as part of the legal maneuver that only recently developed in the last several years and (b) reconditeness as regarding a specialized area of law, bankruptcy. From these objective, *ex facie* facts, it can be reasonably assumed that the bulk, if not all, of Defendants' witnesses' knowledge on the Funding Agreement Topic came from their attorney's advice.[503]

(2)   Step 2: Fairness

(a) *Part 1: Importance and Dispositiveness*

315.   The importance of Defendants' Funding Agreement submissions to their prevailing in the Fraudulent Transfer Adversary Proceeding (and, thus, by extent, the Fiduciary Duties Adversary Proceeding) cannot be overstated. Indeed, as stated above, it is the singular reason that the Restructuring did not per se constitute an extensive fraudulent transfer. Further, the Defendants' ability to prevail overall in their bankruptcy case and obtain their ultimate objective, a confirmed § 524(g) trust, turns on the outcome of the Fraudulent Transfer Adversary Proceeding. These Defendants must recognize the importance of the Funding Agreement to their case.[504]

316.   The Court acknowledges that the importance of the Funding Agreement topic to the Defendants' case by virtue of it being a Texas Two-Step is such that the Defendants were required to make relevant submissions, and, specifically, to submit as to their subjective understanding of it. This, of course, effectively means that every Texas Two-Step, by virtue of its

---

To the extent Defendants are referring simply to testimony from different witness of the privilege asserter in depositions, or any testimony other than state of mind submissions, the Court agrees. However, the Court thinks this bar does not extend to assuming from context that a witness obtained their submitted state of mind from their lawyer, so long as that inference alone is not sufficient for either waiver or Step 1 of the Court's adopted approach.

[503] *Cf. Xuedan Wang v. Hearst Corp.*, 2012 U.S. Dist. LEXIS 179609, at *8 (S.D.N.Y. Dec. 19, 2012); Davidson & Voth, *supra*, at 648 ("[W]here the issue is mental state as to the law, it may be assumed that the principal information from which the mental state was formed had come from the client's attorney").

[504] Defendants' Reply to the Plaintiffs' Objection to the Injunction Motion, p. 7 (arguing that "any actual claim of fraudulent transfer would be frivolous, and the Funding Agreement is the best evidence of that").

filing for bankruptcy, waives privilege as to its funding agreement so long as the second part of Step 2 below is met. The Court accepts this result for two reasons. The first reason is the Court deems the importance of a funding agreement in ensuring that a Texas Two-Step does not defraud claimants—at least now when the legal maneuver is so new and applicable law so lacking—as significant enough to demand claimants have the ability to stress-test a Texas two-step debtor's submissions regarding their funding agreement. The second reason is that such importance signals, if not demands, that the legal standard for confirmation of any Texas Two-Step bankruptcy case plan would involve as an element the debtor's funding agreement, which all courts agree can suffice to waive privilege.[505]

### (b)  Part 2: Necessity of Piercing Privilege

317.    As to the necessity of piercing privilege to stress test the Defendants' Funding Agreement Submissions, such piercing is necessary because the Plaintiffs have no other means of obtaining this information. This information cannot be found in public documents, nor is it sufficiently described in any non-privileged documentation. This exclusivity is displayed by the Depositions where most Deponents could not speak to the key aspects of Funding Agreement and extensively not due to asserted privilege but simply a lack of personal knowledge.

318.    While at least nine Deponents had some knowledge of the Funding Agreement, four such Deponents only had a basic awareness of its existence and lacked any direct knowledge as to any details on it.[506] While three of the remaining four Deponents had some direct

---

[505] *See infra* note 525.
[506] *See* Melroy Dep., at 81:17–82:9; *id.*, at 122:19–124:7; *id.*, at 81:17–82:9; *id.*, at 124:13–23; Placidet Dep., at 233:23–234:25; Kinisky Dep., at 108:4–110:18; Sweeney Dep., at 152:11–153:19; *id.*, at 152:11–153:19; *id.*, at 249:18–22; *id.*, at 249:18–22.

familiarity with the Funding Agreement, they disclaimed personal knowledge as to its formation and/or drafting either at all or in any detail.[507]

319.    Only two Deponent had any detailed personal knowledge regarding the Funding Agreement's formation. One of those two could not proffer details due to insufficient recall or privilege;[508] both could only confirm that the Funding Agreement was not negotiated.[509] Only one Deponent had personal knowledge of any valuation of the Funding Agreement, but could not speak in detail as to it because, according to him, a representative number did not exist since the Funding Agreement is 'uncapped'.[510]

320.    Of the at least six Deponents asked about Funding Agreement provisions, three had no personal knowledge;[511] of the remaining three, only one had personal knowledge that was fully disclosable and accurate,[512] since one could not answer certain questions due to asserted privilege[513] whereas the one purported to have personal knowledge but was mistaken as various questions and needed correction.[514] Neither of the two deponents asked about the Funding Agreement's initial funding under the could speak to that funding's purpose or who had determined its amount.[515]

---

[507] Dinenna Dep., at 74:12–75:4; *id.*, at 74:12–75:4; *id.*, at 145:1–146:16; *id.*, at 145:1–146:16; Rayburn Dep. 151:9–152:7; *id.*, at 162:22–163:12; *id.*, at 186:21–187:25; *id.*, at 152:25–152:25; *id.*, at 157:21–158:24; *id.*, at 186:21–187:25; Rayfield Dep., at 276:3–19; *id.*, at 293:7–295:5.

[508] Starczewski Oct. 2020 Dep., at 226:4–16.

[509] Starczewski Oct. 2020 Dep., at 226:17–227:5; Panaro Dep., at 124:8–18.

[510] Starczewski Oct. 2020 Dep., at 219:21–24.

[511] Rayburn Dep., at 158:25–160:13; *id.*, at 160:14–162:21; *id.*, at 242:15–244:19; Dinenna Dep*., at* 145:1–146:1; Campbell Oct. 2020 Dep., at 145:7–146:6.

[512] Starczewski Oct. 2020 Dep., at 234:16–236:78; *id.*, at 236:24–237:15; Placidet Dep., at 223:12–225:9; Rayfield Dep., at 292:22–25.

[513] Placidet Dep., at 219:7–15; *id.*, at 225:22–226:12.

[514] Rayfield Dep., at 281:22–287:15; *id.*, at 292:22–25.

[515] Dinenna Dep., at 74:12–75:4; Rayburn Dep., at 58:15–60:4.

321.    Of the five Deponents asked about the Funding Agreement's historical operation and any funding occurrence pursuant to it, two Deponents lacked any personal knowledge.[516] Similarly, the other Deponents lacked personal knowledge in any detail beyond the occurrence of funding requests; although one Deponent confirmed such requests were not subject to negotiation, one Deponent submitted that he retained the discretion to approve and/or deny any funding requests, both lacked any personal knowledge as to that discretion. [517]

322.    Lastly, many Deponents could and did offer personal knowledge in support the Defendants' overall Funding Agreement submission.[518] Most Deponents specifically testified to personal knowledge of the Funding Agreement's purposes being (1) the Same Ability Goal,[519] (2) the Same Availability Goal,[520] and/or (3) to pay their asbestos liabilities through it,[521] as specifically it would fund in perpetuity.[522] Additionally, various Deponent testified that New CT would fund and DBMP expected the Funding Agreement to be funded.[523] Four Deponents had personal knowledge as to the Funding Agreement's purposes, but could not answer due to privilege, although one asserted the Same Availability Goal as its purpose based an objective reading of the Funding Agreement.[524]

---

[516] Rayburn Dep., at 58:15–60:4; Melroy Dep., at 81:17–82:9; *id.*, at 95:24–96:8.

[517] Placidet Dep., at 233:23–234:25; Dinenna Dep., at 75:15–76:29; *id.*, at 122:4–123:23; Sweeney Dep., at 155:8–156:8.

[518] Starczewski Oct. 2020 Dep., at 219:21–24; Rayfield Dep., at 281:22–287:15; *id.*, at 292:22–25.

[519] Starczewski Oct. 2020 Dep., at 225:18–226; *id.*, at 242:3–11; *id.*, at 225:18–226:3Panaro, at 94:4–101:27; Panaro Dep., at 124:8–18; Rayfield Dep., at 97:3–98:10; *id.*, at 274:10–275:10; *id.*, at 281:6–21; *id.*, at 281:6–21.

[520] Starczewski Oct. 2020 Dep., at 135:18–22; *id.*, at 242:3–11; Rayfield Dep., at 71:6–74:23; *id.*, at 274:10–275:10; *id.*, at 281:6–21; Placidet Dep., at 69:20–24; *id.*, at 182:6–16.

[521] Sweeney Dep., at 153:20–155:7; Campbell Oct. 2020 Dep., at 114:21–115:10; Starczewski Oct. 2020 Dep., at 229:12–230:7.

[522] Rayfield Dep., at 97:3–98:10.

[523] Rayburn Dep., at 151:9–152:7; *id.*, at 236:16–237:7; *id.*, at 242:15–244:19; Rayfield Dep., at 91:22–92:21; *id.*, at 289:1–24.

[524] Campbell Oct. 2020 Dep., at 143:11–22; Rayfield Dep., at 97:3–98:10; *id.*, at 274:10–275:10; Dinenna Dep., at 143:17–144:10; Placidet Dep., at 228:5–229:4; *id.*, at 69:20–24; *id.*, at 182:6–16.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

323.   Given that the Defendants' Funding Agreement submissions satisfy both Step 1 and Step 2 under the Court's adopted approach, the Court holds that the Defendants, through these submissions, put at-issue, and thus waived privilege as to, their intent behind all provisions and aspects of the Funding Agreement and the Defendants' knowledge as to its validity and possible effects or outcomes. This extends specifically, but not limited, to any information within any Defendant Deponent's knowledge or represented in any Documents, regardless of privilege, that is capable of rebutting the Defendants' Funding Agreement submissions.

324.   Additionally, and even if the Court is incorrect about the state of mind submissions being a potential prerequisite precipitating an implied waiver, the Court thinks the Funding Agreement topic fits into whatever the anticipatory waiver test is, which while the Court does not adopt in preference of the (ostensibly wider) state of mind submission route, it does not repudiate. The Court wishes not to wade into the anticipatory waiver route as an independent basis for why the Defendants have waived privilege as to the Funding Agreement Topic, but it will if required [525]

---

[525] While the Court does not attempt to explain why, based on the attempts at delineating anticipatory waiver test, it believes the Funding Agreement meets all versions of that test, it will just describe, why, practically, the Defendants' case and funding agreement generally should be treated as waived. Even in line with the perhaps limited anticipatory waiver that the Third Circuit recognizes, using explicitly defined 'elements', although there are no appellate rules, much less a statutory ones, outlining the requirements for Texas Two-Steps, which are distinct from other bankruptcy case, any such rules, the Court would have to imagine, would have a funding agreement as an element. Stated differently, the only thing making the Texas Two-Step not a fraudulent transfer (and maybe not even sufficiently so), cannot be something a Texas Two-Step should be confirmable without adequately and fairly submitted on that thing—the funding agreement. Granted, this Court cannot produce such rules.

Thus, the Court would not approve any Texas Two-Step Confirmation Plan where there were open questions about its funding agreement's validity and would struggle approving one where the critical corporate representatives of both contract parties could not sufficiently testify to at least the substance of its funding agreement. Thus, given that the Defendants' ability to survive a good faith dismissal depended on the Funding Agreement preliminarily, it seems Confirmation would require a greater showing.

### iii. Claimant Treatment[526]

325.   DBMP's Four Information First Day Pleadings, in support of the Defendants' Injunction Prayer, asserted that (1) DBMP filed with the intended purpose of obtaining a "fair and equitable" resolution to the Asbestos Liabilities for both the Defendants and the Claimants, a section 524(g) trust and (2) the Defendants executed their Texas Two-Step (a) with the knowledge that the 524(g) Trust Objective would benefit Claimants due to minimizing the litigation required to recover on their Claims, and (b) not with an intent to escape any of the Asbestos Liabilities.[527] The Defendants continued to make these submissions, when litigating the

---

[526] The Court notes that there is of course overlap between the Funding Agreement and the Claimant Treatment topics, although they are distinct.

[527] *See* DBMP's Information Brief, p. 25 (stating that DBMP filed "to address and resolve" its current and future Asbestos Liabilities "in a manner beneficial to both the Debtor and claimants" through a section 524(g) which would let Claimants "resolve their claims" without "the delay, uncertainty, and stress of litigation while at the same time preserving their right to a trial if they prefer"); *id.* at p. 29 (describing DBMP's "objective" as "establishing a section 524(g) [] trust" under which "Claimants would [] benefit" because of the same reasons); *cf.* also *id.* at p. 24 (stating that DBMP "seeks a permanent and global resolution of all [] [A]sbestos [C]laims under section 524(g) []—a resolution that will be fair and equitable to both the company and to asbestos claimants."); 2020 Panaro Declaration, ¶ 37 (describing DBMP's "belie[f]" regarding its ability "to fund a section 524(g) trust that will [] efficiently and fairly review and compensate current and future asbestos claimants"); 2020 Starczewski Declaration, ¶ 22 (stating that the Defendants "are not seeking to escape any asbestos liabilities through" their Injunction Prayer).

Injunction Proceeding,[528] as well as the related Same Availability Goal submissions.[529] The

Defendants continued these submissions when attempting to dismiss the Fraudulent Transfer

Proceeding, asserting that because Old CT "'believed'" and DBMP and New CT "'believe'" their

Texas Two-Step was an appropriate way to use the Bankruptcy Code to resolve their Liabilities,

"[i]t is undisputed that DBMP filed [] with the intent to pay its allowed [A]sbestos [L]iabilities in

a fair, equitable and efficient manner, rather than avoid them."[530] The Plaintiffs argue these

submissions function as an attempt to show good faith specifically as to the Claimants.[531]

(1)   Step 1: Legal State of Mind Submission

326.   These submissions constituted the Defendants submitting their state of mind

regarding the topic of Claimant Treatment—that is, (1) the extent that the Claimants would be

---

[528] *See* Defendants' Objection to Plaintiffs' Motion to Lift Stay, p. 2 (arguing that the Plaintiffs' Motion to Lift the Stay contravenes "the purpose of [DBMP's] bankruptcy case[,] to resolve the asbestos litigation here and now, permanently, globally, and fairly—for the benefit of the Debtor and claimants alike"); *id.*, ¶ 18 (stating that DBMP "filed this bankruptcy case to obtain a permanent, global, and fair resolution of all current and future asbestos claims against it" and arguing that the Plaintiffs' Motion to Lift the Stay "would [] utterly undermine[]" DBMP's "ability to treat all claimants equitably through a section 524(g) [trust]"); Defendants' Reply to the Plaintiffs' Objection to the Injunction Motion, p. 2 (describing DBMP's "reorganization efforts, which [] stand to benefit claimants"); 2021 Bondi Declaration, ¶¶ 18–19 (averring that he "and the other officers of DBMP, and the Board are dedicated to achieving" DBMP's purpose behind its case which include a section 524(g) [] trust "to resolve and pay valid current and future asbestos-related claims" and "bring about a full, fair, and final resolution of [DBMP's] asbestos liability"); 2021 Starczewski Declaration, ¶ 22 (stating that the Defendants are "[n]o[t] [] seeking to escape any asbestos liabilities through" their Injunction Prayer).

[529] *See* 2021 Rayfield Declaration, ¶ 10 (stating that one of the Restructuring's "purpose [] was to … maintain[] funding for [the Asbestos Liabilities] at levels that would ensure that asbestos claimants were not harmed."); *see also supra* notes 495–496 & 500.

[530] *See* Defendants' Reply to Plaintiffs' Objection to Motion to Dismiss Fraudulent Transfer Complaint, ¶ 38 & n. 39 (quoting this Court's finding that Old CT "apparently believed, as DBMP and New CertainTeed now believe, the [Defendants' Texas Two-Step] to be an appropriate way for a corporate conglomerate to use [s]ection 524(g) to treat [A]sbestos [L]iabilities without subjecting the entire enterprise to the uncertainties of bankruptcy' ") (quoting Injunction Order, ¶ 239); *see also* Defendants' Motion to Dismiss Fraudulent Transfer Complaint, ¶ 91 (stating that the Funding Agreement achieving the Same Ability Goal means "current and future asbestos claimants may benefit from this value available to" DBMP for a section 524(g) trust).

[531] Plaintiffs Reply Brief, ¶ 39.

affected, by the Defendants' Texas Two-Step, and (2) the extent that the Defendants desired any such positive or negative effects, either irrespectively of or as to the Claimants. These submissions asserting the Defendants' state of mind is based, at a minimum and similar to the Defendants' Funding Agreement submissions above, on their use of words clearly describing a state of mind, like 'objective', 'seek', 'belief', 'purpose', 'efforts', and others, as well as infinitive purpose clauses to describe DBMP's Filing.[532]

327.    These are also susceptible to stress-testing, since it has not been found that every single individual Claimant benefitted from the Defendants' Texas Two-Step, at least to the same extent. At most, it can plausibly be said that at least some, but maybe many, of the Claimants benefitted from the Defendants' Texas Two-Step. Indeed, the contours of those benefits as opposed to any deleterious effects will ultimately need to be determined to decide whether any Texas Two-Step, and, specifically the Defendants' Texas Two-Step, either (1) constitutes a fraudulent transfer or (2) can proffer a confirmable plan.

328.    Lastly, there is a sufficient legal nexus to these submissions topic to reasonably assume, *ex facie*, that privileged communications substantially, if not predominately, constituted the Defendants' knowledge on the topic of Claimant Treatment. Similar to the Funding Agreement topic above, the Claimant Treatment topic sufficiently regards the law because (1) the topic is abstractly about the contours, similarities, and differences of various expansive and sweeping legal strategies and maneuvers[533] and (2) of the topic's (a) novelty as regarding the recently developed Texas Two-Step and its (b) reconditeness as regarding bankruptcy law.

---

[532] *See supra* notes 527–530.
[533] Indeed, this topic provides an even greater legal nexus as a bare topic than the Funding Agreement submission. This is because the Funding Agreement topic emanated from the Funding Agreement as a contract and thus could support an assumption that the Defendants' witnesses learned about it from their lawyers only to the extent one can reject that the witnesses were sufficiently capable to learn and understand the Funding Agreement topic based on their own independent experience with corporate

(2)  Step 2: Fairness

*(a) Part 1: Importance and Dispositiveness*

329.    The Defendants' Claimant Treatment submissions are significant. First and critically, it must be noted that when DBMP filed, DBMP's Filing was subject to a good faith dismissal under the Fourth Circuit *Carolin* standard which subjects the Plaintiffs to strict requirements to prevail in three keyways. First, the Plaintiffs bear the burden. Second, the Plaintiffs must make a dual showing both as to objective good faith and subjective good faith (i.e., a sufficient showing on either one would not carry the day). Thirdly, and crucially, *Carolin* requires that Plaintiffs do not just show an absence of good faith but specifically bad faith.

330.    This latter fact is important since, as bankruptcy courts have noted, "good faith and bad faith are neither binary nor mutually exclusive," a debtor "who does not prove good faith is not necessarily acting in bad faith," and a creditor "who does not prove bad faith has not proved good faith," whereas a debtor who can prove any good faith does negate a creditor from proving bad faith. *See, e.g.*, *In re Duran v. Rojas*, 630 B.R. 797, 813-14 (B.A.P. 9th Cir. 2021).[534]

transactions and contracts and without their lawyer's advice. And, indeed, such a rejection is more reasonable for a relatively short contract with arguably plain language for relatively intelligent professionals. However, it is much less reasonable to reject that the Defendants' witnesses were sufficiently capable to learn and understand the nuances of the Claimant Treatment topic based on their own professional, but not lawyer-trained, knowledge and experience, given the Claimant Treatment topic's breadth and the multiple, multifaceted, and interrelated considerations involved.

[534] *See also Domson, Inc. v. Kadrmas Lee & Jackson, Inc.,* 918 N.W.2d 396, 404 (2018 S.D.) (acknowledging that "good faith" "is a phrase without general meaning (or meanings) of its own and serves to exclude a wide range of heterogeneous forms of bad faith," and sometimes "takes on specific meaning, but usually [] only by way of contrast with the specific form of bad faith actually or hypothetically ruled out;" clarifying that good faith being such does "not [mean] … good faith [is] simply [] the absence of bad faith" because "good faith has been defined to mean: 'honesty in fact concerning conduct or a transaction', and '[g]ood faith is distinguished from mere negligence or an honest mistake' "); *Klein v. Sanford USD Med. Ctr.*, 872 N.W.2d 802, 807 (2015 S.D. (describing how "'good faith is a defendant's honest belief in the suitability of the actions taken' " and "means 'performing honestly, with proper motive, even if negligently'," but "is not, however, simply the absence of bad faith;" holding this relation between good and bad faith interdicts "requiring evidence of bad faith [] to resist" a defendants' raising good faith as a defense because requiring such "improperly impose[s] on [the

Thus, the Fourth Circuit has held that a proposed plan met the Bankruptcy Code's required good faith (1) where the plan advantaged the debtor compared to a creditor notwithstanding questionable conduct giving rise to the debtor's debts so long as the debtor could show such treatment was proposed with a subjective intent to maximize their assets,[535] or (2) where a plan treated one creditor negatively to the debtor's favor and did not do all to protect the creditor, so long as there was evidence of the debtor's (a) subjective intent behind these provisions being to maximize their assets and creditor approval and (b) their subjective knowledge suggested otherwise was not necessary.[536]

---

plaintiff] the initial burden to produce evidence of [the defendants'] bad faith" when the defendant, as "the moving party[,]… ha[s] the initial burden of establishing entitlement to" a good faith defense).
[535] *Behrmann v. Nat'l Heritage Found., Inc.*, 663 F.3d 704, 709-10 (4th Cir. 2011) (considering the creditor's objection to the debtor's plan as not proposed in good faith on the grounds that the plan "evidences a concentrated effort by the" debtor's insider directors "to extend to itself comprehensive clemency . . . in respect of reprehensible and tortious practices" and "a sham perpetrated by [the directors] to secure immunity for their fraudulent and misleading conduct in soliciting donations for [specific uses] and in administering those funds"; rejecting that such evidence displays that the bankruptcy court clearly erred in rejecting it given that the bankruptcy court "specifically examined the totality of the circumstances surrounding the formulation of the plan and [the debtor's] negotiations with [their creditors], all objections filed and responses thereto, and all other evidence presented" and "concluded specifically that [the debtor] … filed its case and proposed its Plan with the legitimate and honest purpose of reorganizing and maximizing both the value of [the debtor's] Estate and the recovery to Claimants' "); *see also Schwarzmann v. First Union Nat'l Bank (In re Schwarzmann)*, 1996 U.S. App. LEXIS 31262, at *12-13 (4th Cir. Dec. 6, 1996) (considering the creditor's objection arguing that the debtor's proposed plan "violates the good faith requirement of § 1129(a)(3)" "because it does not 'provide adequate means for [its] implementation' " due to the debtor's inability to execute duties under the plan when attempted prior and because the "wide discretion given to the debtors in managing" assets "will be fatal to the plan" and "turn[] it into a two-year court-ordered forbearance"; rejecting this argument on the grounds that it cannot suffice for the required clear error standard since the bankruptcy court found that the creditor's proposed plan "'could conceivably result in premature or unnecessary forced sales of debtors' assets which could jeopardize the continuation of debtors' business' " and that its only difference compared to the debtor's proposed plan was earlier receipt of payment).
[536] *Hanson Permanente Cement, Inc. v. Kaiser Gypsum Co. (In re Kaiser Gypsum Co.)*, 135 F.4th 185, 193–94 (4th Cir. 2025) (discussing how the bankruptcy court had found that the plan "as a factual matter[,] [] comports with the objectives of the Bankruptcy Code" of "'preserving going concerns and maximizing property available to satisfy creditors' "); *id.*, at 195 (rejecting the creditor's first basis for the plan's alleged bad faith, its provisions treating certain situations differently in order "to maximize the [] asset" which (and to the detriment of) the creditor-objectors owed to the debtor, because "a desire to maximize the relevant asset … does not constitute bad faith" since "bankruptcy courts routinely allow"

331.     Simply, it is rare in bankruptcy for a debtor who is not experiencing financial distress making their insolvency and ultimate liquidation imminent to be able to submit that they filed in order to benefit all their creditors, regardless if true. Most such debtors acknowledge seeking some bankruptcy relief that is at least somewhat deleterious to some creditors, usually, because such is particularly allowed and provided for in the Bankruptcy Code. Of course, the Court is not suggesting this with the Defendants' case as to the Claimants, just that the Defendants' ability to submit their belief that DBMP's Filing would benefit Claimants proves to a significant extent the Defendant's subjective good faith, and thus precludes the possibility of showing bad faith, in a way that would be significant for any other debtor.

*(b) Part 2: Necessity of Piercing Privilege*

332.     As to the necessity of piercing privilege to stress test the Defendants' Claimant Treatment submissions, the Court acknowledges that some of the relevant information is either public or is otherwise available through other non-privileged materials. However, some of the information regarding these submissions is not so available.

333.     This is displayed by the Depositions. Three Deponents' testimony spoke to the topic of Claimant Treatment. One Deponent submitted personal knowledge that one purpose

---

plans to provide for such debtor favorable treatment"); *id.*, at 195–96 (rejecting the creditor's second basis, how the plan did not provide for specific guardrails to ensure the creditor's liabilities only extended to legitimate obligations, because (a) guardrails were not particularly needed and (b) the debtor was (i) allowed to "want[] to ensure the Plan's passage by remaining committed to the originally negotiated deal with all parties" without such constituting "collu[sion] with [other creditors] to purposefully facilitate fraudulent claims," and (ii) "merely utilizing the contractual [] rights to which they are entitled," the creditor's "dissatisfaction with [which] does not give it a cognizable basis to rewrite the [contract] [] under the guise of the [d]ebtors' purported 'bad faith' "); *id.*, at 196; *id.*, at 194 n. 6 (rejecting a creditor's assertion that a plan effectively requiring them to expend more, or at least with fewer protections, than other creditors in the same class and under some circumstances satisfies unfair treatment when the creditor also "did not point to a single" instance of such circumstances, since the "[z]ilch" evidence precludes finding clear error in the conclusion that the creditor failed to show "that [p]lan was not proposed in good faith").

of the Defendants Texas Two Step was to benefit Claimants based on the Defendants' having evaluated and decided that their Texas Two Step was the best option for all, given (1) alternatives were dire, (2) a Texas Two Step was in the best interest of the company, (3) whatever was best for the company was best for the claimants because claimants could only recover from the company, but still could only partially respond due to privilege.[537] Another Deponent could only partially answer what "full and fair" meant due to the terms subjectivity, and although he could confirm that the decision to execute their Texas Two Step involved discussions as to what its overall effect as to the Claimants would be, he did could deny explicit discussions that the money "available" to claimants would decrease.[538]

334.    Accordingly, to the extent that the information is not otherwise available, piercing the privilege as it relates to that information is necessary.

*****************************

335.    Because these submissions satisfy both Step 1 and Step 2 of the Court's approach, they put at-issue the Defendants' knowledge as to the effects of their Texas Two-Step, that are dispositive to the Defendants' Claimant Treatment submissions, as well as any subjective state of mind beyond knowledge of such effects, such as any constituting a purpose behind the Defendants' Texas Two-Step, be it an incidental, instrumental, or intrinsic purpose. Thus, the Court holds that these submissions waived any privilege as to any information within any Defendant Deponent's knowledge or represented in any Privilege Documents that can so rebut. However, this holding is narrowly tailored and applies only to the most essential information.[539]

---

[537] Rayburn Dep., at 172:19–173:7; *id.*, at 250:16–252:17; *see also* Campbell Oct. 2020 Dep., at 253:4–254:4

[538] Rayfield Dep., at 59:10–17.

[539] For example, the Court did not allow in any information regarding estimation or legal strategy and carefully balanced the considerations regarding work product.

### iv. Millwork & Panell and Jurisdiction

#### (1) Step 1: Legal State of Mind

336.    Millwork & Panel comes in two ways. First, the Defendants submitted, albeit less extensively, that Millwork & Panel was intended to ensure, along with the Funding Agreement, the Same Ability and Same Availability Goals.[540] Thus, similar to the Funding Agreement submissions, the Defendants' Millwork & Panel submissions' submitted to the Court the Defendants' state of mind as to their inclusion of Millwork & Panel. Granted, the legal nexus for the Defendants' asserted state of mind from their Millwork & Panel submissions is less clear than their Funding Agreement submissions. This is because, on the one hand, their Millwork & Panel submissions adopted an exclusively non-legal, business reason for Millwork & Panel's inclusion, namely, its income. However, on the other hand, it is also known objectively that Millwork & Panel's inclusion was done to comply with a key requirement for a section 524(g) trust, describing the Defendants' state of mind as to the legal status of their action.

337.    Nevertheless, even if the Millwork & Panel submissions did not independently put at-issue the topic of Millwork & Panel's inclusion (i.e., why it specifically was included, as opposed to any other similarly valuable entity), the topic's privilege was waived due to it being some of the most compelling evidence from the Documents to rebut the Defendants' Claimant Treatment submissions. This is because the Defendants may have designed and executed their Texas Two-Step with Millwork & Panel specifically included to obtain jurisdiction that may provide the Defendants a more favorable outcome as to their total payout to Claimants.

---

[540] *See supra* note 495 (2020 Panaro Declaration, ¶ 15; DBMP Information Brief, p. 25; 2021 Panaro Declaration, ¶ 12) & 500 (Defendants' Motion to Dismiss Fraudulent Transfer Complaint; ¶ 20; *id.*, ¶ 24; Defendants' Reply to Plaintiffs' Objection to Motion to Dismiss Fraudulent Transfer Complaint, ¶ 59).

192

(2)   Step 2: Fairness

 *(a) Part 1: Importance*

338. The Defendants' Millwork & Panel submissions are significant to their case. This is because they appear to be the Defendants' affirmatively offering evidence that would explain one fact from which bad faith could possibly be inferred, namely, possible forum shopping, which some courts have held suffice to show bad faith.[541] Thus, these submissions could potentially negate evidence the Plaintiffs can present to prevail against the Defendants' affirmatively raising good faith.

 *(b) Part 2: Necessity*

339. As to the necessity of piercing privilege, the Plaintiffs have no other way to obtain this information. This is displayed by the Depositions. The Depositions queried (1) basic facts about Millwork & Panel, including its makeup, operations, business, and its relationships to DBMP and New CT, (2) the value and significance of its plants, including the North Carolina Plant, (3) Millwork & Panel overall role within DBMP's purpose, (4) its larger role within the Defendant's Texas Two Step independently of jurisdiction, and (5) why it is located in North Carolina. Two Deponents spoke to the first of general group, and particularly could submit that Millwork & Panel was wholly DBMP owned and was one of DBMP's two central responsibilities.[542] A third Deponent asserted Millwork & Panel's centrality was due to the plants' revenue capacity, but acknowledged other reasons which he speak on due to privilege.[543]

---

[541] *Cf., e.g., generally In re Palmetto Interstate Dev. II, Inc.*, 653 B.R. 230 (Bankr. D.S.C. 2023); *St. Paul Self Storage Ltd. P'ship v. Port Auth. of the City of St. Paul (In re St. Paul Self Storage Ltd. P'ship)*, 185 B.R. 580 (9th Cir. BAP 1995); *Silver v. PHH Mortg. Corp. (In re Silver)*, 2022 Bankr. LEXIS 3621 (B.A.P. 9th Cir. Dec. 19, 2022); *Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.)*, 849 F.2d 1393 (11th Cir. 1988). *But see Gremillion v. HealthEdge Inv. Fund, L.P. (In re Gremillion)*, 547 B.R. 196 (Bankr. E.D. La. 2016).

[542] Dinenna Dep., at 33:5–35:23; Rayburn Dep., at 20:7–18; *id.*, at 50:10–13; *id.*, at 215:10–218:19.

[543] Panaro Dep., at 119:16–120:6; *id.*, at 145:20–147:25; *id.*, at 227:13–24.

340.   A fourth Deponent similarly declined to answer why North Carolina specifically due privilege, but did assert that one reason was that the two plants were necessary to minimize disruption to ongoing systems, while acknowledging other reasons protected by privilege.[544] A fifth Deponent also asserted Millwork & Panel's value, but he submitted this did not mean its removal from Old CT financially impaired New CT due to reasons protected by privilege.[545] A sixth Deponent could confirmed that the decision as to North Carolina specifically had occurred sometime prior to mid-2019, but overall could not answer why such a decision was made due to privilege.[546]

341.   A seventh Deponent similarly asserted Millwork & Panel's value, but could not answer who decided the North Carolina location due to not lack of knowledge and nor could he answer whether other forums were considered due to privilege; however, crucially, this Deponent could submit personal knowledge as to the Defendants' only reason for North Carolina currently represented in the record besides the North Carolina Plant's value, namely, that this Court had specialized asbestos bankruptcy knowledge which the Defendants wanted to utilize, while also, of course, acknowledging other reasons protected by privilege.[547]

342.   Preventing the Plaintiffs from gaining access to some of this information forecloses their ability to pursue their claims. Accordingly, piercing the privilege is necessary, albeit in a limited manner. However, once again, this exception has been narrowly applied to only allow only those documents that speak to the Defendants' state of mind regarding jurisdiction and the Same Ability and Same Availability Goals.

---

[544] Campbell Oct. 2020 Dep., at 75:9–13; *id.*, at 152:5–156:12; *id.*, at 250:18–251:7; *id.*, 123:4–124:20.
[545] Rayfield Dep., at 86:22–89:22; *id.*, at 77:20–83:23.
[546] Sweeney Dep., at 92:19–93:12; *id.*, at 193:12–194:23; *id.*, at 197:24–198:14
[547] Starczewski Oct. 2020 Dep., at 278:18–25; *id.*, at 143:4–24; *id.*, at 178:25–179:8; *id.*, at 141:5–142:13; *id.*, at 158:24–159:7.

*v.  Bestwall*

343.    The Plaintiffs request at-issue waiver and point to the Defendants'

submissions, some including those discussed above, about *Bestwall's* effects on the Defendants'

actions constituting their Texas Two-Step.[548] The Court rejects this argument because those

submissions objectively describe facts and do not speak to a subjective state of mind, *see supra*

note 420, with the exception to the extent any of the Defendants' submissions regarding *Bestwall's*

effects as to the timing of their actions do not comport with the Court's finding on the DBMP's

Filing Decision topic above.

### 3.  Remedy

344.    The Court will stay the effect of this order for thirty days to permit any post-ruling

motions or interlocutory appeals and allow the Defendants to appropriately redact the Documents

in accordance with Appendix B. The Debtor shall produce the requisite Documents in accordance

with the specific rulings in Appendix B, as incorporated herein by reference, within thirty days of

entry of this order.

345.    The Defendants shall coordinate with the Plaintiffs within thirty days to schedule

the Reconvened Depositions at mutually agreeable dates and times. Additionally, after review of

the instructions in this opinion, to the extent the Plaintiffs feel it necessary to have a proctor for

the Reconvened Depositions, the parties may do so by consent or by separate motion to the Court.

The Court is hopeful this may not be necessary given the work the Court has put into explaining

to the parties the requisite law, but there may be circumstances or facts the Court is unaware of

warranting a proctor.

---

[548] Plaintiffs Reply Brief, ¶ 33.

346.    Lastly, the documents produced subject to this opinion shall be used by the Plaintiffs only for the Base Case and Adversary Proceedings and there shall not be any waiver as to the outside world. The Defendants and Plaintiffs can enter a consent protective order to further memorialize the use of these documents.

**WHEREFORE IT IS SO ORDERED.**

**This Order has been signed electronically.**          **United States Bankruptcy Court**
**The Judge's signature and Court's seal**
**appear at the top of this order.**